# Exhibit D

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>Peabody Energy Corporation, <u>et</u> <u>al.</u>,<br>               Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered<br><br>Hearing Date and Time:<br>January 26, 2017 at 10 a.m. CST<br><br>Response Deadline:<br>January 12, 2017 at 5 p.m. CST<br><br>Hearing Location:<br>United States Courthouse<br>Thomas F. Eagleton Federal Building<br>5th Floor, North Courtroom<br>111 S. 10th Street<br>St. Louis, Missouri 63102 |

## DEBTORS' MOTION FOR AN ORDER
### (I) APPROVING (A) PRIVATE PLACEMENT AGREEMENT AND (B) BACKSTOP COMMITMENT AGREEMENT; (II) AUTHORIZING DEBTORS TO ENTER INTO (A) PLAN SUPPORT AGREEMENT, (B) PRIVATE PLACEMENT AGREEMENT AND (C) BACKSTOP COMMITMENT AGREEMENT; (III) APPROVING (A) RIGHTS OFFERING, (B) RELATED PROCEDURES AND (C) PAYMENT OF RELATED EXPENSES AND (IV) GRANTING RELATED RELIEF

# TABLE OF CONTENTS

**Preliminary Statement** .................................................................................................... 1

**Jurisdiction and Venue** ................................................................................................. 6

**Background** ................................................................................................................... 7

    A.    General Corporate and Case Background .......................................... 6

    B.    The Debtors' Capital Structure ............................................................ 8

    C.    Summary of Certain Key Plan Terms ................................................. 8

    D.    The Plan Support Agreement ............................................................. 17

    E.    The Private Placement Agreement ..................................................... 27

    F.    The Backstop Commitment Agreement .............................................. 32

    G.    Costs Under the Private Placement Agreement and the Backstop
        Commitment Agreement ....................................................................... 34

    H.    The Section 1145 Rights Offering Procedures ................................. 36

**Legal Basis for Relief Requested** .............................................................................. 37

    A.    The Debtors' Entry into the Plan Agreements is a Valid Exercise of the
        Debtors' Business Judgment ............................................................... 39

    B.    The Section 1145 Rights Offering Meets the Requirements of 11 U.S.C.
        § 1145 .................................................................................................. 41

    C.    The Section 1145 Rights Offering Procedures Are Appropriate ...................... 43

**Notice** .......................................................................................................................... 43

**Request for Immediate Effectiveness of Order** ...................................................... 44

**No Prior Request** ....................................................................................................... 44

NAI-1502313094v13

# TABLE OF AUTHORITIES

PAGE

CASES

Crystalin, L.L.C. v. Selma Props. (In re Crystalin, L.L.C.),
    293 B.R. 455(B.A.P. 8th Cir. 2003)....................................................39

Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),
    107 F.3d 558 (8th Cir. 1997) ...........................................................39

In re AbitibiBowater Inc.,
    No. 09-11296 (KJC) (Bankr. D. Del. Aug. 3, 2010)....................................43

In re Channel One Commc'ns, Inc.,
    117 B.R. 493 (Bankr. E.D. Mo. 1990) .................................................38

In re Cooper-Standard Holdings Inc.,
    No. 09-12743 (PJW) (Bankr. D. Del. Mar. 26, 2010) ...............................43

In re Eastman Kodak Co.,
    No. 12-10202 (Bankr. S.D.N.Y. Jun. 26, 2013) .....................................43

In re Farmland Indus., Inc.,
    294 B.R 855 (Bankr. W.D. Mo. 2003)................................................39

In re Harry & David Holdings, Inc.
    No. 11-10884 (MFW) (Bankr. D. Del. Jun. 24, 2011) ...........................43

In re Lionel Corp.,
    722 F.2d 1063 (2d Cir. 1983)..........................................................38

In re Loehmann's Holdings, Inc.,
    No. 10-16077 (Bankr. S.D.N.Y. Jan. 3, 2011)......................................43

In re Patriot Coal Corp.,
    No. 12-51502-659 (Bankr. E.D. Mo. Nov. 7, 2013)................................43

In re Trilogy Dev. Co., LLC,
    2010 Bankr. LEXIS 5636 (Bankr. W.D. Mo. Aug. 31, 2010)......................38

Meyers v. Martin (In re Martin),
    91 F.3d 389 (3d Cir. 1996)............................................................38

Seidl v. Am. Century Cos.,
    799 F.3d 983 (8th Cir. 2015) ...................................................................38, 39

## STATUTES

11 U.S.C. § 105(a) ..............................................................................................37

11 U.S.C. § 363 ...................................................................................................38

11 U.S.C. § 503(b) ..............................................................................................26

11 U.S.C. § 1102 .................................................................................................21

11 U.S.C. § 1104 .................................................................................................21

11 U.S.C. §§ 1107(a) and 1108...........................................................................6

11 U.S.C. § 1121 .................................................................................................23

11 U.S.C. § 1123(b)(3) ........................................................................................15

11 U.S.C. § 1145(a)(1).........................................................................................41

11 U.S.C. § 1145 ........................................................................................ passim

28 U.S.C. §§ 157 and 1334 .................................................................................6

28 U.S.C. § 157(b) ...............................................................................................6

28 U.S.C. §§ 1408 and 1409 ...............................................................................6

29 U.S.C. § 1392(c) .............................................................................................15

Local R. 81-9.01(B)(1) .........................................................................................6

Rule 144A under 15 U.S.C. § 77a et seq. (the "Securities Act of 1933") ...................33

Rules 501(a)(1), (2), (3) or (7) under the Securities Act of 1933 .................................33

Section 5 of the Securities Act of 1933 ...........................................................................1

## OTHER AUTHORITIES

Fed. R. Bankr. P. 2002.........................................................................................43

Fed. R. Bankr. P. 6004(h), 7062, 9014 ...............................................................44

Fed. R. Bankr. P. 9019 ..............................................................................................15

Barry's Jewelers, Inc, SEC No-Action Letter 1998 SEC No-Act LEXIS 735
    (July 20, 1998) ..............................................................................................42

Bennett Petroleum Corporation, SEC No-Action Letter, 1983 WL 28907
    (Dec. 27, 1983) ..............................................................................................42

Gateway Medical Systems, Inc., SEC No-Action Letter, 1987 WL 107453
    (Jan. 12, 1987)...............................................................................................42

Jet Florida System, Inc., SEC No-Action Letter, 1987 WL 107448 (Jan. 12, 1987) ...................42

Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court, pursuant to sections 363(b) and 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), for an order (I) approving (A) that certain Private Placement Agreement, dated as of December 22, 2016 (the "Private Placement Agreement") and (B) that certain Backstop Commitment Agreement, dated as of December 22, 2016 (the "Backstop Commitment Agreement"); (II) authorizing the Debtors to enter into and perform under (A) that certain Plan Support Agreement, dated as of December 22, 2016 (the "Plan Support Agreement"), (B) the Private Placement Agreement and (C) the Backstop Commitment Agreement; (III) approving the conduct of, procedures for, and the payment of certain expenses related to, the rights offering that the Debtors intend to effectuate in accordance with their proposed chapter 11 plan (the "Section 1145 Rights Offering Procedures"); and (IV) granting related relief.[1]  In support of this Motion, the Debtors respectfully represent as follows:[2]

## PRELIMINARY STATEMENT

1.      As they have conducted negotiations with respect to their plan of reorganization (as filed and as may be amended, modified or supplemented from time to time, the "Plan"), the Debtors have done so with four overarching goals in mind.  The first goal is to ensure that the reorganized Debtors (the "Reorganized Debtors") have adequate liquidity to operate their business in the normal course post emergence from chapter 11 both in the short term and over the long term given the volatile and cyclical nature of the coal industry.  The second, and related,

---

[1]      Copies of the Plan Support Agreement, Private Placement Agreement, Backstop Commitment Agreement and Section 1145 Rights Offering Procedures are attached hereto respectively as Exhibits A, B, C and D.

[2]      A copy of the proposed order will be made available on the Debtors' case website at http://www.kccllc.net/peabody.  The Debtors intend to file a declaration in support of this Motion on or before January 5, 2017.

goal is to ensure that the emergence capital structure of the Reorganized Debtors, including their funded debt balance at emergence, is of such a size that the Reorganized Debtors can service their debts as they come due at every point in the business cycle, including both the peaks (i.e., the recent price environment for seaborne metallurgical and thermal coal) and troughs (i.e., the domestic thermal and seaborne price environment leading up to and in the early months of these chapter 11 cases).  The third goal is to maximize the value of the Debtors' estates such that recoveries for the Debtors' creditors are also maximized to the extent possible.  The final goal is to achieve the broadest possible consensus on the Plan by balancing the varied interests and legal rights of the Debtors' key stakeholders and exit these cases in as timely a manner as possible.

2.    Achieving these goals was difficult since the Debtors' prepetition capital structure included over $4.3 billion in secured debt obligations, approximately $4 billion in senior unsecured notes obligations and approximately $750 million in convertible junior subordinated debenture obligations, as well as hundreds of millions of dollars of general unsecured claims. Given the Debtors' significant and unsustainable amount of funded debt obligations, as well as the Debtors' corresponding need to significantly deleverage their balance sheet in order to weather cyclical downturns post-emergence, the Debtors are unable to satisfy their secured (or partially secured) creditors in full by issuing debt in the full amount of their secured claims.  Nor do the Debtors have enough cash on hand to satisfy their secured creditors' claims in full.  In fact, to achieve the Debtors' liquidity and capital structure goals, which goals are strategic imperatives in order to be able to operate and survive in a cyclical industry, it became apparent to the Debtors in recent months that they would need to (a) obtain a significant new money equity investment of approximately $1.5 billion in order to provide the necessary cash to partially

satisfy the first lien lenders' claims; (b) obtain an exit facility in the amount of $1.5 billion — or

issue to the first lien lenders debt of an equivalent amount — to satisfy (with the addition of

some balance sheet cash) the remaining first lien lender claims; and (c) provide a combination of

a note and equity to satisfy the allowed claims of the holders of the second lien notes.  Notably,

however, obtaining the consent of the second lien noteholders is likely necessary to equitize any

portion of their secured claim.

3.      Obtaining commitments for an equity investment in a coal company of the

magnitude that is contemplated by the Private Placement Agreement and the Backstop

Agreement — $1.5 billion — is nothing short of extraordinary.  It is no secret that capital has

been fleeing the coal industry in droves over the past several years and, upon information and

belief, no other coal company that has filed for chapter 11 in recent years has raised any amount

of equity capital pursuant to a plan of reorganization upon emergence from bankruptcy.

Securing this magnitude of new equity investment is a testament to the Debtors' strong asset

base, their talented management team and their dedicated and hard working employees.

4.      Importantly, by (a) securing this investment, (b) negotiating a backstop from their

first lien lenders in the event that the Debtors are unable to obtain a more attractive exit facility

in the public and private debt markets and (c) reaching a consensus on a chapter 11 plan among

representatives of the Debtors' largest and three most senior funded debt classes, the Debtors

believe that they have achieved each of the four goals referenced above.  In order to ensure

adequate liquidity for the reorganized enterprise and to provide a capital structure for the

Reorganized Debtors that will not be susceptible to default when the industry experiences

another inevitable cyclical downturn, as noted above, the Debtors have secured: (a) a

commitment from seven parties that collectively hold approximately 17% of the total first lien

claims, 39% of the second lien notes and 40% of the senior unsecured notes to backstop a
$1.5 billion new money equity investment in reorganized PEC ("Reorganized PEC"), which will
allow the Debtors to "right-size" the amount of debt on the reorganized company and provide
valuable funds with which the Debtors can satisfy their obligations to creditors under the Plan;
and (b) a backstop from their first lien lenders in the form of the new Replacement Secured First
Lien Term Loan,[3] which the first lien lenders have agreed to accept if the Debtors cannot raise in
the public and private debt markets a more attractive exit facility with which to satisfy the first
lien lenders' allowed claims wholly in cash.  Finally, the Plan as filed has the support of
significant groups of the Debtors' first lien lenders, second lien noteholders and senior unsecured
noteholders, which support is reflected in the Plan Support Agreement.

     5.     These key terms, which form the backbone of the Plan, have only been achieved
through months of hard fought, arms'-length and good faith negotiations among the Debtors, the
First Lien Lender Co-Proponents (as defined below) and the holders of the second lien notes and
the senior unsecured notes who comprise the Noteholder Co-Proponents (as defined below).
Specifically, the Plan Support Agreement, Private Placement Agreement, Backstop Commitment
Agreement (collectively, the "Plan Agreements") and the Section 1145 Rights Offering
Procedures are each inseparable components of the Debtors' proposed restructuring
(the "Restructuring") and Plan.  Authorizing the Debtors to enter into the Plan Support
Agreement will ensure that the Debtors have the creditor support necessary to obtain
confirmation of the Plan.  The Private Placement Agreement sets forth the terms by which the

---

[3]     Under the Plan, "Replacement Secured First Lien Term Loan" means a replacement secured first lien term
loan on the terms and conditions set forth in the Plan, such loan to be issued to the extent that the Debtors
are unable to obtain commitments for the full $1.5 billion in the exit facility contemplated under the Plan
(the "Exit Facility").

Debtors will raise $750 million through the issuance and sale of mandatory convertible preferred equity in Reorganized PEC.  The rights offering and related Backstop Commitment Agreement will provide the Debtors with an additional $750 million of new equity capital by allowing the holders of allowed second lien note claims and the holders of certain allowed general unsecured claims to exercise subscription rights for the purchase of new common stock of Reorganized PEC.  Furthermore, the terms of the Private Placement Agreement and Backstop Commitment Agreement allow holders of second lien note claims and holders of senior unsecured note claims that are accredited investors to participate in the backstop of the $1.5 billion equity raise if such parties execute the Plan Support Agreement within 20 business days of the filing of this Motion.

6.        If effectuated, the Debtors' Plan will result in (a) the deleveraging of the Debtors' balance sheet by no less than $6.6 billion, (b) a new money equity capital infusion of $1.5 billion and (c) the comprehensive settlement of the dispute relating to the extent and priority of secured claims of the lenders under the Debtors' prepetition first lien credit agreement and other disputes among the significant settling creditor parties that could have delayed or otherwise frustrated the Debtors' efforts to reorganize and exit chapter 11.

7.        As noted above, the specific terms of the Plan Support Agreement, Private Placement Agreement, Backstop Commitment Agreement and the Section 1145 Rights Offering Procedures are the product of good faith and arm's-length negotiations among the Debtors and their various creditor constituencies.  The terms set forth in these agreements will allow for the confirmation of a chapter 11 plan that maximizes the value of the Debtors' estates and creditor recoveries.

8.        Nevertheless, the Debtors may terminate each of these agreements if the exercise of their fiduciary duties dictates that such termination is appropriate.  If this termination occurred

prior to the entry of an order approving this Motion, the Debtors would have no liability for any payments or expenses under any of the Plan Agreements.  In addition, the Debtors' financial obligations under the Plan Agreements are subject to a waivable condition regarding the joinder of holders of two-thirds in amount of claims for each of (a) the Debtors' second lien notes and (b) the Debtors' unsecured senior notes to the Plan Support Agreement by the date the Court approves the Debtors' entry into the Backstop Commitment Agreement and the Private Placement Agreement.

9.      In sum, the Debtors submit it is a sound exercise of their business judgment to enter into, and perform under, the Plan Support Agreement, Private Placement Agreement and Backstop Commitment Agreement.  The Debtors further submit the Section 1145 Rights Offering Procedures are fair, reasonable and drafted in a manner that will encourage creditors to participate in the rights offering contemplated under the Plan.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.      General Corporate and Case Background

11.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC
was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a
wholly-owned direct or indirect subsidiary of PEC.

13.     PEC is the world's largest private-sector coal company (by volume), with 26
active coal mining operations located in the United States and Australia.  The Debtors' domestic
mines produce and sell thermal coal, which is primarily purchased by electricity generators.
PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is
exported to international customers.  As of December 31, 2015, Debtor PEC and its subsidiaries'
property holdings include 6.3 billion tons of proven and probable coal reserves and
approximately 500,000 acres of surface property through ownership and lease agreements.  In
the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons
of proven and probable coal reserves, and the Debtors generated sales of approximately
180 million tons of coal.  In addition to its mining operations, the Debtors market and broker
coal from other coal producers across the United States, Australia, Europe and Asia.

14.     The Debtors operate in a competitive and highly regulated industry that has
experienced strong headwinds and precipitously declining demand and pricing in recent years
due to the rise of low priced alternative energy sources – including an abundance of natural gas.
Combined with these factors, slowing global economic growth drove a wide range of goods
prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed,
demand from electric utilities in the United States alone declined approximately 110 million tons
in 2015.  These market conditions, in connection with lower realized pricing in the United States
and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor

subsidiaries' coal sales during 2015.  As a result of these challenges, several large United States

coal companies have filed for chapter 11 protection in recent years.

**B.      The Debtors' Capital Structure**

15.      As of the Petition Date, the Debtors' principal funded secured debt obligations

consisted of the following:

> a.      $1.65 billion in principal amount under a revolving credit facility and
> $1.2 billion in principal amount under a term loan facility, each amounts
> owed pursuant to that certain Credit Agreement dated September 24, 2013
> by and between PEC as Borrower, Citibank, N.A., as Administrative
> Agent, Swing Line Lender and L/C Issuer and the other lenders party to
> the credit agreement, as amended (the "First Lien Credit Agreement"); and
>
> b.      $1.0 billion in principal amount of 10.00% senior secured second lien
> notes that PEC issued and are due March 2022 (the "Second Lien Notes").

16.      As of the Petition Date, the Debtors' principal unsecured funded debt obligations

consisted of (a) approximately $3.7 billion in principal amount of unsecured senior notes issued

in four series (collectively, the "Senior Unsecured Notes") and (b) $732.5 million in principal

amount outstanding under a series of convertible junior subordinated debentures.

**C.      Summary of Certain Key Plan Terms**

17.      Concurrently with the filing of this Motion, the Debtors filed the Plan.[4]  The

Debtors will be divided into five "Debtor Groups" under the Plan depending on their principal

liabilities as follows:

---

[4]      Reference is made to the Plan for a complete description of its terms.  To the extent any excerpts,
summaries and/or descriptions of the relationships of the parties and the terms of the Plan contained in the
Motion differ in any way from that contained in the Plan, the Plan will govern.  Capitalized terms used in
this section and not otherwise defined have the meaning given to them in the Plan.

| Letter | Debtor Group | Description |
|--------|--------------|-------------|
| A | PEC | Debtor Peabody Energy Corporation |
| B | Encumbered Guarantor Debtors | Each Debtor that is a guarantor under the First Lien Credit Agreement, the Second Lien Notes and the Senior Unsecured Notes |
| C | Gold Fields Debtors | Gold Fields Mining, LLC, Arid Operations, Inc., Gold Fields Chile, LLC and Gold Fields Ortiz, LLC |
| D | Peabody Holdings (Gibraltar) Limited | Debtor Peabody Holdings (Gibraltar) Limited ("Gib1") |
| E | Unencumbered Debtors | Each Debtor which is not subject to the liens arising under the First Lien Credit Agreement or with respect to the Second Lien Notes, and is not a guarantor of the Senior Unsecured Notes. |

**1.     Classification of Claims and Related Treatment**

18.     The Plan provides the following treatment for certain key creditor classes:

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|------------------------------|-----------------------------------------|-------------------------------|
| First Lien | $2.980 billion[6] | Each holder of an Allowed First Lien Lender Claim in |

---

[5]  The estimated Allowed amounts set forth herein are estimates only and actual Allowed amounts may be greater or less than such amounts.

[6]  The total estimated amount of Allowed First Lien Lender Claims is currently $2.980 billion, comprised of approximately (a) $1,162,343,00 principal amount of term loans net of unamortized original issue discount, (b) $947,000,000 principal amount of revolver loans, (c) $612,753,000 of letters of credit reimbursement obligations (assuming $6,118,000 of future letter of credit draws and the rollover of the PBGC letter of credit undrawn into the ABL Facility (as defined in Exhibit 1) and (d) $257,300,000 in Swap Contract termination , plus accrued and unpaid interest at the default rate for Allowed First Lien Lender Claims except for claims under Swap Contracts (as defined in the First Lien Credit Agreement) at the contractual rate for claims under the Swap Contracts, plus accrued and unpaid adequate protection payments, plus professional fees and expenses payable under the First Lien Credit Agreement.  The foregoing estimate assumes: (i) an April 3, 2017 Effective Date, (ii) the PBGC letter of credit rolls onto an ABL Facility (as defined in Exhibit 1) and (iii) that adequate protection payments in accordance with the Final DIP Order have been paid in full through and until the Effective Date.  All parties have reserved their rights as to the applicable interest rate for Allowed First Lien Lender Claims other than claims under Swap Contracts.  To the extent the Effective Date occurs after April 3, 2017, any increase in the size of the First Lien Lender Claims shall be satisfied with cash. The amount of the
[Footnote continued on next page]

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
| Lender Claims | | Classes 1A, 1B, 1C and 1D will receive its aggregate pro rata share of:  (i) cash equal to the full amount of the Allowed First Lien Lender Claims, including interest at the default rate (such treatment, a "First Lien Full Cash Recovery") or (ii) solely to the extent that the Debtors have not received commitments for the Exit Facility prior to the Effective Date in the aggregate principal amount of at least $1.5 billion, and subject to the conditions set forth on Exhibit 1 to the term sheet attached to the Plan Support Agreement (the "Replacement First Lien Term Sheet"), each holder's pro rata share of (a) the replacement secured first lien term loan on the terms and conditions set forth in the Replacement First Lien Term Sheet in an aggregate principal amount of up to $1.5 billion, such principal amount to be calculated as set forth in the Replacement First Lien Term Sheet (the "Replacement Secured First Lien Term Loan"), plus (b) cash in an amount equal to the difference between (i) the Allowed First Lien Lender Claims, including interest at the default rate, and (ii) the aggregate principal amount of the Replacement Secured First Lien Term Loan.

The First Lien Lender Claims shall be impaired and holders of such Claims shall be entitled to vote on the Plan. |
| Second Lien Notes Claims | $1.158 billion[7] | On or as soon as practicable after the Effective Date,[8] each holder of an Allowed Second Lien Notes Claim in Classes 2A, 2B, 2C and 2D shall receive: |

---

First Lien Lender Claims will also fluctuate based on letter of credit draws or returns through the Effective Date.

[7]   The Second Lien Notes Claims shall be allowed in the amount of $1.0 billion, plus accrued and unpaid pre-petition interest and post-petition interest at the non-default rate, accruing through and until the Effective Date. The total estimated amount of Second Lien Notes Claims is $1.158 billion, assuming an April 3, 2017 Effective Date.  The Second Lien Notes Claims shall continue to accrue interest at the non-default rate if the Effective Date extends beyond April 3, 2017.

[8]   As part of the global settlement set forth herein and to be embodied in the Plan, upon the Effective Date (subject to its occurrence), the value of any and all collateral securing the Second Lien Notes Claims (including, but not limited to, any and all collateral granted to holders of Second Lien Notes as adequate protection or otherwise pursuant to the Final DIP Order) shall be deemed to exceed the total estimated amount of Second Lien Notes

[Footnote continued on next page]

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
| | | (i) at the option of the Debtors in their sole discretion, provided, in the case of (a) or (b), the First Lien Full Cash Recovery occurs, its aggregate pro rata share of $450 million (calculated as the amount of any such cash and the principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental New Second Lien Notes Claims) in any combination of (a) cash, (b) principal amount of first lien debt on terms consistent with the Exit Facility (the "Additional First Lien Debt") and/or (c) principal amount of new second lien notes on the terms and conditions set forth on Exhibit 2 to the term sheet attached to the Plan Support Agreement ("New Second Lien Notes"); provided that in no event shall the aggregate principal amount of New Second Lien Notes (plus, if applicable, the principal amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250 million; provided, further that in no event shall the combined consideration issued under this clause (i) (calculated as the amount of any such cash and the principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental Second Lien Notes Claims) exceed $450 million in the aggregate;[9] |

Claims (including accrued and unpaid pre-petition and post-petition interest at the non-default rate), and the Second Lien Notes Claims shall be treated in accordance with the terms set forth in this Term Sheet.

[9]   If the total amount of Second Lien Notes Claims increases because the Effective Date extends beyond April 3, 2017 (the total amount of Second Lien Notes Claims in excess of $1.158 billion, the "Incremental Second Lien Notes Claims"), then additional consideration shall be provided to the holders of Second Lien Notes Claims (A) by increasing the consideration pursuant to clause (i) of this paragraph on a pro rata basis in an amount equal to 50% of the amount of the Incremental Second Lien Notes Claims (and any Additional First Lien Debt so distributed pursuant to this footnote shall be referred to herein as the "Incremental Additional First Lien Debt", and any additional New Second Lien Notes so distributed pursuant to this footnote shall be referred to herein as the "Incremental New Second Lien Notes"), subject to a $20 million cap for such increase above $450 million pursuant to this clause (A), and (B) in the form of additional Reorganized PEC Common Stock with a total value at Plan Equity Value equal to the remaining amount of Incremental Second Lien Notes Claims not settled pursuant to clause (A) above; provided, however, that if no Additional First Lien Debt or New Second Lien Notes are being issued pursuant to clause (i)(b) or (i)(c) (prior to giving effect to the additional consideration described in this footnote), then the additional consideration pursuant to clause (A) above shall be paid in cash; and provided further that such incremental amounts may only be paid in cash or Incremental Additional First Lien Debt if the First Lien Full Cash Recovery occurs.

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
|  |  | (ii) its pro rata share of the Pro Rata Split as of the Effective Date of Reorganized PEC Common Stock (as defined below) (which shall be subject to the dilution[10] from the LTIP Shares, the Preferred Equity, and the Penny Warrants, and shall be issued after giving effect to the issuance of the Rights Offering Shares, the issuance of any shares of Reorganized PEC Common Stock issued on account of Incremental Second Lien Notes Claims (the "Incremental Second Lien Shares"), the issuance of any shares of Reorganized PEC Common Stock issued on account of the Commitment Premiums (as defined below), the issuance of any Ticking Premiums (as defined below) (collectively, the "Premium Shares") and the issuance of any Disputed Claims Reserve Shares, the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity (as defined below) and the exercise of the Penny Warrants (as defined below);[11] and<br><br>(iii) its pro rata share of the Pro Rata Split as of the Record Date  (as defined below) of the Section 1145 Equity Rights (as defined below).<br><br>For the avoidance of doubt, any of the consideration received by holders of Second Lien Notes Claims shall be independently transferable, shall not be required to be transferred as part of a "strip" and shall not be subject to any minimum holding period or similar lock-up |

[10]    For the avoidance of doubt, see Exhibit 9 hereto for an illustrative allocation of Reorganized PEC Common Stock (Fully-Diluted).

[11]    "Pro Rata Split" shall mean the following percentages:  (x) in respect of Claims in Class 2, the quotient of (A) $708 million divided by (B) the Allowed Claims in Classes 5B plus $708 million; and (y) in respect of Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million.  The Pro Rata Split for Reorganized PEC Common Stock shall be determined based on Allowed Claims as of the Effective Date, with a reserve of Reorganized PEC Common Stock created for disputed Claims as of the Effective Date.  The Pro Rata Split for all other purposes shall be determined based on Allowed Claims as of the Record Date as determined in accordance with the Rights Offering Procedures.  As set forth below, in lieu of Section 1145 Equity Rights, holders of disputed Claims as of the Record Date whose Claims later become Allowed shall receive Reorganized PEC Common Stock at Plan Equity Value with a value equal to their pro rata share of the Equity Rights Value (as defined below).

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
| | | provisions; provided, that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| General Unsecured Claims[12] | (i) PEC $3.944 billion to $4.219 billion (ii) Encumbered Guarantor Debtors $3.960 billion to $4.160 billion (iii) Gold Fields Debtors $3.929 billion to $5.289 billion (iv) Gib1 None. (v) Unencumbered Debtors $10 million to $30 million | On or as soon as practicable after the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor: (i) each holder of an Allowed General Unsecured Claim against PEC will receive its pro rata share of $3 million plus any Additional PEC Cash;[13] (ii) each holder of an Allowed General Unsecured Claim against one of the Encumbered Guarantor Debtors will receive the holder's pro rata share of: (a) the Pro Rata Split as of the Effective Date of the Reorganized PEC Common Stock (which shall be subject to the dilution from the LTIP Shares, the Preferred Equity, and the Penny Warrants and shall be issued after giving effect to the issuance of the Rights Offering Shares, the issuance of any Incremental Second Lien Shares, the issuance of any Premium Shares and the issuance of any Disputed Claims Reserve Shares), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity and the exercise of the Penny Warrants; and (b)(i) the Pro Rata Split as of the Record Date of the Section 1145 Equity Rights; provided, however, that any holder of a General Unsecured Claim against one of the Encumbered Guarantor Debtors that is not Allowed as of the Record |

---

[12]   "General Unsecured Claim" shall mean any Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, Priority Tax Claim, First Lien Lender Claim, Second Lien Notes Claim, Other Secured Claim, Other Priority Claim, Convenience Class Claim, Unsecured Subordinated Debenture Claim (as defined below), Intercompany Claim (as defined below) or Section 510(b) Claim. For the avoidance of doubt, General Unsecured Claims include the Unsecured Senior Notes Claims. Additional Claims filed by governmental units on or around October 11, 2016, include a $1.8 billion Claim asserted by the U.S. Environmental Protection Agency against PEC, as well as other governmental units' Claims in excess of $1.0 billion against various other Debtors. The Debtors are in the process of reviewing and analyzing these recently filed Claims and therefore they are not included in the Claims estimates herein.

[13]   This pool of cash is available for holders of General Unsecured Claims pursuant to the settlement of the Encumbered PEC Cash Dispute (as defined below). "Additional PEC Cash" means, to the extent payments to Allowed Convenience Claims in Class 6A are less than $2 million, the difference between total payments to Allowed Convenience Claims in Class 6A and $2 million.

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
| | | Date shall not participate in the Rights Offering, and instead, if and when such holder's Claim becomes Allowed, shall receive an amount of Disputed Claims Reserve Shares with a value equal such holders pro rata share of the Equity Rights Value;[14]  (iii) each holder of an Allowed General Unsecured Claim against one of the Gold Fields Debtors will receive the holder's pro rata share of interests in a liquidating trust to be formed to hold and liquidate all of the assets of the Gold Fields Debtors;  (iv) each holder of an Allowed General Unsecured Claim against Gib1 will receive no recovery; and  (v) each holder of an Allowed General Unsecured Claim against one of the Unencumbered Debtors will receive cash in the amount of the holders' Allowed Claim, less any amounts attributable to late payments, postpetition interest or penalties.  For the avoidance of doubt, any of the consideration received by holders of Allowed Unsecured Senior Notes Claims shall be independently transferable and shall not be required to be transferred as part of a "strip;" provided |

---

[14] On the Effective Date, the Debtors shall create a reserve of Reorganized PEC Common Stock (the "Disputed Claims Reserve Shares") for distribution to holders of such disputed Claims as of the Record Date that were not permitted to participate in the Section 1145 Rights Offering. The Disputed Claims Reserve Shares shall have a value, as determined by reference to Plan Equity Value, equal to the estimated value of the Section 1145 Equity Rights holders of disputed Claims as of the Record Date would have been entitled to receive if such disputed Claims later became Allowed Claims (as reasonably estimated by the Debtors) calculated as follows: (a) for each share of Rights Offering Shares that would have been available for purchase by a holder of a Class 5B Claim that was not Allowed as of the Record Date through the exercise of Section 1145 Equity Rights if such holder's Claims had been Allowed as of the Record Date, the difference between (i) the value of such share at Plan Equity Value and (ii) $13.75; and (b) for each Penny Warrant that such holder would have received through the exercise of Rights Offering Equity Rights if such holder's Claim had been Allowed as of the Record Date, the difference between (i) the value of a share of Reorganized PEC Common Stock at Plan Equity Value that underlies such Penny Warrant and (ii) $0.01 (the "Equity Rights Value"). Following completion of the reconciliation, settlement, and distribution procedures in connection with such disputed Claims, any Disputed Claims Reserve Shares which are not distributed from such reserve to holders of such disputed Claims pursuant to such procedures shall be cancelled. Prior to the Effective Date, the Debtors will file a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee, provided, however, that the aggregate face amount of disputed Claims permitted to receive Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee.

| Class of Claims or Interests | Amount of Allowed Claims (estimated)[5] | Treatment of Claim or Interest |
|---|---|---|
| | | that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |

19.     In addition, the Plan separately classifies any claim arising, or related to the

United Mine Workers of America 1974 Pension Plan and any other claim related to any

withdrawal liability under 29 U.S.C. § 1392(c).

**2.     Global Settlement of Material Disputes**

20.     The Plan also represents a global and integrated compromise and settlement

(the "Settlement") of all disputes between the Debtors, the Backstop Parties (as defined below),

the First Lien Lenders and the Committee, including the claims and causes of action set forth

below pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal

Rules of Bankruptcy Procedure.  The resolutions and compromises embodied in the Settlement

encompass the following items, among others:

(a)     the resolution of the CNTA Dispute;[15]

(b)     the settlement of certain material claims;

(c)     the settlement of certain causes of action raised by the Committee with respect to whether cash at PEC on the Petition Date was encumbered or unencumbered and other challenge actions;

(d)     the release by the Debtors of all preference claims against any holder of a General Unsecured Claim; and

(e)     the disregard of Intercompany Claims for purposes of calculating distributions to third party creditors.

---

[15]     "CNTA Dispute" means the dispute regarding the extent of the secured claims of the lenders under the First Lien Credit Agreement in respect of Principal Properties (as defined in the First Lien Credit Agreement and related documentation) and which of the Debtors' U.S. mine complexes constitute Principal Properties.

3.        **Financing Transactions Contemplated Under the Plan**

21.        The Plan provides for two significant equity capital raising transactions.  The first

is the issuance and sale of $750 million of mandatorily convertible preferred equity

(the "Preferred Equity") in PEC following its reorganization under the Plan and emergence from

chapter 11.  Certain holders of Second Lien Notes and certain holders of Senior Unsecured Notes

have committed to purchase the Preferred Equity at a 35 percent discount to the Plan Equity

Value[16] of the Debtors.  This sale will occur in accordance with the terms of the Private

Placement Agreement, which is described in section E below.  The right and obligation to

purchase Preferred Equity under the Private Placement Agreement is not on account of any claim

held by any of the purchasing noteholders and is, thus, separate and apart from any distribution

rights a creditor may possess under the Plan.

22.        The second capital raising transaction is the Section 1145 Rights Offering and

related Backstop Commitment (each as defined below).  As set forth in more detail in sections F

and H below, the Debtors will effectuate a rights offering (the "Section 1145 Rights Offering")

for approximately $750 million of common stock in Reorganized PEC (the "Reorganized PEC

Common Stock").  The Reorganized PEC Common Stock will be offered at an initial purchase

price based upon a 45 percent discount to Plan Equity Value.  Participation in the Section 1145

Rights Offering will be available to (a) holders of allowed claims on account of the Second Lien

Notes ("Second Lien Notes Claims") and (b) holders of allowed unsecured claims against the

Encumbered Guarantor Debtors under the Plan (the "Class 5B Claims").  Holders of Second Lien

Notes Claims (the "Second Lien Noteholders") and Class 5B Claims will be eligible to purchase

---

[16]        The "Plan Equity Value" is $3.105 billion.

stock under the Section 1145 Rights Offering according to the Pro Rata Split calculation under the Plan.

23.     Moreover, and as further described below, certain of the entities that have committed to purchase the Preferred Equity under the Private Placement Agreement have agreed to provide a full backstop of the Section 1145 Rights Offering (the "Backstop Commitment"). The terms of the Backstop Commitment are set forth in the Backstop Commitment Agreement, attached as Exhibit C hereto, and further explained in section F of this Motion.

**D.     The Plan Support Agreement**

**1.     Parties to the Plan Support Agreement**

24.     Three of the Debtors' major creditor constituencies are party to the Plan Support Agreement:  (a) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacity, the "First Lien Agent") under the First Lien Credit Agreement and certain First Lien Lenders party to the Plan Support Agreement (excluding, for the avoidance of doubt, the Noteholder Co-Proponents (defined below) and together with the First Lien Agent, the "First Lien Lender Co-Proponents"); (b) Contrarian Capital Management L.L.C., Panning Capital Management, LP, PointState Capital LP and the South Dakota Investment Council in their respective capacities as owners or advisors to funds or managed accounts who beneficially own Second Lien Notes Claims (collectively, the " Ad Hoc Secured Committee Members"); and (c) Elliott Management Corporation and certain of its affiliates, Discovery Capital Management, LLC and certain of its affiliates, Aurelius Capital Master Ltd. and ACP Master, Ltd., in their respective capacities as owners or advisors to funds or managed accounts who beneficially hold Senior Unsecured Notes claims (collectively, the "Ad Hoc Unsecured Noteholders Group" and, together with the Ad Hoc Secured Committee Members, the "Noteholder Co-Proponents" and, together with the First Lien Lender Co-Proponents, the "Creditor Co-Proponents").

25.     The Plan Support Agreement also contemplates the joinder of any holder of claims on account of the Second Lien Notes or the Senior Unsecured Notes that subsequently enters into the Plan Support Agreement (the "Additional Supporting Parties" and together with the Creditor Co-Proponents the "Supporting Creditor Parties").

**2.      The Plan Support Agreement's Material Terms[17]**

**a.      Supporting Creditor Parties' Support of the Plan**

26.     Subject to the terms of the Plan Support Agreement and the Supporting Creditor Parties' receipt of the disclosure statement related to the Plan (the "Disclosure Statement") and other solicitation materials related to the Plan, each member of the Supporting Creditor Parties has agreed to the following:[18]

> (a)     to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

> (b)     not change or withdraw (or cause or direct to be changed or withdrawn) such vote, provided that upon any termination in accordance with section 12 of the Plan Support Agreement, each member of the Supporting Creditor Parties may, upon written notice to the Company and the other parties to the Plan Support Agreement, revoke its vote or any consents given by such party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and will not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and the Plan Support Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

---

[17]     Reference is made to the Plan Support Agreement for a complete description of its terms.  To the extent any excerpts, summaries and/or descriptions of the relationships of the parties and the terms of the Plan Support Agreement contained in the Motion differ in any way from that contained in the Plan Support Agreement, the Plan Support Agreement shall govern.  Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Plan Support Agreement.

[18]     See Plan Support Agreement §§3-5.

(c)     not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, the Plan Support Agreement;

(d)     not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)     in the case of the First Lien Lender Co-Proponents, not directly or indirectly take an action to direct the First Lien Agent to undertake any action set forth in sections 3.01(c), (d) or (e) of the Plan Support Agreement; provided, however, that except to the extent required by the terms of the First Lien Credit Agreement documents or by applicable law, the First Lien Agent shall be permitted to exercise its duties and obligations under the First Lien Credit Agreement documents in accordance with the Plan Support Agreement and, subject to its obligations under the Plan Support Agreement, the First Lien Agent may grant or withhold its consent or approval without instructions;

(g)     in the case of the First Lien Lender Co-Proponents, if applicable, negotiate in good faith the definitive documents for the Replacement Secured First Lien Term Loan on terms consistent with those set forth on Exhibit 1 to the Restructuring Term Sheet;

(h)     in the case of the Noteholder Co-Proponents and the Additional Supporting Parties, as applicable, not directly or indirectly take an action to direct the indenture trustees under the Second Lien Notes or any of the Unsecured Senior Notes (each, an "Agent") to undertake any action that a member of the Noteholder Co-Proponents is otherwise prohibited from undertaking pursuant to sections (i) sections 4.01(c), (d) or (e) or (ii) 5.01 (c), (d) or (e), as applicable, of the Plan Support Agreement, provided, however, that to the extent a member of the Noteholder Co-Proponents or Additional Supporting Parties chooses to direct an Agent to not undertake an action that a member of the Noteholder Co-Proponents or Additional Supporting Parties is otherwise prohibited from undertaking pursuant to (i) sections 4.01(c), (d) or (e) or (ii) 5.01 (c), (d) or (e), as applicable, of the Plan Support Agreement, such direction will not be construed in any way as requiring any Noteholder Co-Proponent or Additional Supporting Party

to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction;

(i)     in the case of the Noteholder Co-Proponents and the Additional Supporting Parties, as applicable, take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, participation in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof; and

(j)     take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under the Plan Documents (it being understood that the First Lien Lender Co-Proponents shall not be required to incur any out of pocket cost or expense other than professional payments, to the extent that such payments are entitled to payment pursuant to Section V of the Restructuring Term Sheet).

**b.     The Debtors' Commitments under the Plan Support Agreement**

27.     Subject to the Debtors' fiduciary duties as set forth in section 15.01 of the Plan Support Agreement, the Debtors have agreed to use commercially reasonable efforts with respect to the following:[19]

(a)     operate their businesses in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices, provided, however, that the foregoing obligations shall be satisfied in a manner consistent with the terms of the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet;

(b)     prepare the Plan Documents and any related documents, and distribute the applicable documents, each as set forth in sections 3.02 and 4.02 of the Plan Support Agreement, concurrently to the Creditor Co-Proponents and their respective legal advisors thereof, as soon as reasonably practicable, but in no event less than two (2) calendar days before the date when the Debtors intend to file such document (and, if not reasonably practicable, as soon as reasonably practicable before filing) and afford reasonable opportunity to provide prompt comment and review to the respective legal and financial advisors for the Creditor Co-Proponents in advance of any

---

[19]     See Plan Support Agreement § 6.

filing thereof; provided the Debtors will provide advance draft copies of all Plan Documents to be filed with the Bankruptcy Court to the legal advisors of the Creditor Co-Proponents no less than three (3) business days prior to filing such Plan Documents;

(c)     support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided in the Plan Support Agreement;

(d)     take any necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(e)     take no actions and not encourage any other person to take any actions, inconsistent with the Plan Support Agreement or the Restructuring Term Sheet, or that would, or would reasonably be expected to, directly or indirectly, delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "Alternative Transaction"); provided, however, that the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of non-Debtor affiliates' assets in the ordinary course of business and consistent with past practice and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction;

(f)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with the Plan Support Agreement and the Plan Documents;

(g)     take no actions to propose or otherwise consent to the entry of any order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, that is not

acceptable to the Requisite Creditor Parties (as defined under the Plan Support Agreement);

(h)    take no actions that would violate the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet (the "Interim Operating Covenant");

(i)    take no actions to sell, abandon, or otherwise dispose of any material assets of the Debtors and their non-Debtor affiliates, except as provided in the Interim Operating Covenant, without the prior written consent of the Requisite Creditor Parties; and

(j)    if the Debtors know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in the Plan Support Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Creditor Parties.

28.    Each of the Debtors' commitments under the Plan Support Agreement are subject to a fiduciary limitation.  As such, nothing in the Plan Support Agreement requires the Debtors or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable, to take or refrain from any action inconsistent with such party's fiduciary obligations under applicable law.  See Plan Support Agreement § 15.01.

    c.    **Termination Provisions**

29.    As summarized below, the Plan Support Agreement contains several termination provisions.

30.    Section 12.01 of the Plan Support Agreement governs the termination rights of the Debtors in their sole discretion (each, a "Debtor Termination Event"):

(a)    If holders of two-thirds  in amount of each of (i) the Second Lien Notes Claims and (ii) the Unsecured Senior Notes Claims have not joined the Plan Support Agreement by the day on which the Private Placement and Backstop Approval Order is entered (the "PSA Termination Condition"). The Debtors may only exercise the PSA Termination Condition (or waive such condition) prior to entry of the Private Placement and Backstop Approval Order.  In addition, the Debtors' exercise of the PSA Termination Condition relieves them from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations

under the Backstop Commitment Agreement or the Private Placement Agreement.[20]

(b)     The determination by any of the Debtors' boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by the Plan Support Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to the Plan Support Agreement would be inconsistent with its fiduciary obligations;

(c)     the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)     Following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in the Plan Support Agreement that adversely and materially affects the Debtors' rights under the Plan Support Agreement and is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(e)     the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f)     either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

(g)     the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan

---

[20]     The Debtors will provide notice of such a decision to exercise their fiduciary termination rights under section 15.01 of the Plan Support Agreement to the Creditor Co-Proponents within one (1) business day (such notice, a "Debtor Fiduciary Duty Notice")

Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan

31.     Section 12.02 of the Plan Support Agreement governs the termination rights of the Requisite First Lien Lender Co-Proponents or the Requisite Consenting Noteholders (each as defined in the Plan Support Agreement).  Notice of such termination must occur upon two (2) business days prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "Termination Event"):

(a)     any Debtor accepts an Alternative Transaction, including, but not limited to filing with the Bankruptcy Court, or publically announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b)     the Debtors deliver a Debtor Fiduciary Notice (as defined in the Plan Support Agreement) to the Creditor Co-Proponents;

(c)     the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)     the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) a motion seeking approval of the Disclosure Statement and procedures for the solicitation of the Plan, and (iv) a motion seeking approval of the Backstop Commitment Agreement and the Private Placement Agreement by no later than December 22, 2016;

(e)     the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the full amount of the Exit Facility or agreed to use commercially reasonable efforts to arrange for commitments for the full amount of the Exit Facility by January 11, 2017;

(f)     the failure of an order (the "Disclosure Statement Order") to have been entered by the Bankruptcy Court approving the Disclosure Statement and the commencement of solicitation for the Plan by January 31, 2017;

(g)     failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(h)     the failure of the Plan Effective Date to have occurred by April 15, 2017;

(i)     following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in the Plan Support Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(j)     the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority or validity of the Claims of any of the Creditor Co-Proponents;

(k)     any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with the Plan Support Agreement and the exhibits thereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Creditor Parties, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(l)     any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in the Interim Operating Covenant without the prior written consent of the Requisite Creditor Parties;

(m)    either the order approving the Disclosure Statement or the order confirming the Plan is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Creditor Parties (as defined in the Plan Support Agreement); or

(n)     the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan

Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and the Plan Support Agreement.

32.     Section 12.03 of the Plan Support Agreement outlines certain Termination Events under which the Noteholder Steering Committee may terminate the Plan Support Agreement:

(a)     the failure of an order to have been entered by the Bankruptcy Court approving the Private Placement Agreement and the Backstop Commitment Agreement (including approval of the payments set forth therein in connection with the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017;

(b)     any of the orders approving the Backstop Commitment Agreement or the Private Placement Agreement is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Consenting Noteholders; or

(c)     the termination of the Backstop Commitment Agreement or the Private Placement Agreement pursuant to their respective terms.

33.     Section 12.04 of the Plan Support Agreement sets forth a specific Termination Event for Second Lien Noteholders.  Under such Termination Event, and in the event the acknowledgment set forth in Section 3.03 of the Plan Support Agreement by Citibank, N.A. in its capacity as the First Lien Agent ceases to be in effect, any holder of Second Lien Notes may withdraw from and no longer remain bound by the Plan Support Agreement within five (5) business days after receiving written notice of such event, it being understood that the Plan Support Agreement shall remain binding among the remaining parties thereto. The Ad Hoc Secured Committee Members may not utilize this termination event if the Plan provides for unconditional payment in full in cash or unimpairment of claims arising under the First Lien

Credit Agreement.

34.    The Plan Support Agreement will terminate automatically without further

required action or notice upon the Effective Date.  See Plan Support Agreement § 12.10.

**E.    The Private Placement Agreement[21]**

35.    As noted above, the $750 million of proceeds the Debtors will receive under the

Private Placement Agreement is a principal source of funds to satisfy distributions to holders of

certain allowed claims under the Plan (such placement, as further described below, the "Private

Placement").  Under the terms of the Private Placement Agreement, the Noteholder Co-

Proponents must purchase the full amount of the Preferred Equity and have the exclusive right to

purchase 22.5 percent of the Preferred Equity.

36.    To the extent that other holders of claims on account of the Second Lien Notes

and Senior Unsecured Notes wish to participate in the Private Placement, such holders that agree

to become party to the Private Placement Agreement on or before 5 pm New York city time on

the third business day following the execution of the Private Placement Agreement (the "Phase

Two Private Placement Parties") will possess the exclusive right and obligation to the pro rata

purchase of an additional 5 percent of the Preferred Equity in the Private Placement with the

Noteholder Co-Proponents.  Additional holders that become party to the Private Placement

Agreement after this deadline but prior to the date that is 20 business days following the filing of

this Motion (the "Additional Private Placement Parties") may purchase a pro rata share of the

remaining 72.5 percent of the Preferred Equity offered under the Private Placement Agreement

---

[21]    The description of the Private Placement Agreement is intended for the convenience of the Court and does
not supersede the terms of the Private Placement Agreement attached hereto as Exhibit B.  To the extent of
any inconsistency between the description herein and the Private Placement Agreement, the terms of the
Private Placement Agreement shall control.  Capitalized terms not otherwise defined in this summary have
the meanings given to them in the Private Placement Agreement.

(such Additional Private Placement Parties, along with the Noteholder Co-Proponents and the Phase Two Private Placement Parties, the "Private Placement Parties").  The right and obligation to purchase shares in the Private Placement is not on account on any claim held by any of the purchasing noteholders and is, thus, separate and apart from any distribution rights a creditor may possess under the Plan.  The principal material terms of the Private Placement Agreement are further described below.

### 1.     The Preferred Equity Shares

37.     Certain key terms of the Preferred Equity shares are outlined below:

(a)     Preferred Equity Shares.  The Preferred Equity Shares consist of shares of Preferred Equity in Reorganized PEC for an aggregate purchase price of $750 million at a discount of 35 percent to the Plan Equity Value.  Any Preferred Equity purchased by the Private Placement Parties will be solely on account of the new money provided in the Private Placement and not on account of such party's Secured Notes Claims or General Unsecured Claims in Class 5B under the Plan.

(b)     Dividend Rate.  Preferred Equity shares have a dividend rate of 8.5 % per annum, payable semi-annually in kind as a dividend of additional shares of Preferred Equity, and such dividends will accumulate to the extent not paid and shall accrue dividends in the same manner as the outstanding Preferred Equity

(c)     Participation.  The Preferred Equity will participate on an as-converted basis (giving effect to any accrued and unpaid dividends) in any (i) dividend or distribution or (ii) any payments in connection with liquidation event payable on the Reorganized PEC Common Stock.

(d)     Optional Redemption by the Company.  Subject to early conversion or other retirement of the Preferred Equity, if at any time following the Effective Date, less than 25% of the total number of shares of Preferred Equity that were issued on the Effective Date remain outstanding, then the Company shall have the right, but not the obligation, to redeem all (but not less than all) of the remaining shares of Preferred Equity, following thirty (30) days' notice, at a redemption price equal to the Liquidation Preference of such shares of Preferred Equity, payable in cash or shares of Reorganized PEC Common Stock at Reorganized PEC's election; provided that the Company shall not redeem any shares of Preferred Equity for cash during any time that any obligations under the Replacement Secured First Lien Term Loan remain outstanding.  The

Conversion Price for any such optional redemption shall also be adjusted to reflect the Makewhole Amount (if applicable).

(e)   <u>Conversion at the Option of the Holder</u>.  Preferred Equity shares will be convertible into Reorganized PEC Common Stock at any time, at the option of the holder of such Preferred Equity, at an initial conversion price based on a discount of 35% of the equity value of Reorganized PEC contained in the Plan (the "<u>Conversion Price</u>").  The Conversion Price for any such optional redemption shall also be adjusted to reflect the Makewhole Amount (as defined below, and if applicable).

(f)   <u>Conversion Threshold</u>. Beginning on the Effective Date, each outstanding share of Preferred Equity shall automatically convert (unless previously converted at the option of the holder of such Preferred Equity or pursuant to an exercise of a conversion right in connection with a Fundamental Change (as defined below)) into a number of shares of Reorganized PEC Common Stock at the Conversion Price (such conversion, the "<u>Mandatory Conversion</u>") if the volume weighted average price of the Reorganized PEC Common Stock exceeds 130% of the plan common equity value (the "<u>Conversion Threshold</u>") for at least 45 trading days in a 60 consecutive trading day period, including each of the last 20 days in such 60 consecutive trading day period (such period, the "<u>Mandatory Conversion Period</u>").  The issuance of shares of Reorganized PEC Common Stock pursuant to the Mandatory Conversion shall be effected on the third business day following the expiration of the Mandatory Conversion Period (such date, the "<u>Mandatory Conversion Date</u>").  Notwithstanding the foregoing, during the first 45 trading days post Effective Date, a Mandatory Conversion will be deemed to have occurred if the volume weighted average price of Reorganized PEC Common Stock exceeds 150% of the plan common equity value for at least 10 trading days in a 20 consecutive day trading period, including each of the last 5 days of the 10 trading days when the threshold is achieved.

If the Mandatory Conversion occurs within the first 36 months after the Effective Date, the Conversion Price applicable to such Mandatory Conversion shall also be adjusted to reflect the amount of preferred dividends that would otherwise have been payable within the first 36 months to the extent not already paid (such additional amount, the "<u>Makewhole Amount</u>").  In connection with any Mandatory Conversation after the first 36 months after the Effective Date, the Conversion Price shall only be adjusted for accrued but unpaid dividends as of, but not including, the Mandatory Conversion Date.

<u>Conversion by Holders</u>.  At any time following the Effective Date, if holders of at least 66 2/3% of all outstanding Preferred Equity (the "<u>Electing Holders</u>") elect to convert the Preferred Equity held by them, then all Preferred Equity then outstanding that is not held by the Electing

Holders shall automatically convert at the same time and on the same terms as the Preferred Equity held by the Electing Holders. The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable).

(g)   Conversion Upon a Fundamental Change. The Preferred Equity will also automatically convert into shares of Reorganized PEC Common Stock upon occurrence of a fundamental change such as a merger or sale of substantially all the assets of Reorganized PEC, among other specified events as set forth in the Plan.

(h)   Voting and Anti-Dilution Protection. The Preferred Equity contains customary protections against dilution and voting. The Preferred Equity shares are also entitled to vote with the Reorganized PEC Common Stock, though such shares may also have the right to vote as a separate class with respect to certain matters specific to holders of Preferred Equity.

## 2.    Private Placement Commitment Premiums

38.    The Debtors will pay the Private Placement Parties in respect of the Private Placement (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "Private Placement Commitment Premium") and (ii) a 2.5% monthly ticking premium beginning on April 3, 2017 until the Effective Date (with proration for partial months) (the "Private Placement Ticking Premium" and, together with the Private Placement Premium, the "Private Placement Premiums"). Such payments will be paid to the Private Placement Parties according to the distribution scheme contained in the Private Placement Agreement.

39.    The Private Placement Commitment Premium will be fully earned and nonrefundable upon approval of the Private Placement Agreement by the Court. The Private Placement Ticking Premium will be fully earned and nonrefundable as accrued through the Effective Date.

## 3.    Private Placement Agreement Effectiveness and Termination

40.    The Private Placement Agreement contains the following terms regarding effectiveness and termination:

(a)     <u>Effectiveness</u>.  The Private Placement Agreement will become effective upon execution and delivery of such agreement by the Debtors and each Private Placement Party and the entry of the Private Placement and Backstop Approval Order.

(b)     <u>Conditions Precedent</u>.  The effectiveness of the Private Placement Agreement is subject to customary conditions precedent, including without limitation:

(1)     The Company Group must have at least $600 million in cash on hand on the Effective Date of the Plan;

(2)     The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date of the Plan (subject to certain exclusions and other limitations under the Plan), provided that, except in the event of a Full First Lien Full Cash Recovery (as defined in the Plan), no more than $1.5 billion of such outstanding funded debt may be first lien debt;

(3)     The claim asserted by the United Mine Workers of America 1974 Pension Plan shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee if for an amount above the amounts held in reserve by the Debtors for such claim;

(4)     the PSA must remain in effect through the Effective Date;

(5)     no event or events shall have occurred or exist that constitute, individually or in the aggregate, a Material Adverse Event (as defined in the Plan);  and

(6)     the other conditions precedent to the Effective Date of the Plan shall have been satisfied or waived in accordance with the terms of the Plan.

The foregoing conditions will be waivable by (a) the Debtors and (b) the Requisite Noteholder Parties in accordance with the Plan.

(c)     <u>Termination</u>.  The commitments of the Private Placement Parties and the Debtors' obligations to consummate the transactions contemplated in connection with the Private Placement Agreement will be subject to customary termination events (each a "<u>Termination Event</u>"), including, without limitation, the occurrence of any event that would give any party to the Plan Support Agreement  the right to terminate its obligations thereunder, including without limitation, the PSA Termination Condition.

**Upon the occurrence of a Termination Event, all of the Private Placement Parties', Backstop Parties' (as defined below) and Debtors' obligations**

under the Private Placement Agreement and the Backstop Commitment Agreement, respectively, will automatically terminate. Upon termination, the Debtors will have no ongoing obligations or liabilities under the Private Placement Agreement or the Backstop Commitment Agreement (including the payment of the Commitment Premiums (as defined below), except for the Debtors' indemnification obligations; <u>provided</u> that such termination shall not relieve a party of liability for any pre-termination breach, or (subject to entry of the Private Placement and Backstop Approval Order) relieve the Debtors of any obligations with respect to the Breakup Payments (to the extent payable pursuant to the terms thereof) and/or the Expense Reimbursement.

**4.      The Private Placement Agreement Fiduciary Termination Event**

41.      The Private Placement Agreement includes a fiduciary termination event for the Debtors by which the Debtors may not shop or solicit alternative restructurings, but may consider any alternative restructuring brought to them. The Breakup Payments and Expense Reimbursement (each as defined below) will be payable upon exercise by the Debtors of the fiduciary termination event in accordance with the terms of the Private Placement Agreement after entry of the Private Placement and Backstop Approval Order.

**F.      The Backstop Commitment Agreement**

42.      As discussed above, the Section 1145 Rights Offering is the other significant source of funding for distributions to certain holders of allowed claims under the Plan. In connection with the Plan, and as contemplated by the Plan Support Agreement, holders of allowed Claims in Classes 2A-2D and Class 5B as of the Record Date[22] under the Plan (the "<u>Rights Offering Eligible Creditors</u>") will have the right to participate in the Section 1145 Rights Offering. The Section 1145 Rights Offering will provide each such holder of an allowed claim in the relevant classes with (i) the right to purchase a pro-rata share of $750 million in Reorganized PEC Common Stock at a 45 percent discount to Plan Equity Value and (ii) in

---

[22]      "<u>Record Date</u>" means the date on which the order approving the Disclosure Statement is entered by the Bankruptcy Court.

connection with such purchase, warrants (the "<u>Rights Offering Penny Warrants</u>") exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date of the Plan (such rights, collectively, the "<u>Section 1145 Equity Rights</u>").

43.    To ensure that the Debtors will receive the entire $750 million in proceeds from the Section 1145 Rights Offering, the Debtors propose to enter into the Backstop Commitment Agreement with the Noteholder Co-Proponents and any Additional Backstop Parties[23] (collectively, the "<u>Backstop Parties</u>") that may elect to join the Backstop Commitment Agreement and Plan Support Agreement in accordance with the terms of each such agreement. Under the Backstop Commitment Agreement, the Noteholder Co-Proponents have committed to exercise any subscription rights that remain unfulfilled at the conclusion of the Section 1145 Rights Offering.

### 1.    Obligations of the Debtors under the Backstop Commitment Agreement

44.    The key obligations of the Debtors specific to the Backstop Commitment Agreement are as follows:[24]

> (a)    <u>Backstop Premiums</u>. The Debtors will pay to the Backstop Parties (i) a premium equal to 8.0 percent of the $750 million committed amount (the "<u>Backstop Commitment Premium</u>") and (ii) a 2.5% monthly ticking premium beginning on April 3, 2017 until the Effective Date (with proration for partial months) (the "<u>Backstop Ticking Premium</u>" and,

---

[23]    "<u>Additional Backstop Parties</u>" means, collectively, each party that is that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor under the Plan (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims under the Plan and that agrees to participate in the Backstop Commitment by joining the Backstop Commitment Agreement and the Plan Support Agreement in accordance with the terms of each such agreement. Holders of Claims will have the opportunity to become Backstop Parties under the Backstop Commitment Agreement prior to the date that is 20 business days following the filing of this Motion.

[24]    The description of the Backstop Commitment Agreement is intended for the convenience of the Court and does not supersede the terms of the Backstop Commitment Agreement attached hereto as <u>Exhibit C</u>. To the extent of any inconsistency between the description herein and the Backstop Commitment Agreement, the terms of the Backstop Commitment Agreement shall control. Capitalized terms not otherwise defined in this summary have the meanings given to them in the Backstop Commitment Agreement.

together with the Backstop Commitment Premium, the "Backstop Premiums" and together with the Private Placement Premiums, the "Commitment Premiums"), payable upon entry of the Private Placement Agreement and Backstop Approval Order.  Such payments will be paid to the Backstop Parties according to the distribution scheme contained in the Backstop Commitment Agreement.

The Backstop Commitment Premium will be fully earned and nonrefundable upon approval of the Backstop Commitment Agreement by the Court.  The Backstop Ticking Premium will be fully earned and nonrefundable as accrued through the Effective Date.

(b)    Penny Warrants.  On the Effective Date, the Debtors will issue warrants (the "Penny Warrants") exercisable for 5 percent of the fully diluted Reorganized PEC Common Stock as of the Effective Date, half of which will be paid to the Noteholder Co-Proponents and half of which will constitute Rights Offering Penny Warrants.

The Penny Warrants will have the following terms:

(1)    Date of Issuance: the Effective Date;
(2)    Exercise Price: $0.01 per share of Reorganized PEC Common Stock;
(3)    Term: 90 days;
(4)    Exercise Trigger: exercisable from and after the Effective Date.

### 2.    Backstop Commitment Agreement Fiduciary Termination Event

45.    The Backstop Commitment Agreement contains a fiduciary termination event provision for the Debtors substantially similar to the fiduciary termination event provisions in the Private Placement Agreement.

### G.    Costs Under the Private Placement Agreement and the Backstop Commitment Agreement

46.    Under the terms of the Private Placement Agreement and the Backstop Commitment Agreement, the Debtors have agreed to certain payments and expense reimbursements as further outlined below.

(a)    Breakup Payments.  If, following entry of the Private Placement and Backstop Approval Order, either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any

reason other than occurrence of the PSA Termination Condition, each of the following will be payable in cash:

(1)    a termination payment of 8% of the $750 million committed amount shall be paid to the Private Placement Parties in accordance with the distribution scheme in the Private Placement Agreement, and

(2)    a termination payment of 8% of the $750 million committed amount shall be paid to the Backstop Parties (as defined below) in accordance with the distribution scheme in the Backstop Commitment Agreement (collectively, the "Breakup Payments").

If owed, the Breakup Payments will be payable in lieu of the Private Placement Premiums, the Backstop Premiums and half of the Penny Warrants.

(b)    Expense Reimbursement. In accordance with and subject to the entry of the Private Placement and Backstop Approval Order, the Debtors will pay all reasonably incurred and documented out-of-pocket costs and expenses incurred in connection with the Debtors' chapter 11 cases after the Petition Date of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any costs incurred on behalf of any noteholders through the applicable indenture trustee and any costs that have accrued and would otherwise continue to accrue as administrative claims of certain Noteholder Co-Proponents under the Final DIP Order), including the costs and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "Expense Reimbursement"), in each case whether or not the Restructuring is ultimately consummated; occurrence of any Termination Event (as defined in Exhibit 5 to the term sheet attached to the Plan Support Agreement), in each case whether or not the Restructuring is ultimately consummated; provided no such costs shall be payable in the event the PSA Termination Event occurs; and provided further that upon the occurrence of any Termination Event (other than the PSA Termination Event), any and all costs and expenses accrued and unpaid as of such date (whether or not such costs and expenses have been billed or invoiced) shall be paid by the Debtors.

(c)    The payment of the costs set forth in this section shall (i) be approved upon entry of the Private Placement and Backstop Approval Order; (ii) be payable within two weeks of receipt of an invoice; and (iii) prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis pursuant to Exhibit 5 to the term sheet attached to the Plan Support Agreement.

(d)    <u>Priority and Treatment</u>.  The Expense Reimbursement shall be entitled to administrative expense priority, and the Breakup Payments payable shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(1) In the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth in the Replacement First Lien Term Sheet, including no greater amount of first lien notes than would be issued in accordance with the Replacement First Lien Term Sheet) that is equal to the allowed amount of the First Lien Lender Claims, then such costs shall be paid in cash on the Effective Date on such Plan;

(2) In the event the conditions set forth in subsection (1) do not occur, then the Breakup Payments and the administrative expense claim on account of such Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the costs which are on terms consistent with the terms of the New Second Lien Notes set forth in <u>Exhibit 2</u> to the term sheet attached to the Plan Support Agreement;  provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing Intercreditor Agreement governing the First Lien Claims and Second Lien Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes.

47.    The Debtors will have no obligation to make any payment on account of the Expense Reimbursement if (i) the PSA Termination Condition Occurs prior to the date of entry of the Private Placement and Backstop Approval Order or (ii) the Private Placement and Backstop Approval Order is not entered by the Bankruptcy Court.

## H.    The Section 1145 Rights Offering Procedures

48.    The Debtors seek authority to utilize the Section 1145 Rights Offering Procedures attached hereto as <u>Exhibit D</u> to effectuate the Section 1145 Rights Offering.  Key provisions of

the Section 1145 Rights Offering Procedures include the following:

(a)   The "Record Date" to determine the holders of allowed Claims in Classes 2A-D and Class 5B that are eligible to participate in the Section 1145 Rights Offering will be January 26, 2017.

(b)   By February 7, 2017, the Debtors' claims and noticing agent, Kurtzman Carson Consultants, LLC (the "Subscription Agent"), will mail a copy of the following to the Rights Offering Eligible Creditors: (a) the Section 1145 Rights Offering Procedures, (b) the subscription agreement for the Section 1145 Rights Offering (the "Subscription Agreement") and (c) as applicable, a beneficial holder subscription form for the Section 1145 Rights Offering (the "Beneficial Holder Subscription Form").

(c)   To exercise its Equity Rights, a Rights Offering Eligible Creditor must return a duly executed Subscription Agreement and, if applicable, a duly completed and executed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its beneficial nominee, as applicable, so that such documents are actually received by the Subscription Agent on or before March 1, 2017 at 5:00 p.m. New York City Time (the "Subscription Expiration Deadline").

(d)   Any Rights Offering Eligible Creditor who does not return a duly Executed Subscription Agreement or applicable Beneficial Holder Subscription Form such that the documents are actually received by the Subscription Expiration Deadline will not be entitled to participate in the Section 1145 Rights Offering.

49.   The Debtors will utilize the services of their existing claims and noticing agent, Kurtzman Carson Consultants, LLC, for purposes of acting as the Subscription Agent.

## LEGAL BASIS FOR RELIEF REQUESTED

50.   Granting the relief requested in this Motion is appropriate under sections 105(a) and 363(b) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code under equitable common law principles.

51.     Section 363(b)(1) of the Bankruptcy Code provides that "the [debtor] after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate."  11 U.S.C. § 363 (b)(1).  Courts approve transactions under section 363 of the

Bankruptcy Code using a "business judgment" standard.  See, e.g., Meyers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to

a trustee's judgment concerning use of property under section 363(b) when there is a legitimate

business justification); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (same); In re

Trilogy Dev. Co., LLC, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. Aug. 31, 2010)

("The decision to enter into an agreement out of the ordinary course of a debtor's business is to

be based on the reasonable business judgment of the debtor.") (internal citation omitted).

52.     A debtor has the burden of establishing that a valid business purpose exists for the

use of estate property in a manner outside the ordinary course of business.  See In re Channel

One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing In re Lionel Corp.,

722 F.2d at 1071); see also Trilogy, 2010 Bankr. LEXIS 5636, at *3-4 ("The court should

approve a use, sale or lease of property under Bankruptcy Code Section 363(b) if the debtor has

established some articulated business justification for the proposed transaction.") (internal

citation omitted).

53.     Under the business judgment rule, there is a presumption that, "in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interest of the company."  See Seidl v. Am.

Century Cos., 799 F.3d 983, 990 (8th Cir. 2015) (internal citations omitted).  Accordingly, the

business judgment test "is not an onerous one" and may be satisfied "'as long as [the proposed

action] *appears* to enhance [the] debtor's estate.'"  See Crystalin, L.L.C. v. Selma Props. (In re

Crystalin, L.L.C.), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting Four B. Corp. v. Food

Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567 n.16 (8th Cir. 1997)

(emphasis in original).

     54.    Business judgment is a "deferential standard."  See Seidl, 799 F.3d at 990

("[U]nless the directors abused their discretion, the court will respect their judgment and will not

review the substance of the directors' underlying decision.").  As such, courts in this District and

others have consistently been reluctant to interfere with corporate decisions unless "it is made

clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the

officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate

information or study, are made in bad faith, or are in violation of the Bankruptcy Code." In re

Farmland Indus., Inc., 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (citing In re United Artists

Theatre Co., 315 F.3d 217, 233 (3d Cir. 2003), Richmond Leasing Co. v. Capital Bank, N.A.,

762 F.2d 1303, 1309 (5th Cir. 1985) and In re Defender Drug Stores, Inc., 145 B.R. 312, 317

(B.A.P. 9th Cir. 1992)); see also In re Food Barn Stores, Inc., 107 F.3d at 567 n.16 ("Where the

[debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally

grant approval 'as long as [the proposed action] appears to enhance [the] debtor's estate.'")

(quoting Richmond Leasing Co., 762 F.2d at 1309)).

**A.    The Debtors' Entry into the Plan Agreements is a Valid Exercise of the Debtors' Business Judgment**

     55.    The Debtors' entry into the Plan Agreements represents a sound exercise of the

Debtors' business judgment.  Collectively, the consummation of the transactions contemplated

under these agreements will provide the Debtors with the capital necessary to deleverage their

balance sheet, fund required distributions under the Plan and operate their business in an optimal

and stable manner after exiting these cases.  In this regard, the Plan Agreements and the funding

that is contemplated thereunder are essential to maximizing creditor recoveries in these cases, while still leaving the Reorganized Debtors with adequate liquidity and a capital structure that will allow the Debtors to weather both good and bad business cycles.

56.    There are costs associated with obtaining the funding contemplated under the Private Placement Agreement and Backstop Commitment Agreement, to include:

- the Commitment Premiums;

- the Breakup Payments; and

- the Expense Reimbursement (collectively, the "Costs").

57.    The Debtors submit these costs are necessary under the circumstances.  The Debtors' commitment to pay these Costs was essential to inducing the Noteholder Co-Proponents to agree to provide a backstop, as the case may be, for a $1.5 billion equity infusion and to enter into the Private Placement Agreement and the Backstop Commitment Agreement in a highly volatile and uncertain coal industry environment.  The Debtors and other parties to the Plan Agreements and their respective professionals all participated in vigorous and arms-length negotiations with respect to the specific terms and amount of the Costs.  Based upon these negotiations, and considering the recent volatility in the coal industry, the Debtors believe the Costs fairly reflect the risk taken by the Noteholder Co-Proponents to commit to a substantial equity investment in the Debtors.  Indeed, to the Debtors' knowledge, this is the only coal case in recent years in which investors were willing to invest new equity capital in connection with a chapter 11 plan, and this is among the largest equity investments in a debtor in any industry in recent years.

58.    In sum, the Plan Agreements provide the financial basis to allow the Debtors to timely exit these cases with adequate liquidity to operate their business in the normal course through any commodity environment, with a rational and "cycle proof" capital structure in a

highly volatile and unpredictable industry and with sufficient funds to make distributions under the Plan. While there is no basis to believe that a delay in the plan confirmation process will allow for a plan structure that provides greater recoveries to creditors or that will garner greater creditor support, the terms of each of the Plan Agreements provide the Debtors with some measure of flexibility if an alternate plan proposal ultimately requires the Debtors to pursue a different restructuring strategy. The Debtors may avoid any obligations under the Plan Agreements if another party submits a superior plan proposal prior to the entry of an order approving this Motion, and, after entry of such order, the Debtors may still exercise termination rights, if they pay the Breakup Payments and Expense Reimbursement. At this moment, however, no alternative proposal exists, and, given the state of the coal industry, the receipt of a better proposal that significantly increases creditor recoveries in these cases is unlikely. As such, the Debtors submit that their entry into the Plan Agreements and the authorization to pay the related Costs is appropriate and justified under the circumstances.

**B.      The Section 1145 Rights Offering Meets the Requirements of 11 U.S.C. § 1145**

59.      Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state and local securities laws (subject to certain exceptions) if the following requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; and (b) the securities must be issued in exchange for a claim against, an interest in or a claim for an administrative expense in the case concerning, the debtor, or principally in exchange for such a claim or interest and partly for cash or property. Here, there is no question that the subscription rights that the Rights Offering Eligible Creditors will receive are securities offered and sold under a plan and securities of a debtor (PEC).

60.     The Plan also contemplates distributing the subscription rights principally in exchange for the claims of the Rights Offering Eligible Creditors.  As noted above, the Rights Offering Eligible Creditors consist of holders of allowed Claims in Class 2A-2D and Class 5B as of the Record Date under the Plan.

61.     Consistent with past SEC precedent, when a creditor holds a claim with a value that exceeds the purchase price of securities under a Plan, the sale of such securities to such creditor falls under section 1145.  See, e.g, Barry's Jewelers, Inc, SEC No-Action Letter, 1998 SEC No-Act LEXIS 735 (July 20, 1998) (taking no action under plan where creditor purchased new equity for approximately $7.5 million in exchange for claims valued between $13.6 to $23 million dollars); Gateway Medical Systems, Inc., SEC No-Action Letter, 1987 WL 107453 (Jan. 12, 1987) (taking no action with respect to the issuance of new common stock to chapter 11 debtor's creditors where the value of the claims to be exchanged by such creditors exceeded the value of certain equipment to be contributed by such creditors); Bennett Petroleum Corporation, SEC No-Action Letter, 1983 WL 28907 (Dec. 27, 1983) (taking no enforcement action where cash tendered for new securities was equal to 75 percent of the value of old securities to be surrendered); Jet Florida System, Inc., SEC No-Action Letter, 1987 WL 107448 (Jan. 12, 1987) (taking no action where the ratio of the subscription cost of new securities to the value of claims surrendered was approximately 75 percent).  Here, with respect to all Rights Offering Eligible Creditors, the value of their claims (i.e. the value such creditors will receive from distributions under the Plan) far exceed the cost of exercising their subscription rights.  As such, the subscription rights the Rights Offering Eligible Creditors will receive under the Plan are principally in exchange for the Rights Offering Eligible Creditors' claims and partly for cash or property and fall within the exemption set forth in section 1145 of the Bankruptcy Code.

C.    **The Section 1145 Rights Offering Procedures Are Appropriate**

62.    As described above, the capital that the Section 1145 Rights Offering will provide is an essential component of the Plan and the Debtors' ability to exit chapter 11.  The Debtors structured the Section 1145 Rights Offering in a manner that will allow all holders of allowed claims in Classes 2A-2D and Class 5B under the Plan to participate in the offering.

63.    Courts in this and other Districts have approved similar procedures pursuant to which a debtor is authorized to conduct a rights offering. See, e.g., In re Patriot Coal Corp., No. 12-51502-659 (Bankr. E.D. Mo. Nov. 7, 2013); In re Eastman Kodak Co., No. 12-10202 (Bankr. S.D.N.Y. Jun. 26, 2013); In re Harry & David Holdings, Inc.; No. 11-10884 (MFW) (Bankr. D. Del. Jun. 24, 2011); In re Loehmann's Holdings, Inc., No. 10-16077 (Bankr. S.D.N.Y. Jan. 3, 2011); In re AbitibiBowater Inc., No. 09-11296 (KJC) (Bankr. D. Del. Aug. 3, 2010); In re Cooper-Standard Holdings Inc., No. 09-12743 (PJW) (Bankr. D. Del. Mar. 26, 2010).

64.    Based upon the above, the Debtors believe that approval of the Section 1145 Rights Offering Procedures, and the implementation of the Section 1145 Rights Offering in accordance with the Section 1145 Rights Offering Procedures and the Plan is an appropriate exercise of their business judgment and should be authorized.

## NOTICE

65.    In accordance with the *Order Establishing Certain Notice, Case Management and Administrative Procedures* (Docket No. 114) (the "Case Management Order"), notice of this Motion has been given to (a) all parties on the Master Service List (as defined in the Case Management Order); (b) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service and (c) counsel of record in each of the parties to the Plan Support Agreement.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## REQUEST FOR IMMEDIATE EFFECTIVENESS OF ORDER

66.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062,

9014 or otherwise, the Debtors request that the terms and conditions of this Order be

immediately effective and enforceable upon its entry.

## NO PRIOR REQUEST

67.    No prior request for the relief sought in this Motion has been made to this or any

other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order

substantially in the form posted on the Debtors' case website, granting the relief requested herein;

and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: December 22, 2016                    Respectfully submitted,
       St. Louis, Missouri

                                            /s/ Steven N. Cousins
                                            Steven N. Cousins, MO 30788
                                            Susan K. Ehlers, MO 49855
                                            Armstrong Teasdale LLP
                                            7700 Forsyth Boulevard, Suite 1800
                                            St. Louis, MO  63105
                                            Telephone:  (314) 621-5070
                                            Facsimile:  (314) 612-2239
                                            Email:  scousins@armstrongteasdale.com
                                            Email:  sehlers@armstrongteasdale.com

                                            Heather Lennox (admitted *pro hac vice*)
                                            Jones Day
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, OH  44114
                                            Telephone:  (216) 586-3939
                                            Facsimile:  (216) 579-0212

                                            Amy Edgy (admitted *pro hac vice*)
                                            Daniel T. Moss (admitted *pro hac vice*)
                                            Jones Day
                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C.  20001-2113
                                            Telephone:  (202) 879-3939
                                            Facsimile:  (202) 626-1700

                                            *Attorneys for Debtors and*
                                            *Debtors in Possession*

# **EXHIBIT A**

Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT dated December 22, 2016 (this "Agreement") is made by and among the following parties:

(i) Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors" or the "Company"), that have commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on April 13, 2016 (the "Petition Date");

(ii) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacities, the "First Lien Agent") under the First Lien Credit Agreement (as defined below) and certain First Lien Lenders party hereto (excluding, for the avoidance of doubt, the Noteholder Co-Proponents (defined below)), together with the First Lien Agent, (the "First Lien Lender Co-Proponents"), each holding the principal funded debt obligations (including via participations) of the Debtors set forth on their signature pages hereto, including any First Lien Lenders that subsequently enter into this Agreement;

(iii) PointState Capital LP ("PointState"), Contrarian Capital Management L.L.C. ("Contrarian"), Panning Capital Management, LP ("Panning") and the South Dakota Investment Council ("SDIC," together with PointState, Contrarian and Panning, the "Ad Hoc Secured Committee Members"), each holding or advising funds or managed accounts who beneficially hold the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(iv) Elliott Management Corporation and certain of its affiliates (collectively, "Elliott"), Discovery Capital Management and certain of its affiliates (collectively, "Discovery Capital") and Aurelius Capital Master Ltd. and ACP Master, Ltd. (collectively, "Aurelius" and, together with Discovery Capital and Elliott, the "Ad Hoc Unsecured Noteholders Group" and together with the Ad Hoc Secured Committee Members (the "Noteholder Co-Proponents," and, Noteholder Co-Proponents together with the First Lien Lender Co-Proponents, the "Creditor Co-Proponents"), each holding the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(v) any holder of Second Lien Notes or Unsecured Senior Notes (each, as defined below) that subsequently enters into this Agreement (the "Additional Supporting Parties" and the Additional Supporting Parties together with the Creditor Co-Proponents, the "Supporting Creditor Parties"), each holding the principal funded debt obligations of the Debtors to be set forth on their signature pages hereto; and

(vi) each transferee of debt under the First Lien Credit Agreement, the Second Lien Notes or the Unsecured Senior Notes that becomes a party in accordance with Section 8(b) of this Agreement.

Each of the parties named above is a "Party," and collectively they are the "Parties."  All capitalized terms not defined herein have the meanings ascribed to them in the Restructuring Term Sheet (as defined below and as attached hereto as Exhibit 1).

## RECITALS

WHEREAS, on April 13, 2016, the Debtors commenced the Chapter 11 Cases under chapter 11 the Bankruptcy Code in the Bankruptcy Court, which Chapter 11 Cases have been consolidated by order of the Bankruptcy Court for procedural purposes only and are being jointly administered under case number 16-42529 (BSS).   References in this Agreement to pleadings, orders and other filings and related docket numbers are to such pleadings, orders and other filings filed or entered in the Chapter 11 Cases;

WHEREAS, the transactions contemplated and outlined in this Agreement (the "Restructuring") shall be embodied within the Plan, which shall address, among other things, the following principal funded debt obligations of the Debtors:

(a)    that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "First Lien Credit Agreement");

(b)    those certain 10.00% senior secured second lien notes issued in March 2015 by PEC and due in March 2022 (the "Second Lien Notes"); and

(c)    (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes"); and

(d)    those certain 4.75% convertible junior subordinated debentures issued on December 20, 2006 by PEC and due in 2066 (the "Convertible Subordinated Notes," and such claims arising therefrom, the "Unsecured Subordinated Debenture Claims").

WHEREAS, the Debtors and the Initial Supporting Parties have engaged in arm's length, good-faith discussions, including in connection with Bankruptcy Court-ordered mediation overseen by the Honorable James L. Garrity regarding the CNTA Dispute, and regarding the Restructuring pursuant to a chapter 11 plan of reorganization (the "Plan") to be proposed by the Debtors and the Creditor Co-Proponents in the Chapter 11 Cases, which Plan shall contain the terms and conditions set forth in, and be consistent in all material respects with, the Restructuring Term Sheet;

NAI-1502345833v1

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 55 of 876 PageID
#: 1002

WHEREAS, to ensure a more orderly Plan confirmation process, the Debtors and the Initial Supporting Parties desire to allow the Additional Supporting Parties to join in this Agreement and participate in the Backstop Commitment Agreement and Private Placement Agreement on the terms and conditions set forth in the Restructuring Term Sheet and to be embodied in the Backstop Commitment Agreement and Private Placement Agreement;

WHEREAS, in furtherance of the Restructuring, the Debtors have requested each Party to support the Plan in accordance with this Agreement;

WHEREAS, the applicable board of directors, members or managers of each of the Debtors have approved the Restructuring Term Sheet and the applicable Debtor's entry into this Agreement;

WHEREAS, each of the Supporting Creditor Parties has received the requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' agreement concerning their respective rights and obligations in respect of the Restructuring.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    Proposed Restructuring.**    The principal terms of the Restructuring are set forth on the term sheet attached hereto as <u>Exhibit 1</u> (as such term sheet may be modified in accordance with <u>Section 14</u> hereof and together with all exhibits, annexes, schedules, appendices and amendments thereto, the "<u>Restructuring Term Sheet</u>").   The Restructuring will be implemented pursuant to various agreements and related documentation, including, without limitation, the following documents required to implement the Restructuring, which documents shall be consistent in all material respects with the Restructuring Term Sheet and this Agreement, shall be executed (if such document requires execution), and shall be filed with the Bankruptcy Court (the "<u>Plan Documents</u>") shall be subject to the consent rights of the Requisite Creditor Parties[1]  as set forth herein, in each case as applicable in accordance with the Milestones set forth in the Restructuring Term Sheet:

---

[1]    "Requisite Creditor Parties" shall mean the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders.    "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.    "Requisite Consenting Noteholders" shall mean "Requisite Members of the Noteholder Steering Committee" or the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule as set forth in <u>Exhibit 8</u> to the Restructuring Term Sheet. "Requisite Members of the Noteholder Steering Committee" shall mean 75% of the Noteholder Steering Committee, based on combined Class 2 and Class 5 holdings as set

-3-

(i)      the Plan;

(ii)     the disclosure statement related to the Plan (the "<u>Disclosure Statement</u>");

(iii)    the materials related to the solicitation of votes to accept or reject the Plan (the "<u>Solicitation Materials</u>");

(iv)    the order approving the Disclosure Statement and the Solicitation Materials (the "<u>Disclosure Statement Order</u>");

(v)     the credit agreement and/or indenture for the Exit Facility (the "<u>Exit Facility Documentation</u>") (if applicable);

(vi)    the credit agreement for the Replacement Secured First Lien Term Loan (if applicable);

(vii)   the documents relating to the Section 1145 Rights Offering and the Private Placement, including, but not limited to the Private Placement Agreement and the Backstop Commitment Agreement and the orders approving same;

(viii)  the indenture for the New Second Lien Notes (if applicable);

(ix)    the Confirmation Order;

(x)     the exhibits, supplements and appendices to the Plan;

(xi)    the Registration Rights Agreement; and

(xii)   all other documents necessary for the implementation of the Plan and the transactions contemplated therein.

Nothing contained in this section shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet set forth in <u>Section 14</u> hereof.

**Section 2.      Exhibits Incorporated by Reference.**

Each of the exhibits attached hereto, including, without limitation, the Restructuring Term Sheet, is expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless specified otherwise, shall include such exhibits.   In the

---

forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; <u>provided</u>, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member.   The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

### Section 3.    First Lien Lender Co-Proponents' Commitments.

      3.01.    <u>Agreement to Support the Restructuring and Vote on the Plan</u>.    Subject to the conditions contained in <u>Section 3.02</u> hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each member of the First Lien Lender Co-Proponents agrees that it shall:

      (a)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

      (b)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the First Lien Lender Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

      (c)    not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

      (d)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

      (e)    not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

      (f)    not directly or indirectly take an action to direct the First Lien Agent, to undertake any action set forth in <u>Sections 3.01(c)</u> , <u>(d) or (e)</u> hereof, <u>provided</u>, <u>however</u>, that except to the extent required by the terms of the First Lien Credit Agreement

documents or by applicable law, the First Lien Agent shall be permitted to exercise its duties and obligations under the First Lien Credit Agreement documents in accordance with this Agreement and, subject to its obligations under this Agreement, the First Lien Agent may grant or withhold its consent or approval without instructions;

        (g)     if applicable, negotiate in good faith the definitive documents for the Replacement Secured First Lien Term Loan on terms consistent with those set forth on Exhibit 1 to the Restructuring Term Sheet; and

        (h)     take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated this Agreement, the Plan and the Plan Documents (it being understood that the First Lien Lender Co-Proponents shall not be required to incur any out of pocket cost or expense other than professional fees, to the extent that such fees are entitled to payment pursuant to Section V of the Restructuring Term Sheet).

        3.02.    Certain Conditions.   The continuing obligations of each member of the First Lien Co-Proponents set forth in Section 3.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

        (a)     the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 to the Restructuring Term Sheet and otherwise in form and substance acceptable to the Requisite First Lien Lender Co-Proponents in their sole discretion;

        (b)     this Agreement, the Restructuring Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents; and

        (c)     the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents;

        (d)     each other substantive document in connection with the Restructuring (but excluding documents relating to the Bonding Solution), shall be reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the

First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan;

(e)    any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite First Lien Lender Co-Proponents, not to be unreasonably withheld, conditioned or delayed;

(f)    the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet; and

(g)    this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over the documents and/or agreements set forth in the foregoing Sections 3.02(a)-(e).    Notwithstanding any other provision of this Agreement to the contrary, upon the Debtors (i) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court, and (ii) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First Lien Agent or the First Lien Lenders or their respective Representatives, (2) this Agreement or (3) the Breakup Administrative Claim Treatment (as defined in Exhibit 5 to the Restructuring Term Sheet).

3.03.    Acknowledgement.    For so long as this Agreement is in effect, each holder of First Lien Lender Claims from time to time party hereto (whether such holder is a First Lien Lender Co-Proponent, an Additional Supporting Party or a transferee of debt under the First Lien Credit Agreement that becomes a party in accordance with Section 8(b) of this Agreement, in any such case, in its capacity as a holder of First Lien Lender Claims and, with respect to Citibank, N.A., also in its capacity as the First Lien Agent) consents to the Restructuring, including for purposes of Section 6.10(b) of that certain First Lien/Second Lien Intercreditor Agreement among PEC as the borrower, the other grantors party thereto, Citibank, N.A. as the Senior Representative for the First Lien Credit Agreement Secured Parties (as such terms are defined therein), U.S. Bank National Association as the Second Priority Representative for the Second Lien Indenture Secured Parties (as such terms are defined therein), and each additional Representative (as defined therein) from time to time party thereto, dated as of March 16, 2015; provided that the consent of a holder of First Lien Lender Claims pursuant to this Section 3.03 shall cease to be in effect (except to the extent otherwise agreed in writing by such holder) if such holder ceases to be a party to this Agreement in accordance with the terms hereof.

Section 4.    Noteholder Co-Proponents' Commitments.

4.01.    Agreement to Support the Restructuring and Vote on the Plan.    Subject to the conditions contained in Section 4.02 hereof, effective immediately upon execution by each

member of the Noteholder Co-Proponents as to such member, and enforceable against such member as set forth herein (including, for the avoidance of doubt, by each member of the Noteholder Co-Proponents against each other member of the Noteholder Co-Proponents) as long as this Agreement has not been terminated pursuant to the terms hereof, each Noteholder Co-Proponent agrees that it shall:

(a)     subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)     subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the Noteholder Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)     not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)     not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)     not directly or indirectly take an action to direct the indenture trustees under the Second Lien Notes or any of the Unsecured Senior Notes (each, an "<u>Agent</u>"), to undertake any action that a member of the Noteholder Co-Proponents is otherwise prohibited from undertaking pursuant to <u>Sections 4.01(c) , (d) or (e)</u> hereof; <u>provided</u>, <u>however</u>, that to the extent a member of the Noteholder Co-Proponents chooses to direct an Agent to not undertake an action that a member of the Noteholder Co-Proponents is otherwise prohibited

NAI-1502345833v1

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 61 of 876 PageID #: 7008
Case 16-42529   Doc 1834-1   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit A
- Plan Support Agreement   Pg 10 of 164

from undertaking pursuant to Sections 4.01(c), (d) or (e) hereof, such direction shall not be construed in any way as requiring any Noteholder Co-Proponent to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

(g)      take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, participating in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

4.02.      Certain Conditions.    The continuing obligations of each member of the Noteholder Co-Proponents, as set forth in Section 4.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)      each substantive document in connection with the Restructuring including, without limitation, the Plan Documents (but excluding documents related to the Bonding Solution), shall be in form and substance acceptable or reasonably acceptable, as the case may be, to the Requisite Members of the Noteholder Steering Committee or the individual members of the Noteholder Steering Committee as set forth in the Restructuring Term Sheet, provided, that the Noteholder Co-Proponents acknowledge that the terms of the Replacement Secured First Lien Term Loan shall be acceptable if such terms are consistent with Exhibit 1 to the Restructuring Term Sheet;

(b)      any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite Members of the Noteholder Steering Committee, not to be unreasonably withheld, conditioned or delayed;

(c)      the material terms of the Restructuring, the Private Placement Agreement and the Backstop Commitment Agreement, shall not have been amended, modified or supplemented without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet;

(d)      the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet, the Private Placement Agreement, the Backstop Commitment Agreement and this Agreement; and

(e)      this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee or the affected member of the Noteholders Steering Committee, as required under Exhibit 8 to the Restructuring Term Sheet.

-9-

NAI-1502345833v1

4.03.   Effect of Termination.   Notwithstanding any termination of this Agreement (except for any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to Exhibit 8 to the Restructuring Term Sheet)), and further notwithstanding anything to the contrary herein:

(a)   the obligations of each member of the Noteholder Co-Proponents to every other member of the Noteholder Co-Proponents pursuant to Sections 4.01(c), 4.01(d) and 4.01(f) above (Sections 4.01(c), (d), and (f), collectively, the "Surviving Obligations") shall survive such termination, absent express termination of the Surviving Obligations by the Noteholder Steering Committee pursuant to Exhibit 8 to the Restructuring Term Sheet;

(b)   if any of the Noteholder Co-Proponents shall participate, with respect to the Debtors, in any subsequent rights offering of any securities as a backstop party and/or in any subsequent private placement of any securities as a private placement party, then each of the other members of the Noteholder Co-Proponents shall have the rights to participate, in each of their sole discretion, in such subsequent rights offering and/or private placement on identical terms as the original participating member of the Noteholder Co-Proponents, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable;

(c)   each of the Noteholder Co-Proponents shall not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company that disproportionately adversely affects any member of the Noteholder Co-Proponents with respect to the treatment of such member's claims or recovery associated therewith, so long as such claims or recovery arise from or relate to the same debt issuance, security, or other instrument issued by the Debtors, or encourage or cause any party to do any of the foregoing;

(d)   for the avoidance of doubt, this Section 4.03 shall not, and shall not be deemed to, give any party other than a member of the Noteholder Co-Proponents any rights, remedies, or obligations against any member of the Noteholder Co-Proponents, and no other person or entity shall be a third party beneficiary of this Section 4.03;

(e)   for the avoidance of doubt, this Section 4.03 shall not apply in the event of any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to Exhibit 8 to the Restructuring Term Sheet) and in such case this Agreement, including the obligations set forth in this Section 4.03, and the Restructuring Term Sheet shall terminate;

(f)   nothing contained in this Agreement, including this Section 4.03, shall prohibit any member of the Noteholder Co-Proponents from directly or indirectly seeking, soliciting, or encouraging other parties in interest in these Chapter 11 Cases to join this Agreement pursuant to the terms hereof, or to propose modifications or amendments to this

-10-

Agreement, the Plan, the Backstop Commitment Agreement or the Private Placement Agreement pursuant to the applicable modification provisions contained in each respective document;

(g)    notwithstanding anything to the contrary in this Section 4.03, a member of the Ad Hoc Unsecured Noteholders Group will not be bound by the terms of this Section 4.03 so long as the member, during the Survival Period (as defined below), pursues and supports an agreement or order that provides (i) for the payment in full in cash of the Second Lien Notes Claims (including, without limitation, the payment of all post-petition interest at the default rate) (such agreement or order, a "Post-Termination Agreement," (as applicable) ), and (ii) the Unsecured Senior Notes Claims held by all Ad Hoc Secured Committee Members (as set forth in the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule) are treated in all respects in the identical manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, including, without limitation, any and all rights to participate, in each of the Ad Hoc Secured Committee Members' sole discretion, in any subsequent rights offering and/or private placement on identical terms and in an identical capacity and manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable.    To the extent a member of the Ad Hoc Unsecured Noteholders Group pursues such Post-Termination Agreement and related transactions that include the terms and conditions set forth in this paragraph, such member is required (x) to take all actions necessary to support, participate in, and/or vote for such Post-Termination Agreement, (y) not to take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in such Post-Termination Agreement, and (z) not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, consummation or implementation of the Post-Termination Agreement;

(h)    this Section 4.03 shall only survive termination of this Agreement for a period of sixty (60) calendar days following such termination, but in no event later than June 14, 2017 (such period, the "Survival Period");

(i)    any amendment, waiver, or termination of this Section 4.03 shall be subject to the express consent of the Noteholder Steering Committee pursuant to Exhibit 8 to the Restructuring Term Sheet; provided, however, the amendment or waiver of Sections 4.03 (h) or (i) will require the consent of each member of the Noteholder Steering Committee; and

(j)    this Section 4.03 shall be binding and enforceable solely with respect to the Noteholder Co-Proponents and may be amended, waived or terminated by the Noteholder Co-Proponents.    The Debtors and the First Lien Lender Co-Proponents have not agreed to, and will not be bound by, this Section 4.03, nor shall it in any way impact the Debtors' or the First Lien Lender Co-Proponents' ability to enforce the other provisions of this Agreement.

NAI-1502345833v1

**Section 5.    Additional Supporting Parties' Commitments.**

5.01.    <u>Agreement to Support the Restructuring and Vote on the Plan</u>.    Subject to the conditions contained in <u>Section 5.02</u> hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each Additional Supporting Party agrees that it shall:

(a)    subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)    subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each Additional Supporting Party may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)    not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)    not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)    not directly or indirectly take an action to direct an Agent to undertake any action that an Additional Supporting Party, as the case may be, is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof; <u>provided</u>, <u>however</u>, that to the extent an Additional Supporting Party chooses to direct an Agent to not undertake an action that an Additional Supporting Party is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof, such direction shall not be construed in any way

-12-

as requiring any Additional Supporting Party to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

(g)     take any and all reasonably necessary or appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, required participation in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

5.02.   Certain Conditions.   The continuing obligations of each Additional Supporting Party set forth in Section 5.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)     the material terms of the Restructuring Term Sheet, the Backstop Commitment Agreement and the Private Placement Agreement shall not have been materially altered, amended or modified without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet; and

(b)     this Agreement shall have not been terminated in accordance with the terms hereof.

Notwithstanding the foregoing, for the avoidance of doubt, the Additional Supporting Parties shall not have any consent or consultation rights with respect to any of the Plan Documents, except as otherwise set forth on Exhibit 8 to the Restructuring Term Sheet.

### Section 6.   Debtors' Commitments.

6.01.   Debtors' Commitments.   Subject to the approval of the Bankruptcy Court and the Debtors' fiduciary duties as set forth in Section 15.01 hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, the Debtors shall:

(a)     operate their businesses in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices, provided, however, that the foregoing obligations shall be satisfied in a manner consistent with the terms of the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet;

(b)     prepare the Plan Documents and any related documents, and distribute the applicable documents, each as set forth in Sections 3.02 and 4.02 herein, concurrently to the Initial Supporting Parties and their respective legal advisors thereof, as soon as reasonably practicable, but in no event less than at least two (2) calendar days before the date when the Debtors intend to file such document (and, if not reasonably practicable, as soon as reasonably practicable before filing) and afford reasonable opportunity to provide prompt comment and review to the respective legal and financial advisors for the Initial Supporting Parties in advance of any filing thereof provided the Debtors will provide advance draft copies of all Plan Documents to be filed with the Bankruptcy Court to the legal advisors

NAI-1502345833v1

of the Initial Supporting Parties no less than three (3) business days prior to filing such Plan Documents;

(c)       support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided therefor in this Agreement;

(d)       take any necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(e)       take no actions and not encourage any other person to take any actions, inconsistent with this Agreement or the Restructuring Term Sheet, or that would, or would reasonably be executed to, directly or indirectly, delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "Alternative Transaction"); provided, however, that the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of non-Debtor affiliates' assets in the ordinary course of business and consistent with past practice and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction;

(f)       timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement and the Plan Documents; and

(g)       take no actions to propose or otherwise consent to the entry of any order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, that is not acceptable to the Requisite Creditor Parties;

(h)       take no actions that would violate the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet (the "Interim Operating Covenant");

(i)       take no actions to sell, abandon, or otherwise dispose of any material assets of the Debtors and their non-Debtor affiliates, except as provided in the Interim Operating Covenant, without the prior written consent of the Requisite Creditor Parties; and

-14-

(j) if the Debtors know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Creditor Parties.

6.02. <u>Non-Solicitation Provision</u>. From and after the PSA Effective Date (the "<u>Non-Solicitation Period</u>"), the Debtors will not, and will not permit their subsidiaries or affiliates or any of their respective officers, directors, agents or representatives to initiate contact with, or solicit any inquiries, proposals or offers by any party (other than the Creditor Co-Proponents) with respect to an alternative restructuring; <u>provided</u>, <u>however</u>, that the Debtors, their subsidiaries, their affiliates or any of their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers received from any party (so long as such proposal was not obtained, pursued, facilitated or solicited by the Debtors or their subsidiaries, affiliates or their respective officers, directors, agents or representatives as described herein) with respect to an alternative restructuring. To the extent the Debtors, their affiliates, their subsidiaries or any of their respective officers, directors, agents or representatives receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall or shall cause their affiliates, subsidiaries or respective officers, directors, agents or representatives to, provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such inquiry, proposal or offer.

**Section 7.** **Right to Appear and Participate.** Nothing in <u>Sections 3.01, 4.01</u> and <u>5.01</u> hereof shall be deemed to limit any of the following rights of any Party, to the extent consistent with this Agreement and the Restructuring Term Sheet:

(a) to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance or participation and the positions advocated in connection therewith, including positions with respect to the CNTA Dispute, are not inconsistent with this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, and, other than as a result of actions or omissions any such Party takes or does not take in good faith to enforce its rights under this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, do not hinder, delay or prevent consummation of the Plan or the Plan Documents;

(b) to purchase, sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors, subject to the terms of <u>Section 8</u> hereof; or

(c) to enforce all rights under any applicable credit agreement, indenture or other loan document in existence as of the date hereof or under any applicable law.

**Section 8.** **Transfer of Claims.**

(a) Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Party to sell, use, assign, transfer, grant any

participation or other beneficial interest in, or otherwise dispose of ("Transfer") any claims as such term is defined in section 101(5) of the Bankruptcy Code (each a "Claim" and, collectively, the "Claims"); provided, however, that, for the period commencing as of the PSA Effective Date (as defined below) until the termination of this Agreement pursuant to the terms hereof, each Party agrees, solely with respect to itself, that it shall not Transfer any Claims, and any purported Transfer of Claims shall be null and void *ab initio*, unless (i) the transferee is a Party, or (ii) if the transferee is not a Party, such transferee delivers to the Company (in any manner permitted by Section 15.14 hereof) within three (3) business days of the Transfer an executed joinder to this Agreement in the form attached hereto as Exhibit 2 (a "Joinder Agreement") pursuant to which such transferee shall have assumed all obligations of the Party transferring such Claims and shall become a Party to this Agreement, provided, further that this provision shall not apply to a disposition in connection with a pledge or grant of a security interest in any Claim made in good faith by a Party in connection with any financing if such pledge agrees to vote the Claims in favor of the Plan, provided, further, that, if the transferor of the Claims is a Creditor Co-Proponent, the transferee of such Claims (or any subsequent transferee) shall not become or be deemed to become a Creditor Co-Proponent, and shall not undertake the commitments of the Creditor Co-Proponents under the Private Placement Agreement or the Backstop Commitment Agreement, but such transferee of such Claims shall become a Party to this Agreement as an Additional Supporting Creditor Party hereto.   The failure by a Party to comply with the Transfer procedure described in the first proviso of the immediately preceding sentence (resulting in such Transfer becoming null and void *ab initio*) shall not constitute a material breach for purposes of Section 12.02(h) hereof.

For the avoidance of doubt, to the extent not already a Party to this Agreement, a transferee of Claims under this Agreement shall become a Party to this Agreement with respect to any and all Claims owned by such Party, and any and all such Claims owned by such transferee party shall automatically and immediately upon joinder of such transferee party to this Agreement be deemed subject to all of the terms of this Agreement.   This Agreement shall in no way be construed to preclude any Party from acquiring additional Claims; provided, however, that any such additional Claims acquired by a Party shall automatically and immediately upon acquisition by such Party be deemed subject to all of the terms of this Agreement, whether or not notice of such acquisition is given to the Company, and that, so long as this Agreement has not been terminated, such Party shall vote (or cause to be voted) any such additional Claims in favor of the Plan in accordance and consistent with Sections 3.01(a), 4.01(a) and 5.01(a) hereof, as applicable, provided, further, that any and all Claims acquired by any member of the Noteholder Co-Proponents shall not be acquired in such party's capacity as an "Initial Party" (as defined in the Restructuring Term Sheet), but shall be acquired in such party's capacity as a "Phase Two Private Placement Party," "Additional Private Placement Party," "Phase Two Backstop Party," or "Additional Backstop Party," each as defined in the Restructuring Term Sheet, as applicable, provided, further, that in no event shall any such Transfer relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of delivery of such Joinder Agreement.

(b)     Notwithstanding Section 8(a):   (A) a Party may settle or deliver any Claims to settle pursuant to an agreement to Transfer such Claim entered into by such Party prior to the date of this Agreement pending as of the date of such Party's entry into this Agreement without the requirement that the transferee be or become a Party or execute a

-16-

Joinder Agreement (subject to compliance with applicable securities laws and it being understood that any Claims acquired and held (i.e., not as part of a short transaction) shall be subject to the terms of this Agreement); (B) a Party may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Party; provided that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Claims is to a transferee that is or becomes a Party at the time of such transfer; and (C) to the extent that a Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Claims that the Qualified Marketmaker acquires from a lender who is not a Party without the requirement that the transferee be or become a Party or execute a Joinder Agreement.

For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the public or applicable private markets as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in Claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims against the Company, and (y) is in fact regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

**Section 9.    Mutual Representations, Warranties, and Covenants.**    Each of the Parties individually represents, warrants, and covenants to each other Party, as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer), as follows (each of which is a continuing representation, warranty, and covenant):

9.01.    <u>Existence; Enforceability</u>.    It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is the legally valid and binding obligation of such Party (as to the Debtors, subject to the approval of the Bankruptcy Court), enforceable against it in accordance with its terms.

9.02.    <u>No Violation</u>.    The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (a) any provision of law, rule or regulation applicable to it or any of its subsidiaries, as applicable, or (b) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, as applicable, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries, as applicable, is a party.

9.03.    <u>No Consent or Approval</u>.    Except as expressly provided in this Agreement, and except for approval by the Bankruptcy Court with respect to the Debtors, no consent or approval is required by any other person or entity in order for it to carry out the transactions contemplated by, and perform the respective obligations under, this Agreement.

9.04.    <u>Power and Authority</u>.    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been

-17-

duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part (as to the Debtors, subject to the approval of the Bankruptcy Court).

      9.05.    <u>Supporting Creditor Parties' Representations</u>.   Each Supporting Creditor Party individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant):

      (a)    it (i) is either (A) the sole beneficial owner of or has binding commitments to purchase the aggregate principal amount of Claims set forth below its signature hereto, or (B) subject to <u>Section 15.17</u> below, has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement (subject, in the case of participations, to contrary directions to vote that may be received by the nominal owner(s) from other participation counterparties); (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and to dispose of, exchange, assign, and transfer such Claims; and (iii) holds no other Claims;

      (b)    other than pursuant to this Agreement, and subject to <u>Section 15.17</u> below, its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Supporting Creditor Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

      (c)    it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended); and

      (d)    it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of the Claims that are inconsistent or conflict with representations and warranties of such Supporting Creditor Party herein or that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder, either generally or with respect to any specific Claims.

    **Section 10.**    **No Waiver of Participation and Reservation of Rights and Ratification of Liability.**   This Agreement and the Restructuring Term Sheet evidence a proposed settlement of disputes, including, among other disputes, the CNTA Dispute, among the Parties.   Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of each of the Parties to protect and preserve its rights, remedies and interests.   Without limiting the foregoing sentence in any

way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated, or if this Agreement is terminated for any reason, each of the Parties fully reserves any and all of its rights, remedies, and interests.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement, the Restructuring Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any action, case, or proceeding other than an action, case or proceeding to enforce the terms of the foregoing agreements.

**Section 11.    Effectiveness.**   This Agreement shall become effective and enforceable (a) with respect to the Creditor Co-Proponents, upon the date of execution by each of the Creditor Co-Proponents; (b) with respect to the Debtors, on the date the Bankruptcy Court authorizes the Debtors to enter into this Agreement and (c) with respect to any other Party (the date of execution or joinder by such Party to this Agreement) (such date, the "PSA Effective Date").   Upon the PSA Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 12 hereof.

**Section 12.    Termination Events.**

12.01.   Debtors' Termination Events.   This Agreement may be terminated by the Debtors, in their sole discretion, following the occurrence of any of the following events (each, a "Debtor Termination Event"):

(a)     if holders of two-thirds (2/3) in amount of each of (i) the Second Lien Notes Claims and (ii) the Unsecured Senior Notes Claims have not joined this Agreement prior to the date on which the PPA and BCA Approval Order is entered (the "PSA Termination Condition"); provided, however, the Debtors may waive the PSA Termination Condition in their sole discretion, but may only exercise the PSA Termination Condition (or waive such condition) prior to entry of the PPA and BCA Approval Order, provided, further, however that the timely and valid exercise of the PSA Termination Condition shall relieve the Debtors from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations under the Backstop Commitment Agreement or the Private Placement Agreement;

(b)     the determination by any of the Company's boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(c)     the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d) following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that adversely and materially affects the Debtors' rights under this Agreement and is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(e) the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f) either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

(g) the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.02. Creditor Co-Proponents' Termination Events. This Agreement may be terminated by the Requisite First Lien Lender Co-Proponents or the Requisite Members of the Noteholder Steering Committee upon two (2) business days prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "Termination Event"):

(a) any Debtor accepts an Alternative Transaction, including, but not limited to filing with the Bankruptcy Court, or publically announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b) the Debtors deliver a Debtor Fiduciary Notice (as defined below) to the Creditor Co-Proponents;

(c) the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d) the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) a motion seeking approval of the Disclosure Statement and procedures for the solicitation of the Plan, and (iv) a motion seeking approval of the Backstop

Commitment Agreement and the Private Placement Agreement by no later than December 22, 2016;

(e)    the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the full amount of the Exit Facility or agreed to use commercially reasonable efforts to arrange for commitments for the full amount of the Exit Facility by January 11, 2017;

(f)    the failure of an order to have been entered by the Bankruptcy Court approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by January 31, 2017;

(g)    failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(h)    the failure of the Plan Effective Date to have occurred by April 15, 2017;

(i)    following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(j)    the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority or validity of the Claims of any of the Creditor Co-Proponents;

(k)    any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with this Agreement and the exhibits hereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Creditor Parties, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(l)    any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in the Interim Operating Covenant without the prior written consent of the Requisite Creditor Parties;

(m)    either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Creditor Parties; or

(n)    the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or

any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.03.   Noteholder Co-Proponents' Termination Events.   This Agreement may be terminated by the Noteholder Steering Committee upon the occurrence of any of the following events (each, a "Termination Event"):

(a)   the failure of an order to have been entered by the Bankruptcy Court approving the Private Placement Agreement and the Backstop Commitment Agreement (including approval of the fees set forth therein in connection with the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017;

(b)   any of the orders approving the Backstop Commitment Agreement or the Private Placement Agreement is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Consenting Noteholders; or

(c)   the termination of the Backstop Commitment Agreement or the Private Placement Agreement pursuant to their respective terms.

12.04.   Second Lien Noteholders' Termination Event.   In the event the acknowledgment set forth in Section 3.03 of this Agreement by Citibank, N.A. in its capacity as the First Lien Agent ceases to be in effect, any holder of Second Lien Notes may withdraw from and no longer remain bound by this Agreement within five (5) business days after receiving written notice of such event, it being understood that the Agreement shall remain binding among the remaining Parties; provided, however, the Ad Hoc Secured Committee Members may not utilize this termination event if the Plan provides for unconditional payment in full in cash or unimpairment of claims arising under the First Lien Credit Agreement.

12.05.   Citibank Termination Event.   The First Lien Agent may withdraw from and no longer remain bound by this Agreement, it being understood that the Agreement shall remain binding among the remaining Parties, in the event that the First Lien Agent determines, in its sole discretion, that it is subject to the direction from the "Required Lenders," as such term is defined in the First Lien Credit Agreement, requiring it to act in a manner inconsistent with its obligations under this Agreement.

12.06.   Mutual Termination.   This Agreement may be terminated by the mutual consent of the Debtors, the Requisite First Lien Lender Co-Proponents and the Noteholder Steering Committee.

NAI-1502345833v1

12.07.   Automatic Termination Event.   In the event the Backstop Commitment Agreement or the Private Placement Agreement is terminated pursuant to its terms, this Agreement shall be automatically terminated notwithstanding Section 12.08 hereof.

12.08.   Outside Date Termination.   Any individual Creditor Co-Proponent shall have the right to terminate this Agreement, as to itself only, if the effective date of the Plan shall not have occurred by June 14, 2017.   In the event a Creditor Co-Proponent terminates pursuant to this Section 12.08, such termination shall be effective as to such Creditor Co-Proponent only and shall not affect any rights or obligations of any other party to this Agreement.

12.09.   No Party may validly terminate this Agreement based upon its failure to perform or comply in any material respect with the terms and conditions of this Agreement or any of the Plan Documents, to the extent such Plan Document is effective, with such failure to perform or comply causing, or resulting in, the occurrence of one or more Termination Events specified herein.   Nothing in this Section 12 shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

12.10.   Effect of Termination Date.

(a)   Within three (3) days following the delivery of a termination notice pursuant to Sections 12.02 or 12.03 hereof, each of the Debtors and the Requisite Creditor Parties may waive, in writing, the occurrence of the Termination Event identified in the termination notice.   Absent such waiver, this Agreement shall be terminated on the fourth (4th ) day following delivery of the termination notice pursuant to Sections 12.02 or 12.03 hereof (such date, the "Termination Date").   On the Termination Date, the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided in this Agreement.

(b)   For the avoidance of doubt, each of the Parties hereby waives any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agrees not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the provision of any such notice); provided, however, that nothing in this paragraph shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.

12.11.   Termination Upon Effective Date.   This Agreement shall terminate automatically without further required action or notice upon the Effective Date.

**Section 13.   Cooperation and Support.**   The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.   Furthermore, subject to the terms of this Agreement, each of the Parties shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Chapter 11 Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Plan, the

Plan and/or the Restructuring, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 14.    Amendments.**    Any amendment to this Agreement and any exhibits attached hereto, may only be modified, amended or supplemented pursuant to the following conditions:

14.01.    <u>Debtors</u>.    Except with respect to Section 4.03 hereof, the Debtors' written approval (including via email) is required for the effectiveness of any modification, amendment or supplement to this Agreement and any exhibit attached hereto, which approval shall not be unreasonably withheld, conditioned or delayed with respect to any of the foregoing that do not adversely affect the rights of the Debtors under this Agreement.

14.02.    <u>First Lien Lender Co-Proponents</u>.    The Requisite First Lien Lender Co-Proponents' written approval (including via email) is required for any modification, amendment or supplement to the following documents (but excluding documents related to the Bonding Solution):    (i) the indenture for the New Second Lien Notes (if applicable), (ii) the Plan, (iii) the Disclosure Statement, (iv) the Disclosure Statement Order, (v) the Confirmation Order, (vi) the Restructuring Term Sheet (except with respect to written approval rights for <u>Exhibits 3, 5 and 8</u> to the Restructuring Term Sheet) and (vii) this Agreement (except with respect to Section 4.03), in each case subject to <u>Section 3.02</u> hereof, <u>provided</u>, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents.

14.03.    <u>Noteholder Steering Committee</u>.    The Noteholder Steering Committee's express written approval (including via email) is required for any modification, amendment or supplement to this Agreement, any exhibits attached hereto, and/or the Plan Documents in accordance with the terms of the Restructuring Term Sheet.    The Restructuring Term Sheet and any Plan Documents may not be altered, amended or modified without the requisite approval required under the terms of <u>Exhibit 8</u> to the Restructuring Term Sheet.    The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee.

**Section 15.    Miscellaneous.**

15.01.    <u>Company Fiduciary Duties</u>.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations

under applicable law, subject to the Non-Solicitation Provision set forth in <u>Section 6.02</u>, <u>provided</u>, <u>however</u>, for the avoidance of doubt, (a) if the Debtors or the Company exercise the PSA Termination Condition, as set forth in <u>Section 12.01(a)</u> hereto, the Debtors shall be relieved of any obligation to pay the Breakup Payment and Expense Reimbursement and (b) if the Debtors or the Company exercise their right under this <u>Section 15.01</u> after entry by the Bankruptcy Court of the PPA and BCA Approval Order, (x) the Breakup Payments and Expense Reimbursement shall be payable in accordance with the terms set forth in the Restructuring Term Sheet and (y) the Debtors shall provide notice of such decision to exercise their rights under this <u>Section 15.01</u> to the Creditor Co-Proponents within one (1) business day (such notice, a "<u>Debtor Fiduciary Duty Notice</u>").

15.02.   <u>Complete Agreement</u>.   This Agreement, the Backstop Commitment Agreement, the Private Placement Agreement, together with all exhibits and schedules attached hereto and thereto, and any and all amendments or restatements of any of the foregoing, is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.   No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

15.03.   <u>Parties</u>.   This Agreement shall be binding upon, and inure to the benefit of, the Parties.   No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in <u>Section 8</u> hereof.   Subject to <u>Section 13</u> hereof, nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.   Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party executes and becomes bound by this Agreement solely as to a specific business unit, division or desk, no affiliate of such Party or other business unit, division or desk within any such Party (and no Claims held by such other business unit, division or desk) shall be subject to this Agreement unless they separately execute a Joinder Agreement.

15.04.   <u>Headings</u>.   The headings of all sections of this Agreement are solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

15.05.   <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.   Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient

forum or does not have jurisdiction over any party hereto. Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

15.06. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and a non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, without necessity of proving the inadequacy of money damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; <u>provided</u>, <u>however</u>, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

15.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08. <u>Interpretation</u>. This Agreement is the product of negotiations between the Debtors and the Initial Supporting Parties, and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner to effect the intent of the Parties hereto, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

15.09. <u>Successors and Assigns; Severability</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in a bankruptcy case; <u>provided</u> that nothing contained in this <u>Section 15.09</u> shall be deemed to permit sales, assignments, or other Transfers or other claims against or interests in the Company other than in accordance with this Agreement. The agreements, representations and obligations of the Supporting Creditor Parties under this Agreement are, in all respects, several and not joint. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

15.10. <u>Representation by Counsel</u>. Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a

defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

15.11.   <u>Survival</u>.   Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this <u>Section 15</u> and in <u>Sections 10 and 16</u> hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.12.   <u>Independent Due Diligence and Decision-Making</u>.   Each Supporting Creditor Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

15.13.   <u>Relationship Among Parties</u>.   It is understood and agreed that no Supporting Creditor Party has any duty of trust or confidence in any form with any other Supporting Creditor Party, and, except as provided in this Agreement, there are no agreements, commitments or undertakings among or between them.   The Parties further acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any debt or equity securities of the Debtors and the Creditor Co-Proponents do not constitute a "group" within the meaning of Rule 13d-5 under the Securities and Exchange Act of 1934, as amended.   In this regard, it is understood and agreed that any Creditor Co-Proponent may trade in the Claims or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Creditor Co-Proponent, subject to applicable securities laws and the terms of this Agreement; <u>provided</u>, <u>further</u>, that no Creditor Co-Proponent shall have any responsibility for any such trading by any other entity by virtue of this Agreement.   No prior history, pattern or practice of sharing confidences among or between the Supporting Creditor Parties shall in any way affect or negate this understanding and agreement.   Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Creditor Parties under this Agreement shall be several, not joint.

15.14.   <u>Notices</u>.   All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(a)   if to the Debtors, to:

Peabody Energy Corporation
701 Market Street
St. Louis, MO 63101
Fax No. (314) 342-7597
Attention: A. Verona Dorch, Chief Legal Officer
Email: vdorch@peabodyenergy.com

with copies to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Fax No. (216) 579-0212
Attention: Heather Lennox, Esq.
Email: hlennox@jonesday.com

and

Jones Day
77 West Wacker
Chicago, IL 60601
Fax No. (312) 782-8585
Attention: Edward B. Winslow, Esq.
Email: ebwinslow@jonesday.com

and

Armstrong Teasdale LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
Fax No. (314) 621-5065
Attention: Steven N. Cousins, Esq. and Susan K. Ehlers, Esq.
Email: scousins@armstrongteasdale.com; sehlers@armstrongteasdale.com

(b)     if to a Supporting Creditor Party or a transferee thereof, to the addresses, electronic mail addresses or facsimile numbers set forth below following the Supporting Creditor Party's signature (or as directed by any transferee thereof), as the case may be, with copies to any counsel designated by such Supporting Creditor Party, including as follows:

in respect of the First Lien Agent and the First Lien Lender Co-
Proponents:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Fax No. (212) 710-5800
Attention: Damian S. Schaible, Esq., Darren Klein, Esq. and Angela M.
Libby, Esq.
Email: damian.schaible@davispolk.com; darren.klein@davispolk.com;
angela.libby@davispolk.com

-28-

and

Bryan Cave LLP
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
Fax No. (314) 259-2020
Attention: Lloyd A. Palans, Esq., Laura Uberti Hughes, Esq. and Brian C.
             Walsh, Esq.
Email: lapalans@bryancave.com; brian.walsh@bryancave.com;
             laura.hughes@bryancave.com

in respect of PointState, Contrarian and Panning of the Ad Hoc Secured

Committee Members:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Fax No. (212) 735-2000
Attention: Shana A. Elberg, Esq. and Sarah M. Ward, Esq.
Email: Shana.elberg@skadden.com; Sarah.ward@skadden.com

and

Stinson Leonard Street LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Fax No. (314) 863-9388
Attention: John G. Young, Jr., Esq.
Email: john.young@stinson.com

in respect of the South Dakota Investment Council:

Woods, Fuller, Schultz & Smith P.C.
300 South Phillips Ave, Suite 300
Sioux Falls, SD 57104
Attention: Jordan J. Feist, Esq.
Email: jordan.feist@woodsfuller.com; jeff.hallem@state.sd.us

in respect of Aurelius and Elliott:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

-29-

New York, NY 10036
Fax No. (212) 715-8000
Attention: Kenneth H. Eckstein, Esq., Stephen D. Zide, Esq. and Andy
Dove, Esq.
Email: KEckstein@kramerlevin.com; SZide@kramerlevin.com;
      ADove@kramerlevin.com

and

Doster, Ullom & Boyle, LLC
16090 Swingley Ridge Road
Suite 620
St. Louis, MO 63017
Fax No. (636) 532-1082
Attention: Gregory D. Willard, Esq., John G. Boyle, Esq.
Email: gwillard@dubllc.com; jboyle@dubllc.com

in respect of Discovery Capital:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Fax No. (212) 446-4900
Attention: Stephen E. Hessler, Esq.
Email: shessler@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Fax No. (415) 439-1500
Attention: Brian Ford, Esq. and Melissa N. Koss, Esq.
Email: Bford@kirkland.com; Melissa.koss@kirkland.com

Any notice given by delivery, mail or courier shall be effective when received.   Any notice given by facsimile shall be effective upon oral or machine confirmation of successful transmission.   Any notice given by electronic mail shall be effective upon delivery.

      15.15.   <u>Third Party Beneficiaries</u>.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

      15.16.   <u>No Solicitation</u>.   This Agreement is not and shall not be deemed to be a solicitation for votes to accept or reject the Plan or any plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code.   The votes of the holders of Claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have

-30-

received the Disclosure Statement and related ballot, the Plan, and other required solicitation materials.   In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

15.17.   Supporting Creditor Parties' Obligations.   Anything set forth in this Agreement to the contrary, notwithstanding, including without limitation the representations and warranties set forth in Section 9.05, the Parties hereto acknowledge and agree that the Supporting Creditor Parties that are holders of First Lien Lender Claims may be the beneficial owner of all or a portion of the principal amount of such First Lien Lender Claims pursuant to a participation agreement.   Accordingly, such Supporting Creditor Parties' investment and voting discretion for all purposes hereunder may be limited or restricted by the express terms of such Supporting Creditor Parties' respective participation agreement which may grant the nominal or record holder of such First Lien Lender Claims (held by participation) the right to vote or direct actions in respect of such Supporting Creditor Parties' First Lien Lender Claims in accordance with the written direction of other creditors (including such nominal or record holder) owing or holding interests representing more than 50% of such nominal or record holders' First Lien Lender Claims, and such Supporting Creditor Parties' liabilities and obligations hereunder shall be limited accordingly.   Notwithstanding the foregoing and for the avoidance of doubt, any Supporting Creditor Party that holds First Lien Lender Claims pursuant to a participation agreement shall direct any nominal or record holder of such First Lien Lender Claims to vote all of its Claims in favor of the Plan in accordance with Sections 3.01(a), 4.01(a) and 5.01(a).

Section 16.   Public Disclosure.   The Supporting Creditors Parties hereby consent to the disclosure of the execution and contents of this Agreement by the Debtors in the Plan, Disclosure Statement, the other Plan Documents, and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission (the "SEC") or as required by law or regulation; provided, however, that, except as required by law or any rule or regulation of any securities exchange or any governmental agency, the Debtors shall not, without the applicable Supporting Creditor Party's prior consent (which shall not be unreasonably withheld, delayed or conditioned), (i) except insofar such name appears in the body of this Agreement and in the Restructuring Term Sheet, use the name of any Supporting Creditor Party or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the SEC or the Bankruptcy Court or (ii) disclose the holdings of the Debtors' principal funded debt of any Supporting Creditor Party to any person; provided, however, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, debt under the First Lien Credit Agreement, Second Lien Notes or Unsecured Senior Notes beneficially owned by the Supporting Creditor Parties collectively (or by funds or accounts advised or managed by Supporting Creditor Parties).

[Signature pages follow.]

NAI-1502345833v1

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

PEABODY ENERGY CORPORATION ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATE DEBTORS

By: _A. Verona Dorch_

Name: A. Verona Dorch
Title: Executive VP and Chief Legal Officer

[Signature Page to Plan Support Agreement]

Citibank, N.A., solely in its capacity as administrative
agent under the First Lien Credit Agreement


By: _John Tucker_____
Name: JOHN TUCKER
Title: VICE PRESIDENT

Address:   388 Greenwich St
           New York, NY   10013

Attn:   Dale Goncher & Anna Lekander
Tel:    212-816-7446
Fax:    877-501-5821

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

First Lien Lender Claims:

$_N/A_____

Second Lien Notes Claims:

$_____

Unsecured Senior Notes Claims:

$_____

[Signature Page to Plan Support Agreement]

[First Lien Lender Signature Pages Omitted]

[Signature Page to Plan Support Agreement]

BlockHouse Master Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Address:    40 West 57th Street, 25th Floor
            New York, NY 10019
Attn:       Alfred J. Barbagallo
Tel:        (212) 830-7080
Fax:        (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

Conflux Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019

Attn:      Alfred J. Barbagallo

Tel:       (212) 830-7080

Fax:       (212) 621-5780

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

Secured First Lien Lender Claims:

██████████████

Secured Second Lien Notes Claims:

██████████████

Unsecured Senior Notes Claims:

██████████████

[Signature Page to Plan Support Agreement]

SteelMill Master Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019
Attn:      Alfred J. Barbagallo
Tel:       (212) 830-7080
Fax:       (212) 621-5780

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

Secured First Lien Lender Claims:

████████████

Secured Second Lien Notes Claims:

████████████

Unsecured Senior Notes Claims:

████████████

[Signature Page to Plan Support Agreement]

PointState Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019

Attn:      Alfred J. Barbagallo

Tel:       (212) 830-7080

Fax:       (212) 621-5780

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

**Contrarian Capital Fund I, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
              Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Fund I, L.P. will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-A, L.L.C.**
By: Contrarian Capital Management, L.L.C., as
Managing Member

By:_____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. CCM Pension-A, L.L.C. will instruct its
grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in
accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-B, L.L.C.**
By: Contrarian Capital Management, L.L.C., as
Managing Member

By: 
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. CCM Pension-B, L.L.C. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Dome du Gouter Master Fund, LP**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Dome du Gouter Master Fund, LP will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Opportunity Fund, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
               Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:      (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Opportunity Fund, L.P. will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Senior Secured, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
                   Greenwich, CT 06830
Attn:        Josh Weisser
Tel:          (203) 862-8278
Fax:         (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Senior Secured, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Trade Claims, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____

Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Trade Claims, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Advantage-B, LP**
By: Contrarian Capital Management, L.L.C., as
General Partner

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Advantage-B, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Emerging Markets, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Emerging Markets, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian EM SIF Master L.P.**
By: Contrarian Capital Management, L.L.C., as Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
                Greenwich, CT 06830
Attn:      Josh Weisser
Tel:        (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian EM SIF Master, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Boston Patriot Summer St LLC**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____

Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
             Greenwich, CT 06830
Attn:     Josh Weisser
Tel:      (203) 862-8278
Fax:     (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Boston Patriot Summer St LLC will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

Panning Master Fund, LP

By:  Panning Capital Management, LP
Its:  Investment Manager

By:
Name:  William Kelly
Title:  Authorized Signatory

Address:  510 Madison Avenue, 23rd Floor
New York, NY 10022
Attn:  Rayan Joshi
Tel:  212-916-1860
Fax:  212-916-1861

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$ ▮▮▮▮▮▮▮▮

Secured Second Lien Notes Claims:

$ ▮▮▮▮▮

Unsecured Senior Notes Claims:

$ ▮▮▮▮

SOUTH DAKOTA INVESTMENT COUNCIL

By: _____

Name: Matthew L. Clark
Title: State Investment Officer

Address:   South Dakota Investment Council
           4009 West 49th Street, Suite 300
           Sioux Falls, SD 57106-3784
Attn:      A. Laurie Riss
Tel:       605-362-2820
Fax:       605-362-2833

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$_____

Secured Second Lien Notes Claims:

Unsecured Senior Notes Claims:

$_____

[Signature Page to Plan Support Agreement]

Date executed: December 22, 2016

ELLIOTT ASSOCIATES, L.P.
By: Elliot Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc, as general partner

By: _____

Name: Elliot Greenberg
Title: Vice President

Address: c/o Elliott Management Corporation
           40 West 57th Street
           New York, NY 10019

Attn.: _____
Tel.: _____
Fax: _____
Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

Unsecured Senior Notes Claims:

Convertible Notes Claims:

Date executed: December 22, 2016

**THE LIVERPOOL LIMITED PARTNERSHIP**

By: _____

Name: Elliot Greenberg

Title:   Vice President

Address: c/o Elliott Management Corporation

40 West 57th Street

New York, NY 10019

Attn.:   _____

Tel.:    _____

Fax:     _____

Email:   _____

Aggregate principal amount of Claims beneficially owned or managed on behalf of funds or accounts that beneficially own such Claims:

Unsecured Senior Notes Claims:

█████████████  _____

Date executed:  December 22, 2016

ELLIOTT INTERNATIONAL, L.P.
Elliott International Capital Advisors Inc.
As attorney-in-fact

By: _____
Name: Elliot Greenberg
Title:   Vice President

Address: c/o Elliott Management Corporation
              40 West 57th Street
              New York, NY 10019

Attn.:    _____
Tel.:     _____
Fax:      _____
Email:    _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:


Secured First Lien Lender Claims:

▮▮▮▮▮▮▮▮▮▮▮▮


Unsecured Senior Notes Claims:

▮▮▮▮▮▮▮▮▮▮▮▮


Convertible Notes Claims:

▮▮▮▮▮▮▮▮▮▮▮▮


[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

MANCHESTER SECURITIES CORP.

By: _____
Name: Elliot Greenberg
Title:   Vive President

Address: c/o Elliott Management Corporation
           40 West 57th Street
           New York, NY 10019
Attn.:      _____
Tel.:       _____
Fax:        _____
Email:      _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

ZIFF INVESTMENTS LIMITED

By: _____
Name: Elliot Greenberg
Title:  Vice President

Address: c/o Elliott Management Corporation
         40 West 57th Street
         New York, NY 10019
Attn.:   _____
Tel.:    _____
Fax:     _____
Email:   _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

███████████████

DISCOVERY CAPITAL MANAGEMENT, LLC

By: _____

Name: Adam Schreck
Title: General Counsel

Address:   20 Marshall Street, Suite 310
           South Norwalk, CT 06854
Attn:      Adam Schreck
Tel:       (203) 956-7953

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

██████████ _____

Secured Second Lien Notes Claims:

██████████ _____

Unsecured Senior Notes Claims:

████████████ _____

KE 44822950

Date executed: December 22, 2016

AURELIUS CAPITAL MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual
    capacity

By: _____
Name: Dan Gropper
Title: Managing Director

Address:   c/o Aurelius Capital Management, LP
           535 Madison Avenue, 22nd Floor
           New York, NY 10022
Attn:      Dan Gropper
Tel:       (646) 445-6570
Fax:       (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

█████████████ _____

Unsecured Senior Notes Claims:

█████████████ _____

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

ACP MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual
    capacity

By: _____
Name: Dan Gropper
Title: Managing Director

Address:  c/o Aurelius Capital Management, LP
          535 Madison Avenue, 22nd Floor
          New York, NY 10022
Attn:     Dan Gropper
Tel:      (646) 445-6570
Fax:      (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

████████████   _____

Unsecured Senior Notes Claims:

████████████   _____

## EXHIBIT 1

**RESTRUCTURING TERM SHEET**

**<u>Peabody Energy Corporation Plan Term Sheet</u>**

December 22, 2016

      This term sheet (the "<u>Term Sheet</u>") sets forth certain of the principal terms for the proposed restructuring (the "<u>Restructuring</u>") of the obligations of Peabody Energy Corporation ("<u>PEC</u>") and each of its direct and indirect debtor subsidiaries (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>" and, together with their non-Debtor affiliates, the "<u>Company</u>") that have commenced cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Eastern District of Missouri (the "<u>Bankruptcy Court</u>") on April 13, 2016 (the "<u>Petition Date</u>").[1]  The Restructuring contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization for the Debtors (the "<u>Plan</u>") and will provide adequate working capital to the Debtors and their respective non-Debtor subsidiaries, all as described below.  Consistent with the Debtors' exclusive right to file the Plan pursuant to section 1121 of the Bankruptcy Code, the Debtors shall be the proponents of the Plan, and certain supporting creditors listed below (collectively, the "<u>Creditor Co-Proponents</u>") shall be co-proponents of the Plan.

      This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the Plan and the transactions to be contemplated therein, which will remain subject to discussion and negotiation in good faith among the following parties:  (i) the Debtors; (ii) Citibank, N.A. ("<u>Citibank</u>"), as the administrative agent (in such capacity, the "<u>First Lien Agent</u>") under that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "<u>First Lien Credit Agreement</u>");[2] (iii) those certain First Lien Lenders (as defined below) who are signatories to the PSA (as defined below) (together with the First Lien Agent, the "<u>First Lien Lender Co-Proponents</u>"); (iv) PointState Capital LP ("<u>PointState</u>"), Contrarian Capital Management, L.L.C. ("<u>Contrarian</u>") and Panning Capital Management, LP ("<u>Panning</u>") and the South Dakota Investment Council ("<u>SDIC</u>") each as members of the Ad Hoc Committee (the "<u>Ad Hoc Group of Second Lien Noteholders</u>" or the "<u>Second Lien Notes Parties</u>") of holders of those certain 10.00% senior secured second lien notes (the "<u>Second Lien Notes</u>")[3] issued in March 2015 by PEC and due in March 2022; and (vi) an ad hoc group of

---

[1]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Bankruptcy Code.  "<u>Claim</u>" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

[2]    Any and all Claims arising under or in connection with the First Lien Credit Agreement or other Existing Credit Agreement Documents (as defined in the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) [Docket No. 544] (the "<u>Final DIP Order</u>"), including those arising under the Debtors' term loan, revolver, prepetition international swaps, cash management agreements and any letters of credit issued under the terms of the First Lien Credit Agreement are referred to herein collectively as the "<u>First Lien Lender Claims</u>."  Holders of such Claims are referred to herein as the "<u>First Lien Lenders</u>."

[3]    Any and all Claims arising under or in connection with the Second Lien Notes are referred to herein collectively as the "<u>Second Lien Notes Claims</u>."

NAI-1502345820v2

holders of Unsecured Senior Notes (as defined below) composed of entities managed by Elliott Management Corporation ("Elliott"), Discovery Capital Management, LLC ("Discovery") and Aurelius Capital Management, LP ("Aurelius" and, together with Elliott and Discovery, the "Ad Hoc Unsecured Noteholders Group," and, together with the Debtors, the First Lien Lender Co-Proponents, the Second Lien Notes Parties, the "Parties," and each individually, a "Party").  The transactions contemplated by this Term Sheet are subject to (1) satisfaction of all of the conditions set forth herein and in any definitive documentation evidencing the transactions comprising the Restructuring, (2) the negotiation and execution of definitive documents evidencing and related to the Restructuring contemplated herein, which documents shall be in form and substance reasonably acceptable to the Creditor Co-Proponents (as and only to the extent set forth below) and (3) entry of an order of the Bankruptcy Court confirming the Plan (the "Confirmation Order") and the satisfaction of any conditions to the effectiveness thereof (the date of such effectiveness, the "Effective Date").

This Term Sheet has been prepared for settlement discussion purposes only and shall not constitute an admission of liability by any Party, nor be admissible in any action relating to any of the matters addressed herein.  Nothing in this Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a Plan.  Further, nothing herein shall be an admission of fact or liability or deemed binding on the Parties.

NAI-1502345820v2

## I. **Plan Process**

| | |
|---|---|
| Creditor Co-Proponents | Elliott, Discovery, Aurelius, Contrarian, PointState, Panning and SDIC (the "Noteholder Co-Proponents") and the First Lien Lender Co-Proponents (together with the Noteholder Co-Proponents, the "Creditor Co-Proponents").[4]   The Requisite Members of the Noteholder Steering Committee shall mean 75% of the Noteholder Steering Committee,[5] based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member. |
| Requisite Creditor Parties | The "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent, and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.  The Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over this Term Sheet, the PSA, the Plan and certain exhibits to the Plan as set forth herein; provided, however, notwithstanding any other provision herein to the contrary, upon the Debtors (a) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court and (b) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First |

---

[4]   Certain Creditor Co-Proponents are acting and shall act in their capacities as investment advisors or managers for funds or managed accounts which hold First Lien Lender Claims, Second Lien Notes Claims and/or Unsecured Senior Notes Claims subject to this Term Sheet.  The Creditor Co-Proponents assume no fiduciary duties to each other or any other creditors in connection with the transactions contemplated herein or otherwise.

[5]   The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

| | |
|---|---|
| | Lien Agent or the First Lien Lenders or their respective Representatives, (2) the PSA or (3) the Breakup Administrative Claim Treatment.<br><br>The "Requisite Consenting Noteholders" shall mean the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule attached hereto as [Exhibit 8].<br><br>Together, the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders shall be the "Requisite Creditor Parties." |
| PSA | The Creditor Co-Proponents shall execute a Plan Support Agreement with the Debtors in form and substance acceptable to the Creditor Co-Proponents and the Debtors (the "PSA").<br><br>The PSA shall include a fiduciary termination event for the Debtors.  After entry by the Bankruptcy Court of the PPA and BCA Approval Order (as defined below), the Breakup Payments and Expense Reimbursement (both as defined below), shall be payable, following the exercise by the Debtors of the fiduciary out in accordance with the terms of PSA, the Private Placement Agreement and the Backstop Commitment Agreement (both as defined below) and shall, prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis, as set forth in Exhibit 5 hereto and consistent with the Breakup Administrative Claim Treatment (as defined in Exhibit 5).<br><br>From the Debtors' execution of the PSA until the PSA is terminated in accordance with its terms (the "Non-Solicitation Period"), the Debtors will not, and will not permit their affiliates or their respective officers, directors, agents or representatives to initiate contact with or solicit any inquiries, proposals or offers by any party with respect to an alternative restructuring; provided, however, the Debtors, their affiliates or their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers initiated or continued by any party with respect to an alternative restructuring.  To the extent the Debtors receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) |

| | |
|---|---|
| | days of receiving such inquiry, proposal or offer. |
| | Prior to the date on which the PPA and BCA Approval Order is entered, the PSA may be terminated by the Debtors if holders of two-thirds (2/3) in amount of each of the Second Lien Notes Claims and the Unsecured Senior Notes Claims (as defined below) have not joined the PSA by such date (the "PSA Termination Condition"), which PSA Termination Condition may be waived in the Debtors' sole discretion.  No Break Up Fees, Expense Reimbursement or other amounts under the Private Placement Agreement of Backstop Commitment Agreement shall be due and payable if the PSA Termination Condition occurs. |
| Milestones | The Restructuring shall be implemented in accordance with the following milestones (the "Milestones"): |
| | • By no later than December 22, 2016, the Debtors shall file (i) the Plan; (ii) a motion seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement; (iii) the disclosure statement  for the Plan (the "Disclosure Statement"); and (iv) a motion seeking approval of the Disclosure Statement. |
| | • By no later than January 11, 2017, the Debtors shall file a motion to approve a commitment letter or an engagement letter with one or more reputable financial institutions acceptable to the Debtors (the "Lead Arrangers"), pursuant to which the Lead Arrangers shall have provided commitments for the Exit Facility (as defined below) in a principal amount of not less than $1.5 billion or agreed to use commercially reasonable efforts to arrange for commitments for the Exit Facility in a principal amount of not less than $1.5 billion. |
| | • By no later than January 31, 2017, the PPA and BCA Approval Order (as defined in Exhibit 5) (approving the fees under the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) shall have been entered by the Bankruptcy Court. |
| | • By no later than January 31, 2017, an order approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by the Bankruptcy Court (the "Disclosure Statement Order"). |
| | • By no later than five (5) days after the date scheduled for |

|  |  | the Confirmation Hearing by the Bankruptcy Court in the Disclosure Statement Order, the Confirmation Hearing shall have commenced.<br><br>• By no later than April 15, 2017, the Effective Date shall have occurred.<br><br>The amendment or waiver of any Milestone shall require the consent of the Requisite Creditor Parties. |

## II.  Debtor Groups and Proposed Classification Scheme under the Plan

The Debtors will be divided into five "Debtor Groups" depending on their principal liabilities as follows:

| Letter | Debtor Group | Description |
|---|---|---|
| A | PEC | Debtor Peabody Energy Corporation |
| B | Encumbered Guarantor Debtors | Each Debtor as set forth on Exhibit 6 hereto that is a guarantor under the First Lien Credit Agreement and for the Second Lien Notes |
| C | Gold Fields Debtors | Each Debtor as set forth on Exhibit 6 hereto |
| D | Peabody Holdings (Gibraltar) Limited | Debtor Peabody Holdings (Gibraltar) Limited ("Gib1") |
| E | Unencumbered Debtors | Each Debtor as set forth on Exhibit 6 hereto which is not subject to the liens arising under the First Lien Credit Agreement or with respect to the Second Lien Notes, and is not a guarantor of (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and/or (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and, together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes").[6] |

---

[6]   Any and all Claims arising under, evidenced by or in connection with the Unsecured Senior Notes are referred to herein collectively as the "Unsecured Senior Notes Claims."

NAI-1502345820v2

Under the Plan, Claims under the Debtors' postpetition accounts receivable securitization facility (the "Securitization Facility Claims"),[7] Administrative Expense Claims and Priority Tax Claims (each as defined below) will not be classified.  The remaining Claims against each Debtor Group will be divided into the following eleven (11) classes:

| Class Number[8] | Designation |
|---|---|
| 1 | First Lien Lender Claims |
| 2 | Second Lien Notes Claims |
| 3 | Other Secured Claims |
| 4 | Other Priority Claims |
| 5 | General Unsecured Claims |
| 6 | Convenience Claims |
| 7 | MEPP Claim[9] |
| 8 | Unsecured Subordinated Debenture Claims |
| 9 | Intercompany Claims |
| 10 | Section 510(b) Claims against PEC |
| 11 | PEC Interests |
| 12 | Subsidiary Debtor Equity Interests |

A more detailed table reflecting the proposed Debtor Groups and the proposed classes of Claims against each Debtor Group is attached hereto as Exhibit 7.  The proposed treatment of unclassified and classified Claims is set forth below.

---

[7]    "Securitization Facility Claims" means any and all Claims constituting Facility Obligations, as such term is defined in the order of the Bankruptcy Court entered on May 18, 2016 [Docket No. 529] (the "ARS Order"), which order approved the Securitization Facility (as such term is defined in the ARS Order).

[8]    References to "Class" below, shall refer to the classification set forth in this chart.

[9]    "MEPP Claim" means any Claim arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including (a) proof of claim number 4722 and (b) any other Claim related to any withdrawal liability under U.S.C. § 1392(c).

## III.   Claims Treatment

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| **Unclassified Claims** | | |
| Contingent DIP Facility Surviving Claims[10] | $0.00 | All Contingent DIP Facility Surviving Claims (if any) shall be preserved.  If Allowed, any Contingent DIP Facility Surviving Claims shall be paid in full in cash as soon as reasonably practicable after they become Allowed; provided, however, that the foregoing treatment shall not in any way limit or impair any arguments or defenses the Debtors may have with respect to any Contingent DIP Facility Surviving Claims that may be asserted.  Notwithstanding the foregoing, the treatment of certain letters of credit issued under the terms of the DIP Credit Agreement and any related collateral shall be treated in accordance with the terms of that certain Payoff Letter with respect to the DIP Facility, dated December 15, 2016. |
| Securitization Facility Claims | **$[140 million]** to **$[160 million]** | The Securitization Facility (as defined in the ARS Order), which is scheduled to expire as of the Effective Date, shall, at the election of the Debtors, be extended, replaced with a new securitization facility or replaced with one or more ABL Facilities (as defined in Exhibit 1). |
| Administrative Expense Claims[11] | **$[15 million]** to **$[25 million]** | The Debtors (or, if applicable, the Reorganized Debtors[12]) shall pay to each holder of an Allowed Administrative Expense Claim, on account of and in |

---

[10]   "Contingent DIP Facility Surviving Claim" means any Claim of the DIP Facility Agent, DIP Facility Lenders or Citigroup Global Markets Inc. (in its capacity as sole lead arranger and book runner under the DIP Facility Credit Agreement) that are related to obligations of the Debtors that (a) arise under or are evidenced by (i) the DIP Facility Credit Agreement (ii) the Final DIP Order or (iii) any other agreements related thereto and (b) pursuant to the DIP Facility Repayment Order, survived termination of the DIP Facility Credit Agreement and continue in full force and effect.

[11]   "Administrative Expense Claim" means a Claim arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, excluding DIP Facility Claims and Securitization Facility Claims.

[12]   "Reorganized Debtor" means, on and after the Effective Date, subject to the Restructuring, each of the Debtors as to which the Plan is confirmed and "Reorganized PEC" means Peabody Energy Corporation, on and after the

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option in the ordinary course of business or (a) the latest to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter), (ii) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) on such other date as the Bankruptcy Court may order.[13] |
| Priority Tax Claims[14] | $[10 million] to $[30 million] | Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Priority Tax Claim becomes an |

Effective Date.

[13] For purposes of this Term Sheet, "Allowed" when used with respect to any Claim means (a) any Claim that (i) is timely filed by the applicable bar date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or a final order; (b) any Claim (i) that is listed in the Debtors' schedules of assets and liabilities as not contingent, not unliquidated, and not disputed and (ii) for which no proof of Claim has been timely filed; or (c) any Claim allowed under the Plan or by a final order.  With respect to any Claim described in clauses (a) and (b) above, such Claim will be considered Allowed only if, and to the extent that, (i) no objection to the allowance of such Claim has been asserted on or before the bar date for filing objections to Claims under the Plan, (ii) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a final order, (iii) such Claim has not been disallowed by a final order, (iv) such Claim is allowed pursuant to a stipulation with the Debtors on or after the Effective Date or (v) such Claim is allowed pursuant to the Plan or any agreements related thereto and approved and authorized by the Bankruptcy Court.

[14] "Priority Tax Claim" means any Claim of a governmental unit that is entitled to priority in payment pursuant to section 502(i) or section 507(a)(8) of the Bankruptcy Code.

NAI-1502345820v2

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Allowed Priority Tax Claim or (b) cash of a total value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim, payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date. |
| **Classified Claims** | | |
| First Lien Lender Claims | $[2.980 billion][15] | Each holder of an Allowed First Lien Lender Claim in Classes 1A, 1B, 1C and 1D will receive its aggregate pro rata share of: (i) cash equal to the full amount of the Allowed First Lien Lender Claims, including interest at the default rate (such treatment, a "First Lien Full Cash Recovery") or (ii) solely to the extent that the Debtors have not received commitments for the Exit Facility prior to the Effective Date in the aggregate principal amount of at least $1.5 billion, and subject to the conditions set forth on Exhibit 1 hereto, each holder's pro rata share of (a) the replacement secured first lien term loan on the terms and conditions set forth on Exhibit 1 hereto in an aggregate principal amount of up to $1.5 billion, such principal amount to be calculated as set forth on Exhibit 1 (the "Replacement Secured First Lien Term Loan"), plus (b) cash in an amount equal to the difference |

---

[15]   The total estimated amount of Allowed First Lien Lender Claims is currently $2.980 billion, comprised of approximately (a) $1,162,343,00 principal amount of term loans net of unamortized original issue discount, (b) $947,000,000 principal amount of revolver loans, (c) $612,753,000 of letters of credit reimbursement obligations (assuming $6,118,000 of future letter of credit draws and the rollover of the PBGC letter of credit undrawn into the ABL Facility (as defined in Exhibit 1) and (d) $257,300,000 in Swap Contract termination , plus accrued and unpaid interest at the default rate for Allowed First Lien Lender Claims except for claims under Swap Contracts (as defined in the First Lien Credit Agreement) at the contractual rate for claims under the Swap Contracts, plus accrued and unpaid adequate protection payments, plus professional fees and expenses payable under the First Lien Credit Agreement.  The foregoing estimate assumes: (i) an April 3, 2017 Effective Date and (ii) the PBGC letter of credit rolls onto an ABL Facility (as defined in Exhibit 1).  All parties have reserved their rights as to the applicable interest rate for Allowed First Lien Lender Claims other than claims under Swap Contracts.  To the extent the Effective Date occurs after April 3, 2017, any increase in the size of the First Lien Lender Claims shall be satisfied with cash. The amount of the First Lien Lender Claims will also fluctuate based on letter of credit draws or returns through the Effective Date.

-10-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | between (i) the Allowed First Lien Lender Claims, including interest at the default rate, and (ii) the aggregate principal amount of the Replacement Secured First Lien Term Loan.<br><br>The First Lien Lender Claims shall be impaired and holders of such Claims shall be entitled to vote on the Plan. |
| Second Lien Notes Claims | $1.158 billion[16] | On or as soon as practicable after the Effective Date,[17] each holder of an Allowed Second Lien Notes Claim in Classes 2A, 2B, 2C and 2D shall receive:<br><br>(i) at the option of the Debtors in their sole discretion, provided, in the case of (a) or (b), the First Lien Full Cash Recovery occurs, its aggregate pro rata share of $450 million (calculated as the amount of any such cash and the principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental New Second Lien Notes Claims) in any combination of (a) cash, (b) principal amount of first lien debt on terms consistent with the Exit Facility (the "Additional First Lien Debt") and/or (c) principal amount of new second lien notes on the terms and conditions set forth on Exhibit 2 hereto ("New Second Lien Notes"); provided that in no event shall the aggregate principal amount of New Second Lien Notes (plus, if applicable, the principal amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250 million; provided, further that in no event shall the combined consideration issued under this clause (i) (calculated as the amount of any such cash and the |

---

[16]    The Second Lien Notes Claims shall be allowed in the amount of $1.0 billion, plus accrued and unpaid pre-petition interest and post-petition interest at the non-default rate, accruing through and until the Effective Date. The total estimated amount of Second Lien Notes Claims is $1.158 billion, assuming an April 3, 2017 Effective Date. The Second Lien Notes Claims shall continue to accrue interest at the non-default rate if the Effective Date extends beyond April 3, 2017.

[17]    As part of the global settlement set forth herein and to be embodied in the Plan, upon the Effective Date (subject to its occurrence), the value of any and all collateral securing the Second Lien Notes Claims (including, but not limited to, any and all collateral granted to holders of Second Lien Notes as adequate protection or otherwise pursuant to the Final DIP Order) shall be deemed to exceed the total estimated amount of Second Lien Notes Claims (including accrued and unpaid pre-petition and post-petition interest at the non-default rate), and the Second Lien Notes Claims shall be treated in accordance with the terms set forth in this Term Sheet.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental Second Lien Notes Claims) exceed $450 million in the aggregate;[18]<br><br>(ii) its pro rata share of the Pro Rata Split as of the Effective Date of Reorganized PEC Common Stock (as defined below) (which shall be subject to the dilution[19] from the LTIP Shares, the Preferred Equity, and the Penny Warrants (each as defined below), and shall be issued after giving effect to the issuance of the Rights Offering Shares (as defined below),  the issuance of any shares of Reorganized PEC Common Stock issued on account of Incremental Second Lien Notes Claims (the "Incremental Second Lien Shares"), the issuance of any shares of Reorganized PEC Common Stock issued on account of the Commitment Premiums (as defined below), the issuance of any Ticking Premiums (as defined below) (collectively, the "Premium Shares") and the issuance of any Disputed Claims Reserve Shares (as defined below)), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity (as defined below) and the exercise of the Penny Warrants (as defined below);[20] and |

---

[18]    If the total amount of Second Lien Notes Claims increases because the Effective Date extends beyond April 3, 2017 (the total amount of Second Lien Notes Claims in excess of $1.158 billion, the "Incremental Second Lien Notes Claims"), then additional consideration shall be provided to the holders of Second Lien Notes Claims (A) by increasing the consideration pursuant to clause (i) of this paragraph on a pro rata basis in an amount equal to 50% of the amount of the Incremental Second Lien Notes Claims (and any Additional First Lien Debt so distributed pursuant to this footnote shall be referred to herein as the "Incremental Additional First Lien Debt", and any additional New Second Lien Notes so distributed pursuant to this footnote shall be referred to herein as the "Incremental New Second Lien Notes"), subject to a $20 million cap for such increase above $450 million pursuant to this clause (A), and (B) in the form of additional Reorganized PEC Common Stock with a total value at Plan Equity Value equal to the remaining amount of Incremental Second Lien Notes Claims not settled pursuant to clause (A) above; provided, however, that if no Additional First Lien Debt or New Second Lien Notes are being issued pursuant to clause (i)(b) or (i)(c) (prior to giving effect to the additional consideration described in this footnote), then the additional consideration pursuant to clause (A) above shall be paid in cash; and provided further that such incremental amounts may only be paid in cash or Incremental Additional First Lien Debt if the First Lien Full Cash Recovery occurs.

[19]    For the avoidance of doubt, see Exhibit 9 hereto for an illustrative allocation of Reorganized PEC Common Stock (Fully-Diluted).

[20]    "Pro Rata Split" shall mean the following percentages:  (x) in respect of Claims in Class 2, the quotient of

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iii) its pro rata share of the Pro Rata Split as of the Record Date (as defined below) of the Section 1145 Equity Rights (as defined below).<br><br>For the avoidance of doubt, any of the consideration received by holders of Second Lien Notes Claims shall be independently transferable, shall not be required to be transferred as part of a "strip" and shall not be subject to any minimum holding period or similar lock-up provisions; provided, that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Other Secured Claims[21] | $[0-25 million] | On or as soon as practicable after the Effective Date, Other Secured Claims, if any, shall receive the following treatment at the option of the Debtors or the Reorganized Debtors (as applicable): (i) Reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code;[22] (ii) payment in full (in cash) of any such Allowed Other Secured Claim; (iii) satisfaction of any such Allowed Other Secured Claim by delivering the collateral securing any such Allowed Other Secured Claims and paying any interest required to be paid under section 506(b) of |

(A) $708 million divided by (B) the Allowed Claims in Classes 5B plus $708 million; and (y) in respect of Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million. The Pro Rata Split for Reorganized PEC Common Stock shall be determined based on Allowed Claims as of the Effective Date, with a reserve of Reorganized PEC Common Stock created for disputed Claims as of the Effective Date. The Pro Rata Split for all other purposes shall be determined based on Allowed Claims as of the Record Date as determined in accordance with the Rights Offering Procedures. As set forth below, in lieu of Section 1145 Equity Rights, holders of disputed Claims as of the Record Date whose Claims later become Allowed shall receive Reorganized PEC Common Stock at Plan Equity Value with a value equal to their pro rata share of the Equity Rights Value (as defined below).

[21]  "Secured Claim" shall mean a Claim that is secured by a lien on property in which a Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code. "Other Secured Claim" shall mean any Secured Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, First Lien Lender Claim or Second Lien Notes Claim.

[22]  "Reinstatement" shall mean rendering a Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | the Bankruptcy Code; or (iv) providing such holders with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. |
| Other Priority Claims[23] | $[0-25 million] | On or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim will receive cash equal to the amount of such Allowed Claim, unless the holder of such Other Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different treatment. |
| General Unsecured Claims[24] | (i) PEC $[3.944 billion] to $[4.219 billion] (ii) Encumbered Guarantor Debtors $[3.960 billion] to $[4.160 billion] (iii) Gold Fields Debtors $[3.929 billion] to $[5.289 billion] (iv) Gib1 | On or as soon as practicable after the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor: (i) each holder of an Allowed General Unsecured Claim against PEC will receive its pro rata share of $[3 million] plus any Additional PEC Cash;[25] (ii) each holder of an Allowed General Unsecured Claim against one of the Encumbered Guarantor Debtors will receive the holder's pro rata share of: (a) the Pro Rata Split as of the Effective Date of the Reorganized PEC Common Stock (which shall be subject to the dilution from the LTIP Shares, the Preferred Equity, and the Penny Warrants and shall be issued after giving effect to the issuance of the Rights |

---

[23]   "Other Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim or Priority Tax Claim.

[24]   "General Unsecured Claim" shall mean any Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, Priority Tax Claim, First Lien Lender Claim, Second Lien Notes Claim, Other Secured Claim, Other Priority Claim, Convenience Class Claim, Unsecured Subordinated Debenture Claim (as defined below), Intercompany Claim (as defined below) or Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include the Unsecured Senior Notes Claims.  Additional Claims filed by governmental units on or around October 11, 2016, include a $1.8 billion Claim asserted by the U.S. Environmental Protection Agency against PEC, as well as other governmental units' Claims in excess of $1.0 billion against various other Debtors.  The Debtors are in the process of reviewing and analyzing these recently filed Claims and therefore they are not included in the Claims estimates herein.

[25]   This pool of cash is available for holders of General Unsecured Claims pursuant to the settlement of the Encumbered PEC Cash Dispute (as defined below).  "Additional PEC Cash" means, to the extent payments to Allowed Convenience Claims in Class 6A are less than $2 million, the difference between total payments to Allowed Convenience Claims in Class 6A and $2 million.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | None.<br><br>(v) Unencumbered Debtors<br><br>$**[10 million]** to $**[30 million]** | Offering Shares, the issuance of any Incremental Second Lien Shares, the issuance of any Premium Shares and the issuance of any Disputed Claims Reserve Shares), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity and the exercise of the Penny Warrants; and (b)(i) the Pro Rata Split as of the Record Date of the Section 1145 Equity Rights; provided, however, that any holder of a General Unsecured Claim against one of the Encumbered Guarantor Debtors that is not Allowed as of the Record Date shall not participate in the Rights Offering, and instead, if and when such holder's Claim becomes Allowed, shall receive an amount of Disputed Claims Reserve Shares with a value equal such holders pro rata share of the Equity Rights Value;[26]<br><br>(iii) each holder of an Allowed General Unsecured Claim against one of the Gold Fields Debtors will receive the holder's pro rata share of interests in a liquidating trust to be formed to hold and liquidate all of the assets of the Gold Fields Debtors; |

---

[26] On the Effective Date, the Debtors shall create a reserve of Reorganized PEC Common Stock (the "Disputed Claims Reserve Shares") for distribution to holders of such disputed Claims as of the Record Date that were not permitted to participate in the Section 1145 Rights Offering. The Disputed Claims Reserve Shares shall have a value, as determined by reference to Plan Equity Value, equal to the estimated value of the Section 1145 Equity Rights holders of disputed Claims as of the Record Date would have been entitled to receive if such disputed Claims later became Allowed Claims (as reasonably estimated by the Debtors) calculated as follows: (a) for each share of Rights Offering Shares that would have been available for purchase by a holder of a Class 5B Claim that was not Allowed as of the Record Date through the exercise of Section 1145 Equity Rights if such holder's Claims had been Allowed as of the Record Date, the difference between (i) the value of such share at Plan Equity Value and (ii) $**[13.75]**; and (b) for each Penny Warrant that such holder would have received through the exercise of Rights Offering Equity Rights if such holder's Claim had been Allowed as of the Record Date, the difference between (i) the value of a share of Reorganized PEC Common Stock at Plan Equity Value that underlies such Penny Warrant and (ii) $0.01 (the "Equity Rights Value"). Following completion of the reconciliation, settlement, and distribution procedures in connection with such disputed Claims, any Disputed Claims Reserve Shares which are not distributed from such reserve to holders of such disputed Claims pursuant to such procedures shall be cancelled. Prior to the Effective Date, the Debtors will file a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee, provided, however, that the aggregate face amount of disputed Claims permitted to receive Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iv) each holder of an Allowed General Unsecured Claim against Gib1 will receive no recovery; and<br><br>(v) each holder of an Allowed General Unsecured Claim against one of the Unencumbered Debtors will receive cash in the amount of the holders' Allowed Claim, less any amounts attributable to late fees, postpetition interest or penalties.<br><br>For the avoidance of doubt, any of the consideration received by holders of Allowed Unsecured Senior Notes Claims shall be independently transferable and shall not be required to be transferred as part of a "strip;" provided that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Convenience Claims | PEC Convenience Claims - $[2.7 million to $4.0 million]<br><br>Encumbered Guarantor Debtors Convenience Claims - $[24 million to $36 million] | "Convenience Claims" means General Unsecured Claims (other than Unsecured Senior Notes Claims) against PEC or any Encumbered Guarantor Debtor that otherwise would be classified in Class 5A or Class 5B, but, with respect to each such Claim, the aggregate amount of such Claim is equal to or less than $[200,000]; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim.<br><br>On or as soon as practicable after the Effective Date, unless otherwise agreed by a Convenience Claim holder and the applicable Debtor or Reorganized Debtor:<br><br>(i) each holder of an Allowed Convenience Claim against PEC shall receive cash in an amount up to [72.5]% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against PEC shall not exceed $[2] million and (b) to the extent such payments would exceed $[2] million, holders of Allowed Convenience Claims shall receive their pro rata share of $[2] million and (c) to the extent such payments are less than $[2] million, the Additional PEC Cash shall become available for distribution to |

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Class 5A creditors; and |
| | | (ii) each holder of an Allowed Convenience Claim against an Encumbered Guarantor Debtor shall receive an amount up to **[72.5]**% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against the Encumbered Guarantor Debtors shall not exceed $**[18]** million and (b) to the extent such payments would exceed $**[18]** million, holders of Allowed Convenience Claims shall receive their pro rata share of $**[18]** million. |
| MEPP Claim | $**[0.00]** to $**[643 million]** | [TBD] |
| Unsecured Subordinated Debenture Claims[27] | $**[743.9 million]** | In accordance with the provisions in the 2066 Subordinated Indenture and section 510(a) of the Bankruptcy Code, holders of Unsecured Subordinated Debenture Claims have no right to receive any distributions and, therefore, will receive no recovery under the terms of the Plan until holders of senior funded debt Claims are paid in full in accordance with the terms of the 2066 Subordinated Indenture. |
| Intercompany Claims[28] | - | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, all prepetition and postpetition Intercompany Claims shall be ignored for purposes of calculating distributions to holders of Claims pursuant to the Plan.  At the Debtors' option, on the Effective Date, Intercompany Claims may be reinstated, settled, offset, cancelled, extinguished or eliminated, including by way of capital contribution. The intercompany loans (i) owed by Gib1 to Peabody |

---

[27]   "Unsecured Subordinated Debenture Claims" means any and all Claims arising under or in connection with the 2066 Unsecured Subordinated Debentures.  "2066 Unsecured Subordinated Debentures" means the 4.75% convertible junior subordinated debentures due 2066 issued in connection with the First Supplemental Indenture between Peabody Energy Corporation and U.S. Bank National Association, dated as of December 20, 2006 (the "2066 Subordinated Indenture").

[28]   "Intercompany Claims" shall mean (a) any Claim of any Debtor against any other Debtor, (b) any Claim of any Debtor against any non-Debtor Affiliate and (c) any Claim of any non-Debtor Affiliate against any Debtor.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | IC Holdings, LLC, (ii) owed by Peabody IC Holdings, LLC to Peabody IC Funding Corporation and (iii) owed by non-Debtor Peabody Energy Australia Pty Ltd. to Peabody Investments Corp. will be treated as debt for purposes of calculating distributions to holders of Claims pursuant to the Plan.  The principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower, will be reinstated on the Effective Date. |
| Section 510(b) Claims[29] | - | Claims against PEC that are subordinated by operation of section 510(b) of the Bankruptcy Code, if any, shall be extinguished, cancelled and discharged as of the Effective Date, and holders thereof shall receive no distributions from the Debtors in respect of their Claims. |
| PEC Interests[30] | N/A | PEC Interests shall be extinguished, cancelled and discharged as of the Effective Date, and holders of existing PEC Interests shall receive no distribution in respect of their Interests. |
| Subsidiary Debtor Interests[31] | N/A | On the Effective Date, Subsidiary Debtor Interests will be reinstated, subject to any restructuring transactions. |

---

[29]  "Section 510(b) Claims" shall include all Claims subject to subordination pursuant to section 510(b) of the Bankruptcy Code, including, without limitation, for damages arising from the sale or purchase of any debt or equity security of any of the Debtors.

[30]  "PEC Interests" shall mean all Interests in PEC.  "Interests" shall mean the common stock, limited liability company interests, and any other equity, ownership, or profits interests in any Debtor and options, warrants, rights, or other securities or agreements to acquire common stock, limited liability company interests, or other equity, ownership, or profits or interests in any Debtor (arising under, or in connection with, any employment agreement), and includes any "Equity Security" (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

[31]  "Subsidiary Debtor Interests" shall mean as to a particular Debtor other than PEC, all Interests in such Debtor.

NAI-1502345820v2

## IV.   Settlement and Compromise Incorporated into the Plan

| | |
|---|---|
| Settlement and Compromise | The Plan shall contain and effect a global and integrated compromise and settlement (the "Settlement") of all disputes between the Debtors and the Creditor Co-Proponents, including the Claims and causes of action set forth below pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure. |
| CNTA Dispute | The CNTA Dispute (as defined in the DIP Facility credit documents) shall be deemed resolved upon the Effective Date of the Plan based on the settlements and comprises set forth in this Term Sheet and, ultimately, the Plan. On the Effective Date, the declaratory judgment action with respect to the CNTA Dispute shall be dismissed with prejudice. |
| Material Claim Settlements | The Requisite First Lien Lender Co-Proponents and the Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim. |
| Committee Lien Challenge | In full settlement and satisfaction of certain causes of action raised by the creditors' commitee with respect to whether cash at PEC on the Petition Date was encumbered or unencumbered (the "Encumbered PEC Cash Dispute") and other challenge actions, including, without limitation, any and all claims raised in that certain Claims Disclosure Letter [ECF No. 1267] filed by the Committee and the supplement thereto delivered to the Debtors, Citibank and the Second Lien Notes Indenture Trustee on September 15, 2016, $**[3 million]** of cash at PEC shall be made available for distribution to holders of Allowed Claims in Class 5A, and $**[2 million]** of cash at PEC shall be made available for distribution to holders of Allowed Convenience Claims against PEC. |
| Preference Actions | The Debtors shall release all preference claims against any holder of a General Unsecured Claim or a Claim arising under section 503(b)(9) of the Bankruptcy Code. |
| Intercompany Claims | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, Intercompany Claims shall be ignored for purposes of calculating distributions to third party creditors except as otherwise set forth herein. |

NAI-1502345820v2

## V.  Other

| | |
|---|---|
| Plan Value | The Plan enterprise value shall be $4.275 billion (the "Plan Enterprise Value").  The Plan equity value shall be $3.105 billion (the "Plan Equity Value").[32] |
| Distribution Mechanics | Citibank will act as the distribution agent for the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement; provided, however, that any cash distributions on account of Claims arising from Swap Contracts shall be made by the Reorganized Debtors directly to the applicable counter-party to a Swap Contract. |
| Direct Investment Pursuant to Private Placement | Pursuant to a private placement agreement (the "Private Placement Agreement"), the Noteholder Co-Proponents (the "Initial Parties") and, to the extent applicable, the Additional Private Placement Parties (as defined in Exhibit 5) shall have the right and obligation to purchase $750 million in the aggregate of Preferred Equity on the terms and conditions set forth on Exhibit 3 and Exhibit 5, which direct investment shall be a private placement exempt from registration pursuant to Section 4(a)(2) of the Securities Act (the "Private Placement") (as more fully detailed in Exhibit 5 hereto). |
| Section 1145 Rights Offering | In connection with a rights offering pursuant to the Plan (the "Section 1145 Rights Offering"), up to $750 million will be raised through the sale of units consisting of (a) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (b) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date ("Rights Offering Penny Warrants"), in each case, after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein.  Participation in the Section 1145 Rights Offering will be available to all holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B as of the Record Date, in each case, according to the Pro Rata Split as of the Record Date. |
| Backstop Commitment | Pursuant to a backstop agreement (the "Backstop Commitment Agreement"), the Initial Parties, together with any additional |

---

[32]    Calculation of Plan Equity Value assumes $1.95 billion of funded debt and approximately $20 million of capital leases.

|  | holders of Allowed Second Lien Notes Claims and Claims in Class 5B that are qualified institutional buyers and other accredited investors (as such terms are defined under the Securities Act of 1933) who become party to the PSA and Backstop Commitment Agreement on or prior to the date the Backstop Commitment Agreement is approved by the Bankruptcy Court, shall backstop its portion of 100% of the Section 1145 Rights Offering on the terms described in Exhibit 5 hereto. |
|---|---|
| Record Date for the Private Placement, Backstop Commitment Agreement and Section 1145 Rights Offering | The record date for determining a creditor's eligibility to participate in the Private Placement, the Backstop Commitment Agreement and the Section 1145 Rights Offering shall be the date on which the Disclosure Statement Order is entered by the Bankruptcy Court (the "Record Date"). |
| Reclamation Bonding | The Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "Bonding Solution").  The Debtors shall provide updates once every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution. |
| Reorganized PEC Common Stock | The Plan will provide for the cancellation of all outstanding PEC common stock and the issuance of shares of new common stock, par value $**[0.001]** per share, in Reorganized PEC (the "Reorganized PEC Common Stock"), initially subject to dilution by the LTIP Shares, the conversion of the Preferred Equity, and the exercise of the Penny Warrants.  Each share of Reorganized PEC Common Stock shall entitle its holder to one vote on matters submitted to a vote of shareholders and shall vote as one class.

The Plan will also provide that, upon emergence, Reorganized PEC shall amend and restate its charter and bylaws, which shall be in form and substance reasonably acceptable to the Requisite Members of the Noteholder Steering Committee.

The Reorganized PEC Common Stock will be registered under the Securities Exchange Act of 1934 on the Effective Date.

Reorganized PEC shall use reasonable best efforts to cause the Reorganized PEC Common Stock and the Preferred Equity to be listed for trading on the New York Stock Exchange ("NYSE") as soon as practicable after the Effective Date.[33] |

---

[33]   This obligation will be included in the Registration Rights Agreement (as defined in Exhibit 5 hereto) or shareholders' agreement.

| Exit Facility | The Debtors shall attempt, on a best efforts basis, to obtain commitments for an exit facility (the "Exit Facility") of not less than $1.5 billion in principal amount, the terms of which are no less favorable, when taken as a whole, to the Debtors than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, as determined by the Debtors in their reasonable business judgment, and of sufficient size and on appropriate terms, including the ability to enter into up to $250 million of ABL Facilities (as defined in Exhibit 1), to avoid the need to issue all or part of the Replacement Secured First Lien Term Loan and/or the New Second Lien Notes. The Debtors will provide updates as requested to the professional advisors of the First Lien Agent on the process for raising the Exit Facility (including proposals received from any such reputable financial institutions on a professional eyes only basis). In the Debtors' sole discretion, provided that the First Lien Full Cash Recovery occurs, the size of the Exit Facility may be increased up to $1.95 billion in order to provide holders of Second Lien Notes Claims with up to $450 million in cash and/or Additional First Lien Debt as set forth in greater detail above (or incrementally higher, if necessary in accordance with footnote [19], if the Effective Date does not occur on or before April 3, 2017). |
|---|---|
| Corporate Governance Matters | The initial board of directors of the Reorganized PEC (the "New Board") shall include nine (9) members and shall include (a) the chief executive officer of Reorganized PEC and (b) eight independent directors (the "Independent Directors"). Each of the individuals designated as nominees to be Independent Directors on the New Board shall be independent under the listing rules of the NYSE, as applicable, and the independence requirements for members of audit and compensation committees under the rules of the SEC. The Independent Directors shall be selected as follows: (i) the Debtors shall designate one (1) Independent Director; (ii) Contrarian, PointState and Panning may, together, select one (1) Independent Director; (iii) Elliott and Discovery may each select one (1) Independent Director; and (iv) a selection committee comprising the chief executive officer of PEC, Elliott, Discovery, and a nominee acting on behalf of Contrarian, PointState, and Panning (collectively, the "Selection Committee") shall agree on the retention of a search firm to identify and recommend the remaining four (4) Independent Directors, which recommendation shall be decided upon by the Selection Committee; provided that any existing members of the board of directors of PEC who wishes to stand for the New Board shall be interviewed and evaluated by such search firm. Reorganized PEC shall acknowledge that (A) none of Contrarian, PointState nor Panning shall be an "affiliate" |

NAI-1502345820v2

| | |
|---|---|
| | (as defined in Rule 144(a)(1) of the Securities Act) of Reorganized PEC solely on the basis of the right described in clause (ii) of the immediately preceding sentence; and (B) neither Elliot nor Discovery shall be such an "affiliate" solely on the basis of the right described in clause (i) of the immediately preceding sentence.<br><br>The boards of directors for the direct and indirect subsidiaries of Reorganized PEC shall be identified in the supplement to the Plan.<br><br>Reorganized PEC will continue to be a reporting company with the SEC following the Effective Date. |
| Long Term Incentive Plan | The terms and conditions of the long-term incentive plan (the "LTIP") for management and employees shall be as forth on Exhibit 4 hereto, including the amount of Preferred Equity and Reorganized PEC Common Stock to be reserved for the LTIP (the "LTIP Shares").  The number of LTIP Shares reserved for the LTIP will be set forth in the Plan, and the apportionment of LTIP Shares that will be granted to LTIP participants on the Effective Date shall be determined by the compensation committee of the board of directors of PEC.<br><br>For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| Executory Contracts, Unexpired Leases and Employee Benefit Obligations | All executory contracts and unexpired leases not expressly listed for assumption on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed rejected as of the Effective Date.<br><br>The Debtors shall assume all of their existing pension plans (other than the SERP, the Gold Fields PEP and a portion of the SERA), collective bargaining agreements, severance plans, SERA (as modified) and other employee and retiree benefits plans (as the same may be modified or amended in accordance with their terms and applicable law).<br><br>Any contract or lease assumed on the Effective Date shall be deemed amended and modified to provide that the confirmation and consummation of the Plan shall not trigger any "change of |

| | |
|---|---|
| | control" provisions in such contract or lease. |
| Ongoing Environmental and Reclamation Obligations | The Plan shall provide that the Reorganized Debtors (other than the Reorganized Gold Fields Debtors or any claims relating to the Gold Fields Debtors' assets or liabilities), as owners, lessees, permittees or operators of real property or a mining operation after the Effective Date, shall continue to operate in accordance with all applicable laws, rules and regulations, including all applicable environmental laws. |
| Restructuring Transactions | The Plan shall provide for the implementation of a series of restructuring transactions that are necessary or appropriate, in the Debtors' judgment, to streamline and simplify their overall corporate structure. |
| Means of Implementation | The Plan shall contain standard means of implementation, including provisions for the continued corporate existence of the Reorganized Debtors (subject to any restructuring transactions), the cancellation of certain prepetition debt and related agreements, the cancellation of prepetition equity interests in PEC, the issuance of the Reorganized PEC Common Stock, the effectuation of the Section 1145 Rights Offering and the issuance of Section 1145 Equity Rights, Reorganized PEC Common Stock and Penny Warrants in connection therewith (including pursuant to the Backstop Commitments), the effectuation of the Private Placement and the issuance of Preferred Equity in connection therewith, the revesting of the Debtors' assets in the Reorganized Debtors and the creation of appropriate reserves for the distributions contemplated under the Plan. |

-24-

| Releases | The Plan shall provide customary release provisions for the benefit of the Debtors and their Representatives to the maximum extent permitted by applicable law.[34] |
|---|---|
| | The Plan shall include (a) a release by the Debtors and their Representatives of the Released Parties (as defined below) with respect to matters related to the Chapter 11 Cases and (b) a third party release with respect to matters related to the Chapter 11 Cases which shall be binding on creditors that vote in favor of the Plan or are deemed to accept the Plan for the benefit of: (i) the Committee and its members, in their capacity as such; (ii) Citibank, in its capacity as agent under the DIP Facility and First Lien Agent; (iii) the lenders under the DIP Facility and the First Lien Lenders; and (iv) the Creditor Co-Proponents, in their capacity as such and in their capacity as First Lien Lenders, holders of Second Lien Notes and holders of Unsecured Senior Notes, and each of their respective Representatives, in their capacity as such (collectively, the "Released Parties"). |
| Exculpation | The Plan shall provide customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors and their Representatives, solely in their capacity as such, and the Released Parties, to the fullest extent permitted by applicable law, from any and all Claims and causes of action arising before the Effective Date, including, without limitation, any and all Claims and causes of action in connection with, relating to or arising out of the Chapter 11 Cases, the restructuring of the Debtors, the formulation, negotiation, preparation, dissemination, implementation, administration, solicitation, confirmation or consummation of this term sheet, the PSA, the Plan, the Disclosure Statement, the settlements set forth herein and to be embodied in the Plan or any contract, instrument, release or other agreement or document created or entered into in connection therewith or in relation thereto or any act taken or omitted to be taken in connection with or relating to any of the foregoing; provided, that the foregoing shall not affect the liability of any party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a final order to have constituted gross negligence or willful misconduct. |

---

[34]   "Representatives" shall mean any successor, predecessor, assign, subsidiary, affiliate, officer, director, member of a limited liability company, employee, partner, limited partner, general partner, management company, investment manager, shareholder of a Cayman Islands exempted company, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other professional, in each case in such capacity, serving on or after the Petition Date.

| Fees | Subject to (a) entry of the PPA and BCA Approval Order and (b) receipt of documentation reasonably acceptable to the Debtors, the Debtors shall pay or reimburse the Noteholder Co-Proponents, the Second Lien Notes Indenture Trustee and the indenture trustees for the Unsecured Senior Notes for their respective reasonable, documented out-of-pocket fees and expenses incurred after the Petition Date, including payment of the reasonable fees and expenses of legal and financial advisors, in connection with the Debtors' Chapter 11 Cases and the Restructuring earned and accrued up until the occurrence of any Termination Event (as defined in <u>Exhibit 5</u>), in each case whether or not the Restructuring is ultimately consummated; provided no such fees shall be payable in the event the PSA Termination Event occurs; and provided further that upon the occurrence of any Termination Event (other than the PSA Termination Event), any and all fees and expenses accrued and unpaid as of such date (whether or not such fees and expenses have been billed or invoiced) shall be paid by the Debtors. |
|---|---|
| | The payment of the fees set forth above shall (i) be approved upon entry of an order approving the Private Placement Agreement, and/or the Backstop Commitment Agreement; (ii) be payable within two weeks of receipt of an invoice; and (iii) prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis pursuant to <u>Exhibit 5</u> hereto. |
| | It shall be a condition precedent to the Effective Date that all fees provided for in the Final DIP Order, including the reasonable and documented fees and expenses of the legal and financial advisors of Citibank or the First Lien Lenders (subject to and in accordance with the terms of the First Lien Credit Agreement) incurred in connection with the Chapter 11 Cases prior to the Effective Date and for which the Debtors have received invoices, shall have been paid in full by the Debtors.  For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by (a) the absence of the entry of the BCA and PPA Approval Order,  or (b) the occurrence of any Termination Event, including but not limited to the PSA Termination Event. |
| | Each of the Noteholder Co-Proponents agrees to submit bills and invoices with respect to incurred fees and expenses as promptly as possible on a monthly basis.  At least ten (10) days prior to the Effective Date, each of the foregoing shall provide reasonable estimates of the fees and expenses to be paid by the Debtors on the Effective Date, which amount shall be placed into an escrow for payment of such fees and expenses.  Any residual balance in the escrow after payment of the foregoing fees and expenses shall be |

NAI-1502345820v2

| | |
|---|---|
| | returned to the Reorganized Debtors. |
| Creditor Co-Proponent Approval Rights | Each substantive document in connection with the Restructuring, including without limitation, the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee:<br><br>• The Disclosure Statement and the motion and order to approve same;<br>• The Plan and any exhibits, supplements, appendices, etc. thereto;<br>• The credit agreement and/or indenture for the Exit Facility (if applicable);<br>• The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on <u>Exhibit 1</u> hereto;<br>• The corporate constituent documents of the Reorganized Debtors;<br>• The certificate of designation of Series A convertible preferred stock of PEC;<br>• The documents relating to the Section 1145 Rights Offering and the Private Placement;<br>• The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee;<br>• The Confirmation Order; and<br>• The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement.<br><br>Notwithstanding the foregoing, the following material documents in connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent:<br><br>• The Term Sheet;<br>• The PSA;<br>• The Private Placement Agreement;<br>• The Backstop Commitment Agreement; and<br>• The orders relating to the PSA, the Private Placement Agreement, and the Backstop Commitment Agreement.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes |

(including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance acceptable to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.

The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).

As to the Requisite First Lien Lender Co-Proponents:

- If applicable, the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 hereto and otherwise in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents in their sole discretion;
- the PSA, this Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents;
- the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents; and
- each other substantive document in connection with the Restructuring (but excluding documents related to the

| | |
|---|---|
| | Bonding Solution), shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan. |
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan (the "<u>Conditions to Confirmation</u>") shall be customary for a reorganization of this size and type, including, without limitation, the following: <br><br> • The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties as set forth herein, approving the adequacy of the Disclosure Statement. <br><br> • All exhibits and other documents necessary for the implementation of the Plan and any related transactions shall be in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties (except for those documents that should be in form and substance satisfactory to each Noteholder Co-Proponent, as set forth above); provided, however, that the Requisite Creditor Parties shall not have any approval rights regarding exhibits and documents relating to the Bonding Solution. <br><br> • The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties. <br><br> • The PSA shall not have been terminated. <br><br> • All of the schedules documents, supplements and exhibits to the Plan shall be substantially in form and substance as required by the PSA. <br><br> • The Backstop Commitment Agreement shall not have been terminated. <br><br> Each of the foregoing may be waived by the Debtors, subject to the approval rights of the Requisite Creditor Parties set forth above and in the PSA. |
| Conditions to the Effective Date | The conditions precedent to the occurrence of the Effective Date of the Plan shall be customary for a reorganization of this size and type, and shall include, without limitation, the Conditions to |

Confirmation set forth in this Term Sheet and the following:

- All documents and agreements necessary to consummate the Plan shall have been effected or executed;

- If applicable, the conditions to closing of the Exit Facility shall have occurred or will occur on the Effective Date and the Debtors or Reorganized Debtors, as applicable, shall have received (or will receive in connection with the consummation of the Plan) the amounts required to be funded thereunder.

- If applicable, the conditions to issuing the Replacement Secured First Lien Term Loan as set forth in Exhibit 1 shall have occurred or will occur on the Effective Date;

- The conditions to consummating the Private Placement and the Section 1145 Rights Offering shall have been satisfied or waived by the parties thereto, and the Reorganized Debtors shall have received (or will receive simultaneously with the consummation of the Plan) the amounts required to be funded thereunder in the aggregate gross amount of not less than $1.5 billion;

- The MEPP Claim shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee and the Requisite First Lien Lender Co-Proponents if for an amount above the amounts held in reserve by the Debtors for such claim;

- The Debtors shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and that are required by law, regulation, or order and any and all steps necessary to consummate the Restructuring in any applicable jurisdictions other than the United States have been effectuated;

- The Debtors shall have obtained a Bonding Solution to cover all of their self-bonded reclamation obligations in accordance with applicable laws and regulations; and

- Any waiting period applicable to the Restructuring under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or similar law or statute shall have been terminated or shall have expired;

- All of the schedules documents, supplements and exhibits to the Plan shall be in substantially in form and substance as required by the PSA.

|  | • The Backstop Commitment Agreement shall not have been terminated. |
|  | • The PSA shall not have been terminated. |
|  | • The Plan and all exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification are made in accordance with the applicable provisions of the Plan. |
|  | Each of the foregoing may be waived by the Debtors, subject to the approval of the Requisite Creditor Parties (as applicable); provided, however, that for the avoidance of doubt, the Effective Date condition relating to the Bonding Solution shall be waivable solely by the Debtors. |

NAI-1502345820v2

**Exhibit 1 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – Replacement Secured First Lien Term Loan**

This summary of principal terms (this "Replacement 1L Term Loan Term Sheet") sets forth certain of the principal terms for the Replacement Secured First Lien Term Loan referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet").  Capitalized terms used and not otherwise defined in this Replacement 1L Term Loan Term Sheet have the meanings assigned thereto in the Plan Term Sheet. This Replacement 1L Term Loan Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein.  Matters not covered by the provisions hereof and of the Plan Term Sheet (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) are subject to mutual approval and agreement of the Borrower and the Effective Date Lenders referred to herein.  All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Required First Lien Co-Proponents.

| | |
|---|---|
| **Borrower:** | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company" or the "Borrower"). |
| **Guarantors:** | Each of the Borrower's direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), whether now owned or hereafter formed or acquired, subject to certain exceptions to be agreed (together with the Borrower, the "Loan Parties").  Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, or future permitted securitization and captive insurance entities, (ii) Peabody Holdings (Gibraltar) Limited, any future domestic subsidiary of any foreign subsidiary, and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "FSHCO") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Loan Parties; provided that any such FSHCO may only be excluded pursuant to this clause (ii) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the First Lien Debt), and provided further that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor, and (iii) unrestricted subsidiaries.  Notwithstanding the foregoing,  if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FHSCO to be guarantors without causing any adverse tax consequences to the Borrower, the Borrower shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Borrower. |

Exhibit 1-1

NAI-1502346412v1

| | As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes. |
| | |
| | Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed.  The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default, and (b) other conditions and limitations to be agreed.  Notwithstanding the foregoing, none of Peabody Investments Corporation, Peabody IC Funding Corp., Peabody Holdings (Gibraltar) Limited, Peabody Investments (Gibraltar) Limited or Peabody Global Funding, LLC shall be designated as unrestricted subsidiaries. |
| **Administrative Agent:** | An affiliate of Citibank, N.A. shall act as administrative agent in respect of the Replacement Secured First Lien Term Loan (the "Administrative Agent"). |
| **Effective Date Lenders:** | Each holder of a Secured First Lien Lender Claim. |
| **Principal Amount:** | Up to $1.5 billion, provided that the maximum principal amount of the Replacement Secured First Lien Term Loan shall be reduced, on a dollar-for-dollar basis, by (1) the principal amount of the Exit Facility on the Effective Date (as defined below), net of any upfront fees associated therewith that are netted from the amount funded on the Effective Date, (2) cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP, "Unrestricted Cash") as of the Effective Date after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA (the "PSA Transactions") in excess of $800 million and (3) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) (any such transaction, an "Equity Offering") in excess of $1.5 billion. |
| **Closing Date:** | The Effective Date. |
| **Maturity Date:** | Five (5) years after the Effective Date. |
| **Interest Rate:** | LIBOR Rate (subject to a LIBOR floor of 1.0%) + 900 bps (the "Margin"), payable quarterly in arrears in cash (and with typical LIBOR interest period mechanism).  Notwithstanding the foregoing, the Margin shall be increased (by up to but no more than 175bps) on a bp-for-bp basis, based on the greater of the increase in yield for (i) the Bloomberg BVAL U.S. Corporate B+/B/B- BVAL 5 Year Yield Curve  and (ii) the Bank of American Merrill Lynch U.S. Metals & Mining High Yield Index, in each case, measured for the ten trading day period ending on December 22, 2016 as compared to the ten trading day period ending on the day prior to the Effective Date; provided further, that any decrease in such yield will not result in a decrease in the Margin or LIBOR floor. |

Exhibit 1-2

| | |
|---|---|
| **Additional PIK Interest:** | Beginning on the 6-month anniversary of the Effective Date, additional PIK interest of 100bps per annum shall accrue on a quarterly basis (including on capitalized PIK interest), if either (a) the Replacement Secured First Lien Term Loan has not received a facility credit rating from S&P, Moody's or Fitch or (b) the facility credit rating assigned to the Replacement Secured First Lien Term Loan is below B- by S&P or Fitch or below B3 by Moody's.

Beginning on the 12-month anniversary of the Effective Date, either (a) additional PIK interest of 200bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate principal amount of funded indebtedness of the Company secured by first priority liens (excluding the ABL Facilities (defined below), capital leases and other purchase money financings) ("First Lien Debt") of the Borrower exceeds $1.125 billion or (b) additional PIK interest of 100bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate First Lien Debt obligations of the Borrower are greater than $750 million and less than or equal to $1.125 billion, *provided* that, for purposes of calculating the amount of the aggregate First Lien Debt obligations of the Borrower, the First Lien Debt obligations shall be deemed to be increased by the amount by which Unrestricted Cash is less than $800 million. |
| **Default Rate:** | 2% per annum (additive to "Interest Rate" above).  The Default Rate shall be imposed automatically on any Event of Default resulting from the failure of the Borrower to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any Event of Default resulting from the insolvency or bankruptcy of the Borrower, and may be imposed upon the written election of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan while any other Event of Default is continuing. |
| **Amortization:** | The principal amount of the Replacement First Lien Term Loan shall be repayable in quarterly installments equal to 0.75% of the original principal amount of the Replacement First Lien Term Loan as of the Effective Date. |
| **Collateral:** | The Replacement First Lien Term Loan shall be secured by a security interest on substantially all of the existing and after-acquired assets of the Borrowers and Guarantors (including, without limitation, liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), licenses and a pledge of 100% of equity interest of Peabody IC Funding Corp and other domestic subsidiaries and, subject to the last sentence of this paragraph, a pledge limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs formed or acquired on or after the Effective Date (to the extent the pledge of such FSHCO would result in an adverse tax consequences), subject to customary carve-outs) and a pledge limited to 65% of the equity interests in Peabody Investments (Gibraltar) Limited, which liens shall in each case be first in priority with respect to assets other than "ABL Priority Collateral" (to be limited to accounts receivables, cash other than identifiable proceeds of non-ABL Priority Collateral and inventory) and second in priority with respect to all ABL Priority Collateral. Notwithstanding the foregoing, but subject to the last sentence of this paragraph, none of the equity interests in Peabody Holdings (Gibraltar) Limited, and none of the equity interests in any domestic subsidiary of a foreign subsidiary or in any |

Exhibit 1-3

|  | subsidiary, whether now owned or hereafter formed or acquired, substantially all the assets of which consist of equity of Peabody Holdings (Gibraltar) Limited, shall be pledged. Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case, without causing any adverse tax consequences, would permit the Borrower (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Borrower shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Borrower, or (b) if requested by the lenders, to cause the relevant entities described in this sentence to pledge their operating assets, the Borrower shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Borrower.

The Loan Parties shall, not later than the date that is 90 days following the Closing Date (or such later date as the Administrative Agent shall agree in its discretion), cause all deposit accounts and securities accounts of the Loan Parties, subject to customary exceptions to be agreed, to be subject to control agreements for the benefit of the Lenders satisfactory to the Administrative Agent in its reasonable discretion.

The liens securing the Replacement First Lien Term Loan shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.

The liens securing the Replacement First Lien Term Loan shall, if applicable, be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the New Second Lien Notes referred to in the Plan Term Sheet and the collateral agent for the Replacement First Lien Term Loan. The terms of the Intercreditor Agreement in no event shall be less favorable in any material respect to the holders of the Replacement Secured First Lien Term Loan than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes referred to in the Plan Term Sheet (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap).  Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
|---|---|
| **Commitment Fee:** | None |
| **Funding Fee:** | A fee equal to 4.0% of the original principal amount of the Replacement Secured First Lien Term Loan on the Effective Date shall be payable in cash on the Effective Date. |
| **Voluntary Prepayments:** | The Borrower may repay the Replacement Secured First Lien Term Loan at any time and from time to time in whole or in part without premium or penalty, upon written notice, at the option of the Borrower. |

Exhibit 1-4

| Mandatory Prepayments: | Mandatory prepayments (at par) shall be required, without duplication, in an amount equal to: |
|---|---|
| | (i) (a) 100% of the net cash proceeds of non-ordinary course sales or dispositions of assets by the Borrower or any restricted subsidiary subject to thresholds and exceptions to be agreed, but not subject to reinvestment rights; *provided* that, in the case of any such sale or disposition of assets constituting ABL Priority Collateral, the amount of such prepayment will be reduced on a dollar-for-dollar basis by the amount of any repayments of outstanding borrowings or the amount required to cash collateralize letters of credit under the applicable ABL Facility, as a result of such sale or disposition, to be made by the Borrower pursuant to the terms of such ABL Facility; *provided*, *further*, that prepayments described in this subclause (i)(a) shall not be required to the extent (but only to the extent) proceeds are generated or received by any foreign subsidiary and repatriation of such proceeds would be prohibited by law, limited by fiduciary duties, or would reasonably be expected to result in any material adverse tax or other Liabilities (it being understood and agreed that (x) the Borrower and its subsidiaries shall be required to use commercially reasonable efforts to take all actions available under applicable law to permit the repatriation of the relevant amounts, (y) if the applicable barrier to repatriation shall cease to exist within 18 months following the date on which such prepayment would otherwise be required to be made, the Borrower or the applicable subsidiary shall repatriate the relevant amounts to the Borrower for application to the Replacement Secured First Lien Term Loan as required above promptly following the date on which the relevant circumstance shall have ceased to exist and (z) the utilization of available net operating losses or other tax attributes or credits shall not constitute a material adverse tax or other liability); and

(b) 100% of the net cash proceeds from the sale of Metropolitan Collieries Pty Ltd (to the extent such sale is consummated after the Effective Date) to the extent that, after any such prepayment under this subclause (i)(b), the Borrower and its subsidiaries shall have Unrestricted Cash of at least $800 million;

(ii) (a) prior to the later of (X) the 12-month anniversary of the Effective Date and (Y) the time at which at least $425 million of the outstanding principal amount of the Replacement Secured First Lien Term Loan has been repaid, the lesser of (1) the amount of Unrestricted Cash in excess of $800 million and (2) 75% of Excess Cash Flow (to be defined in a manner to be agreed, but will be calculated after giving effect to customary adjustments to be agreed for mandatory prepayments of indebtedness), in each case paid quarterly (to be paid on the 10th business day after the filing of the Borrower's report on Form 10-Q or 10-K, as applicable, or such date that the Borrower is required to have filed its reports on Form 10-Q or 10-K, as applicable (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended)); and |

Exhibit 1-5

| | |
|---|---|
| | (b) thereafter, subject to further reduction based on first lien gross leverage ratios to be agreed, (X) the lesser of the amount of Unrestricted Cash of the Borrower and its subsidiaries in excess of $800 million and (Y) 50% of Excess Cash Flow (to be paid semi-annually on the 10th business day after the filing of the Borrower's reports on Form 10-Q for each of the first and third quarter of a fiscal year or such date that the Borrower is required to have filed such forms (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended) (the prepayments described in section (ii) hereof, the "Cash Flow Sweep"); and<br><br>(iii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "Intercompany Note") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Borrower on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed.<br><br>"Excess Cash Flow" repayments will be reduced by the amount of any voluntary prepayments of the Replacement Secured First Lien Term Loan. |
| **Conditions to Closing:** | Customary conditions to be agreed, including, without limitation:<br><br>(i) Minimum Unrestricted Cash of $600 million after giving effect to the PSA Transactions on the Effective Date;<br><br>(ii) Maximum funded indebtedness of the Borrower and its subsidiaries after giving effect to the PSA Transactions, excluding borrowings under the ABL Facilities, capital leases and similar purchase money financings, as of the Effective Date of $1.95 billion (of which no more than $1.5 billion may be first lien debt) plus, to the extent the Effective Date is after April 3, 2017, the amount of any Incremental New Second Lien Notes;<br><br>(iii) The Debtors shall have consummated the Section 1145 Rights Offering and Private Placement and received at least $1.5 billion in gross proceeds therefrom;<br><br>(iv) The Debtors shall have attempted, on a best efforts basis, to obtain commitments for the full amount of the Exit Facility, the terms of which are no less favorable to the Debtors, when taken as a whole, than the terms provided for in this Replacement 1L Term Loan Term Sheet as determined by the Debtors in their reasonable business judgment;<br><br>(v) All Milestones set forth in the PSA shall have been satisfied (or waived) on the terms set forth therein; and |

Exhibit 1-6

|  | (vi) No Unrestricted Cash and none of the proceeds from any Equity Offering shall be applied, or shall have been applied, to reduce the size of the Section 1145 Rights Offering or the Private Placement, repay or reduce the principal amount of the New Second Lien Notes or otherwise repay or satisfy any claims that are junior to the Secured First Lien Lender Claims except as expressly provided pursuant the PSA. |
|---|---|
| **Representations and Warranties:** | Usual and customary representations and warranties for facilities of this type. |
| **Affirmative Covenants:** | Usual and customary affirmative covenants for facilities of this type, including, without limitation, (i) a covenant to use commercially reasonable efforts to obtain a rating on the Replacement Secured First Lien Term Loan from S&P, Moody's or Fitch within 6 months of the Effective Date, (ii) preservation of existence, (iii) payment of liabilities, including taxes, (iv) maintenance of insurance, (v) maintenance of properties and leases, (vi) visitation rights, (vii) keeping of records and books of accounts, (viii) compliance with laws; sanctions, (iv) collateral; further assurances, (x) subordination of intercompany loans, (xi) reporting requirements, including delivery of financial statements and compliance certificates, (xii) post-closing covenants and (xiii) creation or ownership of certain subsidiaries, partnerships and joint ventures. |
| **Negative Covenants:** | Usual and customary negative covenants for facilities of this type, including, without limitation, restrictions on

(a) indebtedness, including limitations on:

(1) debt at non-guarantor subsidiaries of the Company;

(2) other debt incurrence, liens and guaranties subject to carve-outs TBD, including (i) unsecured debt baskets based on satisfaction of both a total leverage ratio and fixed charge coverage ratio (each to be agreed); (ii) $450 million in New Second Lien Notes, plus any Incremental New Second Lien Notes, plus any accrued and capitalized interest (and refinancing thereof); (iii) one or more or a combination of A/R receivables or securitization facilities and/or ABL facilities in a maximum amount of up to $250 million and secured by a first lien on accounts receivable and inventory (the "ABL Facilities"), it being understood that there may be domestic ABL Facilities and Australian ABL Facilities; and (iv) cash management and hedging obligations baskets secured on a pari passu basis (subject to a $300 million cap) with the First Lien Debt;

(b) repayment or repurchase of subordinated indebtedness, indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan (including the New Second Lien Notes) and unsecured indebtedness, subject to a carve-out for the Borrower's share of Excess Cash Flow for any fiscal period up to $50 million principal amount in the aggregate per year (plus accrued and unpaid interest on the principal amount of such indebtedness so repaid or repurchased), with no roll-over rights, provided that such repayments or repurchases are only permitted if Unrestricted Cash exceeds $800 million immediately after giving effect to the most recent Cash Flow Sweep and pro forma for such repayments or |

Exhibit 1-7

NAI-1502346412v1

repurchases (it being understood and agreed that the foregoing shall not apply to restrict the cash payment of any regularly scheduled interest in respect of any New Second Lien Notes in accordance with the terms described in the section captioned "Interest" in Exhibit 2 to the Plan Term Sheet or repayments due at scheduled maturity);

(c) liquidations, mergers, consolidations, acquisitions;

(d) disposition of assets or subsidiaries, including the equity interests of subsidiaries;

(e) affiliate transactions;

(f) investments (including acquisitions);

(g)  dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests, including:

(1) no cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions); and

(2) no cash payments on account of any principal, interest or premium of junior indebtedness (including indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan and unsecured indebtedness) apart from contractual interest payments, repayments due at scheduled maturity and payments permitted under clause (b) above;

(h) fundamental changes (including dispositions of all or substantially all assets);

(i) transactions with respect to bonding subsidiaries;

(j) hedging transactions;

(k) entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, payments of principal, interest and other amounts in respect of the Intercompany Note or other intercompany indebtedness), and the granting of negative pledges;

(l) continuation of or change in business;

(m) changes in accounting practices or fiscal year;

(n) amendments/modification to organization documents or material agreements;

(o) issuance of preferred stock;

(p) use of proceeds in violation of margin regulations; and

(q) restrictions on activities of the subsidiaries that directly hold equity interests in

Exhibit 1-8

| | |
|---|---|
| | Peabody Holdings (Gibraltar) Limited consistent with standard limitations on activities of special purpose vehicles, including incurrence and guarantees[1] of indebtedness, pledges of assets, bankruptcy remoteness, amendments to organizational documents, ownership of assets and conduct of business other than activities incidental to the ownership of equity interests in Peabody Holdings (Gibraltar) Limited; and<br><br>(r) amendments, waivers or consents in respect of the Intercompany Note and other intercompany loans owed to any Loan Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Loan Party in subsidiaries that are not Loan Parties (subject to exceptions and materiality thresholds to be agreed, in each case that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan. Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the Intercompany Note on the Effective Date shall be subject to the approval of the Requisite First Lien Lender Co-Proponents (as defined in the Plan Term Sheet).<br><br>The covenants under the Replacement Secured First Lien Term Loan shall be at least as restrictive as the covenants under the New Second Lien Notes. |
| **Financial Covenants** | Maximum Gross Leverage Ratio, measured quarterly and Maximum Capital Expenditures, measured annually; *provided* that unused capital expenditures may be carried forward to the immediately succeeding fiscal year (and any amounts so carried forward shall be deemed to have been used last in any fiscal year). |
| **Events of Default** | Usual and customary for facilities of this type. |
| **Governing Law** | New York. |

---

[1] Any unsecured guaranty by any such FSHCO of New Second Lien Notes will be subordinated in right of payment to Permitted First Lien Indebtedness on terms acceptable to the Requisite First Lien Co-Proponents.

Exhibit 1-9

NAI-1502346412v1

**Exhibit 2 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – New Second Lien Notes**

This summary of principal terms (this "New 2L Notes Term Sheet") sets forth certain of the principal terms for the New Second Lien Notes referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet").  Capitalized terms used and not otherwise defined in this New 2L Notes Term Sheet have the meanings assigned thereto in the Plan Term Sheet.  This New 2L Notes Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Indenture referred to below and related documents (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms and conditions set forth in this New 2L Notes Term Sheet and otherwise in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion. All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Requisite Consenting Noteholders.

| Issuer | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company"). |
|---|---|
| **Notes Offered** | New Second Lien Notes (the "Notes"; the holders of the Notes, the "Holders," and the indenture governing the Notes, the "Indenture") in an aggregate principal amount of $450.0 million (plus, if applicable, the principal face amount of any Incremental New Second Lien Notes); provided that the amount of Notes issued on the Effective Date shall be subject to adjustment in connection with cash consideration and/or Additional First Lien Debt distributed to the holders of Second Lien Notes Claims as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"; provided, further, that in no event shall the aggregate principal amount of the Notes (including the principal face amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250.0 million.  The Notes are to be issued on, and as a condition to, the Effective Date (unless cash and/or Additional First Lien Debt in the aggregate amount of $450 million (plus, if applicable, cash and/or Incremental Additional First Lien Debt distributed on account of Incremental Second Lien Notes Claims) is distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"). |
| **Second Lien Debt Adjustment** | Notwithstanding anything herein to the contrary, to the extent there is a First Lien Full Cash Recovery, the aggregate principal amount of the Additional First Lien Debt and the Notes, as appropriate, permitted to be issued or incurred on the Effective Date shall be reduced, on a dollar-for-dollar basis, by the amount by which Unrestricted Cash (as defined below) as of the Effective Date (after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million ( the |

Exhibit 2-1

| | |
|---|---|
| | "Second Lien Debt Adjustment").  "Unrestricted Cash" means cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP). |
| **Maturity Date** | Six (6) years after the Effective Date; provided that, in the event the latest stated maturity of the Permitted First Lien Indebtedness (as defined below) (as in effect on the Effective Date) is six (6) years or longer after the Effective Date, then the maturity of the Notes shall be the 91st day after such latest stated maturity (as in effect on the Effective Date); provided, further, that in no event shall the maturity of the Notes be later than the 91st day after the seventh (7th) anniversary of the Effective Date. |
| **Interest** | The Notes will bear interest at a per annum rate equal to 3-month LIBOR, plus an applicable margin equal to 300 basis points over the highest all-in yield (calculated and otherwise determined as described below) of any Permitted First Lien Indebtedness outstanding on the Effective Date (disregarding the ABL Facilities (as defined below) for this purpose) (such Permitted First Lien Indebtedness with the highest all-in yield, the "1L Reference Debt").  LIBOR shall be subject to an interest rate floor equal to 1.00% (subject to adjustment as described below).  Interest on the Notes shall be payable quarterly in arrears in cash; provided that any applicable portion of interest expressly contemplated below to be payable in kind shall be capitalized on a quarterly basis.

The all-in yield of Permitted First Lien Indebtedness for purposes of identifying the 1L Reference Debt and determining the applicable margin on the Notes shall be determined as follows:

- If more than one series or class of Permitted First Lien Indebtedness is outstanding on the Effective Date, the 1L Reference Debt shall be such debt with the highest all-in yield.
- With respect to any such Permitted First Lien Indebtedness bearing interest at a rate based on LIBOR, the LIBOR component of such debt shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt and has a LIBOR floor greater than the LIBOR floor applicable to the Notes, then the LIBOR floor (but not the applicable margin) applicable to the Notes shall be increased to the extent of such differential between LIBOR floors.
- With respect to any such Permitted First Lien Indebtedness bearing interest at a fixed rate, the all-in yield shall be calculated as described below, minus 1.50%.
- To the extent any Permitted First Lien Indebtedness requires any portion of interest on such debt to be paid in kind with an increase to the principal amount of such debt at specified times during the term of such debt or upon the occurrence of certain conditions ("1L PIK Interest," and the per annum interest rate for such 1L PIK Interest, the "PIK Rate"), then such 1L PIK Interest shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt, then the Notes shall bear additional interest, at the PIK Rate, which shall be paid in kind with an increase to the principal amount of the Notes, subject to the same conditions applicable to the 1L PIK Interest; provided, however, that accrual of any such |

Exhibit 2-2

|  | paid-in-kind interest on the Notes shall not commence until the second (2nd) anniversary of the Effective Date and any such additional paid-in-kind interest shall cease to the extent the 1L Reference Debt is refinanced within 24 months of the Effective Date and such refinanced debt does not contain paid-in-kind interest provisions. |
|  | • The all-in yield calculation for any Permitted First Lien Indebtedness (other than the Replacement Secured First Lien Term Loan (as defined below)) shall not include any commitment or similar fees that are (x) paid or payable to any underwriters or arrangers (in their respective capacities as such) of such debt and (y) not shared generally with lenders in the primary syndication of such debt (it being agreed that any OID shall not be subject to this sentence). |
|  | As used in this section, "all-in yield" means, as to any series or class of Permitted First Lien Indebtedness, the yield to maturity of such debt, whether in the form of interest rate, margin, OID, commitment fees, upfront or similar fees (including, with respect to the Replacement Secured First Lien Term Loan, the "funding fee" referred to in Exhibit 1 to the Plan Term Sheet, provided that the maximum amount of such "funding fee" included in this calculation for the Replacement Secured First Lien Term Loan shall not be more than 300 basis points) or a LIBOR or other interest rate floor (subject to the provisions above), in each case, incurred or payable by the Company generally to all lenders or initial purchasers of such debt or other financing sources (including, as applicable, the Backstop Parties and any arrangers or underwriters of such debt) providing commitments in respect of such debt; provided that OID and upfront fees shall be equated to interest rate assuming a 4-year life to maturity (or, if less, the stated life to maturity at the time of incurrence of the applicable debt). "Replacement Secured First Lien Term Loan" means any replacement secured first lien debt issued to any of the holders of Secured First Lien Lender Claims as part of the treatment for such Claims or other first lien debt committed to by the Backstop Parties in connection with the treatment for such Claims. |
|  | If the holders of any Permitted First Lien Indebtedness receive any non-cash consideration, then (a) such non-cash consideration shall not be included in calculating the all-in yield of such debt and (b) the Holders of the Notes shall receive the same non-cash consideration on a proportionate basis relative to the aggregate principal amount of Notes issued on the Effective Date compared to the aggregate principal amount of the applicable tranche(s) of Permitted First Lien Indebtedness receiving such consideration. |
|  | The Indenture will contain customary "AHYDO" catch-up payment provisions applicable to debt with a term of more than five years. |
| **Default Rate:** | 2% per annum (additive to the interest rate otherwise applicable to the Notes, as described above). The Default Rate shall be imposed automatically on any default under the Indenture resulting from the failure of the Company to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any event of default resulting from the insolvency or bankruptcy of the Company or any Guarantor (as defined below), and may be imposed upon the written election of the Holders of a majority of the outstanding principal amount of the Notes while any other event of default is |

Exhibit 2-3

NAI-1502346427v1

| | continuing. |
|---|---|
| **Guarantees, Collateral and Certain Intercreditor Matters** | The Notes shall be jointly and severally guaranteed by (a) each of the Company's existing or hereafter formed or acquired direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), subject to certain exceptions to be agreed, and (b) each other subsidiary of the Company that, as of the Effective Date or from time to time thereafter, guarantees any Permitted First Lien Indebtedness (as defined below) or certain other debt to be agreed (such entities guarantying the Notes, collectively, the "<u>Guarantors</u>"; the Company collectively with the Guarantors, the "<u>Note Parties</u>").  Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, (ii) future permitted special purpose securitization entities and permitted captive insurance entities, (iii) unrestricted subsidiaries and (iv) Peabody Holdings (Gibraltar) Limited and any future domestic subsidiary of any foreign subsidiary and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "<u>FSHCO</u>") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Note Parties; provided that any such FSHCO may only be excluded pursuant to this clause (iv) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the Indenture); provided, further, that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor.  Notwithstanding the foregoing, if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FSHCO to be guarantors without causing any adverse tax consequences to the Company, the Company shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Company.<br><br>As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes.<br><br>The Notes shall be secured by liens on substantially all of the existing and after-acquired assets of the Company and the Guarantors, including, without limitation, (a) a pledge (i) of 100% of the equity interests of Peabody IC Funding Corp and other domestic subsidiaries, (ii) subject to the last sentence of this paragraph, limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs now existing or hereafter formed or acquired (to the extent the pledge of 100% of the equity interests of any such entity would result in an adverse tax |

Exhibit 2-4

consequence to the Note Parties) and (iii) of intercompany debt owed to the Company or any Guarantor, and (b) liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), and licenses. Assets constituting collateral shall be subject to customary exceptions to be agreed, which exceptions shall in no event be less favorable in any material respect to the Holders than the definition of "Excluded Assets" (as defined in the prepetition First Lien Credit Agreement). Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case without causing any adverse tax consequences, would permit a Note Party (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Company shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Company, or (b) if requested by the trustee or the Holders of a majority of the outstanding principal amount of the Notes, to cause the relevant entities described in this sentence to pledge their operating assets, the Company shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Company.

Notwithstanding the foregoing (but subject to the last sentence of the immediately preceding paragraph), (i) none of the equity interests of Peabody Holdings (Gibraltar) Limited ("Gib1") shall be pledged, (ii) any subsidiary of the Company directly or indirectly owning any equity interests of Gib1 shall be a Guarantor (it being agreed that any such direct owner that is a FSHCO, substantially all the assets of which consist of equity interests of Gib1, shall be permitted to be an unsecured Guarantor (the "Unsecured Guarantors") and shall not be required to have its equity pledged to secure the Notes, to the extent that a secured guaranty and such an equity pledge would have adverse tax consequences to the Note Parties), (iii) Gib1 shall pledge 65% of the equity interests of Peabody Investments (Gibraltar) Limited ("Gib2") and (iv) the equity interests of Gib1 and any Unsecured Guarantor shall not otherwise be pledged to secure other obligations. The guaranty of the Notes provided by any permitted Unsecured Guarantor shall be subordinated in right of payment to any guaranty of Permitted First Lien Indebtedness provided by such Unsecured Guarantor on terms reasonably acceptable to the Ad Hoc Group of Second Lien Noteholders.

The collateral securing the Notes shall include any assets subject to liens securing any Permitted First Lien Indebtedness (other than any Australian ABL Facility) and other debt to be agreed, and the liens securing the Notes shall be junior in priority to the liens securing any such Permitted First Lien Indebtedness.

The liens securing the Notes shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.

The liens securing the Notes shall be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the Notes and the collateral agent(s) for any Permitted First Lien Indebtedness. The terms of the

Exhibit 2-5

| | Intercreditor Agreement in no event shall be less favorable in any material respect to the Holders than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap). Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
|---|---|
| **Special Limitations on the Activities of certain Subsidiaries** | The Unsecured Guarantors, any subsidiary that directly holds equity interests in Gib1 and other subsidiaries to be agreed shall be subject to customary special purpose entity restrictions, including bankruptcy remoteness, and special limitations on (i) incurrence and guarantees of indebtedness, (ii) pledges of assets, (iii) conduct of business activities unrelated to owning certain assets (in the case of any Unsecured Guarantor, unrelated to owning equity interests of Gib1), (iv) ownership of assets, (v) dispositions or other transfers of assets and (vi) amendments to their organizational documents. The organizational documents of such subsidiaries shall be required to be amended to reflect such special purpose entity restrictions and provide that further modification thereof is subject to the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Unrestricted Subsidiaries** | Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed. The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default under the Indenture, and (b) other conditions and limitations to be agreed. Notwithstanding the foregoing, none of the entities identified on Annex A hereto or any direct or indirect parent company of any such entity shall be designated as unrestricted subsidiaries. |
| **Optional Redemption** | Redeemable, in whole or in part, without premium or penalty. |
| **Change of Control Repurchase Offer** | 101% mandatory repurchase offer upon the occurrence of a change of control (customary definition to be agreed). |
| **Asset Sale Proceeds Mandatory Prepayment** | Mandatory prepayment (at par) in an amount equal to (i) 100% of the net proceeds from asset sales by the Company or its restricted subsidiaries (subject to exceptions to be agreed, including exceptions for certain ordinary course or de minimis sales) and (ii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "PIC Intercompany Note") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Company on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments of the Notes and any Permitted First Lien Indebtedness made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed, in any such case, except to the extent such amounts are applied to prepay any Permitted First Lien Indebtedness (other than any revolving or similar credit facility) then outstanding. |
| **Excess Cash** | The Company will be required to make mandatory prepayments of the Notes in |

Exhibit 2-6

| Mandatory Prepayment | an amount equal to the lesser of (x) 25% of Excess Cash Flow (to be defined no less favorable to the Holders than the definition of "Excess Cash Flow" in the definitive documents governing the Permitted First Lien Indebtedness as in effect on the Effective Date) for the applicable fiscal period and (y) the difference between (i) 75% of Excess Cash Flow for the applicable fiscal period minus (ii) the Excess Cash Flow mandatory prepayment percentage applied ratably to outstanding Permitted First Lien Indebtedness (or, if Excess Cash Flow mandatory prepayments on Permitted First Lien Indebtedness are not applied ratably, the aggregate of all Excess Cash Flow mandatory prepayment percentages actually applied to prepay the Permitted First Lien Indebtedness); provided that (A) any liquidity, minimum cash or similar threshold for an Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than any such threshold for "Excess Cash Flow" or "Cash Flow Sweep" summarized in Exhibit 1 to the Plan Term Sheet and (B) any payment restrictions applicable to any Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than the payment restrictions for "Excess Cash Flow" summarized in Exhibit 1 to the Plan Term Sheet.

Notwithstanding the above, for so long as any Replacement Secured First Lien Term Loans remains outstanding and the Excess Cash Flow required to be prepaid (and actually prepaid) under such Replacement Secured First Lien Term Loans in any fiscal year is less than 75%, the Company will be required to make mandatory prepayments of the Notes in an amount equal to 25% of Excess Cash Flow (as defined in and calculated under the definitive documents governing the Replacement Secured First Lien Term Loans as in effect on the Effective Date) for the applicable fiscal period, subject to the thresholds, payment restrictions and other terms and conditions set forth in Exhibit 1 to the Plan Term Sheet.

No amendment or refinancing of the Permitted First Lien Indebtedness shall be permitted to modify the terms of the Excess Cash Flow mandatory prepayments in a manner that is adverse in any material respect to the Holders.

Excess Cash Flow mandatory prepayments of the Notes shall be made no less frequently than on an annual basis, and, in the case of an annual mandatory prepayment, no later than 30 days after the date on which the Company's Annual Report on Form 10-K for its most recently completed fiscal year is filed with the Securities and Exchange Commission or, if the Company is not required to file such reports, the date on which the Company's audited annual financials for its most recently completed fiscal year are delivered under the Indenture (or, if earlier, 30 days after the date on which the annual financials for such fiscal year were required to be delivered under the Indenture), commencing with the Company's fiscal year ending December 31, 2018; provided that (i) the Excess Cash Flow mandatory prepayment for the Notes for any applicable fiscal period shall be made no later than five (5) business days after the Excess Cash Flow mandatory prepayment for such fiscal period is made in respect of any Permitted First Lien Indebtedness and (ii) in the event that any Permitted First Lien Indebtedness requires Excess Cash Flow mandatory prepayments more frequently than on an annual basis for any fiscal period (e.g., quarterly or semi-annually), then Excess Cash Flow mandatory prepayments of the Notes shall be determined and required on the same periodic basis applicable to such Permitted First Lien Indebtedness. |

Exhibit 2-7

| | |
|---|---|
| **Financial Covenants** | The Indenture shall contain financial maintenance covenants identical to the most restrictive financial maintenance covenants contained in any definitive documentation for any Permitted First Lien Indebtedness outstanding from time to time; provided that, in the event the requisite holders of such Permitted First Lien Indebtedness amend or waive compliance with the financial maintenance covenants applicable to such Permitted First Lien Indebtedness, a corresponding amendment or waiver shall automatically apply to the financial maintenance covenants contained in the Indenture. |
| **Permitted ABL Facilities** | One or more of a combination of A/R receivables or securitization facilities and/or ABL facilities in an aggregate principal amount not to exceed the U.S. dollar equivalent of $250 million, on customary terms for facilities of such type (together with any refinancing or replacement facilities of such type, the "ABL Facilities"). The ABL Facilities will be secured by a first priority lien on the ABL Priority Collateral (as defined in Exhibit 1 to the Plan Term Sheet) and, in the case of domestic ABL Facilities that are not A/R receivables or securitization facilities, by a second priority lien on the other collateral securing the Notes. It is understood that there may be domestic ABL Facilities and Australian ABL Facilities. |
| **Certain Intercompany Claims** | Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the PIC Intercompany Note on the Effective Date shall be subject to the approval of the Ad Hoc Group of Second Lien Noteholders. The Indenture shall include restrictions on amendments, waivers or consents in respect of (i) the PIC Intercompany Note and (ii) other intercompany loans owed to any Note Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Note Party in subsidiaries that are not Note Parties (subject to exceptions and materiality thresholds to be agreed), in any such case, that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Certain Covenants** | The Indenture shall contain high-yield bond covenants and other covenants and restrictions to be negotiated, including:<br><br>• Limitations on debt incurrence, liens and guaranties applicable to the Company and its restricted subsidiaries, capping total secured and unsecured debt at $2.20 billion (plus any interest paid in kind on such debt and, if applicable, the amount of any cash or debt consideration on account of any Incremental Second Lien Notes Claims, minus the amount of any Second Lien Debt Adjustment, minus the amount of any First Lien Debt Adjustment[1]), subject to certain ordinary course exceptions to be agreed |

---

[1] "First Lien Debt Adjustment" the reduction of the aggregate principal amount of the Replacement Secured First Lien Term Loan permitted to be issued or incurred on the Effective Date, on a dollar-for-dollar basis, by (i) the amount by which Unrestricted Cash as of the Effective Date (after giving effect to the transactions contemplated
*(cont'd)*

Exhibit 2-8

NAI-1502346427v1

<table>
<tr><td></td><td>

○ First lien indebtedness consisting of the following (any such indebtedness so secured on a senior basis, collectively, the "<u>Permitted First Lien Indebtedness</u>"):

    ▪ the Exit Facility and/or the Replacement Secured First Lien Term Loan issued or incurred on the Effective Date in an aggregate principal amount not to exceed the sum of the following amounts less any amounts prepaid or repaid (not refinanced) thereunder from time to time: (x) $1.5 billion (minus the amount of any First Lien Debt Adjustment), plus (y) the amount of cash consideration and/or Additional First Lien Debt (including any such cash or debt on account of any Incremental Second Lien Notes Claims) distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims -Second Lien Notes Claims,*" plus (z) any interest paid in kind on such first lien indebtedness;

    ▪ the ABL Facilities in an aggregate principal amount of up to $250 million; and

    ▪ any refinancing of the foregoing, subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity than the debt being refinanced, (ii) be secured by assets that do not constitute collateral of the debt being refinanced, unless such collateral shall also secure (or be added to secure) the Notes and (iii) be guaranteed by affiliates of the Company that do not guaranty the debt being refinanced unless such guarantor shall also guarantee (or be added to guarantee) the Notes;

○ Additional first lien or second lien debt may be incurred to the extent the proceeds are used to ratably repay all or a portion of the Notes; provided that any such refinancing of the Notes shall be subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity (unless such refinancing debt is first lien debt) than the Notes, (ii) have a greater all-in yield than the Notes, (iii) be secured by assets that do not constitute collateral for the Notes, (iv) be guaranteed by affiliates of the Company that do not guaranty the Notes, (v) in the case of any such second lien refinancing debt, contain more restrictive covenants or events of default than those applicable to the Notes (unless the Holders receive the benefit of such more restrictive terms) and (vi) in the case of any such second lien refinancing debt, contain any mandatory prepayment or redemption provisions that would

</td></tr>
</table>

---

*(cont'd from previous page)*

    by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million and (ii) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) in excess of $1.5 billion, as described in Exhibit 1 to the Plan Term Sheet in the section captioned "*Principal Amount*".

Exhibit 2-9

result in prepayments or redemptions of such debt prior to the Notes;
- o No pari passu or junior lien debt shall be permitted;
- o Limitations on acquisition indebtedness;
- o Limitations on unsecured indebtedness to be agreed;
- o Non-speculative hedging transactions shall be permitted, subject to customary parameters to be agreed, and up to $300 million to the extent a First Lien Full Cash Recovery does not occur on the Effective Date, otherwise $400 million of net exposure under such hedging transactions shall be permitted to be secured by a senior lien on the collateral securing the Notes;
- o Any debt outstanding on the Effective Date shall not contain restrictions on the payment or prepayment of the Notes that are less favorable to the Holders than any such restrictions contained in Exhibit 1 to the Plan Term Sheet

- Limitations on making dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests and other restricted payments (including repayments or repurchases of, or other cash payments on account of, junior lien, subordinated or unsecured debt and the making of investments and acquisitions)
  - o No cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions);
  - o No cash payments on junior indebtedness apart from contractual interest payments and repayments due at scheduled maturity; and
  - o The up to $50 million annual basket referred to in Exhibit 1 of the Plan Term Sheet for repayments and repurchases of junior lien, subordinated or unsecured indebtedness may only be utilized for the Notes

- Limitations on entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, agreements that restrict payments of principal, interest and other amounts in respect of the PIC Intercompany Note and other intercompany indebtedness), and the granting of negative pledges
- Anti-layering covenant
- Limitations on the issuance of preferred stock
- Limitations on fundamental changes, including dispositions of all or substantially all assets, liquidations, mergers, consolidations and acquisitions
- Limitations on sales of assets, including the equity interests of subsidiaries
- Limitations on affiliate transactions
- Limitations on transactions with respect to bonding subsidiaries
- Limitations on change in business or changes in accounting practices or fiscal year
- Limitations on amendments/modification to organization documents or material agreements
- Limitations on the issuance of preferred stock
- Reporting requirements, including delivery of financial statements and compliance certificates
- Affirmative covenants to be agreed, including (i) preservation of existence, (ii) payment of liabilities, including taxes, (iii) maintenance of insurance, (iv) maintenance of properties and leases, (v) visitation rights, (vi) keeping of

Exhibit 2-10

NAI-1502346427v1

|  | records and books of accounts, (vii) compliance with laws; sanctions, (viii) collateral; further assurances, (ix) subordination of intercompany loans, (x) post-closing covenants and (xi) creation or ownership of certain subsidiaries, partnerships and joint ventures |
|---|---|
| **Limitations on Refinancing Restrictions** | Permitted First Lien Indebtedness may contain customary "permitted refinancing" conditions to be agreed with respect to restrictions on the refinancing or replacement of the Notes; provided that any such restrictions shall not prohibit such refinancing debt from (i) having a greater all-in yield than the Notes to the extent such additional yield is in the form of interest payable only in kind or (ii) having covenants that are more restrictive than the Notes, so long as such (x) covenants are not more restrictive (when taken as a whole) than the most restrictive terms of any Permitted First Lien Indebtedness then outstanding (provided that the foregoing shall not permit the elimination of any first lien/second lien covenant cushions, standstills or like deviations and/or terms) and (y) without in any manner limiting the preceding clause (x), to the extent any particular clause is more restrictive, it is added for the benefit of the holders of the Permitted First Lien Indebtedness. |
| **Events of Default** | The Indenture shall contain event of default provisions customary for high-yield bonds, with certain grace periods and materiality thresholds to be agreed, including, in the case of a default of the financial covenants, a 30-day grace period.  Such provisions shall include a cross-acceleration provision with respect to any Permitted First Lien Indebtedness, and cross-default to other indebtedness subject to a materiality threshold to be agreed. |
| **Governing Law** | The Notes and the Indenture shall be governed by New York law. |

Exhibit 2-11

NAI-1502346427v1

**Annex A to Exhibit 2 to Plan Term Sheet**

Peabody Australia Holdco Pty Ltd
Peabody Australia Intermediate Pty Ltd
Peabody COALTRADE Pacific Pty Ltd
Peabody Energy (Gibraltar) Limited
Peabody Energy Australia Pty Ltd.
Peabody Energy Finance Pty Ltd
Peabody Global Funding, LLC
Peabody Holdings (Gibraltar) Limited
Peabody Holland B.V.
Peabody IC Funding Corp.
Peabody IC Holdings, LLC
Peabody International (Gibraltar) Limited
Peabody International Investments, Inc.
Peabody Investments (Gibraltar) Limited
Peabody Investments (Gibraltar) Limited
Peabody Investments Corporation
Peabody MCC (Gibraltar) Limited
Peabody Mining (Gibraltar) Limited
Peabody Netherlands Holding B.V.
U.S. newco to be formed to hold any equity in Peabody Holdings (Gibraltar) Limited

NAI-1502346427v1

## Exhibit 3

### Preferred Equity Term Sheet

| Term | Description |
|---|---|
| **The Preferred Equity** | Mandatorily convertible preferred equity issued by Reorganized PEC that is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over any another class of capital stock issued by the Reorganized Debtors. |
| **Dividend Rate** | 8.5% per annum, payable semi-annually in kind as a dividend of additional shares of Preferred Equity. Dividends shall accumulate to the extent not paid and shall accrue dividends in the same manner as the outstanding Preferred Equity. |
| **Participation** | The Preferred Equity shall participate on an as-converted basis (giving effect to any accrued and unpaid dividends) in any dividend or distribution (whether in cash, securities, debt, or assets, other than common stock dividends), and any payments in connection with a liquidation event, payable on the Reorganized PEC Common Stock. |
| **Liquidation Preference** | $25.00 per share of Preferred Equity, plus any accrued but unpaid dividends through, but not including, the date of liquidation or other determination (whether or not declared, prorated for any partial dividend period). |
| **Conversion at the Option of the Holder** | The Preferred Equity shall be convertible into Reorganized PEC Common Stock at any time, at the option of the holder of such Preferred Equity, at an initial conversion price based on a discount of 35% to Plan Equity Value (the "Conversion Price"), subject to anti-dilution protection as provided herein.   In connection with any optional conversion of the Preferred Equity, the Conversion Price shall be adjusted for accrued but unpaid dividends to, but not including, the conversion date. The Conversion Price for any such optional conversion shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Optional Redemption by the Company** | Subject to early conversion or other retirement of the Preferred Equity, if at any time following the Effective Date, less than 25% of the total number of shares of Preferred Equity that were issued on the Effective Date remain outstanding, then the Company shall have the right, but not the obligation, to redeem all (but not less than all) of the remaining shares of Preferred Equity, following thirty (30) days' notice, at a redemption price equal to the Liquidation Preference of such shares of Preferred Equity, payable in cash or shares of Reorganized PEC Common Stock at Reorganized PEC's election; provided that the |

| Term | Description |
|---|---|
| | Company shall not redeem any shares of Preferred Equity for cash during any time that any obligations under the Replacement Secured First Lien Term Loan remain outstanding. The Conversion Price for any such optional redemption shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Mandatory Conversion** | <u>Conversion Threshold</u>. Beginning on the Effective Date, each outstanding share of Preferred Equity shall automatically convert (unless previously converted at the option of the holder of such Preferred Equity or pursuant to an exercise of a conversion right in connection with a Fundamental Change (as defined below)) into a number of shares of Reorganized PEC Common Stock at the Conversion Price (such conversion, the "<u>Mandatory Conversion</u>") if the volume weighted average price of the Reorganized PEC Common Stock exceeds 130% of the plan common equity value (the "<u>Conversion Threshold</u>") for at least 45 trading days in a 60 consecutive trading day period, including each of the last 20 days in such 60 consecutive trading day period (such period, the "<u>Mandatory Conversion Period</u>'). The issuance of shares of Reorganized PEC Common Stock pursuant to the Mandatory Conversion shall be effected on the third business day following the expiration of the Mandatory Conversion Period (such date, the "<u>Mandatory Conversion Date</u>"). Notwithstanding the foregoing, during the first 45 trading days post Effective Date, a Mandatory Conversion will be deemed to have occurred if the volume weighted average price of Reorganized PEC Common Stock exceeds 150% of the plan common equity value for at least 10 trading days in a 20 consecutive day trading period, including each of the last 5 days of the 10 trading days when the threshold is achieved. |
| | If the Mandatory Conversion occurs within the first 36 months after the Effective Date, the Conversion Price applicable to such Mandatory Conversion shall also be adjusted to reflect the amount of preferred dividends that would otherwise have been payable within the first 36 months to the extent not already paid (such additional amount, the "<u>Makewhole Amount</u>"). In connection with any Mandatory Conversation after the first 36 months after the Effective Date, the Conversion Price shall only be adjusted for accrued but unpaid dividends as of, but not including, the Mandatory Conversion Date. |
| | <u>Conversion by Holders</u>. At any time following the Effective Date, if holders of at least 66 2/3% of all outstanding Preferred Equity (the "<u>Electing Holders</u>") elect to convert the Preferred |

| Term | Description |
|------|-------------|
|  | Equity held by them, then all Preferred Equity then outstanding that is not held by the Electing Holders shall automatically convert at the same time and on the same terms as the Preferred Equity held by the Electing Holders.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable). |
| **Conversion Upon a Fundamental Change** | The Preferred Equity shall automatically convert into shares of Reorganized PEC Common Stock immediately prior to the consummation of a Fundamental Change, approved as provided below under "Voting Rights," if either (x) at consummation of the Fundamental Change, the price of the Reorganized PEC Common Stock exceeds the Conversion Threshold, or (y) the consideration payable in the Fundamental Change per share of Reorganized PEC Common Stock exceeds the Conversion Threshold and is payable in cash.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable).<br><br>"Fundamental Change" means a sale of Reorganized PEC, whether by merger, share purchase or otherwise, a sale of substantially all of the assets of Reorganized PEC and its subsidiaries taken as a whole or other business combination transaction involving Reorganized PEC as a result of which the equity holders of Reorganized PEC immediately following the transaction are holders of less than 50% of the equity interests in the surviving entity. |
| **Anti-dilution Protection** | If and to the extent not  otherwise paid or provided for as contemplated by "Dividend Participation" above, the Conversion Price shall be subject to customary anti-dilution adjustment for:<br><br>▪ stock splits, reverse stock splits and stock dividends on all or substantially all shares of Reorganized PEC Common Stock;<br><br>▪ issuance to all or substantially all holders of Reorganized PEC Common Stock of certain warrants or rights to purchase additional shares of Reorganized PEC Common Stock;<br><br>▪ issuance of Reorganized PEC Common Stock (and/or securities exercisable for or convertible into Reorganized PEC Common Stock) at a price (or exercise price) per share |

| Term | Description |
|------|-------------|
| | less than 95% of the current market price per share of Reorganized PEC Common Stock;[1] and |
| | ▪ successfully completed above-market self-tender offers and exchanges offers involving the Reorganized PEC Common Stock. |
| | In addition, upon the occurrence of a Fundamental Change, approved as provided below under "Voting Rights," unless the Preferred Equity is mandatorily convertible immediately prior thereto, the Preferred Equity shall thereafter be convertible into the cash, securities or assets receivable by holders of Reorganized PEC Common Stock in the applicable transaction. |
| **Voting Rights** | The Preferred Equity will vote with the Reorganized PEC Common Stock as a single class on an as-converted basis (giving effect to any accrued but unpaid dividends) on all matters submitted to a vote of the holders of Reorganized PEC Common Stock. |
| | The Preferred Equity will be entitled to vote as a separate class in respect of each of the following (with the affirmative vote of a majority of the outstanding Preferred Equity required to approve such matters, except as specified below): |
| | ▪ Any increase in the authorized amount of the Preferred Equity; |
| | ▪ Authorization of any class of equity ranking senior to or on par with the Preferred Equity; |
| | ▪ Any amendment to the terms of the Preferred Equity, which approval shall require the affirmative vote of 2/3 of the outstanding Preferred Equity; |
| | ▪ Any Fundamental Change requiring approval of the holders of Reorganized PEC Common Stock; |
| | ▪ Any liquidation or winding-up of Reorganized PEC; and |
| | ▪ Authorization of dividends on Reorganized PEC Common Stock in excess of $100 million payable to holders of Reorganized PEC Common Stock in any 12-month period. |
| **Registration Rights** | Without limiting the Company's obligations under the Registration Rights Agreement, all holders of Preferred Equity and any shares of Reorganized PEC Common Stock issuable |

---

[1]    Inclusion of this provision is subject to this provision not causing the Preferred Equity to be treated other than as equity for accounting purposes and not requiring debt [or derivative] accounting treatment (and this provision being the only cause of such treatment).

| Term | Description |
|------|-------------|
| | upon exercise or conversion thereof that constitute "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act) and all holders that are "affiliates" of Reorganized PEC (as defined in Rule 144(a)(1) under the Securities Act) shall be entitled to customary resale registration rights, including shelf, demand and resale registration (and, for clarity, the Company shall agree that if any person who proposes to make a sale of any such securities would be entitled to such registration rights but for the Company's view that such proposed seller is not an "affiliate" of Reorganized PEC, then the Company and its legal counsel shall upon request promptly provide, at the Company's sole expense, such transfer instructions  (including instructions regarding the removal of restrictive legends) and legal opinions (on which such proposed seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such proposed sale to be made without compliance with the volume or manner of sale restrictions of Rule 144 under the Securities Act).<br><br>Reorganized PEC shall file a resale shelf registration statement for such holders, and shall use commercially reasonable efforts to cause the registration statement to go effective, as promptly as practicable following the Effective Date, as summarized in more detail in Exhibit 5 under "Registration Rights." |
| **Stock Exchange Listing** | TBD |
| **Accounting Treatment** | TBD |

# Exhibit 4

**PEABODY ENERGY CORPORATION**
**LONG-TERM INCENTIVE PLAN**

PEABODY ENERGY CORPORATION
LONG-TERM INCENTIVE PLAN

The following term sheet summarizes the principal terms of a Long-Term Incentive Plan (the "LTIP") to be sponsored on and after the Effective Date by Reorganized PEC.

| General Description of LTIP | **Purpose.** The purpose of the LTIP is to help align the interests of participants with Reorganized PEC's shareholders and to recognize, reward and retain the services of executives, other employees, and consultants of Reorganized PEC and its subsidiaries and non-employee directors of Reorganized PEC. |
|---|---|
| | **LTIP Pool.** The LTIP will provide for a pool of shares of Reorganized PEC Common Stock to consist of 10% of the fully diluted equity (after giving effect to the exercise of the Penny Warrants and the conversion of the Preferred Equity) of Reorganized PEC (the "LTIP Pool"). The LTIP Pool will be used for awards to be granted on the Effective Date and for potential future awards. |
| | **Awards.** The LTIP will provide for the grant of cash and stock-based awards including stock options, stock appreciation rights, restricted stock, shares of Reorganized PEC Common Stock, restricted stock units, deferred stock, performance units, dividend equivalents and cash incentive awards. |
| | **Administration.** The LTIP initially will be administered by the Compensation Committee of the Board of Directors of PEC (the "Committee"). Emergence Awards will be allocated and approved by the Committee. Future awards will be allocated and approved by the Post-Emergence Committee (as defined below). |
| **Allocation of Emergence Awards** | 25.8% of the LTIP Pool (the "Emergence Pool") will be granted to employees and executives on the Effective Date in the form of restricted Reorganized PEC Common Stock (or units) ("Emergence Awards"). The Emergence Pool will be allocated by the Committee to the six most senior executives as follows: |
| | <table><tr><td>**Executive / Level**</td><td>**Allocation of Emergence Pool**</td></tr><tr><td>G. Kellow</td><td>18.75%</td></tr><tr><td>C. Meintjes</td><td>6.25%</td></tr><tr><td>K. Williamson</td><td>6.25%</td></tr><tr><td>A. Schwetz</td><td>6.50%</td></tr><tr><td>V. Dorch</td><td>4.38%</td></tr><tr><td>B. Galli</td><td>3.75%</td></tr></table> |
| | The remainder of the Emergence Pool (54%) will be allocated by the Committee to other employees prior to the Effective Date. |
| **Terms of Emergence Awards** | **Normal Vesting.** |
| | • Emergence Awards granted to Directors and above will generally vest ratably on each of the first three anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | • Emergence Awards granted to employees below the level of Director will generally vest ratably on each of the first two anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | **Accelerated Vesting.** Emergence Awards will become fully vested upon (i) a participant's termination of employment by Reorganized PEC and its subsidiaries (or any applicable successors) without Cause or for Good Reason and (ii) a participant's termination of |

| | |
|---|---|
| | employment with Reorganized PEC and its subsidiaries (or applicable successors) due to death or Disability. To the extent the Emergence Awards are not replaced upon a Change in Control, the Post-Emergence Committee may convert the awards to cash-settled awards based on the value of the consideration shareholders receive in the Change in Control, as determined by the Post-Emergence Committee.<br><br>Forfeiture. Participants will forfeit unvested Emergence Awards upon (i) any voluntary resignation of employment with Reorganized PEC and its subsidiaries (or applicable successors) (other than for Good Reason) and (ii) any termination of employment by Reorganized PEC and its subsidiaries (or applicable successors) for Cause.<br><br>Dividend Equivalents. Unvested Emergence Awards will accrue dividend equivalents. Accrued dividend equivalents will be subject to the same vesting and termination provisions as the underlying shares of Reorganized PEC Common Stock to which they relate.<br><br>Taxes. Participants will satisfy taxes required to be withheld upon vesting and/or settlement of an Emergence Award through share withholding, subject to compliance with applicable laws. |
| **Future Awards** | The remaining LTIP Pool will be granted, on terms and conditions (including allocation and vesting) to be established by the Compensation Committee of the Board of Directors of Reorganized PEC (the "Post-Emergence Committee"), in its discretion. |
| **Restrictive Covenants** | Generally, participants will be bound by the standard restrictive covenant agreement which contains non-competition and non-solicitation provisions, among others. |
| **Definition of Cause for Emergence Awards** | "Cause" means: (a) any willful fraud, dishonesty or misconduct of the participant that can reasonably be expected to have a detrimental effect on (i) the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates or (ii) the participant's reputation or performance of his or her duties to Reorganized PEC or any of its subsidiaries or affiliates; (b) willful refusal or failure of the participant to comply with Reorganized PEC's Code of Business Conduct and Ethics, Reorganized PEC's Anti- Corruption and Bribery policy or any other material corporate policy of Reorganized PEC; (c) the participant's willful or repeated failure to meet documented performance objectives or to perform his or her duties or to follow reasonable and lawful directives of his or her manager (other than due to death or Disability); (d) the participant's conviction of, or plea of nolo contendere to (i) any felony; or (ii) any other criminal charge that may reasonably be expected to have a material detrimental effect on the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates; or (e) the participant's willful failure to cooperate with a bona fide internal investigation or an investigation by regulatory or law enforcement authorities, whether or not related to the participant's employment with Reorganized PEC, after being instructed to cooperate by the Chairman and/or Chief Executive Officer or by the Board of Directors of Reorganized PEC, or the willful destruction of or willful failure to preserve documents or other material known to be relevant to any such investigation; provided that with respect to clause (b) or (c) above, the participant shall have 15 business days following written notice of the conduct which is the basis for the potential termination for Cause within which to cure such conduct, to the extent it can be cured, to prevent termination for Cause by Reorganized PEC. If the participant cures the conduct that is the basis for the potential termination for Cause within such period, Reorganized PEC's notice of termination shall be deemed withdrawn. |
| **Definition of Change in Control for Emergence Awards** | "Change in Control" means the occurrence of any one or more of the following: (a) any corporation, person or other entity (other than Reorganized PEC, a majority-owned subsidiary of Reorganized PEC or any of its subsidiaries, or an employee benefit plan (or related trust) sponsored or maintained by Reorganized PEC or any of its subsidiaries), including a "group" as defined in Section 13(d)(3) of the Exchange Act, becomes the beneficial owner of stock representing more than 50% of the combined voting power of Reorganized PEC's then outstanding securities; (b) there is consummated (i) a merger, consolidation, plan of arrangement, reorganization or similar transaction or series of |

|  | transactions in which Reorganized PEC is involved, other than such a transaction or series of transactions which would result in the shareholders of Reorganized PEC immediately prior thereto continuing to own (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the securities of Reorganized PEC or such surviving entity (or the parent, if any) outstanding immediately after such transaction(s) in substantially the same proportions as their ownership prior to such transaction(s); (ii) a sale or other disposition of all or substantially all of Reorganized PEC's assets; or (iii) approval by Reorganized PEC's shareholders of a plan of liquidation for Reorganized PEC; or (c) within any period of 24 consecutive months, persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period, together with persons who were first elected as directors (other than as a result of any settlement of a proxy or consent solicitation contest or any action taken to avoid such a contest) during such 24-month period by or upon the recommendation of persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period and who constituted a majority of the Board of Reorganized PEC at the time of such election, cease to constitute a majority of the Board of Reorganized PEC. To the extent required for an award that is "deferred compensation" within the meaning of Section 409A of the Internal Revenue Code ("Code") to comply with Section 409A of the Code, no transaction will be a Change in Control unless it is also a change in the ownership or effective control of Reorganized PEC, or in the ownership of a substantial portion of Reorganized PEC's assets, as provided in Section 409A(a)(2)(A)(v) of the Code and Treasury Regulations Section 1.409A-3(i)(5). |
|---|---|
|  | For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| **Definition of Disability for Emergence Awards** | "Disability" means a mental or physical illness that entitles the participant to receive benefits under the long-term disability plan of an employer, or if the participant is not covered by such a plan or the participant is not an employee of an employer, a mental or physical illness that renders a participant totally and permanently incapable of performing the participant's duties for Reorganized PEC or a subsidiary.  Notwithstanding the foregoing, (a) an illness shall not qualify as a Disability if it is the result of (i) a willfully self-inflicted injury or willfully self-induced sickness; or (ii) an injury or disease contracted, suffered, or incurred while participating in a felony criminal offense; and (b) with respect to any award subject to Section 409A of the Code, Disability shall mean a participant's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. |
| **Definition of Good Reason for Emergence Awards** | "Good Reason" shall mean (a) "Good Reason" as defined in the participant's employment agreement with Reorganized PEC, if any; or (b) if the participant does not have an employment agreement with Reorganized PEC or such agreement does not define Good Reason, then:  (i) a reduction, other than a reduction that generally affects all similarly-situated executives and does not exceed 10% in one year or 20% in the aggregate over three consecutive years, by Reorganized PEC in the participant's base salary from that in effect immediately prior to the reduction; (ii) a material reduction, other than a reduction that generally affects all similarly-situated executives, by Reorganized PEC in the participant's target or maximum annual cash incentive award opportunity or target or maximum annual equity-based compensation award opportunity from those in effect immediately prior to any such reduction; (iii) relocation, other than through mutual agreement in writing between |

3.

|  | Reorganized PEC and the participant or a secondment or temporary relocation for a reasonably finite period of time, of the participant's primary office by more than 50 miles from the location of the participant's primary office as of the agreement date; or (iv) any material diminution or material adverse change in the participant's duties or responsibilities as they exist as of the agreement date; provided, that (x) if the participant terminates participant's employment for "Good Reason," the participant shall provide written notice to Reorganized PEC at least 30 days in advance of the date of termination, such notice shall describe the conduct the participant believes to constitute "Good Reason" and Reorganized PEC shall have the opportunity to cure the "Good Reason" event within 30 days after receiving such notice, (y) if Reorganized PEC cures the conduct that is the basis for the potential termination for "Good Reason" within such 30 day period, the participant's notice of termination shall be deemed withdrawn and (z) if the participant does not give notice to Reorganized PEC as described herein within 90 days after an event giving rise to "Good Reason," the participant's right to claim "Good Reason" termination on the basis of such event shall be deemed waived. |

## Exhibit 5

### Private Placement and Backstop Commitment Term Sheet

Set forth below are the key terms of (i) a private placement for $750 million of Preferred Equity (the "***Private Placement***") and (ii) the backstop of the Section 1145 Rights Offering for up to $750 million of Reorganized PEC Common Stock (the "***Backstop Commitment***") and Rights Offering Penny Warrants, in each case in connection with the Plan.  As set forth herein, certain holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B (the "***Claims***") shall have the right and obligation to participate in the Private Placement and the Backstop Commitment according to the following percentages, based on Allowed Claims as of the Record Date, in each case subject to adjustment as provided herein: such holder's pro rata portion of (i) in respect of Allowed Claims in Class 2, the quotient of (A) $708 million divided by (B) the Allowed Claims in Class 5B plus $708 million; and (ii) in respect of Allowed Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million (such percentage split hereafter defined as the "***Pro Rata Split***").  If a holder of Claims elects to participate in the Private Placement, such holder must also agree to participate in the Backstop Commitment, subscribe for its full entitlement in the Section 1145 Rights Offering and become party to the PSA.

The Noteholder Co-Proponents (or the "***Initial Parties***") have agreed to subscribe for all Preferred Equity being issued in the Private Placement and to provide the full Backstop Commitment, subject to participation by other creditors as provided herein.

| Private Placement | |
| --- | --- |
| **Term** | **Description** |
| **Private Placement:** | This Term Sheet describes the Private Placement of shares of Preferred Equity (the "***Private Placement Shares***") in the Reorganized Debtors for an aggregate purchase price of $750 million at a price per share consistent with the conversion ratio of Preferred Equity to Reorganized PEC Common Stock detailed in the Preferred Equity Term Sheet under "Conversion at the Option of the Holder."  The aggregate number of Private Placement Shares shall be reasonably acceptable to the Requisite Members of the Noteholder Steering Committee.<br><br>For the avoidance of doubt, any Preferred Equity purchased by the Private Placement Parties (as defined below) shall be solely on account of the new money provided in the Private Placement and not on account of such party's Class 2 or Class 5B Claims. |
| **Private Placement Commitments:** | Subject to the terms and conditions of the Private Placement Agreement (as defined below):<br><br>(i) the Initial Parties have each committed (on a several and not joint |

basis) to purchase 22.5% of the Private Placement Shares in the aggregate, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule;

(ii) the Initial Parties and the creditors that become Additional Private Placement Parties by 5:00 pm New York City time on the third business day following execution of the Private Placement Agreement (such creditors, the "***Phase Two Private Placement Parties***") shall have the exclusive right and obligation (on a several and not joint basis) to purchase 5% of the Private Placement Shares in the aggregate; and according to (a) the Pro Rata Split and (b)(1) with respect to the Initial Parties, on a pro rata basis based on, and calculated using, the Initial Parties' claim amounts as set forth on the Initial Private Placement Schedule, and, (b)(2) with respect to the Phase Two Private Placement Parties, each Phase Two Private Placement Party's claim amounts as disclosed to the Initial Parties upon such Phase Two Private Placement Parties' execution of the Private Placement Agreement; and

(iii) the Initial Parties, the Phase Two Private Placement Parties, and any other Additional Private Placement Parties (together, the "***Private Placement Parties***") have each committed (on a several and not joint basis) to purchase their respective Private Placement Percentage of the remaining 72.5% of the Private Placement Shares in the aggregate; provided that, with respect to such 72.5%, if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are party to the Private Placement Agreement before the Private Placement Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to purchase the full amount of such Preferred Equity that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Private Placement Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims participated in the Private Placement (a "***Surplus Preferred Participation Adjustment***"), and the Preferred Equity available to Additional Private Placement Parties in the respective Class shall be reduced accordingly on a pro rata basis.

In accordance with the foregoing, the "***Private Placement Percentages***" means, for any Private Placement Party, a percentage determined by multiplying—

    (I)   the Pro Rata Split applicable to the relevant Class of Claims held by such Private Placement Party by—

    (II) (i)   if the Surplus Preferred Participation Adjustment shall apply—

<table>
<tr><td></td><td>

(X)  in the case of an Initial Party that has elected[1] to apply the Surplus Preferred Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth on the Initial Private Placement Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Private Placement Schedule) <u>divided by</u> (B) the amount of two-thirds (2/3) of all Claims within such Class; and

(Y)  in the case of a Phase Two Private Placement Party, the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Private Placement Party (as defined below) in such Class <u>divided by</u> (B) the amount of two-thirds of all Claims within such Class, (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) (1) 50% of the amount of the Claims of such Phase Two Private Placement Party in such Class, <u>divided by</u> (2) the amount of all Participating Private Placement Claims[2] within such Class, other than the Claims, or portions thereof, to which clause (II)(i)(X) and/or clause (II)(i)(Y)(a) is applicable; and

(ii)  in the case of (x) any other Private Placement Party, if the Surplus Preferred Participation Adjustment applies, or (y) any Private Placement Party, if the Surplus Preferred Participation Adjustment does not apply—

(A)  one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Private Placement Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Private Placement Claims in such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable.

</td></tr>
<tr><td>**Private Placement Agreement**:</td><td>The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Private Placement (the "***Private***</td></tr>
</table>

---

[1]  Each Initial Party must elect to apply the Surplus Preferred Participation Adjustment no later than ten (10) business days following the Private Placement Enrollment Outside Date.

[2]  "<u>Participating Private Placement Claims</u>" shall mean Claims within the applicable class held by all Private Placement Parties.

| | |
|---|---|
| | ***Placement Agreement***"). |
| | The Private Placement Percentage of each Private Placement Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Private Placement Agreement (the "***Private Placement Schedule***"). |
| | The initial commitment schedule attached as <u>Schedule 1(a)</u> hereto (the "***Initial Private Placement Schedule***") reflects the percentage allocation of the obligations of the Initial Parties to purchase shares of Preferred Equity in the Private Placement (prior to the addition of Additional Private Placement Parties as contemplated hereby). The Initial Private Placement Schedule shall be amended only upon consent of each of the Initial Parties. |
| | If any Private Placement Party fails to fund the purchase price for the Private Placement Shares required to be purchased by them under the Private Placement Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Private Placement Party fails to fund. |
| **Additional Private Placement Parties:** | Holders of Claims will have the opportunity to become Private Placement Parties under the Private Placement Agreement prior to the date that is 20 business days following the Debtors' filing of the motion seeking entry of the PPA and BCA Approval Order (such order, the "***PPA and BCA Approval Motion***", and such date, the "***Private Placement Enrollment Outside Date***"). |
| | "***Additional Private Placement Parties***" means, collectively, each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to (i) participate in the Private Placement by joining the Private Placement Agreement and the PSA in accordance with the foregoing, (ii) join the Backstop Commitment Agreement as a Backstop Party prior to the applicable deadline described herein, and (iii) subscribe for its full entitlement of Rights Offering Shares in the Section 1145 Rights Offering. Initial Parties may be Additional Private Placement Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as of the execution of the Private Placement Agreement. |
| **Securities Law Exemptions:** | The Private Placement Shares shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another |

NAI-1502345820v2

| | available exemption from registration. |
|---|---|
| **Implementation of the Private Placement:** | The Debtors shall conduct the Private Placement on behalf of the Reorganized Debtors through customary private placement documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties. |
| **Private Placement Premiums**: | The Debtors will pay the Private Placement Parties in respect of the Private Placement (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Private Placement Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 until the Effective Date (with proration for partial months) (the "***Private Placement Ticking Premium***" and, together with the Private Placement Premium, the "***Private Placement Premiums***").

With respect to the Private Placement Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Private Placement Percentages as set forth on the Initial Private Placement Schedule; (ii) 57.5% shall be allocated to the Initial Parties and the Phase Two Private Placement Parties on a pro rata basis based upon their respective Private Placement Commitment (as defined in the Private Placement Agreement); and (iii) 20% shall be allocated to all Private Placement Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after the filing of the PPA and BCA Approval Motion based upon each Private Placement Party's Private Placement Percentage.  The Private Placement Ticking Premium will be shared pro rata among Private Placement Parties.  The Private Placement Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.  The Reorganized PEC Common Stock issued in connection with the Private Placement Commitment Premium shall be issued after giving effect to the conversion of the Preferred Equity and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 of the Term Sheet.

The Private Placement Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order.  The Private Placement Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
| **Pro Rata Split** | For purposes of the Private Placement Percentages, the Pro Rata Split shall be determined as of the Record Date. |

-5-

| SECTION 1145 RIGHTS OFFERING AND BACKSTOP COMMITMENT | |
|---|---|
| **Term** | **Description** |
| **Rights Offering**: | This Term Sheet describes the Section 1145 Rights Offering of rights to purchase units (the "***Rights Offering Shares***") consisting of (i) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (ii) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date, in each case after giving effect to the conversion of Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> herein.  The price per unit to be paid in the Section 1145 Rights Offering shall be determined in accordance with the Plan such that the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering shall be $750 million.  The holders of Allowed Claims in Classes 2 and 5B as of the Record Date will be permitted to participate in the Section 1145 Rights Offering. <br><br> After consultation with counsel and the Noteholder Steering Committee, the Debtors may decrease the number of Section 1145 Equity Rights distributed to holders of Second Lien Notes Claims, Unsecured Senior Notes Claims and General Unsecured Claims in Class 5B as required or instructed by the Bankruptcy Court or the SEC, in each case to allow the Section 1145 Rights Offering to be exempt from registration under the Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code; provided, however, that (a) in no event shall such decrease in the number of Section 1145 Equity Rights result in a decrease of the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering below $650 million, and (b) in no event shall the price per unit to be paid in the Section 1145 Rights Offering be subject to increase or decrease in connection with such decrease in the number of Section 1145 Equity Rights.  In this event, any amounts excluded shall instead be purchased directly by the Backstop Parties pursuant to the Backstop Commitment Agreement. <br><br> The Section 1145 Rights Offering will be conducted by the Company on behalf of the Reorganized Debtors, and the Plan will provide that the rights and obligations of the Company hereunder will vest in the Reorganized Debtors on the Effective Date. |
| **Commitments**: | Subject to the terms and conditions of the Backstop Commitment Agreement (as defined below), the Initial Parties (together with any Additional Backstop Parties (as defined below), the "***Backstop Parties***") have each committed (on a several and not joint basis, and based on, and calculated using, the claim amount set forth in the Initial Backstop Commitment Schedule) to purchase their respective Backstop Commitment Percentage of any unsubscribed Rights Offering Shares (the "***Backstop Commitment***" and together with the |

NAI-1502345820v2

Private Placement, the "***Commitments***"); provided, however, that if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are parties to the Backstop Commitment Agreement before the Backstop Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to elect for their Backstop Commitments to equal the full amount of Backstop Commitments that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Backstop Commitment Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class participated in the Backstop Commitment (a "***Surplus Backstop Participation Adjustment***"), and the Backstop Commitment available to Additional Backstop Parties in the respective Class shall be reduced accordingly.

In accordance with the foregoing, the "***Backstop Commitment Percentages***" means, for any Backstop Party, a percentage determined by multiplying—

(I)   the Pro Rata Split applicable to the relevant Class of Claims held by such Backstop Party by—

(II) (i)   if the Surplus Backstop Participation Adjustment shall apply—

(X)   in the case of an Initial Party that has elected[3] to apply the Surplus Backstop Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth in the Initial Backstop Commitment Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Backstop Commitment Schedule) divided by (B) the amount of two-thirds (2/3) of all Claims within such Class; and

(Y)   in the case of a Phase Two Backstop Party (as defined herein), the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class divided by (B) the amount of two-thirds of all Claims within such Class, plus (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), multiplied by (B) (1) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class, divided by (2) the amount of all Participating Backstop Claims[4] within such Class, other than the Claims, and/or portions thereof (if any) to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable; and

---

[3]   Each Initial Party must elect to apply the Surplus Backstop Participation Adjustment no later than [three (3)] business days following the Backstop Enrollment Outside Date.

[4]   "Participating Backstop Claims" shall mean Claims within the applicable class held by all Backstop Parties.

<table>
<tbody>
<tr>
<td></td>
<td>

(ii)   in the case of (x) any other Backstop Party, if the Surplus Backstop Participation Adjustment applies, or (y) any Backstop Party, if the Surplus Backstop Participation Adjustment does not apply—

(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Backstop Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Backstop Claims within such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable.

</td>
</tr>
<tr>
<td><strong>Backstop Commitment Agreement</strong>:</td>
<td>

The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Backstop Commitments (the "***<u>Backstop Commitment Agreement</u>***").

The Backstop Commitment Percentage of each Backstop Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Backstop Commitment Agreement (the "***<u>Backstop Commitment Schedule</u>***").

The initial backstop commitment schedule attached as <u>Schedule 1(b)</u> hereto (the "***<u>Initial Backstop Commitment Schedule</u>***") reflects the initial percentage allocation of the backstop obligations of the Initial Parties to purchase unsubscribed Rights Offering Shares pursuant to their Backstop Commitments (prior to the addition of Additional Backstop Parties as contemplated hereby). The Initial Backstop Commitment Schedule shall be amended only upon consent of each of the Initial Parties.

If any Backstop Parties fail to fund the purchase price for the Rights Offering Shares required to be purchased by them under the Backstop Commitment Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Backstop Party fails to fund.

</td>
</tr>
<tr>
<td><strong>Additional Backstop Parties:</strong></td>
<td>

Holders of Claims will have the opportunity to become Backstop Parties under the Backstop Commitment Agreement prior to the date that is 20 business days following the Debtors' filing of the PPA and BCA Approval Motion (such date, the "***<u>Backstop Enrollment Outside Date</u>***").

"***<u>Additional Backstop Parties</u>***" means, collectively, each party that is that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor"

</td>
</tr>
</tbody>
</table>

-8-

|  | as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to participate in the Backstop Commitment by joining the Backstop Commitment Agreement and the PSA in accordance with the foregoing.  Initial Parties may be Additional Backstop Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as the execution of the Backstop Commitment Agreement. |
|---|---|
| **Securities Law Exemptions:** | The Rights Offering Shares issued pursuant to the Section 1145 Rights Offering (other than on account of Backstop Commitments) shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code.<br><br>The Rights Offering Shares purchased in the Backstop Commitment shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another available exemption from registration. |
| **Implementation of the Section 1145 Rights Offering:** | The Debtors shall conduct the Section 1145 Rights Offering on behalf of the Reorganized Debtors through customary subscription documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties.<br><br>The commencement and duration of the offering period for the Rights Offering (the "***Offering Period***") shall be reasonably acceptable to the Initial Parties.<br><br>Subscription rights issued in the Section 1145 Rights Offering to purchase Rights Offering Shares (the "***Section 1145 Equity Rights***") will be exercisable during the Offering Period by completing and returning to the rights agent (an agent appointed by the Debtors, and reasonably acceptable to the Initial Parties, to administer the Section 1145 Rights Offering) the applicable subscription form and paying the per share price for each Rights Offering Share to be purchased by wire transfer of immediately available funds to an account designated by the rights agent prior to the expiration of the Offering Period, except that each Backstop Party (except to the extent it has previously been required to fund, and has funded, such amounts in accordance with the terms of the Backstop Commitment Agreement) shall be permitted to fund its per share price for its exercise of Section 1145 Equity Rights and Backstop Commitments promptly following receipt of written notice from the rights agent advising of the amounts to be funded, and such Backstop Parties may fund to the rights agent or an escrow account established pursuant to terms reasonably satisfactory to the Initial Parties.  All Backstop Parties shall be required to exercise their Section 1145 Equity Rights by completing and returning the applicable subscription form to the rights agent prior to the expiration of the Offering Period. |

NAI-1502345820v2

| | |
|---|---|
| | Section 1145 Equity Rights are not transferable other than in connection with the transfer of the allowed claims to which Section 1145 Equity Rights relate, in accordance with the terms of the PSA. |
| | If the Section 1145 Rights Offering is terminated for any reason, the funded amounts will be refunded to the applicable participant, without interest, as soon as practicable following termination of the Section 1145 Rights Offering. |
| | The exercise of a Section 1145 Equity Right will be irrevocable unless the Section 1145 Rights Offering is not consummated by the date on which the Private Placement Agreement or the Backstop Commitment Agreement is terminated. |
| | There will be no oversubscription rights under the Section 1145 Rights Offering. |
| **Backstop Premiums**: | The Debtors will pay the Backstop Parties in respect of the Backstop Commitment (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Backstop Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 (with proration for partial months) (the "***Backstop Ticking Premium***" and, together with the Backstop Commitment Premium, the "***Backstop Premiums***" and, together with the Private Placement Premiums, the "***Commitment Premiums***")  The Backstop Ticking Premium and the Private Placement Ticking Premium are referred to herein collectively as the "***Ticking Premiums***." |
| | With respect to the Backstop Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Backstop Commitment Percentage as set forth on the Initial Backstop Commitment Schedule; (ii) 57.5% shall be allocated to the Initial Parties and creditors that become Additional Backstop Parties by 5:00 pm New York City time on the third business day following execution of the Backstop Commitment Agreement (the "***Phase Two Backstop Parties***") based upon (a) with respect to the Initial Parties, each Initial Party's Backstop Commitment Percentage, and (b) with respect to Phase Two Backstop Parties, each Phase Two Backstop Party's Backstop Commitment Percentage; and (iii) 20% shall be allocated to all Backstop Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after the filing of the PPA and BCA Approval Motion based upon each Backstop Party's Backstop Commitment Percentage.  The Backstop Ticking Premium will be allocated pro rata among Backstop Parties.  The Backstop Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.   The Reorganized PEC Common Stock issued in connection with the Backstop Commitment Premium shall be issued after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity |

| | |
|---|---|
| | and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 of the Term Sheet<br><br>The Backstop Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order. The Backstop Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
| **Warrants** | On the Effective Date, the Debtors will issue warrants (the "***Penny Warrants***") exercisable for 5% of the fully diluted Reorganized PEC Common Stock as of the Effective Date (after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares, and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein), half of which shall be paid to the Initial Parties and half of which shall constitute the Rights Offering Penny Warrants.  The Penny Warrants shall have the following terms:<br> ▪ Date of Issuance: the Effective Date;<br> ▪ Exercise Price: $0.01 per share of Reorganized PEC Common Stock;<br> ▪ Term: 90 days;<br> ▪ Exercise Trigger: exercisable from and after the Effective Date. |
| **Pro Rata Split** | For purposes of the Backstop Commitment Percentages, the Pro Rata Split shall be determined as of the Record Date. |

| **GENERAL** | |
|---|---|
| **Term** | **Description** |
| **Registration Rights:** | Each Private Placement Party and each Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants) and each other creditor that receives 10% or more of the shares of Reorganized PEC Common Stock on a fully-converted basis (including the Reorganized PEC Common Stock issuable upon conversion of the Preferred Equity) issued under the Plan and/or the Section 1145 Rights Offering and cannot sell its shares under Rule 144 under the Securities Act without volume or manner of sale restrictions, together with each such person's affiliates to whom such person transfers shares or other securities  (collectively, the "***Registration Rights Agreement Parties***"), shall be entitled to customary registration rights |

with respect to such Reorganized PEC Common Stock (including shares of Reorganized PEC Common Stock issuable pursuant to the Penny Warrants) and Preferred Equity pursuant to a registration rights agreement to be entered into, as of the Effective Date, by the Reorganized Debtors and the Registration Rights Agreement Parties (the "***Registration Rights Agreement***"), provided that the Company shall further agree that in any case in which the Company asserts that any Private Placement Party or Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants), or any affiliate of any such person to whom such person has transferred shares or other securities, may sell its shares (no matter the manner herein described under which such shares were acquired) under Rule 144 under the Securities Act without volume or manner of sale restrictions, the Company and its legal counsel shall upon request, and following receipt of all required certifications of such Private Placement Party, Backstop Party or affiliate reasonably requested by the Company or its legal counsel, promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such sale under Rule 144 under the Securities Act.

The Registration Rights Agreement will provide that the Company will (i) file a registration statement on Form S-1 (or other appropriate form) (the "Initial Resale Registration Statement") no later than 30 days following the Effective Date (the "Filing Deadline") covering all registrable securities that the holders thereof request to have included therein, (ii) use its reasonable best efforts to have the Initial Resale Registration Statement declared effective by the SEC no later than (X) in the case of a "no review", the 15th day following the Filing Deadline; (Y) in the case of a "limited review", the 45th day following the Filing Deadline, and (Z) in the case of a "review," the 75th day following the Filing Deadline (each such date, as applicable, the "Registration Deadline") and (iii) use its reasonable best efforts to keep such registration statement continuously effective (including filing any necessary post-effective amendment and/or subsequent registration statements) for a period of three years (or such shorter period if all registrable securities have been disposed by the holder thereof or are no longer registrable securities).

The Registration Rights Agreement will provide for liquidated damages of $75,000 per day in the event that (i) the Initial Resale Registration Statement is not filed on or prior to the Filing Deadline, (ii) the Initial Resale Registration Statement is not declared effective by the SEC on or prior to the applicable Registration Deadline or (iii) Holders are not permitted to use the prospectus included in the Initial Resale Registration

| | |
|---|---|
| | Statement to resell the securities for 15 or more consecutive days, or more than an aggregate of 30 days (which need not be consecutive calendar days), in any 12 month period.  Notwithstanding the foregoing, the aggregate amount of such liquidated damages payable by the Company under this Agreement shall not exceed $10,000,000. |
| | The Registration Rights Agreement will provide customary piggy-back and demand registration rights to the Registration Rights Agreement Parties (including, without limitation, rights regarding "shelf" registrations and underwritten offerings). |
| | The Registration Rights Agreement shall be in substantially the form to be filed with the Plan supplement, provided that such form is in form and substance reasonably acceptable to the Company and the Requisite Members of the Noteholder Steering Committee. |
| **Transferability of Private Placement Commitments and Backstop Commitments:** | A Private Placement Party or a Backstop Party may not transfer, directly or indirectly, all or any portion of its Commitments other than to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Backstop Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors; provided, that no such transfer shall relieve the transferring Private Placement Party or Backstop Party, as applicable, from such obligations. |
| | Claims held by Backstop Parties are transferable only in accordance with the PSA and to the extent the Backstop Party remains a party to the Backstop Commitment Agreement.  Claims held by Private Placement Parties are transferable only in accordance with the PSA and to the extent the Private Placement Party remains a party to the Private Placement Agreement. |
| | For the avoidance of doubt, any Initial Party may transfer its Claims in accordance with the PSA as set forth above, provided, however, such Initial Party shall retain its commitment and obligation to purchase its share as an Initial Party, based on, and calculated using, the Claim amounts set forth in the Initial Private Placement Schedule, of 22.5% of the Private Placement Shares in the aggregate, provided further, that any transferee which receives Claims from an Initial Party may not, in respect of such transferred Claims, become a Phase Two Private Placement Party, a Phase Two Backstop Party, an Additional Private Placement Party, or an Additional Backstop Party.  No such transfer shall relieve the transferring Initial Party from its obligations under the Private Placement Agreement or Backstop Commitment Agreement. |
| **Failure to Fund** | Any party that fails to timely fund its Private Placement Commitments or |

| | |
|---|---|
| **Commitments:** | Backstop Commitments, respectively (a "***Defaulting Party***"), will be liable for the consequences of its breach and that the parties to such agreement can enforce rights of damages and/or specific performance upon the failure to timely fund by the Defaulting Party. |
| **Debtors' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Debtors. |
| **Private Placement / Backstop Parties' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Private Placement Parties and the Backstop Parties, respectively, to be provided severally and not jointly. |
| **Interim Operating Covenant:** | Prior to and through the Effective Date, except as set forth in the Private Placement Agreement or the Plan, or with the written consent of the Requisite Consenting Noteholders, as applicable, the Company (x) shall, and shall cause its subsidiaries to, carry on their businesses in the ordinary course of business (considering the impact of the chapter 11 cases) and, except as currently subject to litigation, use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and make any required filing with the SEC within the time periods required under the Exchange Act, and (y) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with (i) with its business plan dated November 2016, (ii) the parameters described in the Private Placement Agreement or (iii) the Plan. |
| | For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and will require the prior written consent of the Requisite Members of the Noteholder Steering Committee (unless otherwise contemplated by the Backstop Commitment Agreement, the Private Placement Agreement or the Plan): (a) except as currently subject to litigation, any amendment, modification, termination, waiver, supplement, restatement or other change to any material contract (definition to be reasonably agreed) or any assumption of any material contract, (b) any (i) termination by the Debtors without cause or (ii) reduction in title or responsibilities, in each case, of the individuals who are, as of the date of this Agreement, the Chief Executive Officer or the Chief Financial Officer of the Company, (c) the adoption or amendment of any management incentive or equity plan by any of the Debtors, except for as provided in the Plan or (d) any sale, abandonment, or disposition of any assets other than (i) the sale of |

| | |
|---|---|
| | Metropolitan Collieries Pty Ltd and/or Peabody (Burton Coal) Pty Ltd or the Debtors' interests in Dominion Terminal Associates LLC or (ii) any ordinary course land sales made upon reasonable prior notice to the Noteholder Co-Proponents and in accordance with the Company's business plan dated November 2016, provided, however, that such ordinary course land sales shall not exceed $5 million individually or $20 million in the aggregate. Following a request by the Debtors for consent with respect to any operational matter that requires the consent of the Requisite Members of the Noteholder Steering Committee pursuant to this section, if the consent of such parties is not obtained or declined within three (3) business days following the date such request is made in writing and delivered to each of the Noteholder Co-Proponents (which notice will be deemed delivered if given in writing to Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, and Skadden, Arps, Slate, Meagher & Flom LLP), such consent shall be deemed to have been granted by the Requisite Members of the Noteholder Steering Committee, as applicable. If such consent is not given or deemed to be given, the Debtors shall be permitted to seek approval from the Bankruptcy Court to take such actions, and seeking such approval shall not be a breach of this interim operating covenant; provided, that in such event the Noteholder Co-Proponents shall have a termination right under the PSA. |
| **Effectiveness of Private Placement Agreement and Backstop Commitment Agreement:** | The Private Placement Agreement and the Backstop Commitment Agreement and the respective Commitments thereunder shall become effective upon execution and delivery of such agreement by the Debtors and each Private Placement Party or Backstop Party, as applicable, and the entry by the Bankruptcy Court of the PPA and BCA Approval Order; provided that, the obligations of such parties in respect of their Commitments shall be subject to the satisfaction or waiver of the Conditions Precedent below. |
| **PPA and BCA Approval Order:** | The parties hereto agree that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, and the Expense Reimbursement shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code under the PPA and BCA Approval Order, on such terms consistent with the Breakup Administrative Claim Treatment. The "***PPA and BCA Approval Order***" shall mean the final order entered by the Bankruptcy Court, in form and substance acceptable to the Initial Parties, authorizing the Company (on behalf of itself and the other Debtors) to execute and deliver the Private Placement Agreement, the Backstop Commitment Agreement, including the authorization of the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and the indemnification provisions contained in the Private Placement Agreement and the |

|  | Backstop Commitment Agreement, and providing that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and indemnification obligations shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code, on terms consistent with the Breakup Administrative Claim Treatment, and shall be payable by the Debtors as provided in the relevant agreement without further order of the Bankruptcy Court.<br><br>For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by the absence of the entry of the BCA and PPA Approval Order. |
|---|---|

-16-

| Conditions Precedent: | The Commitments and the Backstop Parties' and Private Placement Parties' obligations to consummate the transactions contemplated in connection therewith will be subject to customary conditions precedent (the "Conditions Precedent"), including without limitation: |
|---|---|
| | • The Company Group must have at least $600 million in cash on hand on the Effective Date; |
| | • The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date (excluding any capital lease obligations, borrowings under any ABL facilities, and, to the extent the Effective Date occurs after April 3, 2017, any Incremental Additional First Lien Debt or, Incremental Second Lien Notes or additional amounts under the Exit Facility to finance any cash consideration on account of Incremental Second Lien Notes Claims); provided that, except in the event of a First Lien Full Cash Recovery, no more than $1.5 billion of such outstanding funded debt may be first lien debt; |
| | • The claim asserted by the United Mine Workers of America 1974 Pension Plan shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee if for an amount above the amounts held in reserve by the Debtors for such claim; |
| | • the PSA must remain in effect through the Effective Date; |
| | • no event or events shall have occurred or exist that constitute, individually or in the aggregate, a Material Adverse Event;[5] and |

---

[5] "**_Material Adverse Event_**" means any event, which individually, or together with all other events, has  or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities (including reclamation obligations, whether or not contingent), finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Term Sheet, including the Private Placement and the Section 1145 Rights Offering, in each case, except to the extent such event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the [date hereof] in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the [date hereof] in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of the transactions contemplated by the Term Sheet (including any act or omission of the Debtors expressly required or prohibited, as applicable, by this Term Sheet or consented to or required by the Requisite Members of the Noteholder Steering Committee in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of any of the Debtors not in contravention of the terms and conditions of this Term Sheet (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses

-17-

| | |
|---|---|
| | • the other conditions precedent to the Effective Date shall have been satisfied or waived in accordance with the terms of the Term Sheet as set forth above.<br><br>The foregoing conditions shall be waivable by the Requisite Consenting Noteholders in respect of Backstop Commitment Agreement and Private Placement Agreement, respectively. |
| **Termination of the Private Placement Agreement and the Backstop Commitment Agreement**: | The Commitments and the Debtors' obligations to consummate the transactions contemplated in connection herewith will be subject to customary termination events (each a "***Termination Event***"), including without limitation, the occurrence of any event that would give any party to the PSA the right to terminate its obligations thereunder, including without limitation the PSA Termination Condition.<br><br>Upon the occurrence of a Termination Event, all of the Private Placement Parties', Backstop Parties' and Debtors' obligations under the Private Placement Agreement and the Backstop Commitment Agreement, respectively, shall automatically terminate.  Upon termination, the Debtors shall have no ongoing obligations or liabilities under the Private Placement Agreement or the Backstop Commitment Agreement (including the payment of the Commitment Premiums), except for the Debtors' indemnification obligations; provided that such termination shall not relieve a party of liability for any pre-termination breach, or (subject to entry of the PPA and BCA Approval Order) relieve the Debtors of any obligations with respect to the Breakup Payments (to the extent payable pursuant to the terms thereof) and/or the Expense Reimbursement.<br><br>If either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason, both agreements shall be deemed to have been terminated. |
| **Breakup Payments:** | If following entry by the Bankruptcy Court of the PPA and BCA Approval Order either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason other than occurrence of the PSA Termination Condition (to the extent the Debtors terminate prior to entry of the PPA and BCA Approval Order), each of the following shall be payable in cash:<br><br>• a termination fee of 8% of the $750 million committed amount shall be paid to the Private Placement Parties, with (i) 22.5% of such fee |

contained in this definition); (vi) the filing or pendency of the Debtors' chapter 11 cases (including events resulting from any filings made in such cases); or (vii) declarations of national emergencies in the United States or natural disasters in the United States; provided, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such event is materially and disproportionately adverse to the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Private Placement Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Private Placement Parties pro rata in accordance with the Pro Rata Split and each Private Placement Party's Private Placement Commitment Period;[6] and

- a termination fee of 8% of the $750 million committed amount shall be paid to the Backstop Parties, with (i) 22.5% of the such fee allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Backstop Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Backstop Parties pro rata in accordance with the Pro Rata Split and each Backstop Party's Backstop Commitment Period;

(collectively, the "***Breakup Payments***").

If owed, the Breakup Payments shall be payable in lieu of the Private Placement Premiums, the Backstop Premiums, and half of the Penny Warrants.

All reasonable monthly fees and expenses of legal and financial professionals to the Noteholder Co-Proponents shall be payable in accordance with the terms set forth in this Term Sheet.

The Expense Reimbursement payable under this Term Sheet shall be entitled to administrative expense priority, and the Breakup Payments payable under this Term Sheet shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(a) In the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, including no greater amount of first lien notes than would be issued in accordance with Exhibit 1 hereto) that is equal to the allowed amount of the First Lien Lender Claims, then such fees shall be paid in cash on the Effective

---

[6] "***Private Placement Commitment Period***" shall mean, for each Private Placement Party, the duration of such party's private placement obligations, which days shall be counted from the date on which the documentation necessary to be obligated under the Private Placement Agreement has been executed by a Private Placement Party and received and verified by the Debtors.

| | Date on such Plan; |
|---|---|
| | (b) In the event the conditions set forth in subsection (a) do not occur, then the Breakup Payments and the administrative expense claim on account of such the Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the fees which are on terms consistent with the terms of the New Second Lien Notes set forth in Exhibit 2 hereto;  provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing Intercreditor Agreement governing the First Lien Claims and Second Lien Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes (such treatment, the "Breakup Administrative Claim Treatment"). |
| **Fiduciary Out** | The Backstop Commitment Agreement and Private Placement Agreement shall each include a fiduciary out for the Debtors by which the Debtors may not shop or solicit alternative restructurings but may consider any alternative restructuring brought to them; provided, however, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such proposal; provided, further, the Breakup Payments and Expense Reimbursement (as defined below), shall be payable upon exercise by the Debtors of the fiduciary out in accordance with the terms of the Private Placement Agreement and the Backstop Commitment Agreement after the entry of the PPA and BCA Approval Order on such terms consistent with the Breakup Administrative Claim Treatment. |
| **Expense Reimbursement:** | In accordance with and subject to the entry of the PPA and BCA Approval Order, the Debtors will pay all reasonably incurred and documented out-of-pocket fees and expenses incurred in connection with the Debtors' chapter 11 cases after the Petition Date of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any fees incurred on behalf of any noteholders through the applicable indenture trustee and any fees that have accrued and would otherwise continue to accrue as administrative claims of certain Noteholder Co-Proponents under the Final DIP Order), including the fees and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "*Expense Reimbursement*"), in each case whether or not the Restructuring is ultimately consummated.  The payment of the fees set forth in this section shall (i) be approved upon entry of the PPA and BCA Approval Order; and (ii) prior to the time paid, |

|  | be granted administrative expense priority against each Debtor on a joint and several basis.

Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment hereunder shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court.  The Expense Reimbursement accrued through the date on which the PPA and BCA Approval Order is entered shall be paid as promptly as reasonably practicable after such order is entered.  Thereafter, the Expense Reimbursement shall be payable by the Debtors two weeks following their receipt of invoices.  If the Private Placement Agreement and the Backstop Commitment Agreement are terminated for any reason in accordance with their terms, the Debtors will no longer be obligated to pay the Expense Reimbursement in respect of any fees incurred after the date of such termination.  For the avoidance of doubt, the Debtors shall have no obligation to make any payment on account of the Expense Reimbursement if (i) the PSA Termination Condition occurs prior to the date of entry of the PPA and BCA Approval Order by the Bankruptcy Court, or (ii) the PPA and BCA Approval Order is not entered by the Bankruptcy Court. |
|---|---|

-21-

| Specific Performance | Each of the Debtors, the Private Placement Parties and the Backstop Parties agree that irreparable damage would occur if any provision of the Private Placement Agreement or the Backstop Commitment Agreement were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the Private Placement Agreement and the Backstop Commitment Agreement or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in the Private Placement Agreement or the Backstop Commitment Agreement or herein, no right or remedy described or provided in the Private Placement Agreement or the Backstop Commitment Agreement or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity. |
|---|---|
| Noteholder Co-Proponent Approval Rights | Each substantive document in connection with the Restructuring, including without limitation the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee in accordance with the terms set forth on Exhibit 8:<br><br>• The Disclosure Statement and the motion and order to approve same;<br>• The Plan and any exhibits, supplements, appendices, etc. thereto;<br>• The credit agreement and/or indenture for the Exit Facility;<br>• The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on Exhibit 1 hereto.<br>• The corporate constituent documents of the Reorganized Debtors;<br>• The certificate of designation of Series A convertible preferred stock of PEC;<br>• The documents relating to the Section 1145 Rights Offering and the Private Placement;<br>• The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee;<br>• The Confirmation Order; and<br>• The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement.<br><br>Notwithstanding the foregoing, the following material documents in |

<table>
<tr><td></td><td>connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent:

- The Term Sheet;
- The PSA;
- The Private Placement Agreement;
- The Backstop Commitment Agreement; and
- The orders relating to each of the above.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.

The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).</td></tr>
<tr><td>**Milestones**</td><td>The Restructuring shall be implemented in accordance with the Milestones set forth in the Term Sheet.</td></tr>
<tr><td>**Reclamation Bonding**</td><td>As a condition to the Effective Date, the Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "***Bonding Solution***"). The Debtors shall provide updates every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution.</td></tr>
<tr><td>**Material    Claim Settlements**</td><td>The Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim.</td></tr>
</table>

## Schedule 1(a)

**Initial Private Placement Schedule**

# Initial Private Placement Schedule

*$ in millions*

| Initial Private Placement Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P.1 | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | 100.000% | | | 100.000% | $750.000 |

## Schedule 1(b)

**Initial Backstop Commitment Schedule**

# Initial Backstop Schedule

*$ in millions*

| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
|---|---|---|---|---|---|---|---|
| **Initial Backstop Commitment Schedule** | | | | | | | |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P. | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

## Exhibit 6

## Encumbered Guarantor Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | American Land Development, LLC | 20-3405570 | 16-42535 |
| 2. | American Land Holdings of Colorado, LLC | 26-3730572 | 16-42540 |
| 3. | American Land Holdings of Illinois, LLC | 30-0440127 | 16-42600 |
| 4. | American Land Holdings of Indiana, LLC | 20-2514299 | 16-42546 |
| 5. | American Land Holdings of Kentucky, LLC | 20-0766113 | 16-42589 |
| 6. | American Land Holdings of West Virginia, LLC | 20-5744666 | 16-42571 |
| 7. | Big Ridge, Inc. | 37-1126950 | 16-42553 |
| 8. | Big Sky Coal Company | 81-0476071 | 16-42530 |
| 9. | Black Hills Mining Company, LLC | 32-0049741 | 16-42544 |
| 10. | BTU Western Resources, Inc. | 20-1019486 | 16-42554 |
| 11. | Caballo Grande, LLC | 27-1773243 | 16-42559 |
| 12. | Caseyville Dock Company, LLC | 20-8080107 | 16-42537 |
| 13. | Central States Coal Reserves of Illinois, LLC | 43-1869432 | 16-42688 |
| 14. | Central States Coal Reserves of Indiana, LLC | 20-3960696 | 16-42551 |
| 15. | Century Mineral Resources, Inc. | 36-3925555 | 16-42567 |
| 16. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 | 16-42543 |
| 17. | COALSALES II, LLC | 43-1610419 | 16-42570 |
| 18. | Conservancy Resources, LLC | 20-5744701 | 16-42564 |
| 19. | Cottonwood Land Company | 43-1721982 | 16-42572 |
| 20. | Cyprus Creek Land Company | 73-1625890 | 16-42534 |
| 21. | Cyprus Creek Land Resources LLC | 75-3058264 | 16-42602 |
| 22. | Dyson Creek Coal Company, LLC | 43-1898526 | 16-42612 |
| 23. | Dyson Creek Mining Company, LLC | 20-8080062 | 16-42621 |
| 24. | Empire Land Holdings, LLC | 61-1742786 | 16-42692 |
| 25. | Falcon Coal Company, LLC | 35-2006760 | 16-42547 |
| 26. | Francisco Equipment Company, LLC | 37-1805119 | 16-42568 |
| 27. | Francisco Land Holdings Company, LLC | 36-4831111 | 16-42580 |
| 28. | Francisco Mining, LLC | 30-0922117 | 16-42591 |
| 29. | Highwall Mining Services Company | 20-0010659 | 16-42588 |
| 30. | Hillside Recreational Lands, LLC | 32-0214135 | 16-42594 |
| 31. | HMC Mining, LLC | 43-1875853 | 16-42566 |
| 32. | Illinois Land Holdings, LLC | 26-1865197 | 16-42599 |
| 33. | Independence Material Handling, LLC | 43-1750064 | 16-42606 |
| 34. | James River Coal Terminal, LLC | 55-0643770 | 16-42569 |
| 35. | Kayenta Mobile Home Park, Inc. | 86-0773596 | 16-42607 |
| 36. | Kentucky Syngas, LLC | 26-1156957 | 16-42618 |
| 37. | Lively Grove Energy, LLC | 20-5752800 | 16-42595 |
| 38. | Marigold Electricity, LLC | 26-0180352 | 16-42628 |
| 39. | Midco Supply and Equipment Corporation | 43-6042249 | 16-42585 |
| 40. | Midwest Coal Acquisition Corp. | 20-0217640 | 16-42576 |
| 41. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 | 16-42597 |
| 42. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 | 16-42611 |
| 43. | Mustang Energy Company, LLC | 43-1898532 | 16-42657 |
| 44. | Pacific Export Resources, LLC | 27-5135144 | 16-42598 |
| 45. | Peabody Archveyor, L.L.C. | 43-1898535 | 16-42623 |
| 46. | Peabody Arclar Mining, LLC | 31-1566354 | 16-42545 |
| 47. | Peabody Bear Run Mining, LLC | 26-3582291 | 16-42565 |

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 48. | Peabody Bear Run Services, LLC | 26-3725923 | 16-42574 |
| 49. | Peabody Caballo Mining, LLC | 83-0309633 | 16-42533 |
| 50. | Peabody Cardinal Gasification, LLC | 20-5047955 | 16-42542 |
| 51. | Peabody Coalsales, LLC | 20-1759740 | 16-42539 |
| 52. | Peabody COALTRADE International (CTI), LLC | 20-1435716 | 16-42590 |
| 53. | Peabody COALTRADE, LLC | 43-1666743 | 16-42575 |
| 54. | Peabody Coulterville Mining, LLC | 20-0217834 | 16-42550 |
| 55. | Peabody Development Company, LLC | 43-1265557 | 16-42558 |
| 56. | Peabody Electricity, LLC | 20-3405744 | 16-42532 |
| 57. | Peabody Employment Services, LLC | 26-3730348 | 16-42538 |
| 58. | Peabody Energy Generation Holding Company | 73-1625891 | 16-42656 |
| 59. | Peabody Energy Investments, Inc. | 68-0541702 | 16-42642 |
| 60. | Peabody Energy Solutions, Inc. | 43-1753832 | 16-42632 |
| 61. | Peabody Gateway North Mining, LLC | 27-2294407 | 16-42624 |
| 62. | Peabody Gateway Services, LLC | 26-3724075 | 16-42581 |
| 63. | Peabody Holding Company, LLC | 74-2666822 | 16-42592 |
| 64. | Peabody Illinois Services, LLC | 26-3722638 | 16-42610 |
| 65. | Peabody Indiana Services, LLC | 26-3724339 | 16-42619 |
| 66. | Peabody International Investments, Inc. | 26-1361182 | 16-42536 |
| 67. | Peabody International Services, Inc. | 20-8340434 | 16-42541 |
| 68. | Peabody Investments Corp. | 20-0480084 | 16-42549 |
| 69. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 | 16-42587 |
| 70. | Peabody Midwest Management Services, LLC | 26-3726045 | 16-42593 |
| 71. | Peabody Midwest Mining, LLC | 35-1799736 | 16-42667 |
| 72. | Peabody Midwest Operations, LLC | 20-3405619 | 16-42660 |
| 73. | Peabody Midwest Services, LLC | 26-3722194 | 16-42608 |
| 74. | Peabody Natural Gas, LLC | 43-1890836 | 16-42626 |
| 75. | Peabody Operations Holding, LLC | 26-3723890 | 16-42678 |
| 76. | Peabody Powder River Mining, LLC | 43-0996010 | 16-42666 |
| 77. | Peabody Powder River Operations, LLC | 20-3405797 | 16-42676 |
| 78. | Peabody Powder River Services, LLC | 26-3725850 | 16-42613 |
| 79. | Peabody PowerTree Investments, LLC | 20-0116980 | 16-42596 |
| 80. | Peabody Recreational Lands, L.L.C. | 43-1898382 | 16-42605 |
| 81. | Peabody School Creek Mining, LLC | 20-3585831 | 16-42633 |
| 82. | Peabody Services Holdings, LLC | 26-3726126 | 16-42645 |
| 83. | Peabody Southwest, LLC | 20-5744732 | 16-42631 |
| 84. | Peabody Terminal Holding Company, LLC | 26-1087861 | 16-42650 |
| 85. | Peabody Terminals, LLC | 31-1035824 | 16-42614 |
| 86. | Peabody Trout Creek Reservoir LLC | 30-0746873 | 16-42622 |
| 87. | Peabody Venezuela Coal Corp. | 43-1609813 | 16-42651 |
| 88. | Peabody Venture Fund, LLC | 20-3405779 | 16-42637 |
| 89. | Peabody-Waterside Development, L.L.C. | 75-3098342 | 16-42662 |
| 90. | Peabody Western Coal Company | 86-0766626 | 16-42644 |
| 91. | Peabody Wild Boar Mining, LLC | 26-3730759 | 16-42672 |
| 92. | Peabody Wild Boar Services, LLC | 26-3725591 | 16-42677 |
| 93. | Peabody Wyoming Gas, LLC | 20-5744610 | 16-42640 |
| 94. | Peabody Wyoming Services, LLC | 26-3723011 | 16-42653 |
| 95. | PEC Equipment Company, LLC | 20-0217950 | 16-42673 |
| 96. | Point Pleasant Dock Company, LLC | 20-0117005 | 16-42655 |
| 97. | Pond River Land Company | 73-1625893 | 16-42629 |
| 98. | Porcupine Production, LLC | 43-1898379 | 16-42648 |
| 99. | Porcupine Transportation, LLC | 43-1898380 | 16-42665 |

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 100. | Riverview Terminal Company | 13-2899722 | 16-42664 |
| 101. | Sage Creek Land & Reserves, LLC | 38-3936826 | 16-42635 |
| 102. | School Creek Coal Resources, LLC | 20-2902073 | 16-42643 |
| 103. | Seneca Coal Company, LLC | 84-1273892 | 16-42652 |
| 104. | Shoshone Coal Corporation | 25-1336898 | 16-42668 |
| 105. | Star Lake Energy Company, L.L.C. | 43-1898533 | 16-42639 |
| 106. | Sugar Camp Properties, LLC | 35-2130006 | 16-42649 |
| 107. | Thoroughbred Generating Company, L.L.C. | 43-1898534 | 16-42679 |
| 108. | Thoroughbred Mining Company LLC. | 73-1625889 | 16-42680 |
| 109. | West Roundup Resources, LLC | 20-2561489 | 16-42671 |
| 110. | Wild Boar Equipment Company, LLC | 32-0488114 | 16-42658 |
| 111. | Wild Boar Land Holdings Company, LLC | 36-4831131 | 16-42661 |

### Gold Fields Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Gold Fields Mining, LLC | 36-2079582 | 16-42561 |
| 2. | Arid Operations, Inc. | 84-1199578 | 16-42562 |
| 3. | Gold Fields Chile, LLC | 13-3004607 | 16-42548 |
| 4. | Gold Fields Ortiz, LLC | 22-2204381 | 16-42578 |

### Unencumbered Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Four Star Holdings, LLC | 30-0885825 | 16-42556 |
| 2. | Southwest Coal Holdings, LLC | 37-1794829 | 16-42674 |
| 3. | New Mexico Coal Resources, LLC | 20-3405643 | 16-42647 |
| 4. | El Segundo Coal Company, LLC | 20-8162824 | 16-42691 |
| 5. | Peabody New Mexico Services, LLC | 20-8162939 | 16-42646 |
| 6. | Peabody America, LLC | 93-1116066 | 16-42609 |
| 7. | Gallo Finance Company, LLC | 43-1823616 | 16-42586 |
| 8. | Peabody Natural Resources Company | 51-0332232 | 16-42634 |
| 9. | American Land Holdings of New Mexico, LLC | 32-0478983 | 16-42579 |
| 10. | Peabody Southwestern Coal Company, LLC | 43-1898372 | 16-42641 |
| 11. | NM Equipment Company, LLC | 36-4821991 | 16-42582 |
| 12. | Peabody Colorado Operations, LLC | 20-2561644 | 16-42563 |
| 13. | Twentymile Holdings, LLC | 38-3937156 | 16-42654 |
| 14. | Sage Creek Holdings, LLC | 26-3286872 | 16-42670 |
| 15. | Peabody Sage Creek Mining, LLC | 26-3730653 | 16-42625 |
| 16. | Hayden Gulch Terminal, LLC | 86-0719481 | 16-42583 |
| 17. | Colorado Yampa Coal Company, LLC | 95-3761211 | 16-42560 |
| 18. | Juniper Coal Company, LLC | 43-1744675 | 16-42577 |
| 19. | Peabody Williams Fork Mining, LLC | 20-8162742 | 16-42630 |
| 20. | Moffat County Mining, LLC | 74-1869420 | 16-42636 |
| 21. | Peabody Colorado Services, LLC | 26-3723774 | 16-42531 |
| 22. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 | 16-42603 |
| 23. | Peabody Rocky Mountain Services, LLC | 20-8162706 | 16-42616 |
| 24. | Peabody Twentymile Mining, LLC | 26-3725223 | 16-42627 |

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 25. | Seneca Property, LLC | 36-4820253 | 16-42659 |
| 26. | Twentymile Equipment Company, LLC | 38-3982017 | 16-42675 |
| 27. | Twentymile Coal, LLC | 95-3811846 | 16-42669 |
| 28. | Kentucky United Coal, LLC | 35-2088769 | 16-42573 |
| 29. | United Minerals Company, LLC | 35-1922432 | 16-42663 |
| 30. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 | 16-42620 |
| 31. | Peabody Asset Holdings, LLC | 20-3367333 | 16-42555 |
| 32. | Peabody China, LLC | 43-1898525 | 16-42552 |
| 33. | Peabody Mongolia, LLC | 20-8714315 | 16-42617 |
| 34. | Peabody IC Funding Corp | 46-2326991 | 16-42615 |
| 35. | Peabody IC Holdings, LLC | 30-0829603 | 16-42601 |
| 36. | PG Investments Six, L.L.C. | 43-1898530 | 16-42638 |

## Exhibit 7

## Summary Table of Proposed Classification Scheme

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1A – 1D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | First Lien Lender Claims | Impaired | Entitled to Vote |
| 2A – 2D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 3A – 3E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4A – 4E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Priority Claims | Unimpaired | Deemed to Accept |
| 5A – 5E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | General Unsecured Claims | Impaired | Entitled to Vote /<br>Deemed to Reject (Gib1) |
| 6A, 6B | PEC<br>Encumbered Guarantor Debtors | Convenience Class Claims | Impaired | Entitled to Vote |
| 7A – 7E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | MEPP Claim | TBD | TBD |
| 8A | PEC | Unsecured Subordinated Debenture Claims | Impaired | Deemed to Reject |

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 9A – 9E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Intercompany Claims | Unimpaired | Deemed to Accept |
| 10A | PEC | Section 510(b) Claims | Impaired | Deemed to Reject |
| 11A | PEC | PEC Interests | Impaired | Deemed to Reject |
| 12B – 12E | Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Subsidiary Debtor Interests | Unimpaired | Deemed to Accept |

-2-

## Exhibit 8

## Private Placement and Backstop Commitment Parties
## Voting/Consent Structure

Set forth below is the structure for voting and consents by the Private Placement Parties and the Backstop Commitment Parties with respect to material issues, including the Private Placement, Plan terms, the Backstop Commitment and the Restructuring (the "Voting / Consent Structure").

## Gatekeeping for All Issues – 75% of Noteholder Steering Committee

All proposed changes, modifications and amendments to the Plan Documents (as defined in the PSA) and the Transactions contemplated therein shall be vetted by the Noteholder Steering Committee. Proposals will be submitted for ratification – as set forth below – only if supported by 75% of the committee based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule (a "75% Supermajority"). If one of the seven members of the Noteholder Steering Committee transfers or assigns any of its holdings (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned holdings shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong as of the date of execution of the Plan Support Agreement (the "PSA") to the same ad hoc noteholder group as the transferring or assigning member.[42]

The Noteholder Steering Committee shall retain voting and consent rights with respect to any termination rights, default provisions, cross-default provisions, and waivers of such rights and provisions. Such voting and consent rights shall require a 75% Supermajority of the Noteholder Steering Committee parties, pursuant to the terms and conditions set forth in the immediately

---

[42]    For example, any transfer of any Claims by Elliott (regardless of whether it is a Class 2 or Class 5 Claim) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Elliott to Discovery and Aurelius on a pro rata basis based on the Claim holdings of Discovery and Aurelius, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Similarly, any transfer of any Claims by Point State (regardless of the type of claim transferred) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Point State to Contrarian, Panning, and SDIC on a pro rata basis based on the claim holdings of Contrarian, Panning, and SDIC, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Solely for purposes of this Exhibit, for the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Commitment Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein. For the avoidance of doubt, Contrarian, in its capacity as investment advisor or manager to various entities and managed accounts set forth on the Initial Private Placement Schedule and Initial Backstop Commitment Schedule, shall vote for the same for purposes hereof.

preceding paragraph; provided, however, that for the avoidance of doubt the Steering Committee may not extend the effective date milestone beyond June 14, 2017 absent consent from all parties in accordance with C.10 below.

In the event that a proposed change falls, or could be interpreted to fall, into two or more voting threshold categories (A, B, C, and D) set forth below, such proposed change shall be deemed to fall into the category with the highest voting threshold and shall be subject to such category's voting threshold accordingly.

## A. Class Issues – 66% by Class

Requires a 66% supermajority affirmative vote of parties who vote[43] in each affected class, based on aggregate respective Private Placement Commitments held by each Private Placement Party at such time, on a class-by-class basis (2-class vote):

1. issuance of dilutive securities not contemplated by the Restructuring Term Sheet
2. changes to the allocation of Private Placement Commitment (including changes to holdback)
3. changes to the allocation of Backstop Commitment
4. terms of the New Second Lien Notes; provided, however, that no such vote or approval shall be required in connection with the terms of the New Second Lien Notes, to the extent such terms are consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet
5. changes to the capital structure (e.g. increase in total debt above Restructuring Term Sheet debt levels)
6. any material changes that would disproportionately treat either the Unsecured Senior Notes Claims or Second Lien Notes Claims more favorably or less favorably on anything other than a proportionate basis

## B. Other Issues – 66% of All

Requires a 66% supermajority affirmative vote of all parties who vote, based on aggregate respective Private Placement Commitments held by each party at such time:

1. the Private Placement Amount (as defined in the Private Placement Agreement) or Rights Offering Amount (as defined in the Backstop Commitment Agreement) (except for adjustments of up to $100 million in aggregate in order to ensure that the Rights Offering is compliant with section 1145 of the Bankruptcy Code and any other applicable regulations)
2. changes to corporate governance set forth in the Restructuring Term Sheet
3. priority of dilution of all securities (Penny Warrants, Preferred Equity, Common Shares)
4. Material Adverse Event definition & waivers of potential Material Adverse Events

---

[43]  For the avoidance of doubt, any Additional Private Placement Party or Additional Backstop Party, including, but not limited to, any Phase Two Placement Party or any Additional Backstop Party, shall not be entitled to exercise voting or consent rights as set forth herein unless and until the applicable subscription or enrollment period (as may be extended, reduced, or otherwise modified as set forth herein) has expired.

5.  any other changes not specifically subject to a different standard herein over which the Requisite Consenting Noteholders have consent or approval rights as set forth in the Term Sheet

## C.  All Party Fundamental Rights – 100% of All

Requires unanimous consent by all affected parties.  Except with respect to proposed changes under items 3 or 4 listed below (as well as item 11, to the extent any proposed change under item 11 would impact, directly or indirectly, items 3 or 4), if a proposal achieves affirmative votes from parties holding 66% or more of the aggregate Private Placement Commitments outstanding at such time, the rights and obligations under the Private Placement Agreement and Backstop Commitment Agreement of any party that dissents from such proposed change will be automatically terminated, subject to the decision by a 75% Supermajority to proceed with the proposed change on the basis of redistributing the dissenters' commitments to Private Placement Parties/Commitment Parties that agree to assume the additional commitments.  This ejection shall not limit the dissenters' obligations under the Plan Support Agreement (other than any obligation to be a Private Placement Party or Commitment Party, as applicable).  If the Noteholder Steering Committee determines not to proceed with the amendment, dissenters will remain Private Placement Parties and Commitment Parties, as applicable.

1.  increasing the dollar amount of each party's commitment (other than through the addition of Additional Private Placement/Commitment Parties)
2.  changing any voting or consent threshold or any related definitions (including "Requisite Creditor Parties", "Requisite Consenting Noteholders"  or "Requisite Members of the Noteholder Steering Committee")
3.  changes disproportionately adversely affecting any individual party
4.  changes to the Pro Rata Split
5.  changes to Backstop Premiums, Backstop Breakup Payments, Private Placement Premiums, or Private Placement Breakup Payments or allocation of such fees
6.  changes to Plan Enterprise Value (as set forth in the Restructuring Term Sheet) or Plan Equity Value (as set forth in the Restructuring Term Sheet)
7.  discounts to Plan Equity Value for the Private Placement and Rights Offering
8.  increase of Penny Warrant issuance
9.  conversion rates for Penny Warrants
10. extension or waiver of the Effective Date milestone in the PSA or Term Sheet past June 14, 2017, or any modification of the termination rights set forth in (i) section 9.3 of the Private Placement Agreement (Termination by a Private Placement Party), (ii) section 2.7(a) of the Private Placement Agreement (Designation and Assignment Rights). (iii) section 9.3 of the Backstop Commitment Agreement (Termination by a Commitment Party), (iv) section 2.7(a) of the Backstop Commitment Agreement (Designation and Assignment Rights), and (v) section 12.08 of the PSA
11. changes in definitions impacting, directly or indirectly, any of the above items

## D.  Initial Party Fundamental Rights – 100% of Initial Parties

Requires unanimous consent of Noteholder Co-Proponents:

1.  changes to the Initial Backstop Commitment Schedule or Initial Private Placement Schedule

2.  changes to the allocations, conditions, or other terms of any "protected" commitments of any of the Initial Parties, including but not limited to the Private Placement holdback, the Surplus Private Placement Adjustment, and the Surplus Backstop Participation Adjustment

## Exhibit 9

## Illustrative Allocation of Reorganized PEC Common Stock (Fully-Diluted)

**Exhibit 9: Illustrative Allocation of Reorganized PEC Common Shares (Fully-Diluted)** [1]

| Share Calculation | |
|---|---:|
| Plan Enterprise Value | $4,275,000,000 |
| Less: Net Debt | (1,170,000,000) |
| **Plan Equity Value** | **$3,105,000,000** |
| Divided by: Assumed Per Share Plan Value | $25.00 |
| **Fully-Diluted Common Shares** | **124,200,000** |

| Rights Offering | |
|---|---:|
| Rights Offering Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (BCA) | $13.75 |
| **Rights Offering Shares** | **54,545,454** |

| Private Placement | |
|---|---:|
| Private Placement Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (PPA) | $25.00 |
| **Private Placement Shares** | **30,000,000** |
| Divided by: Conversion Price | $16.25 |
| **Private Placement Shares (As-Converted into Common Shares)** | **46,153,846** |

| Private Placement / Backstop Commitment Premium | |
|---|---:|
| Total Rights Offering / Private Placement Amount | $1,500,000,000 |
| Multiplied by: Private Placement / Backstop Commitment Premium (%) | 8.00% |
| **Private Placement / Backstop Commitment Premium ($)** | **$120,000,000** |
| Divided by: Per Share Plan Value | $25.00 |
| **Commitment Premium Shares** | **4,800,000** |

| Penny Warrants | |
|---|---:|
| Plan Equity Value | $3,105,000,000 |
| Divided by: Per Share Plan Value | $25.00 |
| Multiplied by: Amount of Fully-Diluted Plan Equity Value (%) | 5.00% |
| **Warrant Shares (As-Exercised into Common Shares)** | **6,210,000** |

| Fully-Diluted Equity Capitalization at Emergence | |
|---|---:|
| Rights Offering Shares | 54,545,454 |
| Private Placement Shares (As-Converted) | 46,153,846 |
| Commitment Premium Shares | 4,800,000 |
| Warrant Shares (As-Exercised) | 6,210,000 |
| Incremental Second Lien Shares | TBD |
| Disputed Claims Reserve Shares | TBD |
| Ticking Premium Shares | TBD |
| Shares for Class 2/5B Plan Distributions[1] | 12,490,700 |
| **Total Shares of Reorganized PEC Common Shares (Fully-Diluted)** | **124,200,000** |

---

[1] Shares of Reorganized PEC Common Shares issued to holders of Class 2 and Class 5B claims pursuant to the Plan shall be reduced share-for-share to the extent of the issuance of Incremental Second Lien Shares, Disputed Claims Reserve Shares, and/or Ticking Premium Shares.

## EXHIBIT 2

### FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT to that certain Plan Support Agreement entered into as of [_____], 2016 by and among the Debtors, the Supporting Creditor Parties (in their capacities as parties thereto), and attached hereto as <u>Exhibit A</u> (as amended, modified, or amended and restated from time to time in accordance with its terms, the "<u>Plan Support Agreement</u>"), is hereby executed and delivered by **[●]** (the "<u>Joining Party</u>") as of _____ **[●]**, ___.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Plan Support Agreement.

<u>Agreement to be Bound</u>.  The Joining Party hereby agrees, on a several basis, to be bound by the Plan Support Agreement in accordance with its terms.  The Joining Party shall hereafter be deemed to be a Party, and to the extent the Joining Party is a transferee of a Creditor Co-Proponent, such Joining Party shall hereafter be deemed to be an Additional Supporting Party, for any and all purposes under the Plan Support Agreement, and not a Creditor Co-Proponent.  For the avoidance of doubt, to the extent not already a Party to the Plan Support Agreement, the Joining Party shall only become a Party (or Supporting Creditor Party, to the extent applicable) to the Plan Support Agreement with respect to any and all Claims owned by such a Joining Party shall automatically and immediately upon execution of this Joinder Agreement be deemed to be subject to all of the terms of the Plan Support Agreement.   In the event of any inconsistency between this Joinder Agreement and the Plan Support Agreement, the Plan Support Agreement shall control in all respects.

<u>Representations and Warranties</u>.  With respect to the aggregate principal amount and type of Claims set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Parties set forth in <u>Section 9</u> of the Plan Support Agreement to each other Party to the Plan Support Agreement.  For the avoidance of doubt, only the aggregate principal amount of the Claims that are the subject of the Transfer must be stated on the signature page of this Joinder Agreement.

<u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of laws principles thereof that would require the application of the law of any other jurisdiction.

[Signature pages follow.]

Date executed:   [_____]

[NAME OF TRANSFEREE]

By:   _____
Name:
Title:

Address:   _____
_____
_____
Attn.:   _____
Tel.:   _____
Fax:   _____
Email:  _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

First Lien Lender Claims:

$_____

Second Lien Notes Claims:

$_____

Unsecured Senior Notes Claims:

$_____

[Signature Page to Joinder to Plan Support Agreement]

NAI-1502345833v1

# **EXHIBIT B**

Private Placement Agreement

PRIVATE PLACEMENT AGREEMENT

AMONG

PEABODY ENERGY CORPORATION

AND

THE PRIVATE PLACEMENT PARTIES PARTY HERETO

Dated as of December 22, 2016

TABLE OF CONTENTS

<div align="right">Page</div>

**ARTICLE I DEFINITIONS** ...........................................................................................**2**
    Section 1.1    Definitions ......................................................................2
    Section 1.2    Construction ...................................................................20

**ARTICLE II PRIVATE PLACEMENT** ..............................................................**21**
    Section 2.1    The Private Placement ....................................................21
    Section 2.2    The Private Placement Commitment ...............................21
    Section 2.3    Additional Private Placement Parties ..............................21
    Section 2.4    Escrow Account Funding ................................................22
    Section 2.5    Private Placement Party Default ......................................23
    Section 2.6    Closing ..........................................................................24
    Section 2.7    Designation and Assignment Rights .................................25

**ARTICLE III PRIVATE PLACEMENT AGREEMENT PREMIUMS AND EXPENSE REIMBURSEMENT** ......................................................**26**
    Section 3.1    Applicable Premiums .....................................................26
    Section 3.2    Payment of Private Placement Commitment Premium ............27
    Section 3.3    Expense Reimbursement ..................................................27

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ...........**28**
    Section 4.1    Organization and Qualification .......................................28
    Section 4.2    Corporate Power and Authority .......................................29
    Section 4.3    Execution and Delivery; Enforceability ...........................29
    Section 4.4    Authorized and Issued Equity Interests ............................30
    Section 4.5    No Conflict ....................................................................30
    Section 4.6    Consents and Approvals .................................................31
    Section 4.7    Company SEC Documents and Disclosure Statement ...........31
    Section 4.8    Absence of Certain Changes ...........................................31
    Section 4.9    No Violation; Compliance with Laws ..............................31
    Section 4.10    Legal Proceedings .........................................................32
    Section 4.11    Labor Relations .............................................................32
    Section 4.12    Intellectual Property ......................................................32
    Section 4.13    Title to Real and Personal Property .................................32
    Section 4.14    No Undisclosed Relationships ........................................33
    Section 4.15    Licenses and Permits .....................................................33
    Section 4.16    Environmental ...............................................................34
    Section 4.17    Tax Returns ...................................................................34
    Section 4.18    Employee Benefit Plans ..................................................35
    Section 4.19    Internal Control Over Financial Reporting .......................36
    Section 4.20    Disclosure Controls and Procedures ...............................36
    Section 4.21    Material Contracts .........................................................36
    Section 4.22    No Unlawful Payments ...................................................37
    Section 4.23    Compliance with Money Laundering Laws .......................37
    Section 4.24    Compliance with Sanctions Laws ....................................37
    Section 4.25    No Broker's Fees ...........................................................37

TABLE OF CONTENTS (cont'd)

Section 4.26    Investment Company Act ......................................................37
Section 4.27    Insurance .........................................................................38
Section 4.28    Alternative Transactions ....................................................38
Section 4.29    Issuance ...........................................................................38

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PRIVATE
PLACEMENT PARTIES...................................................................38**
Section 5.1     Organization .....................................................................39
Section 5.2     Organizational Power and Authority ...................................39
Section 5.3     Execution and Delivery ......................................................39
Section 5.4     No Conflict........................................................................39
Section 5.5     Consents and Approvals .....................................................39
Section 5.6     No Registration ..................................................................40
Section 5.7     Purchasing Intent ...............................................................40
Section 5.8     Sophistication; Investigation...............................................40
Section 5.9     No Broker's Fees ................................................................40
Section 5.10    Sufficient Funds .................................................................40
Section 5.11    Execution of PSA and Backstop Commitment Agreement ......41

**ARTICLE VI ADDITIONAL COVENANTS.......................................41**
Section 6.1     Approval of the Private Placement Parties ...........................41
Section 6.2     Conduct of Business ...........................................................42
Section 6.3     Material Claim Settlements.................................................43
Section 6.4     Access to Information; Confidentiality.................................43
Section 6.5     Commercially Reasonable Efforts ........................................44
Section 6.6     Registration Rights Agreement; Reorganized Company
                Organizational Documents...................................................45
Section 6.7     Blue Sky ...........................................................................47
Section 6.8     DTC Eligibility ..................................................................47
Section 6.9     Use of Proceeds..................................................................47
Section 6.10    Securities Legend ..............................................................47
Section 6.11    Antitrust Approval .............................................................48
Section 6.12    Alternative Transactions .....................................................49
Section 6.13    Reclamation Bonding..........................................................49

**ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ...................49**
Section 7.1     Conditions to the Obligations of the Private Placement Parties ...............49
Section 7.2     Waiver of Conditions..........................................................52
Section 7.3     Conditions to the Obligations of the Debtors .........................52

**ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ...........................................54**
Section 8.1     Indemnification Obligations ................................................54
Section 8.2     Indemnification Procedure ..................................................54
Section 8.3     Settlement of Indemnified Claims .........................................55
Section 8.4     Contribution ......................................................................56
Section 8.5     Treatment of Indemnification Payments..................................56

TABLE OF CONTENTS (cont'd)

<div align="right">Page</div>

| | | |
|---|---|---|
| Section 8.6 | No Survival | 56 |
| **ARTICLE IX TERMINATION** | | **56** |
| Section 9.1 | Consensual Termination | 56 |
| Section 9.2 | Termination by the Requisite Members of the Noteholder Steering Committee | 57 |
| Section 9.3 | Termination by a Private Placement Party | 59 |
| Section 9.4 | Termination by the Company | 59 |
| Section 9.5 | Effect of Termination | 60 |
| **ARTICLE X GENERAL PROVISIONS** | | **62** |
| Section 10.1 | Notices | 62 |
| Section 10.2 | Assignment; Third Party Beneficiaries | 64 |
| Section 10.3 | Prior Negotiations; Entire Agreement | 64 |
| Section 10.4 | Governing Law; Venue | 65 |
| Section 10.5 | Waiver of Jury Trial | 65 |
| Section 10.6 | Counterparts | 65 |
| Section 10.7 | Waivers and Amendments; Rights Cumulative; Consent | 66 |
| Section 10.8 | Headings | 66 |
| Section 10.9 | Specific Performance | 66 |
| Section 10.10 | Damages | 66 |
| Section 10.11 | No Reliance | 67 |
| Section 10.12 | Publicity | 67 |
| Section 10.13 | Settlement Discussions | 67 |
| Section 10.14 | No Recourse | 67 |
| Section 10.15 | Relationship Among Parties | 68 |
| Section 10.16 | Tax Forms | 69 |
| Section 10.17 | Company Fiduciary Duties | 69 |

SCHEDULES

| | |
|---|---|
| Schedule 1 | Initial Private Placement Schedule |
| Schedule 2 | Private Placement Schedule |

EXHIBITS

| | |
|---|---|
| Exhibit A | [Reserved] |
| Exhibit B | Form of Joinder Agreement |
| Exhibit C | Voting/Consent Structure |
| Exhibit D | Plan Support Agreement |
| Exhibit E | Illustrative Allocation of Common Shares (Fully-Diluted) |

<div align="center">iii</div>

## PRIVATE PLACEMENT AGREEMENT

THIS PRIVATE PLACEMENT AGREEMENT (this "**Agreement**"), dated as of December 22, 2016, is made by and among Peabody Energy Corporation, a Delaware corporation (the "**Company**"), on behalf of itself and each of its direct and indirect debtor subsidiaries (each a "**Debtor**" and, collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company Group**") on the one hand, and each Private Placement Party (as defined below), on the other hand.  The Company and each Private Placement Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".  Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Plan.

## RECITALS

WHEREAS, the Company and the Private Placement Parties have entered into a Plan Support Agreement, dated as of December 22, 2016, a copy of which is attached hereto as Exhibit D (including the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit 1 to the Plan Support Agreement (the "**Restructuring Term Sheet**" and collectively, including all the exhibits thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Plan Support Agreement**")), which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a plan of reorganization to be filed in jointly administered cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended from time to time, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring and (b) requires that the Plan be consistent with the Plan Support Agreement.

WHEREAS, pursuant to the Plan and this Agreement, the Company will conduct (a) a rights offering pursuant to the Backstop Commitment Agreement and (b) a private placement for the Private Placement Shares at an aggregate purchase price equal to the Private Placement Amount and a per-share purchase price equal to the Per Share Purchase Price on the Effective Date.

WHEREAS, subject to the terms and conditions contained in this Agreement and as set forth in the Restructuring Term Sheet, each Initial Private Placement Party has agreed to purchase (on a several and not joint basis) the Private Placement Shares, subject to the ability of each Additional Private Placement Party (if any) to purchase its Private Placement Percentage of the Private Placement Shares, pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Company (on behalf of itself and each other Debtor) and each of the Private Placement Parties hereby agrees as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified below:

"**Additional Commitment Party**" has the meaning set forth in the Backstop Commitment Agreement.

"**Additional Party Claim Amount**" means the Allowed Claim amount beneficially owned by each Additional Private Placement Party as of 5:00 p.m. New York City time on the Private Placement Enrollment Outside Date (except for any Phase Two Party Claim Amounts beneficially owned by any Phase Two Private Placement Party), as reported by each Additional Private Placement Party (including documentation evidencing such beneficial ownership) to the Claims and Balloting Agent promptly after becoming an Additional Private Placement Party.

"**Additional Private Placement Party**" means each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that is a holder of an Eligible Private Placement Claim that agrees to (i) participate in the Private Placement Commitment by joining this Agreement and the Plan Support Agreement pursuant to <u>Article II</u> of this Agreement, (ii) join the Backstop Commitment Agreement as a Commitment Party prior to the applicable deadline described herein, and (iii) subscribe for its full entitlement of Rights Offering Shares in the Rights Offering.  Initial Private Placement Parties may be Additional Private Placement Parties with respect only to additional Eligible Private Placement Claims purchased in excess of the Eligible Private Placement Claims held by such Initial Private Placement Parties as of the execution of this Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code. "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means any investment fund the primary investment advisor to which is a Private Placement Party or an Affiliate thereof.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allowed Claim**" has the meaning set forth in the Plan.

"**Allowed Class 5B Claims**" has the meaning set forth in the Plan.

"**Allowed Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring of any Debtor or non-Debtor member of the Company Group, other than the Restructuring.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in <u>Section 4.6</u>.

"**Available Shares**" means the Private Placement Shares that any Private Placement Party fails to purchase as a result of a Private Placement Default by such Private Placement Party.

"**Backstop Commitment Agreement**" means that certain Backstop Commitment Agreement among Peabody Energy Corporation and the commitment parties party thereto, dated as of December 22, 2016.

"**Backstop Commitments**" has the meaning set forth in the Backstop Commitment Agreement.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**Bonding Solution**" has the meaning set forth in <u>Section 6.13</u>.

"**Breakup Payments**" has the meaning set forth in <u>Section 9.5(b)</u>.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Bylaws**" means the bylaws of the Reorganized Company, which shall become effective as of Effective Date, and which shall be consistent in all material respects with the terms set forth in the Plan.

"**Certificate of Incorporation**" means the certificate of incorporation of the Reorganized Company as in effect on the Effective Date, which shall be consistent in all material respects with the terms set forth in the Plan.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claim**" has the meaning ascribed to it in the Bankruptcy Code.

"**Claims and Balloting Agent**" has the meaning set forth in the Plan.

"**Class 2**" has the meaning set forth in the Plan.

"**Class 5B**" has the meaning set forth in the Plan.

"**Class 5B Claims**" has the meaning set forth in the Plan.

"**Closing**" has the meaning set forth in Section 2.6(a).

"**Closing Date**" has the meaning set forth in Section 2.6(a).

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment Party**" has the meaning set forth in the Backstop Commitment Agreement.

"**Commitment Premium Shares**" means any Common Shares issued on account of the Private Placement Commitment Premium in accordance with Section 3.1(a) and the Backstop Commitment Premium in accordance with the Backstop Commitment Agreement.

"**Common Shares**" means the shares of common stock, par value $0.001 per share, in the Reorganized Company.

"**Company**" has the meaning set forth in the Preamble.

"**Company Group**" has the meaning set forth in the Preamble.

"**Company Plan**" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 or 430 of the Code or Section 302 of ERISA, and (i) sponsored or maintained (at the time of determination or at any time within the six years prior thereto) by any of the Debtors or any ERISA Affiliate, or with respect to which any such entity has any actual or contingent liability or obligation or (ii) in respect of which any of the Debtors or any ERISA Affiliate is (or, if such plan were terminated, could under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

4

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Confirmation Hearing**" has the meaning set forth in the Plan.

"**Confirmation Order**" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consideration**" has the meaning set forth in Section 2.7(b).

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or agency or otherwise.

"**Debtors**" has the meaning set forth in the Preamble.

"**Defaulting Private Placement Party**" means in respect of a Private Placement Party Default that is continuing, the applicable defaulting Private Placement Party.

"**Definitive Documentation**" means the definitive documents and agreements governing the Restructuring. "**Definitive Documents**" has a correlative meaning.

"**Disclosure Statement**" has the meaning set forth in the Plan.

"**Disclosure Statement Motion**" means the Debtors' motion for an order, among other things, (a) approving the Disclosure Statement; (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of ballots; (e) establishing procedures for voting on the Plan; and (f) establishing notice and objection procedures for the confirmation of the Plan.

"**Disclosure Statement Order**" means an Order approving the Disclosure Statement with respect to the Plan and the solicitation with respect to the Plan.

"**Effective Date**" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and (c) on which the Restructuring and the other transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated.

"**Eligible Private Placement Claims**" means Allowed Second Lien Notes Claims and Allowed Class 5B Claims.

"**Environmental Laws**" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders in council, Orders, decrees, treaties, directives, judgments or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any of the Debtors, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Code.

"**ERISA Event**" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Company Plan; (b) any failure by any Company Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Company Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Company Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Company Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by any of the Debtors or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Company Plan, including the imposition of any Lien in favor of the PBGC or any Company Plan or Multiemployer Plan; (e) a determination that any Company Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); (f) the receipt by any of the Debtors or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Company Plan or to appoint a trustee to administer any Company Plan under Section 4042 of ERISA; (g) the incurrence by any of the Debtors or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Company Plan or Multiemployer Plan; (h) the receipt by any of the Debtors or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any of the Debtors or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical status" (within the meaning of Section 305 of ERISA or Section 432 of the Code); (i) the conditions for imposition of a Lien under Section 303(k) of ERISA or Section 430(k) of the Code shall have been met with respect to any Company Plan; (j) the adoption of an amendment to a Company Plan requiring the provision of security to such Company Plan pursuant to Section 307 of ERISA; (k) the assertion of a material claim (other than routine claims for benefits) against any Company Plan or the assets thereof, or against any of the Debtors or any of the ERISA Affiliates in connection with any Company Plan; or (l) receipt from the IRS of notice of the failure of any Company Plan (or any other employee benefit plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Company Plan to qualify for exemption from taxation under Section 501(a) of the Code.

"**Escrow Account**" has the meaning set forth in <u>Section 2.4(a)</u>.

6

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.4(b).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exit Facility**" means a senior secured credit facility that may be entered into by one or more of the Reorganized Debtors on the Effective Date, the terms of which are no less favorable, when taken as a whole, to the Debtors than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 to the Restructuring Term Sheet, as determined by the Debtors in their reasonable business judgment, and of sufficient size and on appropriate terms, including the ability to enter into up to $250 million of ABL Facilities (as defined in Exhibit 2 to the Restructuring Term Sheet), to avoid the need to issue all or part of the Replacement Secured First Lien Term Loan and/or the New Second Lien Notes.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3(a).

"**Filing Deadline**" has the meaning set forth in Section 6.6(a)(i).

"**Filing Party**" has the meaning set forth in Section 6.11(b).

"**Final DIP Order**" has the meaning set forth in Section 3.3(c).

"**Final Order**" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

"**First Lien Claims**" has the meaning set forth in the Plan.

"**First Lien Credit Agreement**" has the meaning set forth in the Plan.

"**First Lien Full Cash Recovery**" has the meaning set forth in the Plan.

"**Fully Diluted Common Shares**" means the total number of Common Shares outstanding as of the Effective Date after giving effect to (a) the reservation and deemed issuance of Common Shares issuable upon (i) conversion of the Preferred Equity and (ii) exercise of Penny Warrants, and (b) the issuance of (i) any Incremental Second Lien Shares, (ii) any Premium Shares and (iii) any Rights Offering Disputed Claims Reserve Shares, but prior to dilution from the LTIP and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision in the Transaction Agreements.

7

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**Funding Notice Date**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Entity**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law other than naturally occurring material on or inside of any mineral property.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Incremental Additional First Lien Debt**" has the meaning set forth in the Plan.

"**Incremental New Second Lien Notes**" has the meaning set forth in the Plan.

"**Incremental Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Incremental Second Lien Shares**" has the meaning set forth in the Plan.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Initial Commitment Parties**" has the meaning set forth in the Backstop Commitment Agreement.

"**Initial Private Placement Parties**" means the Noteholder Co-Proponents.

"**Initial Private Placement Schedule**" means the initial commitment schedule attached hereto as Schedule 1 hereto reflecting the initial percentage allocation of the obligations of the Initial Private Placement Parties to purchase Private Placement Shares (prior to the addition of Additional Private Placement Parties as contemplated hereby) and which may be amended only upon consent of each of the Initial Private Placement Parties.

"**Initial Resale Registration Statement**" has the meaning set forth in Section 6.6(a)(i).

"**Intellectual Property Rights**" has the meaning set forth in Section 4.12.

"**Investment Company Act**" has the meaning set forth in Section 4.26.

"**IRS**" means the United States Internal Revenue Service.

"**Joinder Agreement**" has the meaning set forth in Section 2.3(a).

"**Joint Filing Party**" has the meaning set forth in Section 6.11(c).

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer or the chief financial officer of the Company. As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Lead Arrangers**" has the meaning set forth in the Restructuring Term Sheet.

"**Legal Proceedings**" has the meaning set forth in Section 4.10.

"**Legend**" has the meaning set forth in Section 6.10.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in Section 8.1.

"**LTIP**" has the meaning set forth in the Plan.

"**Material Adverse Effect**" means any event, which individually, or together with all other events, has or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities (including reclamation obligations, whether or not contingent), finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Restructuring Term Sheet, including the Private Placement and the Rights Offering, in each case, except to the extent such event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution,

announcement or performance of the transactions contemplated by the Plan (including any act or omission of the Debtors expressly required or prohibited, as applicable, by the Plan or consented to or required by the Requisite Members of the Noteholder Steering Committee in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of any of the Debtors not in contravention of the terms and conditions of the Restructuring Term Sheet or the Plan (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (vi) the filing or pendency of the Chapter 11 Cases (including events resulting from any filing made in such Chapter 11 Cases); or (vii) declarations of national emergencies in the United States or natural disasters in the United States; provided, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such event is materially and disproportionately adverse to the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

"**Material Contracts**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any of the Debtors is a party.

"**MEPP Claim**" means any Claim arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including (a) proof of claim number 4722 and (b) any other Claim related to any withdrawal liability under U.S.C. § 1392(c).

"**Money Laundering Laws**" has the meaning set forth in Section 4.23.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any of the Debtors or any ERISA Affiliate is making or accruing an obligation to make contributions, has within any of the preceding six plan years made or accrued an obligation to make contributions.

"**New Second Lien Notes**" has the meaning set forth in the Plan.

"**Noteholder Co-Proponents**" means (a) Contrarian Capital Management L.L.C., Panning Capital Management, LP, PointState Capital LP, and the South Dakota Investment Council, or entities managed by such parties, acting as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective Affiliates, including those designated on the Initial Private Placement Schedule, and (b) entities managed by Elliott Management Corporation, Discovery Capital Management, LLC, and Aurelius Capital Management, LP, acting as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective Affiliates, including those designated on the Initial Private Placement Schedule.

"**Noteholder Steering Committee**" means a steering committee consisting of the Noteholder Co-Proponents.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Participating Private Placement Claims**" shall mean Allowed Claims within the applicable Class held by all Private Placement Parties.

"**Party**" has the meaning set forth in the Preamble.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Penny Warrants**" has the meaning set forth in the Backstop Commitment Agreement.

"**Per Share Purchase Price**" means $25.00. An illustrative allocation of Common Shares (Fully Diluted) is attached here to as Exhibit E.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business or incident to the operation of the Debtors' businesses as described in the Company SEC Documents; (c) if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (d) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (e) leases, subleases, licenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose; (f) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements; (g) (i) Liens to secure the performance of bids, trade contracts and leases, reclamation bonds, insurance bonds, statutory obligations, surety and appeal bonds, performance bonds, bank guarantees and letters of credit and other obligations of a like nature incurred in the ordinary course of business, (ii) Liens on assets to secure obligations under surety bonds obtained as required in connection with the entering into of federal coal leases or (iii) Liens created under or by any turnover trust; (h) Liens securing attachments or judgments for the payment of money or securing appeal or surety bonds related to such attachments or judgments; (i) easements, covenants, conditions, encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the

Debtors' business; (j) Liens granted pursuant to existing indebtedness arrangements of the Debtors described in the Plan or Disclosure Statement; (k) Liens with respect to bailments, operating leases or consignment or retention of title arrangements entered into in the ordinary course of business; (l) (i) production payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties or (ii) cross charges, Liens or security arrangements entered into in respect of a joint venture for the benefit of a participant, manager or operator of such Joint Venture, in each case, consistent with normal practices in the mining industry; (m) eases, subleases, licenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose; (n) (i) Liens in favor of a banking institution arising by operation of law or any contract encumbering deposits (including the right of set-off) held by such banking institutions incurred in the ordinary course of business and which are within the general parameters customary in the banking industry or (ii) contractual rights of setoff to the extent constituting Liens; (o) Liens on capital stock and other equity interests in "Unrestricted Subsidiaries" as defined in the First Lien Credit Agreement securing obligations of Unrestricted Subsidiaries not otherwise prohibited under the First Lien Credit Agreement; (p) Liens on receivables and rights related to such receivables created pursuant to any "Permitted Securitization Programs" as defined in the First Lien Credit Agreement or under any other agreement under which such receivables or rights are transferred; (q) Liens granted under any Contracts to the extent the same are ordinary and customary in the businesses or industries in which the Debtors operate and do not or would not materially impair the ownership, use or occupancy of any material Real Property or the operation of the Debtors' businesses or, if such claim does materially impair such ownership, use, occupancy or operation, are being contested in good faith by appropriate proceedings; (r) mortgages on a lessor's interest in a lease or sublease; provided that no foreclosure proceedings have been duly filed (unless, in such case, such mortgage has been subordinated to the applicable lease); and (s) Liens that, pursuant to the Plan and the Confirmation Order, will be discharged and released on the Effective Date.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Phase Two Commitment Party**" has the meaning set forth in the Backstop Commitment Agreement.

"**Phase Two Party Claim Amount**" means the Allowed Claim amount beneficially owned by each Phase Two Private Placement Party by the Phase Two Party Outside Date, as reported by each Phase Two Private Placement Party (including documentation evidencing such beneficial ownership) to the Claims and Balloting Agent promptly after becoming a Phase Two Private Placement Party no later than the Private Placement Enrollment Outside Date; provided, that such Phase Two Party Claim Amount shall include any Claims that are subject to an agreement to purchase or acquire such Claim that is pending as of the date of such Phase Two Private Placement Party's entry into this Agreement or a Joinder Agreement and settled or delivered to such Phase Two Private Placement Party within three (3) Business Days of the Phase Two Party Outside Date.

"**Phase Two Party Outside Date**" means the date that is the third (3rd) Business Day following December 22, 2016 and by which the relevant party has executed this Agreement or a Joinder Agreement.

"**Phase Two Private Placement Party**" has the meaning set forth in <u>Section 2.3(a)</u>.

"**Plan**" means the *Joint Chapter 11 Plan of Reorganization of Peabody Energy Corporation and Its Debtor Affiliates*, filed on December 22, 2016 (as may be amended, supplemented, or modified from time to time solely as provided for, and in accordance with, the terms and conditions of this Agreement and the Plan Support Agreement), including all exhibits, supplements, appendices, and schedules thereto.

"**Plan Documents**" has the meaning set forth in the Plan Support Agreement.

"**Plan Equity Value**" means $3.105 billion.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement) to be filed by the Debtors no later than ten (10) days before the Confirmation Hearing, and additional documents or amendments to previously filed documents, filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Exit Facility documents; (b) the Reorganized Company Organizational Documents; (c) the Registration Rights Agreement; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan); (e) the Schedule of Rejected Executory Contracts and Unexpired Leases (as defined in the Plan) and (f) the certificate of designation relating to the Preferred Equity.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with and subject to the Plan Support Agreement and this Agreement.

"**Plan Support Agreement**" has the meaning set forth in the Recitals.

"**Plan Support Agreement Termination Condition**" means the Debtors' termination right under the Plan Support Agreement if holders of two-thirds (2/3) in amount of each of the Second Lien Notes Claims and the Unsecured Senior Notes Claims have not joined the Plan Support Agreement prior to the date on which the PPA and BCA Approval Order is entered by the Bankruptcy Court.

"**PPA and BCA Approval Motion**" means the motion to be filed by the Debtors seeking approval of the PPA and BCA Approval Order.

"**PPA and BCA Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement, the Backstop Commitment Agreement and the PPA and BCA Approval Order.

"**PPA and BCA Approval Order**" means the Order entered by the Bankruptcy Court (a) authorizing the Company (on behalf of itself and the other Debtors) to execute and

deliver the Backstop Commitment Agreement, this Agreement, including the authorization of all contemplated premiums, fees and expense reimbursements and the indemnification provisions contained in both the Backstop Commitment Agreement and this Agreement, and providing that the all contemplated premiums, fees and expense reimbursements and the indemnification provisions shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in the relevant agreement without further order of the Bankruptcy Court and (b) approving the Rights Offering Procedures.

"**Pre-Closing Period**" has the meaning set forth in Section 6.4(a).

"**Preferred Equity**" has the meaning set forth in the Plan.

"**Premium Shares**" means, collectively, the Commitment Premium Shares and the Ticking Premium Shares.

"**Private Placement**" means the purchase by the Private Placement Parties of the Private Placement Shares for the Private Placement Amount in connection with the Restructuring substantially on the terms reflected in the Plan and this Agreement.

"**Private Placement Agreement Premiums**" has the meaning set forth in Section 3.1(b).

"**Private Placement Amount**" means an amount equal to $750,000,000.

"**Private Placement Commitment**" has the meaning set forth in Section 2.2.

"**Private Placement Commitment Premium**" has the meaning set forth in Section 3.1(a).

"**Private Placement Enrollment Outside Date**" has the meaning set forth in Section 2.3(a).

"**Private Placement Expiration Time**" means the time and the date on which the rights offering subscription forms must be duly delivered to the Private Placement Agent.

"**Private Placement Participants**" means those Persons who duly subscribe for Private Placement Shares.

"**Private Placement Party**" means an Initial Private Placement Party or an Additional Private Placement Party.

"**Private Placement Party Default**" means the failure by any Private Placement Party to (a) deliver and pay the aggregate Per Share Purchase Price for such Private Placement Party's Private Placement Percentage of any Private Placement Shares by the Escrow Account Funding Date in accordance with Section 2.4(b) or (b) duly purchase all Private Placement Shares, in accordance with this Agreement and the Plan; provided, that no Private Placement Party Default shall constitute a Termination Event, a "Termination Event" as that term is defined

in the Plan Support Agreement or any other right to terminate the Plan Support Agreement by any party thereto.

"**Private Placement Percentage**" means, for any Commitment Party, (1) with respect to Allowed Claims in Class 2, a percentage determined by multiplying:

(a) the Pro Rata Split applicable to the relevant Allowed Claims in Class 2 held by such Private Placement Party; by

(b) (i) if the Surplus Private Placement Participation Adjustment shall apply -

(A)   in the case of an Initial Private Placement Party that may and has elected to apply the Surplus Private Placement Participation Adjustment with respect to the Private Placement Party's Eligible Private Placement Claims in Class 2 (as set forth in the Initial Private Placement Schedule), (I) the amount of the Eligible Private Placement Claims in Class 2 of such Initial Private Placement Party (as set forth in the Initial Private Placement Schedule) divided by (II) the amount of two-thirds (2/3) of the amount of all Eligible Private Placement Claims in Class 2; and

(B) in the case of a Phase Two Private Placement Party, the sum of (I) (a) 50% of such Phase Two Private Placement Party's Phase Two Party Claim Amount in Class 2 divided by (b) the amount of two-thirds of all Allowed Claims within Class 2, and (II) (a) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), multiplied by (b) (1) 50% of such Phase Two Private Placement Party's Phase Two Party Claim Amount in Class 2, divided by (2) the amount of all Participating Private Placement Claims within Class 2, other than the Allowed Claims, and/or portions thereof, to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(ii)   in the case of (x) any other Private Placement Party, if the Surplus Private Placement Participation Adjustment applies, or (y) any Private Placement Party, if the Surplus Private Placement Participation Adjustment does not apply—

(A)   one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), multiplied by (B) the amount of the Allowed Claims of such Private Placement Party in Class 2, and divided by (C) the amount of all Participating Private Placement Claims in Class 2, other than the Allowed Claims, and/or portions thereof (if any), to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(2) with respect to Allowed Claims in Class 5B, a percentage determined by multiplying:

(a) the Pro Rata Split applicable to the relevant Allowed Claims in Class 5B held by such Private Placement Party; by

(b) (i) if the Surplus Private Placement Participation Adjustment shall apply -

(A)     in the case of an Initial Private Placement Party that may and has elected to apply the Surplus Private Placement Participation Adjustment with respect to the Private Placement Party's Eligible Private Placement Claims in Class 5B (as set forth in the Initial Private Placement Schedule), (I) the amount of the Eligible Private Placement Claims in Class 5B of such Initial Private Placement Party (as set forth in the Initial Private Placement Schedule) <u>divided by</u> (II) the amount of two-thirds (2/3) of the amount of all Eligible Private Placement Claims in Class 5B; and

(B) in the case of a Phase Two Private Placement Party, the sum of (I) (*a*) 50% of such Phase Two Private Placement Party's Phase Two Party Claim Amount in Class 5B <u>divided by</u> (*b*) the amount of two-thirds of all Allowed Claims within Class 5B, and (II) (*a*) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (*b*) (1) 50% of such Phase Two Private Placement Party's Phase Two Party Claim Amount in Class 5B, <u>divided by</u> (2) the amount of all Participating Private Placement Claims within Class 5B, other than the Allowed Claims, and/or portions thereof, to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(ii)     in the case of (x) any other Private Placement Party, if the Surplus Private Placement Participation Adjustment applies, or (y) any Private Placement Party, if the Surplus Private Placement Participation Adjustment does not apply—

(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (B) the amount of the Allowed Claims of such Private Placement Party in Class 5B, and <u>divided by</u> (C) the amount of all Participating Private Placement Claims in Class 5B, other than the Allowed Claims, and/or portions thereof (if any), to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable.

"**Private Placement Period**" means the number of days from the date on which documentation necessary to be obligated under this Agreement has been executed and the Effective Date.

"**Private Placement Schedule**" means <u>Schedule 2</u> to this Agreement, as each may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Private Placement Shares**" means the Preferred Equity distributed pursuant to this Agreement.

"**Private Placement Agent**" means an agent appointed by the Debtors, and reasonably acceptable to the Initial Private Placement Parties, to administer the Private Placement.

"**Private Placement Ticking Premium**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Pro Rata Split**" means the following percentages, based on Allowed Claims as of the Record Date:     (x) in respect of Allowed Claims in Class 2, the quotient of

(A) $708,000,000 divided by (B) the Allowed Claims in Class 5B plus $708,000,000; and (y) in respect of Allowed Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708,000,000.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Record Date**" means the date on which the Disclosure Statement Order is entered by the Bankruptcy Court.

"**Registration Deadline**" has the meaning set forth in Section 6.6(a)(i).

"**Registration Rights Agreement**" has the meaning set forth in Section 6.6(a).

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" has the meaning set forth in Section 2.7(a).

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating.

"**Released**" has a correlative meaning.

"**Reorganized Company**" means Peabody Energy Corporation from and after the Effective Date.

"**Reorganized Company Organizational Documents**" means, collectively, the Bylaws and the Certificate of Incorporation.

"**Reorganized Debtors**" means the Debtors from and after the Effective Date.

"**Replacement Secured First Lien Term Loan**" has the meaning set forth in the Plan.

"**Replacing Private Placement Party**" has the meaning set forth in Section 2.5(a).

"**Reportable Event**" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Company Plan.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, limited partners, general partners, management companies, investment managers, shareholders, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requisite Consenting Noteholders**" means the applicable individual(s) or group(s) of holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B identified in the Voting/Consent Structure attached hereto as Exhibit C.

"**Requisite First Lien Lender Co-Proponents**" has the meaning set forth in the Plan.

"**Requisite Members of the Noteholder Steering Committee**" means 75% of the Noteholder Steering Committee, based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule, as applicable; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its Claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule, as applicable, to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member(s) of the Noteholder Steering Committee. For the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly owned by such member or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein.

"**Restructuring**" has the meaning set forth in the Plan Support Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals.

"**Rights Offering**" has the meaning set forth in the Backstop Commitment Agreement.

"**Rights Offering Disputed Claims Reserve Shares**" has the meaning set forth in the Plan.

"**Rights Offering Procedures**" has the meaning set forth in the Backstop Commitment Agreement.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.

"**Surplus Private Placement Participation Adjustment**" has the meaning set forth in Section 2.3(c).

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.  For the avoidance of doubt, such term shall exclude any tax, penalties or interest thereon that result or have resulted from the non-payment of royalties.

"**Tax Forms**" has the meaning set forth in Section 10.16.

"**Termination Date**" has the meaning set forth in Section 9.5(a).

"**Termination Event**" means an event giving rise to a right of termination pursuant to Article IX.

"**Ticking Premium Shares**" means any Common Shares issued on account of the Private Placement Ticking Premium in accordance with Section 3.1(b) of this Agreement and on account of the Backstop Ticking Premium in accordance with Section 3.1(b) of the Backstop Commitment Agreement.

"**Transaction Agreements**" has the meaning set forth in Section 4.2(a).

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest).  "**Transfer**" used as a noun has a correlative meaning.

"**Ultimate Purchaser**" has the meaning set forth in Section 2.7(b).

"**Unlegended Shares**" has the meaning set forth in Section 6.8.

"**Unsecured Senior Notes Claims**" has the meaning set forth in the Plan.

"**Voting/Consent Structure**" means the process set forth on Exhibit C.

19

"**willful or intentional breach**" has the meaning set forth in <u>Section 9.5(a)</u>.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Section 4203 of ERISA.

Section 1.2    <u>Construction</u>.    In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)    the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)    references to "day" or "days" are to calendar days;

(h)    references to "the date hereof" means the date of this Agreement;

(i)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)    references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## PRIVATE PLACEMENT

Section 2.1    The Private Placement.  On and subject to the terms and conditions hereof, including entry of the PPA and BCA Approval Order, the Company shall conduct the Private Placement to holders of Allowed Claims in Class 2 and Class 5B as of the Record Date pursuant to and in accordance with this Agreement.  If reasonably requested by the Requisite Members of the Noteholder Steering Committee, from time to time prior to the Private Placement Expiration Time (and any extensions thereto), the Company shall notify, or cause the Private Placement Agent to notify, within 48 hours of receipt of such request by the Company, the Private Placement Parties of the aggregate number of Private Placement Shares the Private Placement Parties have agreed to purchase. The offer and sale of the Private Placement Shares purchased by the Private Placement Parties pursuant to this Agreement will be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act, and the Disclosure Statement shall include a statement to such effect.

Section 2.2    The Private Placement Commitment.  On and subject to the terms and conditions hereof, including entry of the PPA and BCA Approval Order and the Confirmation Order, each Private Placement Party agrees, severally and not jointly, to purchase, and the Reorganized Company agrees to sell to such Private Placement Party, on the Closing Date for the applicable aggregate Per Share Purchase Price, the number of Private Placement Shares equal to (a) such Private Placement Party's Private Placement Percentage multiplied by (b) the aggregate number of Private Placement Shares (provided, (i) that the 22.5% of the Private Placement Shares shall be purchased solely by the Initial Private Placement Parties in accordance with their respective Private Placement Percentages, (ii) 5% of the Private Placement Shares shall be purchased by the Initial Private Placement Parties and the Phase Two Private Placement Parties (a) with respect to the Initial Private Placement Parties, (x) according to the Pro Rata Split and (y) based on, and calculated using, the Claim amounts set forth in the Initial Private Placement Commitment Schedule and (b) with respect to the Phase Two Private Placement Parties, (x) according to the Pro Rata Split and (y) based on, and calculated using, the Phase Two Party Claim Amount, and (iii) the remaining 72.5% shall be purchased by all Private Placement Parties in accordance with their respective Private Placement Percentages) (such obligation to purchase, the "**Private Placement Commitment**"), rounded among the Private Placement Parties solely to avoid fractional shares as the Requisite Consenting Noteholders may determine (provided that in no event shall such rounding reduce the aggregate commitment of any Private Placement Party).  Any Defaulting Private Placement Party shall be liable to each non-Defaulting Private Placement Party, the Company and the Reorganized Company as a result of any breach of its obligations hereunder.

Section 2.3    Additional Private Placement Parties.

(a)    Additional Private Placement Parties. Holders of Allowed Second Lien Notes Claims and Allowed Class 5B Claims may, in their sole discretion, elect to participate in the rights and obligations set forth by this Agreement as an Additional Private Placement Party (to the extent they meet the qualifications set forth in the definition of such term) until the date

that is twenty (20) Business Days following the Debtors' filing of the PPA and BCA Approval
Motion (the "**Private Placement Enrollment Outside Date**").  All holders of Eligible Private
Placement Claims electing to become Additional Private Placement Parties must execute and
deliver to the Company and the Claims and Balloting Agent a joinder to this Agreement pursuant
to an agreement in substantially the form attached as <u>Exhibit B</u> hereto or otherwise in form and
substance reasonably acceptable to the Company (a "**Joinder Agreement**"), a joinder to the
Backstop Commitment Agreement in the form set forth by the Backstop Commitment
Agreement and a joinder to the Plan Support Agreement.  Any Additional Private Placement
Parties that become a Private Placement Party pursuant to this <u>Section 2.3(a)</u> by 5:00 p.m. New
York City time on the third (3rd) Business Day following the execution of this Agreement
(excluding any Defaulting Private Placement Party) is deemed to be a "**Phase Two Private
Placement Party**".  Each Phase Two Private Placement Party shall report its Phase Two Party
Claim Amount, and each Additional Private Placement Party shall report its Additional Party
Claim Amount, to the Claims and Balloting Agent promptly after becoming a Phase Two Private
Placement Party or Additional Private Placement Party, as the case may be, but in no event later
than the Private Placement Enrollment Outside Date.

(b)     <u>Participation Percentage</u>. Holders of the Allowed Second Lien Notes
Claims and holders of Allowed Class 5B Claims (in their capacities as such) shall participate in
the transactions contemplated by this Agreement according to the Pro Rata Split.

(c)     <u>Surplus Adjustment</u>.  If holders of more than two-thirds of either the
Allowed Second Lien Notes Claims and/or the Allowed Unsecured Senior Notes Claims become
party to this Agreement before the Private Placement Enrollment Outside Date pursuant to
<u>Section 2.3(a)</u>, each Initial Private Placement Party shall have the right, but not the obligation, to
elect for their respective Private Placement Commitments to equal its pro rata portion of the full
amount of Private Placement Commitments that would be allocated to such Initial Private
Placement Party (a) according to its pro rata portion of the Pro Rata Split and (b) based on, and
calculated using, the Claim amounts set forth in the Initial Private Placement Schedule, as if
holders of exactly two-thirds (2/3) of the Allowed Second Lien Notes Claims or the Allowed
Unsecured Senior Notes Claims, as applicable, are party to this Agreement (a "**Surplus Private
Placement Participation Adjustment**"), and the Private Placement Commitment available to
Additional Private Placement Parties in the respective Class shall be reduced accordingly. For
the avoidance of doubt, each Phase Two Private Placement Party will be subject to the dilution
protections as set forth in the Private Placement Commitment Percentage. Each Initial Private
Placement Party must elect to apply the Surplus Private Placement Participation Adjustment no
later than ten (10) Business Days following the Private Placement Enrollment Outside Date.

Section 2.4     <u>Escrow Account Funding</u>.

(a)     <u>Funding Notice</u>.  No later than the seventh (7th) Business Day following
the Private Placement Expiration Time, the Private Placement Agent shall, on behalf of the
Company, deliver to each Private Placement Party a written notice (the "**Funding Notice**", and
the date of such delivery, the "**Funding Notice Date**") setting forth (i) the number of Private
Placement Shares each Private Placement Participant is obligated to purchase, and the aggregate
Per Share Purchase Price therefor; (ii) if applicable, the number of Private Placement Shares
such Private Placement Party is subscribed for in the Private Placement and for which such

Private Placement Party has not yet paid to the Private Placement Agent the aggregate Per Share Purchase Price therefor, together with such aggregate Per Share Purchase Price; and (iii) subject to the last sentence of <u>Section 2.4(b)</u>, the escrow account designated in escrow agreements satisfactory to the Requisite Members of the Noteholder Steering Committee and the Company, each acting reasonably, to which such Private Placement Party shall deliver and pay the aggregate Per Share Purchase Price for such Private Placement Party's Private Placement Percentage of the Private Placement Shares and, if applicable, the aggregate Per Share Purchase Price for the Private Placement Shares such Private Placement Party has subscribed for in the Private Placement (the "**Escrow Account**").  The Company shall promptly direct the Private Placement Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Private Placement Party may reasonably request.

(b)    <u>Escrow Account Funding</u>.  On the fifth (5th) Business Day before the Closing Date (the "**Escrow Account Funding Date**"), each Private Placement Party shall deliver and pay an amount equal to the aggregate Per Share Purchase Price for such Private Placement Party's Private Placement Commitment, by wire transfer of immediately available funds in U.S. dollars into the Escrow Account in satisfaction of such Private Placement Party's Private Placement Commitment and its obligation to purchase Private Placement Shares. Notwithstanding the foregoing, all payments contemplated to be made by any Private Placement Party to the Escrow Account pursuant to this <u>Section 2.4</u> may instead be made, at the option of such Private Placement Party, to a segregated bank account of the Private Placement Agent designated by the Private Placement Agent in the Funding Notice and shall be delivered and paid to such account on the Escrow Account Funding Date. For the avoidance of doubt, any Private Placement Party that fails to fulfil its obligation to fully deliver and pay the aggregate Per Share Purchase Price for such Private Placement Party's Private Placement Commitment Percentage of any Available Shares or fully fund such Private Placement Party's Private Placement Commitment and duly purchase all Private Placement Shares issuable to it pursuant to such exercise on the Funding Date, as applicable, shall be deemed a Defaulting Private Placement Party.

Section 2.5    <u>Private Placement Party Default</u>.

(a)    Upon the occurrence of a Private Placement Party Default, the Company shall give prompt written notice thereof to each of the Initial Private Placement Parties (other than any Defaulting Private Placement Party) shall have the obligation, within three (3) Business Days after receipt of such notice to purchase all of the Available Shares on the terms and subject to the conditions set forth in this Agreement based upon the relative applicable Private Placement Percentages of such Initial Private Placement Parties (other than any Defaulting Private Placement Party) (such party, the "**Replacing Private Placement Parties**").  For the avoidance of doubt, nothing in this <u>Section 2.5(a)</u> shall relieve any Private Placement Party of its obligation to fulfill its Private Placement Commitment and all conditions in this <u>Section 2.5(a)</u> shall be several and not joint.

(b)    Any Available Shares purchased by a Replacing Private Placement Party (and any commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Private Placement Shares

of such Replacing Private Placement Party for all purposes hereunder, and (y) the Private Placement Percentage of such Replacing Private Placement Party for purposes of Section 2.5(d), Section 2.4(b), Section 3.1, Section 3.2, and Section 9.5(b).

(c)     If a Private Placement Party is a Defaulting Private Placement Party, it shall not be entitled to any of the Private Placement Commitment Premium, the Private Placement Ticking Premium or the Breakup Payments hereunder, and to the extent any such amounts are received by a Defaulting Private Placement Party it shall repay to the Company all such amounts by wire transfer in immediately available U.S. dollars or in another appropriate manner within one (1) Business Day of receiving written notice from the Company or any Private Placement Party demanding such repayment, and such amounts shall be thereafter allocated to any Replacing Private Placement Parties or as otherwise provided herein.

(d)     Except as set forth in Section 2.5(a), nothing in this Agreement shall be deemed to require a Private Placement Party to purchase more than its Private Placement Percentage of the Private Placement Shares.

(e)     For the avoidance of doubt, notwithstanding anything to the contrary set forth in Article IX but subject to Section 10.10, no provision of this Agreement shall relieve any Defaulting Private Placement Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.9 or Section 10.10, in connection with any such Defaulting Private Placement Party's Private Placement Default.

Section 2.6     Closing.

(a)     Subject to Article VII and Article IX, unless otherwise mutually agreed in writing between the Company and the Requisite Members of the Noteholder Steering Committee, the closing of the Private Placement Commitments (the "**Closing**") shall take place at the offices of Jones Day, 250 Vesey Street, New York, New York 10281, on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)     At the Closing, the funds held in the Escrow Account (and any amounts paid to a Private Placement Agent bank account pursuant to the last sentence of Section 2.4(b)) shall, as applicable, be released and utilized in accordance with the Plan.

(c)     At the Closing, issuance of the Private Placement Shares will be made by the Reorganized Company to each Private Placement Party (or to its designee in accordance with Section 2.7(a)) against payment of the aggregate Per Share Purchase Price for the Private Placement Shares purchased by such Private Placement Party, in satisfaction of such Private Placement Party's Private Placement Commitment.  Unless a Private Placement Party requests delivery of a physical stock certificate, the entry of any Private Placement Shares to be delivered pursuant to this Section 2.6(c) into the account of a Private Placement Party pursuant to the Reorganized Company's book entry procedures and delivery to such Private Placement Party of an account statement reflecting the book entry of such Private Placement Shares shall be deemed

delivery of such Private Placement Shares for purposes of this Agreement. Notwithstanding anything to the contrary in this Agreement, all Private Placement Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company or the Reorganized Company, as applicable.

<div align="center">Section 2.7      <u>Designation and Assignment Rights</u>.</div>

(a)      Each Private Placement Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of the Private Placement Shares that it is obligated to purchase hereunder be issued in the name of, and delivered to, one or more of its Affiliates or Affiliated Funds (other than any portfolio company of such Private Placement Party or its Affiliates) (each, a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Private Placement Party and each such Related Purchaser, (ii) specify the number of Private Placement Shares to be delivered to or issued in the name of such Related Purchaser and (iii) contain representations by such Related Purchaser as to the matters set forth in <u>Section 5.6</u> through <u>Section 5.9</u> as if such Related Purchaser was a Private Placement Party; <u>provided</u>, that no such designation pursuant to this <u>Section 2.7(a)</u> shall relieve such Private Placement Party from its obligations under this Agreement or the Plan Support Agreement. In addition, the Requisite Members of the Noteholder Steering Committee in consultation with the other members of the Noteholder Steering Committee may agree in writing to reallocate a portion of the rights to purchase Private Placement Shares referred to in clause (i) of <u>Section 2.2</u>(b), or the economics relating thereto, committed to be purchased by the Initial Private Placement Parties (provided that no individual member of the Noteholder Steering Committee may be disproportionately affected), up until the commencement of the hearing on the PPA and BCA Approval Motion, and any Initial Private Placement Party that does not wish to participate in such reallocation may, upon written notice to such Requisite Members of the Noteholder Steering Committee, cease to be an Initial Private Placement Party and an Initial Commitment Party under the Backstop Commitment Agreement. Such withdrawing Initial Private Placement Party thereafter will have no rights or obligations as an Initial Private Placement Party under this Agreement or as an Initial Commitment Party under the Backstop Commitment Agreement. Following such a withdrawal, each of the non-withdrawing Initial Private Placement Parties shall have the obligation, within three (3) Business Days after receipt of written notice from such withdrawing Initial Private Placement Party, to assume (severally and not jointly) such withdrawing Initial Private Placement Party's obligation to purchase all of the withdrawing Private Placement Party's Private Placement Commitment on the terms and conditions set forth in this Agreement based upon the relative applicable Private Placement Percentages of such Initial Private Placement Parties (other than any withdrawing Initial Private Placement Parties). For the avoidance of doubt, the withdrawal of an Initial Private Placement Party pursuant to this <u>Section 2.7(a)</u> shall result in (i) the removal of such Initial Private Placement Party from the Noteholder Steering Committee, and (ii) the reallocation of the voting power attributable to the face amount of such withdrawing Initial Private Placement Party's claims as if such claims were assigned or transferred pursuant to <u>Exhibit C</u> hereto and the definition of "Requisite Members of the Noteholder Steering Committee."

(b)      Other than as set forth in this Section 2.7(b), no Private Placement Party shall be permitted to Transfer all or any portion of its Private Placement Commitment or any of the Private Placement Commitment Premium, Private Placement Ticking Premium or Breakup Payments or any other amounts or consideration payable (collectively, "**Consideration**"), even if the Company consents to such Transfer. Each Private Placement Party shall have the right to Transfer all or any portion of its Private Placement Commitment and/or its Consideration to (i) an Affiliated Fund of the transferring Private Placement Party or (ii) one or more special purpose vehicles that are wholly owned by one or more of such Private Placement Parties and its Affiliated Funds, created for the purpose of holding such Private Placement Commitment or holding debt or equity of the Debtors (each of the Persons referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"); provided, that such transfer shall not relieve the Private Placement Party from its obligations under this Agreement. For the avoidance of doubt, Claims held by Private Placement Parties are transferable only in accordance with the Plan Support Agreement; provided, that such transfer shall not relieve the Private Placement Party from its obligations under this Agreement. Any party which purchases Claims from any Noteholder Co-Proponent, or otherwise is the transferee in respect of any Claims transferred by any Noteholder Co-Proponent, may not, in respect of such purchased or otherwise transferred Claims, become a Phase Two Commitment Party, a Phase Two Private Placement Party, an Additional Commitment Party or Additional Private Placement Party in respect of such Claims.

(c)      After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Private Placement Party (or any permitted transferee thereof) to Transfer any of the Preferred Equity or any interest therein; provided, that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws.

## ARTICLE III

## PRIVATE PLACEMENT AGREEMENT PREMIUMS AND EXPENSE REIMBURSEMENT

Section 3.1    Applicable Premiums.

(a)      Private Placement Commitment Premium.  Subject to Section 3.2, in consideration for the Private Placement Commitment and the other agreements of the Private Placement Parties in this Agreement, the Company shall pay or cause to be paid to the Private Placement Parties a nonrefundable aggregate premium equal to $60,000,000, which represents 8.0% of the Private Placement Amount (the "**Private Placement Commitment Premium**"). The Private Placement Commitment Premium shall be payable according to the following: (i) 22.5% of the Private Placement Commitment Premium to the Initial Private Placement Parties or their designees on a pro rata basis based upon the Initial Private Placement Parties' Private Placement Percentage as set forth on the Initial Private Placement Commitment Schedule (ii) 57.5% of the Private Placement Commitment Premium to the Initial Private Placement Parties, or their designees, and the Phase Two Private Placement Parties, or their designees on a pro rata basis based upon their respective Private Placement Commitment; and (iii) 20% of the Private Placement Commitment Premium to all Private Placement Parties or their designees that have

executed this Agreement or a Joinder Agreement at any time prior to the date occurring fifteen (15) Business Days after the filing of the PPA and BCA Approval Motion, on a pro rata basis based upon their respective Private Placement Commitment.

(b)    Private Placement Ticking Premium. Subject to Section 3.2, in consideration for the Private Placement Commitment and the other agreements of the Private Placement Parties in this Agreement, the Company shall pay or cause to be paid a monthly fee equal to $18,750,000, which represents 2.5% of the Private Placement Amount, payable beginning on April 3, 2017 and ending on the Closing Date (with proration for partial months) (the "**Private Placement Ticking Premium**" and together with the Private Placement Commitment Premium, the "**Private Placement Agreement Premiums**"). The Private Placement Ticking Premium shall be payable to the Private Placement Parties (including any Replacing Private Placement Party, but excluding any Defaulting Private Placement Party) or their designees based upon their respective Private Placement Commitment Percentages as of the Effective Date.

(c)    The provisions for the payment of the Private Placement Agreement Premiums, the Breakup Payments, the Expense Reimbursement, and the indemnification obligations provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Private Placement Parties would not have entered into this Agreement.

Section 3.2    Payment of Private Placement Commitment Premium and the Private Placement Ticking Premium.  The Private Placement Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order and any Private Placement Ticking Premium shall be fully earned, nonrefundable and non-avoidable as accrued through the Effective Date, and each shall be paid promptly on the later to occur of the Closing Date and the Effective Date by the Company to the Private Placement Parties in Common Shares at Plan Equity Value as of the Effective Date, free and clear of any withholding or deduction for any applicable Taxes (except for any Taxes arising as a result of a Private Placement Party's failure to provide a Tax Form in accordance with Section 10.16 establishing a complete exemption from withholding).

Section 3.3    Expense Reimbursement.

(a)    In accordance with and subject to entry by the Bankruptcy Court of the PPA and BCA Approval Order and subject to the receipt of documentation reasonably acceptable to the Debtors, the Debtors will pay all reasonably incurred and documented out-of-pocket fees and expenses incurred in connection with the Chapter 11 Cases after April 13, 2016 of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any fees incurred on behalf of any noteholders through the applicable indenture trustee), including, but not limited to, the fees and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "**Expense Reimbursement**"), in each case whether or not the Restructuring is ultimately consummated. The payment of the fees set forth in this section shall (i) be approved upon entry by the

Bankruptcy Court of the PPA and BCA Approval Order; and (ii) prior to the time paid, be granted administrative expense priority against each Debtor on a joint and several basis.

(b)    Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment under this <u>Section 3.3</u> shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. The Expense Reimbursement accrued through the date on which the PPA and BCA Approval Order is entered shall be paid as promptly as reasonably practicable after the PPA and BCA Approval Order is entered. Thereafter, the Expense Reimbursement shall be payable by the Debtors within two weeks following their receipt of invoices. If this Agreement and the Backstop Commitment Agreement are terminated for any reason in accordance with their terms, the Debtors will promptly pay any accrued and outstanding amounts but will not be obligated to pay the Expense Reimbursement in respect of any fees incurred after the date of such termination.

(c)    Notwithstanding anything to the contrary in this Section 3.3, in no event shall the Debtors have any obligation to make any payment on account of the Expense Reimbursement if (i) the Plan Support Agreement Termination Condition occurs prior to the date of entry of the PPA and BCA Approval Order by the Bankruptcy Court or (ii) the PPA and BCA Approval Order is not entered by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall modify or terminate the Debtors' obligations to pay certain fees and expenses in accordance with the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 544] (the "**Final DIP Order**").

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company SEC Documents filed with the SEC and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof, the Company, on behalf of itself and each of the other Debtors, jointly and severally, hereby represents and warrants to the Private Placement Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 4.1    <u>Organization and Qualification</u>. Each of the Debtors (a) is organized and validly existing corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, (b) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, in each case except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2     Corporate Power and Authority.

(a)     The Company has the requisite corporate power and authority (i) subject to entry of the PPA and BCA Approval Order, to enter into, execute and deliver this Agreement, and to perform its obligations under Section 9.5(b) hereunder, subject to the terms and conditions set forth in this Agreement and (ii) subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order and the Confirmation Order, to perform the PPA and BCA Approval Obligations and to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement and such other agreements and any Plan supplements or documents referred to herein or therein or hereunder or thereunder, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement). Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)     Each of the other Debtors has the requisite power and authority (corporate or otherwise) subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder.  Subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite action (corporate or otherwise) on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(c)     Notwithstanding the foregoing, the Company makes no express or implied representations or warranties, on behalf of itself or the other Debtors, with respect to actions (including in the foregoing) to be undertaken by the Reorganized Company, which such actions shall be governed by the Plan.

Section 4.3     Execution and Delivery; Enforceability.  Subject to entry of the PPA and BCA Approval Order, this Agreement will have been, and subject to the entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, each other Transaction Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto.  Upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery hereof by the Private Placement Parties, the PPA and BCA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors in accordance with their respective terms, subject to

bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.  Upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Private Placement Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4   Authorized and Issued Equity Interests.  Except as set forth in this Agreement and in connection with the Rights Offering and the Backstop Agreement, and as contemplated by the Plan, as of the Closing Date, none of the Debtors will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates any of the Debtors to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of capital stock of, or other equity or voting interests in, any of the Debtors or any security convertible or exercisable for or exchangeable into any units or shares of capital stock of, or other equity or voting interests in, any of the Debtors, (ii) obligates any of the Debtors to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units or shares of capital stock of, or other equity interests in, any of the Debtors or (iv) relates to the voting of any units or other equity interests in any of the Debtors.  For the avoidance of doubt, on the Effective Date the Reorganized Debtors shall only issue capital stock or other equity interests as expressly and specifically authorized pursuant to the Plan, and any additional issuances of capital stock or other equity interests is subject to the consent and approval of the Requisite Consenting Noteholders.

Section 4.5   No Conflict.   Assuming the consents described in clauses (a) through (g) of Section 4.6 are obtained, the execution and delivery by the Company and, if applicable, any other Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which any Debtor will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of any Debtor will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of any of the Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring through the Chapter 11 Cases), or (c) result in any violation of any Law or Order applicable to any Debtor or any of their properties, except in each of the cases described in

clause (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.6 <u>Consents and Approvals</u>. No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over any of the Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, the other Debtors, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, the other Debtors, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the PPA and BCA Approval Order authorizing the Company to enter into this Agreement and perform the PPA and BCA Approval Obligations, (b) entry of the Disclosure Statement Order, (c) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time-to-time; (d) the entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Private Placement Shares by the Private Placement Parties, the issuance of the Private Placement Shares, the issuance of Common Shares as payment of the Private Placement Commitment Premium and Private Placement Ticking Premium, and (g) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7 <u>Company SEC Documents and Disclosure Statement</u>. Since December 31, 2015, the Company has filed all required Company SEC Documents with the SEC. No Company SEC Document that has been filed prior to the date this representation has been made, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date this representation is made, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term is defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 4.8 <u>Absence of Certain Changes</u>. Since December 31, 2015 to the date of this Agreement, no event has occurred or, to the Knowledge of the Company, exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 4.9 <u>No Violation; Compliance with Laws</u>. (i)The Company is not in violation of its articles of incorporation, as amended, or bylaws, and (ii) no other Debtor is in violation of its respective charter or bylaws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect. To the Knowledge of the Company, none of the Debtors is or has been at any time since January 1, 2016 in violation of any Law or Order, except for any such violations that have not had and

31

would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.10   <u>Legal Proceedings</u>. Other than the Chapter 11 Cases and any adversary proceedings or contested matters commenced in connection therewith or any matters referenced in any proof of claim filed therein, or matters for which a proof of Claim must be filed to receive a distribution in the Chapter 11 Cases, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Debtors is a party or to which any property of any of the Debtors is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.11   <u>Labor Relations</u>.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the Knowledge of the Company, threatened against any of the Debtors; (b) the hours worked and payments made to employees of any of the Debtors have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters; and (c) all payments due from any of the Debtors or for which any claim may be made against any of the Debtors on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of any of the Debtors to the extent required by GAAP.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Transaction Agreements will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any of the Debtors (or any predecessor) is a party or by which any of the Debtors (or any predecessor) is bound.

Section 4.12   <u>Intellectual Property</u>.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Debtors owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Knowledge of the Company, none of the Debtors nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

Section 4.13   <u>Title to Real and Personal Property</u>.

(a)   <u>Real Property</u>.   Each of the Debtors has good and defensible title to its respective Real Properties, in each case, except for Permitted Liens and except for defects in title

that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, the enforceability of such leased Real Properties may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases. To the Knowledge of the Company, all such properties and assets are free and clear of Liens, except for Permitted Liens and except for such Liens as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Leased Real Property.  Each of the Debtors is in compliance with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Debtors has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Debtors enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted or have, individually or in the aggregate, a Material Adverse Effect.

Section 4.14   No Undisclosed Relationships.  Other than Contracts or other direct or indirect relationships between or among any of the Debtors, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described, except for the transactions contemplated by this Agreement.  Any Contract existing as of the date hereof between or among the Company, on the one hand, and any director, officer or greater than five percent (5%) stockholder of any of the Debtors, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the year ended December 31, 2015 or any other Company SEC Document filed since March 16, 2016 to the date hereof.

Section 4.15   Licenses and Permits.  The Debtors possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Debtors (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the

extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.16   <u>Environmental</u>.   Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no written notice, claim, demand, request for information, Order, complaint or penalty has been received by any of the Debtors, and there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to any of the Debtors, (b) each Debtor has received (including timely application for renewal of the same), and maintained in full force and effect, all environmental permits, licenses and other approvals, and has maintained all financial assurances, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since January 1, 2016, has been, in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (c) to the Knowledge of the Company, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by any of the Debtors that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, (d) no Hazardous Material has been Released, generated, owned, treated, stored or handled by any of the Debtors, and no Hazardous Material has been transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, and (e) there are no agreements in which any of the Debtors has expressly assumed responsibility for any known obligation of any other Person arising under or relating to Environmental Laws that remains unresolved other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, which has not been made available to the Private Placement Parties prior to the date hereof.   Notwithstanding the generality of any other representations and warranties in this Agreement, the representations and warranties in this <u>Section 4.16</u> constitute the sole and exclusive representations and warranties in this Agreement with respect to any environmental, health or safety matters, including any arising under or relating to Environmental Laws or Hazardous Materials.

Section 4.17   <u>Tax Returns</u>.

(a)   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it and (ii) taken as a whole, each such Tax return is true and correct;

(b)   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each of the Debtors has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the

34

payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which the Debtors (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or with respect to the Debtors only, except to the extent the non-payment thereof is permitted or required by the Bankruptcy Code), which Taxes, if not paid or adequately provided for, would reasonably be expected to be material to the Debtors taken as a whole; and

(c)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, with respect to the Debtors, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith and are not expected to result in significant negative adjustments that would be material to the Debtors taken as a whole, (i) no claims have been asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the IRS or any other Governmental Entity.

Section 4.18      Employee Benefit Plans.

(a)      Except for the filing and pendency of the Chapter 11 Cases or otherwise as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) each Company Plan, if any, is in compliance with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past six years (or is reasonably likely to occur); (iii) no ERISA Event has occurred or is reasonably expected to occur; (iv) none of the Debtors has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject any of the Debtors to Tax; and (v) no employee welfare plan (as defined in Section 3(1) of ERISA) maintained or contributed to by any of the Debtors provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA).

(b)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no pending, or to the Knowledge of the Company, threatened claims, sanctions, actions or lawsuits, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

(c)      Within the last six years, no Company Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all compensation and benefit arrangements of the Debtors comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and none of the Debtors has any obligation to provide

35

any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Sections 409A or 4999 of the Code.

(e)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all liabilities (including all employer contributions and payments required to have been made by any of the Debtors) under or with respect to any compensation or benefit arrangement of any of the Debtors have been properly accounted for in the Company's financial statements in accordance with GAAP.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of each of the Debtors are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or law); and (iii) the Debtors have not and are not engaged in any unfair labor practice.

Section 4.19    Internal Control Over Financial Reporting.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and to the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 4.20    Disclosure Controls and Procedures.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.21    Material Contracts. Other than as a result of the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Debtor party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and no written notice to terminate, in whole or part, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Other than as a result of the filing and pendency of the Chapter 11 Cases, none of the Debtors nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each

36

case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.22   No Unlawful Payments.  To the Knowledge of the Company, since January 1, 2016, none of the Debtors nor any of their respective directors, officers or employees has in any material respect: (a) used any funds of any of the Debtors for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.23   Compliance with Money Laundering Laws.   To the Knowledge of the Company, the operations of the Debtors are and, since January 1, 2016 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Debtors operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.24   Compliance with Sanctions Laws.  To the Knowledge of the Company, none of the Debtors nor any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.  The Company will not directly or indirectly use the proceeds of the Private Placement, or lend, contribute or otherwise make available such proceeds to any other Debtor, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

Section 4.25   No Broker's Fees.  Except for amounts that may be paid or payable to Lazard Frères & Co. LLC in connection with the Restructuring, none of the Debtors is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Private Placement Parties for a brokerage commission, finder's fee or like payment in connection with the Private Placement, the sale of the Private Placement Shares or the payment of the Private Placement Commitment Premium or the Private Placement Ticking Premium.

Section 4.26   Investment Company Act.  None of the Debtors is, or immediately after giving effect to the consummation of the Restructuring will be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended (the "Investment Company Act"), and this conclusion is based on one or more bases or exclusions other than Sections 3(c)(1) and 3(c)(7) of the Investment Company Act, including that none of the Debtors comes within the basic definition of 'investment company' under section 3(a)(1) of the Investment Company Act.

Section 4.27    <u>Insurance</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) the Debtors have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; (ii) all premiums due and payable in respect of insurance policies maintained by the Debtors have been paid; (iii) the Company reasonably believes that the insurance maintained by or on behalf of the Debtors is adequate in all respects; and (iv) as of the date hereof, to the Knowledge of the Company, none of the Debtors has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Debtors of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.28    <u>Alternative Transactions</u>.  As of the date hereof, the Company is not pursuing, or in discussions or negotiations regarding, any solicitation, offer, or proposal from any Person concerning any actual or proposed Alternative Transaction and, as applicable, has terminated any existing discussions or negotiations regarding any actual or proposed Alternative Transaction.

Section 4.29    <u>Issuance; Valid Issuance</u>.  The capital stock to be issued pursuant to the Plan, including the Preferred Equity to be issued in connection with the consummation of the Private Placement and pursuant to the terms of this Agreement, the Common Shares to be issued in connection with the Private Placement Commitment Premium, the Private Placement Ticking Premium or the Breakup Payments, and the Common Shares to be issued upon conversion of the Preferred Equity, will, when issued and delivered on the Closing Date (or the applicable date of conversion with respect to any Common Shares issued upon the conversion of Preferred Equity) and any time thereafter, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and such Common Shares and Preferred Equity will be free and clear of all Taxes (except for any Taxes arising as a result of a Private Placement Party's failure to provide a Tax Form in accordance with <u>Section 10.16</u> establishing a complete exemption from withholding), Liens (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Plan, the Plan Supplement, the Reorganized Company Organizational Documents or Transaction Agreements. Assuming the accuracy of the representations and warranties of the Private Placement Parties set forth in <u>Article V</u>, it is not necessary in connection with the issuance and sale of such Common Shares and Preferred Equity to the Private Placement Parties in the manner contemplated by this Agreement and the Disclosure Statement to register such Preferred Equity and Common Shares under the Securities Act.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PRIVATE PLACEMENT PARTIES

Each Private Placement Party, severally and not jointly, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1    <u>Organization</u>.  Such Private Placement Party is a legal entity organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2    <u>Organizational Power and Authority</u>.    Such Private Placement Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Private Placement Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3    <u>Execution and Delivery</u>.  This Agreement and each other Transaction Agreement to which such Private Placement Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Private Placement Party and (b) upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Private Placement Party, enforceable against such Private Placement Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    <u>No Conflict</u>.  Assuming that the consents referred to in clauses (a) and (b) of <u>Section 5.5</u> are obtained, the execution and delivery by such Private Placement Party of this Agreement and each other Transaction Agreement to which such Private Placement Party is a party, the compliance by such Private Placement Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Private Placement Party is party or is bound or to which any of the property or assets or such Private Placement Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Private Placement Party and (c) will not result in any material violation of any Law or Order applicable to such Private Placement Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Private Placement Party's performance of its obligations under this Agreement.

Section 5.5    <u>Consents and Approvals</u>.    No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Private Placement Party or any of its properties is required for the execution and delivery by such Private Placement Party of this Agreement and each other Transaction Agreement to which such Private Placement Party is a party, the compliance by such Private Placement Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Private Placement Party of its Private Placement

Percentage of the Private Placement Shares and its portion of the Private Placement Shares) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Private Placement Party's performance of its obligations under this Agreement and each other Transaction Agreement to which such Private Placement Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 5.6    No Registration.  Such Private Placement Party understands that (a) the Private Placement Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Private Placement Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    Purchasing Intent.    Such Private Placement Party is acquiring the Private Placement Shares for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Private Placement Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.8    Sophistication; Investigation.    Such Private Placement Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Private Placement Shares.  Such Private Placement Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act. Such Private Placement Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, such Private Placement Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either expressed or implied, by or on behalf of any of the Debtors.

Section 5.9    No Broker's Fees.  Such Private Placement Party is not a party to any Contract with any Person (other than the Transaction Agreements and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Private Placement or the sale of the Private Placement Shares or the payment of the Private Placement Commitment Premium or the Private Placement Ticking Premium.

Section 5.10    Sufficient Funds.    Such Private Placement Party has sufficient assets and the financial capacity to perform all of its obligations under this Agreement,

including the ability to fully fund such Private Placement Party's Private Placement Commitment.

Section 5.11    <u>Execution of PSA and Backstop Commitment Agreement</u>. Solely with respect to any Additional Private Placement Party, such Additional Private Placement Party has, concurrently with its execution of the Joinder Agreement, executed a joinder agreement to the Plan Support Agreement and Backstop Commitment Agreement.

## ARTICLE VI
## ADDITIONAL COVENANTS

Section 6.1    <u>Approval of the Private Placement Parties</u>.

(a)    <u>Approval of the Requisite Members of the Noteholder Steering Committee</u>. Each substantive document in connection with the Restructuring (excluding documents related to the Bonding Solution), including without limitation the following, shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee:

(i)    the Disclosure Statement, the Disclosure Statement Motion and the Disclosure Statement Order;

(ii)    the Plan and any exhibits, supplements, appendices and other attachments thereto;

(iii)    the credit agreement and/or indenture for any Exit Facility (if applicable);

(iv)    the credit agreement for the Replacement Secured First Lien Term Loan (if applicable), provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth in the Restructuring Term Sheet;

(v)    the Reorganized Company Organizational Documents;

(vi)    the certificate of designation of Series A convertible preferred stock for the Preferred Equity;

(vii)    all documents relating to the Rights Offering and the Private Placement;

(viii)    the indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee;

(ix)    the Confirmation Order; and

41

        (x)      the PPA and BCA Approval Motion.

       (b)    <u>Approval of the Noteholder Co-Proponents</u>. Each of the following material documents in connection with the Restructuring shall be in form and substance satisfactory to each of the Noteholder Co-Proponents:

        (i)      this Agreement;

        (ii)     the Backstop Commitment Agreement;

        (iii)    the Plan Support Agreement;

        (iv)    the Restructuring Term Sheet; and

        (v)     the Orders relating to items (b)(i) through (b)(iii) of the above.

       (c)    <u>Amendment of Documents Subject to Approval</u>.  The Plan and any exhibits, supplements, appendices, or other documents related thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Steering Committee (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).

<div align="center">Section 6.2    <u>Conduct of Business</u>.</div>

Prior to and through the Effective Date, except as set forth in this Agreement, the Backstop Commitment Agreement or the Plan, or with the written consent of the Requisite Consenting Noteholders, the Company (a) shall, and shall cause its Subsidiaries to, carry on their businesses in the ordinary course of business (considering the impact of the Chapter 11 Cases) and, except as currently subject to litigation, use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and make any required filing with the SEC within the time periods required under the Exchange Act, (b) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with (i) with its business plan dated November 2016, (ii) the parameters described in this Agreement, the Backstop Commitment Agreement or (iii) the Plan.

For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and will require the prior written consent of the Requisite Members of the Noteholder Steering Committee (unless otherwise contemplated by this Agreement, the Backstop Commitment Agreement or the Plan):  (w) except as currently subject to litigation, any amendment, modification, termination, waiver, supplement, restatement or other change to any Material Contract or any assumption of any Material Contract, (x) any (i) termination by the Debtors without cause or (ii) reduction in title or responsibilities, in each case, of the individuals who are, as of the date of this Agreement, the Chief Executive Officer or the Chief Financial Officer of the Company, (y) the adoption or amendment of any management

<div align="center">42</div>

incentive or equity plan by any of the Debtors, except for as provided in the Plan or (z) any sale, abandonment, or disposition of any assets other than (i) the sale of Metropolitan Collieries Pty Ltd, Peabody (Burton Coal) Pty Ltd or Debtors' interests in Dominion Terminal Associates, LLC or (ii) any ordinary course land sales made upon reasonable prior notice to the Noteholder Co-Proponents and in accordance with the Company's business plan dated November 2016; provided, however, that such ordinary course land sales shall not exceed $5,000,000 individually or $20,000,000 in the aggregate.  Following a request by the Debtors for consent with respect to any operational matter that requires the consent of the Requisite Members of the Noteholder Steering Committee pursuant to this <u>Section 6.2</u> section, if the consent of such parties is not obtained or declined within three (3) Business Days following the date such request is made in writing and delivered to each of the Noteholder Co-Proponents (which notice will be deemed delivered if given in writing to Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, and Skadden, Arps, Slate, Meagher & Flom LLP), such consent shall be deemed to have been granted by the Requisite Members of the Noteholder Steering Committee, as applicable. If such consent is not given or deemed to be given, the Debtors shall be permitted to seek approval from the Bankruptcy Court to take such actions, and seeking such approval shall not be a breach of this <u>Section 6.2</u>; provided, that in such event the Noteholder Co-Proponents shall have a termination right under the Plan Support Agreement pursuant to the terms thereof.  Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Private Placement Parties, directly or indirectly, any right to control or direct the operations of the Debtors.  Prior to the Closing Date, the Debtors shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Debtors.

Section 6.3    <u>Material Claim Settlements</u>. The Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over the settlement of any material Claim, including but not limited to, any such settlement related to the MEPP Claim (whether in the Chapter 11 Cases by the Bankruptcy Court or through arbitration of the MEPP Claim) above the amounts held in reserve by the Debtors for such MEPP Claim.

Section 6.4    <u>Access to Information; Confidentiality</u>.

(a)    Subject to applicable Law and <u>Section 6.4(b)</u>, upon reasonable notice during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms ("**Pre-Closing Period**"), the Debtors shall afford the Private Placement Parties and their Representatives (for the purposes of this <u>Section 6.4(a)</u> only, Representatives shall not include limited partners) upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Debtors' business or operations, to the Debtors' employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Debtors shall furnish promptly to such parties all reasonable information concerning the Debtors' business, properties and personnel as may reasonably be requested by any such party, <u>provided</u> that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Debtors to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of any of the Debtors or (iii) to violate any applicable Laws or Orders.  All requests for information and

access made in accordance with this <u>Section 6.4</u> shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

(b)    From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Private Placement Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Private Placement Party or its Representatives pursuant to <u>Section 6.4(a)</u> (except that provision or disclosure may be made to any Affiliate or Representative of such Private Placement Party who needs to know such information for purposes of this Agreement or the other Transaction Agreements and who agrees to observe the terms of this <u>Section 6.4(b)</u> (and such Private Placement Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby. Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this <u>Section 6.4(b)</u>, (B) becomes available to a Private Placement Party or its Representatives on a non-confidential basis from a source other than any of the Debtors or any of their respective Representatives, (C) becomes available to a Private Placement Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process, or (D) such Private Placement Party or any Representative thereof is required to disclose pursuant to judicial or administrative process or pursuant to applicable Law or applicable securities exchange rules; <u>provided</u>, that, such Private Placement Party or such Representative shall provide the Company with prompt written notice of such legal compulsion and cooperate with the Company to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; <u>provided</u>, <u>further</u>, that, in the event that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents. The provisions of this <u>Section 6.4(b)</u> shall not apply to any Initial Private Placement that, as of the date hereof, is party to a confidentiality or non-disclosure agreement with the Debtors, for so long as such agreement remains in full force and effect.

Section 6.5    <u>Commercially Reasonable Efforts</u>.

(a)    Without in any way limiting any other respective obligation of the Company or any Private Placement Party in this Agreement, each Party shall use (and the Company shall cause the other Debtors and their Representatives to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including, but not limited to, using commercially reasonable efforts in:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)    defending any Legal Proceedings in any way challenging (A) this Agreement, the Plan, the Registration Rights Agreement or any other Transaction Agreement, (B) the PPA and BCA Approval Order, the Disclosure Statement Order or the Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)    working together in good faith to finalize the Reorganized Company Organizational Documents, Transaction Agreements, the Registration Rights Agreement and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court.

(b)    Subject to Laws or applicable rules relating to the exchange of information, and in accordance with the Plan Support Agreement, the Private Placement Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Private Placement Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Private Placement Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

(c)    Nothing contained in this Section 6.5 shall limit the ability of any Private Placement Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Plan Support Agreement.

Section 6.6    Registration Rights Agreement; Reorganized Company Organizational Documents.

(a)    The Plan will provide that from and after the Effective Date each Private Placement Party, and any other holder of Claims receiving at least ten percent (10%) or more of the Common Shares on a fully-converted basis (including the Common Shares issuable upon conversion of the Preferred Equity) issued under the Plan and/or the Private Placement or that cannot sell its Preferred Equity (or the Common Shares issued upon conversion of the Preferred Equity) under Rule 144 of the Securities Act without volume or manner of sale restrictions, shall be entitled to registration rights with respect to their Preferred Equity, and any Common Shares issued upon conversion of their Preferred Equity, that are customary for a transaction of this nature, pursuant to a registration rights agreement to be entered into as of the Effective Date,

45

which agreement shall be in form and substance consistent with the terms set forth in the Restructuring Term Sheet and otherwise reasonably acceptable to the Requisite Consenting Noteholders and the Company (the "**Registration Rights Agreement**"). A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto. The Registration Rights Agreement will provide:

> (i) that the Company will (A) file a registration statement on Form S-1 (or other appropriate form) (the "**Initial Resale Registration Statement**") no later than 30 days following the Effective Date (the "**Filing Deadline**") covering all registrable securities that the holders thereof request to have included therein, (B) use its reasonable best efforts to have the Initial Resale Registration Statement declared effective by the SEC no later than (1) in the case of a "no review", the 15th day following the Filing Deadline; (2) in the case of a "limited review", the 45th day following the Filing Deadline, and (3) in the case of a "review," the 75th day following the Filing Deadline (each such date, as applicable, the "**Registration Deadline**") and (C) use its reasonable best efforts to keep such registration statement continuously effective (including filing any necessary post-effective amendment and/or subsequent registration statements) for a period of three years (or such shorter period if all registrable securities have been disposed by the holder thereof or are no longer registrable securities); and

> (ii) for partial liquidated damages of $75,000 per day in the event that (A) the Initial Resale Registration Statement is not filed on or prior to the Filing Deadline, (B) the Initial Resale Registration Statement is not declared effective by the SEC on or prior to the applicable Registration Deadline or (C) holders are not permitted to use the prospectus included in the Initial Resale Registration Statement to resell the securities for fifteen (15) or more consecutive days, or more than an aggregate of thirty (30) days (which need not be consecutive calendar dates), in any 12-month period.  Notwithstanding the foregoing, the aggregate amount of such liquidated damages payable by the Company under the Registration Rights Agreement shall not exceed $10,000,000.

(b) The Plan will provide that on the Effective Date, the Reorganized Company Organizational Documents will be duly authorized, approved, adopted and in full force and effect.  Forms of the Reorganized Company Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

(c) The Company shall further agree that in any case in which the Company asserts that any Private Placement Party (including their Affiliates who hold Common Shares, Preferred Equity or Penny Warrants), or any affiliate of any such person to whom such person has transferred shares or other securities, may sell its shares (no matter the manner herein described under which such shares were acquired) under Rule 144 under the Securities Act without volume or manner of sale restrictions, the Company and its legal counsel shall upon request, and following receipt of all required certifications of such parties or Affiliates thereof reasonably requested by the Company or its legal counsel, promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such seller may rely), and shall undertake, also

at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such sale under Rule 144 under the Securities Act.

Section 6.7    Blue Sky.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the offer and sale of the Private Placement Shares to the Private Placement Parties pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Private Placement Parties on or prior to the Closing Date.  The Reorganized Company shall timely make all filings and reports relating to the offer and sale of the Private Placement Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company or the Reorganized Company, as applicable, shall pay all fees and expenses in connection with satisfying its obligations under this Section 6.7.

Section 6.8    DTC Eligibility.    Unless otherwise requested by the Requisite Members of the Noteholder Steering Committee, the Reorganized Company shall use commercially reasonable efforts to promptly make, when applicable from time to time after the Closing, all Unlegended Shares eligible for deposit with The Depository Trust Company. "**Unlegended Shares**" means any Common Shares or Preferred Equity acquired by the Private Placement Parties and their respective Affiliates (including any Related Purchaser or Ultimate Purchaser in respect thereof) pursuant to this Agreement and the Plan, including all shares issued to the Private Placement Parties and their respective Affiliates in connection with the Private Placement, that do not require, or are no longer subject to, the Legend.

Section 6.9    Use of Proceeds.  The Reorganized Company will utilize the proceeds from the exercise of the Subscription Rights, the sale of the Unsubscribed Shares, the sale of Private Placement Shares and the Exit Facility for the purposes described in the Disclosure Statement.

Section 6.10    Securities Legend.  Each certificate evidencing securities issued hereunder, and each certificate issued in exchange for or upon the Transfer of any such securities, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such securities are uncertificated, such securities shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Reorganized Company or agent and the term "Legend" shall include such restrictive notation.  The Reorganized Company shall remove the Legend (or restrictive

notation, as applicable) set forth above from the certificates evidencing any such securities (or the securities register or other appropriate Reorganized Company records, in the case of uncertified securities), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such securities may be sold under Rule 144 of the Securities Act.  The Reorganized Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.11   <u>Antitrust Approval</u>.

(a)   Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan and the other Transaction Agreements, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than fifteen (15) Business Days following the date hereof) and (ii) promptly furnishing any documents or information reasonably requested by any Antitrust Authority.

(b)   The Company and each Private Placement Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements that has notified the Company in writing of such obligation (each such Private Placement Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any material communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all material correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Consenting Noteholders and the Company.

(c)   Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish

each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)     The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing.    The communications contemplated by this Section 6.11 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.11 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements.

Section 6.12    Alternative Transactions. Until the Closing Date or the date on which this Agreement shall have terminated, the Company and the other Debtors shall not seek, solicit, or support any Alternative Transaction, and shall not cause or allow any of their Representatives to solicit any agreements relating to an Alternative Transaction; provided, however, that nothing in this Agreement shall require the Company or any of its Subsidiaries or Affiliates or any of their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, or shall limit the Debtors from considering any Alternative Transaction brought to them consistent with their fiduciary duties; provided, further, that the Debtors shall provide the Noteholder Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such proposal; provided, further, the Breakup Payments and Expense Reimbursement shall be payable upon exercise by the Debtors of the fiduciary out contained in this Section 6.12 in accordance with the terms of this Agreement.  For the avoidance of doubt, nothing herein shall limit the Requisite Members of the Noteholder Steering Committee's right to terminate this Agreement pursuant to Section 9.2.

Section 6.13    Reclamation Bonding. The Debtors shall promptly finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "**Bonding Solution**").  The Debtors shall provide updates every two weeks to the Initial Private Placement Parties' professionals regarding their efforts to achieve the Bonding Solution.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Private Placement Parties.  The obligations of each Private Placement Party to consummate the transactions

contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions prior to or at the Closing:

(a)    <u>Cash on Hand</u>. The Company Group must have at least $600 million in cash on hand on the Effective Date;

(b)    <u>Outstanding Funded Debt</u>.    The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date (excluding any capital lease obligations, borrowings under any ABL Facilities (as defined in the Restructuring Term Sheet), and, to the extent the Effective Date occurs after April 3, 2017, any Incremental Additional First Lien Debt, Incremental New Second Lien Notes or additional amounts under the Exit Facility to finance any cash consideration on account of Incremental Second Lien Notes Claims); provided that, except in the event of a First Lien Full Cash Recovery, no more than $1.5 billion of such outstanding funded debt may be first lien debt;

(c)    <u>MEPP Claim</u>. The MEPP Claim shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee and the Requisite First Lien Lender Co-Proponents if for an amount above the amounts held in reserve by the Debtors for such claim;

(d)    <u>Effectiveness of Plan Support Agreement</u>. The Plan Support Agreement must remain in effect through the Effective Date;

(e)    <u>Disclosure Statement Order</u>.  The Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, and such Order shall be a Final Order;

(f)    <u>Confirmation Order</u>.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, and such Order shall be a Final Order;

(g)    <u>Plan</u>.  The Company and all of the other Debtors shall have substantially complied with the terms of the Plan (as amended or supplemented from time to time) that are to be performed by the Company, the Reorganized Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan;

(h)    <u>PPA and BCA Approval Order</u>.  The Bankruptcy Court shall have entered the PPA and BCA Approval Order in form and substance satisfactory to the Requisite Members of the Noteholder Steering Committee;

(i)    <u>Private Placement.</u>  The Private Placement shall have been conducted in accordance with the PPA and BCA Approval Order and this Agreement in all material respects;

(j)    <u>Effective Date</u>.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order;

(k)    <u>Registration Rights Agreement; Reorganized Company Organizational Documents</u>.

(i)    The Registration Rights Agreement shall have been executed and delivered by the Reorganized Company, shall otherwise have become effective with respect to the Private Placement Parties and the other parties thereto, and shall be in full force and effect;

(ii)    The Reorganized Company Organizational Documents shall have been duly approved and adopted and shall be in full force and effect;

(l)    <u>Expense Reimbursement</u>.    The Debtors shall have paid all Expense Reimbursements accrued through the Closing Date pursuant to <u>Section 3.3</u>;

(m)    <u>Governmental Approvals</u>.    All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all notifications, authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by any Governmental Entity in connection with the transactions contemplated by this Agreement shall have been obtained or filed;

(n)    <u>No Legal Impediment to Issuance</u>.    No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(o)    <u>Representations and Warranties</u>.

(i)    The representations and warranties of the Debtors contained in <u>Section 4.8</u> shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date);

(ii)    The representations and warranties of the Debtors contained in <u>Section 4.2</u>, <u>Section 4.3</u>, <u>Section 4.4</u> and <u>Section 4.5</u> shall be true and correct in all material respects on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date);

(iii)    The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and

51

correct does not constitute, individually or in the aggregate, a Material Adverse Effect;

(p)     Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date;

(q)     Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any event that constitutes, individually or in the aggregate, a Material Adverse Effect;

(r)     Officer's Certificate.  The Private Placement Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Section 7.1(o), Section 7.1(p), and Section 7.1(q) have been satisfied;

(s)     Funding Notice.  The Private Placement Parties shall have received the Funding Notice;

(t)     Exit Facility.  The Exit Facility if it is to be entered into pursuant to the Plan, shall have become effective and shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee;

(u)     Disputed Share Reserve.  The Debtors shall have filed a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and Order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee; provided, however, that the aggregate face amount of disputed Claims permitted to receive Rights Offering Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee; and

(v)     Material Contracts.  The assumption or rejection (in each case, pursuant to section 365 of the Bankruptcy Code) and/or amendment of any Material Contracts and the liabilities of the Reorganized Company with respect to such Material Contracts shall, in the aggregate, be reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee.

Section 7.2     Waiver of Conditions.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Private Placement Parties by a written instrument executed by the Requisite Consenting Noteholders and if so waived, all Private Placement Parties shall be bound by such waiver.

Section 7.3     Conditions to the Obligations of the Debtors.  The obligations of the Debtors to consummate the transactions contemplated hereby with the Private Placement Parties is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)      PPA and BCA Approval Order.  The Bankruptcy Court shall have entered the PPA and BCA Approval Order;

(b)      Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order;

(c)      Confirmation Order.   The Bankruptcy Court shall have entered the Confirmation Order;

(d)      Effective Date.   The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order;

(e)      Governmental Approvals.    All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all notifications, authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by any Governmental Entity in connection with the transactions contemplated by this Agreement shall have been obtained or filed;

(f)      No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(g)      Representations and Warranties.

(i)      The representations and warranties of the Private Placement Parties contained in this Agreement that are qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all respects only as of the specified date);

(ii)      The representations and warranties of the Private Placement Parties contained in this Agreement that are not qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date);

(h)      Covenants.  The Private Placement Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement;

(i)      Exit Facility.  The Exit Facility, if it is to be entered into pursuant to the Plan, shall have become effective; and

(j)      Funding. Each Private Placement Party shall have delivered and paid an amount equal to the aggregate Per Share Purchase Price for such Private Placement Party's Private Placement Percentage of the Private Placement Shares.

## ARTICLE VIII

## INDEMNIFICATION AND CONTRIBUTION

Section 8.1      Indemnification Obligations.  Following the entry of the PPA and BCA Approval Order, the Debtors (the "**Indemnifying Parties**" and each, an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Private Placement Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Private Placement Parties) arising out of a claim asserted by a third-party (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement and its obligations hereunder, including the Private Placement Commitment, the Private Placement, the payment of the Private Placement Agreement Premiums, the Breakup Payments or the use of the proceeds of the Private Placement, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the Reorganized Company, the Company Group, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Private Placement Party, its Related Parties or any Indemnified Person related thereto, caused by a Private Placement Default by such Private Placement Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.2      Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII.  In case any such Indemnified Claims are brought against any Indemnified Person

54

and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

Section 8.3    Settlement of Indemnified Claims.  In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such

Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4   <u>Contribution</u>.   If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to <u>Section 8.1</u>, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.   It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company and the Reorganized Company pursuant to the issuance and sale of the Private Placement Shares in the Private Placement contemplated by this Agreement and the Plan bears to (b) the Private Placement Agreement Premium and the Breakup Payments paid or proposed to be paid to the Private Placement Parties.   The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5   <u>Treatment of Indemnification Payments</u>.   All amounts paid by an Indemnifying Party to an Indemnified Person under this <u>Article VIII</u> shall, to the extent permitted by applicable Law, be treated as adjustments to the Per Share Purchase Price for all Tax purposes.   The provisions of this <u>Article VIII</u> are an integral part of the transactions contemplated by this Agreement and without these provisions the Private Placement Parties would not have entered into this Agreement.   The obligations of the Company and the Reorganized Company under this <u>Article VIII</u> shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company and the Reorganized Company may comply with the requirements of this <u>Article VIII</u> without further Order of the Bankruptcy Court.

Section 8.6   <u>No Survival</u>.   All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

Section 9.1   <u>Consensual Termination</u>.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Consenting Noteholders.

Section 9.2    Termination by the Requisite Members of the Noteholder Steering Committee.    Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated by the Requisite Members of the Noteholder Steering Committee upon two (2) Business Days written notice to the Company upon the occurrence of any of the following events:

(a)    any Debtor accepts or supports an Alternative Transaction, including but not limited to filing with the Bankruptcy Court, or publicly announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b)    the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Fields Debtors (as defined in the Plan) shall not cause a Termination Event;

(c)    the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) the Disclosure Statement Motion, and (iv) the PPA and BCA Approval Motion by no later than December 22, 2016;

(d)    the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the Exit Facility in a principal amount of not less than $1,500,000,000 or agreed to use commercially reasonable efforts to arrange for commitments for the Exit Facility in a principal amount of not less than $1,500,000,000 by January 11, 2017;

(e)    the failure of the Disclosure Statement Order to be entered by the Bankruptcy Court by January 31, 2017;

(f)    the failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(g)    the failure of the Effective Date to have occurred by April 15, 2017;

(h)    following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) Business Days following the delivery of such notice; provided, that a Private Placement Party Default is not deemed to be a breach of any obligation under this Agreement for purposes of this Section 9.2(h);

(i)    the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority or validity of the Claims of any of the Noteholder Co-Proponents;

(j)    any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with this Agreement or the Plan Support Agreement and the exhibits hereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(k)    any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in Section 6.2, without the prior written consent of the Requisite Members of the Noteholder Steering Committee;

(l)    either the Disclosure Statement Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Members of the Noteholder Steering Committee;

(m)    the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) Business Days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents, this Agreement and the Plan Support Agreement;

(n)    the Debtors deliver a Debtor Fiduciary Notice (as defined in the Plan Support Agreement) to the Creditor Co-Proponents;

(o)    the failure to obtain entry of the PPA and BCA Approval Order (including approval of the fees and indemnification obligations set forth herein and therein as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017; or

(p)    the PPA and BCA Approval Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Members of the Noteholder Steering Committee; provided, however, that the Debtors shall have five (5) Business Days following the reversal, stay, dismissal, vacation, reconsideration, modification or amendment to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish compliance with the terms of the Transaction Agreements, or (ii) is acceptable to the Requisite Members of the Noteholder Steering Committee.

Section 9.3    <u>Termination by a Private Placement Party</u>.

Any Private Placement Party shall have the right to terminate upon written notice to the Company if the Plan Effective Date has not occurred by June 14, 2017. Termination by a Private Placement Party in this <u>Section 9.3</u> shall only terminate this Agreement as to such Private Placement Party. The effect of a termination by a Private Placement Party pursuant to this <u>Section 9.3</u> shall be governed by <u>Section 9.5</u>, and such terminating party shall be entitled to all rights and protections thereunder.

Section 9.4    <u>Termination by the Company</u>.

This Agreement may be terminated by the Company upon written notice to each Private Placement Party upon the occurrence of any of the following, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of:

(a)    occurrence of the Plan Support Agreement Termination Condition; <u>provided</u>, <u>however</u>, the Debtors may waive the Plan Support Agreement Termination Condition in their sole discretion, but may only exercise the Plan Support Agreement Termination Condition (or waive such condition) prior to entry of the PPA and BCA Approval Order, <u>provided</u>, <u>further</u>, however that the timely and valid exercise of the Plan Support Agreement Termination Condition shall relieve the Debtors from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations under the Backstop Commitment Agreement or the Private Placement Agreement;

(b)    the determination by any of the Company's boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by this Agreement or the Plan Support Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(c)    the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)    following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that adversely and materially affects the Debtors' rights under this Agreement and is either unable to be cured or is not cured within five (5) Business Days following the delivery of such notice;

(e)    the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f)       either the Disclosure Statement Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

(g)       the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) Business Days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

Section 9.5       Effect of Termination.

(a)       Within three (3) days following the delivery of a termination notice pursuant to Article IX, each of the Debtors and the Requisite Consenting Noteholders may waive, in writing, the occurrence of the Termination Event identified in the termination notice; provided, however, that the Termination Event provided for in Section 9.3 may not be waived. Absent such waiver, this Agreement shall be terminated on the fourth (4th) day following delivery of the termination notice pursuant to Article IX (such date, the "Termination Date"). Upon the Termination Date pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII and to pay the Private Placement Commitment Premium and the Private Placement Ticking Premium or the Breakup Payments pursuant to Article III and Section 9.5(b), respectively, shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in Article VIII, this Section 9.5 and Article X shall survive the termination of this Agreement in accordance with their terms, in each case so long as the PPA and BCA Approval Order has been entered by the Bankruptcy Court prior to such termination and (iii) subject to Section 10.10, nothing in this Section 9.5 shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)       If following entry by the Bankruptcy Court of the PPA and BCA Approval Order, this Agreement is terminated by the Debtors for any reason other than the occurrence of a Plan Support Agreement Termination Condition (to the extent the Debtors terminate prior to the entry of the PPA and BCA Approval Order), a termination fee equal to $60,000,000, which represents 8.0% of the Private Placement Amount shall be paid in cash to the Private Placement Parties (the "**Breakup Payments**"). The Breakup Payments shall be payable according to the following: (i) 22.5% of the Breakup Payments to the Initial Private Placement Parties or their

designees in accordance with the Pro Rata Split; (ii) 57.5% of the Breakup Payments to the Initial Private Placement Parties, or their designees, and the Phase Two Private Placement Parties, or their designees, in accordance with the Pro Rata Split and (iii) 20% of the Breakup Payments to all Private Placement Parties or their designees in accordance with the Pro Rata Split and each Private Placement Party's Private Placement Commitment Period. Notwithstanding the the provisions of Article III, if owed, the Breakup Payments shall be payable in lieu of the Private Placement Commitment Premium and the Private Placement Ticking Premium.

(c)     The Expense Reimbursement shall be entitled to administrative expense priority, and the Breakup Payments shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Notes Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(i)     in the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 to the Restructuring Term Sheet, including no greater amount of first lien notes than would be issued in accordance with Exhibit 1 to the Restructuring Term Sheet) that is equal to the allowed amount of the First Lien Lender Claims, then such fees shall be paid in cash on the Effective Date on such Plan; and

(ii)    in the event the conditions set forth in subsection (a) do not occur, then the Breakup Payments and the administrative expense claim on account of such the Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the fees which are on terms consistent with the terms of the New Second Lien Notes set forth in Exhibit 2 to the Restructuring Term Sheet;  provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing intercreditor agreement governing the First Lien Claims and Second Lien Notes Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes.

(d)     If any of the Private Placement Agreement, the Plan Support Agreement, or this Agreement are terminated pursuant to their respective terms, this Agreement shall be automatically terminated notwithstanding any other provision hereof.  For the avoidance of doubt, if following entry by the Bankruptcy Court of the PPA and BCA Approval Order any of the Private Placement Agreement, the Plan Support Agreement, or this Agreement are terminated by the Debtors for any reason, the Debtors shall pay the Breakup Payments pursuant to Section 9.5(b).

# ARTICLE X

## GENERAL PROVISIONS

Section 10.1   <u>Notices</u>.   All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile or email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

    (a)    If to the Company or any of the other Debtors:

Peabody Energy Corporation
701 Market Street
St. Louis, MO 63101
Fax No. (314) 342-7597
Attention: A. Verona Dorch, Chief Legal Officer
Email: vdorch@peabodyenergy.com

*with copies (which shall not constitute notice) to:*

Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Fax No. (216) 579-0212
Attention: Heather Lennox, Esq.
Email: hlennox@jonesday.com

and

Jones Day
77 West Wacker
Chicago, IL 60601
Fax No. (312) 782-8585
Attention: Edward B. Winslow, Esq.
Email: ebwinslow@jonesday.com

and

Armstrong Teasdale LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
Fax No. (314) 621-5065

Attention: Steven N. Cousins, Esq. and Susan K. Ehlers, Esq.
Email: scousins@armstrongteasdale.com; sehlers@armstrongteasdale.com

(b)     If to the Private Placement Parties:

To each Private Placement Party at the addresses or e-mail addresses set forth below the Private Placement Party's signature in its signature page to this Agreement.

*with a copy (which shall not constitute notice) to*:

in respect of certain Ad Hoc Secured Committee Members:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Fax No. (212) 735-2000
Attention: Shana A. Elberg, Esq. and Andrea Nicolas, Esq.
Email: shana.elberg@skadden.com; andrea.nicolas@skadden.com

and

Stinson Leonard Street LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Fax No. (314) 863-9388
Attention: John G. Young, Jr., Esq.
Email: john.young@stinson.com

in respect of the South Dakota Investment Council:

Woods, Fuller, Schultz & Smith P.C.
300 South Phillips Ave, Suite 300
Sioux Falls, SD 57104
Attention: Jordan J. Feist, Esq.
Email: jordan.feist@woodsfuller.com

in respect of Aurelius and Elliott:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Fax No. (212) 715-8000
Attention: Kenneth H. Eckstein, Esq., Stephen D. Zide, Esq. and Jeffrey S.
        Trachtman, Esq.

Email: KEckstein@kramerlevin.com; SZide@kramerlevin.com;
    JBessonette@kramerlevin.com

and

Doster, Ullom & Boyle, LLC
16090 Swingley Ridge Road
Suite 620
St. Louis, MO 63017
Fax No. (636) 532-1082
Attention: Gregory D. Willard, Esq., John G. Boyle, Esq.
Email: gwillard@dubllc.com; jboyle@dubllc.com

in respect of Discovery:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Fax No. (212) 446-4900
Attention: Stephen E. Hessler, Esq.
Email: shessler@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Fax No. (415) 439-1500
Attention: Brian Ford, Esq. and Melissa N. Koss, Esq.
Email: Bford@kirkland.com; Melissa.koss@kirkland.com

    Section 10.2   <u>Assignment; Third Party Beneficiaries</u>.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Consenting Noteholders, other than an assignment by a Private Placement Party expressly permitted by <u>Section 2.5</u> or <u>Section 2.7</u> and any purported assignment in violation of this Section 10.2 shall be void *ab initio*.   Except as provided in <u>Article VIII</u> with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

    Section 10.3   <u>Prior Negotiations; Entire Agreement</u>.

    (a)   This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or

oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Plan Support Agreement (including the Restructuring Term Sheet) will each continue in full force and effect.

(b)     Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Private Placement Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Private Placement Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with <u>Section 10.7</u>.

Section 10.4     <u>Governing Law; Venue</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5     <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7   <u>Waivers and Amendments; Rights Cumulative; Consent</u>. This Agreement may be amended, restated, modified or changed only upon written consent by the Company and the Requisite Consenting Noteholders, solely as permitted in the Voting/Consent Structure and including, for the avoidance of doubt, the rights of Private Placement Parties to dissent and withdraw from this Agreement as set forth therein. Notwithstanding the foregoing, (i) the Private Placement Schedule shall be revised as necessary without requiring a written instrument signed by the Company and the Requisite Consenting Noteholders to reflect changes in the composition of the Private Placement Parties and Private Placement Percentages as a result of Transfers permitted in accordance with the terms and conditions of this Agreement and (ii) Sections 9.5(a) and 10.17 may be amended, restated, modified or changed only upon written consent of the Company and each of the Initial Private Placement Parties.   The terms and conditions of this Agreement (other than the conditions set forth in <u>Section 7.1</u> and <u>Section 7.3</u>, the waiver of which shall be governed solely by <u>Article VII</u>) may be waived (A) by the Debtors only by a written instrument executed by the Company and (B) by the Requisite Consenting Noteholders only by a written instrument executed by the Requisite Consenting Noteholders solely as permitted in the Voting/Consent Structure.   No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8   <u>Headings</u>.   The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9   <u>Specific Performance</u>.   Each of the Parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each of the parties hereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.   Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party hereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity.

Section 10.10   <u>Damages</u>.   The rights of the Company, the Reorganized Company and any non-Defaulting Private Placement Party to claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits against any Defaulting Private Placement Party are expressly preserved; provided, however, that the Initial Private Placement Parties shall be subrogated to all rights of the non-Defaulting Private Placement Parties that are not Initial Private Placement Parties, the Company and the Reorganized Company, including, but not limited to, rights to sue a Defaulting Private Placement Party, control of any litigation against or settlement with a Defaulting Private Placement Party and rights pertaining to any litigation against or settlement with a Defaulting Private Placement Party.

Section 10.11  <u>No Reliance</u>.  No Private Placement Party or any of its Related Parties shall have any duties or obligations to the other Private Placement Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Private Placement Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Private Placement Parties, (b) no Private Placement Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Private Placement Party, (c) no Private Placement Party or any of its Related Parties shall have any duty to the other Private Placement Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Private Placement Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Private Placement Party or any of its Affiliates in any capacity, (d) no Private Placement Party may rely, and each Private Placement Party confirms that it has not relied, on any due diligence investigation that any other Private Placement Party or any Person acting on behalf of such other Private Placement Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Private Placement Party acknowledges that no other Private Placement Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Private Placement Shares or Private Placement Percentage of its Private Placement Commitment.

Section 10.12  <u>Publicity</u>.  At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Private Placement Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this <u>Section 10.12</u> shall (a) prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases or (b) require consultation with the Private Placement Parties prior to the filing of any Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K with the SEC.

Section 10.13  <u>Settlement Discussions</u>.  This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.14  <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this

Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 10.14 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments.  For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 10.15  Relationship Among Parties.

(a)    Notwithstanding anything herein to the contrary, the duties and obligations of the Private Placement Parties, on the one hand, and the Debtors, on the other hand, arising under this Agreement shall be several, not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.  The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Private Placement Parties do not constitute a "group" within the meaning of Rule 13d-5, as amended under the Exchange Act.    Nothing contained herein or in any Definitive Documentation and no action taken by any Private Placement Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any parties that the Private Placement Parties are in any way acting in concert or as a "group" (or a joint venture, partnership or association), and the Debtors will not assert any such claim with respect to such obligations or the transactions contemplated by this Agreement or the Definitive Documentation, and the Debtors acknowledge that none of the Private Placement Parties are acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or the Definitive Documentation.  The Debtors acknowledge and each Private Placement Party confirms that it has independently participated in the negotiation of the transactions contemplated under this Agreement and the Definitive Documentation with the advice of counsel and advisors.

(b)    In connection with any matter requiring consent or a request of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, under this Agreement, there is no requirement or obligation that such holders agree among themselves to take such action and no agreement among such holders with respect to any such action.  In connection with any matter that may be requested by the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, each such holder may, through its counsel, make such request; provided, that the Company will only be required to take

such action if it receives the request of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, as the case may be.  In connection with any matter requiring consent of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, hereunder, the Company will solicit consent independently from each such holder or its respective counsel; *provided*, that such consent shall only be granted if the approval of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, is obtained.

(c)    It is understood and agreed that none of the Private Placement Parties has any duty of trust or confidence in any form with any other Private Placement Party, the Debtors, or any of the Debtors' creditors or other stakeholders and, except as expressly provided in this Agreement, there are no agreements, commitments or undertakings by, among or between any of them with respect to the subject matter hereof.  For the avoidance of doubt, the foregoing sentence does not include any fiduciary obligations owed by any party to the Plan Support Agreement that has been appointed an officer of any Debtor

Section 10.16  <u>Tax Forms</u>. If the Company (or its agent) determines in its reasonable discretion that it is necessary or appropriate to request Internal Revenue Service tax forms (including but not limited to Form W-9, W-8BEN, W-8BEN-E, W-8ECI, W-8IMY (and attachments thereto), or any successors thereto) ("**Tax Forms**") to determine its tax reporting and withholding obligations, if any, the Private Placement Parties shall promptly provide. solely to the extent legally entitled to do so, such duly completed Tax Forms to the Company (or its agent), and the Company (or its agent) shall be entitled to rely on such forms in determining its tax reporting and withholding obligations, if any.  Notwithstanding anything to the contrary contained in this Agreement, the Debtors (and their agents) shall have the rights to request Tax Forms and withhold as necessary in accordance with Plan Article VI.K and Disclosure Statement Sections IX.O and XII.

Section 10.17  <u>Company Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, subject to the Non-Solicitation Provision set forth in Section 6.02 of the Plan Support Agreement; <u>provided</u>, the Breakup Payments and Expense Reimbursement shall be payable upon exercise by the Debtors of the fiduciary out contained in this <u>Section 10.17</u> in accordance with the terms of this Agreement.  For the avoidance of doubt, nothing herein shall limit the rights of any party or parties set forth in <u>Section 2.7(a)</u>, <u>Section 9.2</u> and <u>Section 9.3</u>.

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the date first above written.

PEABODY ENERGY CORPORATION

By: _A. Verona Dorch_

Name: A. Verona Dorch
Title: EVP and Chief Legal Officer

BlockHouse Master Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

compliance@pointstate.com

Alfred J. Barbagallo

*[Signature page to Private Placement Agreement]*

Conflux Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

compliance@pointstate.com

Alfred J. Barbagallo

[*Signature page to Private Placement Agreement*]

SteelMill Master Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

compliance@pointstate.com

Alfred J. Barbagallo

[*Signature page to Private Placement Agreement*]

PointState Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

compliance@pointstate.com

Alfred J. Barbagallo

[*Signature page to Private Placement Agreement*]

**Contrarian Capital Fund I, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**CCM Pension-A, L.L.C.**

By: Contrarian Capital Management, L.L.C.,
as Managing Member

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**CCM Pension-B, L.L.C.**

By: Contrarian Capital Management, L.L.C.,
as Managing Member

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Dome du Gouter Master Fund, LP**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Opportunity Fund, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Capital Senior Secured, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Capital Trade Claims, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Advantage-B, LP**

By: Contrarian Capital Management, L.L.C.,
as General Partner

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian Emerging Markets, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name: Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Contrarian EM SIF Master L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

**Boston Patriot Summer St LLC**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Private Placement Commitment Agreement]*

Panning Master Fund, LP

By:   Panning Capital Management, LP
Its:   Investment Manager

By:   _____
Name:   William Kelly
Title:   Authorized Signatory




Notice Information

510 Madison Avenue, 23rd Floor
New York, NY 10022

rayan@panning.com

Attention to: Rayan Joshi

*Signature page to Private Placement Commitment Agreement*

SOUTH DAKOTA INVESTMENT COUNCIL

By: _____

Name: Matthew L. Clark
Title: State Investment Officer


Address:    South Dakota Investment Council
            4009 West 49th Street, Suite 300
            Sioux Falls, SD 57106-3784
Tel:        605-362-2820
Email:      Laurie.Riss@state.sd.us
Attn:       A. Laurie Riss

*[Signature Page to Private Placement Agreement]*

BLUE TURTLE CAPITAL, LLC, a Delaware Limited
Liability Company

By: _____

    Name: Elliot Greenberg
    Title:


BLUE TURTLE CAPITAL LIMITED, a Cayman Islands
Limited Company

By: _____

    Name: Elliot Greenberg
    Title:


Notice Information

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Email: KEckstein@kramerlevin.com;
       SZide@kramerlevin.com;
       ADove@kramerlevin.com

Attention: Kenneth H. Eckstein, Esq.,
         Stephen D. Zide, Esq.,
         and Andrew M. Dove, Esq.

DISCOVERY CAPITAL MANAGEMENT, LLC

By: _____

Name: Adam Schreck
Title:  General Counsel

Address:   20 Marshall Street, Suite 310
           South Norwalk, CT 06854
Attn:      Adam Schreck
           aschreck@discap.com
Tel:       (203) 956-7953

[Signature Page to Private Placement Agreement]

AURELIUS CAPITAL MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual capacity

By: _____

Name: Dan Gropper
Title:  Managing Director


ACP MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual capacity

By: _____

Name: Dan Gropper
Title:  Managing Director


Notice Information

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Email: KEckstein@kramerlevin.com;
       SZide@kramerlevin.com;
       ADove@kramerlevin.com

Attention: Kenneth H. Eckstein, Esq.,
           Stephen D. Zide, Esq., and
           Andrew M. Dove, Esq.

[Signature Page to Private Placement Agreement]

**<u>Schedule 1</u>**

**<u>Initial Private Placement Schedule</u>**

# Initial Private Placement Schedule

*$ in millions*

| Initial Private Placement Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P.1 | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

**Schedule 2**

**Private Placement Schedule**

[TO BE PROVIDED]

**<u>Exhibit A</u>**

[Reserved]

**Exhibit B**

**Form of Joinder Agreement**

**JOINDER AGREEMENT**

This joinder agreement (the "Joinder Agreement") to the Private Placement Agreement dated December 22, 2016 (as amended, supplemented or otherwise modified from time to time, the "PPA"), between the Debtors (as defined in the PPA) and the Private Placement Parties (as defined in the PPA) is executed and delivered by _____ (the "Joining Party") as of _____, 201_ (the "Joinder Date").  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the PPA.

Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the PPA, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Private Placement Party" for all purposes under the PPA.

Representations and Warranties.  The Joining Party hereby severally and not jointly makes the representations and warranties of the Private Placement Parties set forth in Section 5 of the PPA to the Debtors as of the date of this Joinder Agreement.

Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York without application of any choice of law provisions that would require the application of the laws of another jurisdiction.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the Joinder Date.

**JOINING PARTY**

**[JOINING PARTY]**, by and on behalf of certain of its and its affiliates' managed funds and/or accounts

By: _____
    Name:
    Title:

Private Placement Holdings:

_____

Holdings of Allowed Second Lien Notes Claims:

_____

Holdings of Allowed Class 5B Claims:

_____

**AGREED AND ACCEPTED AS OF THE
JOINDER DATE:**

**PEABODY ENERGY CORPORATION, as Debtor**

By: _____
    Name:
    Title:

# Exhibit C

## Voting/Consent Structure

<div align="center">

**Private Placement and Backstop Commitment Parties**
**Voting/Consent Structure**

</div>

Set forth below is the structure for voting and consents by the Private Placement Parties and the Backstop Commitment Parties with respect to material issues, including the Private Placement, Plan terms, the Backstop Commitment and the Restructuring (the "Voting / Consent Structure").

## Gatekeeping for All Issues – 75% of Noteholder Steering Committee

All proposed changes, modifications and amendments to the Plan Documents (as defined in the PSA) and the Transactions contemplated therein shall be vetted by the Noteholder Steering Committee.  Proposals will be submitted for ratification – as set forth below – only if supported by 75% of the committee based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule (a "75% Supermajority").  If one of the seven members of the Noteholder Steering Committee transfers or assigns any of its holdings (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned holdings shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong as of the date of execution of the Plan Support Agreement (the "PSA") to the same ad hoc noteholder group as the transferring or assigning member.[42]

The Noteholder Steering Committee shall retain voting and consent rights with respect to any termination rights, default provisions, cross-default provisions, and waivers of such rights and provisions.  Such voting and consent rights shall require a 75% Supermajority of the Noteholder Steering Committee parties, pursuant to the terms and conditions set forth in the immediately

---

[42]   For example, any transfer of any Claims by Elliott (regardless of whether it is a Class 2 or Class 5 Claim) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Elliott to Discovery and Aurelius on a pro rata basis based on the Claim holdings of Discovery and Aurelius, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Similarly, any transfer of any Claims by Point State (regardless of the type of claim transferred) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Point State to Contrarian, Panning, and SDIC on a pro rata basis based on the claim holdings of Contrarian, Panning, and SDIC, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule.  Solely for purposes of this Exhibit, for the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Commitment Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein.  For the avoidance of doubt, Contrarian, in its capacity as investment advisor or manager to various entities and managed accounts set forth on the Initial Private Placement Schedule and Initial Backstop Commitment Schedule, shall vote for the same for purposes hereof.

preceding paragraph; provided, however, that for the avoidance of doubt the Steering Committee may not extend the effective date milestone beyond June 14, 2017 absent consent from all parties in accordance with C.10 below.

In the event that a proposed change falls, or could be interpreted to fall, into two or more voting threshold categories (A, B, C, and D) set forth below, such proposed change shall be deemed to fall into the category with the highest voting threshold and shall be subject to such category's voting threshold accordingly.

## A.  Class Issues – 66% by Class

Requires a 66% supermajority affirmative vote of parties who vote[43] in each affected class, based on aggregate respective Private Placement Commitments held by each Private Placement Party at such time, on a class-by-class basis (2-class vote):

1.  issuance of dilutive securities not contemplated by the Restructuring Term Sheet
2.  changes to the allocation of Private Placement Commitment (including changes to holdback)
3.  changes to the allocation of Backstop Commitment
4.  terms of the New Second Lien Notes; provided, however, that no such vote or approval shall be required in connection with the terms of the New Second Lien Notes, to the extent such terms are consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet
5.  changes to the capital structure (e.g. increase in total debt above Restructuring Term Sheet debt levels)
6.  any material changes that would disproportionately treat either the Unsecured Senior Notes Claims or Second Lien Notes Claims more favorably or less favorably on anything other than a proportionate basis

## B.  Other Issues – 66% of All

Requires a 66% supermajority affirmative vote of all parties who vote, based on aggregate respective Private Placement Commitments held by each party at such time:

1.  the Private Placement Amount (as defined in the Private Placement Agreement) or Rights Offering Amount (as defined in the Backstop Commitment Agreement) (except for adjustments of up to $100 million in aggregate in order to ensure that the Rights Offering is compliant with section 1145 of the Bankruptcy Code and any other applicable regulations)
2.  changes to corporate governance set forth in the Restructuring Term Sheet
3.  priority of dilution of all securities (Penny Warrants, Preferred Equity, Common Shares)
4.  Material Adverse Event definition & waivers of potential Material Adverse Events

---

[43]  For the avoidance of doubt, any Additional Private Placement Party or Additional Backstop Party, including, but not limited to, any Phase Two Private Placement Party or any Additional Backstop Party, shall not be entitled to exercise voting or consent rights as set forth herein unless and until the applicable subscription or enrollment period (as may be extended, reduced, or otherwise modified as set forth herein) has expired.

NAI-1502345820v2

5. any other changes not specifically subject to a different standard herein over which the Requisite Consenting Noteholders have consent or approval rights as set forth in the Term Sheet

## C. All Party Fundamental Rights – 100% of All

Requires unanimous consent by all affected parties. Except with respect to proposed changes under items 3 or 4 listed below (as well as item 11, to the extent any proposed change under item 11 would impact, directly or indirectly, items 3 or 4), if a proposal achieves affirmative votes from parties holding 66% or more of the aggregate Private Placement Commitments outstanding at such time, the rights and obligations under the Private Placement Agreement and Backstop Commitment Agreement of any party that dissents from such proposed change will be automatically terminated, subject to the decision by a 75% Supermajority to proceed with the proposed change on the basis of redistributing the dissenters' commitments to Private Placement Parties/Commitment Parties that agree to assume the additional commitments. This ejection shall not limit the dissenters' obligations under the Plan Support Agreement (other than any obligation to be a Private Placement Party or Commitment Party, as applicable). If the Noteholder Steering Committee determines not to proceed with the amendment, dissenters will remain Private Placement Parties and Commitment Parties, as applicable.

1. increasing the dollar amount of each party's commitment (other than through the addition of Additional Private Placement/Commitment Parties)
2. changing any voting or consent threshold or any related definitions (including "Requisite Creditor Parties", "Requisite Consenting Noteholders"  or "Requisite Members of the Noteholder Steering Committee")
3. changes disproportionately adversely affecting any individual party
4. changes to the Pro Rata Split
5. changes to Backstop Premiums, Backstop Breakup Payments, Private Placement Premiums, or Private Placement Breakup Payments or allocation of such fees
6. changes to Plan Enterprise Value (as set forth in the Restructuring Term Sheet) or Plan Equity Value (as set forth in the Restructuring Term Sheet)
7. discounts to Plan Equity Value for the Private Placement and Rights Offering
8. increase of Penny Warrant issuance
9. conversion rates for Penny Warrants
10. extension or waiver of the Effective Date milestone in the PSA or Term Sheet past June 14, 2017, or any modification of the termination rights set forth in (i) section 9.3 of the Private Placement Agreement (Termination by a Private Placement Party), (ii) section 2.7(a) of the Private Placement Agreement (Designation and Assignment Rights). (iii) section 9.3 of the Backstop Commitment Agreement (Termination by a Commitment Party), (iv) section 2.7(a) of the Backstop Commitment Agreement (Designation and Assignment Rights), and (v) section 12.08 of the PSA
11. changes in definitions impacting, directly or indirectly, any of the above items

## D. Initial Party Fundamental Rights – 100% of Initial Parties

Requires unanimous consent of Noteholder Co-Proponents:
1. changes to the Initial Backstop Commitment Schedule or Initial Private Placement Schedule

NAI-1502345820v2

2. changes to the allocations, conditions, or other terms of any "protected" commitments of any of the Initial Parties, including but not limited to the Private Placement holdback, the Surplus Private Placement Adjustment, and the Surplus Backstop Participation Adjustment

NAI-1502345820v2

## **Exhibit D**

## **Plan Support Agreement**

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT dated December 22, 2016 (this "Agreement") is made by and among the following parties:

(i) Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors" or the "Company"), that have commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on April 13, 2016 (the "Petition Date");

(ii) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacities, the "First Lien Agent") under the First Lien Credit Agreement (as defined below) and certain First Lien Lenders party hereto (excluding, for the avoidance of doubt, the Noteholder Co-Proponents (defined below)), together with the First Lien Agent, (the "First Lien Lender Co-Proponents"), each holding the principal funded debt obligations (including via participations) of the Debtors set forth on their signature pages hereto, including any First Lien Lenders that subsequently enter into this Agreement;

(iii) PointState Capital LP ("PointState"), Contrarian Capital Management L.L.C. ("Contrarian"), Panning Capital Management, LP ("Panning") and the South Dakota Investment Council ("SDIC," together with PointState, Contrarian and Panning, the "Ad Hoc Secured Committee Members"), each holding or advising funds or managed accounts who beneficially hold the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(iv) Elliott Management Corporation and certain of its affiliates (collectively, "Elliott"), Discovery Capital Management and certain of its affiliates (collectively, "Discovery Capital") and Aurelius Capital Master Ltd. and ACP Master, Ltd. (collectively, "Aurelius" and, together with Discovery Capital and Elliott, the "Ad Hoc Unsecured Noteholders Group" and together with the Ad Hoc Secured Committee Members (the "Noteholder Co-Proponents," and, Noteholder Co-Proponents together with the First Lien Lender Co-Proponents, the "Creditor Co-Proponents"), each holding the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(v) any holder of Second Lien Notes or Unsecured Senior Notes (each, as defined below) that subsequently enters into this Agreement (the "Additional Supporting Parties" and the Additional Supporting Parties together with the Creditor Co-Proponents, the "Supporting Creditor Parties"), each holding the principal funded debt obligations of the Debtors to be set forth on their signature pages hereto; and

(vi) each transferee of debt under the First Lien Credit Agreement, the Second Lien Notes or the Unsecured Senior Notes that becomes a party in accordance with Section 8(b) of this Agreement.

Each of the parties named above is a "Party," and collectively they are the "Parties." All capitalized terms not defined herein have the meanings ascribed to them in the Restructuring Term Sheet (as defined below and as attached hereto as Exhibit 1).

## RECITALS

WHEREAS, on April 13, 2016, the Debtors commenced the Chapter 11 Cases under chapter 11 the Bankruptcy Code in the Bankruptcy Court, which Chapter 11 Cases have been consolidated by order of the Bankruptcy Court for procedural purposes only and are being jointly administered under case number 16-42529 (BSS). References in this Agreement to pleadings, orders and other filings and related docket numbers are to such pleadings, orders and other filings filed or entered in the Chapter 11 Cases;

WHEREAS, the transactions contemplated and outlined in this Agreement (the "Restructuring") shall be embodied within the Plan, which shall address, among other things, the following principal funded debt obligations of the Debtors:

(a)    that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "First Lien Credit Agreement");

(b)    those certain 10.00% senior secured second lien notes issued in March 2015 by PEC and due in March 2022 (the "Second Lien Notes"); and

(c)    (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes"); and

(d)    those certain 4.75% convertible junior subordinated debentures issued on December 20, 2006 by PEC and due in 2066 (the "Convertible Subordinated Notes," and such claims arising therefrom, the "Unsecured Subordinated Debenture Claims").

WHEREAS, the Debtors and the Initial Supporting Parties have engaged in arm's length, good-faith discussions, including in connection with Bankruptcy Court-ordered mediation overseen by the Honorable James L. Garrity regarding the CNTA Dispute, and regarding the Restructuring pursuant to a chapter 11 plan of reorganization (the "Plan") to be proposed by the Debtors and the Creditor Co-Proponents in the Chapter 11 Cases, which Plan shall contain the terms and conditions set forth in, and be consistent in all material respects with, the Restructuring Term Sheet;

NAI-1502345833v1

WHEREAS, to ensure a more orderly Plan confirmation process, the Debtors and the Initial Supporting Parties desire to allow the Additional Supporting Parties to join in this Agreement and participate in the Backstop Commitment Agreement and Private Placement Agreement on the terms and conditions set forth in the Restructuring Term Sheet and to be embodied in the Backstop Commitment Agreement and Private Placement Agreement;

WHEREAS, in furtherance of the Restructuring, the Debtors have requested each Party to support the Plan in accordance with this Agreement;

WHEREAS, the applicable board of directors, members or managers of each of the Debtors have approved the Restructuring Term Sheet and the applicable Debtor's entry into this Agreement;

WHEREAS, each of the Supporting Creditor Parties has received the requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' agreement concerning their respective rights and obligations in respect of the Restructuring.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## <u>AGREEMENT</u>

**Section 1.     Proposed Restructuring.**   The principal terms of the Restructuring are set forth on the term sheet attached hereto as <u>Exhibit 1</u> (as such term sheet may be modified in accordance with <u>Section 14</u> hereof and together with all exhibits, annexes, schedules, appendices and amendments thereto, the "<u>Restructuring Term Sheet</u>").   The Restructuring will be implemented pursuant to various agreements and related documentation, including, without limitation, the following documents required to implement the Restructuring, which documents shall be consistent in all material respects with the Restructuring Term Sheet and this Agreement, shall be executed (if such document requires execution), and shall be filed with the Bankruptcy Court (the "<u>Plan Documents</u>") shall be subject to the consent rights of the Requisite Creditor Parties[1]  as set forth herein, in each case as applicable in accordance with the Milestones set forth in the Restructuring Term Sheet:

---

[1]   "Requisite Creditor Parties" shall mean the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders.   "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.   "Requisite Consenting Noteholders" shall mean "Requisite Members of the Noteholder Steering Committee" or the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule as set forth in <u>Exhibit 8</u> to the Restructuring Term Sheet. "Requisite Members of the Noteholder Steering Committee" shall mean 75% of the Noteholder Steering Committee, based on combined Class 2 and Class 5 holdings as set

(i)      the Plan;

(ii)     the disclosure statement related to the Plan (the "<u>Disclosure Statement</u>");

(iii)    the materials related to the solicitation of votes to accept or reject the Plan (the "<u>Solicitation Materials</u>");

(iv)     the order approving the Disclosure Statement and the Solicitation Materials (the "<u>Disclosure Statement Order</u>");

(v)      the credit agreement and/or indenture for the Exit Facility (the "<u>Exit Facility Documentation</u>") (if applicable);

(vi)     the credit agreement for the Replacement Secured First Lien Term Loan (if applicable);

(vii)    the documents relating to the Section 1145 Rights Offering and the Private Placement, including, but not limited to the Private Placement Agreement and the Backstop Commitment Agreement and the orders approving same;

(viii)   the indenture for the New Second Lien Notes (if applicable);

(ix)     the Confirmation Order;

(x)      the exhibits, supplements and appendices to the Plan;

(xi)     the Registration Rights Agreement; and

(xii)    all other documents necessary for the implementation of the Plan and the transactions contemplated therein.

Nothing contained in this section shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet set forth in <u>Section 14</u> hereof.

**Section 2.      Exhibits Incorporated by Reference.**

Each of the exhibits attached hereto, including, without limitation, the Restructuring Term Sheet, is expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless specified otherwise, shall include such exhibits.   In the

---

forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; <u>provided</u>, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member.   The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

NAI-1502345833v1

event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

### Section 3.    First Lien Lender Co-Proponents' Commitments.

3.01.    <u>Agreement to Support the Restructuring and Vote on the Plan</u>.    Subject to the conditions contained in <u>Section 3.02</u> hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each member of the First Lien Lender Co-Proponents agrees that it shall:

(a)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the First Lien Lender Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)    not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)    not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)    not directly or indirectly take an action to direct the First Lien Agent, to undertake any action set forth in <u>Sections 3.01(c)</u> , <u>(d) or (e)</u> hereof, <u>provided, however</u>, that except to the extent required by the terms of the First Lien Credit Agreement

-5-

documents or by applicable law, the First Lien Agent shall be permitted to exercise its duties and obligations under the First Lien Credit Agreement documents in accordance with this Agreement and, subject to its obligations under this Agreement, the First Lien Agent may grant or withhold its consent or approval without instructions;

(g)    if applicable, negotiate in good faith the definitive documents for the Replacement Secured First Lien Term Loan on terms consistent with those set forth on Exhibit 1 to the Restructuring Term Sheet; and

(h)    take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated this Agreement, the Plan and the Plan Documents (it being understood that the First Lien Lender Co-Proponents shall not be required to incur any out of pocket cost or expense other than professional fees, to the extent that such fees are entitled to payment pursuant to Section V of the Restructuring Term Sheet).

3.02.    Certain Conditions.    The continuing obligations of each member of the First Lien Co-Proponents set forth in Section 3.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)    the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 to the Restructuring Term Sheet and otherwise in form and substance acceptable to the Requisite First Lien Lender Co-Proponents in their sole discretion;

(b)    this Agreement, the Restructuring Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents; and

(c)    the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents;

(d)    each other substantive document in connection with the Restructuring (but excluding documents relating to the Bonding Solution), shall be reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the

First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan;

(e)        any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite First Lien Lender Co-Proponents, not to be unreasonably withheld, conditioned or delayed;

(f)        the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet; and

(g)        this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over the documents and/or agreements set forth in the foregoing Sections 3.02(a)-(e).    Notwithstanding any other provision of this Agreement to the contrary, upon the Debtors (i) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court, and (ii) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First Lien Agent or the First Lien Lenders or their respective Representatives, (2) this Agreement or (3) the Breakup Administrative Claim Treatment (as defined in Exhibit 5 to the Restructuring Term Sheet).

3.03.    Acknowledgement.    For so long as this Agreement is in effect, each holder of First Lien Lender Claims from time to time party hereto (whether such holder is a First Lien Lender Co-Proponent, an Additional Supporting Party or a transferee of debt under the First Lien Credit Agreement that becomes a party in accordance with Section 8(b) of this Agreement, in any such case, in its capacity as a holder of First Lien Lender Claims and, with respect to Citibank, N.A., also in its capacity as the First Lien Agent) consents to the Restructuring, including for purposes of Section 6.10(b) of that certain First Lien/Second Lien Intercreditor Agreement among PEC as the borrower, the other grantors party thereto, Citibank, N.A. as the Senior Representative for the First Lien Credit Agreement Secured Parties (as such terms are defined therein), U.S. Bank National Association as the Second Priority Representative for the Second Lien Indenture Secured Parties (as such terms are defined therein), and each additional Representative (as defined therein) from time to time party thereto, dated as of March 16, 2015; provided that the consent of a holder of First Lien Lender Claims pursuant to this Section 3.03 shall cease to be in effect (except to the extent otherwise agreed in writing by such holder) if such holder ceases to be a party to this Agreement in accordance with the terms hereof.

Section 4.    Noteholder Co-Proponents' Commitments.

4.01.    Agreement to Support the Restructuring and Vote on the Plan.    Subject to the conditions contained in Section 4.02 hereof, effective immediately upon execution by each

-7-

member of the Noteholder Co-Proponents as to such member, and enforceable against such member as set forth herein (including, for the avoidance of doubt, by each member of the Noteholder Co-Proponents against each other member of the Noteholder Co-Proponents) as long as this Agreement has not been terminated pursuant to the terms hereof, each Noteholder Co-Proponent agrees that it shall:

(a)     subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)     subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the Noteholder Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)     not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)     not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)     not directly or indirectly take an action to direct the indenture trustees under the Second Lien Notes or any of the Unsecured Senior Notes (each, an "Agent"), to undertake any action that a member of the Noteholder Co-Proponents is otherwise prohibited from undertaking pursuant to Sections 4.01(c) , (d) or (e) hereof; provided, however, that to the extent a member of the Noteholder Co-Proponents chooses to direct an Agent to not undertake an action that a member of the Noteholder Co-Proponents is otherwise prohibited

-8-

from undertaking pursuant to Sections 4.01(c), (d) or (e) hereof, such direction shall not be construed in any way as requiring any Noteholder Co-Proponent to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

        (g)      take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, participating in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

        4.02.    Certain Conditions.    The continuing obligations of each member of the Noteholder Co-Proponents, as set forth in Section 4.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

        (a)      each substantive document in connection with the Restructuring including, without limitation, the Plan Documents (but excluding documents related to the Bonding Solution), shall be in form and substance acceptable or reasonably acceptable, as the case may be, to the Requisite Members of the Noteholder Steering Committee or the individual members of the Noteholder Steering Committee as set forth in the Restructuring Term Sheet, provided, that the Noteholder Co-Proponents acknowledge that the terms of the Replacement Secured First Lien Term Loan shall be acceptable if such terms are consistent with Exhibit 1 to the Restructuring Term Sheet;

        (b)      any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite Members of the Noteholder Steering Committee, not to be unreasonably withheld, conditioned or delayed;

        (c)      the material terms of the Restructuring, the Private Placement Agreement and the Backstop Commitment Agreement, shall not have been amended, modified or supplemented without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet;

        (d)      the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet, the Private Placement Agreement, the Backstop Commitment Agreement and this Agreement; and

        (e)      this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee or the affected member of the Noteholders Steering Committee, as required under Exhibit 8 to the Restructuring Term Sheet.

4.03.    <u>Effect of Termination</u>.    Notwithstanding any termination of this Agreement (except for any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to <u>Exhibit 8</u> to the Restructuring Term Sheet)), and further notwithstanding anything to the contrary herein:

(a)    the obligations of each member of the Noteholder Co-Proponents to every other member of the Noteholder Co-Proponents pursuant to <u>Sections 4.01(c), 4.01(d) and 4.01(f)</u> above (<u>Sections 4.01(c), (d), and (f)</u>, collectively, the "<u>Surviving Obligations</u>") shall survive such termination, absent express termination of the Surviving Obligations by the Noteholder Steering Committee pursuant to <u>Exhibit 8</u> to the Restructuring Term Sheet;

(b)    if any of the Noteholder Co-Proponents shall participate, with respect to the Debtors, in any subsequent rights offering of any securities as a backstop party and/or in any subsequent private placement of any securities as a private placement party, then each of the other members of the Noteholder Co-Proponents shall have the rights to participate, in each of their sole discretion, in such subsequent rights offering and/or private placement on identical terms as the original participating member of the Noteholder Co-Proponents, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable;

(c)    each of the Noteholder Co-Proponents shall not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company that disproportionately adversely affects any member of the Noteholder Co-Proponents with respect to the treatment of such member's claims or recovery associated therewith, so long as such claims or recovery arise from or relate to the same debt issuance, security, or other instrument issued by the Debtors, or encourage or cause any party to do any of the foregoing;

(d)    for the avoidance of doubt, this <u>Section 4.03</u> shall not, and shall not be deemed to, give any party other than a member of the Noteholder Co-Proponents any rights, remedies, or obligations against any member of the Noteholder Co-Proponents, and no other person or entity shall be a third party beneficiary of this <u>Section 4.03</u>;

(e)    for the avoidance of doubt, this <u>Section 4.03</u> shall not apply in the event of any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to <u>Exhibit 8</u> to the Restructuring Term Sheet) and in such case this Agreement, including the obligations set forth in this <u>Section 4.03</u>, and the Restructuring Term Sheet shall terminate;

(f)    nothing contained in this Agreement, including this <u>Section 4.03</u>, shall prohibit any member of the Noteholder Co-Proponents from directly or indirectly seeking, soliciting, or encouraging other parties in interest in these Chapter 11 Cases to join this Agreement pursuant to the terms hereof, or to propose modifications or amendments to this

-10-

Agreement, the Plan, the Backstop Commitment Agreement or the Private Placement Agreement pursuant to the applicable modification provisions contained in each respective document;

(g)    notwithstanding anything to the contrary in this <u>Section 4.03</u>, a member of the Ad Hoc Unsecured Noteholders Group will not be bound by the terms of this Section 4.03 so long as the member, during the Survival Period (as defined below), pursues and supports an agreement or order that provides (i) for the payment in full in cash of the Second Lien Notes Claims (including, without limitation, the payment of all post-petition interest at the default rate) (such agreement or order, a "<u>Post-Termination Agreement</u>," (as applicable) ), and (ii) the Unsecured Senior Notes Claims held by all Ad Hoc Secured Committee Members (as set forth in the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule) are treated in all respects in the identical manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, including, without limitation, any and all rights to participate, in each of the Ad Hoc Secured Committee Members' sole discretion, in any subsequent rights offering and/or private placement on identical terms and in an identical capacity and manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable.    To the extent a member of the Ad Hoc Unsecured Noteholders Group pursues such Post-Termination Agreement and related transactions that include the terms and conditions set forth in this paragraph, such member is required (x) to take all actions necessary to support, participate in, and/or vote for such Post-Termination Agreement, (y) not to take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in such Post-Termination Agreement, and (z) not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, consummation or implementation of the Post-Termination Agreement;

(h)    this <u>Section 4.03</u> shall only survive termination of this Agreement for a period of sixty (60) calendar days following such termination, but in no event later than June 14, 2017 (such period, the "<u>Survival Period</u>");

(i)    any amendment, waiver, or termination of this <u>Section 4.03</u> shall be subject to the express consent of the Noteholder Steering Committee pursuant to <u>Exhibit 8</u> to the Restructuring Term Sheet; <u>provided</u>, however, the amendment or waiver of <u>Sections 4.03 (h) or (i)</u> will require the consent of each member of the Noteholder Steering Committee; and

(j)    this <u>Section 4.03</u> shall be binding and enforceable solely with respect to the Noteholder Co-Proponents and may be amended, waived or terminated by the Noteholder Co-Proponents.    The Debtors and the First Lien Lender Co-Proponents have not agreed to, and will not be bound by, this Section 4.03, nor shall it in any way impact the Debtors' or the First Lien Lender Co-Proponents' ability to enforce the other provisions of this Agreement.

**Section 5.**     **Additional Supporting Parties' Commitments.**

5.01.     <u>Agreement to Support the Restructuring and Vote on the Plan</u>.     Subject to the conditions contained in <u>Section 5.02</u> hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each Additional Supporting Party agrees that it shall:

(a)     subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)     subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each Additional Supporting Party may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)     not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)     not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)     not directly or indirectly take an action to direct an Agent to undertake any action that an Additional Supporting Party, as the case may be, is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof; <u>provided</u>, <u>however</u>, that to the extent an Additional Supporting Party chooses to direct an Agent to not undertake an action that an Additional Supporting Party is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof, such direction shall not be construed in any way

-12-

as requiring any Additional Supporting Party to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

(g)    take any and all reasonably necessary or appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, required participation in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

5.02.    Certain Conditions.    The continuing obligations of each Additional Supporting Party set forth in Section 5.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)    the material terms of the Restructuring Term Sheet, the Backstop Commitment Agreement and the Private Placement Agreement shall not have been materially altered, amended or modified without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet; and

(b)    this Agreement shall have not been terminated in accordance with the terms hereof.

Notwithstanding the foregoing, for the avoidance of doubt, the Additional Supporting Parties shall not have any consent or consultation rights with respect to any of the Plan Documents, except as otherwise set forth on Exhibit 8 to the Restructuring Term Sheet.

### Section 6.    Debtors' Commitments.

6.01.    Debtors' Commitments.    Subject to the approval of the Bankruptcy Court and the Debtors' fiduciary duties as set forth in Section 15.01 hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, the Debtors shall:

(a)    operate their businesses in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices, provided, however, that the foregoing obligations shall be satisfied in a manner consistent with the terms of the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet;

(b)    prepare the Plan Documents and any related documents, and distribute the applicable documents, each as set forth in Sections 3.02 and 4.02 herein, concurrently to the Initial Supporting Parties and their respective legal advisors thereof, as soon as reasonably practicable, but in no event less than at least two (2) calendar days before the date when the Debtors intend to file such document (and, if not reasonably practicable, as soon as reasonably practicable before filing) and afford reasonable opportunity to provide prompt comment and review to the respective legal and financial advisors for the Initial Supporting Parties in advance of any filing thereof provided the Debtors will provide advance draft copies of all Plan Documents to be filed with the Bankruptcy Court to the legal advisors

NAI-1502345833v1

of the Initial Supporting Parties no less than three (3) business days prior to filing such Plan Documents;

(c)    support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided therefor in this Agreement;

(d)    take any necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(e)    take no actions and not encourage any other person to take any actions, inconsistent with this Agreement or the Restructuring Term Sheet, or that would, or would reasonably be executed to, directly or indirectly, delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "Alternative Transaction"); provided, however, that the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of non-Debtor affiliates' assets in the ordinary course of business and consistent with past practice and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction;

(f)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement and the Plan Documents; and

(g)    take no actions to propose or otherwise consent to the entry of any order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, that is not acceptable to the Requisite Creditor Parties;

(h)    take no actions that would violate the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet (the "Interim Operating Covenant");

(i)    take no actions to sell, abandon, or otherwise dispose of any material assets of the Debtors and their non-Debtor affiliates, except as provided in the Interim Operating Covenant, without the prior written consent of the Requisite Creditor Parties; and

-14-

(j)    if the Debtors know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Creditor Parties.

6.02.    Non-Solicitation Provision.   From and after the PSA Effective Date (the "Non-Solicitation Period"), the Debtors will not, and will not permit their subsidiaries or affiliates or any of their respective officers, directors, agents or representatives to initiate contact with, or solicit any inquiries, proposals or offers by any party (other than the Creditor Co-Proponents) with respect to an alternative restructuring; provided, however, that the Debtors, their subsidiaries, their affiliates or any of their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers received from any party (so long as such proposal was not obtained, pursued, facilitated or solicited by the Debtors or their subsidiaries, affiliates or their respective officers, directors, agents or representatives as described herein) with respect to an alternative restructuring.   To the extent the Debtors, their affiliates, their subsidiaries or any of their respective officers, directors, agents or representatives receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall or shall cause their affiliates, subsidiaries or respective officers, directors, agents or representatives to, provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such inquiry, proposal or offer.

Section 7.    **Right to Appear and Participate.** Nothing in Sections 3.01, 4.01 and 5.01 hereof shall be deemed to limit any of the following rights of any Party, to the extent consistent with this Agreement and the Restructuring Term Sheet:

(a)    to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance or participation and the positions advocated in connection therewith, including positions with respect to the CNTA Dispute, are not inconsistent with this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, and, other than as a result of actions or omissions any such Party takes or does not take in good faith to enforce its rights under this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, do not hinder, delay or prevent consummation of the Plan or the Plan Documents;

(b)    to purchase, sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors, subject to the terms of Section 8 hereof; or

(c)    to enforce all rights under any applicable credit agreement, indenture or other loan document in existence as of the date hereof or under any applicable law.

Section 8.    **Transfer of Claims.**

(a)    Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Party to sell, use, assign, transfer, grant any

participation or other beneficial interest in, or otherwise dispose of ("Transfer") any claims as such term is defined in section 101(5) of the Bankruptcy Code (each a "Claim" and, collectively, the "Claims"); provided, however, that, for the period commencing as of the PSA Effective Date (as defined below) until the termination of this Agreement pursuant to the terms hereof, each Party agrees, solely with respect to itself, that it shall not Transfer any Claims, and any purported Transfer of Claims shall be null and void *ab initio*, unless (i) the transferee is a Party, or (ii) if the transferee is not a Party, such transferee delivers to the Company (in any manner permitted by Section 15.14 hereof) within three (3) business days of the Transfer an executed joinder to this Agreement in the form attached hereto as Exhibit 2 (a "Joinder Agreement") pursuant to which such transferee shall have assumed all obligations of the Party transferring such Claims and shall become a Party to this Agreement, provided, further that this provision shall not apply to a disposition in connection with a pledge or grant of a security interest in any Claim made in good faith by a Party in connection with any financing if such pledge agrees to vote the Claims in favor of the Plan, provided, further, that, if the transferor of the Claims is a Creditor Co-Proponent, the transferee of such Claims (or any subsequent transferee) shall not become or be deemed to become a Creditor Co-Proponent, and shall not undertake the commitments of the Creditor Co-Proponents under the Private Placement Agreement or the Backstop Commitment Agreement, but such transferee of such Claims shall become a Party to this Agreement as an Additional Supporting Creditor Party hereto.   The failure by a Party to comply with the Transfer procedure described in the first proviso of the immediately preceding sentence (resulting in such Transfer becoming null and void *ab initio*) shall not constitute a material breach for purposes of Section 12.02(h) hereof.

        For the avoidance of doubt, to the extent not already a Party to this Agreement, a transferee of Claims under this Agreement shall become a Party to this Agreement with respect to any and all Claims owned by such Party, and any and all such Claims owned by such transferee party shall automatically and immediately upon joinder of such transferee party to this Agreement be deemed subject to all of the terms of this Agreement.   This Agreement shall in no way be construed to preclude any Party from acquiring additional Claims; provided, however, that any such additional Claims acquired by a Party shall automatically and immediately upon acquisition by such Party be deemed subject to all of the terms of this Agreement, whether or not notice of such acquisition is given to the Company, and that, so long as this Agreement has not been terminated, such Party shall vote (or cause to be voted) any such additional Claims in favor of the Plan in accordance and consistent with Sections 3.01(a), 4.01(a) and 5.01(a) hereof, as applicable, provided, further, that any and all Claims acquired by any member of the Noteholder Co-Proponents shall not be acquired in such party's capacity as an "Initial Party" (as defined in the Restructuring Term Sheet), but shall be acquired in such party's capacity as a "Phase Two Private Placement Party," "Additional Private Placement Party," "Phase Two Backstop Party," or "Additional Backstop Party," each as defined in the Restructuring Term Sheet, as applicable, provided, further, that in no event shall any such Transfer relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of delivery of such Joinder Agreement.

        (b)    Notwithstanding Section 8(a):   (A) a Party may settle or deliver any Claims to settle pursuant to an agreement to Transfer such Claim entered into by such Party prior to the date of this Agreement pending as of the date of such Party's entry into this Agreement without the requirement that the transferee be or become a Party or execute a

NAI-1502345833v1

Joinder Agreement (subject to compliance with applicable securities laws and it being understood that any Claims acquired and held (i.e., not as part of a short transaction) shall be subject to the terms of this Agreement); (B) a Party may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Party; provided that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Claims is to a transferee that is or becomes a Party at the time of such transfer; and (C) to the extent that a Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Claims that the Qualified Marketmaker acquires from a lender who is not a Party without the requirement that the transferee be or become a Party or execute a Joinder Agreement.

For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the public or applicable private markets as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in Claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims against the Company, and (y) is in fact regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

**Section 9.      Mutual Representations, Warranties, and Covenants.**   Each of the Parties individually represents, warrants, and covenants to each other Party, as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer), as follows (each of which is a continuing representation, warranty, and covenant):

9.01.   Existence; Enforceability.   It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is the legally valid and binding obligation of such Party (as to the Debtors, subject to the approval of the Bankruptcy Court), enforceable against it in accordance with its terms.

9.02.   No Violation.   The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (a) any provision of law, rule or regulation applicable to it or any of its subsidiaries, as applicable, or (b) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, as applicable, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries, as applicable, is a party.

9.03.   No Consent or Approval.   Except as expressly provided in this Agreement, and except for approval by the Bankruptcy Court with respect to the Debtors, no consent or approval is required by any other person or entity in order for it to carry out the transactions contemplated by, and perform the respective obligations under, this Agreement.

9.04.   Power and Authority.   It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been

duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part (as to the Debtors, subject to the approval of the Bankruptcy Court).

   9.05. <u>Supporting Creditor Parties' Representations</u>. Each Supporting Creditor Party individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant):

    (a) it (i) is either (A) the sole beneficial owner of or has binding commitments to purchase the aggregate principal amount of Claims set forth below its signature hereto, or (B) subject to <u>Section 15.17</u> below, has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement (subject, in the case of participations, to contrary directions to vote that may be received by the nominal owner(s) from other participation counterparties); (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and to dispose of, exchange, assign, and transfer such Claims; and (iii) holds no other Claims;

    (b) other than pursuant to this Agreement, and subject to <u>Section 15.17</u> below, its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Supporting Creditor Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

    (c) it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended); and

    (d) it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of the Claims that are inconsistent or conflict with representations and warranties of such Supporting Creditor Party herein or that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder, either generally or with respect to any specific Claims.

   **Section 10.** **No Waiver of Participation and Reservation of Rights and Ratification of Liability.** This Agreement and the Restructuring Term Sheet evidence a proposed settlement of disputes, including, among other disputes, the CNTA Dispute, among the Parties. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of each of the Parties to protect and preserve its rights, remedies and interests. Without limiting the foregoing sentence in any

-18-

way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated, or if this Agreement is terminated for any reason, each of the Parties fully reserves any and all of its rights, remedies, and interests.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement, the Restructuring Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any action, case, or proceeding other than an action, case or proceeding to enforce the terms of the foregoing agreements.

**Section 11.    Effectiveness.**   This Agreement shall become effective and enforceable (a) with respect to the Creditor Co-Proponents, upon the date of execution by each of the Creditor Co-Proponents; (b) with respect to the Debtors, on the date the Bankruptcy Court authorizes the Debtors to enter into this Agreement and (c) with respect to any other Party (the date of execution or joinder by such Party to this Agreement) (such date, the "PSA Effective Date").   Upon the PSA Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 12 hereof.

**Section 12.    Termination Events.**

12.01.   Debtors' Termination Events.   This Agreement may be terminated by the Debtors, in their sole discretion, following the occurrence of any of the following events (each, a "Debtor Termination Event"):

(a)    if holders of two-thirds (2/3) in amount of each of (i) the Second Lien Notes Claims and (ii) the Unsecured Senior Notes Claims have not joined this Agreement prior to the date on which the PPA and BCA Approval Order is entered (the "PSA Termination Condition"); provided, however, the Debtors may waive the PSA Termination Condition in their sole discretion, but may only exercise the PSA Termination Condition (or waive such condition) prior to entry of the PPA and BCA Approval Order, provided, further, however that the timely and valid exercise of the PSA Termination Condition shall relieve the Debtors from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations under the Backstop Commitment Agreement or the Private Placement Agreement;

(b)    the determination by any of the Company's boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(c)    the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)       following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that adversely and materially affects the Debtors' rights under this Agreement and is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(e)       the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f)       either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

(g)       the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.02.    Creditor Co-Proponents' Termination Events.   This Agreement may be terminated by the Requisite First Lien Lender Co-Proponents or the Requisite Members of the Noteholder Steering Committee upon two (2) business days prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "Termination Event"):

(a)       any Debtor accepts an Alternative Transaction, including, but not limited to filing with the Bankruptcy Court, or publically announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b)       the Debtors deliver a Debtor Fiduciary Notice (as defined below) to the Creditor Co-Proponents;

(c)       the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)       the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) a motion seeking approval of the Disclosure Statement and procedures for the solicitation of the Plan, and (iv) a motion seeking approval of the Backstop

NAI-1502345833v1

Commitment Agreement and the Private Placement Agreement by no later than December 22, 2016;

(e)     the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the full amount of the Exit Facility or agreed to use commercially reasonable efforts to arrange for commitments for the full amount of the Exit Facility by January 11, 2017;

(f)     the failure of an order to have been entered by the Bankruptcy Court approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by January 31, 2017;

(g)     failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(h)     the failure of the Plan Effective Date to have occurred by April 15, 2017;

(i)     following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(j)     the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority or validity of the Claims of any of the Creditor Co-Proponents;

(k)     any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with this Agreement and the exhibits hereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Creditor Parties, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(l)     any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in the Interim Operating Covenant without the prior written consent of the Requisite Creditor Parties;

(m)     either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Creditor Parties; or

(n)     the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or

any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.03.    Noteholder Co-Proponents' Termination Events.    This Agreement may be terminated by the Noteholder Steering Committee upon the occurrence of any of the following events (each, a "Termination Event"):

(a)    the failure of an order to have been entered by the Bankruptcy Court approving the Private Placement Agreement and the Backstop Commitment Agreement (including approval of the fees set forth therein in connection with the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017;

(b)    any of the orders approving the Backstop Commitment Agreement or the Private Placement Agreement is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Consenting Noteholders; or

(c)    the termination of the Backstop Commitment Agreement or the Private Placement Agreement pursuant to their respective terms.

12.04.    Second Lien Noteholders' Termination Event.    In the event the acknowledgment set forth in Section 3.03 of this Agreement by Citibank, N.A. in its capacity as the First Lien Agent ceases to be in effect, any holder of Second Lien Notes may withdraw from and no longer remain bound by this Agreement within five (5) business days after receiving written notice of such event, it being understood that the Agreement shall remain binding among the remaining Parties; provided, however, the Ad Hoc Secured Committee Members may not utilize this termination event if the Plan provides for unconditional payment in full in cash or unimpairment of claims arising under the First Lien Credit Agreement.

12.05.    Citibank Termination Event.    The First Lien Agent may withdraw from and no longer remain bound by this Agreement, it being understood that the Agreement shall remain binding among the remaining Parties, in the event that the First Lien Agent determines, in its sole discretion, that it is subject to the direction from the "Required Lenders," as such term is defined in the First Lien Credit Agreement, requiring it to act in a manner inconsistent with its obligations under this Agreement.

12.06.    Mutual Termination.    This Agreement may be terminated by the mutual consent of the Debtors, the Requisite First Lien Lender Co-Proponents and the Noteholder Steering Committee.

12.07.    <u>Automatic Termination Event</u>.    In the event the Backstop Commitment Agreement or the Private Placement Agreement is terminated pursuant to its terms, this Agreement shall be automatically terminated notwithstanding <u>Section 12.08</u> hereof.

12.08.    <u>Outside Date Termination</u>.    Any individual Creditor Co-Proponent shall have the right to terminate this Agreement, as to itself only, if the effective date of the Plan shall not have occurred by June 14, 2017.    In the event a Creditor Co-Proponent terminates pursuant to this <u>Section 12.08</u>, such termination shall be effective as to such Creditor Co-Proponent only and shall not affect any rights or obligations of any other party to this Agreement.

12.09.    No Party may validly terminate this Agreement based upon its failure to perform or comply in any material respect with the terms and conditions of this Agreement or any of the Plan Documents, to the extent such Plan Document is effective, with such failure to perform or comply causing, or resulting in, the occurrence of one or more Termination Events specified herein.    Nothing in this <u>Section 12</u> shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

12.10.    <u>Effect of Termination Date</u>.

(a)    Within three (3) days following the delivery of a termination notice pursuant to Sections 12.02 or 12.03 hereof, each of the Debtors and the Requisite Creditor Parties may waive, in writing, the occurrence of the Termination Event identified in the termination notice.    Absent such waiver, this Agreement shall be terminated on the fourth (4th ) day following delivery of the termination notice pursuant to Sections 12.02 or 12.03 hereof (such date, the "<u>Termination Date</u>").    On the Termination Date, the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided in this Agreement.

(b)    For the avoidance of doubt, each of the Parties hereby waives any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agrees not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the provision of any such notice); <u>provided</u>, <u>however</u>, that nothing in this paragraph shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.

12.11.    <u>Termination Upon Effective Date</u>.    This Agreement shall terminate automatically without further required action or notice upon the Effective Date.

**Section 13.    Cooperation and Support.**    The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.    Furthermore, subject to the terms of this Agreement, each of the Parties shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Chapter 11 Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Plan, the

Plan and/or the Restructuring, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 14.    Amendments.**    Any amendment to this Agreement and any exhibits attached hereto, may only be modified, amended or supplemented pursuant to the following conditions:

14.01.    <u>Debtors</u>.    Except with respect to Section 4.03 hereof, the Debtors' written approval (including via email) is required for the effectiveness of any modification, amendment or supplement to this Agreement and any exhibit attached hereto, which approval shall not be unreasonably withheld, conditioned or delayed with respect to any of the foregoing that do not adversely affect the rights of the Debtors under this Agreement.

14.02.    <u>First Lien Lender Co-Proponents</u>.    The Requisite First Lien Lender Co-Proponents' written approval (including via email) is required for any modification, amendment or supplement to the following documents (but excluding documents related to the Bonding Solution):    (i) the indenture for the New Second Lien Notes (if applicable), (ii) the Plan, (iii) the Disclosure Statement, (iv) the Disclosure Statement Order, (v) the Confirmation Order, (vi) the Restructuring Term Sheet (except with respect to written approval rights for <u>Exhibits 3, 5 and 8</u> to the Restructuring Term Sheet) and (vii) this Agreement (except with respect to Section 4.03), in each case subject to <u>Section 3.02</u> hereof, <u>provided</u>, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents.

14.03.    <u>Noteholder Steering Committee</u>.    The Noteholder Steering Committee's express written approval (including via email) is required for any modification, amendment or supplement to this Agreement, any exhibits attached hereto, and/or the Plan Documents in accordance with the terms of the Restructuring Term Sheet.    The Restructuring Term Sheet and any Plan Documents may not be altered, amended or modified without the requisite approval required under the terms of <u>Exhibit 8</u> to the Restructuring Term Sheet.    The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee.

**Section 15.    Miscellaneous.**

15.01.    <u>Company Fiduciary Duties</u>.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations

NAI-1502345833v1

under applicable law, subject to the Non-Solicitation Provision set forth in <u>Section 6.02</u>, <u>provided</u>, <u>however</u>, for the avoidance of doubt, (a) if the Debtors or the Company exercise the PSA Termination Condition, as set forth in <u>Section 12.01(a)</u> hereto, the Debtors shall be relieved of any obligation to pay the Breakup Payment and Expense Reimbursement and (b) if the Debtors or the Company exercise their right under this <u>Section 15.01</u> after entry by the Bankruptcy Court of the PPA and BCA Approval Order, (x) the Breakup Payments and Expense Reimbursement shall be payable in accordance with the terms set forth in the Restructuring Term Sheet and (y) the Debtors shall provide notice of such decision to exercise their rights under this <u>Section 15.01</u> to the Creditor Co-Proponents within one (1) business day (such notice, a "<u>Debtor Fiduciary Duty Notice</u>").

15.02.    <u>Complete Agreement</u>.    This Agreement, the Backstop Commitment Agreement, the Private Placement Agreement, together with all exhibits and schedules attached hereto and thereto, and any and all amendments or restatements of any of the foregoing, is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.    No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

15.03.    <u>Parties</u>.    This Agreement shall be binding upon, and inure to the benefit of, the Parties.    No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in <u>Section 8</u> hereof.    Subject to <u>Section 13</u> hereof, nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.    Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party executes and becomes bound by this Agreement solely as to a specific business unit, division or desk, no affiliate of such Party or other business unit, division or desk within any such Party (and no Claims held by such other business unit, division or desk) shall be subject to this Agreement unless they separately execute a Joinder Agreement.

15.04.    <u>Headings</u>.    The headings of all sections of this Agreement are solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

15.05.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient

-25-

forum or does not have jurisdiction over any party hereto.   Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

      15.06.   Specific Performance.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and a non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, without necessity of proving the inadequacy of money damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

      15.07.   Execution of Agreement.   This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.   Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

      15.08.   Interpretation.   This Agreement is the product of negotiations between the Debtors and the Initial Supporting Parties, and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner to effect the intent of the Parties hereto, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

      15.09.   Successors and Assigns; Severability.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in a bankruptcy case; provided that nothing contained in this Section 15.09 shall be deemed to permit sales, assignments, or other Transfers or other claims against or interests in the Company other than in accordance with this Agreement.   The agreements, representations and obligations of the Supporting Creditor Parties under this Agreement are, in all respects, several and not joint.   If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.   Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

      15.10.   Representation by Counsel.   Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a

defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

15.11.    Survival.    Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this Section 15 and in Sections 10 and 16 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.12.    Independent Due Diligence and Decision-Making.    Each Supporting Creditor Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

15.13.    Relationship Among Parties.    It is understood and agreed that no Supporting Creditor Party has any duty of trust or confidence in any form with any other Supporting Creditor Party, and, except as provided in this Agreement, there are no agreements, commitments or undertakings among or between them.    The Parties further acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any debt or equity securities of the Debtors and the Creditor Co-Proponents do not constitute a "group" within the meaning of Rule 13d-5 under the Securities and Exchange Act of 1934, as amended.    In this regard, it is understood and agreed that any Creditor Co-Proponent may trade in the Claims or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Creditor Co-Proponent, subject to applicable securities laws and the terms of this Agreement; provided, further, that no Creditor Co-Proponent shall have any responsibility for any such trading by any other entity by virtue of this Agreement.    No prior history, pattern or practice of sharing confidences among or between the Supporting Creditor Parties shall in any way affect or negate this understanding and agreement.    Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Creditor Parties under this Agreement shall be several, not joint.

15.14.    Notices.    All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(a)    if to the Debtors, to:

Peabody Energy Corporation
701 Market Street
St. Louis, MO 63101
Fax No. (314) 342-7597
Attention: A. Verona Dorch, Chief Legal Officer
Email: vdorch@peabodyenergy.com

with copies to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Fax No. (216) 579-0212
Attention: Heather Lennox, Esq.
Email: hlennox@jonesday.com

and

Jones Day
77 West Wacker
Chicago, IL 60601
Fax No. (312) 782-8585
Attention: Edward B. Winslow, Esq.
Email: ebwinslow@jonesday.com

and

Armstrong Teasdale LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
Fax No. (314) 621-5065
Attention: Steven N. Cousins, Esq. and Susan K. Ehlers, Esq.
Email: scousins@armstrongteasdale.com; sehlers@armstrongteasdale.com

(b)    if to a Supporting Creditor Party or a transferee thereof, to the addresses, electronic mail addresses or facsimile numbers set forth below following the Supporting Creditor Party's signature (or as directed by any transferee thereof), as the case may be, with copies to any counsel designated by such Supporting Creditor Party, including as follows:

in respect of the First Lien Agent and the First Lien Lender Co-Proponents:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Fax No. (212) 710-5800
Attention: Damian S. Schaible, Esq., Darren Klein, Esq. and Angela M. Libby, Esq.
Email: damian.schaible@davispolk.com; darren.klein@davispolk.com; angela.libby@davispolk.com

and

Bryan Cave LLP
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
Fax No. (314) 259-2020
Attention: Lloyd A. Palans, Esq., Laura Uberti Hughes, Esq. and Brian C.
        Walsh, Esq.
Email: lapalans@bryancave.com; brian.walsh@bryancave.com;
        laura.hughes@bryancave.com

in respect of PointState, Contrarian and Panning of the Ad Hoc Secured
Committee Members:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Fax No. (212) 735-2000
Attention: Shana A. Elberg, Esq. and Sarah M. Ward, Esq.
Email: Shana.elberg@skadden.com; Sarah.ward@skadden.com

and

Stinson Leonard Street LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Fax No. (314) 863-9388
Attention: John G. Young, Jr., Esq.
Email: john.young@stinson.com

in respect of the South Dakota Investment Council:

Woods, Fuller, Schultz & Smith P.C.
300 South Phillips Ave, Suite 300
Sioux Falls, SD 57104
Attention: Jordan J. Feist, Esq.
Email: jordan.feist@woodsfuller.com; jeff.hallem@state.sd.us

in respect of Aurelius and Elliott:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

New York, NY 10036
Fax No. (212) 715-8000
Attention: Kenneth H. Eckstein, Esq., Stephen D. Zide, Esq. and Andy
Dove, Esq.
Email: KEckstein@kramerlevin.com; SZide@kramerlevin.com;
       ADove@kramerlevin.com

and

Doster, Ullom & Boyle, LLC
16090 Swingley Ridge Road
Suite 620
St. Louis, MO 63017
Fax No. (636) 532-1082
Attention: Gregory D. Willard, Esq., John G. Boyle, Esq.
Email: gwillard@dubllc.com; jboyle@dubllc.com

in respect of Discovery Capital:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Fax No. (212) 446-4900
Attention: Stephen E. Hessler, Esq.
Email: shessler@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Fax No. (415) 439-1500
Attention: Brian Ford, Esq. and Melissa N. Koss, Esq.
Email: Bford@kirkland.com; Melissa.koss@kirkland.com

Any notice given by delivery, mail or courier shall be effective when received.    Any notice
given by facsimile shall be effective upon oral or machine confirmation of successful
transmission.    Any notice given by electronic mail shall be effective upon delivery.

     15.15.    Third Party Beneficiaries.    Unless expressly stated herein, this
Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a
third party beneficiary hereof.

     15.16.    No Solicitation.    This Agreement is not and shall not be deemed to be a
solicitation for votes to accept or reject the Plan or any plan of reorganization for purposes of
sections 1125 and 1126 of the Bankruptcy Code.    The votes of the holders of Claims against the
Company will not be solicited until such holders who are entitled to vote on the Plan have

-30-

received the Disclosure Statement and related ballot, the Plan, and other required solicitation materials.    In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

15.17.    <u>Supporting Creditor Parties' Obligations</u>.    Anything set forth in this Agreement to the contrary, notwithstanding, including without limitation the representations and warranties set forth in <u>Section 9.05</u>, the Parties hereto acknowledge and agree that the Supporting Creditor Parties that are holders of First Lien Lender Claims may be the beneficial owner of all or a portion of the principal amount of such First Lien Lender Claims pursuant to a participation agreement.    Accordingly, such Supporting Creditor Parties' investment and voting discretion for all purposes hereunder may be limited or restricted by the express terms of such Supporting Creditor Parties' respective participation agreement which may grant the nominal or record holder of such First Lien Lender Claims (held by participation) the right to vote or direct actions in respect of such Supporting Creditor Parties' First Lien Lender Claims in accordance with the written direction of other creditors (including such nominal or record holder) owing or holding interests representing more than 50% of such nominal or record holders' First Lien Lender Claims, and such Supporting Creditor Parties' liabilities and obligations hereunder shall be limited accordingly.    Notwithstanding the foregoing and for the avoidance of doubt, any Supporting Creditor Party that holds First Lien Lender Claims pursuant to a participation agreement shall direct any nominal or record holder of such First Lien Lender Claims to vote all of its Claims in favor of the Plan in accordance with <u>Sections 3.01(a), 4.01(a) and 5.01(a)</u>.

**Section 16.    Public Disclosure.**    The Supporting Creditors Parties hereby consent to the disclosure of the execution and contents of this Agreement by the Debtors in the Plan, Disclosure Statement, the other Plan Documents, and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission (the "<u>SEC</u>") or as required by law or regulation; <u>provided</u>, <u>however</u>, that, except as required by law or any rule or regulation of any securities exchange or any governmental agency, the Debtors shall not, without the applicable Supporting Creditor Party's prior consent (which shall not be unreasonably withheld, delayed or conditioned), (i) except insofar such name appears in the body of this Agreement and in the Restructuring Term Sheet, use the name of any Supporting Creditor Party or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the SEC or the Bankruptcy Court or (ii) disclose the holdings of the Debtors' principal funded debt of any Supporting Creditor Party to any person; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, debt under the First Lien Credit Agreement, Second Lien Notes or Unsecured Senior Notes beneficially owned by the Supporting Creditor Parties collectively (or by funds or accounts advised or managed by Supporting Creditor Parties).

[Signature pages follow.]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

PEABODY ENERGY CORPORATION ON
ITS OWN BEHALF AND ON BEHALF OF
ITS AFFILIATE DEBTORS

By: _A. Verona Dorch_

Name:  A. Verona Dorch
Title:   Executive VP and Chief Legal Officer

[Signature Page to Plan Support Agreement]

Citibank, N.A., solely in its capacity as administrative agent under the First Lien Credit Agreement

By: _John Tucker_____

Name: JOHN TUCKER

Title: VICE PRESIDENT

Address:    388 Greenwich St
            New York, NY    10013

Attn:    Dale Goncher & Anna Lekander
Tel:     212-816-7446
Fax:     877-501-5821

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

First Lien Lender Claims:

$_N/A_____

Second Lien Notes Claims:

$_____

Unsecured Senior Notes Claims:

$_____

[Signature Page to Plan Support Agreement]

[First Lien Lender Signature Pages Omitted]

[Signature Page to Plan Support Agreement]

BlockHouse Master Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019
Attn:      Alfred J. Barbagallo
Tel:       (212) 830-7080
Fax:       (212) 621-5780

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

Secured First Lien Lender Claims:

Secured Second Lien Notes Claims:

Unsecured Senior Notes Claims:

[Signature Page to Plan Support Agreement]

Conflux Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:  40 West 57th Street, 25th Floor
          New York, NY 10019
Attn:     Alfred J. Barbagallo
Tel:      (212) 830-7080
Fax:      (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

SteelMill Master Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:    40 West 57th Street, 25th Floor
            New York, NY 10019
Attn:       Alfred J. Barbagallo
Tel:        (212) 830-7080
Fax:        (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

PointState Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

| | |
|---|---|
| Address: | 40 West 57th Street, 25th Floor |
| | New York, NY 10019 |
| Attn: | Alfred J. Barbagallo |
| Tel: | (212) 830-7080 |
| Fax: | (212) 621-5780 |

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

██████████

Secured Second Lien Notes Claims:

██████████

Unsecured Senior Notes Claims:

██████████

[Signature Page to Plan Support Agreement]

**Contrarian Capital Fund I, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Fund I, L.P. will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-A, L.L.C.**
By: Contrarian Capital Management, L.L.C., as Managing Member

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
                Greenwich, CT 06830
Attn:        Josh Weisser
Tel:          (203) 862-8278
Fax:         (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. CCM Pension-A, L.L.C. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-B, L.L.C.**
By: Contrarian Capital Management, L.L.C., as
Managing Member

By: 
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. CCM Pension-B, L.L.C. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Dome du Gouter Master Fund, LP**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Dome du Gouter Master Fund, LP will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Opportunity Fund, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Opportunity Fund, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Senior Secured, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

| | |
|---|---|
| Address: | 411 West Putnam Avenue |
| | Greenwich, CT 06830 |
| Attn: | Josh Weisser |
| Tel: | (203) 862-8278 |
| Fax: | (203) 629-1977 |



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Senior Secured, L.P.
will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement
and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the
bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Trade Claims, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Trade Claims, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Advantage-B, LP**
By: Contrarian Capital Management, L.L.C., as
General Partner

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
          Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:      (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Advantage-B, L.P. will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

[Signature Page to Plan Support Agreement]

**Contrarian Emerging Markets, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Emerging Markets, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian EM SIF Master L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
                  Greenwich, CT 06830
Attn:        Josh Weisser
Tel:         (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian EM SIF Master, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Boston Patriot Summer St LLC**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: 
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Boston Patriot Summer St LLC will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

Panning Master Fund, LP

By:   Panning Capital Management, LP
Its:   Investment Manager

By:
Name:  William Kelly
Title:  Authorized Signatory

Address:   510 Madison Avenue, 23rd Floor
           New York, NY 10022
Attn:      Rayan Joshi
Tel:       212-916-1860
Fax:       212-916-1861

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$ ███████████████

Secured Second Lien Notes Claims:

$ ██████████

Unsecured Senior Notes Claims:

$ ███████

Signature Page to Plan Support Agreement

SOUTH DAKOTA INVESTMENT COUNCIL

By: _____

Name: Matthew L. Clark
Title: State Investment Officer

Address:   South Dakota Investment Council
           4009 West 49th Street, Suite 300
           Sioux Falls, SD 57106-3784
Attn:      A. Laurie Riss
Tel:       605-362-2820
Fax:       605-362-2833

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$_____

Secured Second Lien Notes Claims:

Unsecured Senior Notes Claims:

$_____

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

ELLIOTT ASSOCIATES, L.P.
By: Elliot Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc, as general partner

By: _____
Name: Elliot Greenberg
Title:  Vice President

Address: c/o Elliott Management Corporation
40 West 57th Street
New York, NY 10019
Attn.:   _____
Tel.:    _____
Fax:     _____
Email:   _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

███████████

Unsecured Senior Notes Claims:

███████████

Convertible Notes Claims:

███████

Date executed:  December 22, 2016

THE LIVERPOOL LIMITED PARTNERSHIP

By: _____
Name: Elliot Greenberg
Title:   Vice President

Address: c/o Elliott Management Corporation
40 West 57th Street
New York, NY 10019
Attn.:        _____
Tel.:          _____
Fax:          _____
Email:        _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Unsecured Senior Notes Claims:

██████████████

Date executed:  December 22, 2016

ELLIOTT INTERNATIONAL, L.P.
Elliott International Capital Advisors Inc.
As attorney-in-fact

By: _____
Name: Elliot Greenberg
Title:   Vice President

Address: c/o Elliott Management Corporation
              40 West 57th Street
              New York, NY 10019

Attn.:    _____
Tel.:      _____
Fax:      _____
Email:    _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

Unsecured Senior Notes Claims:

Convertible Notes Claims:

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

MANCHESTER SECURITIES CORP.

By: _____

Name: Elliot Greenberg

Title:  Vive President

Address: c/o Elliott Management Corporation
        40 West 57th Street
        New York, NY 10019

Attn.: _____

Tel.: _____

Fax: _____

Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

Date executed:  December 22, 2016

**ZIFF INVESTMENTS LIMITED**

By: _____
Name: Elliot Greenberg
Title:  Vice President

Address: c/o Elliott Management Corporation
         40 West 57th Street
         New York, NY 10019
Attn.:   _____
Tel.:    _____
Fax:     _____
Email:   _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

[Signature Page to Plan Support Agreement]

DISCOVERY CAPITAL MANAGEMENT, LLC

By: _____

Name: Adam Schreck
Title: General Counsel

Address:    20 Marshall Street, Suite 310
            South Norwalk, CT 06854
Attn:       Adam Schreck
Tel:        (203) 956-7953

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

█████████ _____

Secured Second Lien Notes Claims:

█████████ _____

Unsecured Senior Notes Claims:

█████████ _____

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

AURELIUS CAPITAL MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual
    capacity

By: _____
Name: Dan Gropper
Title:  Managing Director

Address:   c/o Aurelius Capital Management, LP
           535 Madison Avenue, 22nd Floor
           New York, NY 10022
Attn:      Dan Gropper
Tel:       (646) 445-6570
Fax:       (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

████████████    _____

Unsecured Senior Notes Claims:

████████████    _____

[Signature Page to Plan Support Agreement]

Date executed:  December 22, 2016

ACP MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual
    capacity

By: _____
Name: Dan Gropper
Title:  Managing Director

Address:   c/o Aurelius Capital Management, LP
           535 Madison Avenue, 22nd Floor
           New York, NY 10022
Attn:      Dan Gropper
Tel:       (646) 445-6570
Fax:       (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

███████████████

Unsecured Senior Notes Claims:

███████████████

## **EXHIBIT 1**

## **RESTRUCTURING TERM SHEET**

## Peabody Energy Corporation Plan Term Sheet

### December 22, 2016

This term sheet (the "Term Sheet") sets forth certain of the principal terms for the proposed restructuring (the "Restructuring") of the obligations of Peabody Energy Corporation ("PEC") and each of its direct and indirect debtor subsidiaries (each a "Debtor" and, collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") that have commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on April 13, 2016 (the "Petition Date").[1]  The Restructuring contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization for the Debtors (the "Plan") and will provide adequate working capital to the Debtors and their respective non-Debtor subsidiaries, all as described below.  Consistent with the Debtors' exclusive right to file the Plan pursuant to section 1121 of the Bankruptcy Code, the Debtors shall be the proponents of the Plan, and certain supporting creditors listed below (collectively, the "Creditor Co-Proponents") shall be co-proponents of the Plan.

This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the Plan and the transactions to be contemplated therein, which will remain subject to discussion and negotiation in good faith among the following parties:  (i) the Debtors; (ii) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacity, the "First Lien Agent") under that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "First Lien Credit Agreement");[2] (iii) those certain First Lien Lenders (as defined below) who are signatories to the PSA (as defined below) (together with the First Lien Agent, the "First Lien Lender Co-Proponents"); (iv) PointState Capital LP ("PointState"), Contrarian Capital Management, L.L.C. ("Contrarian") and Panning Capital Management, LP ("Panning") and the South Dakota Investment Council ("SDIC") each as members of the Ad Hoc Committee (the "Ad Hoc Group of Second Lien Noteholders" or the "Second Lien Notes Parties") of holders of those certain 10.00% senior secured second lien notes (the "Second Lien Notes")[3] issued in March 2015 by PEC and due in March 2022; and (vi) an ad hoc group of

---

[1]   Capitalized terms used herein but not otherwise defined have the meanings given to them in the Bankruptcy Code.  "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

[2]   Any and all Claims arising under or in connection with the First Lien Credit Agreement or other Existing Credit Agreement Documents (as defined in the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) [Docket No. 544] (the "Final DIP Order"), including those arising under the Debtors' term loan, revolver, prepetition international swaps, cash management agreements and any letters of credit issued under the terms of the First Lien Credit Agreement are referred to herein collectively as the "First Lien Lender Claims."  Holders of such Claims are referred to herein as the "First Lien Lenders."

[3]   Any and all Claims arising under or in connection with the Second Lien Notes are referred to herein collectively as the "Second Lien Notes Claims."

holders of Unsecured Senior Notes (as defined below) composed of entities managed by Elliott Management Corporation ("Elliott"), Discovery Capital Management, LLC ("Discovery") and Aurelius Capital Management, LP ("Aurelius" and, together with Elliott and Discovery, the "Ad Hoc Unsecured Noteholders Group," and, together with the Debtors, the First Lien Lender Co-Proponents, the Second Lien Notes Parties, the "Parties," and each individually, a "Party").  The transactions contemplated by this Term Sheet are subject to (1) satisfaction of all of the conditions set forth herein and in any definitive documentation evidencing the transactions comprising the Restructuring, (2) the negotiation and execution of definitive documents evidencing and related to the Restructuring contemplated herein, which documents shall be in form and substance reasonably acceptable to the Creditor Co-Proponents (as and only to the extent set forth below) and (3) entry of an order of the Bankruptcy Court confirming the Plan (the "Confirmation Order") and the satisfaction of any conditions to the effectiveness thereof (the date of such effectiveness, the "Effective Date").

This Term Sheet has been prepared for settlement discussion purposes only and shall not constitute an admission of liability by any Party, nor be admissible in any action relating to any of the matters addressed herein.  Nothing in this Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a Plan.  Further, nothing herein shall be an admission of fact or liability or deemed binding on the Parties.

NAI-1502345820v2

# I. **Plan Process**

| Creditor Co-Proponents | Elliott, Discovery, Aurelius, Contrarian, PointState, Panning and SDIC (the "Noteholder Co-Proponents") and the First Lien Lender Co-Proponents (together with the Noteholder Co-Proponents, the "Creditor Co-Proponents").[4]   The Requisite Members of the Noteholder Steering Committee shall mean 75% of the Noteholder Steering Committee,[5] based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member. |
|---|---|
| Requisite Creditor Parties | The "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent, and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.  The Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over this Term Sheet, the PSA, the Plan and certain exhibits to the Plan as set forth herein; provided, however, notwithstanding any other provision herein to the contrary, upon the Debtors (a) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court and (b) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First |

---

[4]   Certain Creditor Co-Proponents are acting and shall act in their capacities as investment advisors or managers for funds or managed accounts which hold First Lien Lender Claims, Second Lien Notes Claims and/or Unsecured Senior Notes Claims subject to this Term Sheet.  The Creditor Co-Proponents assume no fiduciary duties to each other or any other creditors in connection with the transactions contemplated herein or otherwise.

[5]   The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

NAI-1502345820v2

| | |
|---|---|
| | Lien Agent or the First Lien Lenders or their respective Representatives, (2) the PSA or (3) the Breakup Administrative Claim Treatment.<br><br>The "Requisite Consenting Noteholders" shall mean the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule attached hereto as [Exhibit 8].<br><br>Together, the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders shall be the "Requisite Creditor Parties." |
| PSA | The Creditor Co-Proponents shall execute a Plan Support Agreement with the Debtors in form and substance acceptable to the Creditor Co-Proponents and the Debtors (the "PSA").<br><br>The PSA shall include a fiduciary termination event for the Debtors.  After entry by the Bankruptcy Court of the PPA and BCA Approval Order (as defined below), the Breakup Payments and Expense Reimbursement (both as defined below), shall be payable, following the exercise by the Debtors of the fiduciary out in accordance with the terms of PSA, the Private Placement Agreement and the Backstop Commitment Agreement (both as defined below) and shall, prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis, as set forth in Exhibit 5 hereto and consistent with the Breakup Administrative Claim Treatment (as defined in Exhibit 5).<br><br>From the Debtors' execution of the PSA until the PSA is terminated in accordance with its terms (the "Non-Solicitation Period"), the Debtors will not, and will not permit their affiliates or their respective officers, directors, agents or representatives to initiate contact with or solicit any inquiries, proposals or offers by any party with respect to an alternative restructuring; provided, however, the Debtors, their affiliates or their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers initiated or continued by any party with respect to an alternative restructuring.  To the extent the Debtors receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) |

NAI-1502345820v2

| | |
|---|---|
| | days of receiving such inquiry, proposal or offer.<br><br>Prior to the date on which the PPA and BCA Approval Order is entered, the PSA may be terminated by the Debtors if holders of two-thirds (2/3) in amount of each of the Second Lien Notes Claims and the Unsecured Senior Notes Claims (as defined below) have not joined the PSA by such date (the "<u>PSA Termination Condition</u>"), which PSA Termination Condition may be waived in the Debtors' sole discretion.  No Break Up Fees, Expense Reimbursement or other amounts under the Private Placement Agreement of Backstop Commitment Agreement shall be due and payable if the PSA Termination Condition occurs. |
| Milestones | The Restructuring shall be implemented in accordance with the following milestones (the "<u>Milestones</u>"):<br><br>• By no later than December 22, 2016, the Debtors shall file (i) the Plan; (ii) a motion seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement; (iii) the disclosure statement  for the Plan (the "<u>Disclosure Statement</u>"); and (iv) a motion seeking approval of the Disclosure Statement.<br><br>• By no later than January 11, 2017, the Debtors shall file a motion to approve a commitment letter or an engagement letter with one or more reputable financial institutions acceptable to the Debtors (the "<u>Lead Arrangers</u>"), pursuant to which the Lead Arrangers shall have provided commitments for the Exit Facility (as defined below) in a principal amount of not less than $1.5 billion or agreed to use commercially reasonable efforts to arrange for commitments for the Exit Facility in a principal amount of not less than $1.5 billion.<br><br>• By no later than January 31, 2017, the PPA and BCA Approval Order (as defined in <u>Exhibit 5</u>) (approving the fees under the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) shall have been entered by the Bankruptcy Court.<br><br>• By no later than January 31, 2017, an order approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by the Bankruptcy Court (the "<u>Disclosure Statement Order</u>").<br><br>• By no later than five (5) days after the date scheduled for |

|  | | the Confirmation Hearing by the Bankruptcy Court in the Disclosure Statement Order, the Confirmation Hearing shall have commenced.<br><br>• By no later than April 15, 2017, the Effective Date shall have occurred.<br><br>The amendment or waiver of any Milestone shall require the consent of the Requisite Creditor Parties. |

## II.  Debtor Groups and Proposed Classification Scheme under the Plan

The Debtors will be divided into five "Debtor Groups" depending on their principal liabilities as follows:

| Letter | Debtor Group | Description |
|---|---|---|
| A | PEC | Debtor Peabody Energy Corporation |
| B | Encumbered Guarantor Debtors | Each Debtor as set forth on Exhibit 6 hereto that is a guarantor under the First Lien Credit Agreement and for the Second Lien Notes |
| C | Gold Fields Debtors | Each Debtor as set forth on Exhibit 6 hereto |
| D | Peabody Holdings (Gibraltar) Limited | Debtor Peabody Holdings (Gibraltar) Limited ("Gib1") |
| E | Unencumbered Debtors | Each Debtor as set forth on Exhibit 6 hereto which is not subject to the liens arising under the First Lien Credit Agreement or with respect to the Second Lien Notes, and is not a guarantor of (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and/or (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and, together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes").[6] |

---

[6]   Any and all Claims arising under, evidenced by or in connection with the Unsecured Senior Notes are referred to herein collectively as the "Unsecured Senior Notes Claims."

Under the Plan, Claims under the Debtors' postpetition accounts receivable securitization facility (the "Securitization Facility Claims"),[7] Administrative Expense Claims and Priority Tax Claims (each as defined below) will not be classified.  The remaining Claims against each Debtor Group will be divided into the following eleven (11) classes:

| Class Number[8] | Designation |
|---|---|
| 1 | First Lien Lender Claims |
| 2 | Second Lien Notes Claims |
| 3 | Other Secured Claims |
| 4 | Other Priority Claims |
| 5 | General Unsecured Claims |
| 6 | Convenience Claims |
| 7 | MEPP Claim[9] |
| 8 | Unsecured Subordinated Debenture Claims |
| 9 | Intercompany Claims |
| 10 | Section 510(b) Claims against PEC |
| 11 | PEC Interests |
| 12 | Subsidiary Debtor Equity Interests |

A more detailed table reflecting the proposed Debtor Groups and the proposed classes of Claims against each Debtor Group is attached hereto as Exhibit 7.  The proposed treatment of unclassified and classified Claims is set forth below.

---

[7]    "Securitization Facility Claims" means any and all Claims constituting Facility Obligations, as such term is defined in the order of the Bankruptcy Court entered on May 18, 2016 [Docket No. 529] (the "ARS Order"), which order approved the Securitization Facility (as such term is defined in the ARS Order).

[8]    References to "Class" below, shall refer to the classification set forth in this chart.

[9]    "MEPP Claim" means any Claim arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including (a) proof of claim number 4722 and (b) any other Claim related to any withdrawal liability under U.S.C. § 1392(c).

NAI-1502345820v2

### III.    Claims Treatment

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| **Unclassified Claims** | | |
| Contingent DIP Facility Surviving Claims[10] | $0.00 | All Contingent DIP Facility Surviving Claims (if any) shall be preserved.  If Allowed, any Contingent DIP Facility Surviving Claims shall be paid in full in cash as soon as reasonably practicable after they become Allowed; provided, however, that the foregoing treatment shall not in any way limit or impair any arguments or defenses the Debtors may have with respect to any Contingent DIP Facility Surviving Claims that may be asserted.  Notwithstanding the foregoing, the treatment of certain letters of credit issued under the terms of the DIP Credit Agreement and any related collateral shall be treated in accordance with the terms of that certain Payoff Letter with respect to the DIP Facility, dated December 15, 2016. |
| Securitization Facility Claims | **$[140 million]** to **$[160 million]** | The Securitization Facility (as defined in the ARS Order), which is scheduled to expire as of the Effective Date, shall, at the election of the Debtors, be extended, replaced with a new securitization facility or replaced with one or more ABL Facilities (as defined in Exhibit 1). |
| Administrative Expense Claims[11] | **$[15 million]** to **$[25 million]** | The Debtors (or, if applicable, the Reorganized Debtors[12]) shall pay to each holder of an Allowed Administrative Expense Claim, on account of and in |

---

[10]  "Contingent DIP Facility Surviving Claim" means any Claim of the DIP Facility Agent, DIP Facility Lenders or Citigroup Global Markets Inc. (in its capacity as sole lead arranger and book runner under the DIP Facility Credit Agreement) that are related to obligations of the Debtors that (a) arise under or are evidenced by (i) the DIP Facility Credit Agreement (ii) the Final DIP Order or (iii) any other agreements related thereto and (b) pursuant to the DIP Facility Repayment Order, survived termination of the DIP Facility Credit Agreement and continue in full force and effect.

[11]  "Administrative Expense Claim" means a Claim arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, excluding DIP Facility Claims and Securitization Facility Claims.

[12]  "Reorganized Debtor" means, on and after the Effective Date, subject to the Restructuring, each of the Debtors as to which the Plan is confirmed and "Reorganized PEC" means Peabody Energy Corporation, on and after the

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option in the ordinary course of business or (a) the latest to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter), (ii) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) on such other date as the Bankruptcy Court may order.[13] |
| Priority Tax Claims[14] | $[10 million] to $[30 million] | Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Priority Tax Claim becomes an |

Effective Date.

[13]   For purposes of this Term Sheet, "Allowed" when used with respect to any Claim means (a) any Claim that (i) is timely filed by the applicable bar date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or a final order; (b) any Claim (i) that is listed in the Debtors' schedules of assets and liabilities as not contingent, not unliquidated, and not disputed and (ii) for which no proof of Claim has been timely filed; or (c) any Claim allowed under the Plan or by a final order.  With respect to any Claim described in clauses (a) and (b) above, such Claim will be considered Allowed only if, and to the extent that, (i) no objection to the allowance of such Claim has been asserted on or before the bar date for filing objections to Claims under the Plan, (ii) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a final order, (iii) such Claim has not been disallowed by a final order, (iv) such Claim is allowed pursuant to a stipulation with the Debtors on or after the Effective Date or (v) such Claim is allowed pursuant to the Plan or any agreements related thereto and approved and authorized by the Bankruptcy Court.

[14]   "Priority Tax Claim" means any Claim of a governmental unit that is entitled to priority in payment pursuant to section 502(i) or section 507(a)(8) of the Bankruptcy Code.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Allowed Priority Tax Claim or (b) cash of a total value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim, payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date. |
| **Classified Claims** | | |
| First Lien Lender Claims | $[2.980 billion][15] | Each holder of an Allowed First Lien Lender Claim in Classes 1A, 1B, 1C and 1D will receive its aggregate pro rata share of:  (i) cash equal to the full amount of the Allowed First Lien Lender Claims, including interest at the default rate (such treatment, a "First Lien Full Cash Recovery") or (ii) solely to the extent that the Debtors have not received commitments for the Exit Facility prior to the Effective Date in the aggregate principal amount of at least $1.5 billion, and subject to the conditions set forth on Exhibit 1 hereto, each holder's pro rata share of (a) the replacement secured first lien term loan on the terms and conditions set forth on Exhibit 1 hereto in an aggregate principal amount of up to $1.5 billion, such principal amount to be calculated as set forth on Exhibit 1 (the "Replacement Secured First Lien Term Loan"), plus (b) cash in an amount equal to the difference |

---

[15]   The total estimated amount of Allowed First Lien Lender Claims is currently $2.980 billion, comprised of approximately (a) $1,162,343,00 principal amount of term loans net of unamortized original issue discount, (b) $947,000,000 principal amount of revolver loans, (c) $612,753,000 of letters of credit reimbursement obligations (assuming $6,118,000 of future letter of credit draws and the rollover of the PBGC letter of credit undrawn into the ABL Facility (as defined in Exhibit 1) and (d) $257,300,000 in Swap Contract termination , plus accrued and unpaid interest at the default rate for Allowed First Lien Lender Claims except for claims under Swap Contracts (as defined in the First Lien Credit Agreement) at the contractual rate for claims under the Swap Contracts, plus accrued and unpaid adequate protection payments, plus professional fees and expenses payable under the First Lien Credit Agreement.  The foregoing estimate assumes: (i) an April 3, 2017 Effective Date and (ii) the PBGC letter of credit rolls onto an ABL Facility (as defined in Exhibit 1).  All parties have reserved their rights as to the applicable interest rate for Allowed First Lien Lender Claims other than claims under Swap Contracts.  To the extent the Effective Date occurs after April 3, 2017, any increase in the size of the First Lien Lender Claims shall be satisfied with cash. The amount of the First Lien Lender Claims will also fluctuate based on letter of credit draws or returns through the Effective Date.

-10-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | between (i) the Allowed First Lien Lender Claims, including interest at the default rate, and (ii) the aggregate principal amount of the Replacement Secured First Lien Term Loan.<br><br>The First Lien Lender Claims shall be impaired and holders of such Claims shall be entitled to vote on the Plan. |
| Second Lien Notes Claims | $1.158 billion[16] | On or as soon as practicable after the Effective Date,[17] each holder of an Allowed Second Lien Notes Claim in Classes 2A, 2B, 2C and 2D shall receive:<br><br>(i) at the option of the Debtors in their sole discretion, provided, in the case of (a) or (b), the First Lien Full Cash Recovery occurs, its aggregate pro rata share of $450 million (calculated as the amount of any such cash and the principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental New Second Lien Notes Claims) in any combination of (a) cash, (b) principal amount of first lien debt on terms consistent with the Exit Facility (the "Additional First Lien Debt") and/or (c) principal amount of new second lien notes on the terms and conditions set forth on Exhibit 2 hereto ("New Second Lien Notes"); provided that in no event shall the aggregate principal amount of New Second Lien Notes (plus, if applicable, the principal amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250 million; provided, further that in no event shall the combined consideration issued under this clause (i) (calculated as the amount of any such cash and the |

---

[16]    The Second Lien Notes Claims shall be allowed in the amount of $1.0 billion, plus accrued and unpaid pre-petition interest and post-petition interest at the non-default rate, accruing through and until the Effective Date. The total estimated amount of Second Lien Notes Claims is $1.158 billion, assuming an April 3, 2017 Effective Date.  The Second Lien Notes Claims shall continue to accrue interest at the non-default rate if the Effective Date extends beyond April 3, 2017.

[17]    As part of the global settlement set forth herein and to be embodied in the Plan, upon the Effective Date (subject to its occurrence), the value of any and all collateral securing the Second Lien Notes Claims (including, but not limited to, any and all collateral granted to holders of Second Lien Notes as adequate protection or otherwise pursuant to the Final DIP Order) shall be deemed to exceed the total estimated amount of Second Lien Notes Claims (including accrued and unpaid pre-petition and post-petition interest at the non-default rate), and the Second Lien Notes Claims shall be treated in accordance with the terms set forth in this Term Sheet.

-11-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental Second Lien Notes Claims) exceed $450 million in the aggregate;[18]<br><br>(ii) its pro rata share of the Pro Rata Split as of the Effective Date of Reorganized PEC Common Stock (as defined below) (which shall be subject to the dilution[19] from the LTIP Shares, the Preferred Equity, and the Penny Warrants (each as defined below), and shall be issued after giving effect to the issuance of the Rights Offering Shares (as defined below),  the issuance of any shares of Reorganized PEC Common Stock issued on account of Incremental Second Lien Notes Claims (the "Incremental Second Lien Shares"), the issuance of any shares of Reorganized PEC Common Stock issued on account of the Commitment Premiums (as defined below), the issuance of any Ticking Premiums (as defined below) (collectively, the "Premium Shares") and the issuance of any Disputed Claims Reserve Shares (as defined below)), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity (as defined below) and the exercise of the Penny Warrants (as defined below);[20] and |

---

[18]  If the total amount of Second Lien Notes Claims increases because the Effective Date extends beyond April 3, 2017 (the total amount of Second Lien Notes Claims in excess of $1.158 billion, the "Incremental Second Lien Notes Claims"), then additional consideration shall be provided to the holders of Second Lien Notes Claims (A) by increasing the consideration pursuant to clause (i) of this paragraph on a pro rata basis in an amount equal to 50% of the amount of the Incremental Second Lien Notes Claims (and any Additional First Lien Debt so distributed pursuant to this footnote shall be referred to herein as the "Incremental Additional First Lien Debt", and any additional New Second Lien Notes so distributed pursuant to this footnote shall be referred to herein as the "Incremental New Second Lien Notes"), subject to a $20 million cap for such increase above $450 million pursuant to this clause (A), and (B) in the form of additional Reorganized PEC Common Stock with a total value at Plan Equity Value equal to the remaining amount of Incremental Second Lien Notes Claims not settled pursuant to clause (A) above; provided, however, that if no Additional First Lien Debt or New Second Lien Notes are being issued pursuant to clause (i)(b) or (i)(c) (prior to giving effect to the additional consideration described in this footnote), then the additional consideration pursuant to clause (A) above shall be paid in cash; and provided further that such incremental amounts may only be paid in cash or Incremental Additional First Lien Debt if the First Lien Full Cash Recovery occurs.

[19]  For the avoidance of doubt, see Exhibit 9 hereto for an illustrative allocation of Reorganized PEC Common Stock (Fully-Diluted).

[20]  "Pro Rata Split" shall mean the following percentages:  (x) in respect of Claims in Class 2, the quotient of

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iii) its pro rata share of the Pro Rata Split as of the Record Date  (as defined below) of the Section 1145 Equity Rights (as defined below).

For the avoidance of doubt, any of the consideration received by holders of Second Lien Notes Claims shall be independently transferable, shall not be required to be transferred as part of a "strip" and shall not be subject to any minimum holding period or similar lock-up provisions; provided, that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Other Secured Claims[21] | $[0-25 million] | On or as soon as practicable after the Effective Date, Other Secured Claims, if any, shall receive the following treatment at the option of the Debtors or the Reorganized Debtors (as applicable): (i) Reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code;[22] (ii) payment in full (in cash) of any such Allowed Other Secured Claim; (iii) satisfaction of any such Allowed Other Secured Claim by delivering the collateral securing any such Allowed Other Secured Claims and paying any interest required to be paid under section 506(b) of |

---

(A) $708 million divided by (B) the Allowed Claims in Classes 5B plus $708 million; and (y) in respect of Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million.  The Pro Rata Split for Reorganized PEC Common Stock shall be determined based on Allowed Claims as of the Effective Date, with a reserve of Reorganized PEC Common Stock created for disputed Claims as of the Effective Date.  The Pro Rata Split for all other purposes shall be determined based on Allowed Claims as of the Record Date as determined in accordance with the Rights Offering Procedures.  As set forth below, in lieu of Section 1145 Equity Rights, holders of disputed Claims as of the Record Date whose Claims later become Allowed shall receive Reorganized PEC Common Stock at Plan Equity Value with a value equal to their pro rata share of the Equity Rights Value (as defined below).

21   "Secured Claim" shall mean a Claim that is secured by a lien on property in which a Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code. "Other Secured Claim" shall mean any Secured Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, First Lien Lender Claim or Second Lien Notes Claim.

22   "Reinstatement" shall mean rendering a Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | the Bankruptcy Code; or (iv) providing such holders with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. |
| Other Priority Claims[23] | $[0-25 million] | On or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim will receive cash equal to the amount of such Allowed Claim, unless the holder of such Other Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different treatment. |
| General Unsecured Claims[24] | (i) PEC $[3.944 billion] to $[4.219 billion] (ii) Encumbered Guarantor Debtors $[3.960 billion] to $[4.160 billion] (iii) Gold Fields Debtors $[3.929 billion] to $[5.289 billion] (iv) Gib1 | On or as soon as practicable after the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor: (i) each holder of an Allowed General Unsecured Claim against PEC will receive its pro rata share of $[3 million] plus any Additional PEC Cash;[25] (ii) each holder of an Allowed General Unsecured Claim against one of the Encumbered Guarantor Debtors will receive the holder's pro rata share of: (a) the Pro Rata Split as of the Effective Date of the Reorganized PEC Common Stock (which shall be subject to the dilution from the LTIP Shares, the Preferred Equity, and the Penny Warrants and shall be issued after giving effect to the issuance of the Rights |

---

[23]  "Other Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim or Priority Tax Claim.

[24]  "General Unsecured Claim" shall mean any Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, Priority Tax Claim, First Lien Lender Claim, Second Lien Notes Claim, Other Secured Claim, Other Priority Claim, Convenience Class Claim, Unsecured Subordinated Debenture Claim (as defined below), Intercompany Claim (as defined below) or Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include the Unsecured Senior Notes Claims.  Additional Claims filed by governmental units on or around October 11, 2016, include a $1.8 billion Claim asserted by the U.S. Environmental Protection Agency against PEC, as well as other governmental units' Claims in excess of $1.0 billion against various other Debtors.  The Debtors are in the process of reviewing and analyzing these recently filed Claims and therefore they are not included in the Claims estimates herein.

[25]  This pool of cash is available for holders of General Unsecured Claims pursuant to the settlement of the Encumbered PEC Cash Dispute (as defined below).  "Additional PEC Cash" means, to the extent payments to Allowed Convenience Claims in Class 6A are less than $2 million, the difference between total payments to Allowed Convenience Claims in Class 6A and $2 million.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | None. (v) Unencumbered Debtors $[10 million] to $[30 million] | Offering Shares, the issuance of any Incremental Second Lien Shares, the issuance of any Premium Shares and the issuance of any Disputed Claims Reserve Shares), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity and the exercise of the Penny Warrants; and (b)(i) the Pro Rata Split as of the Record Date of the Section 1145 Equity Rights; provided, however, that any holder of a General Unsecured Claim against one of the Encumbered Guarantor Debtors that is not Allowed as of the Record Date shall not participate in the Rights Offering, and instead, if and when such holder's Claim becomes Allowed, shall receive an amount of Disputed Claims Reserve Shares with a value equal such holders pro rata share of the Equity Rights Value;[26] (iii) each holder of an Allowed General Unsecured Claim against one of the Gold Fields Debtors will receive the holder's pro rata share of interests in a liquidating trust to be formed to hold and liquidate all of the assets of the Gold Fields Debtors; |

[26] On the Effective Date, the Debtors shall create a reserve of Reorganized PEC Common Stock (the "Disputed Claims Reserve Shares") for distribution to holders of such disputed Claims as of the Record Date that were not permitted to participate in the Section 1145 Rights Offering. The Disputed Claims Reserve Shares shall have a value, as determined by reference to Plan Equity Value, equal to the estimated value of the Section 1145 Equity Rights holders of disputed Claims as of the Record Date would have been entitled to receive if such disputed Claims later became Allowed Claims (as reasonably estimated by the Debtors) calculated as follows: (a) for each share of Rights Offering Shares that would have been available for purchase by a holder of a Class 5B Claim that was not Allowed as of the Record Date through the exercise of Section 1145 Equity Rights if such holder's Claims had been Allowed as of the Record Date, the difference between (i) the value of such share at Plan Equity Value and (ii) $[13.75]; and (b) for each Penny Warrant that such holder would have received through the exercise of Rights Offering Equity Rights if such holder's Claim had been Allowed as of the Record Date, the difference between (i) the value of a share of Reorganized PEC Common Stock at Plan Equity Value that underlies such Penny Warrant and (ii) $0.01 (the "Equity Rights Value"). Following completion of the reconciliation, settlement, and distribution procedures in connection with such disputed Claims, any Disputed Claims Reserve Shares which are not distributed from such reserve to holders of such disputed Claims pursuant to such procedures shall be cancelled. Prior to the Effective Date, the Debtors will file a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee, provided, however, that the aggregate face amount of disputed Claims permitted to receive Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee.

NAI-1502345820v2

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iv) each holder of an Allowed General Unsecured Claim against Gib1 will receive no recovery; and<br><br>(v) each holder of an Allowed General Unsecured Claim against one of the Unencumbered Debtors will receive cash in the amount of the holders' Allowed Claim, less any amounts attributable to late fees, postpetition interest or penalties.<br><br>For the avoidance of doubt, any of the consideration received by holders of Allowed Unsecured Senior Notes Claims shall be independently transferable and shall not be required to be transferred as part of a "strip;" provided that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Convenience Claims | PEC Convenience Claims - $[2.7 million to $4.0 million]<br><br>Encumbered Guarantor Debtors Convenience Claims - $[24 million to $36 million] | "Convenience Claims" means General Unsecured Claims (other than Unsecured Senior Notes Claims) against PEC or any Encumbered Guarantor Debtor that otherwise would be classified in Class 5A or Class 5B, but, with respect to each such Claim, the aggregate amount of such Claim is equal to or less than $[200,000]; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim.<br><br>On or as soon as practicable after the Effective Date, unless otherwise agreed by a Convenience Claim holder and the applicable Debtor or Reorganized Debtor:<br><br>(i) each holder of an Allowed Convenience Claim against PEC shall receive cash in an amount up to [72.5]% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against PEC shall not exceed $[2] million and (b) to the extent such payments would exceed $[2] million, holders of Allowed Convenience Claims shall receive their pro rata share of $[2] million and (c) to the extent such payments are less than $[2] million, the Additional PEC Cash shall become available for distribution to |

-16-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Class 5A creditors; and |
| | | (ii) each holder of an Allowed Convenience Claim against an Encumbered Guarantor Debtor shall receive an amount up to **[72.5]**% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against the Encumbered Guarantor Debtors shall not exceed $**[18]** million and (b) to the extent such payments would exceed $**[18]** million, holders of Allowed Convenience Claims shall receive their pro rata share of $**[18]** million. |
| MEPP Claim | $**[0.00]** to $**[643 million]** | [TBD] |
| Unsecured Subordinated Debenture Claims[27] | $**[743.9 million]** | In accordance with the provisions in the 2066 Subordinated Indenture and section 510(a) of the Bankruptcy Code, holders of Unsecured Subordinated Debenture Claims have no right to receive any distributions and, therefore, will receive no recovery under the terms of the Plan until holders of senior funded debt Claims are paid in full in accordance with the terms of the 2066 Subordinated Indenture. |
| Intercompany Claims[28] | - | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, all prepetition and postpetition Intercompany Claims shall be ignored for purposes of calculating distributions to holders of Claims pursuant to the Plan. At the Debtors' option, on the Effective Date, Intercompany Claims may be reinstated, settled, offset, cancelled, extinguished or eliminated, including by way of capital contribution. The intercompany loans (i) owed by Gib1 to Peabody |

---

[27] "Unsecured Subordinated Debenture Claims" means any and all Claims arising under or in connection with the 2066 Unsecured Subordinated Debentures. "2066 Unsecured Subordinated Debentures" means the 4.75% convertible junior subordinated debentures due 2066 issued in connection with the First Supplemental Indenture between Peabody Energy Corporation and U.S. Bank National Association, dated as of December 20, 2006 (the "2066 Subordinated Indenture").

[28] "Intercompany Claims" shall mean (a) any Claim of any Debtor against any other Debtor, (b) any Claim of any Debtor against any non-Debtor Affiliate and (c) any Claim of any non-Debtor Affiliate against any Debtor.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | IC Holdings, LLC, (ii) owed by Peabody IC Holdings, LLC to Peabody IC Funding Corporation and (iii) owed by non-Debtor Peabody Energy Australia Pty Ltd. to Peabody Investments Corp. will be treated as debt for purposes of calculating distributions to holders of Claims pursuant to the Plan.  The principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower, will be reinstated on the Effective Date. |
| Section 510(b) Claims[29] | - | Claims against PEC that are subordinated by operation of section 510(b) of the Bankruptcy Code, if any, shall be extinguished, cancelled and discharged as of the Effective Date, and holders thereof shall receive no distributions from the Debtors in respect of their Claims. |
| PEC Interests[30] | N/A | PEC Interests shall be extinguished, cancelled and discharged as of the Effective Date, and holders of existing PEC Interests shall receive no distribution in respect of their Interests. |
| Subsidiary Debtor Interests[31] | N/A | On the Effective Date, Subsidiary Debtor Interests will be reinstated, subject to any restructuring transactions. |

---

[29]  "Section 510(b) Claims" shall include all Claims subject to subordination pursuant to section 510(b) of the Bankruptcy Code, including, without limitation, for damages arising from the sale or purchase of any debt or equity security of any of the Debtors.

[30]  "PEC Interests" shall mean all Interests in PEC.  "Interests" shall mean the common stock, limited liability company interests, and any other equity, ownership, or profits interests in any Debtor and options, warrants, rights, or other securities or agreements to acquire common stock, limited liability company interests, or other equity, ownership, or profits or interests in any Debtor (arising under, or in connection with, any employment agreement), and includes any "Equity Security" (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

[31]  "Subsidiary Debtor Interests" shall mean as to a particular Debtor other than PEC, all Interests in such Debtor.

## IV.   Settlement and Compromise Incorporated into the Plan

| | |
|---|---|
| Settlement and Compromise | The Plan shall contain and effect a global and integrated compromise and settlement (the "Settlement") of all disputes between the Debtors and the Creditor Co-Proponents, including the Claims and causes of action set forth below pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure. |
| CNTA Dispute | The CNTA Dispute (as defined in the DIP Facility credit documents) shall be deemed resolved upon the Effective Date of the Plan based on the settlements and comprises set forth in this Term Sheet and, ultimately, the Plan. On the Effective Date, the declaratory judgment action with respect to the CNTA Dispute shall be dismissed with prejudice. |
| Material Claim Settlements | The Requisite First Lien Lender Co-Proponents and the Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim. |
| Committee Lien Challenge | In full settlement and satisfaction of certain causes of action raised by the creditors' commitee with respect to whether cash at PEC on the Petition Date was encumbered or unencumbered (the "Encumbered PEC Cash Dispute") and other challenge actions, including, without limitation, any and all claims raised in that certain Claims Disclosure Letter [ECF No. 1267] filed by the Committee and the supplement thereto delivered to the Debtors, Citibank and the Second Lien Notes Indenture Trustee on September 15, 2016, $**[3 million]** of cash at PEC shall be made available for distribution to holders of Allowed Claims in Class 5A, and $**[2 million]** of cash at PEC shall be made available for distribution to holders of Allowed Convenience Claims against PEC. |
| Preference Actions | The Debtors shall release all preference claims against any holder of a General Unsecured Claim or a Claim arising under section 503(b)(9) of the Bankruptcy Code. |
| Intercompany Claims | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, Intercompany Claims shall be ignored for purposes of calculating distributions to third party creditors except as otherwise set forth herein. |

NAI-1502345820v2

## V. **Other**

| Plan Value | The Plan enterprise value shall be $4.275 billion (the "Plan Enterprise Value").  The Plan equity value shall be $3.105 billion (the "Plan Equity Value").[32] |
|---|---|
| Distribution Mechanics | Citibank will act as the distribution agent for the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement; provided, however, that any cash distributions on account of Claims arising from Swap Contracts shall be made by the Reorganized Debtors directly to the applicable counter-party to a Swap Contract. |
| Direct Investment Pursuant to Private Placement | Pursuant to a private placement agreement (the "Private Placement Agreement"), the Noteholder Co-Proponents (the "Initial Parties") and, to the extent applicable, the Additional Private Placement Parties (as defined in Exhibit 5) shall have the right and obligation to purchase $750 million in the aggregate of Preferred Equity on the terms and conditions set forth on Exhibit 3 and Exhibit 5, which direct investment shall be a private placement exempt from registration pursuant to Section 4(a)(2) of the Securities Act (the "Private Placement") (as more fully detailed in Exhibit 5 hereto). |
| Section 1145 Rights Offering | In connection with a rights offering pursuant to the Plan (the "Section 1145 Rights Offering"), up to $750 million will be raised through the sale of units consisting of (a) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (b) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date ("Rights Offering Penny Warrants"), in each case, after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein.  Participation in the Section 1145 Rights Offering will be available to all holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B as of the Record Date, in each case, according to the Pro Rata Split as of the Record Date. |
| Backstop Commitment | Pursuant to a backstop agreement (the "Backstop Commitment Agreement"), the Initial Parties, together with any additional |

---

[32]    Calculation of Plan Equity Value assumes $1.95 billion of funded debt and approximately $20 million of capital leases.

NAI-1502345820v2

|  | holders of Allowed Second Lien Notes Claims and Claims in Class 5B that are qualified institutional buyers and other accredited investors (as such terms are defined under the Securities Act of 1933) who become party to the PSA and Backstop Commitment Agreement on or prior to the date the Backstop Commitment Agreement is approved by the Bankruptcy Court, shall backstop its portion of 100% of the Section 1145 Rights Offering on the terms described in Exhibit 5 hereto. |
|---|---|
| Record Date for the Private Placement, Backstop Commitment Agreement and Section 1145 Rights Offering | The record date for determining a creditor's eligibility to participate in the Private Placement, the Backstop Commitment Agreement and the Section 1145 Rights Offering shall be the date on which the Disclosure Statement Order is entered by the Bankruptcy Court (the "Record Date"). |
| Reclamation Bonding | The Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "Bonding Solution").  The Debtors shall provide updates once every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution. |
| Reorganized PEC Common Stock | The Plan will provide for the cancellation of all outstanding PEC common stock and the issuance of shares of new common stock, par value $**[0.001]** per share, in Reorganized PEC (the "Reorganized PEC Common Stock"), initially subject to dilution by the LTIP Shares, the conversion of the Preferred Equity, and the exercise of the Penny Warrants.  Each share of Reorganized PEC Common Stock shall entitle its holder to one vote on matters submitted to a vote of shareholders and shall vote as one class.

The Plan will also provide that, upon emergence, Reorganized PEC shall amend and restate its charter and bylaws, which shall be in form and substance reasonably acceptable to the Requisite Members of the Noteholder Steering Committee.

The Reorganized PEC Common Stock will be registered under the Securities Exchange Act of 1934 on the Effective Date.

Reorganized PEC shall use reasonable best efforts to cause the Reorganized PEC Common Stock and the Preferred Equity to be listed for trading on the New York Stock Exchange ("NYSE") as soon as practicable after the Effective Date.[33] |

---

[33]   This obligation will be included in the Registration Rights Agreement (as defined in Exhibit 5 hereto) or shareholders' agreement.

| | |
|---|---|
| Exit Facility | The Debtors shall attempt, on a best efforts basis, to obtain commitments for an exit facility (the "Exit Facility") of not less than $1.5 billion in principal amount, the terms of which are no less favorable, when taken as a whole, to the Debtors than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, as determined by the Debtors in their reasonable business judgment, and of sufficient size and on appropriate terms, including the ability to enter into up to $250 million of ABL Facilities (as defined in Exhibit 1), to avoid the need to issue all or part of the Replacement Secured First Lien Term Loan and/or the New Second Lien Notes.  The Debtors will provide updates as requested to the professional advisors of the First Lien Agent on the process for raising the Exit Facility (including proposals received from any such reputable financial institutions on a professional eyes only basis).  In the Debtors' sole discretion, provided that the First Lien Full Cash Recovery occurs, the size of the Exit Facility may be increased up to $1.95 billion in order to provide holders of Second Lien Notes Claims with up to $450 million in cash and/or Additional First Lien Debt as set forth in greater detail above (or incrementally higher, if necessary in accordance with footnote [19], if the Effective Date does not occur on or before April 3, 2017). |
| Corporate Governance Matters | The initial board of directors of the Reorganized PEC (the "New Board") shall include nine (9) members and shall include (a) the chief executive officer of Reorganized PEC and (b) eight independent directors (the "Independent Directors").  Each of the individuals designated as nominees to be Independent Directors on the New Board shall be independent under the listing rules of the NYSE, as applicable, and the independence requirements for members of audit and compensation committees under the rules of the SEC.  The Independent Directors shall be selected as follows: (i) the Debtors shall designate one (1) Independent Director;  (ii) Contrarian, PointState and Panning may, together, select one (1) Independent Director; (iii) Elliott and Discovery may each select one (1) Independent Director; and (iv) a selection committee comprising the chief executive officer of PEC, Elliott, Discovery, and a nominee acting on behalf of Contrarian, PointState, and Panning (collectively, the "Selection Committee") shall agree on the retention of a search firm to identify and recommend the remaining four (4) Independent Directors, which recommendation shall be decided upon by the Selection Committee; provided that any existing members of the board of directors of PEC who wishes to stand for the New Board shall be interviewed and evaluated by such search firm.  Reorganized PEC shall acknowledge that (A) none of Contrarian, PointState nor Panning shall be an "affiliate" |

NAI-1502345820v2

| | |
|---|---|
| | (as defined in Rule 144(a)(1) of the Securities Act) of Reorganized PEC solely on the basis of the right described in clause (ii) of the immediately preceding sentence; and (B) neither Elliot nor Discovery shall be such an "affiliate" solely on the basis of the right described in clause (i) of the immediately preceding sentence. |
| | The boards of directors for the direct and indirect subsidiaries of Reorganized PEC shall be identified in the supplement to the Plan. |
| | Reorganized PEC will continue to be a reporting company with the SEC following the Effective Date. |
| Long Term Incentive Plan | The terms and conditions of the long-term incentive plan (the "<u>LTIP</u>") for management and employees shall be as forth on <u>Exhibit 4</u> hereto, including the amount of Preferred Equity and Reorganized PEC Common Stock to be reserved for the LTIP (the "<u>LTIP Shares</u>").  The number of LTIP Shares reserved for the LTIP will be set forth in the Plan, and the apportionment of LTIP Shares that will be granted to LTIP participants on the Effective Date shall be determined by the compensation committee of the board of directors of PEC. |
| | For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| Executory Contracts, Unexpired Leases and Employee Benefit Obligations | All executory contracts and unexpired leases not expressly listed for assumption on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed rejected as of the Effective Date. |
| | The Debtors shall assume all of their existing pension plans (other than the SERP, the Gold Fields PEP and a portion of the SERA), collective bargaining agreements, severance plans, SERA (as modified) and other employee and retiree benefits plans (as the same may be modified or amended in accordance with their terms and applicable law). |
| | Any contract or lease assumed on the Effective Date shall be deemed amended and modified to provide that the confirmation and consummation of the Plan shall not trigger any "change of |

| | control" provisions in such contract or lease. |
|---|---|
| Ongoing Environmental and Reclamation Obligations | The Plan shall provide that the Reorganized Debtors (other than the Reorganized Gold Fields Debtors or any claims relating to the Gold Fields Debtors' assets or liabilities), as owners, lessees, permittees or operators of real property or a mining operation after the Effective Date, shall continue to operate in accordance with all applicable laws, rules and regulations, including all applicable environmental laws. |
| Restructuring Transactions | The Plan shall provide for the implementation of a series of restructuring transactions that are necessary or appropriate, in the Debtors' judgment, to streamline and simplify their overall corporate structure. |
| Means of Implementation | The Plan shall contain standard means of implementation, including provisions for the continued corporate existence of the Reorganized Debtors (subject to any restructuring transactions), the cancellation of certain prepetition debt and related agreements, the cancellation of prepetition equity interests in PEC, the issuance of the Reorganized PEC Common Stock, the effectuation of the Section 1145 Rights Offering and the issuance of Section 1145 Equity Rights, Reorganized PEC Common Stock and Penny Warrants in connection therewith (including pursuant to the Backstop Commitments), the effectuation of the Private Placement and the issuance of Preferred Equity in connection therewith, the revesting of the Debtors' assets in the Reorganized Debtors and the creation of appropriate reserves for the distributions contemplated under the Plan. |

NAI-1502345820v2

| Releases | The Plan shall provide customary release provisions for the benefit of the Debtors and their Representatives to the maximum extent permitted by applicable law.[34] |
|---|---|
| | The Plan shall include (a) a release by the Debtors and their Representatives of the Released Parties (as defined below) with respect to matters related to the Chapter 11 Cases and (b) a third party release with respect to matters related to the Chapter 11 Cases which shall be binding on creditors that vote in favor of the Plan or are deemed to accept the Plan for the benefit of:  (i) the Committee and its members, in their capacity as such; (ii) Citibank, in its capacity as agent under the DIP Facility and First Lien Agent; (iii) the lenders under the DIP Facility and the First Lien Lenders; and (iv) the Creditor Co-Proponents, in their capacity as such and in their capacity as First Lien Lenders, holders of Second Lien Notes and holders of Unsecured Senior Notes, and each of their respective Representatives, in their capacity as such (collectively, the "Released Parties"). |
| Exculpation | The Plan shall provide customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors and their Representatives, solely in their capacity as such, and the Released Parties, to the fullest extent permitted by applicable law, from any and all Claims and causes of action arising before the Effective Date, including, without limitation, any and all Claims and causes of action in connection with, relating to or arising out of the Chapter 11 Cases, the restructuring of the Debtors, the formulation, negotiation, preparation, dissemination, implementation, administration, solicitation, confirmation or consummation of this term sheet, the PSA, the Plan, the Disclosure Statement, the settlements set forth herein and to be embodied in the Plan or any contract, instrument, release or other agreement or document created or entered into in connection therewith or in relation thereto or any act taken or omitted to be taken in connection with or relating to any of the foregoing; provided, that the foregoing shall not affect the liability of any party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a final order to have constituted gross negligence or willful misconduct. |

[34] "Representatives" shall mean any successor, predecessor, assign, subsidiary, affiliate, officer, director, member of a limited liability company, employee, partner, limited partner, general partner, management company, investment manager, shareholder of a Cayman Islands exempted company, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other professional, in each case in such capacity, serving on or after the Petition Date.

| Fees | Subject to (a) entry of the PPA and BCA Approval Order and (b) receipt of documentation reasonably acceptable to the Debtors, the Debtors shall pay or reimburse the Noteholder Co-Proponents, the Second Lien Notes Indenture Trustee and the indenture trustees for the Unsecured Senior Notes for their respective reasonable, documented out-of-pocket fees and expenses incurred after the Petition Date, including payment of the reasonable fees and expenses of legal and financial advisors, in connection with the Debtors' Chapter 11 Cases and the Restructuring earned and accrued up until the occurrence of any Termination Event (as defined in <u>Exhibit 5</u>), in each case whether or not the Restructuring is ultimately consummated; provided no such fees shall be payable in the event the PSA Termination Event occurs; and provided further that upon the occurrence of any Termination Event (other than the PSA Termination Event), any and all fees and expenses accrued and unpaid as of such date (whether or not such fees and expenses have been billed or invoiced) shall be paid by the Debtors. |
|---|---|
| | The payment of the fees set forth above shall (i) be approved upon entry of an order approving the Private Placement Agreement, and/or the Backstop Commitment Agreement; (ii) be payable within two weeks of receipt of an invoice; and (iii) prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis pursuant to <u>Exhibit 5</u> hereto. |
| | It shall be a condition precedent to the Effective Date that all fees provided for in the Final DIP Order, including the reasonable and documented fees and expenses of the legal and financial advisors of Citibank or the First Lien Lenders (subject to and in accordance with the terms of the First Lien Credit Agreement) incurred in connection with the Chapter 11 Cases prior to the Effective Date and for which the Debtors have received invoices, shall have been paid in full by the Debtors.  For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by (a) the absence of the entry of the BCA and PPA Approval Order,  or (b) the occurrence of any Termination Event, including but not limited to the PSA Termination Event. |
| | Each of the Noteholder Co-Proponents agrees to submit bills and invoices with respect to incurred fees and expenses as promptly as possible on a monthly basis.  At least ten (10) days prior to the Effective Date, each of the foregoing shall provide reasonable estimates of the fees and expenses to be paid by the Debtors on the Effective Date, which amount shall be placed into an escrow for payment of such fees and expenses.  Any residual balance in the escrow after payment of the foregoing fees and expenses shall be |

-26-

| | |
|---|---|
| | returned to the Reorganized Debtors. |
| Creditor Co-Proponent Approval Rights | Each substantive document in connection with the Restructuring, including without limitation, the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee:<br><br>• The Disclosure Statement and the motion and order to approve same;<br>• The Plan and any exhibits, supplements, appendices, etc. thereto;<br>• The credit agreement and/or indenture for the Exit Facility (if applicable);<br>• The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on Exhibit 1 hereto;<br>• The corporate constituent documents of the Reorganized Debtors;<br>• The certificate of designation of Series A convertible preferred stock of PEC;<br>• The documents relating to the Section 1145 Rights Offering and the Private Placement;<br>• The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee;<br>• The Confirmation Order; and<br>• The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement.<br><br>Notwithstanding the foregoing, the following material documents in connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent:<br><br>• The Term Sheet;<br>• The PSA;<br>• The Private Placement Agreement;<br>• The Backstop Commitment Agreement; and<br>• The orders relating to the PSA, the Private Placement Agreement, and the Backstop Commitment Agreement.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes |

(including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance acceptable to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.

The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).

As to the Requisite First Lien Lender Co-Proponents:

- If applicable, the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 hereto and otherwise in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents in their sole discretion;
- the PSA, this Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents;
- the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents; and
- each other substantive document in connection with the Restructuring (but excluding documents related to the

| | |
|---|---|
| | Bonding Solution), shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan. |
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan (the "Conditions to Confirmation") shall be customary for a reorganization of this size and type, including, without limitation, the following:<br><br>• The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties as set forth herein, approving the adequacy of the Disclosure Statement.<br><br>• All exhibits and other documents necessary for the implementation of the Plan and any related transactions shall be in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties (except for those documents that should be in form and substance satisfactory to each Noteholder Co-Proponent, as set forth above); provided, however, that the Requisite Creditor Parties shall not have any approval rights regarding exhibits and documents relating to the Bonding Solution.<br><br>• The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties.<br><br>• The PSA shall not have been terminated.<br><br>• All of the schedules documents, supplements and exhibits to the Plan shall be substantially in form and substance as required by the PSA.<br><br>• The Backstop Commitment Agreement shall not have been terminated.<br><br>Each of the foregoing may be waived by the Debtors, subject to the approval rights of the Requisite Creditor Parties set forth above and in the PSA. |
| Conditions to the Effective Date | The conditions precedent to the occurrence of the Effective Date of the Plan shall be customary for a reorganization of this size and type, and shall include, without limitation, the Conditions to |

Confirmation set forth in this Term Sheet and the following:

- All documents and agreements necessary to consummate the Plan shall have been effected or executed;

- If applicable, the conditions to closing of the Exit Facility shall have occurred or will occur on the Effective Date and the Debtors or Reorganized Debtors, as applicable, shall have received (or will receive in connection with the consummation of the Plan) the amounts required to be funded thereunder.

- If applicable, the conditions to issuing the Replacement Secured First Lien Term Loan as set forth in Exhibit 1 shall have occurred or will occur on the Effective Date;

- The conditions to consummating the Private Placement and the Section 1145 Rights Offering shall have been satisfied or waived by the parties thereto, and the Reorganized Debtors shall have received (or will receive simultaneously with the consummation of the Plan) the amounts required to be funded thereunder in the aggregate gross amount of not less than $1.5 billion;

- The MEPP Claim shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee and the Requisite First Lien Lender Co-Proponents if for an amount above the amounts held in reserve by the Debtors for such claim;

- The Debtors shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and that are required by law, regulation, or order and any and all steps necessary to consummate the Restructuring in any applicable jurisdictions other than the United States have been effectuated;

- The Debtors shall have obtained a Bonding Solution to cover all of their self-bonded reclamation obligations in accordance with applicable laws and regulations; and

- Any waiting period applicable to the Restructuring under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or similar law or statute shall have been terminated or shall have expired;

- All of the schedules documents, supplements and exhibits to the Plan shall be in substantially in form and substance as required by the PSA.

|  | • The Backstop Commitment Agreement shall not have been terminated.<br><br>• The PSA shall not have been terminated.<br><br>• The Plan and all exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification are made in accordance with the applicable provisions of the Plan.<br><br>Each of the foregoing may be waived by the Debtors, subject to the approval of the Requisite Creditor Parties (as applicable); provided, however, that for the avoidance of doubt, the Effective Date condition relating to the Bonding Solution shall be waivable solely by the Debtors. |
|---|---|

NAI-1502345820v2

**Exhibit 1 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – Replacement Secured First Lien Term Loan**

This summary of principal terms (this "Replacement 1L Term Loan Term Sheet") sets forth certain of the principal terms for the Replacement Secured First Lien Term Loan referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet"). Capitalized terms used and not otherwise defined in this Replacement 1L Term Loan Term Sheet have the meanings assigned thereto in the Plan Term Sheet. This Replacement 1L Term Loan Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein. Matters not covered by the provisions hereof and of the Plan Term Sheet (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) are subject to mutual approval and agreement of the Borrower and the Effective Date Lenders referred to herein. All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Required First Lien Co-Proponents.

| | |
|---|---|
| **Borrower:** | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company" or the "Borrower"). |
| **Guarantors:** | Each of the Borrower's direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), whether now owned or hereafter formed or acquired, subject to certain exceptions to be agreed (together with the Borrower, the "Loan Parties"). Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, or future permitted securitization and captive insurance entities, (ii) Peabody Holdings (Gibraltar) Limited, any future domestic subsidiary of any foreign subsidiary, and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "FSHCO") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Loan Parties; provided that any such FSHCO may only be excluded pursuant to this clause (ii) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the First Lien Debt), and provided further that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor, and (iii) unrestricted subsidiaries. Notwithstanding the foregoing, if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FHSCO to be guarantors without causing any adverse tax consequences to the Borrower, the Borrower shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Borrower. |

Exhibit 1-1

| | |
|---|---|
| | As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes.

Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed. The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default, and (b) other conditions and limitations to be agreed. Notwithstanding the foregoing, none of Peabody Investments Corporation, Peabody IC Funding Corp., Peabody Holdings (Gibraltar) Limited, Peabody Investments (Gibraltar) Limited or Peabody Global Funding, LLC shall be designated as unrestricted subsidiaries. |
| **Administrative Agent:** | An affiliate of Citibank, N.A. shall act as administrative agent in respect of the Replacement Secured First Lien Term Loan (the "Administrative Agent"). |
| **Effective Date Lenders:** | Each holder of a Secured First Lien Lender Claim. |
| **Principal Amount:** | Up to $1.5 billion, provided that the maximum principal amount of the Replacement Secured First Lien Term Loan shall be reduced, on a dollar-for-dollar basis, by (1) the principal amount of the Exit Facility on the Effective Date (as defined below), net of any upfront fees associated therewith that are netted from the amount funded on the Effective Date, (2) cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP, "Unrestricted Cash") as of the Effective Date after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA (the "PSA Transactions") in excess of $800 million and (3) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) (any such transaction, an "Equity Offering") in excess of $1.5 billion. |
| **Closing Date:** | The Effective Date. |
| **Maturity Date:** | Five (5) years after the Effective Date. |
| **Interest Rate:** | LIBOR Rate (subject to a LIBOR floor of 1.0%) + 900 bps (the "Margin"), payable quarterly in arrears in cash (and with typical LIBOR interest period mechanism). Notwithstanding the foregoing, the Margin shall be increased (by up to but no more than 175bps) on a bp-for-bp basis, based on the greater of the increase in yield for (i) the Bloomberg BVAL U.S. Corporate B+/B/B- BVAL 5 Year Yield Curve  and (ii) the Bank of America Merrill Lynch U.S. Metals & Mining High Yield Index, in each case, measured for the ten trading day period ending on December 22, 2016 as compared to the ten trading day period ending on the day prior to the Effective Date; provided further, that any decrease in such yield will not result in a decrease in the Margin or LIBOR floor. |

Exhibit 1-2

| | |
|---|---|
| **Additional PIK Interest:** | Beginning on the 6-month anniversary of the Effective Date, additional PIK interest of 100bps per annum shall accrue on a quarterly basis (including on capitalized PIK interest), if either (a) the Replacement Secured First Lien Term Loan has not received a facility credit rating from S&P, Moody's or Fitch or (b) the facility credit rating assigned to the Replacement Secured First Lien Term Loan is below B- by S&P or Fitch or below B3 by Moody's.<br><br>Beginning on the 12-month anniversary of the Effective Date, either (a) additional PIK interest of 200bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate principal amount of funded indebtedness of the Company secured by first priority liens (excluding the ABL Facilities (defined below), capital leases and other purchase money financings) ("First Lien Debt") of the Borrower exceeds $1.125 billion or (b) additional PIK interest of 100bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate First Lien Debt obligations of the Borrower are greater than $750 million and less than or equal to $1.125 billion, *provided* that, for purposes of calculating the amount of the aggregate First Lien Debt obligations of the Borrower, the First Lien Debt obligations shall be deemed to be increased by the amount by which Unrestricted Cash is less than $800 million. |
| **Default Rate:** | 2% per annum (additive to "Interest Rate" above).  The Default Rate shall be imposed automatically on any Event of Default resulting from the failure of the Borrower to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any Event of Default resulting from the insolvency or bankruptcy of the Borrower, and may be imposed upon the written election of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan while any other Event of Default is continuing. |
| **Amortization:** | The principal amount of the Replacement First Lien Term Loan shall be repayable in quarterly installments equal to 0.75% of the original principal amount of the Replacement First Lien Term Loan as of the Effective Date. |
| **Collateral:** | The Replacement First Lien Term Loan shall be secured by a security interest on substantially all of the existing and after-acquired assets of the Borrowers and Guarantors (including, without limitation, liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), licenses and a pledge of 100% of equity interest of Peabody IC Funding Corp and other domestic subsidiaries and, subject to the last sentence of this paragraph, a pledge limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs formed or acquired on or after the Effective Date (to the extent the pledge of such FSHCO would result in an adverse tax consequences), subject to customary carve-outs) and a pledge limited to 65% of the equity interests in Peabody Investments (Gibraltar) Limited, which liens shall in each case be first in priority with respect to assets other than "ABL Priority Collateral" (to be limited to accounts receivables, cash other than identifiable proceeds of non-ABL Priority Collateral and inventory) and second in priority with respect to all ABL Priority Collateral. Notwithstanding the foregoing, but subject to the last sentence of this paragraph, none of the equity interests in Peabody Holdings (Gibraltar) Limited, and none of the equity interests in any domestic subsidiary of a foreign subsidiary or in any |

Exhibit 1-3

|  | subsidiary, whether now owned or hereafter formed or acquired, substantially all the assets of which consist of equity of Peabody Holdings (Gibraltar) Limited, shall be pledged. Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case, without causing any adverse tax consequences, would permit the Borrower (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Borrower shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Borrower, or (b) if requested by the lenders, to cause the relevant entities described in this sentence to pledge their operating assets, the Borrower shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Borrower.

The Loan Parties shall, not later than the date that is 90 days following the Closing Date (or such later date as the Administrative Agent shall agree in its discretion), cause all deposit accounts and securities accounts of the Loan Parties, subject to customary exceptions to be agreed, to be subject to control agreements for the benefit of the Lenders satisfactory to the Administrative Agent in its reasonable discretion.

The liens securing the Replacement First Lien Term Loan shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.

The liens securing the Replacement First Lien Term Loan shall, if applicable, be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the New Second Lien Notes referred to in the Plan Term Sheet and the collateral agent for the Replacement First Lien Term Loan. The terms of the Intercreditor Agreement in no event shall be less favorable in any material respect to the holders of the Replacement Secured First Lien Term Loan than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes referred to in the Plan Term Sheet (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap).  Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
|---|---|
| **Commitment Fee:** | None |
| **Funding Fee:** | A fee equal to 4.0% of the original principal amount of the Replacement Secured First Lien Term Loan on the Effective Date shall be payable in cash on the Effective Date. |
| **Voluntary Prepayments:** | The Borrower may repay the Replacement Secured First Lien Term Loan at any time and from time to time in whole or in part without premium or penalty, upon written notice, at the option of the Borrower. |

Exhibit 1-4

NAI-1502346412v1

| | |
|---|---|
| **Mandatory Prepayments:** | Mandatory prepayments (at par) shall be required, without duplication, in an amount equal to: |
| | (i) (a) 100% of the net cash proceeds of non-ordinary course sales or dispositions of assets by the Borrower or any restricted subsidiary subject to thresholds and exceptions to be agreed, but not subject to reinvestment rights; *provided* that, in the case of any such sale or disposition of assets constituting ABL Priority Collateral, the amount of such prepayment will be reduced on a dollar-for-dollar basis by the amount of any repayments of outstanding borrowings or the amount required to cash collateralize letters of credit under the applicable ABL Facility, as a result of such sale or disposition, to be made by the Borrower pursuant to the terms of such ABL Facility; *provided*, *further*, that prepayments described in this subclause (i)(a) shall not be required to the extent (but only to the extent) proceeds are generated or received by any foreign subsidiary and repatriation of such proceeds would be prohibited by law, limited by fiduciary duties, or would reasonably be expected to result in any material adverse tax or other Liabilities (it being understood and agreed that (x) the Borrower and its subsidiaries shall be required to use commercially reasonable efforts to take all actions available under applicable law to permit the repatriation of the relevant amounts, (y) if the applicable barrier to repatriation shall cease to exist within 18 months following the date on which such prepayment would otherwise be required to be made, the Borrower or the applicable subsidiary shall repatriate the relevant amounts to the Borrower for application to the Replacement Secured First Lien Term Loan as required above promptly following the date on which the relevant circumstance shall have ceased to exist and (z) the utilization of available net operating losses or other tax attributes or credits shall not constitute a material adverse tax or other liability); and |
| | (b) 100% of the net cash proceeds from the sale of Metropolitan Collieries Pty Ltd (to the extent such sale is consummated after the Effective Date) to the extent that, after any such prepayment under this subclause (i)(b), the Borrower and its subsidiaries shall have Unrestricted Cash of at least $800 million; |
| | (ii) (a) prior to the later of (X) the 12-month anniversary of the Effective Date and (Y) the time at which at least $425 million of the outstanding principal amount of the Replacement Secured First Lien Term Loan has been repaid, the lesser of (1) the amount of Unrestricted Cash in excess of $800 million and (2) 75% of Excess Cash Flow (to be defined in a manner to be agreed, but will be calculated after giving effect to customary adjustments to be agreed for mandatory prepayments of indebtedness), in each case paid quarterly (to be paid on the 10th business day after the filing of the Borrower's report on Form 10-Q or 10-K, as applicable, or such date that the Borrower is required to have filed its reports on Form 10-Q or 10-K, as applicable (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended)); and |

Exhibit 1-5

<table>
<tr><td></td><td>

(b) thereafter, subject to further reduction based on first lien gross leverage ratios to be agreed, (X) the lesser of the amount of Unrestricted Cash of the Borrower and its subsidiaries in excess of $800 million and (Y) 50% of Excess Cash Flow (to be paid semi-annually on the 10th business day after the filing of the Borrower's reports on Form 10-Q for each of the first and third quarter of a fiscal year or such date that the Borrower is required to have filed such forms (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended) (the prepayments described in section (ii) hereof, the "<u>Cash Flow Sweep</u>"); and

(iii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "<u>Intercompany Note</u>") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Borrower on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed.

"Excess Cash Flow" repayments will be reduced by the amount of any voluntary prepayments of the Replacement Secured First Lien Term Loan.

</td></tr>
<tr><td>

**Conditions to Closing:**

</td><td>

Customary conditions to be agreed, including, without limitation:

(i) Minimum Unrestricted Cash of $600 million after giving effect to the PSA Transactions on the Effective Date;

(ii) Maximum funded indebtedness of the Borrower and its subsidiaries after giving effect to the PSA Transactions, excluding borrowings under the ABL Facilities, capital leases and similar purchase money financings, as of the Effective Date of $1.95 billion (of which no more than $1.5 billion may be first lien debt) plus, to the extent the Effective Date is after April 3, 2017, the amount of any Incremental New Second Lien Notes;

(iii) The Debtors shall have consummated the Section 1145 Rights Offering and Private Placement and received at least $1.5 billion in gross proceeds therefrom;

(iv) The Debtors shall have attempted, on a best efforts basis, to obtain commitments for the full amount of the Exit Facility, the terms of which are no less favorable to the Debtors, when taken as a whole, than the terms provided for in this Replacement 1L Term Loan Term Sheet as determined by the Debtors in their reasonable business judgment;

(v) All Milestones set forth in the PSA shall have been satisfied (or waived) on the terms set forth therein; and

</td></tr>
</table>

Exhibit 1-6

| | |
|---|---|
| | (vi) No Unrestricted Cash and none of the proceeds from any Equity Offering shall be applied, or shall have been applied, to reduce the size of the Section 1145 Rights Offering or the Private Placement, repay or reduce the principal amount of the New Second Lien Notes or otherwise repay or satisfy any claims that are junior to the Secured First Lien Lender Claims except as expressly provided pursuant the PSA. |
| **Representations and Warranties:** | Usual and customary representations and warranties for facilities of this type. |
| **Affirmative Covenants:** | Usual and customary affirmative covenants for facilities of this type, including, without limitation, (i) a covenant to use commercially reasonable efforts to obtain a rating on the Replacement Secured First Lien Term Loan from S&P, Moody's or Fitch within 6 months of the Effective Date, (ii) preservation of existence, (iii) payment of liabilities, including taxes, (iv) maintenance of insurance, (v) maintenance of properties and leases, (vi) visitation rights, (vii) keeping of records and books of accounts, (viii) compliance with laws; sanctions, (iv) collateral; further assurances, (x) subordination of intercompany loans, (xi) reporting requirements, including delivery of financial statements and compliance certificates, (xii) post-closing covenants and (xiii) creation or ownership of certain subsidiaries, partnerships and joint ventures. |
| **Negative Covenants:** | Usual and customary negative covenants for facilities of this type, including, without limitation, restrictions on

(a) indebtedness, including limitations on:

(1) debt at non-guarantor subsidiaries of the Company;

(2) other debt incurrence, liens and guaranties subject to carve-outs TBD, including (i) unsecured debt baskets based on satisfaction of both a total leverage ratio and fixed charge coverage ratio (each to be agreed); (ii) $450 million in New Second Lien Notes, plus any Incremental New Second Lien Notes, plus any accrued and capitalized interest (and refinancing thereof); (iii) one or more or a combination of A/R receivables or securitization facilities and/or ABL facilities in a maximum amount of up to $250 million and secured by a first lien on accounts receivable and inventory (the "ABL Facilities"), it being understood that there may be domestic ABL Facilities and Australian ABL Facilities; and (iv) cash management and hedging obligations baskets secured on a pari passu basis (subject to a $300 million cap) with the First Lien Debt;

(b) repayment or repurchase of subordinated indebtedness, indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan (including the New Second Lien Notes) and unsecured indebtedness, subject to a carve-out for the Borrower's share of Excess Cash Flow for any fiscal period up to $50 million principal amount in the aggregate per year (plus accrued and unpaid interest on the principal amount of such indebtedness so repaid or repurchased), with no roll-over rights, provided that such repayments or repurchases are only permitted if Unrestricted Cash exceeds $800 million immediately after giving effect to the most recent Cash Flow Sweep and pro forma for such repayments or |

Exhibit 1-7

NAI-1502346412v1

repurchases (it being understood and agreed that the foregoing shall not apply to restrict the cash payment of any regularly scheduled interest in respect of any New Second Lien Notes in accordance with the terms described in the section captioned "Interest" in Exhibit 2 to the Plan Term Sheet or repayments due at scheduled maturity);

(c) liquidations, mergers, consolidations, acquisitions;

(d) disposition of assets or subsidiaries, including the equity interests of subsidiaries;

(e) affiliate transactions;

(f) investments (including acquisitions);

(g)  dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests, including:

(1) no cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions); and

(2) no cash payments on account of any principal, interest or premium of junior indebtedness (including indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan and unsecured indebtedness) apart from contractual interest payments, repayments due at scheduled maturity and payments permitted under clause (b) above;

(h) fundamental changes (including dispositions of all or substantially all assets);

(i) transactions with respect to bonding subsidiaries;

(j) hedging transactions;

(k) entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, payments of principal, interest and other amounts in respect of the Intercompany Note or other intercompany indebtedness), and the granting of negative pledges;

(l) continuation of or change in business;

(m) changes in accounting practices or fiscal year;

(n) amendments/modification to organization documents or material agreements;

(o) issuance of preferred stock;

(p) use of proceeds in violation of margin regulations; and

(q) restrictions on activities of the subsidiaries that directly hold equity interests in

Exhibit 1-8

|  | Peabody Holdings (Gibraltar) Limited consistent with standard limitations on activities of special purpose vehicles, including incurrence and guarantees[1] of indebtedness, pledges of assets, bankruptcy remoteness, amendments to organizational documents, ownership of assets and conduct of business other than activities incidental to the ownership of equity interests in Peabody Holdings (Gibraltar) Limited; and<br><br>(r) amendments, waivers or consents in respect of the Intercompany Note and other intercompany loans owed to any Loan Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Loan Party in subsidiaries that are not Loan Parties (subject to exceptions and materiality thresholds to be agreed, in each case that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan. Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the Intercompany Note on the Effective Date shall be subject to the approval of the Requisite First Lien Lender Co-Proponents (as defined in the Plan Term Sheet).<br><br>The covenants under the Replacement Secured First Lien Term Loan shall be at least as restrictive as the covenants under the New Second Lien Notes. |
|---|---|
| **Financial Covenants** | Maximum Gross Leverage Ratio, measured quarterly and Maximum Capital Expenditures, measured annually; *provided* that unused capital expenditures may be carried forward to the immediately succeeding fiscal year (and any amounts so carried forward shall be deemed to have been used last in any fiscal year). |
| **Events of Default** | Usual and customary for facilities of this type. |
| **Governing Law** | New York. |

---

[1]    Any unsecured guaranty by any such FSHCO of New Second Lien Notes will be subordinated in right of payment to Permitted First Lien Indebtedness on terms acceptable to the Requisite First Lien Co-Proponents.

Exhibit 1-9

**Exhibit 2 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – New Second Lien Notes**

This summary of principal terms (this "New 2L Notes Term Sheet") sets forth certain of the principal terms for the New Second Lien Notes referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet"). Capitalized terms used and not otherwise defined in this New 2L Notes Term Sheet have the meanings assigned thereto in the Plan Term Sheet. This New 2L Notes Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Indenture referred to below and related documents (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms and conditions set forth in this New 2L Notes Term Sheet and otherwise in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion. All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Requisite Consenting Noteholders.

| Issuer | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company"). |
|---|---|
| Notes Offered | New Second Lien Notes (the "Notes"; the holders of the Notes, the "Holders," and the indenture governing the Notes, the "Indenture") in an aggregate principal amount of $450.0 million (plus, if applicable, the principal face amount of any Incremental New Second Lien Notes); provided that the amount of Notes issued on the Effective Date shall be subject to adjustment in connection with cash consideration and/or Additional First Lien Debt distributed to the holders of Second Lien Notes Claims as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"; provided, further, that in no event shall the aggregate principal amount of the Notes (including the principal face amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250.0 million. The Notes are to be issued on, and as a condition to, the Effective Date (unless cash and/or Additional First Lien Debt in the aggregate amount of $450 million (plus, if applicable, cash and/or Incremental Additional First Lien Debt distributed on account of Incremental Second Lien Notes Claims) is distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"). |
| Second Lien Debt Adjustment | Notwithstanding anything herein to the contrary, to the extent there is a First Lien Full Cash Recovery, the aggregate principal amount of the Additional First Lien Debt and the Notes, as appropriate, permitted to be issued or incurred on the Effective Date shall be reduced, on a dollar-for-dollar basis, by the amount by which Unrestricted Cash (as defined below) as of the Effective Date (after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million ( the |

Exhibit 2-1

NAI-1502346427v1

| | |
|---|---|
| | "Second Lien Debt Adjustment").  "Unrestricted Cash" means cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP). |
| **Maturity Date** | Six (6) years after the Effective Date; provided that, in the event the latest stated maturity of the Permitted First Lien Indebtedness (as defined below) (as in effect on the Effective Date) is six (6) years or longer after the Effective Date, then the maturity of the Notes shall be the 91st day after such latest stated maturity (as in effect on the Effective Date); provided, further, that in no event shall the maturity of the Notes be later than the 91st day after the seventh (7th) anniversary of the Effective Date. |
| **Interest** | The Notes will bear interest at a per annum rate equal to 3-month LIBOR, plus an applicable margin equal to 300 basis points over the highest all-in yield (calculated and otherwise determined as described below) of any Permitted First Lien Indebtedness outstanding on the Effective Date (disregarding the ABL Facilities (as defined below) for this purpose) (such Permitted First Lien Indebtedness with the highest all-in yield, the "1L Reference Debt").  LIBOR shall be subject to an interest rate floor equal to 1.00% (subject to adjustment as described below).  Interest on the Notes shall be payable quarterly in arrears in cash; provided that any applicable portion of interest expressly contemplated below to be payable in kind shall be capitalized on a quarterly basis.

The all-in yield of Permitted First Lien Indebtedness for purposes of identifying the 1L Reference Debt and determining the applicable margin on the Notes shall be determined as follows:

- If more than one series or class of Permitted First Lien Indebtedness is outstanding on the Effective Date, the 1L Reference Debt shall be such debt with the highest all-in yield.
- With respect to any such Permitted First Lien Indebtedness bearing interest at a rate based on LIBOR, the LIBOR component of such debt shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt and has a LIBOR floor greater than the LIBOR floor applicable to the Notes, then the LIBOR floor (but not the applicable margin) applicable to the Notes shall be increased to the extent of such differential between LIBOR floors.
- With respect to any such Permitted First Lien Indebtedness bearing interest at a fixed rate, the all-in yield shall be calculated as described below, minus 1.50%.
- To the extent any Permitted First Lien Indebtedness requires any portion of interest on such debt to be paid in kind with an increase to the principal amount of such debt at specified times during the term of such debt or upon the occurrence of certain conditions ("1L PIK Interest," and the per annum interest rate for such 1L PIK Interest, the "PIK Rate"), then such 1L PIK Interest shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt, then the Notes shall bear additional interest, at the PIK Rate, which shall be paid in kind with an increase to the principal amount of the Notes, subject to the same conditions applicable to the 1L PIK Interest; provided, however, that accrual of any such |

|  | paid-in-kind interest on the Notes shall not commence until the second (2nd) anniversary of the Effective Date and any such additional paid-in-kind interest shall cease to the extent the 1L Reference Debt is refinanced within 24 months of the Effective Date and such refinanced debt does not contain paid-in-kind interest provisions.<br><br>• The all-in yield calculation for any Permitted First Lien Indebtedness (other than the Replacement Secured First Lien Term Loan (as defined below)) shall not include any commitment or similar fees that are (x) paid or payable to any underwriters or arrangers (in their respective capacities as such) of such debt and (y) not shared generally with lenders in the primary syndication of such debt (it being agreed that any OID shall not be subject to this sentence).<br><br>As used in this section, "all-in yield" means, as to any series or class of Permitted First Lien Indebtedness, the yield to maturity of such debt, whether in the form of interest rate, margin, OID, commitment fees, upfront or similar fees (including, with respect to the Replacement Secured First Lien Term Loan, the "funding fee" referred to in Exhibit 1 to the Plan Term Sheet, provided that the maximum amount of such "funding fee" included in this calculation for the Replacement Secured First Lien Term Loan shall be not more than 300 basis points) or a LIBOR or other interest rate floor (subject to the provisions above), in each case, incurred or payable by the Company generally to all lenders or initial purchasers of such debt or other financing sources (including, as applicable, the Backstop Parties and any arrangers or underwriters of such debt) providing commitments in respect of such debt; provided that OID and upfront fees shall be equated to interest rate assuming a 4-year life to maturity (or, if less, the stated life to maturity at the time of incurrence of the applicable debt). "Replacement Secured First Lien Term Loan" means any replacement secured first lien debt issued to any of the holders of Secured First Lien Lender Claims as part of the treatment for such Claims or other first lien debt committed to by the Backstop Parties in connection with the treatment for such Claims.<br><br>If the holders of any Permitted First Lien Indebtedness receive any non-cash consideration, then (a) such non-cash consideration shall not be included in calculating the all-in yield of such debt and (b) the Holders of the Notes shall receive the same non-cash consideration on a proportionate basis relative to the aggregate principal amount of Notes issued on the Effective Date compared to the aggregate principal amount of the applicable tranche(s) of Permitted First Lien Indebtedness receiving such consideration.<br><br>The Indenture will contain customary "AHYDO" catch-up payment provisions applicable to debt with a term of more than five years. |
|---|---|
| **Default Rate:** | 2% per annum (additive to the interest rate otherwise applicable to the Notes, as described above). The Default Rate shall be imposed automatically on any default under the Indenture resulting from the failure of the Company to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any event of default resulting from the insolvency or bankruptcy of the Company or any Guarantor (as defined below), and may be imposed upon the written election of the Holders of a majority of the outstanding principal amount of the Notes while any other event of default is |

Exhibit 2-3

| | |
|---|---|
| | continuing. |
| **Guarantees, Collateral and Certain Intercreditor Matters** | The Notes shall be jointly and severally guaranteed by (a) each of the Company's existing or hereafter formed or acquired direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), subject to certain exceptions to be agreed, and (b) each other subsidiary of the Company that, as of the Effective Date or from time to time thereafter, guarantees any Permitted First Lien Indebtedness (as defined below) or certain other debt to be agreed (such entities guarantying the Notes, collectively, the "<u>Guarantors</u>"; the Company collectively with the Guarantors, the "<u>Note Parties</u>").  Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, (ii) future permitted special purpose securitization entities and permitted captive insurance entities, (iii) unrestricted subsidiaries and (iv) Peabody Holdings (Gibraltar) Limited and any future domestic subsidiary of any foreign subsidiary and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "<u>FSHCO</u>") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Note Parties; provided that any such FSHCO may only be excluded pursuant to this clause (iv) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the Indenture); provided, further, that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor.  Notwithstanding the foregoing, if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FSHCO to be guarantors without causing any adverse tax consequences to the Company, the Company shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Company.

As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes.

The Notes shall be secured by liens on substantially all of the existing and after-acquired assets of the Company and the Guarantors, including, without limitation, (a) a pledge (i) of 100% of the equity interests of Peabody IC Funding Corp and other domestic subsidiaries, (ii) subject to the last sentence of this paragraph, limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs now existing or hereafter formed or acquired (to the extent the pledge of 100% of the equity interests of any such entity would result in an adverse tax |

Exhibit 2-4

consequence to the Note Parties) and (iii) of intercompany debt owed to the Company or any Guarantor, and (b) liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), and licenses.  Assets constituting collateral shall be subject to customary exceptions to be agreed, which exceptions shall in no event be less favorable in any material respect to the Holders than the definition of "Excluded Assets" (as defined in the prepetition First Lien Credit Agreement).  Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case without causing any adverse tax consequences, would permit a Note Party (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Company shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Company, or (b) if requested by the trustee or the Holders of a majority of the outstanding principal amount of the Notes, to cause the relevant entities described in this sentence to pledge their operating assets, the Company shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Company.

Notwithstanding the foregoing (but subject to the last sentence of the immediately preceding paragraph), (i) none of the equity interests of Peabody Holdings (Gibraltar) Limited ("Gib1") shall be pledged, (ii) any subsidiary of the Company directly or indirectly owning any equity interests of Gib1 shall be a Guarantor (it being agreed that any such direct owner that is a FSHCO, substantially all the assets of which consist of equity interests of Gib1, shall be permitted to be an unsecured Guarantor (the "Unsecured Guarantors") and shall not be required to have its equity pledged to secure the Notes, to the extent that a secured guaranty and such an equity pledge would have adverse tax consequences to the Note Parties), (iii) Gib1 shall pledge 65% of the equity interests of Peabody Investments (Gibraltar) Limited ("Gib2") and (iv) the equity interests of Gib1 and any Unsecured Guarantor shall not otherwise be pledged to secure other obligations.  The guaranty of the Notes provided by any permitted Unsecured Guarantor shall be subordinated in right of payment to any guaranty of Permitted First Lien Indebtedness provided by such Unsecured Guarantor on terms reasonably acceptable to the Ad Hoc Group of Second Lien Noteholders.

The collateral securing the Notes shall include any assets subject to liens securing any Permitted First Lien Indebtedness (other than any Australian ABL Facility) and other debt to be agreed, and the liens securing the Notes shall be junior in priority to the liens securing any such Permitted First Lien Indebtedness.

The liens securing the Notes shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.

The liens securing the Notes shall be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the Notes and the collateral agent(s) for any Permitted First Lien Indebtedness. The terms of the

Exhibit 2-5

| | |
|---|---|
| | Intercreditor Agreement in no event shall be less favorable in any material respect to the Holders than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap). Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
| **Special Limitations on the Activities of certain Subsidiaries** | The Unsecured Guarantors, any subsidiary that directly holds equity interests in Gib1 and other subsidiaries to be agreed shall be subject to customary special purpose entity restrictions, including bankruptcy remoteness and special limitations on (i) incurrence and guarantees of indebtedness, (ii) pledges of assets, (iii) conduct of business activities unrelated to owning certain assets (in the case of any Unsecured Guarantor, unrelated to owning equity interests of Gib1), (iv) ownership of assets, (v) dispositions or other transfers of assets and (vi) amendments to their organizational documents. The organizational documents of such subsidiaries shall be required to be amended to reflect such special purpose entity restrictions and provide that further modification thereof is subject to the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Unrestricted Subsidiaries** | Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed. The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default under the Indenture, and (b) other conditions and limitations to be agreed. Notwithstanding the foregoing, none of the entities identified on Annex A hereto or any direct or indirect parent company of any such entity shall be designated as unrestricted subsidiaries. |
| **Optional Redemption** | Redeemable, in whole or in part, without premium or penalty. |
| **Change of Control Repurchase Offer** | 101% mandatory repurchase offer upon the occurrence of a change of control (customary definition to be agreed). |
| **Asset Sale Proceeds Mandatory Prepayment** | Mandatory prepayment (at par) in an amount equal to (i) 100% of the net proceeds from asset sales by the Company or its restricted subsidiaries (subject to exceptions to be agreed, including exceptions for certain ordinary course or de minimis sales) and (ii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "PIC Intercompany Note") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Company on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments of the Notes and any Permitted First Lien Indebtedness made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed, in any such case, except to the extent such amounts are applied to prepay any Permitted First Lien Indebtedness (other than any revolving or similar credit facility) then outstanding. |
| **Excess Cash** | The Company will be required to make mandatory prepayments of the Notes in |

Exhibit 2-6

NAI-1502346427v1

| Mandatory Prepayment | an amount equal to the lesser of (x) 25% of Excess Cash Flow (to be defined no less favorable to the Holders than the definition of "Excess Cash Flow" in the definitive documents governing the Permitted First Lien Indebtedness as in effect on the Effective Date) for the applicable fiscal period and (y) the difference between (i) 75% of Excess Cash Flow for the applicable fiscal period minus (ii) the Excess Cash Flow mandatory prepayment percentage applied ratably to outstanding Permitted First Lien Indebtedness (or, if Excess Cash Flow mandatory prepayments on Permitted First Lien Indebtedness are not applied ratably, the aggregate of all Excess Cash Flow mandatory prepayment percentages actually applied to prepay the Permitted First Lien Indebtedness); provided that (A) any liquidity, minimum cash or similar threshold for an Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than any such threshold for "Excess Cash Flow" or "Cash Flow Sweep" summarized in Exhibit 1 to the Plan Term Sheet and (B) any payment restrictions applicable to any Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than the payment restrictions for "Excess Cash Flow" summarized in Exhibit 1 to the Plan Term Sheet.

Notwithstanding the above, for so long as any Replacement Secured First Lien Term Loans remains outstanding and the Excess Cash Flow required to be prepaid (and actually prepaid) under such Replacement Secured First Lien Term Loans in any fiscal year is less than 75%, the Company will be required to make mandatory prepayments of the Notes in an amount equal to 25% of Excess Cash Flow (as defined in and calculated under the definitive documents governing the Replacement Secured First Lien Term Loans as in effect on the Effective Date) for the applicable fiscal period, subject to the thresholds, payment restrictions and other terms and conditions set forth in Exhibit 1 to the Plan Term Sheet.

No amendment or refinancing of the Permitted First Lien Indebtedness shall be permitted to modify the terms of the Excess Cash Flow mandatory prepayments in a manner that is adverse in any material respect to the Holders.

Excess Cash Flow mandatory prepayments of the Notes shall be made no less frequently than on an annual basis, and, in the case of an annual mandatory prepayment, no later than 30 days after the date on which the Company's Annual Report on Form 10-K for its most recently completed fiscal year is filed with the Securities and Exchange Commission or, if the Company is not required to file such reports, the date on which the Company's audited annual financials for its most recently completed fiscal year are delivered under the Indenture (or, if earlier, 30 days after the date on which the annual financials for such fiscal year were required to be delivered under the Indenture), commencing with the Company's fiscal year ending December 31, 2018; provided that (i) the Excess Cash Flow mandatory prepayment for the Notes for any applicable fiscal period shall be made no later than five (5) business days after the Excess Cash Flow mandatory prepayment for such fiscal period is made in respect of any Permitted First Lien Indebtedness and (ii) in the event that any Permitted First Lien Indebtedness requires Excess Cash Flow mandatory prepayments more frequently than on an annual basis for any fiscal period (e.g., quarterly or semi-annually), then Excess Cash Flow mandatory prepayments of the Notes shall be determined and required on the same periodic basis applicable to such Permitted First Lien Indebtedness. |
|---|---|

Exhibit 2-7

NAI-1502346427v1

| | |
|---|---|
| **Financial Covenants** | The Indenture shall contain financial maintenance covenants identical to the most restrictive financial maintenance covenants contained in any definitive documentation for any Permitted First Lien Indebtedness outstanding from time to time; provided that, in the event the requisite holders of such Permitted First Lien Indebtedness amend or waive compliance with the financial maintenance covenants applicable to such Permitted First Lien Indebtedness, a corresponding amendment or waiver shall automatically apply to the financial maintenance covenants contained in the Indenture. |
| **Permitted ABL Facilities** | One or more of a combination of A/R receivables or securitization facilities and/or ABL facilities in an aggregate principal amount not to exceed the U.S. dollar equivalent of $250 million, on customary terms for facilities of such type (together with any refinancing or replacement facilities of such type, the "ABL Facilities"). The ABL Facilities will be secured by a first priority lien on the ABL Priority Collateral (as defined in Exhibit 1 to the Plan Term Sheet) and, in the case of domestic ABL Facilities that are not A/R receivables or securitization facilities, by a second priority lien on the other collateral securing the Notes. It is understood that there may be domestic ABL Facilities and Australian ABL Facilities. |
| **Certain Intercompany Claims** | Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the PIC Intercompany Note on the Effective Date shall be subject to the approval of the Ad Hoc Group of Second Lien Noteholders. The Indenture shall include restrictions on amendments, waivers or consents in respect of (i) the PIC Intercompany Note and (ii) other intercompany loans owed to any Note Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Note Party in subsidiaries that are not Note Parties (subject to exceptions and materiality thresholds to be agreed), in any such case, that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Certain Covenants** | The Indenture shall contain high-yield bond covenants and other covenants and restrictions to be negotiated, including:<br><br>• Limitations on debt incurrence, liens and guaranties applicable to the Company and its restricted subsidiaries, capping total secured and unsecured debt at $2.20 billion (plus any interest paid in kind on such debt and, if applicable, the amount of any cash or debt consideration on account of any Incremental Second Lien Notes Claims, minus the amount of any Second Lien Debt Adjustment, minus the amount of any First Lien Debt Adjustment[1]), subject to certain ordinary course exceptions to be agreed |

---

[1] "First Lien Debt Adjustment" the reduction of the aggregate principal amount of the Replacement Secured First Lien Term Loan permitted to be issued or incurred on the Effective Date, on a dollar-for-dollar basis, by (i) the amount by which Unrestricted Cash as of the Effective Date (after giving effect to the transactions contemplated *(cont'd)*

Exhibit 2-8

  ○ First lien indebtedness consisting of the following (any such indebtedness so secured on a senior basis, collectively, the "Permitted First Lien Indebtedness"):

    ▪ the Exit Facility and/or the Replacement Secured First Lien Term Loan issued or incurred on the Effective Date in an aggregate principal amount not to exceed the sum of the following amounts less any amounts prepaid or repaid (not refinanced) thereunder from time to time: (x) $1.5 billion (minus the amount of any First Lien Debt Adjustment), plus (y) the amount of cash consideration and/or Additional First Lien Debt (including any such cash or debt on account of any Incremental Second Lien Notes Claims) distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims -Second Lien Notes Claims*," plus (z) any interest paid in kind on such first lien indebtedness;

    ▪ the ABL Facilities in an aggregate principal amount of up to $250 million; and

    ▪ any refinancing of the foregoing, subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity than the debt being refinanced, (ii) be secured by assets that do not constitute collateral of the debt being refinanced, unless such collateral shall also secure (or be added to secure) the Notes and (iii) be guaranteed by affiliates of the Company that do not guaranty the debt being refinanced unless such guarantor shall also guarantee (or be added to guarantee) the Notes;

  ○ Additional first lien or second lien debt may be incurred to the extent the proceeds are used to ratably repay all or a portion of the Notes; provided that any such refinancing of the Notes shall be subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity (unless such refinancing debt is first lien debt) than the Notes, (ii) have a greater all-in yield than the Notes, (iii) be secured by assets that do not constitute collateral for the Notes, (iv) be guaranteed by affiliates of the Company that do not guaranty the Notes, (v) in the case of any such second lien refinancing debt, contain more restrictive covenants or events of default than those applicable to the Notes (unless the Holders receive the benefit of such more restrictive terms) and (vi) in the case of any such second lien refinancing debt, contain any mandatory prepayment or redemption provisions that would

---

*(cont'd from previous page)*

  by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million and (ii) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) in excess of $1.5 billion, as described in Exhibit 1 to the Plan Term Sheet in the section captioned "*Principal Amount*".

Exhibit 2-9

result in prepayments or redemptions of such debt prior to the Notes;
- o No pari passu or junior lien debt shall be permitted;
- o Limitations on acquisition indebtedness;
- o Limitations on unsecured indebtedness to be agreed;
- o Non-speculative hedging transactions shall be permitted, subject to customary parameters to be agreed, and up to $300 million to the extent a First Lien Full Cash Recovery does not occur on the Effective Date, otherwise $400 million of net exposure under such hedging transactions shall be permitted to be secured by a senior lien on the collateral securing the Notes;
- o Any debt outstanding on the Effective Date shall not contain restrictions on the payment or prepayment of the Notes that are less favorable to the Holders than any such restrictions contained in Exhibit 1 to the Plan Term Sheet
- Limitations on making dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests and other restricted payments (including repayments or repurchases of, or other cash payments on account of, junior lien, subordinated or unsecured debt and the making of investments and acquisitions)
  - o No cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions);
  - o No cash payments on junior indebtedness apart from contractual interest payments and repayments due at scheduled maturity; and
  - o The up to $50 million annual basket referred to in Exhibit 1 of the Plan Term Sheet for repayments and repurchases of junior lien, subordinated or unsecured indebtedness may only be utilized for the Notes
- Limitations on entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, agreements that restrict payments of principal, interest and other amounts in respect of the PIC Intercompany Note and other intercompany indebtedness), and the granting of negative pledges
- Anti-layering covenant
- Limitations on the issuance of preferred stock
- Limitations on fundamental changes, including dispositions of all or substantially all assets, liquidations, mergers, consolidations and acquisitions
- Limitations on sales of assets, including the equity interests of subsidiaries
- Limitations on affiliate transactions
- Limitations on transactions with respect to bonding subsidiaries
- Limitations on change in business or changes in accounting practices or fiscal year
- Limitations on amendments/modification to organization documents or material agreements
- Limitations on the issuance of preferred stock
- Reporting requirements, including delivery of financial statements and compliance certificates
- Affirmative covenants to be agreed, including (i) preservation of existence, (ii) payment of liabilities, including taxes, (iii) maintenance of insurance, (iv) maintenance of properties and leases, (v) visitation rights, (vi) keeping of

Exhibit 2-10

| | |
|---|---|
| | records and books of accounts, (vii) compliance with laws; sanctions, (viii) collateral; further assurances, (ix) subordination of intercompany loans, (x) post-closing covenants and (xi) creation or ownership of certain subsidiaries, partnerships and joint ventures |
| **Limitations on Refinancing Restrictions** | Permitted First Lien Indebtedness may contain customary "permitted refinancing" conditions to be agreed with respect to restrictions on the refinancing or replacement of the Notes; provided that any such restrictions shall not prohibit such refinancing debt from (i) having a greater all-in yield than the Notes to the extent such additional yield is in the form of interest payable only in kind or (ii) having covenants that are more restrictive than the Notes, so long as such (x) covenants are not more restrictive (when taken as a whole) than the most restrictive terms of any Permitted First Lien Indebtedness then outstanding (provided that the foregoing shall not permit the elimination of any first lien/second lien covenant cushions, standstills or like deviations and/or terms) and (y) without in any manner limiting the preceding clause (x), to the extent any particular clause is more restrictive, it is added for the benefit of the holders of the Permitted First Lien Indebtedness. |
| **Events of Default** | The Indenture shall contain event of default provisions customary for high-yield bonds, with certain grace periods and materiality thresholds to be agreed, including, in the case of a default of the financial covenants, a 30-day grace period.  Such provisions shall include a cross-acceleration provision with respect to any Permitted First Lien Indebtedness, and cross-default to other indebtedness subject to a materiality threshold to be agreed. |
| **Governing Law** | The Notes and the Indenture shall be governed by New York law. |

Exhibit 2-11

NAI-1502346427v1

**Annex A to Exhibit 2 to Plan Term Sheet**

Peabody Australia Holdco Pty Ltd
Peabody Australia Intermediate Pty Ltd
Peabody COALTRADE Pacific Pty Ltd
Peabody Energy (Gibraltar) Limited
Peabody Energy Australia Pty Ltd.
Peabody Energy Finance Pty Ltd
Peabody Global Funding, LLC
Peabody Holdings (Gibraltar) Limited
Peabody Holland B.V.
Peabody IC Funding Corp.
Peabody IC Holdings, LLC
Peabody International (Gibraltar) Limited
Peabody International Investments, Inc.
Peabody Investments (Gibraltar) Limited
Peabody Investments (Gibraltar) Limited
Peabody Investments Corporation
Peabody MCC (Gibraltar) Limited
Peabody Mining (Gibraltar) Limited
Peabody Netherlands Holding B.V.
U.S. newco to be formed to hold any equity in Peabody Holdings (Gibraltar) Limited

## Exhibit 3

### Preferred Equity Term Sheet

| Term | Description |
|---|---|
| **The Preferred Equity** | Mandatorily convertible preferred equity issued by Reorganized PEC that is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over any another class of capital stock issued by the Reorganized Debtors. |
| **Dividend Rate** | 8.5% per annum, payable semi-annually in kind as a dividend of additional shares of Preferred Equity. Dividends shall accumulate to the extent not paid and shall accrue dividends in the same manner as the outstanding Preferred Equity. |
| **Participation** | The Preferred Equity shall participate on an as-converted basis (giving effect to any accrued and unpaid dividends) in any dividend or distribution (whether in cash, securities, debt, or assets, other than common stock dividends), and any payments in connection with a liquidation event, payable on the Reorganized PEC Common Stock. |
| **Liquidation Preference** | $25.00 per share of Preferred Equity, plus any accrued but unpaid dividends through, but not including, the date of liquidation or other determination (whether or not declared, prorated for any partial dividend period). |
| **Conversion at the Option of the Holder** | The Preferred Equity shall be convertible into Reorganized PEC Common Stock at any time, at the option of the holder of such Preferred Equity, at an initial conversion price based on a discount of 35% to Plan Equity Value (the "Conversion Price"), subject to anti-dilution protection as provided herein.  In connection with any optional conversion of the Preferred Equity, the Conversion Price shall be adjusted for accrued but unpaid dividends to, but not including, the conversion date. The Conversion Price for any such optional conversion shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Optional Redemption by the Company** | Subject to early conversion or other retirement of the Preferred Equity, if at any time following the Effective Date, less than 25% of the total number of shares of Preferred Equity that were issued on the Effective Date remain outstanding, then the Company shall have the right, but not the obligation, to redeem all (but not less than all) of the remaining shares of Preferred Equity, following thirty (30) days' notice, at a redemption price equal to the Liquidation Preference of such shares of Preferred Equity, payable in cash or shares of Reorganized PEC Common Stock at Reorganized PEC's election; provided that the |

| Term | Description |
|---|---|
| | Company shall not redeem any shares of Preferred Equity for cash during any time that any obligations under the Replacement Secured First Lien Term Loan remain outstanding. The Conversion Price for any such optional redemption shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Mandatory Conversion** | Conversion Threshold. Beginning on the Effective Date, each outstanding share of Preferred Equity shall automatically convert (unless previously converted at the option of the holder of such Preferred Equity or pursuant to an exercise of a conversion right in connection with a Fundamental Change (as defined below)) into a number of shares of Reorganized PEC Common Stock at the Conversion Price (such conversion, the "Mandatory Conversion") if the volume weighted average price of the Reorganized PEC Common Stock exceeds 130% of the plan common equity value (the "Conversion Threshold") for at least 45 trading days in a 60 consecutive trading day period, including each of the last 20 days in such 60 consecutive trading day period (such period, the "Mandatory Conversion Period'). The issuance of shares of Reorganized PEC Common Stock pursuant to the Mandatory Conversion shall be effected on the third business day following the expiration of the Mandatory Conversion Period (such date, the "Mandatory Conversion Date"). Notwithstanding the foregoing, during the first 45 trading days post Effective Date, a Mandatory Conversion will be deemed to have occurred if the volume weighted average price of Reorganized PEC Common Stock exceeds 150% of the plan common equity value for at least 10 trading days in a 20 consecutive day trading period, including each of the last 5 days of the 10 trading days when the threshold is achieved.

If the Mandatory Conversion occurs within the first 36 months after the Effective Date, the Conversion Price applicable to such Mandatory Conversion shall also be adjusted to reflect the amount of preferred dividends that would otherwise have been payable within the first 36 months to the extent not already paid (such additional amount, the "Makewhole Amount"). In connection with any Mandatory Conversation after the first 36 months after the Effective Date, the Conversion Price shall only be adjusted for accrued but unpaid dividends as of, but not including, the Mandatory Conversion Date.

Conversion by Holders. At any time following the Effective Date, if holders of at least 66 2/3% of all outstanding Preferred Equity (the "Electing Holders") elect to convert the Preferred |

| Term | Description |
|---|---|
| | Equity held by them, then all Preferred Equity then outstanding that is not held by the Electing Holders shall automatically convert at the same time and on the same terms as the Preferred Equity held by the Electing Holders.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable). |
| **Conversion Upon a Fundamental Change** | The Preferred Equity shall automatically convert into shares of Reorganized PEC Common Stock immediately prior to the consummation of a Fundamental Change, approved as provided below under "Voting Rights," if either (x) at consummation of the Fundamental Change, the price of the Reorganized PEC Common Stock exceeds the Conversion Threshold, or (y) the consideration payable in the Fundamental Change per share of Reorganized PEC Common Stock exceeds the Conversion Threshold and is payable in cash.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable). <br><br> "Fundamental Change" means a sale of Reorganized PEC, whether by merger, share purchase or otherwise, a sale of substantially all of the assets of Reorganized PEC and its subsidiaries taken as a whole or other business combination transaction involving Reorganized PEC as a result of which the equity holders of Reorganized PEC immediately following the transaction are holders of less than 50% of the equity interests in the surviving entity. |
| **Anti-dilution Protection** | If and to the extent not  otherwise paid or provided for as contemplated by "Dividend Participation" above,  the Conversion Price shall be subject to customary anti-dilution adjustment for: <br><br> ▪ stock splits, reverse stock splits and stock dividends on all or substantially all shares of Reorganized PEC Common Stock; <br><br> ▪ issuance to all or substantially all holders of Reorganized PEC Common Stock of certain warrants or rights to purchase additional shares of Reorganized PEC Common Stock; <br><br> ▪ issuance of Reorganized PEC Common Stock (and/or securities exercisable for or convertible into Reorganized PEC Common Stock) at a price (or exercise price) per share |

| __Term__ | __Description__ |
|---|---|
| | less than 95% of the current market price per share of Reorganized PEC Common Stock;[1] and |
| | ▪ successfully completed above-market self-tender offers and exchanges offers involving the Reorganized PEC Common Stock. |
| | In addition, upon the occurrence of a Fundamental Change, approved as provided below under "Voting Rights," unless the Preferred Equity is mandatorily convertible immediately prior thereto, the Preferred Equity shall thereafter be convertible into the cash, securities or assets receivable by holders of Reorganized PEC Common Stock in the applicable transaction. |
| **Voting Rights** | The Preferred Equity will vote with the Reorganized PEC Common Stock as a single class on an as-converted basis (giving effect to any accrued but unpaid dividends) on all matters submitted to a vote of the holders of Reorganized PEC Common Stock. |
| | The Preferred Equity will be entitled to vote as a separate class in respect of each of the following (with the affirmative vote of a majority of the outstanding Preferred Equity required to approve such matters, except as specified below): |
| | ▪ Any increase in the authorized amount of the Preferred Equity; |
| | ▪ Authorization of any class of equity ranking senior to or on par with the Preferred Equity; |
| | ▪ Any amendment to the terms of the Preferred Equity, which approval shall require the affirmative vote of 2/3 of the outstanding Preferred Equity; |
| | ▪ Any Fundamental Change requiring approval of the holders of Reorganized PEC Common Stock; |
| | ▪ Any liquidation or winding-up of Reorganized PEC; and |
| | ▪ Authorization of dividends on Reorganized PEC Common Stock in excess of $100 million payable to holders of Reorganized PEC Common Stock in any 12-month period. |
| **Registration Rights** | Without limiting the Company's obligations under the Registration Rights Agreement, all holders of Preferred Equity and any shares of Reorganized PEC Common Stock issuable |

---

[1]   Inclusion of this provision is subject to this provision not causing the Preferred Equity to be treated other than as equity for accounting purposes and not requiring debt [or derivative] accounting treatment (and this provision being the only cause of such treatment).

| Term | Description |
|---|---|
| | upon exercise or conversion thereof that constitute "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act) and all holders that are "affiliates" of Reorganized PEC (as defined in Rule 144(a)(1) under the Securities Act) shall be entitled to customary resale registration rights, including shelf, demand and resale registration (and, for clarity, the Company shall agree that if any person who proposes to make a sale of any such securities would be entitled to such registration rights but for the Company's view that such proposed seller is not an "affiliate" of Reorganized PEC, then the Company and its legal counsel shall upon request promptly provide, at the Company's sole expense, such transfer instructions  (including instructions regarding the removal of restrictive legends) and legal opinions (on which such proposed seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such proposed sale to be made without compliance with the volume or manner of sale restrictions of Rule 144 under the Securities Act). <br><br>Reorganized PEC shall file a resale shelf registration statement for such holders, and shall use commercially reasonable efforts to cause the registration statement to go effective, as promptly as practicable following the Effective Date, as summarized in more detail in Exhibit 5 under "Registration Rights." |
| **Stock Exchange Listing** | TBD |
| **Accounting Treatment** | TBD |

# Exhibit 4

**PEABODY ENERGY CORPORATION**
**LONG-TERM INCENTIVE PLAN**

PEABODY ENERGY CORPORATION
LONG-TERM INCENTIVE PLAN

The following term sheet summarizes the principal terms of a Long-Term Incentive Plan (the "LTIP") to be sponsored on and after the Effective Date by Reorganized PEC.

| General Description of LTIP | **Purpose.** The purpose of the LTIP is to help align the interests of participants with Reorganized PEC's shareholders and to recognize, reward and retain the services of executives, other employees, and consultants of Reorganized PEC and its subsidiaries and non-employee directors of Reorganized PEC. |
|---|---|
| | **LTIP Pool.** The LTIP will provide for a pool of shares of Reorganized PEC Common Stock to consist of 10% of the fully diluted equity (after giving effect to the exercise of the Penny Warrants and the conversion of the Preferred Equity) of Reorganized PEC (the "LTIP Pool"). The LTIP Pool will be used for awards to be granted on the Effective Date and for potential future awards. |
| | **Awards.** The LTIP will provide for the grant of cash and stock-based awards including stock options, stock appreciation rights, restricted stock, shares of Reorganized PEC Common Stock, restricted stock units, deferred stock, performance units, dividend equivalents and cash incentive awards. |
| | **Administration.** The LTIP initially will be administered by the Compensation Committee of the Board of Directors of PEC (the "Committee"). Emergence Awards will be allocated and approved by the Committee. Future awards will be allocated and approved by the Post-Emergence Committee (as defined below). |
| **Allocation of Emergence Awards** | 25.8% of the LTIP Pool (the "Emergence Pool") will be granted to employees and executives on the Effective Date in the form of restricted Reorganized PEC Common Stock (or units) ("Emergence Awards"). The Emergence Pool will be allocated by the Committee to the six most senior executives as follows: |

| Executive / Level | Allocation of Emergence Pool |
|---|---|
| G. Kellow | 18.75% |
| C. Meintjes | 6.25% |
| K. Williamson | 6.25% |
| A. Schwetz | 6.50% |
| V. Dorch | 4.38% |
| B. Galli | 3.75% |

| | The remainder of the Emergence Pool (54%) will be allocated by the Committee to other employees prior to the Effective Date. |
|---|---|
| **Terms of Emergence Awards** | **Normal Vesting.** |
| | • Emergence Awards granted to Directors and above will generally vest ratably on each of the first three anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | • Emergence Awards granted to employees below the level of Director will generally vest ratably on each of the first two anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | **Accelerated Vesting.** Emergence Awards will become fully vested upon (i) a participant's termination of employment by Reorganized PEC and its subsidiaries (or any applicable successors) without Cause or for Good Reason and (ii) a participant's termination of |

| | |
|---|---|
| | employment with Reorganized PEC and its subsidiaries (or applicable successors) due to death or Disability. To the extent the Emergence Awards are not replaced upon a Change in Control, the Post-Emergence Committee may convert the awards to cash-settled awards based on the value of the consideration shareholders receive in the Change in Control, as determined by the Post-Emergence Committee.<br><br>Forfeiture.  Participants will forfeit unvested Emergence Awards upon (i) any voluntary resignation of employment with Reorganized PEC and its subsidiaries (or applicable successors) (other than for Good Reason) and (ii) any termination of employment by Reorganized PEC and its subsidiaries (or applicable successors) for Cause.<br><br>Dividend Equivalents.  Unvested Emergence Awards will accrue dividend equivalents. Accrued dividend equivalents will be subject to the same vesting and termination provisions as the underlying shares of Reorganized PEC Common Stock to which they relate.<br><br>Taxes.  Participants will satisfy taxes required to be withheld upon vesting and/or settlement of an Emergence Award through share withholding, subject to compliance with applicable laws. |
| **Future Awards** | The remaining LTIP Pool will be granted, on terms and conditions (including allocation and vesting) to be established by the Compensation Committee of the Board of Directors of Reorganized PEC (the "Post-Emergence Committee"), in its discretion. |
| **Restrictive Covenants** | Generally, participants will be bound by the standard restrictive covenant agreement which contains non-competition and non-solicitation provisions, among others. |
| **Definition of Cause for Emergence Awards** | "Cause" means: (a) any willful fraud, dishonesty or misconduct of the participant that can reasonably be expected to have a detrimental effect on (i) the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates or (ii) the participant's reputation or performance of his or her duties to Reorganized PEC or any of its subsidiaries or affiliates; (b) willful refusal or failure of the participant to comply with Reorganized PEC's Code of Business Conduct and Ethics, Reorganized PEC's Anti- Corruption and Bribery policy or any other material corporate policy of Reorganized PEC; (c) the participant's willful or repeated failure to meet documented performance objectives or to perform his or her duties or to follow reasonable and lawful directives of his or her manager (other than due to death or Disability); (d) the participant's conviction of, or plea of nolo contendere to (i) any felony; or (ii) any other criminal charge that may reasonably be expected to have a material detrimental effect on the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates; or (e) the participant's willful failure to cooperate with a bona fide internal investigation or an investigation by regulatory or law enforcement authorities, whether or not related to the participant's employment with Reorganized PEC, after being instructed to cooperate by the Chairman and/or Chief Executive Officer or by the Board of Directors of Reorganized PEC, or the willful destruction of or willful failure to preserve documents or other material known to be relevant to any such investigation; provided that with respect to clause (b) or (c) above, the participant shall have 15 business days following written notice of the conduct which is the basis for the potential termination for Cause within which to cure such conduct, to the extent it can be cured, to prevent termination for Cause by Reorganized PEC. If the participant cures the conduct that is the basis for the potential termination for Cause within such period, Reorganized PEC's notice of termination shall be deemed withdrawn. |
| **Definition of Change in Control for Emergence Awards** | "Change in Control" means the occurrence of any one or more of the following: (a) any corporation, person or other entity (other than Reorganized PEC, a majority-owned subsidiary of Reorganized PEC or any of its subsidiaries, or an employee benefit plan (or related trust) sponsored or maintained by Reorganized PEC or any of its subsidiaries), including a "group" as defined in Section 13(d)(3) of the Exchange Act, becomes the beneficial owner of stock representing more than 50% of the combined voting power of Reorganized PEC's then outstanding securities; (b) there is consummated (i) a merger, consolidation, plan of arrangement, reorganization or similar transaction or series of |

| | |
|---|---|
| | transactions in which Reorganized PEC is involved, other than such a transaction or series of transactions which would result in the shareholders of Reorganized PEC immediately prior thereto continuing to own (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the securities of Reorganized PEC or such surviving entity (or the parent, if any) outstanding immediately after such transaction(s) in substantially the same proportions as their ownership immediately prior to such transaction(s); (ii) a sale or other disposition of all or substantially all of Reorganized PEC's assets; or (iii) approval by Reorganized PEC's shareholders of a plan of liquidation for Reorganized PEC; or (c) within any period of 24 consecutive months, persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period, together with persons who were first elected as directors (other than as a result of any settlement of a proxy or consent solicitation contest or any action taken to avoid such a contest) during such 24-month period by or upon the recommendation of persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period and who constituted a majority of the Board of Reorganized PEC at the time of such election, cease to constitute a majority of the Board of Reorganized PEC. To the extent required for an award that is "deferred compensation" within the meaning of Section 409A of the Internal Revenue Code ("Code") to comply with Section 409A of the Code, no transaction will be a Change in Control unless it is also a change in the ownership or effective control of Reorganized PEC, or in the ownership of a substantial portion of Reorganized PEC's assets, as provided in Section 409A(a)(2)(A)(v) of the Code and Treasury Regulations Section 1.409A-3(i)(5). |
| | For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| **Definition of Disability for Emergence Awards** | "Disability" means a mental or physical illness that entitles the participant to receive benefits under the long-term disability plan of an employer, or if the participant is not covered by such a plan or the participant is not an employee of an employer, a mental or physical illness that renders a participant totally and permanently incapable of performing the participant's duties for Reorganized PEC or a subsidiary. Notwithstanding the foregoing, (a) an illness shall not qualify as a Disability if it is the result of (i) a willfully self-inflicted injury or willfully self-induced sickness; or (ii) an injury or disease contracted, suffered, or incurred while participating in a felony criminal offense; and (b) with respect to any award subject to Section 409A of the Code, Disability shall mean a participant's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. |
| **Definition of Good Reason for Emergence Awards** | "Good Reason" shall mean (a) "Good Reason" as defined in the participant's employment agreement with Reorganized PEC, if any; or (b) if the participant does not have an employment agreement with Reorganized PEC or such agreement does not define Good Reason, then: (i) a reduction, other than a reduction that generally affects all similarly-situated executives and does not exceed 10% in one year or 20% in the aggregate over three consecutive years, by Reorganized PEC in the participant's base salary from that in effect immediately prior to the reduction; (ii) a material reduction, other than a reduction that generally affects all similarly-situated executives, by Reorganized PEC in the participant's target or maximum annual cash incentive award opportunity or target or maximum annual equity-based compensation award opportunity from those in effect immediately prior to any such reduction; (iii) relocation, other than through mutual agreement in writing between |

|  | Reorganized PEC and the participant or a secondment or temporary relocation for a reasonably finite period of time, of the participant's primary office by more than 50 miles from the location of the participant's primary office as of the agreement date; or (iv) any material diminution or material adverse change in the participant's duties or responsibilities as they exist as of the agreement date; provided, that (x) if the participant terminates participant's employment for "Good Reason," the participant shall provide written notice to Reorganized PEC at least 30 days in advance of the date of termination, such notice shall describe the conduct the participant believes to constitute "Good Reason" and Reorganized PEC shall have the opportunity to cure the "Good Reason" event within 30 days after receiving such notice, (y) if Reorganized PEC cures the conduct that is the basis for the potential termination for "Good Reason" within such 30 day period, the participant's notice of termination shall be deemed withdrawn and (z) if the participant does not give notice to Reorganized PEC as described herein within 90 days after an event giving rise to "Good Reason," the participant's right to claim "Good Reason" termination on the basis of such event shall be deemed waived. |

## Exhibit 5

### Private Placement and Backstop Commitment Term Sheet

Set forth below are the key terms of (i) a private placement for $750 million of Preferred Equity (the "***Private Placement***") and (ii) the backstop of the Section 1145 Rights Offering for up to $750 million of Reorganized PEC Common Stock (the "***Backstop Commitment***") and Rights Offering Penny Warrants, in each case in connection with the Plan.  As set forth herein, certain holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B (the "***Claims***") shall have the right and obligation to participate in the Private Placement and the Backstop Commitment according to the following percentages, based on Allowed Claims as of the Record Date, in each case subject to adjustment as provided herein: such holder's pro rata portion of (i) in respect of Allowed Claims in Class 2, the quotient of (A) $708 million divided by (B) the Allowed Claims in Class 5B plus $708 million; and (ii) in respect of Allowed Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million (such percentage split hereafter defined as the "***Pro Rata Split***").  If a holder of Claims elects to participate in the Private Placement, such holder must also agree to participate in the Backstop Commitment, subscribe for its full entitlement in the Section 1145 Rights Offering and become party to the PSA.

The Noteholder Co-Proponents (or the "***Initial Parties***") have agreed to subscribe for all Preferred Equity being issued in the Private Placement and to provide the full Backstop Commitment, subject to participation by other creditors as provided herein.

| Private Placement | |
|---|---|
| **Term** | **Description** |
| **Private Placement:** | This Term Sheet describes the Private Placement of shares of Preferred Equity (the "***Private Placement Shares***") in the Reorganized Debtors for an aggregate purchase price of $750 million at a price per share consistent with the conversion ratio of Preferred Equity to Reorganized PEC Common Stock detailed in the Preferred Equity Term Sheet under "Conversion at the Option of the Holder."  The aggregate number of Private Placement Shares shall be reasonably acceptable to the Requisite Members of the Noteholder Steering Committee. |
| | For the avoidance of doubt, any Preferred Equity purchased by the Private Placement Parties (as defined below) shall be solely on account of the new money provided in the Private Placement and not on account of such party's Class 2 or Class 5B Claims. |
| **Private Placement Commitments**: | Subject to the terms and conditions of the Private Placement Agreement (as defined below): |
| | (i) the Initial Parties have each committed (on a several and not joint |

basis) to purchase 22.5% of the Private Placement Shares in the aggregate, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule;

(ii) the Initial Parties and the creditors that become Additional Private Placement Parties by 5:00 pm New York City time on the third business day following execution of the Private Placement Agreement (such creditors, the "***Phase Two Private Placement Parties***") shall have the exclusive right and obligation (on a several and not joint basis) to purchase 5% of the Private Placement Shares in the aggregate; and according to (a) the Pro Rata Split and (b)(1) with respect to the Initial Parties, on a pro rata basis based on, and calculated using, the Initial Parties' claim amounts as set forth on the Initial Private Placement Schedule, and, (b)(2) with respect to the Phase Two Private Placement Parties, each Phase Two Private Placement Party's claim amounts as disclosed to the Initial Parties upon such Phase Two Private Placement Parties' execution of the Private Placement Agreement; and

(iii) the Initial Parties, the Phase Two Private Placement Parties, and any other Additional Private Placement Parties (together, the "***Private Placement Parties***") have each committed (on a several and not joint basis) to purchase their respective Private Placement Percentage of the remaining 72.5% of the Private Placement Shares in the aggregate; provided that, with respect to such 72.5%, if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are party to the Private Placement Agreement before the Private Placement Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to purchase the full amount of such Preferred Equity that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Private Placement Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims participated in the Private Placement (a "***Surplus Preferred Participation Adjustment***"), and the Preferred Equity available to Additional Private Placement Parties in the respective Class shall be reduced accordingly on a pro rata basis.

In accordance with the foregoing, the "***Private Placement Percentages***" means, for any Private Placement Party, a percentage determined by multiplying—

(I)    the Pro Rata Split applicable to the relevant Class of Claims held by such Private Placement Party by—

(II) (i)    if the Surplus Preferred Participation Adjustment shall apply—

(X)    in the case of an Initial Party that has elected[1] to apply the Surplus Preferred Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth on the Initial Private Placement Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Private Placement Schedule) <u>divided by</u> (B) the amount of two-thirds (2/3) of all Claims within such Class; and

(Y)    in the case of a Phase Two Private Placement Party, the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Private Placement Party (as defined below) in such Class <u>divided by</u> (B) the amount of two-thirds of all Claims within such Class, (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) (1) 50% of the amount of the Claims of such Phase Two Private Placement Party in such Class, <u>divided by</u> (2) the amount of all Participating Private Placement Claims[2] within such Class, other than the Claims, or portions thereof, to which clause (II)(i)(X) and/or clause (II)(i)(Y)(a) is applicable; and

(ii)    in the case of (x) any other Private Placement Party, if the Surplus Preferred Participation Adjustment applies, or (y) any Private Placement Party, if the Surplus Preferred Participation Adjustment does not apply—

(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Private Placement Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Private Placement Claims in such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable.

| | |
|---|---|
| **Private Placement Agreement**: | The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Private Placement (the "***Private*** |

---

[1]    Each Initial Party must elect to apply the Surplus Preferred Participation Adjustment no later than ten (10) business days following the Private Placement Enrollment Outside Date.

[2]    "<u>Participating Private Placement Claims</u>" shall mean Claims within the applicable class held by all Private Placement Parties.

NAI-1502345820v2

|  | _**Placement Agreement**_"). |
|--|-----------------------------|
|  | The Private Placement Percentage of each Private Placement Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Private Placement Agreement (the "_**Private Placement Schedule**_"). |
|  | The initial commitment schedule attached as <u>Schedule 1(a)</u> hereto (the "_**Initial Private Placement Schedule**_") reflects the percentage allocation of the obligations of the Initial Parties to purchase shares of Preferred Equity in the Private Placement (prior to the addition of Additional Private Placement Parties as contemplated hereby).  The Initial Private Placement Schedule shall be amended only upon consent of each of the Initial Parties. |
|  | If any Private Placement Party fails to fund the purchase price for the Private Placement Shares required to be purchased by them under the Private Placement Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Private Placement Party fails to fund. |
| **Additional Private Placement Parties:** | Holders of Claims will have the opportunity to become Private Placement Parties under the Private Placement Agreement prior to the date that is 20 business days following the Debtors' filing of the motion seeking entry of the PPA and BCA Approval Order (such order, the "_**PPA and BCA Approval Motion**_", and such date, the "_**Private Placement Enrollment Outside Date**_"). |
|  | "_**Additional Private Placement Parties**_" means, collectively, each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to (i) participate in the Private Placement by joining the Private Placement Agreement and the PSA in accordance with the foregoing, (ii) join the Backstop Commitment Agreement as a Backstop Party prior to the applicable deadline described herein, and (iii) subscribe for its full entitlement of Rights Offering Shares in the Section 1145 Rights Offering.  Initial Parties may be Additional Private Placement Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as of the execution of the Private Placement Agreement. |
| **Securities Law Exemptions:** | The Private Placement Shares shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another |

| | available exemption from registration. |
|---|---|
| **Implementation of the Private Placement:** | The Debtors shall conduct the Private Placement on behalf of the Reorganized Debtors through customary private placement documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties. |
| **Private Placement Premiums**: | The Debtors will pay the Private Placement Parties in respect of the Private Placement (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Private Placement Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 until the Effective Date (with proration for partial months) (the "***Private Placement Ticking Premium***" and, together with the Private Placement Premium, the "***Private Placement Premiums***").<br><br>With respect to the Private Placement Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Private Placement Percentages as set forth on the Initial Private Placement Schedule; (ii) 57.5% shall be allocated to the Initial Parties and the Phase Two Private Placement Parties on a pro rata basis based upon their respective Private Placement Commitment (as defined in the Private Placement Agreement); and (iii) 20% shall be allocated to all Private Placement Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after the filing of the PPA and BCA Approval Motion based upon each Private Placement Party's Private Placement Percentage.  The Private Placement Ticking Premium will be shared pro rata among Private Placement Parties.  The Private Placement Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.  The Reorganized PEC Common Stock issued in connection with the Private Placement Commitment Premium shall be issued after giving effect to the conversion of the Preferred Equity and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> of the Term Sheet.<br><br>The Private Placement Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order.  The Private Placement Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
| **Pro Rata Split** | For purposes of the Private Placement Percentages, the Pro Rata Split shall be determined as of the Record Date. |

NAI-1502345820v2

| SECTION 1145 RIGHTS OFFERING AND BACKSTOP COMMITMENT | |
|---|---|
| **Term** | **Description** |
| **Rights Offering**: | This Term Sheet describes the Section 1145 Rights Offering of rights to purchase units (the "***Rights Offering Shares***") consisting of (i) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (ii) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date, in each case after giving effect to the conversion of Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> herein.  The price per unit to be paid in the Section 1145 Rights Offering shall be determined in accordance with the Plan such that the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering shall be $750 million.  The holders of Allowed Claims in Classes 2 and 5B as of the Record Date will be permitted to participate in the Section 1145 Rights Offering. <br><br> After consultation with counsel and the Noteholder Steering Committee, the Debtors may decrease the number of Section 1145 Equity Rights distributed to holders of Second Lien Notes Claims, Unsecured Senior Notes Claims and General Unsecured Claims in Class 5B as required or instructed by the Bankruptcy Court or the SEC, in each case to allow the Section 1145 Rights Offering to be exempt from registration under the Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code; provided, however, that (a) in no event shall such decrease in the number of Section 1145 Equity Rights result in a decrease of the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering below $650 million, and (b) in no event shall the price per unit to be paid in the Section 1145 Rights Offering be subject to increase or decrease in connection with such decrease in the number of Section 1145 Equity Rights.  In this event, any amounts excluded shall instead be purchased directly by the Backstop Parties pursuant to the Backstop Commitment Agreement. <br><br> The Section 1145 Rights Offering will be conducted by the Company on behalf of the Reorganized Debtors, and the Plan will provide that the rights and obligations of the Company hereunder will vest in the Reorganized Debtors on the Effective Date. |
| **Commitments**: | Subject to the terms and conditions of the Backstop Commitment Agreement (as defined below), the Initial Parties (together with any Additional Backstop Parties (as defined below), the "***Backstop Parties***") have each committed (on a several and not joint basis, and based on, and calculated using, the claim amount set forth in the Initial Backstop Commitment Schedule) to purchase their respective Backstop Commitment Percentage of any unsubscribed Rights Offering Shares (the "***Backstop Commitment***" and together with the |

NAI-1502345820v2

Private Placement, the "***Commitments***"); provided, however, that if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are parties to the Backstop Commitment Agreement before the Backstop Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to elect for their Backstop Commitments to equal the full amount of Backstop Commitments that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Backstop Commitment Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class participated in the Backstop Commitment (a "***Surplus Backstop Participation Adjustment***"), and the Backstop Commitment available to Additional Backstop Parties in the respective Class shall be reduced accordingly.

In accordance with the foregoing, the "***Backstop Commitment Percentages***" means, for any Backstop Party, a percentage determined by multiplying—

(I)    the Pro Rata Split applicable to the relevant Class of Claims held by such Backstop Party by—

(II) (i)    if the Surplus Backstop Participation Adjustment shall apply—

(X)    in the case of an Initial Party that has elected[3] to apply the Surplus Backstop Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth in the Initial Backstop Commitment Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Backstop Commitment Schedule) divided by (B) the amount of two-thirds (2/3) of all Claims within such Class; and

(Y)    in the case of a Phase Two Backstop Party (as defined herein), the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class divided by (B) the amount of two-thirds of all Claims within such Class, plus (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), multiplied by (B) (1) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class, divided by (2) the amount of all Participating Backstop Claims[4] within such Class, other than the Claims, and/or portions thereof (if any) to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable; and

---

[3]    Each Initial Party must elect to apply the Surplus Backstop Participation Adjustment no later than [three (3)] business days following the Backstop Enrollment Outside Date.

[4]    "Participating Backstop Claims" shall mean Claims within the applicable class held by all Backstop Parties.

|  |  |
|---|---|
|  | (ii) in the case of (x) any other Backstop Party, if the Surplus Backstop Participation Adjustment applies, or (y) any Backstop Party, if the Surplus Backstop Participation Adjustment does not apply— <br><br>(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Backstop Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Backstop Claims within such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable. |
| **Backstop Commitment Agreement:** | The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Backstop Commitments (the "***Backstop Commitment Agreement***"). <br><br>The Backstop Commitment Percentage of each Backstop Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Backstop Commitment Agreement (the "***Backstop Commitment Schedule***"). <br><br>The initial backstop commitment schedule attached as <u>Schedule 1(b)</u> hereto (the "***Initial Backstop Commitment Schedule***") reflects the initial percentage allocation of the backstop obligations of the Initial Parties to purchase unsubscribed Rights Offering Shares pursuant to their Backstop Commitments (prior to the addition of Additional Backstop Parties as contemplated hereby).  The Initial Backstop Commitment Schedule shall be amended only upon consent of each of the Initial Parties. <br><br>If any Backstop Parties fail to fund the purchase price for the Rights Offering Shares required to be purchased by them under the Backstop Commitment Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Backstop Party fails to fund. |
| **Additional Backstop Parties:** | Holders of Claims will have the opportunity to become Backstop Parties under the Backstop Commitment Agreement prior to the date that is 20 business days following the Debtors' filing of the PPA and BCA Approval Motion (such date, the "***Backstop Enrollment Outside Date***"). <br><br>"***Additional Backstop Parties***" means, collectively, each party that is that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" |

-8-

|  | as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to participate in the Backstop Commitment by joining the Backstop Commitment Agreement and the PSA in accordance with the foregoing. Initial Parties may be Additional Backstop Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as the execution of the Backstop Commitment Agreement. |
|---|---|
| **Securities Law Exemptions:** | The Rights Offering Shares issued pursuant to the Section 1145 Rights Offering (other than on account of Backstop Commitments) shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code.<br><br>The Rights Offering Shares purchased in the Backstop Commitment shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another available exemption from registration. |
| **Implementation of the Section 1145 Rights Offering:** | The Debtors shall conduct the Section 1145 Rights Offering on behalf of the Reorganized Debtors through customary subscription documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties.<br><br>The commencement and duration of the offering period for the Rights Offering (the "***Offering Period***") shall be reasonably acceptable to the Initial Parties.<br><br>Subscription rights issued in the Section 1145 Rights Offering to purchase Rights Offering Shares (the "***Section 1145 Equity Rights***") will be exercisable during the Offering Period by completing and returning to the rights agent (an agent appointed by the Debtors, and reasonably acceptable to the Initial Parties, to administer the Section 1145 Rights Offering) the applicable subscription form and paying the per share price for each Rights Offering Share to be purchased by wire transfer of immediately available funds to an account designated by the rights agent prior to the expiration of the Offering Period, except that each Backstop Party (except to the extent it has previously been required to fund, and has funded, such amounts in accordance with the terms of the Backstop Commitment Agreement) shall be permitted to fund its per share price for its exercise of Section 1145 Equity Rights and Backstop Commitments promptly following receipt of written notice from the rights agent advising of the amounts to be funded, and such Backstop Parties may fund to the rights agent or an escrow account established pursuant to terms reasonably satisfactory to the Initial Parties. All Backstop Parties shall be required to exercise their Section 1145 Equity Rights by completing and returning the applicable subscription form to the rights agent prior to the expiration of the Offering Period. |

| | |
|---|---|
| | Section 1145 Equity Rights are not transferable other than in connection with the transfer of the allowed claims to which Section 1145 Equity Rights relate, in accordance with the terms of the PSA.<br><br>If the Section 1145 Rights Offering is terminated for any reason, the funded amounts will be refunded to the applicable participant, without interest, as soon as practicable following termination of the Section 1145 Rights Offering.<br><br>The exercise of a Section 1145 Equity Right will be irrevocable unless the Section 1145 Rights Offering is not consummated by the date on which the Private Placement Agreement or the Backstop Commitment Agreement is terminated.<br><br>There will be no oversubscription rights under the Section 1145 Rights Offering. |
| **Backstop Premiums**: | The Debtors will pay the Backstop Parties in respect of the Backstop Commitment (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Backstop Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 (with proration for partial months) (the "***Backstop Ticking Premium***" and, together with the Backstop Commitment Premium, the "***Backstop Premiums***" and, together with the Private Placement Premiums, the "***Commitment Premiums***")  The Backstop Ticking Premium and the Private Placement Ticking Premium are referred to herein collectively as the "***Ticking Premiums***."<br><br>With respect to the Backstop Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Backstop Commitment Percentage as set forth on the Initial Backstop Commitment Schedule; (ii) 57.5% shall be allocated to the Initial Parties and creditors that become Additional Backstop Parties by 5:00 pm New York City time on the third business day following execution of the Backstop Commitment Agreement (the "***Phase Two Backstop Parties***") based upon (a) with respect to the Initial Parties, each Initial Party's Backstop Commitment Percentage, and (b) with respect to Phase Two Backstop Parties, each Phase Two Backstop Party's Backstop Commitment Percentage; and (iii) 20% shall be allocated to all Backstop Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after  the filing of the PPA and BCA Approval Motion based upon each Backstop Party's Backstop Commitment Percentage.  The Backstop Ticking Premium will be allocated pro rata among Backstop Parties.  The Backstop Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.   The Reorganized PEC Common Stock issued in connection with the Backstop Commitment Premium shall be issued after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity |

| | |
|---|---|
| | and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> of the Term Sheet<br><br>The Backstop Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order. The Backstop Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
| **Warrants** | On the Effective Date, the Debtors will issue warrants (the "***Penny Warrants***") exercisable for 5% of the fully diluted Reorganized PEC Common Stock as of the Effective Date (after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares, and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein), half of which shall be paid to the Initial Parties and half of which shall constitute the Rights Offering Penny Warrants.  The Penny Warrants shall have the following terms:<br> ▪ Date of Issuance: the Effective Date;<br><br> ▪ Exercise Price: $0.01 per share of Reorganized PEC Common Stock;<br><br> ▪ Term: 90 days;<br><br> ▪ Exercise Trigger: exercisable from and after the Effective Date. |
| **Pro Rata Split** | For purposes of the Backstop Commitment Percentages, the Pro Rata Split shall be determined as of the Record Date. |

| **GENERAL** | |
|---|---|
| **Term** | **Description** |
| **Registration Rights:** | Each Private Placement Party and each Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants) and each other creditor that receives 10% or more of the shares of Reorganized PEC Common Stock on a fully-converted basis (including the Reorganized PEC Common Stock issuable upon conversion of the Preferred Equity) issued under the Plan and/or the Section 1145 Rights Offering and cannot sell its shares under Rule 144 under the Securities Act without volume or manner of sale restrictions, together with each such person's affiliates to whom such person transfers such shares or other securities  (collectively, the "***Registration Rights Agreement Parties***"), shall be entitled to customary registration rights |

with respect to such Reorganized PEC Common Stock (including shares of Reorganized PEC Common Stock issuable pursuant to the Penny Warrants) and Preferred Equity pursuant to a registration rights agreement to be entered into, as of the Effective Date, by the Reorganized Debtors and the Registration Rights Agreement Parties (the "***Registration Rights Agreement***"), provided that the Company shall further agree that in any case in which the Company asserts that any Private Placement Party or Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants), or any affiliate of any such person to whom such person has transferred shares or other securities, may sell its shares (no matter the manner herein described under which such shares were acquired) under Rule 144 under the Securities Act without volume or manner of sale restrictions, the Company and its legal counsel shall upon request, and following receipt of all required certifications of such Private Placement Party, Backstop Party or affiliate reasonably requested by the Company or its legal counsel, promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such sale under Rule 144 under the Securities Act.

The Registration Rights Agreement will provide that the Company will (i) file a registration statement on Form S-1 (or other appropriate form) (the "Initial Resale Registration Statement") no later than 30 days following the Effective Date (the "Filing Deadline") covering all registrable securities that the holders thereof request to have included therein, (ii) use its reasonable best efforts to have the Initial Resale Registration Statement declared effective by the SEC no later than (X) in the case of a "no review", the 15th day following the Filing Deadline; (Y) in the case of a "limited review", the 45th day following the Filing Deadline, and (Z) in the case of a "review," the 75th day following the Filing Deadline (each such date, as applicable, the "Registration Deadline") and (iii) use its reasonable best efforts to keep such registration statement continuously effective (including filing any necessary post-effective amendment and/or subsequent registration statements) for a period of three years (or such shorter period if all registrable securities have been disposed by the holder thereof or are no longer registrable securities).

The Registration Rights Agreement will provide for liquidated damages of $75,000 per day in the event that (i) the Initial Resale Registration Statement is not filed on or prior to the Filing Deadline, (ii) the Initial Resale Registration Statement is not declared effective by the SEC on or prior to the applicable Registration Deadline or (iii) Holders are not permitted to use the prospectus included in the Initial Resale Registration

-12-

| | |
|---|---|
| | Statement to resell the securities for 15 or more consecutive days, or more than an aggregate of 30 days (which need not be consecutive calendar days), in any 12 month period.  Notwithstanding the foregoing, the aggregate amount of such liquidated damages payable by the Company under this Agreement shall not exceed $10,000,000.<br><br>The Registration Rights Agreement will provide customary piggy-back and demand registration rights to the Registration Rights Agreement Parties (including, without limitation, rights regarding "shelf" registrations and underwritten offerings).<br><br>The Registration Rights Agreement shall be in substantially the form to be filed with the Plan supplement, provided that such form is in form and substance reasonably acceptable to the Company and the Requisite Members of the Noteholder Steering Committee. |
| **Transferability of Private Placement Commitments and Backstop Commitments:** | A Private Placement Party or a Backstop Party may not transfer, directly or indirectly, all or any portion of its Commitments other than to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Backstop Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors; provided, that no such transfer shall relieve the transferring Private Placement Party or Backstop Party, as applicable, from such obligations.<br><br>Claims held by Backstop Parties are transferable only in accordance with the PSA and to the extent the Backstop Party remains a party to the Backstop Commitment Agreement.  Claims held by Private Placement Parties are transferable only in accordance with the PSA and to the extent the Private Placement Party remains a party to the Private Placement Agreement.<br><br>For the avoidance of doubt, any Initial Party may transfer its Claims in accordance with the PSA as set forth above, provided, however, such Initial Party shall retain its commitment and obligation to purchase its share as an Initial Party, based on, and calculated using, the Claim amounts set forth in the Initial Private Placement Schedule, of 22.5% of the Private Placement Shares in the aggregate, provided further, that any transferee which receives Claims from an Initial Party may not, in respect of such transferred Claims, become a Phase Two Private Placement Party, a Phase Two Backstop Party, an Additional Private Placement Party, or an Additional Backstop Party.  No such transfer shall relieve the transferring Initial Party from its obligations under the Private Placement Agreement or Backstop Commitment Agreement. |
| **Failure to Fund** | Any party that fails to timely fund its Private Placement Commitments or |

| | |
|---|---|
| **Commitments:** | Backstop Commitments, respectively (a "***Defaulting Party***"), will be liable for the consequences of its breach and that the parties to such agreement can enforce rights of damages and/or specific performance upon the failure to timely fund by the Defaulting Party. |
| **Debtors' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Debtors. |
| **Private Placement / Backstop Parties' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Private Placement Parties and the Backstop Parties, respectively, to be provided severally and not jointly. |
| **Interim Operating Covenant**: | Prior to and through the Effective Date, except as set forth in the Private Placement Agreement or the Plan, or with the written consent of the Requisite Consenting Noteholders, as applicable, the Company (x) shall, and shall cause its subsidiaries to, carry on their businesses in the ordinary course of business (considering the impact of the chapter 11 cases) and, except as currently subject to litigation, use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and make any required filing with the SEC within the time periods required under the Exchange Act, and (y) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with (i) with its business plan dated November 2016, (ii) the parameters described in the Private Placement Agreement or (iii) the Plan.<br><br>For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and will require the prior written consent of the Requisite Members of the Noteholder Steering Committee (unless otherwise contemplated by the Backstop Commitment Agreement, the Private Placement Agreement or the Plan): (a) except as currently subject to litigation, any amendment, modification, termination, waiver, supplement, restatement or other change to any material contract (definition to be reasonably agreed) or any assumption of any material contract, (b) any (i) termination by the Debtors without cause or (ii) reduction in title or responsibilities, in each case, of the individuals who are, as of the date of this Agreement, the Chief Executive Officer or the Chief Financial Officer of the Company, (c) the adoption or amendment of any management incentive or equity plan by any of the Debtors, except for as provided in the Plan or (d) any sale, abandonment, or disposition of any assets other than (i) the sale of |

| | |
|---|---|
| | Metropolitan Collieries Pty Ltd and/or Peabody (Burton Coal) Pty Ltd or the Debtors' interests in Dominion Terminal Associates LLC or (ii) any ordinary course land sales made upon reasonable prior notice to the Noteholder Co-Proponents and in accordance with the Company's business plan dated November 2016, provided, however, that such ordinary course land sales shall not exceed $5 million individually or $20 million in the aggregate.  Following a request by the Debtors for consent with respect to any operational matter that requires the consent of the Requisite Members of the Noteholder Steering Committee pursuant to this section, if the consent of such parties is not obtained or declined within three (3) business days following the date such request is made in writing and delivered to each of the Noteholder Co-Proponents (which notice will be deemed delivered if given in writing to Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, and Skadden, Arps, Slate, Meagher & Flom LLP), such consent shall be deemed to have been granted by the Requisite Members of the Noteholder Steering Committee, as applicable. If such consent is not given or deemed to be given, the Debtors shall be permitted to seek approval from the Bankruptcy Court to take such actions, and seeking such approval shall not be a breach of this interim operating covenant; provided, that in such event the Noteholder Co-Proponents shall have a termination right under the PSA. |
| **Effectiveness of Private Placement Agreement and Backstop Commitment Agreement:** | The Private Placement Agreement and the Backstop Commitment Agreement and the respective Commitments thereunder shall become effective upon execution and delivery of such agreement by the Debtors and each Private Placement Party or Backstop Party, as applicable, and the entry by the Bankruptcy Court of the PPA and BCA Approval Order; provided that, the obligations of such parties in respect of their Commitments shall be subject to the satisfaction or waiver of the Conditions Precedent below. |
| **PPA and BCA Approval Order:** | The parties hereto agree that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, and the Expense Reimbursement shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code under the PPA and BCA Approval Order, on such terms consistent with the Breakup Administrative Claim Treatment.<br><br>The "***PPA and BCA Approval Order***" shall mean the final order entered by the Bankruptcy Court, in form and substance acceptable to the Initial Parties, authorizing the Company (on behalf of itself and the other Debtors) to execute and deliver the Private Placement Agreement, the Backstop Commitment Agreement, including the authorization of the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and the indemnification provisions contained in the Private Placement Agreement and the |

|   | Backstop Commitment Agreement, and providing that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and indemnification obligations shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code, on terms consistent with the Breakup Administrative Claim Treatment, and shall be payable by the Debtors as provided in the relevant agreement without further order of the Bankruptcy Court.<br><br>For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by the absence of the entry of the BCA and PPA Approval Order. |
|---|---|

-16-

| | |
|---|---|
| **Conditions Precedent:** | The Commitments and the Backstop Parties' and Private Placement Parties' obligations to consummate the transactions contemplated in connection therewith will be subject to customary conditions precedent (the "<u>Conditions Precedent</u>"), including without limitation:<br><br>• The Company Group must have at least $600 million in cash on hand on the Effective Date;<br><br>• The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date (excluding any capital lease obligations, borrowings under any ABL facilities, and, to the extent the Effective Date occurs after April 3, 2017, any Incremental Additional First Lien Debt or, Incremental Second Lien Notes or additional amounts under the Exit Facility to finance any cash consideration on account of Incremental Second Lien Notes Claims); provided that, except in the event of a First Lien Full Cash Recovery, no more than $1.5 billion of such outstanding funded debt may be first lien debt;<br><br>• The claim asserted by the United Mine Workers of America 1974 Pension Plan shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee if for an amount above the amounts held in reserve by the Debtors for such claim;<br><br>• the PSA must remain in effect through the Effective Date;<br><br>• no event or events shall have occurred or exist that constitute, individually or in the aggregate, a Material Adverse Event;[5] and |

---

[5]   "**_Material Adverse Event_**" means any event, which individually, or together with all other events, has  or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities (including reclamation obligations, whether or not contingent), finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Term Sheet, including the Private Placement and the Section 1145 Rights Offering, in each case, except to the extent such event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the [date hereof] in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the [date hereof] in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of the transactions contemplated by the Term Sheet (including any act or omission of the Debtors expressly required or prohibited, as applicable, by this Term Sheet or consented to or required by the Requisite Members of the Noteholder Steering Committee in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of any of the Debtors not in contravention of the terms and conditions of this Term Sheet (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses

| | |
|---|---|
| | • the other conditions precedent to the Effective Date shall have been satisfied or waived in accordance with the terms of the Term Sheet as set forth above.<br><br>The foregoing conditions shall be waivable by the Requisite Consenting Noteholders in respect of Backstop Commitment Agreement and Private Placement Agreement, respectively. |
| **Termination of the Private Placement Agreement and the Backstop Commitment Agreement:** | The Commitments and the Debtors' obligations to consummate the transactions contemplated in connection herewith will be subject to customary termination events (each a "***Termination Event***"), including without limitation, the occurrence of any event that would give any party to the PSA the right to terminate its obligations thereunder, including without limitation the PSA Termination Condition.<br><br>Upon the occurrence of a Termination Event, all of the Private Placement Parties', Backstop Parties' and Debtors' obligations under the Private Placement Agreement and the Backstop Commitment Agreement, respectively, shall automatically terminate.  Upon termination, the Debtors shall have no ongoing obligations or liabilities under the Private Placement Agreement or the Backstop Commitment Agreement (including the payment of the Commitment Premiums), except for the Debtors' indemnification obligations; provided that such termination shall not relieve a party of liability for any pre-termination breach, or (subject to entry of the PPA and BCA Approval Order) relieve the Debtors of any obligations with respect to the Breakup Payments (to the extent payable pursuant to the terms thereof) and/or the Expense Reimbursement.<br><br>If either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason, both agreements shall be deemed to have been terminated. |
| **Breakup Payments:** | If following entry by the Bankruptcy Court of the PPA and BCA Approval Order either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason other than occurrence of the PSA Termination Condition (to the extent the Debtors terminate prior to entry of the PPA and BCA Approval Order), each of the following shall be payable in cash:<br><br>• a termination fee of 8% of the $750 million committed amount shall be paid to the Private Placement Parties, with (i) 22.5% of such fee |

contained in this definition); (vi) the filing or pendency of the Debtors' chapter 11 cases (including events resulting from any filings made in such cases); or (vii) declarations of national emergencies in the United States or natural disasters in the United States; provided, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such event is materially and disproportionately adverse to the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Private Placement Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Private Placement Parties pro rata in accordance with the Pro Rata Split and each Private Placement Party's Private Placement Commitment Period;[6] and

- a termination fee of 8% of the $750 million committed amount shall be paid to the Backstop Parties, with (i) 22.5% of the such fee allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Backstop Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Backstop Parties pro rata in accordance with the Pro Rata Split and each Backstop Party's Backstop Commitment Period;

(collectively, the "***Breakup Payments***").

If owed, the Breakup Payments shall be payable in lieu of the Private Placement Premiums, the Backstop Premiums, and half of the Penny Warrants.

All reasonable monthly fees and expenses of legal and financial professionals to the Noteholder Co-Proponents shall be payable in accordance with the terms set forth in this Term Sheet.

The Expense Reimbursement payable under this Term Sheet shall be entitled to administrative expense priority, and the Breakup Payments payable under this Term Sheet shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(a) In the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, including no greater amount of first lien notes than would be issued in accordance with Exhibit 1 hereto) that is equal to the allowed amount of the First Lien Lender Claims, then such fees shall be paid in cash on the Effective

---

[6]    "***Private Placement Commitment Period***" shall mean, for each Private Placement Party, the duration of such party's private placement obligations, which days shall be counted from the date on which the documentation necessary to be obligated under the Private Placement Agreement has been executed by a Private Placement Party and received and verified by the Debtors.

| | Date on such Plan; |
|---|---|
| | (b) In the event the conditions set forth in subsection (a) do not occur, then the Breakup Payments and the administrative expense claim on account of such the Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the fees which are on terms consistent with the terms of the New Second Lien Notes set forth in Exhibit 2 hereto;  provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing Intercreditor Agreement governing the First Lien Claims and Second Lien Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes (such treatment, the "Breakup Administrative Claim Treatment"). |
| **Fiduciary Out** | The Backstop Commitment Agreement and Private Placement Agreement shall each include a fiduciary out for the Debtors by which the Debtors may not shop or solicit alternative restructurings but may consider any alternative restructuring brought to them; provided, however, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such proposal; provided, further, the Breakup Payments and Expense Reimbursement (as defined below), shall be payable upon exercise by the Debtors of the fiduciary out in accordance with the terms of the Private Placement Agreement and the Backstop Commitment Agreement after the entry of the PPA and BCA Approval Order on such terms consistent with the Breakup Administrative Claim Treatment. |
| **Expense Reimbursement**: | In accordance with and subject to the entry of the PPA and BCA Approval Order, the Debtors will pay all reasonably incurred and documented out-of-pocket fees and expenses incurred in connection with the Debtors' chapter 11 cases after the Petition Date of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any fees incurred on behalf of any noteholders through the applicable indenture trustee and any fees that have accrued and would otherwise continue to accrue as administrative claims of certain Noteholder Co-Proponents under the Final DIP Order), including the fees and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "*Expense Reimbursement*"), in each case whether or not the Restructuring is ultimately consummated.  The payment of the fees set forth in this section shall (i) be approved upon entry of the PPA and BCA Approval Order; and (ii) prior to the time paid, |

NAI-1502345820v2

|  | be granted administrative expense priority against each Debtor on a joint and several basis.

Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment hereunder shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. The Expense Reimbursement accrued through the date on which the PPA and BCA Approval Order is entered shall be paid as promptly as reasonably practicable after such order is entered. Thereafter, the Expense Reimbursement shall be payable by the Debtors two weeks following their receipt of invoices. If the Private Placement Agreement and the Backstop Commitment Agreement are terminated for any reason in accordance with their terms, the Debtors will no longer be obligated to pay the Expense Reimbursement in respect of any fees incurred after the date of such termination. For the avoidance of doubt, the Debtors shall have no obligation to make any payment on account of the Expense Reimbursement if (i) the PSA Termination Condition occurs prior to the date of entry of the PPA and BCA Approval Order by the Bankruptcy Court, or (ii) the PPA and BCA Approval Order is not entered by the Bankruptcy Court. |

-21-

| Specific Performance | Each of the Debtors, the Private Placement Parties and the Backstop Parties agree that irreparable damage would occur if any provision of the Private Placement Agreement or the Backstop Commitment Agreement were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the Private Placement Agreement and the Backstop Commitment Agreement or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in the Private Placement Agreement or the Backstop Commitment Agreement or herein, no right or remedy described or provided in the Private Placement Agreement or the Backstop Commitment Agreement or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity. |
|---|---|
| Noteholder Co-Proponent Approval Rights | Each substantive document in connection with the Restructuring, including without limitation the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee in accordance with the terms set forth on Exhibit 8: <br><br>• The Disclosure Statement and the motion and order to approve same; <br>• The Plan and any exhibits, supplements, appendices, etc. thereto; <br>• The credit agreement and/or indenture for the Exit Facility; <br>• The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on Exhibit 1 hereto. <br>• The corporate constituent documents of the Reorganized Debtors; <br>• The certificate of designation of Series A convertible preferred stock of PEC; <br>• The documents relating to the Section 1145 Rights Offering and the Private Placement; <br>• The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee; <br>• The Confirmation Order; and <br>• The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement. <br><br>Notwithstanding the foregoing, the following material documents in |

-22-

<table>
<tr><td></td><td>connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent:

- The Term Sheet;
- The PSA;
- The Private Placement Agreement;
- The Backstop Commitment Agreement; and
- The orders relating to each of the above.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.

The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).</td></tr>
<tr><td>**Milestones**</td><td>The Restructuring shall be implemented in accordance with the Milestones set forth in the Term Sheet.</td></tr>
<tr><td>**Reclamation Bonding**</td><td>As a condition to the Effective Date, the Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "***Bonding Solution***"). The Debtors shall provide updates every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution.</td></tr>
<tr><td>**Material Claim Settlements**</td><td>The Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim.</td></tr>
</table>

-23-

<u>**Schedule 1(a)**</u>

**Initial Private Placement Schedule**

NAI-1502345820v2

# Initial Private Placement Schedule

*$ in millions*

### Initial Private Placement Schedule

| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
|---|---|---|---|---|---|---|---|
| Discovery Capital Management, LLC | ▉ | ▉ | 32.585% | ▉ | ▉ | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P. | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | ▉ | ▉ | **100.000%** | ▉ | ▉ | **100.000%** | **$750.000** |

## <u>Schedule 1(b)</u>

**Initial Backstop Commitment Schedule**

# Initial Backstop Schedule

*$ in millions*

| | Class 2 Holdings | Class 5B Holdings | Steering Comm Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
|---|---|---|---|---|---|---|---|
| **Initial Backstop Commitment Schedule** | | | | | | | |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P.1 | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

## Exhibit 6

## Encumbered Guarantor Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | American Land Development, LLC | 20-3405570 | 16-42535 |
| 2. | American Land Holdings of Colorado, LLC | 26-3730572 | 16-42540 |
| 3. | American Land Holdings of Illinois, LLC | 30-0440127 | 16-42600 |
| 4. | American Land Holdings of Indiana, LLC | 20-2514299 | 16-42546 |
| 5. | American Land Holdings of Kentucky, LLC | 20-0766113 | 16-42589 |
| 6. | American Land Holdings of West Virginia, LLC | 20-5744666 | 16-42571 |
| 7. | Big Ridge, Inc. | 37-1126950 | 16-42553 |
| 8. | Big Sky Coal Company | 81-0476071 | 16-42530 |
| 9. | Black Hills Mining Company, LLC | 32-0049741 | 16-42544 |
| 10. | BTU Western Resources, Inc. | 20-1019486 | 16-42554 |
| 11. | Caballo Grande, LLC | 27-1773243 | 16-42559 |
| 12. | Caseyville Dock Company, LLC | 20-8080107 | 16-42537 |
| 13. | Central States Coal Reserves of Illinois, LLC | 43-1869432 | 16-42688 |
| 14. | Central States Coal Reserves of Indiana, LLC | 20-3960696 | 16-42551 |
| 15. | Century Mineral Reserves, LLC | 36-3925555 | 16-42567 |
| 16. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 | 16-42543 |
| 17. | COALSALES II, LLC | 43-1610419 | 16-42570 |
| 18. | Conservancy Resources, LLC | 20-5744701 | 16-42564 |
| 19. | Cottonwood Land Company | 43-1721982 | 16-42572 |
| 20. | Cyprus Creek Land Company | 73-1625890 | 16-42534 |
| 21. | Cyprus Creek Land Resources LLC | 75-3058264 | 16-42602 |
| 22. | Dyson Creek Coal Company, LLC | 43-1898526 | 16-42612 |
| 23. | Dyson Creek Mining Company, LLC | 20-8080062 | 16-42621 |
| 24. | Empire Land Holdings, LLC | 61-1742786 | 16-42692 |
| 25. | Falcon Coal Company, LLC | 35-2006760 | 16-42547 |
| 26. | Francisco Equipment Company, LLC | 37-1805119 | 16-42568 |
| 27. | Francisco Land Holdings Company, LLC | 36-4831111 | 16-42580 |
| 28. | Francisco Mining, LLC | 30-0922117 | 16-42591 |
| 29. | Highwall Mining Services Company | 20-0010659 | 16-42588 |
| 30. | Hillside Recreational Lands, LLC | 32-0214135 | 16-42594 |
| 31. | HMC Mining, LLC | 43-1875853 | 16-42566 |
| 32. | Illinois Land Holdings, LLC | 26-1865197 | 16-42599 |
| 33. | Independence Material Handling, LLC | 43-1750064 | 16-42606 |
| 34. | James River Coal Terminal, LLC | 55-0643770 | 16-42569 |
| 35. | Kayenta Mobile Home Park, Inc. | 86-0773596 | 16-42607 |
| 36. | Kentucky Syngas, LLC | 26-1156957 | 16-42618 |
| 37. | Lively Grove Energy, LLC | 20-5752800 | 16-42595 |
| 38. | Marigold Electricity, LLC | 26-0180352 | 16-42628 |
| 39. | Midco Supply and Equipment Corporation | 43-6042249 | 16-42585 |
| 40. | Midwest Coal Acquisition Corp. | 20-0217640 | 16-42576 |
| 41. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 | 16-42597 |
| 42. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 | 16-42611 |
| 43. | Mustang Energy Company, LLC | 43-1898532 | 16-42657 |
| 44. | Pacific Export Resources, LLC | 27-5135144 | 16-42598 |
| 45. | Peabody Archveyor, L.L.C. | 43-1898535 | 16-42623 |
| 46. | Peabody Arclar Mining, LLC | 31-1566354 | 16-42545 |
| 47. | Peabody Bear Run Mining, LLC | 26-3582291 | 16-42565 |

NAI-1502345820v2

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 48. | Peabody Bear Run Services, LLC | 26-3725923 | 16-42574 |
| 49. | Peabody Caballo Mining, LLC | 83-0309633 | 16-42533 |
| 50. | Peabody Cardinal Gasification, LLC | 20-5047955 | 16-42542 |
| 51. | Peabody Coalsales, LLC | 20-1759740 | 16-42539 |
| 52. | Peabody COALTRADE International (CTI), LLC | 20-1435716 | 16-42590 |
| 53. | Peabody COALTRADE, LLC | 43-1666743 | 16-42575 |
| 54. | Peabody Coulterville Mining, LLC | 20-0217834 | 16-42550 |
| 55. | Peabody Development Company, LLC | 43-1265557 | 16-42558 |
| 56. | Peabody Electricity, LLC | 20-3405744 | 16-42532 |
| 57. | Peabody Employment Services, LLC | 26-3730348 | 16-42538 |
| 58. | Peabody Energy Generation Holding Company | 73-1625891 | 16-42656 |
| 59. | Peabody Energy Investments, Inc. | 68-0541702 | 16-42642 |
| 60. | Peabody Energy Solutions, Inc. | 43-1753832 | 16-42632 |
| 61. | Peabody Gateway North Mining, LLC | 27-2294407 | 16-42624 |
| 62. | Peabody Gateway Services, LLC | 26-3724075 | 16-42581 |
| 63. | Peabody Holding Company, LLC | 74-2666822 | 16-42592 |
| 64. | Peabody Illinois Services, LLC | 26-3722638 | 16-42610 |
| 65. | Peabody Indiana Services, LLC | 26-3724339 | 16-42619 |
| 66. | Peabody International Investments, Inc. | 26-1361182 | 16-42536 |
| 67. | Peabody International Services, Inc. | 20-8340434 | 16-42541 |
| 68. | Peabody Investments Corp. | 20-0480084 | 16-42549 |
| 69. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 | 16-42587 |
| 70. | Peabody Midwest Management Services, LLC | 26-3726045 | 16-42593 |
| 71. | Peabody Midwest Mining, LLC | 35-1799736 | 16-42667 |
| 72. | Peabody Midwest Operations, LLC | 20-3405619 | 16-42660 |
| 73. | Peabody Midwest Services, LLC | 26-3722194 | 16-42608 |
| 74. | Peabody Natural Gas, LLC | 43-1890836 | 16-42626 |
| 75. | Peabody Operations Holding, LLC | 26-3723890 | 16-42678 |
| 76. | Peabody Powder River Mining, LLC | 43-0996010 | 16-42666 |
| 77. | Peabody Powder River Operations, LLC | 20-3405797 | 16-42676 |
| 78. | Peabody Powder River Services, LLC | 26-3725850 | 16-42613 |
| 79. | Peabody PowerTree Investments, LLC | 20-0116980 | 16-42596 |
| 80. | Peabody Recreational Lands, L.L.C. | 43-1898382 | 16-42605 |
| 81. | Peabody School Creek Mining, LLC | 20-3585831 | 16-42633 |
| 82. | Peabody Services Holdings, LLC | 26-3726126 | 16-42645 |
| 83. | Peabody Southwest, LLC | 20-5744732 | 16-42631 |
| 84. | Peabody Terminal Holding Company, LLC | 26-1087861 | 16-42650 |
| 85. | Peabody Terminals, LLC | 31-1035824 | 16-42614 |
| 86. | Peabody Trout Creek Reservoir LLC | 30-0746873 | 16-42622 |
| 87. | Peabody Venezuela Coal Corp. | 43-1609813 | 16-42651 |
| 88. | Peabody Venture Fund, LLC | 20-3405779 | 16-42637 |
| 89. | Peabody-Waterside Development, L.L.C. | 75-3098342 | 16-42662 |
| 90. | Peabody Western Coal Company | 86-0766626 | 16-42644 |
| 91. | Peabody Wild Boar Mining, LLC | 26-3730759 | 16-42672 |
| 92. | Peabody Wild Boar Services, LLC | 26-3725591 | 16-42677 |
| 93. | Peabody Wyoming Gas, LLC | 20-5744610 | 16-42640 |
| 94. | Peabody Wyoming Services, LLC | 26-3723011 | 16-42653 |
| 95. | PEC Equipment Company, LLC | 20-0217950 | 16-42673 |
| 96. | Point Pleasant Dock Company, LLC | 20-0117005 | 16-42655 |
| 97. | Pond River Land Company | 73-1625893 | 16-42629 |
| 98. | Porcupine Production, LLC | 43-1898379 | 16-42648 |
| 99. | Porcupine Transportation, LLC | 43-1898380 | 16-42665 |

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 100. | Riverview Terminal Company | 13-2899722 | 16-42664 |
| 101. | Sage Creek Land & Reserves, LLC | 38-3936826 | 16-42635 |
| 102. | School Creek Coal Resources, LLC | 20-2902073 | 16-42643 |
| 103. | Seneca Coal Company, LLC | 84-1273892 | 16-42652 |
| 104. | Shoshone Coal Corporation | 25-1336898 | 16-42668 |
| 105. | Star Lake Energy Company, L.L.C. | 43-1898533 | 16-42639 |
| 106. | Sugar Camp Properties, LLC | 35-2130006 | 16-42649 |
| 107. | Thoroughbred Generating Company, L.L.C. | 43-1898534 | 16-42679 |
| 108. | Thoroughbred Mining Company LLC. | 73-1625889 | 16-42680 |
| 109. | West Roundup Resources, LLC | 20-2561489 | 16-42671 |
| 110. | Wild Boar Equipment Company, LLC | 32-0488114 | 16-42658 |
| 111. | Wild Boar Land Holdings Company, LLC | 36-4831131 | 16-42661 |

## Gold Fields Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Gold Fields Mining, LLC | 36-2079582 | 16-42561 |
| 2. | Arid Operations, Inc. | 84-1199578 | 16-42562 |
| 3. | Gold Fields Chile, LLC | 13-3004607 | 16-42548 |
| 4. | Gold Fields Ortiz, LLC | 22-2204381 | 16-42578 |

## Unencumbered Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Four Star Holdings, LLC | 30-0885825 | 16-42556 |
| 2. | Southwest Coal Holdings, LLC | 37-1794829 | 16-42674 |
| 3. | New Mexico Coal Resources, LLC | 20-3405643 | 16-42647 |
| 4. | El Segundo Coal Company, LLC | 20-8162824 | 16-42691 |
| 5. | Peabody New Mexico Services, LLC | 20-8162939 | 16-42646 |
| 6. | Peabody America, LLC | 93-1116066 | 16-42609 |
| 7. | Gallo Finance Company, LLC | 43-1823616 | 16-42586 |
| 8. | Peabody Natural Resources Company | 51-0332232 | 16-42634 |
| 9. | American Land Holdings of New Mexico, LLC | 32-0478983 | 16-42579 |
| 10. | Peabody Southwestern Coal Company, LLC | 43-1898372 | 16-42641 |
| 11. | NM Equipment Company, LLC | 36-4821991 | 16-42582 |
| 12. | Peabody Colorado Operations, LLC | 20-2561644 | 16-42563 |
| 13. | Twentymile Holdings, LLC | 38-3937156 | 16-42654 |
| 14. | Sage Creek Holdings, LLC | 26-3286872 | 16-42670 |
| 15. | Peabody Sage Creek Mining, LLC | 26-3730653 | 16-42625 |
| 16. | Hayden Gulch Terminal, LLC | 86-0719481 | 16-42583 |
| 17. | Colorado Yampa Coal Company, LLC | 95-3761211 | 16-42560 |
| 18. | Juniper Coal Company, LLC | 43-1744675 | 16-42577 |
| 19. | Peabody Williams Fork Mining, LLC | 20-8162742 | 16-42630 |
| 20. | Moffat County Mining, LLC | 74-1869420 | 16-42636 |
| 21. | Peabody Colorado Services, LLC | 26-3723774 | 16-42531 |
| 22. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 | 16-42603 |
| 23. | Peabody Rocky Mountain Services, LLC | 20-8162706 | 16-42616 |
| 24. | Peabody Twentymile Mining, LLC | 26-3725223 | 16-42627 |

| | | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|---|
| 25. | | Seneca Property, LLC | 36-4820253 | 16-42659 |
| 26. | | Twentymile Equipment Company, LLC | 38-3982017 | 16-42675 |
| 27. | | Twentymile Coal, LLC | 95-3811846 | 16-42669 |
| 28. | | Kentucky United Coal, LLC | 35-2088769 | 16-42573 |
| 29. | | United Minerals Company, LLC | 35-1922432 | 16-42663 |
| 30. | | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 | 16-42620 |
| 31. | | Peabody Asset Holdings, LLC | 20-3367333 | 16-42555 |
| 32. | | Peabody China, LLC | 43-1898525 | 16-42552 |
| 33. | | Peabody Mongolia, LLC | 20-8714315 | 16-42617 |
| 34. | | Peabody IC Funding Corp | 46-2326991 | 16-42615 |
| 35. | | Peabody IC Holdings, LLC | 30-0829603 | 16-42601 |
| 36. | | PG Investments Six, L.L.C. | 43-1898530 | 16-42638 |

# Exhibit 7

## Summary Table of Proposed Classification Scheme

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1A – 1D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | First Lien Lender Claims | Impaired | Entitled to Vote |
| 2A – 2D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 3A – 3E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4A – 4E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Priority Claims | Unimpaired | Deemed to Accept |
| 5A – 5E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | General Unsecured Claims | Impaired | Entitled to Vote /<br>Deemed to Reject (Gib1) |
| 6A, 6B | PEC<br>Encumbered Guarantor Debtors | Convenience Class Claims | Impaired | Entitled to Vote |
| 7A – 7E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | MEPP Claim | TBD | TBD |
| 8A | PEC | Unsecured Subordinated Debenture Claims | Impaired | Deemed to Reject |

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|-----------|---------------|-------------|------------|------------------|
| 9A – 9E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Intercompany Claims | Unimpaired | Deemed to Accept |
| 10A | PEC | Section 510(b) Claims | Impaired | Deemed to Reject |
| 11A | PEC | PEC Interests | Impaired | Deemed to Reject |
| 12B – 12E | Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Subsidiary Debtor Interests | Unimpaired | Deemed to Accept |

## Exhibit 8

### Private Placement and Backstop Commitment Parties
### Voting/Consent Structure

Set forth below is the structure for voting and consents by the Private Placement Parties and the Backstop Commitment Parties with respect to material issues, including the Private Placement, Plan terms, the Backstop Commitment and the Restructuring (the "Voting / Consent Structure").

### Gatekeeping for All Issues – 75% of Noteholder Steering Committee

All proposed changes, modifications and amendments to the Plan Documents (as defined in the PSA) and the Transactions contemplated therein shall be vetted by the Noteholder Steering Committee.  Proposals will be submitted for ratification – as set forth below – only if supported by 75% of the committee based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule (a "75% Supermajority").  If one of the seven members of the Noteholder Steering Committee transfers or assigns any of its holdings (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned holdings shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong as of the date of execution of the Plan Support Agreement (the "PSA") to the same ad hoc noteholder group as the transferring or assigning member.[42]

The Noteholder Steering Committee shall retain voting and consent rights with respect to any termination rights, default provisions, cross-default provisions, and waivers of such rights and provisions.  Such voting and consent rights shall require a 75% Supermajority of the Noteholder Steering Committee parties, pursuant to the terms and conditions set forth in the immediately

---

[42]  For example, any transfer of any Claims by Elliott (regardless of whether it is a Class 2 or Class 5 Claim) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Elliott to Discovery and Aurelius on a pro rata basis based on the Claim holdings of Discovery and Aurelius, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Similarly, any transfer of any Claims by Point State (regardless of the type of claim transferred) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Point State to Contrarian, Panning, and SDIC on a pro rata basis based on the claim holdings of Contrarian, Panning, and SDIC, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule.  Solely for purposes of this Exhibit, for the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Commitment Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein.  For the avoidance of doubt, Contrarian, in its capacity as investment advisor or manager to various entities and managed accounts set forth on the Initial Private Placement Schedule and Initial Backstop Commitment Schedule, shall vote for the same for purposes hereof.

preceding paragraph; provided, however, that for the avoidance of doubt the Steering Committee may not extend the effective date milestone beyond June 14, 2017 absent consent from all parties in accordance with C.10 below.

In the event that a proposed change falls, or could be interpreted to fall, into two or more voting threshold categories (A, B, C, and D) set forth below, such proposed change shall be deemed to fall into the category with the highest voting threshold and shall be subject to such category's voting threshold accordingly.

## A. Class Issues – 66% by Class

Requires a 66% supermajority affirmative vote of parties who vote[43] in each affected class, based on aggregate respective Private Placement Commitments held by each Private Placement Party at such time, on a class-by-class basis (2-class vote):

1. issuance of dilutive securities not contemplated by the Restructuring Term Sheet
2. changes to the allocation of Private Placement Commitment (including changes to holdback)
3. changes to the allocation of Backstop Commitment
4. terms of the New Second Lien Notes; provided, however, that no such vote or approval shall be required in connection with the terms of the New Second Lien Notes, to the extent such terms are consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet
5. changes to the capital structure (e.g. increase in total debt above Restructuring Term Sheet debt levels)
6. any material changes that would disproportionately treat either the Unsecured Senior Notes Claims or Second Lien Notes Claims more favorably or less favorably on anything other than a proportionate basis

## B. Other Issues – 66% of All

Requires a 66% supermajority affirmative vote of all parties who vote, based on aggregate respective Private Placement Commitments held by each party at such time:

1. the Private Placement Amount (as defined in the Private Placement Agreement) or Rights Offering Amount (as defined in the Backstop Commitment Agreement) (except for adjustments of up to $100 million in aggregate in order to ensure that the Rights Offering is compliant with section 1145 of the Bankruptcy Code and any other applicable regulations)
2. changes to corporate governance set forth in the Restructuring Term Sheet
3. priority of dilution of all securities (Penny Warrants, Preferred Equity, Common Shares)
4. Material Adverse Event definition & waivers of potential Material Adverse Events

---

[43]    For the avoidance of doubt, any Additional Private Placement Party or Additional Backstop Party, including, but not limited to, any Phase Two Placement Party or any Additional Backstop Party, shall not be entitled to exercise voting or consent rights as set forth herein unless and until the applicable subscription or enrollment period (as may be extended, reduced, or otherwise modified as set forth herein) has expired.

NAI-1502345820v2

5. any other changes not specifically subject to a different standard herein over which the Requisite Consenting Noteholders have consent or approval rights as set forth in the Term Sheet

### C.  All Party Fundamental Rights – 100% of All

Requires unanimous consent by all affected parties.  Except with respect to proposed changes under items 3 or 4 listed below (as well as item 11, to the extent any proposed change under item 11 would impact, directly or indirectly, items 3 or 4), if a proposal achieves affirmative votes from parties holding 66% or more of the aggregate Private Placement Commitments outstanding at such time, the rights and obligations under the Private Placement Agreement and Backstop Commitment Agreement of any party that dissents from such proposed change will be automatically terminated, subject to the decision by a 75% Supermajority to proceed with the proposed change on the basis of redistributing the dissenters' commitments to Private Placement Parties/Commitment Parties that agree to assume the additional commitments.  This ejection shall not limit the dissenters' obligations under the Plan Support Agreement (other than any obligation to be a Private Placement Party or Commitment Party, as applicable).  If the Noteholder Steering Committee determines not to proceed with the amendment, dissenters will remain Private Placement Parties and Commitment Parties, as applicable.

1. increasing the dollar amount of each party's commitment (other than through the addition of Additional Private Placement/Commitment Parties)
2. changing any voting or consent threshold or any related definitions (including "Requisite Creditor Parties", "Requisite Consenting Noteholders"  or "Requisite Members of the Noteholder Steering Committee")
3. changes disproportionately adversely affecting any individual party
4. changes to the Pro Rata Split
5. changes to Backstop Premiums, Backstop Breakup Payments, Private Placement Premiums, or Private Placement Breakup Payments or allocation of such fees
6. changes to Plan Enterprise Value (as set forth in the Restructuring Term Sheet) or Plan Equity Value (as set forth in the Restructuring Term Sheet)
7. discounts to Plan Equity Value for the Private Placement and Rights Offering
8. increase of Penny Warrant issuance
9. conversion rates for Penny Warrants
10. extension or waiver of the Effective Date milestone in the PSA or Term Sheet past June 14, 2017, or any modification of the termination rights set forth in (i) section 9.3 of the Private Placement Agreement (Termination by a Private Placement Party), (ii) section 2.7(a) of the Private Placement Agreement (Designation and Assignment Rights). (iii) section 9.3 of the Backstop Commitment Agreement (Termination by a Commitment Party), (iv) section 2.7(a) of the Backstop Commitment Agreement (Designation and Assignment Rights), and (v) section 12.08 of the PSA
11. changes in definitions impacting, directly or indirectly, any of the above items

### D.  Initial Party Fundamental Rights – 100% of Initial Parties

Requires unanimous consent of Noteholder Co-Proponents:
1. changes to the Initial Backstop Commitment Schedule or Initial Private Placement Schedule

2. changes to the allocations, conditions, or other terms of any "protected" commitments of any of the Initial Parties, including but not limited to the Private Placement holdback, the Surplus Private Placement Adjustment, and the Surplus Backstop Participation Adjustment

## **Exhibit 9**

## **Illustrative Allocation of Reorganized PEC Common Stock (Fully-Diluted)**

**Exhibit 9: Illustrative Allocation of Reorganized PEC Common Shares (Fully-Diluted)** [1]

| Share Calculation | |
|---|---:|
| Plan Enterprise Value | $4,275,000,000 |
| Less: Net Debt | (1,170,000,000) |
| **Plan Equity Value** | **$3,105,000,000** |
| Divided by: Assumed Per Share Plan Value | $25.00 |
| **Fully-Diluted Common Shares** | **124,200,000** |

| Rights Offering | |
|---|---:|
| Rights Offering Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (BCA) | $13.75 |
| **Rights Offering Shares** | **54,545,454** |

| Private Placement | |
|---|---:|
| Private Placement Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (PPA) | $25.00 |
| **Private Placement Shares** | **30,000,000** |
| Divided by: Conversion Price | $16.25 |
| **Private Placement Shares (As-Converted into Common Shares)** | **46,153,846** |

| Private Placement / Backstop Commitment Premium | |
|---|---:|
| Total Rights Offering / Private Placement Amount | $1,500,000,000 |
| Multiplied by: Private Placement / Backstop Commitment Premium (%) | 8.00% |
| **Private Placement / Backstop Commitment Premium ($)** | **$120,000,000** |
| Divided by: Per Share Plan Value | $25.00 |
| **Commitment Premium Shares** | **4,800,000** |

| Penny Warrants | |
|---|---:|
| Plan Equity Value | $3,105,000,000 |
| Divided by: Per Share Plan Value | $25.00 |
| Multiplied by: Amount of Fully-Diluted Plan Equity Value (%) | 5.00% |
| **Warrant Shares (As-Exercised into Common Shares)** | **6,210,000** |

| Fully-Diluted Equity Capitalization at Emergence | |
|---|---:|
| Rights Offering Shares | 54,545,454 |
| Private Placement Shares (As-Converted) | 46,153,846 |
| Commitment Premium Shares | 4,800,000 |
| Warrant Shares (As-Exercised) | 6,210,000 |
| Incremental Second Lien Shares | TBD |
| Disputed Claims Reserve Shares | TBD |
| Ticking Premium Shares | TBD |
| Shares for Class 2/5B Plan Distributions [1] | 12,490,700 |
| **Total Shares of Reorganized PEC Common Shares (Fully-Diluted)** | **124,200,000** |

[1] Shares of Reorganized PEC Common Shares issued to holders of Class 2 and Class 5B claims pursuant to the Plan shall be reduced share-for-share to the extent of the issuance of Incremental Second Lien Shares, Disputed Claims Reserve Shares, and/or Ticking Premium Shares.

## EXHIBIT 2

### FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT to that certain Plan Support Agreement entered into as of [_____], 2016 by and among the Debtors, the Supporting Creditor Parties (in their capacities as parties thereto), and attached hereto as <u>Exhibit A</u> (as amended, modified, or amended and restated from time to time in accordance with its terms, the "<u>Plan Support Agreement</u>"), is hereby executed and delivered by **[●]** (the "<u>Joining Party</u>") as of _____ **[●]**, ___.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Plan Support Agreement.

<u>Agreement to be Bound</u>.  The Joining Party hereby agrees, on a several basis, to be bound by the Plan Support Agreement in accordance with its terms.  The Joining Party shall hereafter be deemed to be a Party, and to the extent the Joining Party is a transferee of a Creditor Co-Proponent, such Joining Party shall hereafter be deemed to be an Additional Supporting Party, for any and all purposes under the Plan Support Agreement, and not a Creditor Co-Proponent.  For the avoidance of doubt, to the extent not already a Party to the Plan Support Agreement, the Joining Party shall only become a Party (or Supporting Creditor Party, to the extent applicable) to the Plan Support Agreement with respect to any and all Claims owned by such a Joining Party shall automatically and immediately upon execution of this Joinder Agreement be deemed to be subject to all of the terms of the Plan Support Agreement.   In the event of any inconsistency between this Joinder Agreement and the Plan Support Agreement, the Plan Support Agreement shall control in all respects.

<u>Representations and Warranties</u>.  With respect to the aggregate principal amount and type of Claims set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Parties set forth in <u>Section 9</u> of the Plan Support Agreement to each other Party to the Plan Support Agreement.  For the avoidance of doubt, only the aggregate principal amount of the Claims that are the subject of the Transfer must be stated on the signature page of this Joinder Agreement.

<u>Governing Law</u>.   This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of laws principles thereof that would require the application of the law of any other jurisdiction.

[Signature pages follow.]

Date executed:   [_____]

[NAME OF TRANSFEREE]

By:   _____
Name:
Title:

Address:   _____

_____

_____

Attn.:   _____
Tel.:   _____
Fax:   _____
Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

First Lien Lender Claims:

$_____

Second Lien Notes Claims:

$_____

Unsecured Senior Notes Claims:

$_____

[Signature Page to Joinder to Plan Support Agreement]

NAI-1502345833v1

<u>**Exhibit A**</u>

**Plan Support Agreement**

## Exhibit E

## Illustrative Allocation of Common Shares (Fully Diluted)

**Exhibit 9: Illustrative Allocation of Reorganized PEC Common Shares (Fully-Diluted)** [1]

| Share Calculation | |
|---|---:|
| Plan Enterprise Value | $4,275,000,000 |
| Less: Net Debt | (1,170,000,000) |
| **Plan Equity Value** | **$3,105,000,000** |
| Divided by: Assumed Per Share Plan Value | $25.00 |
| **Fully-Diluted Common Shares** | **124,200,000** |

| Rights Offering | |
|---|---:|
| Rights Offering Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (BCA) | $13.75 |
| **Rights Offering Shares** | **54,545,454** |

| Private Placement | |
|---|---:|
| Private Placement Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (PPA) | $25.00 |
| **Private Placement Shares** | **30,000,000** |
| Divided by: Conversion Price | $16.25 |
| **Private Placement Shares (As-Converted into Common Shares)** | **46,153,846** |

| Private Placement / Backstop Commitment Premium | |
|---|---:|
| Total Rights Offering / Private Placement Amount | $1,500,000,000 |
| Multiplied by: Private Placement / Backstop Commitment Premium (%) | 8.00% |
| **Private Placement / Backstop Commitment Premium ($)** | **$120,000,000** |
| Divided by: Per Share Plan Value | $25.00 |
| **Commitment Premium Shares** | **4,800,000** |

| Penny Warrants | |
|---|---:|
| Plan Equity Value | $3,105,000,000 |
| Divided by: Per Share Plan Value | $25.00 |
| Multiplied by: Amount of Fully-Diluted Plan Equity Value (%) | 5.00% |
| **Warrant Shares (As-Exercised into Common Shares)** | **6,210,000** |

| Fully-Diluted Equity Capitalization at Emergence | |
|---|---:|
| Rights Offering Shares | 54,545,454 |
| Private Placement Shares (As-Converted) | 46,153,846 |
| Commitment Premium Shares | 4,800,000 |
| Warrant Shares (As-Exercised) | 6,210,000 |
| Incremental Second Lien Shares | TBD |
| Disputed Claims Reserve Shares | TBD |
| Ticking Premium Shares | TBD |
| Shares for Class 2/5B Plan Distributions[1] | 12,490,700 |
| **Total Shares of Reorganized PEC Common Shares (Fully-Diluted)** | **124,200,000** |

---

[1] Shares of Reorganized PEC Common Shares issued to holders of Class 2 and Class 5B claims pursuant to the Plan shall be reduced share-for-share to the extent of the issuance of Incremental Second Lien Shares, Disputed Claims Reserve Shares, and/or Ticking Premium Shares.

# **EXHIBIT C**

Backstop Commitment Agreement

BACKSTOP COMMITMENT AGREEMENT

AMONG

PEABODY ENERGY CORPORATION

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of December 22, 2016

TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ....................................................................................**4**
    Section 1.1    Definitions..................................................................4
    Section 1.2    Construction...............................................................23

**ARTICLE II BACKSTOP COMMITMENT** .........................................................**24**
    Section 2.1    The Rights Offering; Subscription Rights ................24
    Section 2.2    The Backstop Commitment .....................................24
    Section 2.3    Additional **Commitment** Parties. ............................25
    Section 2.4    Escrow Account Funding.........................................26
    Section 2.5    Commitment Party Default ......................................27
    Section 2.6    Closing ....................................................................27
    Section 2.7    Designation and Assignment Rights.........................28

**ARTICLE III BACKSTOP PREMIUMS, EXPENSE REIMBURSEMENT AND
WARRANTS** .......................................................................................................**30**
    Section 3.1    Applicable Premiums...............................................30
    Section 3.2    Payment of Backstop Commitment Premium...........30
    Section 3.3    Expense Reimbursement ..........................................31
    Section 3.4    Warrants...................................................................31

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ...........**32**
    Section 4.1    Organization and Qualification................................32
    Section 4.2    Corporate Power and Authority ...............................32
    Section 4.3    Execution and Delivery; Enforceability....................33
    Section 4.4    Authorized and Issued Equity Interests ...................33
    Section 4.5    No Conflict...............................................................34
    Section 4.6    Consents and Approvals ..........................................34
    Section 4.7    Company SEC Documents and Disclosure Statement............35
    Section 4.8    Absence of Certain Changes ....................................35
    Section 4.9    No Violation; Compliance with Laws .......................35
    Section 4.10    Legal Proceedings ...................................................35
    Section 4.11    Labor Relations .......................................................35
    Section 4.12    Intellectual Property ................................................36
    Section 4.13    Title to Real and Personal Property ..........................36
    Section 4.14    No Undisclosed Relationships .................................37
    Section 4.15    Licenses and Permits...............................................37
    Section 4.16    Environmental..........................................................37
    Section 4.17    Tax Returns .............................................................38
    Section 4.18    Employee Benefit Plans ..........................................39
    Section 4.19    Internal Control Over Financial Reporting ...............40
    Section 4.20    Disclosure Controls and Procedures ........................40
    Section 4.21    Material Contracts...................................................40
    Section 4.22    No Unlawful Payments ............................................40
    Section 4.23    Compliance with Money Laundering Laws...............40
    Section 4.24    Compliance with Sanctions Laws ............................41

i

TABLE OF CONTENTS (cont'd)

Page

Section 4.25    No Broker's Fees ..................................................................................41
Section 4.26    Investment Company Act .....................................................................41
Section 4.27    Insurance ..............................................................................................41
Section 4.28    Alternative Transactions .......................................................................41
Section 4.29    Issuance ................................................................................................42

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE
COMMITMENT PARTIES** ...............................................................................**42**
Section 5.1     Organization .........................................................................................42
Section 5.2     Organizational Power and Authority ....................................................42
Section 5.3     Execution and Delivery ........................................................................42
Section 5.4     No Conflict ...........................................................................................43
Section 5.5     Consents and Approvals .......................................................................43
Section 5.6     No Registration .....................................................................................43
Section 5.7     Purchasing Intent ..................................................................................43
Section 5.8     Sophistication; Investigation ................................................................44
Section 5.9     No Broker's Fees ..................................................................................44
Section 5.10    Sufficient Funds ...................................................................................44
Section 5.11    Execution of PSA .................................................................................44

**ARTICLE VI ADDITIONAL COVENANTS** ...............................................................**44**
Section 6.1     Approval of the Commitment Parties ...................................................44
Section 6.2     Conduct of Business .............................................................................46
Section 6.3     Material Claim Settlements ..................................................................47
Section 6.4     Access to Information; Confidentiality .................................................47
Section 6.5     Commercially Reasonable Efforts ........................................................48
Section 6.6     Registration Rights Agreement; Reorganized Company
                Organizational Documents ....................................................................49
Section 6.7     Blue Sky ...............................................................................................50
Section 6.8     DTC Eligibility .....................................................................................50
Section 6.9     Use of Proceeds ....................................................................................51
Section 6.10    Securities Legend .................................................................................51
Section 6.11    Antitrust Approval ................................................................................51
Section 6.12    Alternative Transactions .......................................................................52
Section 6.13    Reclamation Bonding ...........................................................................53

**ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ...................**53**
Section 7.1     Conditions to the Obligations of the Commitment Parties .....................53
Section 7.2     Waiver of Conditions ...........................................................................56
Section 7.3     Conditions to the Obligations of the Debtors ........................................56

**ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION** ................................**57**
Section 8.1     Indemnification Obligations .................................................................57
Section 8.2     Indemnification Procedure ...................................................................58
Section 8.3     Settlement of Indemnified Claims ........................................................59
Section 8.4     Contribution .........................................................................................59

ii

TABLE OF CONTENTS (cont'd)

Page

Section 8.5    Treatment of Indemnification Payments ........................................60
Section 8.6    No Survival .........................................................................................60

**ARTICLE IX TERMINATION** .................................................................................**60**
Section 9.1    Consensual Termination ....................................................................60
Section 9.2    Termination by the Requisite Members of the Noteholder Steering
               Committee ............................................................................................60
Section 9.3    Termination by a Commitment Party ...............................................62
Section 9.4    Termination by the Company ............................................................63
Section 9.5    Effect of Termination.........................................................................64

**ARTICLE X GENERAL PROVISIONS** ....................................................................**66**
Section 10.1    Notices ...............................................................................................66
Section 10.2    Assignment; Third Party Beneficiaries ..........................................68
Section 10.3    Prior Negotiations; Entire Agreement ............................................68
Section 10.4    Governing Law; Venue.....................................................................69
Section 10.5    Waiver of Jury Trial .........................................................................69
Section 10.6    Counterparts ......................................................................................69
Section 10.7    Waivers and Amendments; Rights Cumulative; Consent................70
Section 10.8    Headings ............................................................................................70
Section 10.9    Specific Performance ........................................................................70
Section 10.10   Damages.............................................................................................70
Section 10.11   No Reliance .......................................................................................71
Section 10.12   Publicity ............................................................................................71
Section 10.13   Settlement Discussions .....................................................................71
Section 10.14   No Recourse.......................................................................................71
Section 10.15   Relationship Among Parties. ............................................................72
Section 10.16   Tax Forms ..........................................................................................73
Section 10.17   Company Fiduciary Duties ...............................................................73

SCHEDULES

Schedule 1    Initial Backstop Commitment Schedule
Schedule 2    Backstop Commitment Schedule

EXHIBITS

Exhibit A    Form of Rights Offering Procedures
Exhibit B    Form of Joinder Agreement
Exhibit C    Voting/Consent Structure
Exhibit D    Plan Support Agreement
Exhibit E    Illustrative Allocation of Common Shares (Fully-Diluted)

## BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of December 22, 2016, is made by and among Peabody Energy Corporation, a Delaware corporation (the "**Company**"), on behalf of itself and each of its direct and indirect debtor subsidiaries (each a "**Debtor**" and, collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company Group**") on the one hand, and each Commitment Party (as defined below), on the other hand.  The Company and each Commitment Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".  Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Plan.

## RECITALS

WHEREAS, the Company and the Commitment Parties have entered into a Plan Support Agreement, dated as of December 22, 2016, a copy of which is attached hereto as Exhibit D (including the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit 1 to the Plan Support Agreement (the "**Restructuring Term Sheet**" and collectively, including all the exhibits thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Plan Support Agreement**")), which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a plan of reorganization to be filed in jointly administered cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended from time to time, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring and (b) requires that the Plan be consistent with the Plan Support Agreement.

WHEREAS, pursuant to the Plan and this Agreement, the Company will conduct (a) a private placement pursuant to the Private Placement Agreement and (b) a rights offering for the Rights Offering Shares at an aggregate purchase price equal to the Rights Offering Amount and a per-share purchase price equal to the Per Share Purchase Price on the Effective Date.

WHEREAS, subject to the terms and conditions contained in this Agreement and as set forth in the Restructuring Term Sheet, each Initial Commitment Party has agreed to purchase (on a several and not joint basis) its Backstop Commitment Percentage of the Unsubscribed Shares, if any pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Company (on behalf of itself and each other Debtor) and each of the Commitment Parties hereby agrees as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1   Definitions.   Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified below:

4

"**Additional Commitment Party**" means each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that is a holder of an Eligible Backstop Claim that agrees to participate in the Backstop Commitment by joining this Agreement and the Plan Support Agreement pursuant to Article II of this Agreement. Initial Commitment Parties may be Additional Commitment Parties with respect only to additional Eligible Backstop Claims purchased in excess of the Eligible Backstop Claims held by such Initial Commitment Parties as of the execution of this Agreement.

"**Additional Commitment Party Claim Amount**" means the Allowed Claim amount beneficially owned by each Additional Commitment Party as of 5:00 p.m. New York City time on the Backstop Enrollment Outside Date (except for any Phase Two Party Claim Amounts beneficially owned by any Phase Two Commitment Party), as reported by each Additional Commitment Party (including documentation evidencing such beneficial ownership) to the Claims and Balloting Agent promptly after becoming an Additional Commitment Party.

"**Additional Private Placement Party**" has the meaning set forth in the Private Placement Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code. "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means any investment fund the primary investment advisor to which is a Commitment Party or an Affiliate thereof.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allowed Claim**" has the meaning set forth in the Plan.

"**Allowed Class 5B Claims**" has the meaning set forth in the Plan.

"**Allowed Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring of any Debtor or non-Debtor member of the Company Group, other than the Restructuring.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

5

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in <u>Section 4.6</u>.

"**Available Shares**" means the Unsubscribed Shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Backstop Commitment**" has the meaning set forth in <u>Section 2.2</u>.

"**Backstop Commitment Percentage**" means for any Commitment Party, (1) with respect to Allowed Claims in Class 2, a percentage determined by multiplying:

(a) the Pro Rata Split applicable to the relevant Allowed Claims in Class 2 held by such Commitment Party; by

(b) (i) if the Surplus Backstop Participation Adjustment shall apply -

(A)    in the case of an Initial Commitment Party that has elected to apply the Surplus Backstop Participation Adjustment with respect to the Initial Commitment Party's Allowed Claims in Class 2 (as set forth in the Initial Backstop Commitment Schedule), (I) the amount of the Allowed Claims in Class 2 of such Initial Commitment Party (as set forth in the Initial Backstop Commitment Schedule) <u>divided by</u> (II) the amount of two-thirds (2/3) of all Allowed Claims within Class 2; and

(B) in the case of a Phase Two Commitment Party, the sum of (I) (*a*) 50% of such Phase Two Commitment Party's Phase Two Party Claim Amount in Class 2 <u>divided by</u> (*b*) the amount of two-thirds of all Allowed Claims within Class 2, <u>and</u> (II) (*a*) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (*b*) (1) 50% of such Phase Two Commitment Party's Phase Two Party Claim Amount in Class 2, <u>divided by</u> (2) the amount of all Participating Commitment Claims within Class 2, other than the Allowed Claims, and/or portions thereof, to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(ii)    in the case of (x) any other Commitment Party, if the Surplus Backstop Participation Adjustment applies, or (y) any Commitment Party, if the Surplus Backstop Participation Adjustment does not apply—

(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (B) the amount of the Allowed Claims of such Commitment Party in Class 2, <u>and divided by</u> (C) the amount of the Participating Commitment Claims within Class 2, other than the Allowed Claims, and/or portions thereof (if any), to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(2) with respect to Allowed Claims in Class 5B, a percentage determined by multiplying:

(a) the Pro Rata Split applicable to the relevant Allowed Claims in Class 5B held by such Commitment Party; by

(b) (i) if the Surplus Backstop Participation Adjustment shall apply -

(A)      in the case of an Initial Commitment Party that has elected to apply the Surplus Backstop Participation Adjustment with respect to the Initial Commitment Party's Allowed Claims in Class 5B (as set forth in the Initial Backstop Commitment Schedule), (I) the amount of the Allowed Claims in Class 5B of such Initial Commitment Party (as set forth in the Initial Backstop Commitment Schedule) <u>divided by</u> (II) the amount of two-thirds (2/3) of all Allowed Claims within Class 5B; and

(B) in the case of a Phase Two Commitment Party, the sum of (I) (a) 50% of such Phase Two Commitment Party's Phase Two Party Claim Amount in Class 5B <u>divided by</u> (b) the amount of two-thirds of all Allowed Claims within Class 5B, <u>and</u> (II) (a) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (b) (1) 50% of such Phase Two Commitment Party's Phase Two Party Claim Amount in Class 5B, <u>divided by</u> (2) the amount of all Participating Commitment Claims within Class 5B, other than the Allowed Claims, and/or portions thereof, to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable; and

(ii)      in the case of (x) any other Commitment Party, if the Surplus Backstop Participation Adjustment applies, or (y) any Commitment Party, if the Surplus Backstop Participation Adjustment does not apply—

(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (b)(i)(A) and/or clause (b)(i)(B)(I), <u>multiplied by</u> (B) the amount of the Allowed Claims of such Commitment Party in Class 5B, and <u>divided by</u> (C) the amount of the Participating Commitment Claims within Class 5B, other than the Allowed Claims, and/or portions thereof (if any), to which clause (b)(i)(A) or clause (b)(i)(B)(I) is applicable.

The Backstop Commitment Percentages as of the date hereof are set forth on the Backstop Commitment Schedule attached hereto as the date hereof, which shall be updated from time to time to reflect the addition of Phase Two Commitment Parties and Additional Commitment Parties that become party hereto, which such updates shall be provided to the Noteholder Co-Proponents on a weekly basis or more frequently as requested by any of them or their respective counsels.

"**<u>Backstop Commitment Period</u>**" means the number of days from the date on which documentation necessary to be obligated under this Agreement has been executed and the Effective Date.

"**<u>Backstop Commitment Premium</u>**" has the meaning set forth in <u>Section 3.1(a)</u>.

7

"**Backstop Commitment Schedule**" means Schedule 2 to this Agreement, as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Backstop Enrollment Outside Date**" has the meaning set forth in Section 2.3(a).

"**Backstop Penny Warrants**" has the meaning set forth in Section 3.4.

"**Backstop Premiums**" has the meaning set forth in Section 3.1(b).

"**Backstop Ticking Premium**" has the meaning set forth in Section 3.1(b).

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**Bonding Solution**" has the meaning set forth in Section 6.13.

"**Breakup Payments**" has the meaning set forth in Section 9.5(b).

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Bylaws**" means the bylaws of the Reorganized Company, which shall become effective as of Effective Date, and which shall be consistent in all material respects with the terms set forth in the Plan.

"**Certificate of Incorporation**" means the certificate of incorporation of the Reorganized Company as in effect on the Effective Date, which shall be consistent in all material respects with the terms set forth in the Plan.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claim**" has the meaning ascribed to it in the Bankruptcy Code.

"**Claims and Balloting Agent**" has the meaning set forth in the Plan.

"**Class 2**" has the meaning set forth in the Plan.

"**Class 5B**" has the meaning set forth in the Plan.

"**Class 5B Claims**" has the meaning set forth in the Plan.

"**Closing**" has the meaning set forth in Section 2.6(a).

"**Closing Date**" has the meaning set forth in <u>Section 2.6(a)</u>.

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment Party**" means an Initial Commitment Party or an Additional Commitment Party.

"**Commitment Party Default**" means the failure by any Commitment Party to (a) deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Shares by the Escrow Account Funding Date in accordance with <u>Section 2.4(b)</u> or (b) fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with this Agreement and the Plan; provided, that no Commitment Party Default shall constitute a Termination Event, a "Termination Event" as that term is defined in the Plan Support Agreement or any other right to terminate the Plan Support Agreement by any party thereto.

"**Commitment Premium Shares**" means any Common Shares issued on account of the Backstop Commitment Premium in accordance with <u>Section 3.1(a)</u> and the Private Placement Commitment Premium in accordance with the Private Placement Agreement.

"**Common Shares**" means the shares of common stock, par value $0.001 per share, in the Reorganized Company.

"**Company**" has the meaning set forth in the Preamble.

"**Company Group**" has the meaning set forth in the Preamble.

"**Company Plan**" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 or 430 of the Code or Section 302 of ERISA, and (i) sponsored or maintained (at the time of determination or at any time within the six years prior thereto) by any of the Debtors or any ERISA Affiliate, or with respect to which any such entity has any actual or contingent liability or obligation or (ii) in respect of which any of the Debtors or any ERISA Affiliate is (or, if such plan were terminated, could under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Confirmation Hearing**" has the meaning set forth in the Plan.

"**Confirmation Order**" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consideration**" has the meaning set forth in <u>Section 2.7(b)</u>.

9

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or agency or otherwise.

"**Debtors**" has the meaning set forth in the Preamble.

"**Defaulting Commitment Party**" means in respect of a Commitment Party Default that is continuing, the applicable defaulting Commitment Party.

"**Definitive Documentation**" means the definitive documents and agreements governing the Restructuring.  "**Definitive Documents**" has a correlative meaning.

"**Disclosure Statement**" has the meaning set forth in the Plan.

"**Disclosure Statement Motion**" means the Debtors' motion for an order, among other things, (a) approving the Disclosure Statement; (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of ballots; (e) establishing procedures for voting on the Plan; and (f) establishing notice and objection procedures for the confirmation of the Plan.

"**Disclosure Statement Order**" means an Order approving the Disclosure Statement with respect to the Plan and the solicitation with respect to the Plan.

"**Effective Date**" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and (c) on which the Restructuring and the other transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated.

"**Eligible Backstop Claims**" means Allowed Second Lien Notes Claims and Allowed Class 5B Claims.

"**Environmental Laws**" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders in council, Orders, decrees, treaties, directives, judgments or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any of the Debtors, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Code.

"**ERISA Event**" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Company Plan; (b) any failure by any Company Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Company Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Company Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Company Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by any of the Debtors or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Company Plan, including the imposition of any Lien in favor of the PBGC or any Company Plan or Multiemployer Plan; (e) a determination that any Company Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); (f) the receipt by any of the Debtors or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Company Plan or to appoint a trustee to administer any Company Plan under Section 4042 of ERISA; (g) the incurrence by any of the Debtors or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Company Plan or Multiemployer Plan; (h) the receipt by any of the Debtors or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any of the Debtors or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical status" (within the meaning of Section 305 of ERISA or Section 432 of the Code); (i) the conditions for imposition of a Lien under Section 303(k) of ERISA or Section 430(k) of the Code shall have been met with respect to any Company Plan; (j) the adoption of an amendment to a Company Plan requiring the provision of security to such Company Plan pursuant to Section 307 of ERISA; (k) the assertion of a material claim (other than routine claims for benefits) against any Company Plan or the assets thereof, or against any of the Debtors or any of the ERISA Affiliates in connection with any Company Plan; or (l) receipt from the IRS of notice of the failure of any Company Plan (or any other employee benefit plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Company Plan to qualify for exemption from taxation under Section 501(a) of the Code.

"**Escrow Account**" has the meaning set forth in Section 2.4(a).

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.4(b).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exit Facility**" means a senior secured credit facility that may be entered into by one or more of the Reorganized Debtors on the Effective Date, the terms of which are no less favorable, when taken as a whole, to the Debtors than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 to the Restructuring Term Sheet, as determined by the

Debtors in their reasonable business judgment, and of sufficient size and on appropriate terms, including the ability to enter into up to $250 million of ABL Facilities (as defined in Exhibit 2 to the Restructuring Term Sheet), to avoid the need to issue all or part of the Replacement Secured First Lien Term Loan and/or the New Second Lien Notes.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3(a).

"**Filing Deadline**" has the meaning set forth in Section 6.6(a)(i).

"**Filing Party**" has the meaning set forth in Section 6.11(b).

"**Final DIP Order**" has the meaning set forth in Section 3.3(c).

"**Final Order**" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

"**First Lien Claims**" has the meaning set forth in the Plan.

"**First Lien Credit Agreement**" has the meaning set forth in the Plan.

"**First Lien Full Cash Recovery**" has the meaning set forth in the Plan.

"**Fully Diluted Common Shares**" means the total number of Common Shares outstanding as of the Effective Date after giving effect to (a) the reservation and deemed issuance of Common Shares issuable upon (i) conversion of the Preferred Equity and (ii) exercise of the Penny Warrants, and (b) the issuance of (i) any Incremental Second Lien Shares, (ii) any Premium Shares and (iii) any Rights Offering Disputed Claims Reserve Shares, but prior to dilution from the LTIP and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision in the Transaction Agreements.

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**Funding Notice Date**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means United States generally accepted accounting principles.

"**General Unsecured Claims**" has the meaning set forth in the Plan.

"**Governmental Entity**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law other than naturally occurring material on or inside of any mineral property.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Incremental Additional First Lien Debt**" has the meaning set forth in the Plan.

"**Incremental New Second Lien Notes**" has the meaning set forth in the Plan.

"**Incremental Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Incremental Second Lien Shares**" has the meaning set forth in the Plan.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Initial Backstop Commitment Schedule**" means the initial commitment schedule attached hereto as Schedule 1 hereto reflecting the initial percentage allocation of the obligations of the Initial Commitment Parties to purchase Unsubscribed Shares (prior to the addition of Additional Commitment Parties as contemplated hereby) and which may be amended only upon consent of each of the Initial Commitment Parties.

"**Initial Commitment Parties**" means the Noteholder Co-Proponents.

"**Initial Private Placement Parties**" has the meaning set forth in the Private Placement Agreement.

"**Initial Private Placement Schedule**" has the meaning set forth in the Private Placement Agreement.

"**Initial Resale Registration Statement**" has the meaning set forth in Section 6.6(a)(i).

"**Intellectual Property Rights**" has the meaning set forth in Section 4.12.

"**Investment Company Act**" has the meaning set forth in Section 4.26.

"**IRS**" means the United States Internal Revenue Service.

13

"**Joinder Agreement**" has the meaning set forth in <u>Section 2.3(a)</u>.

"**Joint Filing Party**" has the meaning set forth in <u>Section 6.11(c)</u>.

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer or the chief financial officer of the Company. As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Lead Arrangers**" has the meaning set forth in the Restructuring Term Sheet.

"**Legal Proceedings**" has the meaning set forth in <u>Section 4.10</u>.

"**Legend**" has the meaning set forth in <u>Section 6.10</u>.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in <u>Section 8.1</u>.

"**LTIP**" has the meaning set forth in the Plan.

"**Material Adverse Effect**" means any event, which individually, or together with all other events, has or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities (including reclamation obligations, whether or not contingent), finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Restructuring Term Sheet, including the Private Placement and the Rights Offering, in each case, except to the extent such event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of the transactions contemplated by the Plan (including any act or omission of the Debtors expressly required or prohibited, as applicable, by the Plan or consented to or required by the Requisite Members of the Noteholder Steering Committee in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the

14

Debtors (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of any of the Debtors not in contravention of the terms and conditions of the Restructuring Term Sheet or the Plan (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (vi) the filing or pendency of the Chapter 11 Cases (including events resulting from any filing made in such Chapter 11 Cases); or (vii) declarations of national emergencies in the United States or natural disasters in the United States; provided, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such event is materially and disproportionately adverse to the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

"**Material Contracts**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any of the Debtors is a party.

"**MEPP Claim**" means any Claim arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including (a) proof of claim number 4722 and (b) any other Claim related to any withdrawal liability under U.S.C. § 1392(c).

"**Money Laundering Laws**" has the meaning set forth in Section 4.23.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any of the Debtors or any ERISA Affiliate is making or accruing an obligation to make contributions, has within any of the preceding six plan years made or accrued an obligation to make contributions.

"**New Second Lien Notes**" has the meaning set forth in the Plan.

"**Noteholder Co-Proponents**" means (a) Contrarian Capital Management L.L.C., Panning Capital Management, LP, PointState Capital LP, and the South Dakota Investment Council, or entities managed by such parties, acting as holders of Eligible Backstop Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective Affiliates, including those designated on the Initial Private Placement Schedule, and (b) entities managed by Elliott Management Corporation, Discovery Capital Management, LLC, and Aurelius Capital Management, LP, acting as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective Affiliates, including those designated on the Initial Backstop Commitment Schedule.

"**Noteholder Steering Committee**" means a steering committee consisting of the Noteholder Co-Proponents.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

15

"**Participating Commitment Claims**" shall mean Allowed Claims within the applicable Class held by all Commitment Parties.

"**Party**" has the meaning set forth in the Preamble.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Penny Warrants**" means the Rights Offering Penny Warrants and the Backstop Penny Warrants, and shall have the following terms: (a) Date of Issuance: the Effective Date; (b) Exercise Price: $0.01 per share of Common Shares; (c) Term: 90 days; and (d) Exercise Trigger: exercisable from and after the Effective Date.

"**Per Share Purchase Price**" means $13.75. An illustrative allocation of Common Shares (Fully Diluted) is attached here to as <u>Exhibit E</u>.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business or incident to the operation of the Debtors' businesses as described in the Company SEC Documents; (c) if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (d) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; <u>provided</u>, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (e) leases, subleases, licenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose; (f) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements; (g) (i) Liens to secure the performance of bids, trade contracts and leases, reclamation bonds, insurance bonds, statutory obligations, surety and appeal bonds, performance bonds, bank guarantees and letters of credit and other obligations of a like nature incurred in the ordinary course of business, (ii) Liens on assets to secure obligations under surety bonds obtained as required in connection with the entering into of federal coal leases or (iii) Liens created under or by any turnover trust; (h) Liens securing attachments or judgments for the payment of money or securing appeal or surety bonds related to such attachments or judgments; (i) easements, covenants, conditions, encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the Debtors' business; (j) Liens granted pursuant to existing indebtedness arrangements of the Debtors described in the Plan or Disclosure Statement; (k) Liens with respect to bailments, operating leases or consignment or retention of title arrangements entered into in the ordinary course of business; (l) (i) production payments, royalties, dedication of reserves under supply

agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties or (ii) cross charges, Liens or security arrangements entered into in respect of a joint venture for the benefit of a participant, manager or operator of such Joint Venture, in each case, consistent with normal practices in the mining industry; (m) eases, subleases, licenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose; (n) (i) Liens in favor of a banking institution arising by operation of law or any contract encumbering deposits (including the right of set-off) held by such banking institutions incurred in the ordinary course of business and which are within the general parameters customary in the banking industry or (ii) contractual rights of setoff to the extent constituting Liens; (o) Liens on capital stock and other equity interests in "Unrestricted Subsidiaries" as defined in the First Lien Credit Agreement securing obligations of Unrestricted Subsidiaries not otherwise prohibited under the First Lien Credit Agreement; (p) Liens on receivables and rights related to such receivables created pursuant to any "Permitted Securitization Programs" as defined in the First Lien Credit Agreement or under any other agreement under which such receivables or rights are transferred; (q) Liens granted under any Contracts to the extent the same are ordinary and customary in the businesses or industries in which the Debtors operate and do not or would not materially impair the ownership, use or occupancy of any material Real Property or the operation of the Debtors' businesses or, if such claim does materially impair such ownership, use, occupancy or operation, are being contested in good faith by appropriate proceedings; (r) mortgages on a lessor's interest in a lease or sublease; provided that no foreclosure proceedings have been duly filed (unless, in such case, such mortgage has been subordinated to the applicable lease); and (s) Liens that, pursuant to the Plan and the Confirmation Order, will be discharged and released on the Effective Date.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Phase Two Commitment Party**" has the meaning set forth in Section 2.3(a).

"**Phase Two Party Claim Amount**" means the Allowed Claim amount beneficially owned by each Phase Two Commitment Party by the Phase Two Party Outside Date, as reported by each Phase Two Commitment Party (including documentation evidencing such beneficial ownership) to the Claims and Balloting Agent promptly after becoming a Phase Two Commitment Party no later than the Backstop Enrollment Outside Date; provided, that such Phase Two Party Claim Amount shall include any Claims that are subject to an agreement to purchase or acquire such Claim that is pending as of the date of such Phase Two Commitment Party's entry into this Agreement or a Joinder Agreement and settled or delivered to such Phase Two Commitment Party within three (3) Business Days of the Phase Two Party Outside Date.

"**Phase Two Party Outside Date**" means the date that is the third (3rd) Business Day following December 22, 2016 and by which the relevant party has executed this Agreement or a Joinder Agreement.

"**Phase Two Private Placement Party**" has the meaning set forth in the Private Placement Agreement.

"**Plan**" means the *Joint Chapter 11 Plan of Reorganization of Peabody Energy Corporation and Its Debtor Affiliates*, filed on December 22, 2016 (as may be amended, supplemented, or modified from time to time solely as provided for, and in accordance with, the terms and conditions of this Agreement and the Plan Support Agreement), including all exhibits, supplements, appendices, and schedules thereto.

"**Plan Documents**" has the meaning set forth in the Plan Support Agreement.

"**Plan Equity Value**" means $3.105 billion.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement) to be filed by the Debtors no later than ten (10) days before the Confirmation Hearing, and additional documents or amendments to previously filed documents, filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Exit Facility documents; (b) the Reorganized Company Organizational Documents; (c) the Registration Rights Agreement; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan); (e) the Schedule of Rejected Executory Contracts and Unexpired Leases (as defined in the Plan) and (f) the certificate of designation relating to the Preferred Equity.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with and subject to the Plan Support Agreement and this Agreement.

"**Plan Support Agreement**" has the meaning set forth in the Recitals.

"**Plan Support Agreement Termination Condition**" means the Debtors' termination right under the Plan Support Agreement if holders of two-thirds (2/3) in amount of each of the Second Lien Notes Claims and the Unsecured Senior Notes Claims have not joined the Plan Support Agreement prior to the date on which the PPA and BCA Approval Order is entered by the Bankruptcy Court.

"**PPA and BCA Approval Motion**" means the motion to be filed by the Debtors seeking approval of the PPA and BCA Approval Order.

"**PPA and BCA Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement, the Private Placement Agreement and the PPA and BCA Approval Order.

"**PPA and BCA Approval Order**" means the Order entered by the Bankruptcy Court (a) authorizing the Company (on behalf of itself and the other Debtors) to execute and deliver the Private Placement Agreement, this Agreement, including the authorization of all contemplated premiums, fees and expense reimbursements and the indemnification provisions contained in both the Private Placement Agreement and this Agreement, and providing that the all contemplated premiums, fees and expense reimbursements and the indemnification provisions shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in the relevant

18

agreement without further order of the Bankruptcy Court and (b) approving the Rights Offering Procedures.

"**Pre-Closing Period**" has the meaning set forth in <u>Section 6.4(a)</u>.

"**Preferred Equity**" has the meaning set forth in the Plan.

"**Premium Shares**" means, collectively, the Commitment Premium Shares and the Ticking Premium Shares.

"**Private Placement**" has the meaning set forth in the Private Placement Agreement.

"**Private Placement Agreement**" means that certain Private Placement Agreement among Peabody Energy Corporation and the private placement parties party thereto, dated as of December 22, 2016.

"**Private Placement Commitments**" has the meaning set forth in the Private Placement Agreement.

"**Private Placement Commitment Premium**" has the meaning set forth in the Private Placement Agreement.

"**Private Placement Party**" has the meaning set forth in the Private Placement Agreement.

"**Pro Rata Split**" means the following percentages, based on Allowed Claims as of the Record Date:    (x) in respect of Allowed Claims in Class 2, the quotient of (A) $708,000,000 divided by (B) the Allowed Claims in Class 5B plus $708,000,000; and (y) in respect of Allowed Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708,000,000.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Record Date**" means the date on which the Disclosure Statement Order is entered by the Bankruptcy Court.

"**Registration Deadline**" has the meaning set forth in <u>Section 6.6(a)(i)</u>.

"**Registration Rights Agreement**" has the meaning set forth in <u>Section 6.6(a)</u>.

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent,

19

Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" has the meaning set forth in Section 2.7(a).

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating.

"**Released**" has a correlative meaning.

"**Reorganized Company**" means Peabody Energy Corporation from and after the Effective Date.

"**Reorganized Company Organizational Documents**" means, collectively, the Bylaws and the Certificate of Incorporation.

"**Reorganized Debtors**" means the Debtors from and after the Effective Date.

"**Replacement Secured First Lien Term Loan**" has the meaning set forth in the Plan.

"**Replacing Commitment Party**" has the meaning set forth in Section 2.5(a).

"**Reportable Event**" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Company Plan.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, limited partners, general partners, management companies, investment managers, shareholders, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requisite Consenting Noteholders**" means the applicable individual(s) or group(s) of holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B identified in the Voting/Consent Structure attached hereto as Exhibit C.

"**Requisite First Lien Lender Co-Proponents**" has the meaning set forth in the Plan.

"**Requisite Members of the Noteholder Steering Committee**" means 75% of the Noteholder Steering Committee, based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule, as applicable; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its Claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule, as

applicable, to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member(s) of the Noteholder Steering Committee.  For the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly owned by such member or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein.

"**Restructuring**" has the meaning set forth in the Plan Support Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals.

"**Rights Offering**" means the rights offering of Rights Offering Shares that is backstopped by the Commitment Parties for the Rights Offering Amount in connection with the Restructuring consistent with the terms reflected in the Plan Support Agreement and this Agreement, and in accordance with the Rights Offering Procedures.

"**Rights Offering Amount**" means an amount equal to $750,000,000.

"**Rights Offering Disputed Claims Reserve Shares**" has the meaning set forth in the Plan.

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription forms, together with the applicable aggregate Per Share Purchase Price, must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures.

"**Rights Offering Penny Warrants**" means the Penny Warrants exercisable for two and one half percent (2.5%) of the Fully Diluted Common Shares as of the Effective Date.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering that are approved by the Bankruptcy Court pursuant to the PPA and BCA Approval Order, which procedures shall be in form and substance substantially as set forth on Exhibit A hereto, as they may be modified from time to time by the Company in a manner that is not materially adverse to the Commitment Parties.

"**Rights Offering Shares**" means the units constituting Common Shares and Rights Offering Penny Warrants (including all Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement) distributed pursuant to and in accordance with the Rights Offering Procedures in the Rights Offering.

"**Rights Offering Subscription Agent**" means an agent appointed by the Debtors, and reasonably acceptable to the Requisite Members of the Noteholder Steering Committee, to administer the Rights Offering.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Lien Notes Claims**" has the meaning set forth in the Plan.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subscription Rights**" means the subscription rights to purchase Rights Offering Shares.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.

"**Surplus Backstop Participation Adjustment**" has the meaning set forth in Section 2.3(c).

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.  For the avoidance of doubt, such term shall exclude any tax, penalties or interest thereon that result or have resulted from the non-payment of royalties.

"**Tax Forms**" has the meaning set forth in Section 10.16.

"**Termination Date**" has the meaning set forth in Section 9.2.

"**Termination Event**" means an event giving rise to a right of termination pursuant to Article IX.

"**Ticking Premium Shares**" means any Common Shares issued on account of the Backstop Ticking Premium in accordance with Section 3.1(b) of this Agreement and on account of Private Placement Ticking Premium in accordance with Section 3.1(b) of the Private Placement Agreement.

"**Transaction Agreements**" has the meaning set forth in Section 4.2(a).

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest).  "**Transfer**" used as a noun has a correlative meaning.

22

"**Ultimate Purchaser**" has the meaning set forth in <u>Section 2.7(b)</u>.

"**Unlegended Shares**" has the meaning set forth in <u>Section 6.8</u>.

"**Unsecured Senior Notes Claims**" has the meaning set forth in the Plan.

"**Unsubscribed Shares**" means the Rights Offering Shares that have not been duly purchased in the Rights Offering by holders of Allowed Second Lien Notes Claims and Allowed Class 5B Claims in accordance with the Rights Offering Procedures and the Plan.

"**Voting/Consent Structure**" means the process set forth on <u>Exhibit C</u> hereof.

"**willful or intentional breach**" has the meaning set forth in <u>Section 9.5(a)</u>.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Section 4203 of ERISA.

Section 1.2    <u>Construction</u>.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)    the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)    references to "day" or "days" are to calendar days;

(h)    references to "the date hereof" means the date of this Agreement;

23

(i)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)    references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## BACKSTOP COMMITMENT

Section 2.1    The Rights Offering; Subscription Rights.  On and subject to the terms and conditions hereof, including entry of the PPA and BCA Approval Order, the Company shall conduct the Rights Offering to holders of Allowed Claims in Class 2 and Class 5B as of the Record Date pursuant to and in accordance with the Rights Offering Procedures and the PPA and BCA Approval Order.  If reasonably requested by the Requisite Members of the Noteholder Steering Committee, from time to time prior to the Rights Offering Expiration Time (and any extensions thereto), the Company shall notify, or cause the Rights Offering Subscription Agent to notify, within 48 hours of receipt of such request by the Company, the Commitment Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.  The Rights Offering will be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 1145 of the Bankruptcy Code, and all Rights Offering Shares (other than the Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement) will be issued in reliance upon such exemption, and the Disclosure Statement shall include a statement to such effect. After consultation with counsel and the Noteholder Steering Committee, the Debtors may decrease the number of Subscription Rights distributed to and/or exercisable by (if previously distributed to) holders of Allowed Second Lien Notes Claims and Allowed Class 5B Claims as required by the Bankruptcy Court or the SEC, in each case, to allow the Rights Offering to be exempt from registration under the Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code; provided, however, that (a) in no event shall such decrease in the number of Subscription Rights result in a decrease of the aggregate Per Share Purchase Price for all Rights Offering Shares offered in the Rights Offering below $650 million, and (b) in no event shall the Per Share Purchase Price to be paid in the Rights Offering be subject to increase or decrease in connection with such decrease in the number of Subscription Rights. In the event of such decrease or reduction, any amounts excluded shall instead be purchased directly by the Commitment Parties pursuant to this Agreement and the Rights Offering Shares otherwise distributable pursuant to such excluded Subscription Rights shall be deemed to be Unsubscribed Shares. The offer and sale of the Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement, as well as the issuance of Common Shares in connection with the Backstop Premiums, will be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act, and the Disclosure Statement shall include a statement to such effect.

Section 2.2    The Backstop Commitment. On and subject to the terms and conditions hereof, including entry of the PPA and BCA Approval Order, each

24

Commitment Party agrees, severally and not jointly, to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with the Rights Offering Procedures and the Plan; provided that any Defaulting Commitment Party shall be liable to each non-Defaulting Commitment Party, the Company and the Reorganized Debtors as a result of any breach of its obligations hereunder.  On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase, and the Reorganized Company shall sell to such Commitment Party, on the Closing Date for the applicable aggregate Per Share Purchase Price, the number of Unsubscribed Shares equal to (x) such Commitment Party's Backstop Commitment Percentage multiplied by (y) the aggregate number of Unsubscribed Shares (such obligation to purchase, the "**Backstop Commitment**"), rounded among the Commitment Parties solely to avoid fractional shares as the Requisite Consenting Noteholders may determine (provided that in no event shall such rounding reduce the aggregate commitment of any Commitment Party).

Section 2.3    Additional **Commitment** Parties.

(a)    Additional Commitment Parties. Holders of Allowed Second Lien Notes Claims and Allowed Class 5B Claims may, in their sole discretion, elect to participate in the rights and obligations set forth by this Agreement as an Additional Commitment Party (to the extent they meet the qualifications set forth in the definition of such term) until the date that is twenty (20) Business Days following the Debtors' filing of the PPA and BCA Approval Motion (the "**Backstop Enrollment Outside Date**"). All holders of Eligible Backstop Claims electing to become Additional Commitment Parties must execute a joinder to this Agreement pursuant to an agreement in substantially the form attached as Exhibit B hereto or otherwise in form and substance reasonably acceptable to the Company (a "**Joinder Agreement**") and a joinder to the Plan Support Agreement.  Any Additional Commitment Parties that become a Commitment Party pursuant to this Section 2.3(a) by 5:00 p.m. New York City time on the third (3rd) Business Day following the execution of this Agreement (excluding any Defaulting Commitment Party) is deemed to be a "**Phase Two Commitment Party**". Each Phase Two Commitment Party shall report its Phase Two Party Claim Amount, and each Additional Commitment Party shall report its Additional Commitment Party Claim Amount, to the Claims and Balloting Agent promptly after becoming a Phase Two Commitment Party or Additional Commitment Party, as the case may be, but in no event later than the Backstop Enrollment Outside Date.

(b)    Participation Percentage. Holders of the Allowed Second Lien Notes Claims and holders of Allowed Class 5B Claims (in their capacities as such) shall participate in the transactions contemplated by this Agreement according to the Pro Rata Split and the Rights Offering Procedures.

(c)    Surplus Adjustment.  If holders of more than two-thirds of either the Allowed Second Lien Notes Claims and/or the Allowed Unsecured Senior Notes Claims become party to this Agreement before the Backstop Enrollment Outside Date pursuant to Section 2.3(a), each Initial Commitment Party shall have the right, but not the obligation, to elect for their respective Backstop Commitments to equal its pro rata portion of the full amount of Backstop Commitments that would be allocated to such Initial Commitment Party (a) according to its pro rata portion of the Pro Rata Split and (b) based on, and calculated using, the Claim amounts set

forth in the Initial Backstop Commitment Schedule, as if holders of exactly two-thirds (2/3) of the Allowed Second Lien Notes Claims or the Allowed Unsecured Senior Notes Claims, as applicable, are party to this Agreement (a "**Surplus Backstop Participation Adjustment**"), and the Backstop Commitments available to Additional Commitment Parties in the respective Class shall be reduced accordingly. For the avoidance of doubt, each Phase Two Commitment Party will be subject to the dilution protections as set forth in the Backstop Commitment Percentage. Each Initial Commitment Party must elect to apply the Surplus Backstop Participation Adjustment no later than ten (10) Business Days following the Backstop Enrollment Outside Date.

<div align="center">Section 2.4   Escrow Account Funding.</div>

(a)   Funding Notice.  No later than the seventh (7th) Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall, on behalf of the Company, deliver to each Commitment Party a written notice (the "**Funding Notice**," and the date of such delivery, the "**Funding Notice Date**") setting forth (i) the number of Rights Offering Shares each Commitment Party is obligated to purchase, and the aggregate Per Share Purchase Price therefor; (ii) if applicable, the number of Rights Offering Shares such Commitment Party is subscribed for in the Rights Offering and for which such Commitment Party has not yet paid to the Rights Offering Subscription Agent the aggregate Per Share Purchase Price therefor, together with such aggregate Per Share Purchase Price; and (iii) subject to the last sentence of Section 2.4(b), the escrow account designated in escrow agreements satisfactory to the Requisite Members of the Noteholder Steering Committee and the Company, each acting reasonably, to which such Commitment Party shall deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares and, if applicable, the aggregate Per Share Purchase Price for the Rights Offering Shares such Commitment Party has subscribed for in the Rights Offering (the "**Escrow Account**").  The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)   Escrow Account Funding.  On the fifth (5th) Business Day before the Closing Date (the "**Escrow Account Funding Date**"), each Commitment Party shall deliver and pay an amount equal to the sum of (i) the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares, as applicable, plus (ii) the aggregate Per Share Purchase Price for the Common Shares issuable pursuant to this Agreement, by wire transfer of immediately available funds in U.S. dollars into the Escrow Account in satisfaction of such Commitment Party's Backstop Commitment and its obligation to fully exercise its Subscription Rights. Notwithstanding the foregoing, all payments contemplated to be made by any Commitment Party to the Escrow Account pursuant to this Section 2.4 may instead be made, at the option of such Commitment Party, to a segregated bank account of the Rights Offering Subscription Agent designated by the Rights Offering Subscription Agent in the Funding Notice and shall be delivered and paid to such account on the Escrow Account Funding Date. For the avoidance of doubt, any Commitment Party that fails to fulfil its obligation to fully deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Shares or fully exercise such Commitment Party's Subscription Rights and duly purchase all Rights Offering

<div align="center">26</div>

Shares issuable to it pursuant to such exercise on the Funding Date, as applicable, shall be deemed a Defaulting Commitment Party.

Section 2.5    Commitment Party Default.

(a)    Upon the occurrence of a Commitment Party Default, the Company shall give prompt written notice thereof to each of the Initial Commitment Parties and the Initial Commitment Parties (other than any Defaulting Commitment Party) shall have the obligation, within three (3) Business Days after receipt of such notice to purchase all of the Available Shares on the terms and subject to the conditions set forth in this Agreement based upon the relative applicable Backstop Commitment Percentages of such Initial Commitment Parties (other than any Defaulting Commitment Party) (such party, the "**Replacing Commitment Party**"). For the avoidance of doubt, nothing in this Section 2.5(a) shall relieve any Commitment Party of its obligation to fulfill its Backstop Commitment and all conditions in this Section 2.5(a) shall be several and not joint.

(b)    Any Available Shares purchased by a Replacing Commitment Party (and any commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Unsubscribed Shares of such Replacing Commitment Party for all purposes hereunder, and (y) the Backstop Commitment Percentage of such Replacing Commitment Party for purposes of Section 2.5(d), Section 2.4(b), Section 3.1, Section 3.2, and Section 9.5(b).

(c)    If a Commitment Party is a Defaulting Commitment Party, it shall not be entitled to any of the Backstop Commitment Premium, the Backstop Ticking Premium or the Breakup Payments hereunder, and to the extent any such amounts are received by a Defaulting Commitment Party it shall repay to the Company all such amounts by wire transfer in immediately available U.S. dollars or in another appropriate manner within one (1) Business Day of receiving written notice from the Company or any Commitment Party demanding such repayment, and such amounts shall be thereafter allocated to any Replacing Commitment Parties or as otherwise provided herein.

(d)    Except as set forth in Section 2.5(a), nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Shares.

(e)    For the avoidance of doubt, notwithstanding anything to the contrary set forth in Article IX but subject to Section 10.10, no provision of this Agreement shall relieve any Defaulting Commitment Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.9 or Section 10.10, in connection with any such Defaulting Commitment Party's Commitment Party Default.

Section 2.6    Closing.

(a)    Subject to Article VII and Article IX, unless otherwise mutually agreed in writing between the Company and the Requisite Members of the Noteholder Steering Commitee, the closing of the Backstop Commitments (the "**Closing**") shall take place at the offices of Jones Day, 250 Vesey Street, New York, New York 10281, on the date on which all of the conditions

27

set forth in <u>Article VII</u> shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)     At the Closing, the funds held in the Escrow Account (and any amounts paid to a Rights Offering Subscription Agent bank account pursuant to the last sentence of <u>Section 2.4(b)</u>) shall, as applicable, be released and utilized in accordance with the Plan.

(c)     At the Closing, issuance of the Unsubscribed Shares will be made by the Reorganized Company to each Commitment Party (or to its designee in accordance with <u>Section 2.7(a)</u>) against payment of the aggregate Per Share Purchase Price for the Unsubscribed Shares purchased by such Commitment Party, in satisfaction of such Commitment Party's Backstop Commitment.  Unless a Commitment Party requests delivery of a physical stock certificate, the entry of any Unsubscribed Shares to be delivered pursuant to this <u>Section 2.6(c)</u> into the account of a Commitment Party pursuant to the Reorganized Company's book entry procedures and delivery to such Commitment Party of an account statement reflecting the book entry of such Unsubscribed Shares shall be deemed delivery of such Unsubscribed Shares for purposes of this Agreement.  Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company or the Reorganized Company, as applicable.

<div align="center">Section 2.7     <u>Designation and Assignment Rights.</u></div>

(a)     Each Commitment Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of the Rights Offering Shares and Unsubscribed Shares that it is obligated to purchase hereunder be issued in the name of, and delivered to, one or more of its Affiliates or Affiliated Funds (other than any portfolio company of such Commitment Party or its Affiliates) (each, a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Commitment Party and each such Related Purchaser, (ii) specify the number of Rights Offering Shares and Unsubscribed Shares to be delivered to or issued in the name of such Related Purchaser and (iii) contain representations by such Related Purchaser as to the matters set forth in <u>Section 5.6</u> through <u>Section 5.9</u> as if such Related Purchaser was a Commitment Party; <u>provided</u>, that no such designation pursuant to this <u>Section 2.7(a)</u> shall relieve such Commitment Party from its obligations under this Agreement or the Plan Support Agreement.  In addition, the Requisite Members of the Noteholder Steering Committee in consultation with the other members of the Noteholder Steering Committee may agree in writing to reallocate a portion of the rights to purchase Rights Offering Shares and Unsubscribed Shares, or the economics relating thereto, committed to be purchased by the Initial Commitment Parties (provided that no individual member of the Noteholder Steering Committee may be disproportionately affected), up until the commencement of the hearing on the PPA and BCA Approval Motion, and any Initial Commitment Party that does not wish to participate in such reallocation may, upon written notice to such Requisite Members of the Noteholder Steering Committee, cease to be an Initial Commitment Party and an Initial Private Placement Party under the Private Placement

<div align="center">28</div>

Agreement. Such withdrawing Initial Commitment Party thereafter will have no rights or obligations as an Initial Commitment Party under this Agreement or as an Initial Private Placement Party under the Private Placement Agreement. Following such a withdrawal, each of the non-withdrawing Initial Commitment Parties shall have the obligation, within three (3) Business Days after receipt of written notice from such withdrawing Initial Commitment Party, to assume (severally and not jointly) such withdrawing Initial Commitment Party's obligation to purchase all of the withdrawing Commitment Party's Backstop Commitment on the terms and conditions set forth in this Agreement based upon the relative applicable Backstop Commitment Percentages of such Initial Commitment Parties (other than any withdrawing Initial Commitment Parties). For the avoidance of doubt, the withdrawal of an Initial Commitment Party pursuant to this Section 2.7(a) shall result in (i) the removal of such Initial Commitment Party from the Noteholder Steering Committee, and (ii) the reallocation of the voting power attributable to the face amount of such withdrawing Initial Commitment Party's claims as if such claims were assigned or transferred pursuant to Exhibit C hereto and the definition of "Requisite Members of the Noteholder Steering Committee."

(b)    Other than as set forth in this Section 2.7(b), no Commitment Party shall be permitted to Transfer all or any portion of its Backstop Commitment or any of the Backstop Commitment Premium, Backstop Ticking Premium or Breakup Payments or any other amounts or consideration payable (collectively, "**Consideration**"), even if the Company consents to such Transfer. Each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment and/or its Consideration to (i) an Affiliated Fund of the transferring Commitment Party or (ii) one or more special purpose vehicles that are wholly owned by one or more of such Commitment Parties and its Affiliated Funds, created for the purpose of holding such Backstop Commitment or holding debt or equity of the Debtors (each of the Persons referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"); provided, that such transfer shall not relieve the Commitment Party from its obligations under this Agreement. For the avoidance of doubt, Claims held by Commitment Parties are transferable only in accordance with the Plan Support Agreement; provided, that such transfer shall not relieve the Commitment Party from its obligations under this Agreement.  Any party which purchases Claims from any Noteholder Co-Proponent, or otherwise is the transferee in respect of any Claims transferred by any Noteholder Co-Proponent, may not, in respect of such purchased or otherwise transferred Claims, become a Phase Two Commitment Party, a Phase Two Private Placement Party, an Additional Commitment Party or Additional Private Placement Party in respect of such Claims.

(c)    After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of the Common Shares or any interest therein; provided, that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws.

(d)    If a Commitment Party does not wish to purchase some or all of the number of Unsubscribed Shares which it is required to purchase pursuant to its Backstop Commitment in Section 2.2, one or more of the Initial Commitment Parties may, in their sole discretion, agree to purchase from the Company (and the Company shall sell to such Initial Commitment Parties) the applicable Unsubscribed Shares, for the Per Share Purchase Price.

## ARTICLE III

## BACKSTOP PREMIUMS, EXPENSE REIMBURSEMENT AND WARRANTS

Section 3.1    <u>Applicable Premiums</u>.

(a)    <u>Backstop Commitment Premium</u>.  Subject to <u>Section 3.2</u>, in consideration for the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, the Company shall pay or cause to be paid to the Commitment Parties a nonrefundable aggregate premium equal to $60,000,000, which represents 8.0% of the Rights Offering Amount (the "**Backstop Commitment Premium**"). The Backstop Commitment Premium shall be payable according to the following: (i) 22.5% of the Backstop Commitment Premium to the Initial Commitment Parties or their designees on a pro rata basis based upon the Initial Commitment Parties' Backstop Commitment Percentage as set forth on the Initial Backstop Commitment Schedule; (ii) 57.5% of the Backstop Commitment Premium to the Initial Commitment Parties, or their designees, and the Phase Two Commitment Parties, or their designees, (a) with respect to the Initial Commitment Parties, or their designees, each Initial Commitment Party's Backstop Commitment Percentage, or (b) with respect to the Phase Two Commitment Parties, or their designees, each Phase Two Commitment Party's Backstop Commitment Percentage; and (iii) 20% of the Backstop Commitment Premium to all Commitment Parties or their designees that have executed this Agreement or a Joinder Agreement at any time prior to the date occurring fifteen (15) Business Days after the filing of the PPA and BCA Approval Motion, based on their respective Backstop Commitment Percentages as of the Effective Date.

(b)    <u>Backstop Ticking Premium</u>. Subject to <u>Section 3.2</u>, in consideration for the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, the Company shall pay or cause to be paid a monthly fee equal to $18,750,000, which represents 2.5% of the Rights Offering Amount, payable beginning on April 3, 2017 and ending on the Closing Date (with proration for partial months) (the "**Backstop Ticking Premium**," and together with the Backstop Commitment Premium, the "**Backstop Premiums**"). The Backstop Ticking Premium shall be payable to the Commitment Parties (including any Replacing Commitment Party, but excluding any Defaulting Commitment Party) or their designees based upon their respective Backstop Commitment Percentages as of the Effective Date.

(c)    The provisions for the payment of the Backstop Premiums, the Breakup Payments, the Expense Reimbursement, the Backstop Penny Warrants, and the indemnification obligations provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

Section 3.2    <u>Payment of Backstop Commitment Premium and the Backstop Ticking Premium</u>.  The Backstop Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order and any Backstop Ticking Premium shall be fully earned, nonrefundable and non-avoidable as accrued through the Effective Date, and each shall be paid promptly on the later to occur of the Closing Date and the Effective Date by the Company to the Commitment

30

Parties in Common Shares at Plan Equity Value as of the Effective Date, free and clear of any withholding or deduction for any applicable Taxes (except for any Taxes arising as a result of a Commitment Party's failure to provide a Tax Form in accordance with <u>Section 10.16</u> establishing a complete exemption from withholding).

<div align="center">Section 3.3   <u>Expense Reimbursement</u>.</div>

(a)   In accordance with and subject to entry by the Bankruptcy Court of the PPA and BCA Approval Order and subject to the receipt of documentation reasonably acceptable to the Debtors, the Debtors will pay all reasonably incurred and documented out-of-pocket fees and expenses incurred in connection with the Chapter 11 Cases after April 13, 2016 of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any fees incurred on behalf of any noteholders through the applicable indenture trustee), including, but not limited to, the fees and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "**<u>Expense Reimbursement</u>**"), in each case whether or not the Restructuring is ultimately consummated. The payment of the fees set forth in this section shall (i) be approved upon entry by the Bankruptcy Court of the PPA and BCA Approval Order; and (ii) prior to the time paid, be granted administrative expense priority against each Debtor on a joint and several basis.

(b)   Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment under this <u>Section 3.3</u> shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court.  The Expense Reimbursement accrued through the date on which the PPA and BCA Approval Order is entered shall be paid as promptly as reasonably practicable after the PPA and BCA Approval Order is entered. Thereafter, the Expense Reimbursement shall be payable by the Debtors within two weeks following their receipt of invoices. If this Agreement and the Private Placement Agreement are terminated for any reason in accordance with their terms, the Debtors will promptly pay any accrued and outstanding amounts but will not be obligated to pay the Expense Reimbursement in respect of any fees incurred after the date of such termination.

(c)   Notwithstanding anything to the contrary in this <u>Section 3.3</u>, in no event shall the Debtors have any obligation to make any payment on account of the Expense Reimbursement if (i) the Plan Support Agreement Termination Condition occurs prior to the date of entry of the PPA and BCA Approval Order by the Bankruptcy Court or (ii) the PPA and BCA Approval Order is not entered by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall modify or terminate the Debtors' obligations to pay certain fees and expenses in accordance with the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 544] (the "**<u>Final DIP Order</u>**").

<div align="center">Section 3.4   <u>Warrants</u>.</div>

<div align="center">31</div>

On the Effective Date, the Debtors will issue the Penny Warrants (the "**Backstop Penny Warrants**") exercisable for two and one half percent (2.5%) of the Fully Diluted Common Shares as of the Effective Date. Such Backstop Penny Warrants shall be distributed among the Initial Commitment Parties based upon each Initial Commitment Party's Backstop Commitment Percentage as set forth on the Initial Backstop Commitment Schedule.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company SEC Documents filed with the SEC and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof, the Company, on behalf of itself and each of the other Debtors, jointly and severally, hereby represents and warrants to the Commitment Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 4.1    Organization and Qualification.    Each of the Debtors (a) is organized and validly existing corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, (b) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, in each case except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2    Corporate Power and Authority.

(a)    The Company has the requisite corporate power and authority (i) subject to entry of the PPA and BCA Approval Order, to enter into, execute and deliver this Agreement and to perform its obligations under Section 9.5(b) hereunder, subject to the terms and conditions set forth in this Agreement and (ii) subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, to perform the PPA and BCA Approval Obligations and to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement and such other agreements and any Plan supplements or documents referred to herein or therein or hereunder or thereunder, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)     Each of the other Debtors has the requisite power and authority (corporate or otherwise) subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order and the Confirmation Order, to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder. Subject to entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite action (corporate or otherwise) on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(c)     Notwithstanding the foregoing, the Company makes no express or implied representations or warranties, on behalf of itself or the other Debtors, with respect to actions (including in the foregoing) to be undertaken by the Reorganized Company, which such actions shall be governed by the Plan.

Section 4.3     Execution and Delivery; Enforceability.  Subject to entry of the PPA and BCA Approval Order, this Agreement will have been, and subject to the entry of the PPA and BCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, each other Transaction Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto.  Upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery hereof by the Commitment Parties, the PPA and BCA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.  Upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Commitment Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4     Authorized and Issued Equity Interests.  Except as set forth in this Agreement and in connection with the Private Placement and the Private Placement Agreement, and as contemplated by the Plan, as of the Closing Date, none of the Debtors will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates any of the Debtors to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of capital stock of, or other equity or voting interests in, any of the Debtors or any security convertible or exercisable for or

exchangeable into any units or shares of capital stock of, or other equity or voting interests in, any of the Debtors, (ii) obligates any of the Debtors to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units or shares of capital stock of, or other equity interests in, any of the Debtors or (iv) relates to the voting of any units or other equity interests in any of the Debtors. For the avoidance of doubt, on the Effective Date the Reorganized Debtors shall only issue capital stock or other equity interests as expressly and specifically authorized pursuant to the Plan and any additional issuances of capital stock or other equity interests is subject to the consent and approval of the Requisite Consenting Noteholders.

Section 4.5    No Conflict.  Assuming the consents described in clauses (a) through (g) of Section 4.6 are obtained, the execution and delivery by the Company and, if applicable, any other Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which any Debtor will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of any Debtor will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of any of the Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring through the Chapter 11 Cases), or (c) result in any violation of any Law or Order applicable to any Debtor or any of their properties, except in each of the cases described in clause (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.6    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over any of the Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, the other Debtors, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, the other Debtors, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the PPA and BCA Approval Order authorizing the Company to enter into this Agreement and perform the PPA and BCA Approval Obligations, (b) entry of the Disclosure Statement Order, (c) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time-to-time; (d) the entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Shares by the Commitment Parties, the issuance of the Subscription Rights, the issuance of the Rights Offering Shares

34

pursuant to the exercise of the Subscription Rights, the issuance of Common Shares as payment of the Backstop Commitment Premium and the Backstop Ticking Premium, and (g) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Company SEC Documents and Disclosure Statement.  Since December 31, 2015, the Company has filed all required Company SEC Documents with the SEC.  No Company SEC Document that has been filed prior to the date this representation has been made, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date this representation is made, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term is defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 4.8    Absence of Certain Changes.  Since December 31, 2015 to the date of this Agreement, no event has occurred or, to the Knowledge of the Company, exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 4.9    No Violation; Compliance with Laws.    (i) The Company is not in violation of its articles of incorporation, as amended, or bylaws, and (ii) no other Debtor is in violation of its respective charter or bylaws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect. To the Knowledge of the Company, none of the Debtors is or has been at any time since January 1, 2016 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.10    Legal Proceedings. Other than the Chapter 11 Cases and any adversary proceedings or contested matters commenced in connection therewith or any matters referenced in any proof of claim filed therein, or matters for which a proof of Claim must be filed to receive a distribution in the Chapter 11 Cases, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Debtors is a party or to which any property of any of the Debtors is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.11    Labor Relations.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the Knowledge of the Company, threatened against any of the Debtors; (b) the hours worked and payments made to employees of any of the Debtors have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing

with such matters; and (c) all payments due from any of the Debtors or for which any claim may be made against any of the Debtors on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of any of the Debtors to the extent required by GAAP.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Transaction Agreements will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any of the Debtors (or any predecessor) is a party or by which any of the Debtors (or any predecessor) is bound.

Section 4.12   Intellectual Property.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Debtors owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Knowledge of the Company, none of the Debtors nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

Section 4.13   Title to Real and Personal Property.

(a)   Real Property.   Each of the Debtors has good and defensible title to its respective Real Properties, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, the enforceability of such leased Real Properties may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases.  To the Knowledge of the Company, all such properties and assets are free and clear of Liens, except for Permitted Liens and except for such Liens as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)   Leased Real Property.   Each of the Debtors is in compliance with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Debtors has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Debtors enjoys peaceful and undisturbed possession under all such leases, other

36

than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted or have, individually or in the aggregate, a Material Adverse Effect.

Section 4.14    No Undisclosed Relationships.    Other than Contracts or other direct or indirect relationships between or among any of the Debtors, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described, except for the transactions contemplated by this Agreement.    Any Contract existing as of the date hereof between or among the Company, on the one hand, and any director, officer or greater than five percent (5%) stockholder of any of the Debtors, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the year ended December 31, 2015 or any other Company SEC Document filed since March 16, 2016 to the date hereof.

Section 4.15    Licenses and Permits.    The Debtors possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.    None of the Debtors (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.16    Environmental.    Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no written notice, claim, demand, request for information, Order, complaint or penalty has been received by any of the Debtors, and there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to any of the Debtors, (b) each Debtor has received (including timely application for renewal of the same), and maintained in full force and effect, all environmental permits, licenses and other approvals, and has maintained all financial assurances, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since January 1, 2016, has been, in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (c) to the Knowledge of the Company, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by any of the Debtors that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, (d) no Hazardous Material has been Released, generated,

37

owned, treated, stored or handled by any of the Debtors, and no Hazardous Material has been transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, and (e) there are no agreements in which any of the Debtors has expressly assumed responsibility for any known obligation of any other Person arising under or relating to Environmental Laws that remains unresolved other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, which has not been made available to the Commitment Parties prior to the date hereof.  Notwithstanding the generality of any other representations and warranties in this Agreement, the representations and warranties in this Section 4.16 constitute the sole and exclusive representations and warranties in this Agreement with respect to any environmental, health or safety matters, including any arising under or relating to Environmental Laws or Hazardous Materials.

Section 4.17   Tax Returns.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it and (ii) taken as a whole, each such Tax return is true and correct;

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each of the Debtors has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which the Debtors (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or with respect to the Debtors only, except to the extent the non-payment thereof is permitted or required by the Bankruptcy Code), which Taxes, if not paid or adequately provided for, would reasonably be expected to be material to the Debtors taken as a whole; and

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, with respect to the Debtors, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith and are not expected to result in significant negative adjustments that would be material to the Debtors taken as a whole, (i) no claims have been asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the IRS or any other Governmental Entity.

Section 4.18    <u>Employee Benefit Plans</u>.

(a)    Except for the filing and pendency of the Chapter 11 Cases or otherwise as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) each Company Plan, if any, is in compliance with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past six years (or is reasonably likely to occur); (iii) no ERISA Event has occurred or is reasonably expected to occur; (iv) none of the Debtors has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject any of the Debtors to Tax; and (v) no employee welfare plan (as defined in Section 3(1) of ERISA) maintained or contributed to by any of the Debtors provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA).

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no pending, or to the Knowledge of the Company, threatened claims, sanctions, actions or lawsuits, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

(c)    Within the last six years, no Company Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all compensation and benefit arrangements of the Debtors comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and none of the Debtors has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Sections 409A or 4999 of the Code.

(e)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all liabilities (including all employer contributions and payments required to have been made by any of the Debtors) under or with respect to any compensation or benefit arrangement of any of the Debtors have been properly accounted for in the Company's financial statements in accordance with GAAP.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of each of the Debtors are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or law); and (iii) the Debtors have not and are not engaged in any unfair labor practice.

Section 4.19    <u>Internal Control Over Financial Reporting</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and to the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 4.20    <u>Disclosure Controls and Procedures</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.21    <u>Material Contracts</u>. Other than as a result of the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Debtor party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and no written notice to terminate, in whole or part, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Other than as a result of the filing and pendency of the Chapter 11 Cases, none of the Debtors nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.22    <u>No Unlawful Payments</u>.  To the Knowledge of the Company, since January 1, 2016, none of the Debtors nor any of their respective directors, officers or employees has in any material respect: (a) used any funds of any of the Debtors for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.23    <u>Compliance with Money Laundering Laws</u>.  To the Knowledge of the Company, the operations of the Debtors are and, since January 1, 2016 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions

Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Debtors operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.24    Compliance with Sanctions Laws.    To the Knowledge of the Company, none of the Debtors nor any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.  The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any other Debtor, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

Section 4.25    No Broker's Fees.  Except for amounts that may be paid or payable to Lazard Frères & Co. LLC in connection with the Restructuring, none of the Debtors is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering, the sale of the Unsubscribed Shares or the payment of the Backstop Commitment Premium or the Backstop Ticking Premium.

Section 4.26    Investment Company Act.  None of the Debtors is, or immediately after giving effect to the consummation of the Restructuring will be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended (the "Investment Company Act"), and this conclusion is based on one or more bases or exclusions other than Sections 3(c)(1) and 3(c)(7) of the Investment Company Act, including that none of the Debtors comes within the basic definition of 'investment company' under section 3(a)(1) of the Investment Company Act.

Section 4.27    Insurance.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) the Debtors have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; (ii) all premiums due and payable in respect of insurance policies maintained by the Debtors have been paid; (iii) the Company reasonably believes that the insurance maintained by or on behalf of the Debtors is adequate in all respects; and (iv) as of the date hereof, to the Knowledge of the Company, none of the Debtors has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Debtors of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.28    Alternative Transactions. As of the date hereof, the Company is not pursuing, or in discussions or negotiations regarding, any solicitation, offer, or proposal from any Person concerning any actual or proposed Alternative Transaction and, as

applicable, has terminated any existing discussions or negotiations regarding any actual or proposed Alternative Transaction.

Section 4.29   Issuance; Valid Offering. The capital stock to be issued pursuant to the Plan, including the Common Shares to be issued in connection with the consummation of the Rights Offering and pursuant to the terms of this Agreement, including in connection with the Backstop Commitment Premium, the Backstop Ticking Premium or the Breakup Payments, will, when issued and delivered on the Closing Date and any time thereafter, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and such Common Shares will be free and clear of all Taxes (except for any Taxes arising as a result of a Commitment Party's failure to provide a Tax Form in accordance with Section 10.16 establishing a complete exemption from withholding), Liens (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Plan, the Plan Supplement, the Reorganized Company Organizational Documents or Transaction Agreements. Assuming the accuracy of the representations and warranties of the Private Placement Parties set forth in Article V, it is not necessary in connection with the issuance and sale of such Common Shares to the Commitment Parties in the manner contemplated by this Agreement and the Disclosure Statement to register such Common Shares under the Securities Act.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES

Each Commitment Party, severally and not jointly, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1   Organization.  Such Commitment Party is a legal entity organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2   Organizational Power and Authority.   Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3   Execution and Delivery.  This Agreement and each other Transaction Agreement to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) upon entry of the PPA and BCA Approval Order and assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as

enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    No Conflict.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by such Commitment Party of this Agreement and each other Transaction Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Commitment Party is party or is bound or to which any of the property or assets or such Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Commitment Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 5.5    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Transaction Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Backstop Commitment Percentage of the Unsubscribed Shares and its portion of the Rights Offering Shares) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement and each other Transaction Agreement to which such Commitment Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 5.6    No Registration.  Such Commitment Party understands that (a) the Unsubscribed Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    Purchasing Intent.  Such Commitment Party is acquiring the Unsubscribed Shares for its own account or accounts or funds over which it holds

43

voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

     Section 5.8 <u>Sophistication; Investigation</u>. Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Shares. Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act. Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either expressed or implied, by or on behalf of any of the Debtors.

     Section 5.9 <u>No Broker's Fees</u>. Such Commitment Party is not a party to any Contract with any Person (other than the Transaction Agreements and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares or the payment of the Backstop Commitment Premium or the Backstop Ticking Premium.

     Section 5.10 <u>Sufficient Funds</u>. Such Commitment Party has sufficient assets and the financial capacity to perform all of its obligations under this Agreement, including the ability to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering and fund such Commitment Party's Backstop Commitment.

     Section 5.11 <u>Execution of PSA</u>. Solely with respect to any Additional Commitment Party, such Additional Commitment Party has, concurrently with its execution of the Joinder Agreement, executed a joinder agreement to the Plan Support Agreement.

<div align="center">

**ARTICLE VI**
**ADDITIONAL COVENANTS**

</div>

     Section 6.1 <u>Approval of the Commitment Parties</u>.

    (a) <u>Approval of the Requisite Members of the Noteholder Steering Committee</u>. Each substantive document in connection with the Restructuring (excluding documents related to the Bonding Solution), including without limitation the following, shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee:

<div align="center">44</div>

(i) the Disclosure Statement, the Disclosure Statement Motion and the Disclosure Statement Order;

(ii) the Plan and any exhibits, supplements, appendices and other attachments thereto;

(iii) the credit agreement and/or indenture for any Exit Facility (if applicable);

(iv) the credit agreement for the Replacement Secured First Lien Term Loan (if applicable), provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth in the Restructuring Term Sheet;

(v) the Reorganized Company Organizational Documents;

(vi) the certificate of designation of Series A convertible preferred stock for the Preferred Equity;

(vii) all documents relating to the Rights Offering and the Private Placement;

(viii) the indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Require Members of the Noteholder Steering Committee;

(ix) the Confirmation Order; and

(x) the PPA and BCA Approval Motion.

(b) <u>Approval of the Noteholder Co-Proponents</u>. Each of the following material documents in connection with the Restructuring shall be in form and substance satisfactory to each of the Noteholder Co-Proponents:

(i) this Agreement;

(ii) the Private Placement Agreement;

(iii) the Plan Support Agreement;

(iv) the Restructuring Term Sheet; and

(v) the Orders relating to items (b)(i) through (b)(iii) of the above.

(c) <u>Amendment of Documents Subject to Approval</u>. The Plan and any exhibits, supplements, appendices, or other documents related thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other

rights or entitlements of the Noteholder Steering Committee (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).

<p style="text-align:center">Section 6.2      Conduct of Business.</p>

Prior to and through the Effective Date, except as set forth in this Agreement, the Private Placement Agreement or the Plan, or with the written consent of the Requisite Consenting Noteholders, the Company (a) shall, and shall cause its Subsidiaries to, carry on their businesses in the ordinary course of business (considering the impact of the Chapter 11 Cases) and, except as currently subject to litigation, use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and make any required filing with the SEC within the time periods required under the Exchange Act and (b) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with (i) with its business plan dated November 2016, (ii) the parameters described in this Agreement, the Private Placement Agreement or (iii) the Plan.

For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and will require the prior written consent of the Requisite Members of the Noteholder Steering Committee (unless otherwise contemplated by this Agreement, the Private Placement Agreement or the Plan): (w) except as currently subject to litigation, any amendment, modification, termination, waiver, supplement, restatement or other change to any Material Contract or any assumption of any Material Contract, (x) any (i) termination by the Debtors without cause or (ii) reduction in title or responsibilities, in each case, of the individuals who are, as of the date of this Agreement, the Chief Executive Officer or the Chief Financial Officer of the Company, (y) the adoption or amendment of any management incentive or equity plan by any of the Debtors, except for as provided in the Plan or (z) any sale, abandonment, or disposition of any assets other than (i) the sale of Metropolitan Collieries Pty Ltd, Peabody (Burton Coal) Pty Ltd or Debtors' interests in Dominion Terminal Associates, LLC or (ii) any ordinary course land sales made upon reasonable prior notice to the Noteholder Co-Proponents and in accordance with the Company's business plan dated November 2016; provided, however, that such ordinary course land sales shall not exceed $5,000,000 individually or $20,000,000 in the aggregate.  Following a request by the Debtors for consent with respect to any operational matter that requires the consent of the Requisite Members of the Noteholder Steering Committee pursuant to this Section 6.2 section, if the consent of such parties is not obtained or declined within three (3) Business Days following the date such request is made in writing and delivered to each of the Noteholder Co-Proponents (which notice will be deemed delivered if given in writing to Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, and Skadden, Arps, Slate, Meagher & Flom LLP), such consent shall be deemed to have been granted by the Requisite Members of the Noteholder Steering Committee, as applicable. If such consent is not given or deemed to be given, the Debtors shall be permitted to seek approval from the Bankruptcy Court to take such actions, and seeking such approval shall not be a breach of this Section 6.2; provided, that in such event the Noteholder Co-Proponents shall have a termination right under the Plan Support Agreement pursuant to the terms thereof.  Except as

<p style="text-align:center">46</p>

otherwise provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Debtors. Prior to the Closing Date, the Debtors shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Debtors.

Section 6.3    <u>Material Claim Settlements</u>. The Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over the settlement of any material Claim, including but not limited to, any such settlement related to the MEPP Claim (whether in the Chapter 11 Cases by the Bankruptcy Court or through arbitration of the MEPP Claim) above the amounts held in reserve by the Debtors for such MEPP Claim.

Section 6.4    <u>Access to Information; Confidentiality</u>.

(a)    Subject to applicable Law and <u>Section 6.4(b)</u>, upon reasonable notice during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms ("**Pre-Closing Period**"), the Debtors shall afford the Commitment Parties and their Representatives (for the purposes of this <u>Section 6.4(a)</u> only, Representatives shall not include limited partners) upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Debtors' business or operations, to the Debtors' employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Debtors shall furnish promptly to such parties all reasonable information concerning the Debtors' business, properties and personnel as may reasonably be requested by any such party, <u>provided</u> that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Debtors to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of any of the Debtors or (iii) to violate any applicable Laws or Orders. All requests for information and access made in accordance with this <u>Section 6.4</u> shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

(b)    From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Commitment Party or its Representatives pursuant to <u>Section 6.4(a)</u> (except that provision or disclosure may be made to any Affiliate or Representative of such Commitment Party who needs to know such information for purposes of this Agreement or the other Transaction Agreements and who agrees to observe the terms of this <u>Section 6.4(b)</u> (and such Commitment Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby. Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this <u>Section 6.4(b)</u>, (B) becomes available to a Commitment Party or its Representatives on a non-confidential basis from a source other than any of the Debtors or any of

47

their respective Representatives, (C) becomes available to a Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process, or (D) such Commitment Party or any Representative thereof is required to disclose pursuant to judicial or administrative process or pursuant to applicable Law or applicable securities exchange rules; <u>provided</u>, that, such Commitment Party or such Representative shall provide the Company with prompt written notice of such legal compulsion and cooperate with the Company to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; <u>provided</u>, <u>further</u>, that, in the event that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents. The provisions of this <u>Section 6.4(b)</u> shall not apply to any Initial Commitment Party that, as of the date hereof, is party to a confidentiality or non-disclosure agreement with the Debtors, for so long as such agreement remains in full force and effect.

<div align="center">Section 6.5     <u>Commercially Reasonable Efforts</u>.</div>

(a)     Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement, each Party shall use (and the Company shall cause the other Debtors and their Representatives to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including, but not limited to, using commercially reasonable efforts in:

(i)     timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)     defending any Legal Proceedings in any way challenging (A) this Agreement, the Plan, the Registration Rights Agreement or any other Transaction Agreement, (B) the PPA and BCA Approval Order, the Disclosure Statement Order or the Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)     working together in good faith to finalize the Reorganized Company Organizational Documents, Transaction Agreements, the Registration Rights Agreement and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court.

<div align="center">48</div>

(b)     Subject to Laws or applicable rules relating to the exchange of information, and in accordance with the Plan Support Agreement, the Commitment Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Commitment Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Commitment Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

(c)     Nothing contained in this Section 6.5 shall limit the ability of any Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Plan Support Agreement.

Section 6.6     Registration Rights Agreement; Reorganized Company Organizational Documents.

(a)     The Plan will provide that from and after the Effective Date each Commitment Party, and any other holder of Claims receiving at least ten percent (10%) or more of the Common Shares on a fully-converted basis issued under the Plan and/or the Rights Offering or that cannot sell its Common Shares under Rule 144 of the Securities Act without volume or manner of sale restrictions, shall be entitled to registration rights with respect to their Common Shares that are customary for a transaction of this nature, pursuant to a registration rights agreement to be entered into as of the Effective Date, which agreement shall be in form and substance consistent with the terms set forth in the Restructuring Term Sheet and otherwise reasonably acceptable to the Requisite Consenting Noteholders and the Company (the "**Registration Rights Agreement**").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto. The Registration Rights Agreement will provide:

(i)     that the Company will (A) file a registration statement on Form S-1 (or other appropriate form) (the "**Initial Resale Registration Statement**") no later than 30 days following the Effective Date (the "**Filing Deadline**") covering all registrable securities that the holders thereof request to have included therein, (B) use its reasonable best efforts to have the Initial Resale Registration Statement declared effective by the SEC no later than (1) in the case of a "no review", the 15th day following the Filing Deadline; (2) in the case of a "limited review", the 45th day following the Filing Deadline, and (3) in the case of a "review," the 75th day following the Filing Deadline (each such date, as applicable, the "**Registration Deadline**") and (C) use its reasonable best efforts to keep such registration statement continuously effective (including filing any necessary post-effective amendment and/or subsequent registration statements) for a period of three years (or such shorter period if all registrable securities have been disposed by the holder thereof or are no longer registrable securities); and

49

(ii)  for partial liquidated damages of $75,000 per day in the event that (A) the Initial Resale Registration Statement is not filed on or prior to the Filing Deadline, (B) the Initial Resale Registration Statement is not declared effective by the SEC on or prior to the applicable Registration Deadline or (C) holders are not permitted to use the prospectus included in the Initial Resale Registration Statement to resell the securities for fifteen (15) or more consecutive days, or more than an aggregate of thirty (30) days (which need not be consecutive calendar dates), in any 12-month period. Notwithstanding the foregoing, the aggregate amount of such liquidated damages payable by the Company under the Registration Rights Agreement shall not exceed $10,000,000.

(b)  The Plan will provide that on the Effective Date, the Reorganized Company Organizational Documents will be duly authorized, approved, adopted and in full force and effect.  Forms of the Reorganized Company Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

(c)  The Company shall further agree that in any case in which the Company asserts that any Commitment Party (including their Affiliates who hold Common Shares, Preferred Equity or Penny Warrants), or any affiliate of any such person to whom such person has transferred shares or other securities, may sell its shares (no matter the manner herein described under which such shares were acquired) under Rule 144 under the Securities Act without volume or manner of sale restrictions, the Company and its legal counsel shall upon request, and following receipt of all required certifications of such parties or Affiliates thereof reasonably requested by the Company or its legal counsel, promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such sale under Rule 144 under the Securities Act.

Section 6.7    Blue Sky.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the offer and sale of the Unsubscribed Shares to the Commitment Parties pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing Date.  The Reorganized Company shall timely make all filings and reports relating to the offer and sale of the Unsubscribed Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company or the Reorganized Company, as applicable, shall pay all fees and expenses in connection with satisfying its obligations under this Section 6.7.

Section 6.8    DTC Eligibility.  Unless otherwise requested by the Requisite Members of the Noteholder Steering Committee, the Reorganized Company shall use commercially reasonable efforts to promptly make, when applicable from time to time after the Closing, all Unlegended Shares eligible for deposit with The Depository Trust Company.  "**Unlegended Shares**" means any Common Shares acquired by the Commitment Parties and

50

their respective Affiliates (including any Related Purchaser or Ultimate Purchaser in respect thereof) pursuant to this Agreement and the Plan, including all shares issued to the Commitment Parties and their respective Affiliates in connection with the Rights Offering, that do not require, or are no longer subject to, the Legend.

Section 6.9    Use of Proceeds.    The Reorganized Company will utilize the proceeds from the exercise of the Subscription Rights, the sale of the Unsubscribed Shares, the sale of Private Placement Shares and the Exit Facility for the purposes described in the Disclosure Statement.

Section 6.10    Securities Legend.    Each certificate evidencing securities issued hereunder, and each certificate issued in exchange for or upon the Transfer of any such securities, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such securities are uncertificated, such securities shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Reorganized Company or agent and the term "Legend" shall include such restrictive notation.  The Reorganized Company shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such securities (or the securities register or other appropriate Reorganized Company records, in the case of uncertified securities), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such securities may be sold under Rule 144 of the Securities Act.  The Reorganized Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.11    Antitrust Approval.

(a)    Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan and the other Transaction Agreements, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than fifteen (15) Business

Days following the date hereof) and (ii) promptly furnishing any documents or information reasonably requested by any Antitrust Authority.

(b)    The Company and each Commitment Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements that has notified the Company in writing of such obligation (each such Commitment Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any material communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all material correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Consenting Noteholders and the Company.

(c)    Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)    The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing.   The communications contemplated by this Section 6.11 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.11 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements.

Section 6.12    Alternative Transactions. Until the Closing Date or the date on which this Agreement shall have terminated, the Company and the other Debtors shall not seek, solicit, or support any Alternative Transaction, and shall not cause or allow any of their Representatives to solicit any agreements relating to an Alternative Transaction; provided, however, that nothing in this Agreement shall require the Company or any of its Subsidiaries or

Affiliates or any of their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, or shall limit the Debtors from considering any Alternative Transaction brought to them consistent with their fiduciary duties; provided, further, that the Debtors shall provide the Noteholder Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such proposal; provided, further, the Breakup Payments and Expense Reimbursement shall be payable upon exercise by the Debtors of the fiduciary out contained in this Section 6.12 in accordance with the terms of this Agreement.  For the avoidance of doubt, nothing herein shall limit the Requisite Members of the Noteholder Steering Committee's right to terminate this Agreement pursuant to Section 9.2.

Section 6.13    Reclamation Bonding. The Debtors shall promptly finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "**Bonding Solution**").  The Debtors shall provide updates every two weeks to the Initial Commitment Parties' professionals regarding their efforts to achieve the Bonding Solution.

# ARTICLE VII

# CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Commitment Parties.  The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions prior to or at the Closing:

(a)    Cash on Hand. The Company Group must have at least $600 million in cash on hand on the Effective Date;

(b)    Outstanding Funded Debt.    The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date (excluding any capital lease obligations, borrowings under any ABL Facilities (as defined in the Restructuring Term Sheet), and, to the extent the Effective Date occurs after April 3, 2017, any Incremental Additional First Lien Debt, Incremental New Second Lien Notes or additional amounts under the Exit Facility to finance any cash consideration on account of Incremental Second Lien Notes Claims); provided that, except in the event of a First Lien Full Cash Recovery, no more than $1.5 billion of such outstanding funded debt may be first lien debt;

(c)    MEPP Claim. The MEPP Claim shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee and the Requisite First Lien Lender Co-Proponents if for an amount above the amounts held in reserve by the Debtors for such claim;

(d)     <u>Effectiveness of Plan Support Agreement</u>. The Plan Support Agreement must remain in effect through the Effective Date;

(e)     <u>Disclosure Statement Order</u>.  The Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, and such Order shall be a Final Order;

(f)     <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, and such Order shall be a Final Order;

(g)     <u>Plan</u>. The Company and all of the other Debtors shall have substantially complied with the terms of the Plan (as amended or supplemented from time to time) that are to be performed by the Company, the Reorganized Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan;

(h)     <u>PPA and BCA Approval Order</u>.  The Bankruptcy Court shall have entered the PPA and BCA Approval Order in form and substance satisfactory to the Requisite Members of the Noteholder Steering Committee;

(i)     <u>Rights Offering</u>.  The Rights Offering shall have been conducted in accordance with the PPA and BCA Approval Order and this Agreement in all material respects;

(j)     <u>Effective Date</u>.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order;

(k)     <u>Registration Rights Agreement; Reorganized Company Organizational Documents</u>.

(i)     The Registration Rights Agreement shall have been executed and delivered by the Reorganized Company, shall otherwise have become effective with respect to the Commitment Parties and the other parties thereto, and shall be in full force and effect;

(ii)     The Reorganized Company Organizational Documents shall have been duly approved and adopted and shall be in full force and effect;

(l)     <u>Expense Reimbursement</u>.  The Debtors shall have paid all Expense Reimbursements accrued through the Closing Date pursuant to <u>Section 3.3</u>;

(m)     <u>Governmental Approvals</u>.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all notifications, authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by any Governmental

Entity in connection with the transactions contemplated by this Agreement shall have been obtained or filed;

(n)     No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(o)     Representations and Warranties.

(i)     The representations and warranties of the Debtors contained in Section 4.8 shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date);

(ii)     The representations and warranties of the Debtors contained in Section 4.2, Section 4.3, Section 4.4 and Section 4.5 shall be true and correct in all material respects on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date);

(iii)     The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect;

(p)     Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date;

(q)     Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any event that constitutes, individually or in the aggregate, a Material Adverse Effect;

(r)     Officer's Certificate.  The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Section 7.1(o), Section 7.1(p), and Section 7.1(q) have been satisfied;

(s)     <u>Funding Notice</u>. The Commitment Parties shall have received the Funding Notice;

(t)     <u>Exit Facility</u>. The Exit Facility, if it is to be entered into pursuant to the Plan, shall have become effective and shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee;

(u)     <u>Disputed Share Reserve</u>. The Debtors shall have filed a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and Order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee; provided, however, that the aggregate face amount of disputed Claims permitted to receive Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee; and

(v)     <u>Material Contracts</u>. The assumption or rejection (in each case, pursuant to section 365 of the Bankruptcy Code) and/or amendment of any Material Contracts and the liabilities of the Reorganized Company with respect to such Material Contracts shall, in the aggregate, be reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee.

Section 7.2     <u>Waiver of Conditions</u>. All or any of the conditions set forth in <u>Section 7.1</u> may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by the Requisite Consenting Noteholders and if so waived, all Commitment Parties shall be bound by such waiver.

Section 7.3     <u>Conditions to the Obligations of the Debtors</u>. The obligations of the Debtors to consummate the transactions contemplated hereby with the Commitment Parties is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)     <u>PPA and BCA Approval Order</u>. The Bankruptcy Court shall have entered the PPA and BCA Approval Order;

(b)     <u>Disclosure Statement Order</u>. The Bankruptcy Court shall have entered the Disclosure Statement Order;

(c)     <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order;

(d)     <u>Effective Date</u>. The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order;

(e)     <u>Governmental Approvals</u>. All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all notifications, authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by any Governmental

Entity in connection with the transactions contemplated by this Agreement shall have been obtained or filed;

(f)     <u>No Legal Impediment to Issuance</u>.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(g)     <u>Representations and Warranties</u>.

(i)     The representations and warranties of the Commitment Parties contained in this Agreement that are qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all respects only as of the specified date);

(ii)     The representations and warranties of the Commitment Parties contained in this Agreement that are not qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date);

(h)     <u>Covenants</u>.  The Commitment Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement;

(i)     <u>Exit Facility</u>. The Exit Facility, if it is to be entered into pursuant to the Plan, shall have become effective; and

(j)     <u>Funding</u>. Each Commitment Party shall have delivered and paid an amount equal to (i) the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of Unsubscribed Shares plus (ii) the aggregate Per Share Purchase Price for the Rights Offering Shares issuable pursuant to such Commitment Party's exercise of all of the Subscription Rights issued to it in the Rights Offering in accordance with <u>Section 2.5(b)</u>.

**ARTICLE VIII**

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1     <u>Indemnification Obligations</u>.  Following the entry of the PPA and BCA Approval Order, the Debtors (the "**<u>Indemnifying Parties</u>**" and each, an "**<u>Indemnifying Party</u>**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an

"**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties) arising out of a claim asserted by a third-party (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement and its obligations hereunder, including the Backstop Commitment, the Rights Offering, the payment of the Backstop Premiums, the Breakup Payments or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the Reorganized Company, the Company Group, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, caused by a Commitment Party Default by such Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.2    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in

58

connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

Section 8.3    Settlement of Indemnified Claims.    In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    Contribution.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or

proposed to be received by the Company and the Reorganized Company pursuant to the issuance and sale of the Unsubscribed Shares in the Rights Offering contemplated by this Agreement and the Plan bears to (b) the Backstop Premiums and the Breakup Payments paid or proposed to be paid to the Commitment Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5   Treatment of Indemnification Payments.   All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Per Share Purchase Price for all Tax purposes. The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement. The obligations of the Company and the Reorganized Company under this Article VIII shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company and the Reorganized Company may comply with the requirements of this Article VIII without further Order of the Bankruptcy Court.

Section 8.6   No Survival.   All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

Section 9.1   Consensual Termination.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Consenting Noteholders.

Section 9.2   Termination by the Requisite Members of the Noteholder Steering Committee.   Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated by the Requisite Members of the Noteholder Steering Committee upon two (2) Business Days written notice to the Company upon the occurrence of any of the following events:

(a)   any Debtor accepts or supports an Alternative Transaction, including but not limited to filing with the Bankruptcy Court, or publicly announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b)   the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the

60

occurrence of any of the foregoing as to the Gold Fields Debtors (as defined in the Plan) shall not cause a Termination Event;

(c)    the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) the Disclosure Statement Motion, and (iv) the PPA and BCA Approval Motion by no later than December 22, 2016;

(d)    the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the Exit Facility in a principal amount of not less than $1,500,000,000 or agreed to use commercially reasonable efforts to arrange for commitments for the Exit Facility in a principal amount of not less than $1,500,000,000 by January 11, 2017;

(e)    the failure of the Disclosure Statement Order to be entered by the Bankruptcy Court by January 31, 2017;

(f)    the failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(g)    the failure of the Effective Date to have occurred by April 15, 2017;

(h)    following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) Business Days following the delivery of such notice; provided, that a Commitment Party Default is not deemed to be a breach of any obligation under this Agreement for purposes of this Section 9.2(h);

(i)    the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority, or validity of the Claims of any of the Noteholder Co-Proponents;

(j)    any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with this Agreement or the Plan Support Agreement and the exhibits hereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(k)    any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in Section 6.2, without the prior written consent of the Requisite Members of the Noteholder Steering Committee;

61

(l)      either the Disclosure Statement Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Members of the Noteholder Steering Committee;

(m)      the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) Business Days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents, this Agreement and the Plan Support Agreement;

(n)      the Debtors deliver a Debtor Fiduciary Notice (as defined in the Plan Support Agreement) to the Creditor Co-Proponents;

(o)      the failure to obtain entry of the PPA and BCA Approval Order (including approval of the fees and indemnification obligations set forth herein and therein as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017;

(p)      the PPA and BCA Approval Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Members of the Noteholder Steering Committee; provided, however, that the Debtors shall have five (5) Business Days following the reversal, stay, dismissal, vacation, reconsideration, modification or amendment to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish compliance with the terms of the Transaction Agreements, or (ii) is acceptable to the Requisite Members of the Noteholder Steering Committee; or

(q)      a decrease of the number of Subscription Rights distributed to holders of Second Lien Notes Claims, Unsecured Senior Notes Claims and General Unsecured Claims in Class 5B for the purpose of allowing the Rights Offering to be exempt from registration under Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code that results in (i) the aggregate purchase price for all Rights Offering Shares offered in the Rights Offering being below $650 million or (ii) the Per Share Purchase Price to be paid in the Rights Offering increasing or decreasing.

Section 9.3      Termination by a Commitment Party

Any Commitment Party shall have the right to terminate upon written notice to the Company if the Plan Effective Date has not occurred by June 14, 2017.  Termination by a

Commitment Party in this <u>Section 9.3</u> shall only terminate this Agreement as to such Commitment Party. The effect of a termination by a Commitment Party pursuant to this <u>Section 9.3</u> shall be governed by <u>Section 9.5</u>, and such terminating party shall be entitled to all rights and protections thereunder.

<p align="center">Section 9.4      <u>Termination by the Company</u>.</p>

This Agreement may be terminated by the Company upon written notice to each Commitment Party upon the occurrence of any of the following, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of:

(a)     occurrence of the Plan Support Agreement Termination Condition; <u>provided</u>, <u>however</u>, the Debtors may waive the Plan Support Agreement Termination Condition in their sole discretion, but may only exercise the Plan Support Agreement Termination Condition (or waive such condition) prior to entry of the PPA and BCA Approval Order, <u>provided</u>, <u>further</u>, however that the timely and valid exercise of the Plan Support Agreement Termination Condition shall relieve the Debtors from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations under the Backstop Commitment Agreement or the Private Placement Agreement;

(b)     the determination by any of the Company's boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by this Agreement or the Plan Support Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(c)     the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d)     following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that adversely and materially affects the Debtors' rights under this Agreement and is either unable to be cured or is not cured within five (5) Business Days following the delivery of such notice;

(e)     the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f)     either the Disclosure Statement Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

<p align="center">63</p>

(g)   the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) Business Days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

<div align="center">Section 9.5      Effect of Termination.</div>

(a)   Within three (3) days following the delivery of a termination notice pursuant to Article IX, each of the Debtors and the Requisite Members of the Noteholder Steering Committee may waive, in writing, the occurrence of the Termination Event identified in the termination notice; provided, however, that the Termination Event provided for in Section 9.3 may not be waived. Absent such waiver, this Agreement shall be terminated on the fourth (4th) day following delivery of the termination notice pursuant to Article IX (such date, the "Termination Date"). Upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII and to pay the Backstop Commitment Premium and the Backstop Ticking Premium or the Breakup Payments pursuant to Article III and Section 9.5(b), respectively, shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in Article VIII, this Section 9.5 and Article X shall survive the termination of this Agreement in accordance with their terms, in each case so long as the PPA and BCA Approval Order has been entered by the Bankruptcy Court prior to such termination and (iii) subject to Section 10.10, nothing in this Section 9.5 shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement. For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)   If following entry by the Bankruptcy Court of the PPA and BCA Approval Order, this Agreement is terminated by the Debtors for any reason other than the occurrence of a Plan Support Agreement Termination Condition (to the extent the Debtors terminate prior to the entry of the PPA and BCA Approval Order), a termination fee equal to $60,000,000, which represents 8.0% of the Rights Offering Amount shall be paid in cash to the Commitment Parties (the "**Breakup Payments**"). The Breakup Payments shall be payable according to the following: (i) 22.5% of the Breakup Payments to the Initial Commitment Parties or their designees in accordance with the Pro Rata Split; (ii) 57.5% of the Breakup Payments to the Initial Commitment Parties, or their designees, and the Phase Two Commitment Parties, or their designees, in accordance with the Pro Rata Split and (iii) 20% of the Breakup Payments to all

<div align="center">64</div>

Commitment Parties or their designees in accordance with the Pro Rata Split and each Commitment Party's Backstop Commitment Period.  Notwithstanding the the provisions of Article III, if owed, the Breakup Payments shall be payable in lieu of the Backstop Commitment Premium, the Backstop Ticking Premium and the issuance of any Penny Warrants.

(c)    The Expense Reimbursement shall be entitled to administrative expense priority, and the Breakup Payments shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Notes Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(i)    in the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 to the Restructuring Term Sheet, including no greater amount of first lien notes than would be issued in accordance with Exhibit 1 to the Restructuring Term Sheet) that is equal to the allowed amount of the First Lien Lender Claims, then such fees shall be paid in cash on the Effective Date on such Plan; and

(ii)    in the event the conditions set forth in subsection (a) do not occur, then the Breakup Payments and the administrative expense claim on account of such the Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the fees which are on terms consistent with the terms of the New Second Lien Notes set forth in Exhibit 2 to the Restructuring Term Sheet;  provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing intercreditor agreement governing the First Lien Claims and Second Lien Notes Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes.

(d)    If any of the Private Placement Agreement, the Plan Support Agreement, or this Agreement are terminated pursuant to their respective terms, this Agreement shall be automatically terminated notwithstanding any other provision hereof.  For the avoidance of doubt, if following entry by the Bankruptcy Court of the PPA and BCA Order any of the Private Placement Agreement, the Plan Support Agreement, or this Agreement are terminated by the Debtors for any reason, the Debtors shall pay the Breakup Payments pursuant to Section 9.5(b).

# ARTICLE X

# GENERAL PROVISIONS

Section 10.1    Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile or email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)    If to the Company or any of the other Debtors:

Peabody Energy Corporation
701 Market Street
St. Louis, MO 63101
Fax No. (314) 342-7597
Attention: A. Verona Dorch, Chief Legal Officer
Email: vdorch@peabodyenergy.com


*with copies (which shall not constitute notice) to:*

Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Fax No. (216) 579-0212
Attention: Heather Lennox, Esq.
Email: hlennox@jonesday.com

and

Jones Day
77 West Wacker
Chicago, IL 60601
Fax No. (312) 782-8585
Attention: Edward B. Winslow, Esq.
Email: ebwinslow@jonesday.com

and

Armstrong Teasdale LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
Fax No. (314) 621-5065

Attention: Steven N. Cousins, Esq. and Susan K. Ehlers, Esq.
Email: scousins@armstrongteasdale.com; sehlers@armstrongteasdale.com

(b)   If to the Commitment Parties:

To each Commitment Party at the addresses or e-mail addresses set forth below the Commitment Party's signature in its signature page to this Agreement.

*with a copy (which shall not constitute notice) to*:

in respect of certain Ad Hoc Secured Committee Members:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Fax No. (212) 735-2000
Attention: Shana A. Elberg, Esq. and Andrea Nicolas, Esq.
Email: shana.elberg@skadden.com; andrea.nicolas@skadden.com

and

Stinson Leonard Street LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Fax No. (314) 863-9388
Attention: John G. Young, Jr., Esq.
Email: john.young@stinson.com

in respect of the South Dakota Investment Council:

Woods, Fuller, Schultz & Smith P.C.
300 South Phillips Ave, Suite 300
Sioux Falls, SD 57104
Attention: Jordan J. Feist, Esq.
Email: jordan.feist@woodsfuller.com

in respect of Aurelius and Elliott:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Fax No. (212) 715-8000
Attention: Kenneth H. Eckstein, Esq., Stephen D. Zide, Esq. and Jeffrey S.
            Trachtman, Esq.

67

Email: KEckstein@kramerlevin.com; SZide@kramerlevin.com;
JBessonette@kramerlevin.com

and

Doster, Ullom & Boyle, LLC
16090 Swingley Ridge Road
Suite 620
St. Louis, MO 63017
Fax No. (636) 532-1082
Attention: Gregory D. Willard, Esq., John G. Boyle, Esq.
Email: gwillard@dubllc.com; jboyle@dubllc.com

in respect of Discovery:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Fax No. (212) 446-4900
Attention: Stephen E. Hessler, Esq.
Email: shessler@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Fax No. (415) 439-1500
Attention: Brian Ford, Esq. and Melissa N. Koss, Esq.
Email: Bford@kirkland.com; Melissa.koss@kirkland.com

Section 10.2    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Consenting Noteholders, other than an assignment by a Commitment Party expressly permitted by Section 2.5 or Section 2.7 and any purported assignment in violation of this Section 10.2 shall be void ab initio.  Except as provided in Article VIII with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

Section 10.3    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or

68

oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Plan Support Agreement (including the Restructuring Term Sheet) will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with <u>Section 10.7</u>.

Section 10.4   <u>Governing Law; Venue</u>.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.   BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5   <u>Waiver of Jury Trial</u>.   EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7    Waivers and Amendments; Rights Cumulative; Consent.  This Agreement may be amended, restated, modified or changed only upon written consent by the Company and the Requisite Consenting Noteholders, solely as permitted in the Voting/Consent Structure and including, for the avoidance of doubt, the rights of Commitment Parties to dissent and withdraw from this Agreement as set forth therein.  Notwithstanding the foregoing, (i) the Backstop Commitment Schedule shall be revised as necessary without requiring a written instrument signed by the Company and the Requisite Consenting Noteholders to reflect changes in the composition of the Commitment Parties and Backstop Commitment Percentages as a result of Transfers permitted in accordance with the terms and conditions of this Agreement and (ii) Sections 9.5(a) and 10.17 may be amended, restated, modified or changed only upon written consent of the Company and each of the Initial Commitment Parties.  The terms and conditions of this Agreement (other than the conditions set forth in Section 7.1 and Section 7.3, the waiver of which shall be governed solely by Article VII) may be waived (A) by the Debtors only by a written instrument executed by the Company and (B) by the Requisite Consenting Noteholders only by a written instrument executed by the Requisite Consenting Noteholders solely as permitted in the Voting/Consent Structure.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8    Headings.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9    Specific Performance.  Each of the Parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each of the parties hereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party hereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity.

Section 10.10   Damages.    The rights of the Company, the Reorganized Company and any non-Defaulting Commitment Party to claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits against any Defaulting Commitment Party are expressly preserved; provided, however, that the Initial Commitment Parties shall be subrogated to all rights of the non-Defaulting Commitment Parties that are not Initial Commitment Parties, the Company and the Reorganized Company, including, but not limited to, rights to sue a Defaulting Commitment Party, control of any litigation against or settlement with a Defaulting Commitment Party and rights pertaining to any litigation against or settlement with a Defaulting Commitment Party.

70

Section 10.11  <u>No Reliance</u>.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and each Commitment Party confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Shares or Backstop Commitment Percentage of its Backstop Commitment.

Section 10.12  <u>Publicity</u>.  At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this <u>Section 10.12</u> shall (a) prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases or (b) require consultation with the Commitment Parties prior to the filing of any Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K with the SEC.

Section 10.13  <u>Settlement Discussions</u>.  This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.14  <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable

71

proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 10.14 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments. For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 10.15  Relationship Among Parties.

(a)    Notwithstanding anything herein to the contrary, the duties and obligations of the Commitment Parties, on the one hand, and the Debtors, on the other hand, arising under this Agreement shall be several, not joint. No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Commitment Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act, as amended. Nothing contained herein or in any Definitive Documentation and no action taken by any Commitment Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any parties that the Commitment Parties are in any way acting in concert or as a "group" (or a joint venture, partnership or association), and the Debtors will not assert any such claim with respect to such obligations or the transactions contemplated by this Agreement or the Definitive Documentation, and the Debtors acknowledge that none of the Commitment Parties are acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or the Definitive Documentation. The Debtors acknowledge and each Commitment Party confirms that it has independently participated in the negotiation of the transactions contemplated under this Agreement and the Definitive Documentation with the advice of counsel and advisors.

(b)    In connection with any matter requiring consent or a request of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, under this Agreement, there is no requirement or obligation that such holders agree among themselves to take such action and no agreement among such holders with respect to any such action. In connection with any matter that may be requested by the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, each such holder may, through its counsel, make such request; provided, that the Company will only be required to take such action if it receives the request of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, as the case may be. In connection with any matter requiring consent of the Requisite Consenting

Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, hereunder, the Company will solicit consent independently from each such holder or its respective counsel; *provided*, that such consent shall only be granted if the approval of the Requisite Consenting Noteholders, the Noteholder Co-Proponents, or the Requisite Members of the Noteholder Steering Committee, as applicable, is obtained.

(c)     It is understood and agreed that none of the Commitment Parties has any duty of trust or confidence in any form with any other Commitment Party, the Debtors, or any of the Debtors' creditors or other stakeholders and, except as expressly provided in this Agreement, there are no agreements, commitments or undertakings by, among or between any of them with respect to the subject matter hereof.  For the avoidance of doubt, the foregoing sentence does not include any fiduciary obligations owed by any party to the Plan Support Agreement that has been appointed an officer of any Debtor.

Section 10.16 <u>Tax Forms</u>. If the Company (or its agent) determines in its reasonable discretion that it is necessary or appropriate to request Internal Revenue Service tax forms (including but not limited to Form W-9, W-8BEN, W-8BEN-E, W-8ECI, W-8IMY (and attachments thereto), or any successors thereto) ("**Tax Forms**") to determine its tax reporting and withholding obligations, if any, the Commitment Parties shall promptly provide, solely to the extent legally entitled to do so, such duly completed Tax Forms to the Company (or its agent), and the Company (or its agent) shall be entitled to rely on such forms in determining its tax reporting and withholding obligations, if any.  Notwithstanding anything to the contrary contained in this Agreement, the Debtors (and their agents) shall have the rights to request Tax Forms and withhold as necessary in accordance with Plan Article VI.K and Disclosure Statement Sections IX.O and XII.

Section 10.17 <u>Company Fiduciary Duties</u>.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, subject to the Non-Solicitation Provision set forth in Section 6.02 of the Plan Support Agreement; <u>provided</u>, the Breakup Payments and Expense Reimbursement shall be payable upon exercise by the Debtors of the fiduciary out contained in this <u>Section 10.17</u> in accordance with the terms of this Agreement.  For the avoidance of doubt, nothing herein shall limit the rights of any party or parties set forth in <u>Section 2.7(a)</u>, <u>Section 9.2</u> and <u>Section 9.3</u>.

73

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the date first above written.

PEABODY ENERGY CORPORATION

By: _A. Verna Dorch_____

Name: _A. Verona Dorch_

Title: _EVP and Chief Legal Officer_

BlockHouse Master Fund LP

By: _____
       Name: Alfred J. Barbagallo
       Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

Compliance@pointstate.com

Alfred J. Barbagallo

*[Signature page to Backstop Commitment Agreement]*

Conflux Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

Compliance@pointstate.com

Alfred J. Barbagallo

*[Signature page to Backstop Commitment Agreement]*

SteelMill Master Fund LP

By: _____
      Name: Alfred J. Barbagallo
      Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

Compliance@pointstate.com

Alfred J. Barbagallo

[*Signature page to Backstop Commitment Agreement*]

PointState Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Notice Information

40 West 57th Street, 25th Floor
New York, NY 10019

Compliance@pointstate.com

Alfred J. Barbagallo

*[Signature page to Backstop Commitment Agreement]*

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 569 of 876 PageID #: 1576

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 81 of 330

**Contrarian Capital Fund I, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name: Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Backstop Commitment Agreement]*

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 570 of 876 PageID #: 1527

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 82 of 330

**CCM Pension-A, L.L.C.**

By: Contrarian Capital Management, L.L.C.,
as Managing Member

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

**CCM Pension-B, L.L.C.**

By: Contrarian Capital Management, L.L.C., as Managing Member

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

[*Signature page to Backstop Commitment Agreement*]

**Contrarian Dome du Gouter Master Fund, LP**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 573 of 876 PageID #: 1520

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 85 of 330

**Contrarian Opportunity Fund, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Backstop Commitment Agreement]*

**Contrarian Capital Senior Secured, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

**Contrarian Capital Trade Claims, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

**Contrarian Advantage-B, LP**

By: Contrarian Capital Management, L.L.C.,
as General Partner

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Backstop Commitment Agreement]*

**Contrarian Emerging Markets, L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

[*Signature page to Backstop Commitment Agreement*]

**Contrarian EM SIF Master L.P.**

By: Contrarian Capital Management, L.L.C.,
as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

[*Signature page to Backstop Commitment Agreement*]

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 579 of 876 PageID #: 7526

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 91 of 330

**Boston Patriot Summer St LLC**

By: Contrarian Capital Management, L.L.C., as Investment Manager

By: _____
Name:  Jon Bauer
Title:  Managing Member

Notice Information
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Attention to: Josh Weisser
Email: jweisser@contrariancapital.com

*[Signature page to Backstop Commitment Agreement]*

Panning Master Fund, LP

By:    Panning Capital Management, LP
Its:    Investment Manager

By:    
    Name:   William Kelly
    Title:   Authorized Signatory

Notice Information

510 Madison Avenue, 23rd Floor
New York, NY 10022

rayan@panning.com

Attention to: Rayan Joshi

*Signature page to Backstop Commitment Agreement*

SOUTH DAKOTA INVESTMENT COUNCIL

By: _____

Name: Matthew L. Clark
Title: State Investment Officer


Address:    South Dakota Investment Council
            4009 West 49th Street, Suite 300
            Sioux Falls, SD 57106-3784
Tel:        605-362-2820
Email:      Laurie.Riss@state.sd.us
Attn:       A. Laurie Riss

*[Signature page to Backstop Commitment Agreement]*

BLUE TURTLE CAPITAL, LLC, a Delaware Limited
Liability Company

By: _____
    Name: Elliot Greenberg
    Title:


BLUE TURTLE CAPITAL LIMITED, a Cayman Islands
Limited Company

By: _____
    Name: Elliot Greenberg
    Title:


Notice Information

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Email: KEckstein@kramerlevin.com;
       SZide@kramerlevin.com;
       ADove@kramerlevin.com

Attention:  Kenneth H. Eckstein, Esq.,
            Stephen D. Zide, Esq.,
            and Andrew M. Dove, Esq.


[Signature Page to Backstop Commitment Agreement]

DISCOVERY CAPITAL MANAGEMENT, LLC

By: _____

Name: Adam Schreck
Title: General Counsel

Address: 20 Marshall Street, Suite 310
South Norwalk, CT 06854
Attn: Adam Schreck
aschreck@discap.com
Tel: (203) 956-7953

AURELIUS CAPITAL MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual capacity

By: _____
    Name: Dan Gropper
    Title:  Managing Director


ACP MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual capacity

By: _____
    Name: Dan Gropper
    Title:  Managing Director


Notice Information

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Email: KEckstein@kramerlevin.com;
       SZide@kramerlevin.com;
       ADove@kramerlevin.com

Attention: Kenneth H. Eckstein, Esq.,
           Stephen D. Zide, Esq., and
           Andrew M. Dove, Esq.


[Signature Page to Backstop Commitment Agreement]

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 585 of 876 PageID #: 1532

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 97 of 330

**<u>Schedule 1</u>**

**<u>Initial Backstop Commitment Schedule</u>**

# Initial Backstop Schedule

*$ in millions*

| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
|---|---|---|---|---|---|---|---|
| **Initial Backstop Commitment Schedule** | | | | | | | |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P. | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

**<u>Schedule 2</u>**

**<u>Backstop Commitment Schedule</u>**

[TO BE PROVIDED]

**Exhibit A**

**Rights Offering Procedures**

## PEABODY ENERGY CORPORATION

## RIGHTS OFFERING PROCEDURES

---

**The Offered Shares are being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").**

**None of the Rights Offering Equity Rights distributed in connection with these Rights Offering Procedures or any Offered Shares have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no Rights Offering Equity Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Rights Offering Equity Rights, the Allowed Claims in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) and 5B (General Unsecured Claims against the Encumbered Guarantor Debtors), or the Offered Shares) (each of the above, a "<u>Transfer</u>") except in compliance with the applicable registration requirements of the Securities Act and applicable state or local laws and the terms of the Subscription Agreement.**

**The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, or of an affiliate participating in a joint plan with the debtor, or of a newly organized debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

---

**Terms used and not defined herein or in the Subscription Agreement have the meanings assigned to them in the Plan (as defined below).**

To Eligible Holders and Nominees of Eligible Holders:

On December 22, 2016, the Debtors filed the Joint Chapter 11 Plan of Reorganization of the Debtors with the United States Bankruptcy Court for the Eastern District of Missouri (as such plan of reorganization may be amended, supplemented or modified from time to time in accordance with its terms, the "<u>Plan</u>"), and the Disclosure Statement with respect to the Plan (as such disclosure statement may be amended, supplemented or modified from time to time in accordance with its terms, the "<u>Disclosure Statement</u>").  Pursuant to the Plan, each holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) and 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) as of the Record Date (as defined below) has the right to participate in the Rights Offering in accordance with the terms and conditions of the Subscription Agreement and these Rights Offering Procedures.  Only holders of Allowed Claims

in Classes 2A - 2D and 5B as of the Record Date and their permitted Transferees may participate in the Rights Offering of the Offered Shares.

Pursuant to the Plan, each Eligible Holder will receive Rights Offering Equity Rights to subscribe for its Pro Rata Shares, provided that it timely and properly executes and delivers a Subscription Agreement and the appropriate Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent in advance of the Subscription Expiration Deadline.

**Please note that Eligible Holders that hold Allowed Claims in Classes 2A - 2D and 5B through a broker, dealer, commercial bank, trust company or other nominee ("Nominee") must deliver their Subscription Agreements and the appropriate Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee instead of the Subscription Agent. All Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) of Allowed Claims held through a Nominee must be delivered to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, in sufficient time to allow such Nominee to process and deliver the Master Subscription Form, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.**

No Eligible Holder will be entitled to participate in the Rights Offering unless the aggregate Purchase Price for the Offered Shares it subscribes for is received by the Subscription Agent in advance of the Subscription Expiration Deadline; provided, that, notwithstanding anything to the contrary herein, Eligible Holders that have agreed to backstop the Rights Offering pursuant the Backstop Commitment Agreement will be entitled to submit the applicable Purchase Price in accordance with that agreement. No interest is payable on any advanced funding of the Purchase Price. Any Eligible Holder submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent in advance of the Subscription Expiration Deadline.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline, you will be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

**1.    Rights Offering**

Eligible Holders have the right, but not the obligation, to participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreements, each Eligible Holder is entitled to subscribe for up to its Pro

Rata Shares at the Purchase Price, subject to the individual limits included in the calculations under Item 2 of such Eligible Holder's Beneficial Holder Subscription Form.  The number of Offered Shares actually subscribed for and purchased by an Eligible Holder is referred to as such Eligible Holder's "Subscribed Shares" and the aggregate Purchase Price to be paid for such Eligible Holder's Subscribed Shares is referred to as such Eligible Holder's "Rights Offering Payment."

Any Eligible Holder that is an Affiliate of the Debtors will receive restricted securities under the Securities Act bearing a legend indicating that the securities may not be resold unless such securities are registered with the Securities and Exchange Commission ("SEC") or the resale is exempt from the registration requirements of the Securities Act.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

2.      **Subscription Period**

The Rights Offering will commence on the date on which Subscription Agreements are first sent to Eligible Holders (the "Subscription Commencement Date") and will expire on the Subscription Expiration Deadline.  Each Eligible Holder intending to purchase Offered Shares in the Rights Offering must affirmatively elect to exercise its Rights Offering Equity Rights in the manner set forth in the Rights Offering Instructions included with the Subscription Agreement (consistent herewith, including as described in Sections 4 and 5 hereof) on or prior to the Subscription Expiration Deadline.

If you do not exercise Rights Offering Equity Rights on or prior to the Subscription Expiration Deadline, upon the Subscription Expiration Deadline you will be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering, so any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

3.      **Delivery of Subscription Agreement**

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Rights Offering Equity Rights, but subject to the terms and conditions of the Subscription Agreement, the exercise of any Rights Offering Equity Rights will be unconditional and irrevocable.  In order to facilitate the exercise of the Rights Offering Equity Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Agreement and appropriate Beneficial Holder Subscription Form and the payment of the applicable Rights Offering Payment.

4.      **Exercise of Rights Offering Equity Rights**

In order to validly exercise Rights Offering Equity Rights, each Eligible Holder must:

(a)    return a duly executed Subscription Agreement along with the appropriate duly completed and executed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent on or before the Subscription Expiration Deadline; and

(b)    at the same time it returns its Subscription Agreement and Beneficial Holder Subscription Form to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Rights Offering Payment by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 3 of the Beneficial Holder Subscription Form; provided, that, notwithstanding anything to the contrary herein, Eligible Holders that have agreed to backstop the Rights Offering pursuant the Backstop Commitment Agreement will be entitled to submit the applicable Purchase Price in accordance with that agreement.

With respect to (a) and (b) above, any Eligible Holder that holds Allowed Claims in Classes 2A - 2D and 5B through a Nominee must duly complete, execute and return its Subscription Agreement and Beneficial Holder Subscription Form in accordance with the instructions herein **directly to its Nominee** in sufficient time to allow the Nominee to process the instructions and deliver to the Subscription Agent the completed Subscription Agreement and Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and payment on or before the Subscription Expiration Deadline.

Any Eligible Holder that does not hold an Allowed Claim through a Nominee must deliver its completed Subscription Agreement, Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and payment directly to the Subscription Agent on or before the Subscription Expiration Deadline.

In the event that funds received by the Subscription Agent in payment for an Eligible Holder's Subscribed Shares are less than the Rights Offering Payment required to be paid, the number of Subscribed Shares deemed to be purchased by the Eligible Holder will be the lesser of (i) the number of Subscribed Shares elected to be purchased by such Eligible Holder as set forth in such Eligible Holder's Beneficial Holder Subscription Form and (ii) a number determined by dividing the amount of such funds received by the Purchase Price.

The Subscription Agent will deposit and hold the payments of cash made in accordance with the Rights Offering in a segregated escrow account until administered in connection with the settlement of the Rights Offering on the Effective Date. The Subscription Agent may not use such funds for any other purpose prior to such Effective Date and may not encumber or permit such funds to be encumbered with any lien or similar encumbrance. Such funds held by the Subscription Agent will not be deemed part of the Debtors' bankruptcy estates.

5.    **Practices and Procedures of DTC**

The Second Lien Notes and Unsecured Senior Notes are held in book-entry form in accordance with the practices and procedures of the Depository Trust Company ("DTC"). The sole registered holder of the Second Lien Notes and Unsecured Senior Notes is Cede & Co., the

custodian for DTC. In the event the Rights Offering with respect to Second Lien Notes Claims
and Unsecured Senior Notes Claims is conducted through DTC, the Debtors will employ DTC's
customary practices, processes, and procedures, including but not limited to DTC's Automated
Tender Offer Program ("ATOP"). The banks, brokers, or other Nominees that hold the Second
Lien Notes and Unsecured Senior Notes in "street name" through DTC on behalf of the
beneficial owners of the Second Lien Notes and Unsecured Senior Notes (the "DTC
Participating Nominees") possess the necessary access to ATOP.

On the Subscription Commencement Date (or as soon as practicable thereafter), the
Subscription Agent will cause to be opened on the DTC's ATOP platform one or more
"envelopes" into which DTC Participating Nominees can submit "instructions" on behalf of their
clients—the beneficial holders of the Second Lien Notes and Unsecured Senior Notes that are
Eligible Holders. Submitting an instruction into ATOP is akin to the voluntary electronic
tendering of the Second Lien Notes and Unsecured Senior Notes. Once "tendered," DTC will
assign to the tendered Second Lien Notes and Unsecured Senior Notes "Contra CUSIPs"—
designed to identify and isolate the tendered Second Lien Notes and Unsecured Senior Notes
separate and apart from the non-tendered Second Lien Notes and Unsecured Senior Notes. Upon
the successful submission of instructions into an ATOP envelope, the DTC ATOP system
generates (and sends to the DTC Participating Nominee submitting the instruction) a unique
reference number called a "voluntary offering instruction" or "VOI."

Submission of instructions into a DTC ATOP envelope (a "Contra-CUSIP Envelope")
will constitute a valid representation that the holder of the Second Lien Notes or Unsecured
Senior Notes is an Eligible Holder.

Upon receiving a valid submission from an Eligible Holder's DTC Participating
Nominee, DTC will debit each DTC Participating Nominee the corresponding Rights Offering
Payment for the Rights Offering Equity Rights exercised and will forward those funds to the
Subscription Agent in one lump sum at or promptly following the Subscription Expiration
Deadline.

The Debtors intend to comply with the practices and procedures of DTC for these
purposes, and these Rights Offering Procedures will be deemed appropriately modified to
achieve such compliance. In lieu of returning the Subscription Agreement and Beneficial Holder
Subscription Form and making the Rights Offering Payment directly to the Subscription Agent,
Eligible Holders of Second Lien Notes and Unsecured Senior Notes are directed to instruct their
respective DTC Participating Nominees to exercise the Rights Offering Equity Rights on their
behalf, and will be required to remit the Rights Offering Payment through DTC, before the
Subscription Expiration Deadline. In all other respects, these Rights Offering Procedures will
apply.

### 6.    Transfer Restriction; Revocation

The Rights Offering Equity Rights will not be transferable, assignable or detachable,
other than in connection with the transfer by the Eligible Holder thereof of the corresponding
Allowed Claims in respect of which such Rights Offering Equity Rights were issued, as

evidenced by delivery of a Transfer Notice to the Subscription Agent or other procedure acceptable to the Debtors and the Subscription Agent.

A "<u>Transfer Notice</u>" is a notice delivered to the Subscription Agent notifying the Subscription Agent of the transfer of an Allowed Claim by the Eligible Holder of the corresponding Rights Offering Equity Rights through the Subscription Expiration Deadline, which indicates the name of the transferor, the name of the transferee, the type of Allowed Claim being transferred and the principal amount of such Allowed Claim.

Following the exercise of any Rights Offering Equity Rights, the Eligible Holder thereof cannot transfer or assign the Allowed Claim corresponding to such Rights Offering Equity Rights until the earlier of (i) the Effective Date and (ii) the termination of the Rights Offering. By its execution of the Subscription Agreement, the Eligible Holder of the Rights Offering Equity Rights will be deemed to have represented and warranted to the Debtors and the Reorganized Debtors that the Eligible Holder is the beneficial owner of the Allowed Claims corresponding to the Rights Offering Equity Rights and will be the Eligible Holder of such Allowed Claims as of the Effective Date.

If and to the extent that an Eligible Holder of Rights Offering Equity Rights transfers or assigns a corresponding Allowed Claims in violation of these provisions, the exercise of the Rights Offering Equity Rights by the holder will be null and void and of no effect, and the holder will be liable to the Debtors, Reorganized Debtors and the Subscription Agent for any claims, damages or losses incurred by them as a result of such transfer or assignment.

The exercise of Rights Offering Equity Rights is irrevocable.

### 7.      Return of Payment

If the Rights Offering is terminated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days, after the date on which the Rights Offering is terminated.

### 8.      Settlement of the Rights Offering and Distribution of the Subscribed Shares

The Debtors intend that the Subscribed Shares will be issued in book-entry form through accounts maintained by Reorganized PEC's transfer agent.

With respect to Subscribed Shares issued on account of Second Lien Notes Claims and Unsecured Senior Notes Claims, DTC or its nominee will be the holder of record of such Subscribed Shares. The ownership interest of each holder of such Subscribed Shares will be recorded on the records of the direct and indirect participants in DTC. Holders who exercise their Rights Offering Equity Rights may be required to furnish the Debtors or their agents information regarding their broker, bank or other Nominee in order that the Subscribed Shares for which they have subscribed can be properly credited to their securities account. To the extent required, the Debtors intend to solicit such information on a timely basis, so that the Subscribed Shares may be delivered to the holders exercising their Rights Offering Equity Rights on or as promptly as practicable after the Effective Date.

9.      **Fractional Subscribed Shares**

No fractional shares will be issued in the Rights Offering.  All share allocations (including each Eligible Holder's Subscribed Shares) will be calculated and rounded down to the nearest whole share.  Any exercise of Rights Offering Equity Rights that would result in less than one share of Reorganized PEC Common Stock being issued to the Eligible Holder will be rejected and the Rights Offering Payment relating to that exercised returned to the Eligible Holder.

10.     **Validity of Exercise of Rights Offering Equity Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights Offering Equity Rights (including each Eligible Holder's Subscribed Shares) will be determined in good faith by the Debtors, subject to the obligations of the Debtors under the Backstop Commitment Agreement and, if necessary, subject to a final and binding determination by the Bankruptcy Court.  The Debtors may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as they may determine in good faith, or reject the purported exercise of any Rights Offering Equity Rights.  Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.  In addition, the Debtors may permit any such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.

*Before exercising any Rights Offering Equity Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and risk factors to be considered.*

11.     **Modification of Procedures**

The Debtors reserve the right to modify or adopt additional procedures, including to comply with the practices and procedures of DTC or to comply with applicable law, consistent with the provisions of these Rights Offering Procedures to effectuate the Rights Offering and to issue the Subscribed Shares; provided, however, that the Debtors will provide prompt written notice to each Eligible Holder of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date.  In so doing, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effect and implement the Rights Offering and the issuance of the Subscribed Shares.  Nothing in this paragraph will be construed so as to permit the Debtors to modify the terms of the Subscription Agreement, other than to reduce the number of Offered Shares available in the Rights Offering, without the consent of the Subscriber party thereto.

12.     **Inquiries And Transmittal of Documents; Subscription Agent**

The Rights Offering Instructions included with the Subscription Agreement should be carefully read and strictly followed.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number:  [_____].

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

**PEABODY ENERGY CORPORATION**

_____

**SUBSCRIPTION AGREEMENT**

_____

<u>NOTICES</u>

THIS SUBSCRIPTION AGREEMENT HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF ELIGIBLE HOLDERS IN CONNECTION WITH THE RIGHTS OFFERING BY PEABODY ENERGY CORPORATION (THE "<u>COMPANY</u>") PURSUANT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE COMPANY AND ITS SUBSIDIARIES THAT COMMENCED JOINTLY ADMINISTERED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS SUCH TERM IS HEREINAFTER DEFINED) (THE "<u>PLAN</u>").  ANY REPRODUCTION OR DISTRIBUTION OF THIS SUBSCRIPTION AGREEMENT, OR RETRANSMITTAL OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY.  NONE OF THE FOREGOING AUTHORITIES HAVE PASSED UPON, OR ENDORSED THE MERITS OF, THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED [_____] (THE "<u>DISCLOSURE STATEMENT</u>") PREVIOUSLY DISTRIBUTED.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR UNDER THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES WILL BE OFFERED AND SOLD PURSUANT TO THE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE.  THIS SUBSCRIPTION AGREEMENT IS NOT AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR WILL ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

THE COMPANY MAKES NO REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS SUBSCRIPTION AGREEMENT, THE DISCLOSURE STATEMENT OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ANY OF ITS AGENTS, OFFICERS OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE.  EACH OFFEREE SHOULD CONSULT ITS OWN ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  IT IS SPECULATIVE AND
SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL
RESOURCES, CAN AFFORD TO LOSE ITS ENTIRE INVESTMENT AND HAVE NO
NEED FOR LIQUIDITY IN THIS INVESTMENT.  FURTHER, THIS INVESTMENT
SHOULD ONLY BE MADE BY THOSE WHO UNDERSTAND OR HAVE BEEN ADVISED
WITH RESPECT TO THE TAX CONSEQUENCES OF AND RISK FACTORS
ASSOCIATED WITH THE INVESTMENT AND WHO ARE ABLE TO BEAR THE
SUBSTANTIAL ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD
OF TIME.

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Subscription Agreement"), by and among Peabody Energy Corporation (the "Company"), and the undersigned (the "Subscriber"), will be deemed executed as of the date the Company executes a counterpart to this Subscription Agreement previously executed by the Subscriber.

WHEREAS, on April 13, 2016, the Company and certain of its direct and indirect debtor subsidiaries (collectively, the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court");

WHEREAS, the Debtors submitted a Disclosure Statement with respect to the Debtors' Joint Chapter 11 Plan of Reorganization, dated as of December 22, 2016 (as amended, supplemented or modified, the "Disclosure Statement), to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Joint Chapter 11 Plan of Reorganization of Peabody Energy Corporation and Certain of its Affiliates, dated as of December 22 (as amended, supplemented or modified, the "Plan");

WHEREAS, capitalized terms used but not defined in this Subscription Agreement have the meaning given to them in the Plan;

WHEREAS, pursuant to the Plan, each Eligible Holder (as defined below) of Allowed Claims in Classes 2A - 2D or 5B as of the Record Date will be granted Rights Offering Equity Rights (as defined below) entitling such Eligible Holder to purchase up to its Pro Rata Shares (as defined below) at the Purchase Price, as calculated in accordance with Item 2a of such Eligible Holder's Beneficial Holder Subscription Form(s) and the Rights Offering Procedures (such offering of the Rights Offering Equity Rights, the "Rights Offering");

WHEREAS, the Subscriber has certified that it is a Eligible Holder and that it beneficially holds an Allowed Claim in Classes 2A - 2D or 5B set forth in Item 1 of such Eligible Holder's Beneficial Holder Subscription Form(s); and

WHEREAS, the Subscriber wishes to subscribe to purchase Subscribed Shares (as defined below) as set forth herein on the terms and subject to the conditions of the Rights Offering and in accordance with the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.    SUBSCRIPTION.

(a)    The Subscriber hereby irrevocably agrees to subscribe for that number of Offered Shares set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s) (the "Subscribed Shares") in accordance with and subject to the terms and conditions

contained in this Subscription Agreement. The Subscriber will pay to the Subscription Agent the Purchase Price for such Subscribed Shares set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s) in cash, at the time it returns this Subscription Agreement to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, by wire transfer of immediately available funds in accordance with the instructions included on Item 3 of such Eligible Holder's Beneficial Holder Subscription Form(s) (or, if the Subscriber is a party to the Backstop Commitment Agreement, in accordance with that agreement).

(b)     In the event that funds received by the Subscription Agent in payment for the Subscriber's Subscribed Shares in accordance with the instructions provided with this Subscription Agreement are less than the Rights Offering Payment required to be paid (as set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s)), the number of Subscribed Shares deemed to be purchased by the Subscriber pursuant to this Subscription Agreement will be the lesser of (i) the aggregate number of Subscribed Shares set forth set forth in Item 2b of the Beneficial Holder Subscription Forms submitted by such Eligible Holder and (ii) a number determined by dividing the amount of such funds received in accordance with the instructions included with this Subscription Agreement by the Purchase Price and rounding down to the nearest whole number.

(c)     Subject to the conditions specified in Section 6, the closing of the issuance of Subscribed Shares contemplated by this Subscription Agreement (the "Closing") will take place at the offices of Jones Day, 250 Vesey Street, New York, New York 10281 on the Effective Date. The date on which the Closing occurs is the "Closing Date."

(d)     If the Rights Offering is terminated, any cash paid to the Subscription Agent will be returned, without interest, to the Subscriber as soon as reasonably practicable, but in any event within six (6) Business Days, after the date on which the Rights Offering is terminated.

2.     REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Subscriber as follows:

(a)     The Company is and, as of the Effective Date, will be, duly organized and validly existing under the laws of the State of Delaware.

(b)     Subject to the entry of the Bankruptcy Court's confirmation order relating to the Plan and occurrence of the Closing, (i) the Company will have the requisite corporate power and authority to execute and deliver this Subscription Agreement, (ii) this Subscription Agreement and the consummation by the Company of the transactions contemplated hereby will have been duly authorized by all requisite corporate action of the Company and (iii) this Subscription Agreement will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)     The shares of Reorganized PEC Common Stock to be issued (i) in the Rights Offering, when issued in accordance with the provisions hereof, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company and (ii)

upon the exercise of Penny Warrants upon the valid exercise thereof and payment to Reorganized PEC of the exercise price, when issued in accordance with the Penny Warrants, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company.

Except for the representations and warranties contained in this <u>Section 2</u>, the Plan and the Disclosure Statement, neither the Company, the Debtors nor any other Person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber.  Neither the Company, the Debtors nor any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber, unless and only to the extent that any such information is included in a representation or warranty contained in this <u>Section 2</u>, the Plan or the Disclosure Statement.

3.      <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>.

The Subscriber represents and warrants to the Company as follows:

(a)      The Subscriber is an Eligible Holder and beneficially holds on the date hereof the Allowed Claim in Classes 2A - 2D or 5B set forth on Item 1 of such Eligible Holder's Beneficial Holder Subscription Form(s).

(b)      The Subscriber has the requisite corporate or other applicable power and authority to execute and deliver this Subscription Agreement and the Beneficial Holder Subscription Form(s) and to perform its respective obligations hereunder and thereunder.  This Subscription Agreement and the consummation by the Subscriber of the transactions contemplated hereby have been duly authorized by all requisite action.  This Subscription Agreement has been duly and validly executed and delivered by the Subscriber and constitutes the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.  Except to the extent the Subscriber is an individual, the Subscriber is a duly organized entity validly existing under the laws of the jurisdiction of its incorporation or formation.

(c)      Except as provided under applicable state securities laws and subject to the conditions contained in <u>Section 6</u>, this subscription is and will be irrevocable, except that the Subscriber will have no obligation hereunder if this Subscription Agreement is for any reason rejected or the Rights Offering is for any reason terminated.

(d)      The Subscriber understands that the Subscribed Shares have not been registered under the Securities Act nor qualified under any state securities laws and that the Subscribed Shares are being offered and sold pursuant to an exemption from such registration and qualification requirements based in part upon the Subscriber's representations, warranties and acknowledgements contained herein.

(e)      The Subscriber has read and understands this Subscription Agreement, the Plan, the Disclosure Statement (including but not limited to the risks described under the caption titled "PLAN-RELATED RISK FACTORS") and the appropriate Beneficial Holder Subscription

Form(s) and understands the terms and conditions herein and therein and the risks associated with the Company and its business as described in the Disclosure Statement. The Subscriber has, to the extent deemed necessary by the Subscriber, discussed with legal counsel the representations, warranties, acknowledgements and agreements that the Subscriber is making herein.

(f)     The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment contemplated by this Subscription Agreement, and it is able to bear the economic risk of an investment in the Company. The Subscriber has sufficient financial resources available to support the loss of all or a portion of its investment in the Company, and has no need for liquidity in its investment in the Company.

(g)     The Subscriber is acquiring the Subscribed Shares solely for its own account for investment and neither with a view toward, nor any present intention of, Transferring the Subscribed Shares. No other Person has any right with respect to or interest in the Subscribed Shares to be purchased by the Subscriber, nor has the Subscriber agreed to give any Person any such interest or right in the future.

(h)     The Subscriber is not a party to any contract with any Person (other than, if applicable, the Backstop Commitment Agreement and/or the Private Placement Agreement) that would give rise to a valid claim against the Company or any of its subsidiaries for a brokerage commission, finder's fee or like payment in connection with the Subscriber's investment in the Company.

(i)     No third-party consents or approvals (including governmental consents or approvals) are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this Subscription Agreement and to perform its obligations hereunder.

(j)     Neither the execution and delivery of this Subscription Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees to which the Subscriber is subject.

(k)     The Subscriber is not relying upon any information, representation or warranty by the Company other than as set forth in this Subscription Agreement, the Plan or the Disclosure Statement. The Subscriber has consulted, to the extent deemed appropriate by the Subscriber, with the Subscriber's own advisors as to the financial, tax, legal and related matters concerning an investment in the Subscribed Shares and on that basis believes that an investment in the Subscribed Shares is suitable and appropriate for the Subscriber.

(l)     The foregoing representations and warranties are true on the date hereof and will be true as of the Closing Date and will survive delivery of this Subscription Agreement. If any of such representations and warranties is not true prior to acceptance of this Subscription Agreement by the Company or prior to the Closing Date, the Subscriber will give written notice

of such fact to the Company, specifying which representations and warranties are not true and the reasons therefor.

## 4.   SUBSCRIBER ACKNOWLEDGMENTS.

The Subscriber further acknowledges and agrees as follows:

(a)    The Subscribed Shares purchased pursuant hereto will be initially issued in the name of the Subscriber, an Affiliate of the Subscriber or a Related Fund, as indicated on such Subscriber's Beneficial Holder Subscription Form(s).

(b)    This Subscription Agreement contains its irrevocable firm commitment, subject only to the terms and conditions of this Subscription Agreement and the Rights Offering, to purchase the Subscribed Shares.

(c)    Except to the extent provided in this Subscription Agreement, the Plan or the Disclosure Statement, neither the Debtors nor the Company makes any representation or warranty in connection with the purchase of the Subscribed Shares.

(d)    No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in connection with its consideration of its investment in the Subscribed Shares or as to the fairness of this private placement for investment, nor any recommendation or endorsement of the Subscribed Shares.

(e)    The Debtors and the Company will be relying on representations, warranties, acknowledgements and agreements made by the Subscriber to the Company, and the covenants agreed to by the Subscriber, herein; that the Subscriber will promptly provide, if requested, any additional information that may reasonably be required to determine its eligibility to purchase the Subscribed Shares; and that if there is any change in any of the information provided by the Subscriber, or if any of the Subscriber's representations and warranties becomes inaccurate in any respect, the Subscriber will furnish such revised or corrected information to the Company as soon as reasonably practicable, but in any event within five (5) Business Days prior to the Subscription Expiration Deadline.

(f)    All calculations, including, to the extent applicable, the calculation of (i) the value of the Subscriber's or any other Eligible Holder's Allowed Claims under Classes 2A - 2D or 5B or (ii) the Subscriber's or any other Eligible Holder's Pro Rata Shares, will be made in good faith by the Company and in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations will be subject to a final and binding determination by the Bankruptcy Court.

(g)    The Disclosure Statement contains projections.  The projections are subjective in many respects and are based on expectations, estimates, opinions and beliefs of the Debtors and the Company's management with respect to its financial condition, business and industry performance, general economic, industry and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Debtors' and the Company's control.  Accordingly, there can be no assurance that the estimates and assumptions made in

preparing the projections will prove accurate or that the forecasts will be realized.  In addition, the projections do not and cannot take into account such factors as general economic conditions, unforeseen changes and developments in available technologies and products, the entry into the Company's industry of significant additional competitors, natural disasters, the terms and conditions of future financings of the Company, and other risks inherent to the business of the Company.  While management believes that the projections reflect the possible future results of the Company's operations, such results cannot be guaranteed.  The Subscriber acknowledges that it is prepared for the substantial economic risks involved in the purchase of the Subscribed Shares, including the total loss of its investment.  The Company will not be under any duty to update the projections or the risk factors included in the Disclosure Statement prior to or after the Closing Date.

(h)     If the Subscriber is an "underwriter" as defined under section 1145(b)(1) of the Bankruptcy Code, any Subscribed Shares it subscribes for will be "restricted securities" and may not be resold under the Securities Act and applicable state "Blue Sky Laws" absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning a debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

(i)     The Debtors and the Company may decrease the number of Offered Shares available to the Subscriber as reasonably required by the Debtors, or as required by the Bankruptcy Court or the Securities and Exchange Commission, in each case to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

5.      <u>TRANSFER RESTRICTION; REVOCATION</u>.

(a)     The Subscriber acknowledges and agrees that the Rights Offering Equity Rights are not transferable, assignable or detachable, other than in connection with the Transfer by the Eligible Holder thereof of the corresponding Allowed Claims in respect of which such Rights Offering Equity Rights were issued, as evidenced by delivery of a Transfer Notice to the Subscription Agent or other procedure acceptable to the Debtors and the Subscription Agent.

(b)     Following the exercise of any Rights Offering Equity Rights, the Subscriber cannot Transfer the Allowed Claim corresponding to such Rights Offering Equity

Rights until the earlier of (i) the Effective Date and (ii) the termination of the Rights Offering in accordance with <u>Section 7</u>.

(c)     The Subscriber acknowledges and agrees that, if and to the extent that the Subscriber Transfers or assigns a corresponding Allowed Claims in violation of these provisions, the exercise of the Rights Offering Equity Rights by the Transferee will be null and void and of no effect, and the Subscriber and the Transferee will be liable to the Debtors, Reorganized Debtors and the Subscription Agent for any claims, damages or losses incurred by them as a result of such Transfer or assignment.

(d)     The exercise of Rights Offering Equity Rights pursuant to this Subscription Agreement is irrevocable.

6.     <u>CONDITIONS TO CLOSING</u>.

(a)     <u>Conditions to Each Party's Obligations</u>.  The respective obligations of the Subscriber and the Company to consummate the transactions contemplated by this Subscription Agreement are subject to the simultaneous occurrence of the Effective Date.

(b)     <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the transactions contemplated by this Subscription Agreement with the Subscriber are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)     All representations and warranties of the Subscriber in <u>Section 3</u> of this Subscription Agreement must be true, correct and complete in all material respects on the Closing Date;

(ii)     All acknowledgments of the Subscriber in <u>Section 4</u> of this Subscription Agreement must be true, correct and complete in all material respects on the Closing Date;

(iii)     The Plan must have been confirmed by the Bankruptcy Court;

(iv)     Any waiting period applicable to the restructuring contemplated by the Plan under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or similar law or statute shall have been terminated or shall have expired;

(v)     The conditions to the Effective Date other than completion of the Rights Offering must have been satisfied or waived by the Company; and

(vi)     Compliance by the Subscriber with the Rights Offering Procedures governing the Rights Offering, including payment by the Subscriber of the Purchase Price.

(c)     <u>Conditions to Obligations of the Subscriber</u>.  The obligations of the Subscriber to consummate the transactions contemplated by this Subscription Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)      All representations and warranties of the Company in <u>Section 2</u> of this Subscription Agreement must be true and correct in all material respects on the Closing Date; and

(ii)      Compliance by the Company in all material respects with the Rights Offering Procedures governing the Rights Offering.

7.      <u>TERMINATION</u>.

This Subscription Agreement will terminate upon the earlier to occur of (i) rejection of the Plan by all Classes entitled to vote and (ii) termination of the Backstop Commitment Agreement.

8.      <u>INTERPRETATION OF THIS SUBSCRIPTION AGREEMENT</u>.

(a)      <u>Terms Defined</u>.  As used in this Subscription Agreement, the following terms have the respective meanings set forth below:

"<u>Affiliate</u>":  With respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by agreement, contract, obligation, promise, undertaking or understanding, whether written or oral, or otherwise).

"<u>Allowed Claims in Classes 2A - 2D and 5B</u>":  Allowed Second Lien Notes Claims in Classes 2A - 2D under the Plan and Allowed General Unsecured Claims in Class 5B under the Plan.

"<u>Backstop Commitment Agreement</u>":  The Backstop Commitment Agreement dated as of December 22, 2016 by and among the holders of Second Lien Notes Claims in Classes 2A-2D and General Unsecured Claims in Class 5B identified therein, the other parties thereto and the Company, as may be amended or modified from time to time in accordance with its terms.

"<u>Beneficial Holder Subscription Form(s)</u>":  The applicable subscription form(s) to be completed by Eligible Holders included as <u>Schedule 1B</u> hereto.

"<u>Business Day</u>":  Any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"<u>Class 2 Offered Shares</u>":  The number of total Offered Shares that will be available to Eligible Holders in Classes 2A - 2D, which shall be determined based on the following percentage applied to the total Offered Shares:  the quotient of (A) $708

- 8 -

million divided by (B) the Allowed Claims in Class 5B (measured as of the Record Date) plus $708 million.

"Class 5B Offered Shares": The number of total Offered Shares that will be available to Eligible Holders in Class 5B shall be determined based on the following percentage applied to the total Offered Shares: the quotient of (A) the Allowed Claims in Class 5B (measured as of the Record Date) divided by (B) the Allowed Claims in Class 5B (measured as of the Record Date) plus $708 million.

"Debtors": The Company and each of its direct and indirect debtor subsidiaries listed on Exhibit A.

"Disclosure Statement Order": An order approving the Disclosure Statement with respect to the Plan and the solicitation with respect to the Plan.

"Effective Date": The date the Plan becomes effective in accordance with its terms.

"Eligible Holder": Any holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) or Class 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) as of the Record Date and any Transferee that received such Allowed Claim in accordance with Section 5.

"Master Subscription Form": The applicable subscription form to be completed by the Nominee of any beneficial holders of Allowed Claims in Classes 2A - 2D and 5B included as Schedule 1C hereto.

"Nominee": Broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, as applicable.

"Offered Shares": The [_____] units offered pursuant to the exercise of Rights Offering Equity Rights in the Rights Offering, each unit constituting (i) one (1) share of Reorganized PEC Common Stock having a Plan Equity Value (as defined in the Plan) equal to $[_____], and (ii) [____] Penny Warrants each exercisable into one (1) share of Reorganized PEC Common Stock; provided, that the Debtors and the Company may decrease such number of units as reasonably required by the Debtors, or as required by the Bankruptcy Court or the Securities and Exchange Commission, in each case to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

"Penny Warrants": Warrants exercisable in the aggregate for 2.50% of the fully diluted Reorganized PEC Common Stock as of the Effective Date, which Penny Warrants will be issued on the Effective Date, have an exercise price of $0.01 per share of Reorganized PEC Common Stock, have a term of 90 days from issuance and will be exercisable from and after the Effective Date.

"Person":  An individual, partnership, limited liability company, joint-stock company, corporation, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"Private Placement Agreement":  The Private Placement Agreement dated as of December 22, 2016 by and among the holders of Second Lien Notes Claims in Classes 2A-2D and General Unsecured Claims in Class 5B identified therein, the other parties thereto and the Company, as may be amended or modified from time to time in accordance with its terms.

"Pro Rata Shares":  In respect of each Eligible Holder's Allowed Claims in Classes 2A - 2D, the number of Class 2 Offered Shares offered to such Eligible Holder in the Rights Offering so that the ratio of (a)(i) the amount of the Class 2 Offered Shares offered to such Eligible Holder to (ii) the total Class 2 Offered Shares is the same as the ratio of (b)(i) the total amount of Second Lien Notes Claims in Class 2A - 2D beneficially held by the Eligible Holder as of the Record Date to (ii) total Second Lien Notes Claims in Class 2A - 2D as of the Record Date.  In respect of each Eligible Holder's Allowed Claims in Class 5B, the number of Class 5B Offered Shares offered to such Eligible Holder in the Rights Offering so that the ratio of (a)(i) the amount of the Class 5B Offered Shares offered to such Eligible Holder to (ii) the total Class 5B Offered Shares is the same as the ratio of (b)(i) the total amount of Allowed Claims in Class 5B beneficially held by such Eligible Holder as of the Record Date to (ii) total Allowed Claims in Class 5B as of the Record Date.

"Purchase Price":  $[_____] per Offered Share.

"Record Date":  The date on which the Disclosure Statement Order is entered by the Bankruptcy Court.

"Related Fund":  With respect to the Subscriber, any fund, account or investment vehicle that is controlled or managed by (a) the Subscriber, (b) an Affiliate of the Subscriber or (c) the same investment manager or advisor as the Subscriber or an Affiliate of such investment manager or advisor.

"Reorganized PEC Common Stock": Common stock, par value $[0.001] per share, in reorganized Peabody Energy Corporation.

"Rights Offering Equity Rights":  The rights to purchase Offered Shares on the Effective Date for an aggregate Purchase Price equal to $750 million pursuant to the terms and conditions set forth in the Plan, the Rights Offering Procedures and this Subscription Agreement.

"Rights Offering Instructions":  The instructions included as Schedule 1A hereto.

"Rights Offering Payment":  The aggregate Purchase Price for the Subscribed Shares to be purchased by an Eligible Holder in the Rights Offering.

"Subscribed Shares":  Offered Shares acquired in connection with the exercise of Rights Offering Equity Rights by an Eligible Holder pursuant to the terms and conditions set forth in the Plan, the Rights Offering Procedures and this Subscription Agreement.

"Subscription Agent": [_____], or any other entity designated as such by the Company, in its capacity as a subscription agent and escrow agent in connection with the Rights Offering.

"Subscription Expiration Deadline": 5:00 p.m. New York City Time on [_____], 2017, the date by which properly completed Subscription Agreements and the Rights Offering Payment will be required to be delivered to the Subscription Agent as provided in this Subscription Agreement.

"Transfer":  With respect to any object, any resale, sale, transfer, assignment, pledge, hypothecation, participation, donation, or other disposition or encumbrance, direct or indirect (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in such object).

"Transfer Notice":  A notice delivered to the Subscription Agent within three (3) Business Days of any Transfer of an Allowed Claim by the Eligible Holder notifying the Subscription Agent of the Transfer of the Allowed Claim and the corresponding Rights Offering Equity Rights and indicates the name of the transferor, the name of the transferee, the type of Allowed Claim being transferred and the principal amount of such Allowed Claim (in the case of Allowed Claims in Classes 2A - 2D and Allowed Claims in Class 5B on account of Unsecured Senior Notes) and amount of such Allowed Claim (in the case of Allowed Claims in Class 5B not on account of Unsecured Senior Notes).

(b)    Directly or Indirectly.  Where any provision in this Subscription Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person.

(c)    Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each party hereto agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party hereto.

Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby

(d)     Section Headings.  The headings of the sections and subsections of this Subscription Agreement are inserted for convenience only and will not be deemed to constitute a part thereof.

(e)     Construction.  This Subscription Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Subscription Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Subscription Agreement.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  The words "or," "either" and "any" are not exclusive.  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Subscription Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Subscription Agreement as a whole and not to any particular subdivision unless expressly so limited.

9.     MISCELLANEOUS.

(a)     Notices.

(i)     The Subscriber acknowledges that a completed and signed copy of this Subscription Agreement, the appropriate Beneficial Holder Subscription Form(s) or Master Subscription Form(s), as applicable, together with payment of the Rights Offering Payment, must be received by the Subscription Agent in accordance with the instructions included herewith prior to the Subscription Expiration Deadline for the subscription contemplated hereby to be valid.

(ii)     Except as otherwise provided in this Subscription Agreement, following execution of this Subscription Agreement, all demands, notices, requests, consents and other communications under this Subscription Agreement must be in writing, sent contemporaneously to all of the notice parties set forth below and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by facsimile, or if no response to the effect that an email cannot be delivered to the sender is received within two (2) hours, if delivered by email, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

(A)     if to the Subscriber, at its address or facsimile number shown on the applicable Beneficial Holder Subscription Form, or at such other address or facsimile number as the Subscriber may have furnished the Company and the Subscription Agent in writing; and

(B)     if to the Company, at (or at such other address or facsimile number as it may have furnished in writing to the Subscriber):

Peabody Energy Corporation
701 Market Street
St. Louis, Missouri 63101
Facsimile:  (314) 342-3419
Attention:  Chief Legal Officer

with a copy (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
Facsimile:  (216) 579-0212
Attention:    Heather Lennox

(b)    Expenses and Taxes.  The Company will pay stamp and other taxes (other than income taxes and other similar taxes), if any, which may be payable or determined to be payable under applicable law on the execution and delivery of this Subscription Agreement or acquisition of the Subscribed Shares pursuant to this Subscription Agreement.

(c)    Reproduction of Documents.  This Subscription Agreement and all documents relating hereto may not be reproduced or distributed by the Subscriber without the prior written consent of the Company.

(d)    Assignment; Successors.  This Subscription Agreement is not assignable by the Subscriber without the prior written consent of the Company.  This Subscription Agreement and the rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties.

(e)    Entire Agreement; Amendment and Waiver.  This Subscription Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings among such parties with respect to the matters covered herein.  This Subscription Agreement may be amended, and the observance of any term of this Subscription Agreement may be waived, with (and only with) the written consent of the Company and the Subscriber.

(f)    Severability.  If any provision of this Subscription Agreement or the application of such provision to any Person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Subscription Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

(g)    Specific Performance.  It is understood and agreed by the parties that money damages would be an insufficient remedy for any breach of this Agreement by any party, and a non-breaching party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder; provided, however, that each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

       (h)    <u>Counterparts; Facsimile and PDF Signatures</u>.  This Subscription Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement.  The exchange of copies of this Subscription Agreement and of signature pages by facsimile or portable document format (PDF) transmission will constitute effective execution and delivery of this Subscription Agreement as to the parties hereto and may be used in lieu of the original Subscription Agreement for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF will be deemed to be their original signatures for all purposes.

       (i)    <u>Survival</u>. All representations, warranties and covenants contained in this Subscription Agreement shall survive (i) the acceptance of the subscription by the Company and the Closing, (ii) changes in the transactions, documents and instruments described in the Plan, the Disclosure Statement, this Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions which are not material or which are to the benefit of the Subscriber and (iii) the death, disability, insolvency or dissolution of the Subscriber.

       [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Please indicate your acceptance and approval of the foregoing in the space provided below.


ACCEPTED AND APPROVED

as of the _____ day of _____, 2017

SUBSCRIBER: _____
(Please provide full legal name)

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

City: _____ State: _____

Postal Code: _____

Country: _____

Telephone: _____ Facsimile: _____

Email Address: _____

If U.S. person, check here and attach IRS Form W-9:  ☐ U.S. person

If Non-U.S. person, check here and attach appropriate IRS Form W-8:  ☐ Non-U.S. person


                              Peabody Energy Corporation


                              _____
                              Name:
                              Title:

Exhibit A

## Debtors

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Marigold Electricity, LLC | 26-0180352 |
| 52. | Midco Supply and Equipment Corporation | 43-6042249 |

| | **Debtor's Name** | **Debtor's EIN Number** |
|---|---|---|
| 53. | Midwest Coal Acquisition Corp. | 20-0217640 |
| 54. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |
| 55. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 56. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 57. | Moffat County Mining, LLC | 74-1869420 |
| 58. | Mustang Energy Company, LLC | 43-1898532 |
| 59. | New Mexico Coal Resources, LLC | 20-3405643 |
| 60. | NM Equipment Company, LLC | 36-4821991 |
| 61. | Pacific Export Resources, LLC | 27-5135144 |
| 62. | Peabody America, LLC | 93-1116066 |
| 63. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 64. | Peabody Arclar Mining, LLC | 31-1566354 |
| 65. | Peabody Asset Holdings, LLC | 20-3367333 |
| 66. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 67. | Peabody Bear Run Services, LLC | 26-3725923 |
| 68. | Peabody Caballo Mining, LLC | 83-0309633 |
| 69. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 70. | Peabody China, LLC | 43-1898525 |
| 71. | Peabody Coalsales, LLC | 20-1759740 |
| 72. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 73. | Peabody COALTRADE, LLC | 43-1666743 |
| 74. | Peabody Colorado Operations, LLC | 20-2561644 |
| 75. | Peabody Colorado Services, LLC | 26-3723774 |
| 76. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 77. | Peabody Development Company, LLC | 43-1265557 |
| 78. | Peabody Electricity, LLC | 20-3405744 |
| 79. | Peabody Employment Services, LLC | 26-3730348 |
| 80. | Peabody Energy Generation Holding Company | 73-1625891 |
| 81. | Peabody Energy Investments, Inc. | 68-0541702 |
| 82. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 83. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 84. | Peabody Gateway Services, LLC | 26-3724075 |
| 85. | Peabody Holding Company, LLC | 74-2666822 |
| 86. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 87. | Peabody IC Funding Corporation | 46-2326991 |
| 88. | Peabody IC Holdings, LLC | 30-0829603 |
| 89. | Peabody Illinois Services, LLC | 26-3722638 |
| 90. | Peabody Indiana Services, LLC | 26-3724339 |
| 91. | Peabody International Investments, Inc. | 26-1361182 |
| 92. | Peabody International Services, Inc. | 20-8340434 |
| 93. | Peabody Investments Corp. | 20-0480084 |
| 94. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 95. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 96. | Peabody Midwest Mining, LLC | 35-1799736 |
| 97. | Peabody Midwest Operations, LLC | 20-3405619 |
| 98. | Peabody Midwest Services, LLC | 26-3722194 |
| 99. | Peabody Mongolia, LLC | 20-8714315 |
| 100. | Peabody Natural Gas, LLC | 43-1890836 |
| 101. | Peabody Natural Resources Company | 51-0332232 |
| 102. | Peabody New Mexico Services, LLC | 20-8162939 |
| 103. | Peabody Operations Holding, LLC | 26-3723890 |
| 104. | Peabody Powder River Mining, LLC | 43-0996010 |
| 105. | Peabody Powder River Operations, LLC | 20-3405797 |
| 106. | Peabody Powder River Services, LLC | 26-3725850 |
| 107. | Peabody PowerTree Investments, LLC | 20-0116980 |
| 108. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 109. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 110. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 111. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 112. | Peabody School Creek Mining, LLC | 20-3585831 |
| 113. | Peabody Services Holdings, LLC | 26-3726126 |
| 114. | Peabody Southwest, LLC | 20-5744732 |
| 115. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 116. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 117. | Peabody Terminals, LLC | 31-1035824 |
| 118. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 119. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 120. | Peabody Venezuela Coal Corp. | 43-1609813 |
| 121. | Peabody Venture Fund, LLC | 20-3405779 |
| 122. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 123. | Peabody Western Coal Company | 86-0766626 |
| 124. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 125. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 126. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 127. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 128. | Peabody Wyoming Services, LLC | 26-3723011 |
| 129. | PEC Equipment Company, LLC | 20-0217950 |
| 130. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 131. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 132. | Pond River Land Company | 73-1625893 |
| 133. | Porcupine Production, LLC | 43-1898379 |
| 134. | Porcupine Transportation, LLC | 43-1898380 |
| 135. | Riverview Terminal Company | 13-2899722 |
| 136. | Sage Creek Holdings, LLC | 26-3286872 |
| 137. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 138. | School Creek Coal Resources, LLC | 20-2902073 |
| 139. | Seneca Coal Company, LLC | 84-1273892 |
| 140. | Seneca Property, LLC | 36-4820253 |
| 141. | Shoshone Coal Corporation | 25-1336898 |
| 142. | Southwest Coal Holdings, LLC | 37-1794829 |
| 143. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 144. | Sugar Camp Properties, LLC | 35-2130006 |
| 145. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 146. | Thoroughbred Mining Company LLC. | 73-1625889 |
| 147. | Twentymile Coal, LLC | 95-3811846 |
| 148. | Twentymile Equipment Company, LLC | 38-3982017 |
| 149. | Twentymile Holdings, LLC | 38-3937156 |
| 150. | United Minerals Company, LLC | 35-1922432 |
| 151. | West Roundup Resources, LLC | 20-2561489 |
| 152. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 153. | Wild Boar Land Holdings Company, LLC | 36-4831131 |

Schedule 1A

## PEABODY ENERGY CORPORATION

## RIGHTS OFFERING INSTRUCTIONS

**Terms used and not defined herein or in the Subscription Agreement have the meanings assigned to them in the Plan (as defined below).**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1. **Insert** the amount(s) of your Allowed Claim(s) that you hold in Item 1 of the appropriate Beneficial Holder Subscription Form.  You may be required to complete multiple Beneficial Holder Subscription Forms if you hold Allowed Claims in different Classes or in multiple series of Unsecured Senior Notes.  If your Nominee holds your Allowed Claims in Classes 2A - 2D or 5B on your behalf and you do not know the amount, please contact your Nominee immediately.  For Second Lien Notes Claims and Unsecured Senior Notes Claims, the amount of your Allowed Claims on account of Second Lien Notes and Unsecured Senior Notes is the principal amount of those securities that you beneficially hold.

2. **Complete** the calculation in Item 2a of your Beneficial Holder Subscription Form(s), which calculates the maximum number of Offered Shares available for you to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates.  Such amount must be rounded down to the nearest whole share.

3. **Insert** the number of Subscribed Shares that you elect to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates (this amount may not be greater than the number of Offered Shares available for you to purchase on account of those Allowed Claims as calculated in Item 2a).  **Complete** the calculation in Item 2b of your Beneficial Holder Subscription Form(s), which calculates the Rights Offering Payment for the amount of Subscribed Shares that you elect to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates.

4. **Read, complete and sign** the certification in Item 4 of your Beneficial Holder Subscription Form(s).  If you are a party to the Backstop Commitment Agreement and will submit your Rights Offering Payment in accordance with that agreement, you should check the appropriate box on the signature page to the Beneficial Holder Subscription Form(s).

5. **Read and countersign** the Subscription Agreement.  Your signature indicates your acceptance and approval of the terms and conditions set forth therein.

6. **Read, complete and sign** an IRS Form W-9 if you are a U.S. person.  If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8.  These forms may be obtained from the IRS at its website:  www.irs.gov.

7. **Return** your signed Subscription Agreement and Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the

Subscription Agent prior to the Subscription Expiration Deadline.  **Please note** that if you hold Allowed Claims through a Nominee, you must deliver your Subscription Agreement and any Beneficial Holder Subscription Form relating to Allowed Claims held through the applicable Nominee (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) **to the applicable Nominee instead of the Subscription Agent**.  All Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) of Allowed Claims held through a Nominee must be delivered to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, in sufficient time to allow such Nominee to process and deliver the Master Subscription Form, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.  The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

      **8.**    **Arrange for full payment** of the Rights Offering Payment by wire transfer of immediately available funds, calculated in accordance with Item 2b of your Beneficial Holder Subscription Form(s).  For Eligible Holders that hold Allowed Claims via a Nominee, please instruct your Nominee to coordinate payment of the Rights Offering Payment and transmit and deliver such payment to the Subscription Agent prior to the Subscription Expiration Deadline.

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by your Beneficial Holder Subscription Form(s) will not be counted and will be deemed forever relinquished and waived.**

**Schedule 1B**

## PEABODY ENERGY CORPORATION

### BENEFICIAL HOLDER SUBSCRIPTION FORM
### FOR RIGHTS OFFERING

### FOR USE BY ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN CLASSES 2A - 2D

### 10.00% SENIOR SECURED SECOND LIEN NOTES DUE MARCH 2022
### OF PEABODY ENERGY CORPORATION
### (CUSIP: [_____]) IN CONNECTION WITH DEBTORS'
### DISCLOSURE STATEMENT DATED [_____]

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by this Beneficial Holder Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to this Beneficial Holder Subscription Form. Any terms capitalized but not defined herein have the meanings as set forth in the Plan.**

---

**Item 1. Amount of Allowed Claims in Classes 2A - 2D.**

I certify that I am a beneficial holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) or that I am the authorized signatory of that beneficial holder. For purposes of this Beneficial Holder Subscription Form, do not adjust the principal (face) amount of 10% Senior Secured Second Lien Notes due 2022 of Peabody Energy Corporation for any accrued or unmatured interest. Accrued prepetition interest is accounted for in the multipliers set forth in Item 2a below. If you do not know the principal amount, please contact your Nominee immediately).

Insert amount of Allowed Claims in Classes 2A - 2D held
    (principal amount of 10% Senior Secured Second Lien
    Notes due 2022)                                        _____

**Item 2. Rights.**

    **2a. Calculation of Maximum Number of Offered Shares**.  The maximum number of Offered Shares for which you may subscribe is calculated as follows:

| Allowed Claims in Classes 2A - 2D (insert amount from Item 1 above) | | | | |
|---|---|---|---|---|
| _____ | X | [Rights Factor][1] | = | _____<br>Maximum Number of Offered Shares in respect of Allowed Claims in Classes 2A - 2D<br>(round down to nearest whole number) |

    Each Eligible Holder may subscribe for its Pro Rata Shares (the "<u>Maximum Participation Amount</u>"), subject to the individual limits included in the calculations in Item 2.  To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

    **2b. Purchase Price**.  By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____<br>(Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____<br>Total Purchase Price |
|---|---|---|---|---|

**Item 3. Payment and Delivery Instructions**

    You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below.  No other method of payment is permitted.

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

    Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the

---

[1] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

**Item 4. Certification.**

I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

By electing to subscribe for the amount of Subscribed Shares designated under Item 2b above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Subscription Agreement Deadline.

**I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here ☐

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____


**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 624 of 876 PageID #: 7571

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 136 of 330

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

# PEABODY ENERGY CORPORATION

## BENEFICIAL HOLDER SUBSCRIPTION FORM
## FOR RIGHTS OFFERING

### FOR USE BY ELIGIBLE HOLDERS OF CLAIMS IN CLASS 5B ON ACCOUNT OF
### UNSECURED SENIOR NOTES

**6.00% SENIOR NOTES DUE NOVEMBER 2018**
**(CUSIP: [_____])**

**6.50% SENIOR NOTES DUE SEPTEMBER 2020**
**(CUSIP: [_____])**

**6.25% SENIOR NOTES DUE NOVEMBER 2021**
**(CUSIP: [_____])**

**7.875% SENIOR NOTES DUE NOVEMBER 2026**
**(CUSIP: [_____])**

**OF PEABODY ENERGY CORPORATION**
**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [_____]**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____],
2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription
Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable)
must be received by the Subscription Agent prior to the Subscription Expiration Deadline
or the subscription represented by this Beneficial Holder Subscription Form will not be
counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures
for additional information with respect to this Beneficial Holder Subscription Form.  Any
terms capitalized but not defined herein have the meanings as set forth in the Plan.**

---

**Item 1. Amount of Allowed Claims in Class 5B on Account of Unsecured Senior Notes.**

I certify that I am a beneficial holder of an Allowed Claim in Class 5B (General
Unsecured Claims against the Encumbered Guarantor Debtors) on account of Unsecured Senior
Notes in the following amounts as of the date hereof (insert amount on the line below) or that I
am the authorized signatory of that beneficial holder.  For purposes of this Beneficial Holder
Subscription Form, do not adjust the principal (face) amount of Unsecured Senior Notes for any
accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multipliers set

forth in Item 2a below.  If you do not know the principal amount, please contact your Nominee immediately).

Insert amounts of Allowed Claims in Class 5B **on account of Unsecured Senior Notes** held (principal amount of Unsecured Senior Notes)

| 6.00% Senior Notes due November 2018 | _____ |
| 6.50% Senior Notes due September 2020 | _____ |
| 6.25% Senior Notes due November 2021 | _____ |
| 7.875% Senior Notes due November 2026 | _____ |

**Item 2. Rights.**

     **2a. Calculation of Maximum Number of Offered Shares**.  The maximum number of Offered Shares for which you may subscribe is calculated as follows:

| **Allowed Claims in Class 5B on Account of Unsecured Senior Notes** (insert amounts from Item 1 above) | | | | |
|---|---|---|---|---|
| _____<br>(6.00% Senior Notes due 2018) | X | [Rights Factor][2] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(6.50% Senior Notes due 2020) | X | [Rights Factor][3] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(6.25% Senior Notes due 2021) | X | [Rights Factor][4] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(7.875% Senior Notes due 2026) | X | [Rights Factor][5] | = | _____<br>Maximum Number of Offered Shares |
| | | | | _____<br>Total Maximum Number of Offered Shares in respect of Allowed Claims in Class 5B on Account of Unsecured Senior Notes |

---

[2] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[3] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[4] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[5] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

| | (round down to nearest whole number) |
|---|---|
| | |

Each Eligible Holder may subscribe for its Pro Rata Shares (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in Item 2.  To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

**2b. Purchase Price**.  By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____ (Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____ Total Purchase Price |
|---|---|---|---|---|

## Item 3. Payment and Delivery Instructions

You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below.  No other method of payment is permitted

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

**Item 4. Certification.**

I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

By electing to subscribe for the amount of Subscribed Shares designated under Item 2b above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Subscription Agreement Deadline.

**I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8  ☐

If U.S. person, check here and attach IRS Form W-9  ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here  ☐

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____

- 4 -

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 630 of 876 PageID #: 1577

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 142 of 330

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

## PEABODY ENERGY CORPORATION

### BENEFICIAL HOLDER SUBSCRIPTION FORM
### FOR RIGHTS OFFERING

### FOR USE BY ELIGIBLE HOLDERS OF CLAIMS IN CLASS 5B OTHER THAN ON ACCOUNT OF UNSECURED SENIOR NOTES

### IN CONNECTION WITH DEBTORS'
### DISCLOSURE STATEMENT DATED [_____]

<table>
<tr><td>

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by this Beneficial Holder Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to this Beneficial Holder Subscription Form. Any terms capitalized but not defined herein have the meanings as set forth in the Plan.**

</td></tr>
</table>

**Item 1. Amount of Allowed Claims in 5B Other Than on Account of Unsecured Senior Notes.**

I certify that I am a beneficial holder of an Allowed Claim in Class 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) other than on account of Unsecured Senior Notes in the following amounts as of the date hereof (insert amount on the line below) or that I am the authorized signatory of that beneficial holder.

Insert amount of Allowed Claims in Class 5B **other than on account of Unsecured Senior Notes** held

_____

**Item 2. Rights.**

**2a. Calculation of Maximum Number of Offered Shares**. The maximum number of Offered Shares for which you may subscribe is calculated as follows:

<table>
<tr><td colspan="5">**Allowed Claims in Class 5B <u>Not on Account of Unsecured Senior Notes</u>** (insert amount from Item 1 above)</td></tr>
<tr><td>_____</td><td>X</td><td>[Rights</td><td>=</td><td>_____<br>Maximum Number of Offered Shares in</td></tr>
</table>

| | | Factor][6] | | respect of Allowed Claims in Class 5B Other Than on Account of Unsecured Senior Notes (round down to nearest whole number) |
|---|---|---|---|---|

Each Eligible Holder may subscribe for its Pro Rata Shares (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in Item 2. To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

**2b. Purchase Price**. By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____ (Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____ Total Purchase Price |
|---|---|---|---|---|

## Item 3. Payment and Delivery Instructions

You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below. No other method of payment is permitted

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent such that they are received by the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

---

[6] Rights Factor to be provided.

**Item 4. Certification.**

      I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

      **I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8  ☐

If U.S. person, check here and attach IRS Form W-9  ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here  ☐

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

- 3 -

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____



Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____



Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

**Schedule 1C**

## PEABODY ENERGY CORPORATION

### MASTER SUBSCRIPTION FORM
### FOR RIGHTS OFFERING

### FOR USE BY NOMINEES OF ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN CLASSES 2A - 2D

### 10.00% SENIOR SECURED SECOND LIEN NOTES DUE MARCH 2022
### OF PEABODY ENERGY CORPORATION
### (CUSIP: [_____])

### IN CONNECTION WITH DEBTORS'
### DISCLOSURE STATEMENT DATED [_____]

> **For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees for beneficial holders of Second Lien Notes (the "Notes").**

> **YOUR MASTER SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 5:00 P.M. (NEW YORK CITY TIME) ON [_____], 2017 (THE "SUBSCRIPTION EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS MASTER SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**
>
> **PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**
>
> **PLEASE CONSULT THE PLAN, THE SUBSCRIPTION AGREEMENT AND THE RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS MASTER SUBSCRIPTION FORM.  IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT [_____].**

**Item 1. Certification of Authority to Subscribe.**

The undersigned certifies that as of the date hereof it (please check the applicable box):

☐    Is a broker, bank or other nominee for the beneficial holders of the Notes listed in Item 2 below, and is the registered holder of such Notes, or

☐    Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Notes listed in Item 2 below.

## Item 2. Notes Beneficial Holder Information.

The undersigned certifies that as of the date hereof the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Notes, as identified by their respective account numbers, that have delivered duly completed Beneficial Holder Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below.  Attach additional sheets if necessary)**

| 10.00% Senior Secured Second Lien Notes due March 2022 (Classes 2A - 2D) | | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

## Item 3. Payment and Delivery Instructions

All cash payments with respect to the exercise of Rights Offering Equity Rights that are being transmitted by this Master Subscription Form must be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| | |
|---|---|
| Account Name : | [_____] |
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please email, mail or deliver your completed subscription form (together with any duly completed and received Beneficial Holder Subscription Forms (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreements) to:

[KCC
1290 Avenue of the Americas, 9th Floor

New York, New York 10104

Attn:  [Peabody Energy Rights Offer]

Tel#:  [(917) 281-4800]

Email:  [_]@kccllc.com]

---

**PLEASE NOTE:  NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND EXECUTED SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE AGGREGATE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE (5:00 P.M. NEW YORK CITY TIME ON [_____], 2017).**

---

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**PROPERLY EXECUTED MASTER SUBSCRIPTION FORMS ALONG WITH RESPECTIVE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [_]@KCCLLC.COM BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

---

**Item 4. Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Notes listed under Item 1 of the Beneficial Holder Subscription Form, (ii) the beneficial holder is entitled to participate in the Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the Beneficial Holder Subscription Form have been received from each beneficial holder.

Case: 4:17-cv-01053-AGF   Doc. #:  6-5   Filed: 03/23/17   Page: 639 of 876 PageID
#: 7586

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C
- Backstop Commitment Agreement   Pg 151 of 330

Date: _____

Name of Nominee: _____

DTC Participant Number: _____

U.S. Federal Tax EIN/SSN (optional): _____

Signature: _____

Name: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email: _____

**PEABODY ENERGY CORPORATION**

**MASTER SUBSCRIPTION FORM
FOR RIGHTS OFFERING**

**FOR USE BY NOMINEES OF ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN
CLASS 5B**

**6.00% SENIOR NOTES DUE NOVEMBER 2018
(CUSIP: [_____])**

**6.50% SENIOR NOTES DUE SEPTEMBER 2020
(CUSIP: [_____])**

**6.25% SENIOR NOTES DUE NOVEMBER 2021
(CUSIP: [_____])**

**7.875% SENIOR NOTES DUE NOVEMBER 2026
(CUSIP: [_____])**

**OF PEABODY ENERGY CORPORATION**

**IN CONNECTION WITH DEBTORS'
DISCLOSURE STATEMENT DATED [_____]**

---

**For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or
other agents or nominees for beneficial holders Unsecured Senior Notes (the "Notes").**

---

**YOUR MASTER SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER
SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND
SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION
PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY
5:00 P.M. (NEW YORK CITY TIME) ON [_____], 2017 (THE "SUBSCRIPTION
EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS
MASTER SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE
DEEMED FOREVER RELINQUISHED AND WAIVED.**

**PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER SUBSCRIPTION FORM
TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**

**PLEASE CONSULT THE PLAN, THE SUBSCRIPTION AGREEMENT AND THE
RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH
RESPECT TO THIS MASTER SUBSCRIPTION FORM.  IF YOU HAVE ANY
QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT [_____].**

## Item 1. Certification of Authority to Subscribe.

The undersigned certifies that as of the date hereof it (please check the applicable box):

☐  Is a broker, bank or other nominee for the beneficial holders of the Notes listed in Item 2 below, and is the registered holder of such Notes, or

☐  Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Notes listed in Item 2 below.

## Item 2. Notes Beneficial Holder Information.

The undersigned certifies that as of the date hereof the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Notes, as identified by their respective account numbers, that have delivered duly completed Beneficial Holder Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below.  Attach additional sheets if necessary)**

| 6.00% Senior Notes due 2018 (Class 5B) | | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |

| 6.50% Senior Notes due 2020 (Class 5B) | | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

| 6.25% Senior Notes due 2021 (Class 5B) | | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
|---|---|---|---|---|---|---|
| **7.875% Senior Notes due 2026 (Class 5B)** | | | | | | |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| **TOTALS** | | | | | | |

## Item 3. Payment and Delivery Instructions

All cash payments with respect to the exercise of Rights Offering Equity Rights that are being transmitted by this Master Subscription Form must be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| | |
|---|---|
| Account Name : | [_____] |
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please email, mail or deliver your completed subscription form (together with any duly completed and received Beneficial Holder Subscription Forms (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreements) to:

[KCC
1290 Avenue of the Americas, 9th Floor
New York, New York 10104
Attn:  [Peabody Energy Rights Offer]
Tel#:  [(917) 281-4800]
Email:  [_]@kccllc.com]

**PLEASE NOTE:  NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS**

APPLICABLE) AND EXECUTED SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE AGGREGATE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE (5:00 P.M. NEW YORK CITY TIME ON [_____], 2017).

---

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

PROPERLY EXECUTED MASTER SUBSCRIPTION FORMS ALONG WITH RESPECTIVE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [_]@KCCLLC.COM BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.

---

**Item 4. Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Notes listed under Item 1 of the Beneficial Holder Subscription Form, (ii) the beneficial holder is entitled to participate in the Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the Beneficial Holder Subscription Form have been received from each beneficial holder.

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 645 of 876 PageID #: 1592

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 157 of 330

Date: _____

Name of Nominee: _____

DTC Participant Number: _____

U.S. Federal Tax EIN/SSN (optional): _____

Signature: _____

Name: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email: _____

Nominee Contact Information:
(if different from above)

_____

_____

_____

## Exhibit B

## Form of Joinder Agreement

### JOINDER AGREEMENT

This joinder agreement (the "Joinder Agreement") to the Backstop Commitment Agreement dated December 22, 2016 (as amended, supplemented or otherwise modified from time to time, the "BCA"), between the Debtors (as defined in the BCA) and the Commitment Parties (as defined in the BCA) is executed and delivered by _____ (the "Joining Party") as of _____, 201__ (the "Joinder Date"). Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the BCA.

Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the BCA, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Commitment Party" for all purposes under the BCA.

Representations and Warranties. The Joining Party hereby severally and not jointly makes the representations and warranties of the Commitment Parties set forth in Section 5 of the BCA to the Debtors as of the date of this Joinder Agreement.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York without application of any choice of law provisions that would require the application of the laws of another jurisdiction.

*[Signature pages follow.]*

Case: 4:17-cv-01053-AGF   Doc. #:  6-5   Filed: 03/23/17   Page: 647 of 876 PageID #: 1594

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 159 of 330

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the Joinder Date.

**JOINING PARTY**

**[JOINING PARTY]**, by and on behalf of certain of its and its affiliates' managed funds and/or accounts

By:_____

    Name:

    Title:

Backstop Commitment Holdings:

_____

Holdings of Allowed Second Lien Notes Claims:

_____

Holdings of Allowed Class 5B Claims:

_____

**AGREED AND ACCEPTED AS OF THE JOINDER DATE:**

**PEABODY ENERGY CORPORATION, as Debtor**

By:_____

    Name:

    Title:

## Exhibit C

## Private Placement and Backstop Commitment Parties
## Voting/Consent Structure

Set forth below is the structure for voting and consents by the Private Placement Parties and the Backstop Commitment Parties with respect to material issues, including the Private Placement, Plan terms, the Backstop Commitment and the Restructuring (the "Voting / Consent Structure").

## Gatekeeping for All Issues – 75% of Noteholder Steering Committee

All proposed changes, modifications and amendments to the Plan Documents (as defined in the PSA) and the Transactions contemplated therein shall be vetted by the Noteholder Steering Committee. Proposals will be submitted for ratification – as set forth below – only if supported by 75% of the committee based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule (a "75% Supermajority"). If one of the seven members of the Noteholder Steering Committee transfers or assigns any of its holdings (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned holdings shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong as of the date of execution of the Plan Support Agreement (the "PSA") to the same ad hoc noteholder group as the transferring or assigning member.[42]

The Noteholder Steering Committee shall retain voting and consent rights with respect to any termination rights, default provisions, cross-default provisions, and waivers of such rights and provisions. Such voting and consent rights shall require a 75% Supermajority of the Noteholder Steering Committee parties, pursuant to the terms and conditions set forth in the immediately

---

[42]   For example, any transfer of any Claims by Elliott (regardless of whether it is a Class 2 or Class 5 Claim) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Elliott to Discovery and Aurelius on a pro rata basis based on the Claim holdings of Discovery and Aurelius, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Similarly, any transfer of any Claims by Point State (regardless of the type of claim transferred) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Point State to Contrarian, Panning, and SDIC on a pro rata basis based on the claim holdings of Contrarian, Panning, and SDIC, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Solely for purposes of this Exhibit, for the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Commitment Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein. For the avoidance of doubt, Contrarian, in its capacity as investment advisor or manager to various entities and managed accounts set forth on the Initial Private Placement Schedule and Initial Backstop Commitment Schedule, shall vote for the same for purposes hereof.

preceding paragraph; provided, however, that for the avoidance of doubt the Steering Committee may not extend the effective date milestone beyond June 14, 2017 absent consent from all parties in accordance with C.10 below.

In the event that a proposed change falls, or could be interpreted to fall, into two or more voting threshold categories (A, B, C, and D) set forth below, such proposed change shall be deemed to fall into the category with the highest voting threshold and shall be subject to such category's voting threshold accordingly.

## A. Class Issues – 66% by Class

Requires a 66% supermajority affirmative vote of parties who vote[43] in each affected class, based on aggregate respective Private Placement Commitments held by each Private Placement Party at such time, on a class-by-class basis (2-class vote):

1.  issuance of dilutive securities not contemplated by the Restructuring Term Sheet
2.  changes to the allocation of Private Placement Commitment (including changes to holdback)
3.  changes to the allocation of Backstop Commitment
4.  terms of the New Second Lien Notes; provided, however, that no such vote or approval shall be required in connection with the terms of the New Second Lien Notes, to the extent such terms are consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet
5.  changes to the capital structure (e.g. increase in total debt above Restructuring Term Sheet debt levels)
6.  any material changes that would disproportionately treat either the Unsecured Senior Notes Claims or Second Lien Notes Claims more favorably or less favorably on anything other than a proportionate basis

## B. Other Issues – 66% of All

Requires a 66% supermajority affirmative vote of all parties who vote, based on aggregate respective Private Placement Commitments held by each party at such time:

1.  the Private Placement Amount (as defined in the Private Placement Agreement) or Rights Offering Amount (as defined in the Backstop Commitment Agreement) (except for adjustments of up to $100 million in aggregate in order to ensure that the Rights Offering is compliant with section 1145 of the Bankruptcy Code and any other applicable regulations)
2.  changes to corporate governance set forth in the Restructuring Term Sheet
3.  priority of dilution of all securities (Penny Warrants, Preferred Equity, Common Shares)
4.  Material Adverse Event definition & waivers of potential Material Adverse Events

---

[43]    For the avoidance of doubt, any Additional Private Placement Party or Additional Backstop Party, including, but not limited to, any Phase Two Placement Party or any Additional Backstop Party, shall not be entitled to exercise voting or consent rights as set forth herein unless and until the applicable subscription or enrollment period (as may be extended, reduced, or otherwise modified as set forth herein) has expired.

5. any other changes not specifically subject to a different standard herein over which the Requisite Consenting Noteholders have consent or approval rights as set forth in the Term Sheet

## C.  All Party Fundamental Rights – 100% of All

Requires unanimous consent by all affected parties.  Except with respect to proposed changes under items 3 or 4 listed below (as well as item 11, to the extent any proposed change under item 11 would impact, directly or indirectly, items 3 or 4), if a proposal achieves affirmative votes from parties holding 66% or more of the aggregate Private Placement Commitments outstanding at such time, the rights and obligations under the Private Placement Agreement and Backstop Commitment Agreement of any party that dissents from such proposed change will be automatically terminated, subject to the decision by a 75% Supermajority to proceed with the proposed change on the basis of redistributing the dissenters' commitments to Private Placement Parties/Commitment Parties that agree to assume the additional commitments.  This ejection shall not limit the dissenters' obligations under the Plan Support Agreement (other than any obligation to be a Private Placement Party or Commitment Party, as applicable).  If the Noteholder Steering Committee determines not to proceed with the amendment, dissenters will remain Private Placement Parties and Commitment Parties, as applicable.

1. increasing the dollar amount of each party's commitment (other than through the addition of Additional Private Placement/Commitment Parties)
2. changing any voting or consent threshold or any related definitions (including "Requisite Creditor Parties", "Requisite Consenting Noteholders"  or "Requisite Members of the Noteholder Steering Committee")
3. changes disproportionately adversely affecting any individual party
4. changes to the Pro Rata Split
5. changes to Backstop Premiums, Backstop Breakup Payments, Private Placement Premiums, or Private Placement Breakup Payments or allocation of such fees
6. changes to Plan Enterprise Value (as set forth in the Restructuring Term Sheet) or Plan Equity Value (as set forth in the Restructuring Term Sheet)
7. discounts to Plan Equity Value for the Private Placement and Rights Offering
8. increase of Penny Warrant issuance
9. conversion rates for Penny Warrants
10. extension or waiver of the Effective Date milestone in the PSA or Term Sheet past June 14, 2017, or any modification of the termination rights set forth in (i) section 9.3 of the Private Placement Agreement (Termination by a Private Placement Party), (ii) section 2.7(a) of the Private Placement Agreement (Designation and Assignment Rights). (iii) section 9.3 of the Backstop Commitment Agreement (Termination by a Commitment Party), (iv) section 2.7(a) of the Backstop Commitment Agreement (Designation and Assignment Rights), and (v) section 12.08 of the PSA
11. changes in definitions impacting, directly or indirectly, any of the above items

## D.  Initial Party Fundamental Rights – 100% of Initial Parties

Requires unanimous consent of Noteholder Co-Proponents:

1. changes to the Initial Backstop Commitment Schedule or Initial Private Placement Schedule

2.  changes to the allocations, conditions, or other terms of any "protected" commitments of any of the Initial Parties, including but not limited to the Private Placement holdback, the Surplus Private Placement Adjustment, and the Surplus Backstop Participation Adjustment

NAI-1502345820v2

## Exhibit D

## Plan Support Agreement

**PLAN SUPPORT AGREEMENT**

This PLAN SUPPORT AGREEMENT dated December 22, 2016 (this "Agreement") is made by and among the following parties:

(i) Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors" or the "Company"), that have commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on April 13, 2016 (the "Petition Date");

(ii) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacities, the "First Lien Agent") under the First Lien Credit Agreement (as defined below) and certain First Lien Lenders party hereto (excluding, for the avoidance of doubt, the Noteholder Co-Proponents (defined below)), together with the First Lien Agent, (the "First Lien Lender Co-Proponents"), each holding the principal funded debt obligations (including via participations) of the Debtors set forth on their signature pages hereto, including any First Lien Lenders that subsequently enter into this Agreement;

(iii) PointState Capital LP ("PointState"), Contrarian Capital Management L.L.C. ("Contrarian"), Panning Capital Management, LP ("Panning") and the South Dakota Investment Council ("SDIC," together with PointState, Contrarian and Panning, the "Ad Hoc Secured Committee Members"), each holding or advising funds or managed accounts who beneficially hold the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(iv) Elliott Management Corporation and certain of its affiliates (collectively, "Elliott"), Discovery Capital Management and certain of its affiliates (collectively, "Discovery Capital") and Aurelius Capital Master Ltd. and ACP Master, Ltd. (collectively, "Aurelius" and, together with Discovery Capital and Elliott, the "Ad Hoc Unsecured Noteholders Group" and together with the Ad Hoc Secured Committee Members (the "Noteholder Co-Proponents," and, Noteholder Co-Proponents together with the First Lien Lender Co-Proponents, the "Creditor Co-Proponents"), each holding the principal funded debt obligations of the Debtors set forth on their signature pages hereto;

(v) any holder of Second Lien Notes or Unsecured Senior Notes (each, as defined below) that subsequently enters into this Agreement (the "Additional Supporting Parties" and the Additional Supporting Parties together with the Creditor Co-Proponents, the "Supporting Creditor Parties"), each holding the principal funded debt obligations of the Debtors to be set forth on their signature pages hereto; and

(vi) each transferee of debt under the First Lien Credit Agreement, the Second Lien Notes or the Unsecured Senior Notes that becomes a party in accordance with Section 8(b) of this Agreement.

Each of the parties named above is a "Party," and collectively they are the "Parties."   All capitalized terms not defined herein have the meanings ascribed to them in the Restructuring Term Sheet (as defined below and as attached hereto as Exhibit 1).

## RECITALS

WHEREAS, on April 13, 2016, the Debtors commenced the Chapter 11 Cases under chapter 11 the Bankruptcy Code in the Bankruptcy Court, which Chapter 11 Cases have been consolidated by order of the Bankruptcy Court for procedural purposes only and are being jointly administered under case number 16-42529 (BSS).   References in this Agreement to pleadings, orders and other filings and related docket numbers are to such pleadings, orders and other filings filed or entered in the Chapter 11 Cases;

WHEREAS, the transactions contemplated and outlined in this Agreement (the "Restructuring") shall be embodied within the Plan, which shall address, among other things, the following principal funded debt obligations of the Debtors:

(a)     that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "First Lien Credit Agreement");

(b)     those certain 10.00% senior secured second lien notes issued in March 2015 by PEC and due in March 2022 (the "Second Lien Notes"); and

(c)     (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes"); and

(d)     those certain 4.75% convertible junior subordinated debentures issued on December 20, 2006 by PEC and due in 2066 (the "Convertible Subordinated Notes," and such claims arising therefrom, the "Unsecured Subordinated Debenture Claims").

WHEREAS, the Debtors and the Initial Supporting Parties have engaged in arm's length, good-faith discussions, including in connection with Bankruptcy Court-ordered mediation overseen by the Honorable James L. Garrity regarding the CNTA Dispute, and regarding the Restructuring pursuant to a chapter 11 plan of reorganization (the "Plan") to be proposed by the Debtors and the Creditor Co-Proponents in the Chapter 11 Cases, which Plan shall contain the terms and conditions set forth in, and be consistent in all material respects with, the Restructuring Term Sheet;

NAI-1502345833v1

WHEREAS, to ensure a more orderly Plan confirmation process, the Debtors and the Initial Supporting Parties desire to allow the Additional Supporting Parties to join in this Agreement and participate in the Backstop Commitment Agreement and Private Placement Agreement on the terms and conditions set forth in the Restructuring Term Sheet and to be embodied in the Backstop Commitment Agreement and Private Placement Agreement;

WHEREAS, in furtherance of the Restructuring, the Debtors have requested each Party to support the Plan in accordance with this Agreement;

WHEREAS, the applicable board of directors, members or managers of each of the Debtors have approved the Restructuring Term Sheet and the applicable Debtor's entry into this Agreement;

WHEREAS, each of the Supporting Creditor Parties has received the requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' agreement concerning their respective rights and obligations in respect of the Restructuring.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## <u>AGREEMENT</u>

**Section 1.      Proposed Restructuring.**   The principal terms of the Restructuring are set forth on the term sheet attached hereto as <u>Exhibit 1</u> (as such term sheet may be modified in accordance with <u>Section 14</u> hereof and together with all exhibits, annexes, schedules, appendices and amendments thereto, the "<u>Restructuring Term Sheet</u>").   The Restructuring will be implemented pursuant to various agreements and related documentation, including, without limitation, the following documents required to implement the Restructuring, which documents shall be consistent in all material respects with the Restructuring Term Sheet and this Agreement, shall be executed (if such document requires execution), and shall be filed with the Bankruptcy Court (the "<u>Plan Documents</u>") shall be subject to the consent rights of the Requisite Creditor Parties[1]  as set forth herein, in each case as applicable in accordance with the Milestones set forth in the Restructuring Term Sheet:

---

[1]     "Requisite Creditor Parties" shall mean the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders.   "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.   "Requisite Consenting Noteholders" shall mean "Requisite Members of the Noteholder Steering Committee" or the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule as set forth in <u>Exhibit 8</u> to the Restructuring Term Sheet. "Requisite Members of the Noteholder Steering Committee" shall mean 75% of the Noteholder Steering Committee, based on combined Class 2 and Class 5 holdings as set

(i)     the Plan;

(ii)    the disclosure statement related to the Plan (the "Disclosure Statement");

(iii)   the materials related to the solicitation of votes to accept or reject the Plan (the "Solicitation Materials");

(iv)    the order approving the Disclosure Statement and the Solicitation Materials (the "Disclosure Statement Order");

(v)     the credit agreement and/or indenture for the Exit Facility (the "Exit Facility Documentation") (if applicable);

(vi)    the credit agreement for the Replacement Secured First Lien Term Loan (if applicable);

(vii)   the documents relating to the Section 1145 Rights Offering and the Private Placement, including, but not limited to the Private Placement Agreement and the Backstop Commitment Agreement and the orders approving same;

(viii)  the indenture for the New Second Lien Notes (if applicable);

(ix)    the Confirmation Order;

(x)     the exhibits, supplements and appendices to the Plan;

(xi)    the Registration Rights Agreement; and

(xii)   all other documents necessary for the implementation of the Plan and the transactions contemplated therein.

Nothing contained in this section shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet set forth in Section 14 hereof.

**Section 2.    Exhibits Incorporated by Reference.**

Each of the exhibits attached hereto, including, without limitation, the Restructuring Term Sheet, is expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless specified otherwise, shall include such exhibits.    In the

---

forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member.    The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.    First Lien Lender Co-Proponents' Commitments.**

3.01.    Agreement to Support the Restructuring and Vote on the Plan.    Subject to the conditions contained in Section 3.02 hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each member of the First Lien Lender Co-Proponents agrees that it shall:

(a)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, provided that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the First Lien Lender Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)    not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)    not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)    not directly or indirectly take an action to direct the First Lien Agent, to undertake any action set forth in Sections 3.01(c) , (d) or (e) hereof, provided, however, that except to the extent required by the terms of the First Lien Credit Agreement

documents or by applicable law, the First Lien Agent shall be permitted to exercise its duties and obligations under the First Lien Credit Agreement documents in accordance with this Agreement and, subject to its obligations under this Agreement, the First Lien Agent may grant or withhold its consent or approval without instructions;

(g)     if applicable, negotiate in good faith the definitive documents for the Replacement Secured First Lien Term Loan on terms consistent with those set forth on Exhibit 1 to the Restructuring Term Sheet; and

(h)     take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated this Agreement, the Plan and the Plan Documents (it being understood that the First Lien Lender Co-Proponents shall not be required to incur any out of pocket cost or expense other than professional fees, to the extent that such fees are entitled to payment pursuant to Section V of the Restructuring Term Sheet).

3.02.     Certain Conditions.     The continuing obligations of each member of the First Lien Co-Proponents set forth in Section 3.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)     the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 to the Restructuring Term Sheet and otherwise in form and substance acceptable to the Requisite First Lien Lender Co-Proponents in their sole discretion;

(b)     this Agreement, the Restructuring Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents; and

(c)     the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents;

(d)     each other substantive document in connection with the Restructuring (but excluding documents relating to the Bonding Solution), shall be reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the

First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan;

(e)    any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite First Lien Lender Co-Proponents, not to be unreasonably withheld, conditioned or delayed;

(f)    the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet; and

(g)    this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over the documents and/or agreements set forth in the foregoing Sections 3.02(a)-(e).    Notwithstanding any other provision of this Agreement to the contrary, upon the Debtors (i) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court, and (ii) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First Lien Agent or the First Lien Lenders or their respective Representatives, (2) this Agreement or (3) the Breakup Administrative Claim Treatment (as defined in Exhibit 5 to the Restructuring Term Sheet).

3.03.    Acknowledgement.    For so long as this Agreement is in effect, each holder of First Lien Lender Claims from time to time party hereto (whether such holder is a First Lien Lender Co-Proponent, an Additional Supporting Party or a transferee of debt under the First Lien Credit Agreement that becomes a party in accordance with Section 8(b) of this Agreement, in any such case, in its capacity as a holder of First Lien Lender Claims and, with respect to Citibank, N.A., also in its capacity as the First Lien Agent) consents to the Restructuring, including for purposes of Section 6.10(b) of that certain First Lien/Second Lien Intercreditor Agreement among PEC as the borrower, the other grantors party thereto, Citibank, N.A. as the Senior Representative for the First Lien Credit Agreement Secured Parties (as such terms are defined therein), U.S. Bank National Association as the Second Priority Representative for the Second Lien Indenture Secured Parties (as such terms are defined therein), and each additional Representative (as defined therein) from time to time party thereto, dated as of March 16, 2015; provided that the consent of a holder of First Lien Lender Claims pursuant to this Section 3.03 shall cease to be in effect (except to the extent otherwise agreed in writing by such holder) if such holder ceases to be a party to this Agreement in accordance with the terms hereof.

Section 4.    Noteholder Co-Proponents' Commitments.

4.01.    Agreement to Support the Restructuring and Vote on the Plan.    Subject to the conditions contained in Section 4.02 hereof, effective immediately upon execution by each

-7-

member of the Noteholder Co-Proponents as to such member, and enforceable against such member as set forth herein (including, for the avoidance of doubt, by each member of the Noteholder Co-Proponents against each other member of the Noteholder Co-Proponents) as long as this Agreement has not been terminated pursuant to the terms hereof, each Noteholder Co-Proponent agrees that it shall:

(a)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)    subject to the receipt by such member of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, provided that upon any termination of this Agreement in accordance with Section 12 hereof, each member of the Noteholder Co-Proponents may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)    not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)    not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)    not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)    not directly or indirectly take an action to direct the indenture trustees under the Second Lien Notes or any of the Unsecured Senior Notes (each, an "Agent"), to undertake any action that a member of the Noteholder Co-Proponents is otherwise prohibited from undertaking pursuant to Sections 4.01(c) , (d) or (e) hereof; provided, however, that to the extent a member of the Noteholder Co-Proponents chooses to direct an Agent to not undertake an action that a member of the Noteholder Co-Proponents is otherwise prohibited

-8-

from undertaking pursuant to Sections 4.01(c), (d) or (e) hereof, such direction shall not be construed in any way as requiring any Noteholder Co-Proponent to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

(g)     take any and all commercially reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, participating in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

4.02.     Certain Conditions.     The continuing obligations of each member of the Noteholder Co-Proponents, as set forth in Section 4.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)     each substantive document in connection with the Restructuring including, without limitation, the Plan Documents (but excluding documents related to the Bonding Solution), shall be in form and substance acceptable or reasonably acceptable, as the case may be, to the Requisite Members of the Noteholder Steering Committee or the individual members of the Noteholder Steering Committee as set forth in the Restructuring Term Sheet, provided, that the Noteholder Co-Proponents acknowledge that the terms of the Replacement Secured First Lien Term Loan shall be acceptable if such terms are consistent with Exhibit 1 to the Restructuring Term Sheet;

(b)     any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim, shall be subject to the approval of the Requisite Members of the Noteholder Steering Committee, not to be unreasonably withheld, conditioned or delayed;

(c)     the material terms of the Restructuring, the Private Placement Agreement and the Backstop Commitment Agreement, shall not have been amended, modified or supplemented without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet;

(d)     the Debtors shall have otherwise complied with the terms of the Restructuring Term Sheet, the Private Placement Agreement, the Backstop Commitment Agreement and this Agreement; and

(e)     this Agreement shall have not been terminated in accordance with the terms hereof.

For the avoidance of doubt, the Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee or the affected member of the Noteholders Steering Committee, as required under Exhibit 8 to the Restructuring Term Sheet.

-9-

4.03.    Effect of Termination.    Notwithstanding any termination of this Agreement (except for any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to Exhibit 8 to the Restructuring Term Sheet)), and further notwithstanding anything to the contrary herein:

(a)    the obligations of each member of the Noteholder Co-Proponents to every other member of the Noteholder Co-Proponents pursuant to Sections 4.01(c), 4.01(d) and 4.01(f) above (Sections 4.01(c), (d), and (f), collectively, the "Surviving Obligations") shall survive such termination, absent express termination of the Surviving Obligations by the Noteholder Steering Committee pursuant to Exhibit 8 to the Restructuring Term Sheet;

(b)    if any of the Noteholder Co-Proponents shall participate, with respect to the Debtors, in any subsequent rights offering of any securities as a backstop party and/or in any subsequent private placement of any securities as a private placement party, then each of the other members of the Noteholder Co-Proponents shall have the rights to participate, in each of their sole discretion, in such subsequent rights offering and/or private placement on identical terms as the original participating member of the Noteholder Co-Proponents, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable;

(c)    each of the Noteholder Co-Proponents shall not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company that disproportionately adversely affects any member of the Noteholder Co-Proponents with respect to the treatment of such member's claims or recovery associated therewith, so long as such claims or recovery arise from or relate to the same debt issuance, security, or other instrument issued by the Debtors, or encourage or cause any party to do any of the foregoing;

(d)    for the avoidance of doubt, this Section 4.03 shall not, and shall not be deemed to, give any party other than a member of the Noteholder Co-Proponents any rights, remedies, or obligations against any member of the Noteholder Co-Proponents, and no other person or entity shall be a third party beneficiary of this Section 4.03;

(e)    for the avoidance of doubt, this Section 4.03 shall not apply in the event of any termination of this Agreement with the express consent of, or a termination by, the Noteholder Steering Committee (pursuant to Exhibit 8 to the Restructuring Term Sheet) and in such case this Agreement, including the obligations set forth in this Section 4.03, and the Restructuring Term Sheet shall terminate;

(f)    nothing contained in this Agreement, including this Section 4.03, shall prohibit any member of the Noteholder Co-Proponents from directly or indirectly seeking, soliciting, or encouraging other parties in interest in these Chapter 11 Cases to join this Agreement pursuant to the terms hereof, or to propose modifications or amendments to this

-10-

Agreement, the Plan, the Backstop Commitment Agreement or the Private Placement Agreement pursuant to the applicable modification provisions contained in each respective document;

(g)     notwithstanding anything to the contrary in this Section 4.03, a member of the Ad Hoc Unsecured Noteholders Group will not be bound by the terms of this Section 4.03 so long as the member, during the Survival Period (as defined below), pursues and supports an agreement or order that provides (i) for the payment in full in cash of the Second Lien Notes Claims (including, without limitation, the payment of all post-petition interest at the default rate) (such agreement or order, a "Post-Termination Agreement," (as applicable) ), and (ii) the Unsecured Senior Notes Claims held by all Ad Hoc Secured Committee Members (as set forth in the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule) are treated in all respects in the identical manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, including, without limitation, any and all rights to participate, in each of the Ad Hoc Secured Committee Members' sole discretion, in any subsequent rights offering and/or private placement on identical terms and in an identical capacity and manner as Unsecured Senior Notes Claims held by members of the Ad Hoc Unsecured Noteholders Group, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule or the Initial Backstop Commitment Schedule, as applicable.   To the extent a member of the Ad Hoc Unsecured Noteholders Group pursues such Post-Termination Agreement and related transactions that include the terms and conditions set forth in this paragraph, such member is required (x) to take all actions necessary to support, participate in, and/or vote for such Post-Termination Agreement, (y) not to take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in such Post-Termination Agreement, and (z) not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, consummation or implementation of the Post-Termination Agreement;

(h)     this Section 4.03 shall only survive termination of this Agreement for a period of sixty (60) calendar days following such termination, but in no event later than June 14, 2017 (such period, the "Survival Period");

(i)     any amendment, waiver, or termination of this Section 4.03 shall be subject to the express consent of the Noteholder Steering Committee pursuant to Exhibit 8 to the Restructuring Term Sheet; provided, however, the amendment or waiver of Sections 4.03 (h) or (i) will require the consent of each member of the Noteholder Steering Committee; and

(j)     this Section 4.03 shall be binding and enforceable solely with respect to the Noteholder Co-Proponents and may be amended, waived or terminated by the Noteholder Co-Proponents.   The Debtors and the First Lien Lender Co-Proponents have not agreed to, and will not be bound by, this Section 4.03, nor shall it in any way impact the Debtors' or the First Lien Lender Co-Proponents' ability to enforce the other provisions of this Agreement.

**Section 5.**        **Additional Supporting Parties' Commitments.**

5.01.        <u>Agreement to Support the Restructuring and Vote on the Plan</u>.    Subject to the conditions contained in <u>Section 5.02</u> hereof and as long as this Agreement has not been terminated pursuant to the terms hereof, each Additional Supporting Party agrees that it shall:

(a)        subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, to the extent solicited, timely vote or cause or direct to be voted all of its Claims (as defined in the Bankruptcy Code) in favor of the Plan by delivering its duly executed and completed ballot or ballots accepting such Plan on a timely basis following the commencement of the solicitation;

(b)        subject to the receipt by such Additional Supporting Party of the Disclosure Statement and other Solicitation Materials that are subsequently approved by the Bankruptcy Court as complying with section 1126(b) of the Bankruptcy Code, not change or withdraw (or cause or direct to be changed or withdrawn) such vote, <u>provided</u> that upon any termination of this Agreement in accordance with Section 12 hereof, each Additional Supporting Party may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(c)        not take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval and consummation of the transactions described in, this Agreement;

(d)        not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of the Restructuring or the Plan;

(e)        not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in, or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Company other than the Plan, or encourage or cause any party to do any of the foregoing;

(f)        not directly or indirectly take an action to direct an Agent to undertake any action that an Additional Supporting Party, as the case may be, is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof; <u>provided</u>, <u>however</u>, that to the extent an Additional Supporting Party chooses to direct an Agent to not undertake an action that an Additional Supporting Party is otherwise prohibited from undertaking pursuant to <u>Sections 5.01(c), (d) or (e)</u> hereof, such direction shall not be construed in any way

as requiring any Additional Supporting Party to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability in connection with such direction; and

(g)      take any and all reasonably necessary or appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, but not limited to, required participation in the Backstop Commitment Agreement and Private Placement Agreement in accordance with the terms thereof.

5.02.    Certain Conditions.   The continuing obligations of each Additional Supporting Party set forth in Section 5.01 hereof, following the occurrence of the PSA Effective Date (as defined below), are subject to the following conditions:

(a)      the material terms of the Restructuring Term Sheet, the Backstop Commitment Agreement and the Private Placement Agreement shall not have been materially altered, amended or modified without the requisite approval required under the terms of Exhibit 8 to the Restructuring Term Sheet; and

(b)      this Agreement shall have not been terminated in accordance with the terms hereof.

Notwithstanding the foregoing, for the avoidance of doubt, the Additional Supporting Parties shall not have any consent or consultation rights with respect to any of the Plan Documents, except as otherwise set forth on Exhibit 8 to the Restructuring Term Sheet.

**Section 6.    Debtors' Commitments.**

6.01.    Debtors' Commitments.   Subject to the approval of the Bankruptcy Court and the Debtors' fiduciary duties as set forth in Section 15.01 hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, the Debtors shall:

(a)      operate their businesses in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices, provided, however, that the foregoing obligations shall be satisfied in a manner consistent with the terms of the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet;

(b)      prepare the Plan Documents and any related documents, and distribute the applicable documents, each as set forth in Sections 3.02 and 4.02 herein, concurrently to the Initial Supporting Parties and their respective legal advisors thereof, as soon as reasonably practicable, but in no event less than at least two (2) calendar days before the date when the Debtors intend to file such document (and, if not reasonably practicable, as soon as reasonably practicable before filing) and afford reasonable opportunity to provide prompt comment and review to the respective legal and financial advisors for the Initial Supporting Parties in advance of any filing thereof provided the Debtors will provide advance draft copies of all Plan Documents to be filed with the Bankruptcy Court to the legal advisors

-13-

of the Initial Supporting Parties no less than three (3) business days prior to filing such Plan Documents;

(c)        support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents within the applicable timeframes provided therefor in this Agreement;

(d)        take any necessary actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and the Plan Documents, including, without limitation, taking any actions necessary to consummate the Restructuring in any applicable jurisdictions other than the United States;

(e)        take no actions and not encourage any other person to take any actions, inconsistent with this Agreement or the Restructuring Term Sheet, or that would, or would reasonably be executed to, directly or indirectly, delay or impede the solicitation, confirmation or consummation of the Plan, including the soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction other than the Plan (an "Alternative Transaction"); provided, however, that the Debtors' solicitation of interest in, and the negotiation of one or more agreements relating to, a sale of non-Debtor affiliates' assets in the ordinary course of business and consistent with past practice and/or negotiation and consummation of amendments or a restructuring of indebtedness owed by non-Debtor affiliates, in each case, shall not itself constitute an Alternative Transaction;

(f)        timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement and the Plan Documents; and

(g)        take no actions to propose or otherwise consent to the entry of any order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, that is not acceptable to the Requisite Creditor Parties;

(h)        take no actions that would violate the Interim Operating Covenant, as set forth in Exhibit 5 to the Restructuring Term Sheet (the "Interim Operating Covenant");

(i)        take no actions to sell, abandon, or otherwise dispose of any material assets of the Debtors and their non-Debtor affiliates, except as provided in the Interim Operating Covenant, without the prior written consent of the Requisite Creditor Parties; and

-14-

(j)    if the Debtors know of a breach by any Debtor in any respect of the obligations, representations, warranties or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Creditor Parties.

6.02.    Non-Solicitation Provision.    From and after the PSA Effective Date (the "Non-Solicitation Period"), the Debtors will not, and will not permit their subsidiaries or affiliates or any of their respective officers, directors, agents or representatives to initiate contact with, or solicit any inquiries, proposals or offers by any party (other than the Creditor Co-Proponents) with respect to an alternative restructuring; provided, however, that the Debtors, their subsidiaries, their affiliates or any of their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers received from any party (so long as such proposal was not obtained, pursued, facilitated or solicited by the Debtors or their subsidiaries, affiliates or their respective officers, directors, agents or representatives as described herein) with respect to an alternative restructuring.    To the extent the Debtors, their affiliates, their subsidiaries or any of their respective officers, directors, agents or representatives receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall or shall cause their affiliates, subsidiaries or respective officers, directors, agents or representatives to, provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such inquiry, proposal or offer.

**Section 7.    Right to Appear and Participate.** Nothing in Sections 3.01, 4.01 and 5.01 hereof shall be deemed to limit any of the following rights of any Party, to the extent consistent with this Agreement and the Restructuring Term Sheet:

(a)    to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance or participation and the positions advocated in connection therewith, including positions with respect to the CNTA Dispute, are not inconsistent with this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, and, other than as a result of actions or omissions any such Party takes or does not take in good faith to enforce its rights under this Agreement, the Restructuring Term Sheet, or the terms of the Plan or the Plan Documents, do not hinder, delay or prevent consummation of the Plan or the Plan Documents;

(b)    to purchase, sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors, subject to the terms of Section 8 hereof; or

(c)    to enforce all rights under any applicable credit agreement, indenture or other loan document in existence as of the date hereof or under any applicable law.

**Section 8.    Transfer of Claims.**

(a)    Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Party to sell, use, assign, transfer, grant any

-15-

participation or other beneficial interest in, or otherwise dispose of ("Transfer") any claims as such term is defined in section 101(5) of the Bankruptcy Code (each a "Claim" and, collectively, the "Claims"); provided, however, that, for the period commencing as of the PSA Effective Date (as defined below) until the termination of this Agreement pursuant to the terms hereof, each Party agrees, solely with respect to itself, that it shall not Transfer any Claims, and any purported Transfer of Claims shall be null and void *ab initio*, unless (i) the transferee is a Party, or (ii) if the transferee is not a Party, such transferee delivers to the Company (in any manner permitted by Section 15.14 hereof) within three (3) business days of the Transfer an executed joinder to this Agreement in the form attached hereto as Exhibit 2 (a "Joinder Agreement") pursuant to which such transferee shall have assumed all obligations of the Party transferring such Claims and shall become a Party to this Agreement, provided, further that this provision shall not apply to a disposition in connection with a pledge or grant of a security interest in any Claim made in good faith by a Party in connection with any financing if such pledge agrees to vote the Claims in favor of the Plan, provided, further, that, if the transferor of the Claims is a Creditor Co-Proponent, the transferee of such Claims (or any subsequent transferee) shall not become or be deemed to become a Creditor Co-Proponent, and shall not undertake the commitments of the Creditor Co-Proponents under the Private Placement Agreement or the Backstop Commitment Agreement, but such transferee of such Claims shall become a Party to this Agreement as an Additional Supporting Creditor Party hereto.   The failure by a Party to comply with the Transfer procedure described in the first proviso of the immediately preceding sentence (resulting in such Transfer becoming null and void *ab initio*) shall not constitute a material breach for purposes of Section 12.02(h) hereof.

For the avoidance of doubt, to the extent not already a Party to this Agreement, a transferee of Claims under this Agreement shall become a Party to this Agreement with respect to any and all Claims owned by such Party, and any and all such Claims owned by such transferee party shall automatically and immediately upon joinder of such transferee party to this Agreement be deemed subject to all of the terms of this Agreement.   This Agreement shall in no way be construed to preclude any Party from acquiring additional Claims; provided, however, that any such additional Claims acquired by a Party shall automatically and immediately upon acquisition by such Party be deemed subject to all of the terms of this Agreement, whether or not notice of such acquisition is given to the Company, and that, so long as this Agreement has not been terminated, such Party shall vote (or cause to be voted) any such additional Claims in favor of the Plan in accordance and consistent with Sections 3.01(a), 4.01(a) and 5.01(a) hereof, as applicable, provided, further, that any and all Claims acquired by any member of the Noteholder Co-Proponents shall not be acquired in such party's capacity as an "Initial Party" (as defined in the Restructuring Term Sheet), but shall be acquired in such party's capacity as a "Phase Two Private Placement Party," "Additional Private Placement Party," "Phase Two Backstop Party," or "Additional Backstop Party," each as defined in the Restructuring Term Sheet, as applicable, provided, further, that in no event shall any such Transfer relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of delivery of such Joinder Agreement.

(b)      Notwithstanding Section 8(a):   (A) a Party may settle or deliver any Claims to settle pursuant to an agreement to Transfer such Claim entered into by such Party prior to the date of this Agreement pending as of the date of such Party's entry into this Agreement without the requirement that the transferee be or become a Party or execute a

Joinder Agreement (subject to compliance with applicable securities laws and it being understood that any Claims acquired and held (i.e., not as part of a short transaction) shall be subject to the terms of this Agreement); (B) a Party may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Party; provided that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Claims is to a transferee that is or becomes a Party at the time of such transfer; and (C) to the extent that a Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Claims that the Qualified Marketmaker acquires from a lender who is not a Party without the requirement that the transferee be or become a Party or execute a Joinder Agreement.

For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the public or applicable private markets as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in Claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims against the Company, and (y) is in fact regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

**Section 9.    Mutual Representations, Warranties, and Covenants.**    Each of the Parties individually represents, warrants, and covenants to each other Party, as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer), as follows (each of which is a continuing representation, warranty, and covenant):

9.01.    Existence; Enforceability.    It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is the legally valid and binding obligation of such Party (as to the Debtors, subject to the approval of the Bankruptcy Court), enforceable against it in accordance with its terms.

9.02.    No Violation.    The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (a) any provision of law, rule or regulation applicable to it or any of its subsidiaries, as applicable, or (b) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, as applicable, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it or any of its subsidiaries, as applicable, is a party.

9.03.    No Consent or Approval.    Except as expressly provided in this Agreement, and except for approval by the Bankruptcy Court with respect to the Debtors, no consent or approval is required by any other person or entity in order for it to carry out the transactions contemplated by, and perform the respective obligations under, this Agreement.

9.04.    Power and Authority.    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been

-17-

duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part (as to the Debtors, subject to the approval of the Bankruptcy Court).

      9.05.   <u>Supporting Creditor Parties' Representations</u>.  Each Supporting Creditor Party individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant):

      (a)   it (i) is either (A) the sole beneficial owner of or has binding commitments to purchase the aggregate principal amount of Claims set forth below its signature hereto, or (B) subject to <u>Section 15.17</u> below, has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement (subject, in the case of participations, to contrary directions to vote that may be received by the nominal owner(s) from other participation counterparties); (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and to dispose of, exchange, assign, and transfer such Claims; and (iii) holds no other Claims;

      (b)   other than pursuant to this Agreement, and subject to <u>Section 15.17</u> below, its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Supporting Creditor Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

      (c)   it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended); and

      (d)   it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of the Claims that are inconsistent or conflict with representations and warranties of such Supporting Creditor Party herein or that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder, either generally or with respect to any specific Claims.

      **Section 10.**   **No Waiver of Participation and Reservation of Rights and Ratification of Liability.**  This Agreement and the Restructuring Term Sheet evidence a proposed settlement of disputes, including, among other disputes, the CNTA Dispute, among the Parties.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of each of the Parties to protect and preserve its rights, remedies and interests.  Without limiting the foregoing sentence in any

-18-

way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated, or if this Agreement is terminated for any reason, each of the Parties fully reserves any and all of its rights, remedies, and interests.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement, the Restructuring Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any action, case, or proceeding other than an action, case or proceeding to enforce the terms of the foregoing agreements.

    **Section 11.    Effectiveness.**    This Agreement shall become effective and enforceable (a) with respect to the Creditor Co-Proponents, upon the date of execution by each of the Creditor Co-Proponents; (b) with respect to the Debtors, on the date the Bankruptcy Court authorizes the Debtors to enter into this Agreement and (c) with respect to any other Party (the date of execution or joinder by such Party to this Agreement) (such date, the "PSA Effective Date").    Upon the PSA Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 12 hereof.

    **Section 12.    Termination Events.**

        12.01.    Debtors' Termination Events.    This Agreement may be terminated by the Debtors, in their sole discretion, following the occurrence of any of the following events (each, a "Debtor Termination Event"):

            (a)    if holders of two-thirds (2/3) in amount of each of (i) the Second Lien Notes Claims and (ii) the Unsecured Senior Notes Claims have not joined this Agreement prior to the date on which the PPA and BCA Approval Order is entered (the "PSA Termination Condition"); provided, however, the Debtors may waive the PSA Termination Condition in their sole discretion, but may only exercise the PSA Termination Condition (or waive such condition) prior to entry of the PPA and BCA Approval Order, provided, further, however that the timely and valid exercise of the PSA Termination Condition shall relieve the Debtors from any obligation to pay the Breakup Payments or Expense Reimbursement or any other obligations under the Backstop Commitment Agreement or the Private Placement Agreement;

            (b)    the determination by any of the Company's boards of directors or members, as applicable, in good faith, based on the advice of its outside counsel, that (i) proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties, or (ii) having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Plan and that continued support of the Plan pursuant to this Agreement would be inconsistent with its fiduciary obligations;

            (c)    the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d) following the delivery of written notice thereof by the Debtors, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that adversely and materially affects the Debtors' rights under this Agreement and is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(e) the entry by the Bankruptcy Court of an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f) either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors; or

(g) the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.02. Creditor Co-Proponents' Termination Events.   This Agreement may be terminated by the Requisite First Lien Lender Co-Proponents or the Requisite Members of the Noteholder Steering Committee upon two (2) business days prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "Termination Event"):

(a) any Debtor accepts an Alternative Transaction, including, but not limited to filing with the Bankruptcy Court, or publically announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Plan;

(b) the Debtors deliver a Debtor Fiduciary Notice (as defined below) to the Creditor Co-Proponents;

(c) the appointment in the Chapter 11 Cases of a trustee or receiver, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases by order of the Bankruptcy Court, provided, however, that the occurrence of any of the foregoing as to the Gold Field Debtors shall not cause a Termination Event;

(d) the failure of the Debtors to have filed (i) the Plan, (ii) the Disclosure Statement, (iii) a motion seeking approval of the Disclosure Statement and procedures for the solicitation of the Plan, and (iv) a motion seeking approval of the Backstop

Commitment Agreement and the Private Placement Agreement by no later than December 22, 2016;

(e)     the failure of the Debtors to have filed a motion to approve a commitment letter or an engagement letter with the Lead Arrangers pursuant to which the Lead Arrangers shall have provided commitments for the full amount of the Exit Facility or agreed to use commercially reasonable efforts to arrange for commitments for the full amount of the Exit Facility by January 11, 2017;

(f)     the failure of an order to have been entered by the Bankruptcy Court approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by January 31, 2017;

(g)     failure of the Confirmation Hearing to have commenced by no later than five (5) days after the date scheduled by the Bankruptcy Court in the Disclosure Statement Order for the Confirmation Hearing to occur;

(h)     the failure of the Plan Effective Date to have occurred by April 15, 2017;

(i)     following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(j)     the entry by the Bankruptcy Court of an order (i) terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (ii) invalidating, disallowing, subordinating, or limiting the enforceability, priority or validity of the Claims of any of the Creditor Co-Proponents;

(k)     any Debtor (i) amending, modifying, or filing a pleading with the Bankruptcy Court seeking authority to, or with the effect of, amending or modifying the Plan Documents, in a manner that is inconsistent with this Agreement and the exhibits hereto, or which is otherwise in a form or substance not reasonably satisfactory to the Requisite Creditor Parties, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(l)     any Debtor files with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, except as provided in the Interim Operating Covenant without the prior written consent of the Requisite Creditor Parties;

(m)     either the order approving the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Debtors and the Requisite Creditor Parties; or

(n)     the issuance by any governmental authority, including but not limited to the Bankruptcy Court, any regulatory authority (local, state, federal or otherwise), or

any other court of competent jurisdiction (state or federal), of any ruling, order or any other document or official record (i) denying approval of any material term or condition of the Plan, the Plan Documents, or the Restructuring, (ii) enjoining the substantial consummation of the Restructuring, (iii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or (iv) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days following the issuance of any such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish compliance with the terms of the Plan Documents and this Agreement.

12.03.   Noteholder Co-Proponents' Termination Events.   This Agreement may be terminated by the Noteholder Steering Committee upon the occurrence of any of the following events (each, a "Termination Event"):

(a)   the failure of an order to have been entered by the Bankruptcy Court approving the Private Placement Agreement and the Backstop Commitment Agreement (including approval of the fees set forth therein in connection with the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) by January 31, 2017;

(b)   any of the orders approving the Backstop Commitment Agreement or the Private Placement Agreement is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Requisite Consenting Noteholders; or

(c)   the termination of the Backstop Commitment Agreement or the Private Placement Agreement pursuant to their respective terms.

12.04.   Second Lien Noteholders' Termination Event.   In the event the acknowledgment set forth in Section 3.03 of this Agreement by Citibank, N.A. in its capacity as the First Lien Agent ceases to be in effect, any holder of Second Lien Notes may withdraw from and no longer remain bound by this Agreement within five (5) business days after receiving written notice of such event, it being understood that the Agreement shall remain binding among the remaining Parties; provided, however, the Ad Hoc Secured Committee Members may not utilize this termination event if the Plan provides for unconditional payment in full in cash or unimpairment of claims arising under the First Lien Credit Agreement.

12.05.   Citibank Termination Event.   The First Lien Agent may withdraw from and no longer remain bound by this Agreement, it being understood that the Agreement shall remain binding among the remaining Parties, in the event that the First Lien Agent determines, in its sole discretion, that it is subject to the direction from the "Required Lenders," as such term is defined in the First Lien Credit Agreement, requiring it to act in a manner inconsistent with its obligations under this Agreement.

12.06.   Mutual Termination.   This Agreement may be terminated by the mutual consent of the Debtors, the Requisite First Lien Lender Co-Proponents and the Noteholder Steering Committee.

      12.07.   <u>Automatic Termination Event</u>.   In the event the Backstop Commitment Agreement or the Private Placement Agreement is terminated pursuant to its terms, this Agreement shall be automatically terminated notwithstanding <u>Section 12.08</u> hereof.

      12.08.   <u>Outside Date Termination</u>.   Any individual Creditor Co-Proponent shall have the right to terminate this Agreement, as to itself only, if the effective date of the Plan shall not have occurred by June 14, 2017.   In the event a Creditor Co-Proponent terminates pursuant to this <u>Section 12.08</u>, such termination shall be effective as to such Creditor Co-Proponent only and shall not affect any rights or obligations of any other party to this Agreement.

      12.09.   No Party may validly terminate this Agreement based upon its failure to perform or comply in any material respect with the terms and conditions of this Agreement or any of the Plan Documents, to the extent such Plan Document is effective, with such failure to perform or comply causing, or resulting in, the occurrence of one or more Termination Events specified herein.   Nothing in this <u>Section 12</u> shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

      12.10.   <u>Effect of Termination Date</u>.

      (a)   Within three (3) days following the delivery of a termination notice pursuant to Sections 12.02 or 12.03 hereof, each of the Debtors and the Requisite Creditor Parties may waive, in writing, the occurrence of the Termination Event identified in the termination notice.   Absent such waiver, this Agreement shall be terminated on the fourth (4th ) day following delivery of the termination notice pursuant to Sections 12.02 or 12.03 hereof (such date, the "<u>Termination Date</u>").   On the Termination Date, the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided in this Agreement.

      (b)   For the avoidance of doubt, each of the Parties hereby waives any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agrees not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the provision of any such notice); <u>provided</u>, <u>however</u>, that nothing in this paragraph shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.

      12.11.   <u>Termination Upon Effective Date</u>.   This Agreement shall terminate automatically without further required action or notice upon the Effective Date.

    **Section 13.   Cooperation and Support.**   The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.   Furthermore, subject to the terms of this Agreement, each of the Parties shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Chapter 11 Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Plan, the

Plan and/or the Restructuring, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

   **Section 14.    Amendments.**    Any amendment to this Agreement and any exhibits attached hereto, may only be modified, amended or supplemented pursuant to the following conditions:

      14.01.    <u>Debtors</u>.    Except with respect to Section 4.03 hereof, the Debtors' written approval (including via email) is required for the effectiveness of any modification, amendment or supplement to this Agreement and any exhibit attached hereto, which approval shall not be unreasonably withheld, conditioned or delayed with respect to any of the foregoing that do not adversely affect the rights of the Debtors under this Agreement.

      14.02.    <u>First Lien Lender Co-Proponents</u>.    The Requisite First Lien Lender Co-Proponents' written approval (including via email) is required for any modification, amendment or supplement to the following documents (but excluding documents related to the Bonding Solution):    (i) the indenture for the New Second Lien Notes (if applicable), (ii) the Plan, (iii) the Disclosure Statement, (iv) the Disclosure Statement Order, (v) the Confirmation Order, (vi) the Restructuring Term Sheet (except with respect to written approval rights for <u>Exhibits 3, 5 and 8</u> to the Restructuring Term Sheet) and (vii) this Agreement (except with respect to Section 4.03), in each case subject to <u>Section 3.02</u> hereof, <u>provided</u>, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents.

      14.03.    <u>Noteholder Steering Committee</u>.    The Noteholder Steering Committee's express written approval (including via email) is required for any modification, amendment or supplement to this Agreement, any exhibits attached hereto, and/or the Plan Documents in accordance with the terms of the Restructuring Term Sheet.    The Restructuring Term Sheet and any Plan Documents may not be altered, amended or modified without the requisite approval required under the terms of <u>Exhibit 8</u> to the Restructuring Term Sheet.    The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on <u>Exhibit 2</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee.

   **Section 15.    Miscellaneous.**

      15.01.    <u>Company Fiduciary Duties</u>.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of its or their respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations

under applicable law, subject to the Non-Solicitation Provision set forth in <u>Section 6.02</u>, <u>provided</u>, <u>however</u>, for the avoidance of doubt, (a) if the Debtors or the Company exercise the PSA Termination Condition, as set forth in <u>Section 12.01(a)</u> hereto, the Debtors shall be relieved of any obligation to pay the Breakup Payment and Expense Reimbursement and (b) if the Debtors or the Company exercise their right under this <u>Section 15.01</u> after entry by the Bankruptcy Court of the PPA and BCA Approval Order, (x) the Breakup Payments and Expense Reimbursement shall be payable in accordance with the terms set forth in the Restructuring Term Sheet and (y) the Debtors shall provide notice of such decision to exercise their rights under this <u>Section 15.01</u> to the Creditor Co-Proponents within one (1) business day (such notice, a "<u>Debtor Fiduciary Duty Notice</u>").

15.02.    <u>Complete Agreement</u>.    This Agreement, the Backstop Commitment Agreement, the Private Placement Agreement, together with all exhibits and schedules attached hereto and thereto, and any and all amendments or restatements of any of the foregoing, is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.    No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

15.03.    <u>Parties</u>.    This Agreement shall be binding upon, and inure to the benefit of, the Parties.    No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in <u>Section 8</u> hereof.    Subject to <u>Section 13</u> hereof, nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.    Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party executes and becomes bound by this Agreement solely as to a specific business unit, division or desk, no affiliate of such Party or other business unit, division or desk within any such Party (and no Claims held by such other business unit, division or desk) shall be subject to this Agreement unless they separately execute a Joinder Agreement.

15.04.    <u>Headings</u>.    The headings of all sections of this Agreement are solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

15.05.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient

forum or does not have jurisdiction over any party hereto.   Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

15.06.    Specific Performance.    It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and a non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, without necessity of proving the inadequacy of money damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

15.07.    Execution of Agreement.    This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.   Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.    Interpretation.    This Agreement is the product of negotiations between the Debtors and the Initial Supporting Parties, and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner to effect the intent of the Parties hereto, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

15.09.    Successors and Assigns; Severability.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in a bankruptcy case; provided that nothing contained in this Section 15.09 shall be deemed to permit sales, assignments, or other Transfers or other claims against or interests in the Company other than in accordance with this Agreement.   The agreements, representations and obligations of the Supporting Creditor Parties under this Agreement are, in all respects, several and not joint.   If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.   Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

15.10.    Representation by Counsel.    Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a

-26-

defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

15.11.   Survival.   Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this Section 15 and in Sections 10 and 16 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.12.   Independent Due Diligence and Decision-Making.   Each Supporting Creditor Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

15.13.   Relationship Among Parties.   It is understood and agreed that no Supporting Creditor Party has any duty of trust or confidence in any form with any other Supporting Creditor Party, and, except as provided in this Agreement, there are no agreements, commitments or undertakings among or between them.   The Parties further acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any debt or equity securities of the Debtors and the Creditor Co-Proponents do not constitute a "group" within the meaning of Rule 13d-5 under the Securities and Exchange Act of 1934, as amended.   In this regard, it is understood and agreed that any Creditor Co-Proponent may trade in the Claims or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Creditor Co-Proponent, subject to applicable securities laws and the terms of this Agreement; provided, further, that no Creditor Co-Proponent shall have any responsibility for any such trading by any other entity by virtue of this Agreement.   No prior history, pattern or practice of sharing confidences among or between the Supporting Creditor Parties shall in any way affect or negate this understanding and agreement.   Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Creditor Parties under this Agreement shall be several, not joint.

15.14.   Notices.   All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(a)   if to the Debtors, to:

Peabody Energy Corporation
701 Market Street
St. Louis, MO 63101
Fax No. (314) 342-7597
Attention: A. Verona Dorch, Chief Legal Officer
Email: vdorch@peabodyenergy.com

with copies to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Fax No. (216) 579-0212
Attention: Heather Lennox, Esq.
Email: hlennox@jonesday.com

and

Jones Day
77 West Wacker
Chicago, IL 60601
Fax No. (312) 782-8585
Attention: Edward B. Winslow, Esq.
Email: ebwinslow@jonesday.com

and

Armstrong Teasdale LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
Fax No. (314) 621-5065
Attention: Steven N. Cousins, Esq. and Susan K. Ehlers, Esq.
Email: scousins@armstrongteasdale.com; sehlers@armstrongteasdale.com

(b)    if to a Supporting Creditor Party or a transferee thereof, to the addresses, electronic mail addresses or facsimile numbers set forth below following the Supporting Creditor Party's signature (or as directed by any transferee thereof), as the case may be, with copies to any counsel designated by such Supporting Creditor Party, including as follows:

in respect of the First Lien Agent and the First Lien Lender Co-Proponents:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Fax No. (212) 710-5800
Attention: Damian S. Schaible, Esq., Darren Klein, Esq. and Angela M. Libby, Esq.
Email: damian.schaible@davispolk.com; darren.klein@davispolk.com; angela.libby@davispolk.com

-28-

and

Bryan Cave LLP
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
Fax No. (314) 259-2020
Attention: Lloyd A. Palans, Esq., Laura Uberti Hughes, Esq. and Brian C.
              Walsh, Esq.
Email: lapalans@bryancave.com; brian.walsh@bryancave.com;
          laura.hughes@bryancave.com

in respect of PointState, Contrarian and Panning of the Ad Hoc Secured
Committee Members:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Fax No. (212) 735-2000
Attention: Shana A. Elberg, Esq. and Sarah M. Ward, Esq.
Email: Shana.elberg@skadden.com; Sarah.ward@skadden.com

and

Stinson Leonard Street LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Fax No. (314) 863-9388
Attention: John G. Young, Jr., Esq.
Email: john.young@stinson.com

in respect of the South Dakota Investment Council:

Woods, Fuller, Schultz & Smith P.C.
300 South Phillips Ave, Suite 300
Sioux Falls, SD 57104
Attention: Jordan J. Feist, Esq.
Email: jordan.feist@woodsfuller.com; jeff.hallem@state.sd.us

in respect of Aurelius and Elliott:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

NAI-1502345833v1

New York, NY 10036
Fax No. (212) 715-8000
Attention: Kenneth H. Eckstein, Esq., Stephen D. Zide, Esq. and Andy
Dove, Esq.
Email: KEckstein@kramerlevin.com; SZide@kramerlevin.com;
     ADove@kramerlevin.com

and

Doster, Ullom & Boyle, LLC
16090 Swingley Ridge Road
Suite 620
St. Louis, MO 63017
Fax No. (636) 532-1082
Attention: Gregory D. Willard, Esq., John G. Boyle, Esq.
Email: gwillard@dubllc.com; jboyle@dubllc.com

in respect of Discovery Capital:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Fax No. (212) 446-4900
Attention: Stephen E. Hessler, Esq.
Email: shessler@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Fax No. (415) 439-1500
Attention: Brian Ford, Esq. and Melissa N. Koss, Esq.
Email: Bford@kirkland.com; Melissa.koss@kirkland.com

Any notice given by delivery, mail or courier shall be effective when received.   Any notice given by facsimile shall be effective upon oral or machine confirmation of successful transmission.   Any notice given by electronic mail shall be effective upon delivery.

15.15.   Third Party Beneficiaries.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

15.16.   No Solicitation.   This Agreement is not and shall not be deemed to be a solicitation for votes to accept or reject the Plan or any plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code.   The votes of the holders of Claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have

-30-

received the Disclosure Statement and related ballot, the Plan, and other required solicitation materials.   In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

15.17.   Supporting Creditor Parties' Obligations.    Anything set forth in this Agreement to the contrary, notwithstanding, including without limitation the representations and warranties set forth in Section 9.05, the Parties hereto acknowledge and agree that the Supporting Creditor Parties that are holders of First Lien Lender Claims may be the beneficial owner of all or a portion of the principal amount of such First Lien Lender Claims pursuant to a participation agreement.   Accordingly, such Supporting Creditor Parties' investment and voting discretion for all purposes hereunder may be limited or restricted by the express terms of such Supporting Creditor Parties' respective participation agreement which may grant the nominal or record holder of such First Lien Lender Claims (held by participation) the right to vote or direct actions in respect of such Supporting Creditor Parties' First Lien Lender Claims in accordance with the written direction of other creditors (including such nominal or record holder) owing or holding interests representing more than 50% of such nominal or record holders' First Lien Lender Claims, and such Supporting Creditor Parties' liabilities and obligations hereunder shall be limited accordingly.   Notwithstanding the foregoing and for the avoidance of doubt, any Supporting Creditor Party that holds First Lien Lender Claims pursuant to a participation agreement shall direct any nominal or record holder of such First Lien Lender Claims to vote all of its Claims in favor of the Plan in accordance with Sections 3.01(a), 4.01(a) and 5.01(a).

**Section 16.    Public Disclosure.**   The Supporting Creditors Parties hereby consent to the disclosure of the execution and contents of this Agreement by the Debtors in the Plan, Disclosure Statement, the other Plan Documents, and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission (the "SEC") or as required by law or regulation; provided, however, that, except as required by law or any rule or regulation of any securities exchange or any governmental agency, the Debtors shall not, without the applicable Supporting Creditor Party's prior consent (which shall not be unreasonably withheld, delayed or conditioned), (i) except insofar such name appears in the body of this Agreement and in the Restructuring Term Sheet, use the name of any Supporting Creditor Party or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the SEC or the Bankruptcy Court or (ii) disclose the holdings of the Debtors' principal funded debt of any Supporting Creditor Party to any person; provided, however, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, debt under the First Lien Credit Agreement, Second Lien Notes or Unsecured Senior Notes beneficially owned by the Supporting Creditor Parties collectively (or by funds or accounts advised or managed by Supporting Creditor Parties).

[Signature pages follow.]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

PEABODY ENERGY CORPORATION ON
ITS OWN BEHALF AND ON BEHALF OF
ITS AFFILIATE DEBTORS

By: _A. Verona Dorch_

Name: A. Verona Dorch
Title:   Executive VP and Chief Legal Officer

Citibank, N.A., solely in its capacity as administrative
agent under the First Lien Credit Agreement


By: _____

Name: JOHN TUCKER

Title: VICE PRESIDENT


Address:    388 Greenwich St
            New York, NY    10013


Attn:    Dale Goncher & Anna Lekander
Tel:     212-816-7446
Fax:     877-501-5821


Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:


First Lien Lender Claims:

$  N/A _____


Second Lien Notes Claims:

$_____


Unsecured Senior Notes Claims:

$_____

[First Lien Lender Signature Pages Omitted]

[Signature Page to Plan Support Agreement]

BlockHouse Master Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019
Attn:      Alfred J. Barbagallo
Tel:       (212) 830-7080
Fax:       (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

Conflux Fund LP

By: _____

Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019
Attn:      Alfred J. Barbagallo
Tel:       (212) 830-7080
Fax:       (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 689 of 876 PageID #: 1636

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 201 of 330

SteelMill Master Fund LP

By: _____

Name: Alfred J. Barbagallo

Title: Managing Director & General Counsel

Address:   40 West 57th Street, 25th Floor
           New York, NY 10019

Attn:      Alfred J. Barbagallo

Tel:       (212) 830-7080

Fax:       (212) 621-5780

Aggregate principal amount of Claims beneficially owned, or advising funds or managed accounts that beneficially own such Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

PointState Fund LP

By: _____
Name: Alfred J. Barbagallo
Title: Managing Director & General Counsel

Address:    40 West 57th Street, 25th Floor
            New York, NY 10019
Attn:       Alfred J. Barbagallo
Tel:        (212) 830-7080
Fax:        (212) 621-5780

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

███████████

Secured Second Lien Notes Claims:

███████████

Unsecured Senior Notes Claims:

███████████

[Signature Page to Plan Support Agreement]

**Contrarian Capital Fund I, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:   Josh Weisser
Tel:   (203) 862-8278
Fax:   (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Fund I, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-A, L.L.C.**
By: Contrarian Capital Management, L.L.C., as
Managing Member

By:_____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. CCM Pension-A, L.L.C. will instruct its
grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in
accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**CCM Pension-B, L.L.C.**
By: Contrarian Capital Management, L.L.C., as
Managing Member

By:_____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. CCM Pension-B, L.L.C. will instruct its
grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in
accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Dome du Gouter Master Fund, LP**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
                  Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Dome du Gouter Master Fund, LP will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Opportunity Fund, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____

Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Opportunity Fund, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Senior Secured, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Senior Secured, L.P.
will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement
and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the
bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Capital Trade Claims, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____

Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Capital Trade Claims, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian Advantage-B, LP**
By: Contrarian Capital Management, L.L.C., as
General Partner

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations.  Contrarian Advantage-B, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 699 of 876 PageID #: 1646

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 211 of 330

**Contrarian Emerging Markets, L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By:_____
Name: Jon Bauer
Title: Managing Member

Address:   411 West Putnam Avenue
           Greenwich, CT 06830
Attn:      Josh Weisser
Tel:       (203) 862-8278
Fax:       (203) 629-1977

Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian Emerging Markets, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Contrarian EM SIF Master L.P.**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____
Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending trade settlement in accordance with standard LSTA confirmations. Contrarian EM SIF Master, L.P. will instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank debt.

[Signature Page to Plan Support Agreement]

**Boston Patriot Summer St LLC**
By: Contrarian Capital Management, L.L.C., as
Investment Manager

By: _____

Name: Jon Bauer
Title: Managing Member

Address:    411 West Putnam Avenue
            Greenwich, CT 06830
Attn:       Josh Weisser
Tel:        (203) 862-8278
Fax:        (203) 629-1977



Represents both bank debt held by participation on standard LSTA documentation and bank debt pending
trade settlement in accordance with standard LSTA confirmations. Boston Patriot Summer St LLC will
instruct its grantors or upstream trade parties, as the case may be, to vote as required by this Agreement and
in accordance with, and subject to, its rights, if any, under its definitive documentation regarding the bank
debt.

[Signature Page to Plan Support Agreement]

Panning Master Fund, LP

By: Panning Capital Management, LP
Its: Investment Manager

By:
Name: William Kelly
Title: Authorized Signatory

Address:  510 Madison Avenue, 23rd Floor
          New York, NY 10022
Attn:     Rayan Joshi
Tel:      212-916-1860
Fax:      212-916-1861

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$

Secured Second Lien Notes Claims:

$

Unsecured Senior Notes Claims:

$

SOUTH DAKOTA INVESTMENT COUNCIL

By: _____

Name: Matthew L. Clark
Title: State Investment Officer

Address:  South Dakota Investment Council
          4009 West 49th Street, Suite 300
          Sioux Falls, SD 57106-3784
Attn:     A. Laurie Riss
Tel:      605-362-2820
Fax:      605-362-2833

Aggregate principal amount of Claims
beneficially owned, or advising funds or
managed accounts that beneficially own such
Claims:

Secured First Lien Lender Claims:

$ _____

Secured Second Lien Notes Claims:

Unsecured Senior Notes Claims:

$ _____

[Signature Page to Plan Support Agreement]

Date executed: December 22, 2016

ELLIOTT ASSOCIATES, L.P.
By: Elliott Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc, as general partner

By: _____

Name: Elliot Greenberg
Title: Vice President

Address: c/o Elliott Management Corporation
          40 West 57th Street
          New York, NY 10019

Attn.: _____
Tel.: _____
Fax: _____
Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

███████████████

Unsecured Senior Notes Claims:

███████████████

Convertible Notes Claims:

██████████

Date executed: December 22, 2016

THE LIVERPOOL LIMITED PARTNERSHIP

By: _____

Name: Elliot Greenberg

Title: Vice President

Address: c/o Elliott Management Corporation

         40 West 57th Street

         New York, NY 10019

Attn.: _____

Tel.: _____

Fax: _____

Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Unsecured Senior Notes Claims:

█████████████

Date executed:  December 22, 2016

ELLIOTT INTERNATIONAL, L.P.
Elliott International Capital Advisors Inc.
        As attorney-in-fact

By: _____
Name: Elliot Greenberg
Title:    Vice President

Address: c/o Elliott Management Corporation
        40 West 57th Street
        New York, NY 10019
Attn.:    _____
Tel.:     _____
Fax:      _____
Email:    _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

Unsecured Senior Notes Claims:

Convertible Notes Claims:

[Signature Page to Plan Support Agreement]

Date executed: December 22, 2016

MANCHESTER SECURITIES CORP.

By: _____
Name: Elliot Greenberg
Title: Vive President

Address: c/o Elliott Management Corporation
                40 West 57th Street
                New York, NY 10019
Attn.:      _____
Tel.:       _____
Fax:        _____
Email:      _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

Date executed:  December 22, 2016

ZIFF INVESTMENTS LIMITED

By: _____
Name: Elliot Greenberg
Title:  Vice President

Address: c/o Elliott Management Corporation
          40 West 57th Street
          New York, NY 10019
Attn.: _____
Tel.: _____
Fax: _____
Email: _____

Aggregate principal amount of Claims beneficially
owned or managed on behalf of funds or accounts
that beneficially own such Claims:

Secured First Lien Lender Claims:

████████████

DISCOVERY CAPITAL MANAGEMENT, LLC

By: _____

Name: Adam Schreck
Title: General Counsel

Address:   20 Marshall Street, Suite 310
           South Norwalk, CT 06854
Attn:      Adam Schreck
Tel:       (203) 956-7953

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

█████████ _____

Secured Second Lien Notes Claims:

█████████ _____

Unsecured Senior Notes Claims:

█████████ _____

Date executed:  December 22, 2016

AURELIUS CAPITAL MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
     investment manager and not in its individual
     capacity

By: _____

Name: Dan Gropper
Title:  Managing Director

Address:    c/o Aurelius Capital Management, LP
            535 Madison Avenue, 22nd Floor
            New York, NY 10022
Attn:       Dan Gropper
Tel:        (646) 445-6570
Fax:        (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

█████████████ _____

Unsecured Senior Notes Claims:

█████████████ _____

Date executed:  December 22, 2016

ACP MASTER, LTD.
By: Aurelius Capital Management, LP, solely as
    investment manager and not in its individual
    capacity

By: _____
Name: Dan Gropper
Title:  Managing Director

Address:  c/o Aurelius Capital Management, LP
          535 Madison Avenue, 22nd Floor
          New York, NY 10022
Attn:     Dan Gropper
Tel:      (646) 445-6570
Fax:      (212) 786-5870

Aggregate principal amount of Claims beneficially
owned, or advising funds or managed accounts that
beneficially own such Claims:

Secured First Lien Lender Claims:

████████████     _____

Unsecured Senior Notes Claims:

████████████     _____

[Signature Page to Plan Support Agreement]

# **EXHIBIT 1**

**RESTRUCTURING TERM SHEET**

NAI-1502345833v1

**Peabody Energy Corporation Plan Term Sheet**

December 22, 2016

This term sheet (the "Term Sheet") sets forth certain of the principal terms for the proposed restructuring (the "Restructuring") of the obligations of Peabody Energy Corporation ("PEC") and each of its direct and indirect debtor subsidiaries (each a "Debtor" and, collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") that have commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on April 13, 2016 (the "Petition Date").[1]  The Restructuring contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization for the Debtors (the "Plan") and will provide adequate working capital to the Debtors and their respective non-Debtor subsidiaries, all as described below.  Consistent with the Debtors' exclusive right to file the Plan pursuant to section 1121 of the Bankruptcy Code, the Debtors shall be the proponents of the Plan, and certain supporting creditors listed below (collectively, the "Creditor Co-Proponents") shall be co-proponents of the Plan.

This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the Plan and the transactions to be contemplated therein, which will remain subject to discussion and negotiation in good faith among the following parties:  (i) the Debtors; (ii) Citibank, N.A. ("Citibank"), as the administrative agent (in such capacity, the "First Lien Agent") under that certain revolving credit facility and that certain term loan facility issued pursuant to that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as it has been or may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "First Lien Credit Agreement");[2] (iii) those certain First Lien Lenders (as defined below) who are signatories to the PSA (as defined below) (together with the First Lien Agent, the "First Lien Lender Co-Proponents"); (iv) PointState Capital LP ("PointState"), Contrarian Capital Management, L.L.C. ("Contrarian") and Panning Capital Management, LP ("Panning") and the South Dakota Investment Council ("SDIC") each as members of the Ad Hoc Committee (the "Ad Hoc Group of Second Lien Noteholders" or the "Second Lien Notes Parties") of holders of those certain 10.00% senior secured second lien notes (the "Second Lien Notes")[3] issued in March 2015 by PEC and due in March 2022; and (vi) an ad hoc group of

---

[1]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Bankruptcy Code.  "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

[2]    Any and all Claims arising under or in connection with the First Lien Credit Agreement or other Existing Credit Agreement Documents (as defined in the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) [Docket No. 544] (the "Final DIP Order"), including those arising under the Debtors' term loan, revolver, prepetition international swaps, cash management agreements and any letters of credit issued under the terms of the First Lien Credit Agreement are referred to herein collectively as the "First Lien Lender Claims."  Holders of such Claims are referred to herein as the "First Lien Lenders."

[3]    Any and all Claims arising under or in connection with the Second Lien Notes are referred to herein collectively as the "Second Lien Notes Claims."

holders of Unsecured Senior Notes (as defined below) composed of entities managed by Elliott Management Corporation ("Elliott"), Discovery Capital Management, LLC ("Discovery") and Aurelius Capital Management, LP ("Aurelius" and, together with Elliott and Discovery, the "Ad Hoc Unsecured Noteholders Group," and, together with the Debtors, the First Lien Lender Co-Proponents, the Second Lien Notes Parties, the "Parties," and each individually, a "Party"). The transactions contemplated by this Term Sheet are subject to (1) satisfaction of all of the conditions set forth herein and in any definitive documentation evidencing the transactions comprising the Restructuring, (2) the negotiation and execution of definitive documents evidencing and related to the Restructuring contemplated herein, which documents shall be in form and substance reasonably acceptable to the Creditor Co-Proponents (as and only to the extent set forth below) and (3) entry of an order of the Bankruptcy Court confirming the Plan (the "Confirmation Order") and the satisfaction of any conditions to the effectiveness thereof (the date of such effectiveness, the "Effective Date").

This Term Sheet has been prepared for settlement discussion purposes only and shall not constitute an admission of liability by any Party, nor be admissible in any action relating to any of the matters addressed herein. Nothing in this Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a Plan. Further, nothing herein shall be an admission of fact or liability or deemed binding on the Parties.

NAI-1502345820v2

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 715 of 876 PageID #: 1682

Case 16-42529   Doc 1854-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 227 of 330

## I. **Plan Process**

| | |
|---|---|
| Creditor Co-Proponents | Elliott, Discovery, Aurelius, Contrarian, PointState, Panning and SDIC (the "Noteholder Co-Proponents") and the First Lien Lender Co-Proponents (together with the Noteholder Co-Proponents, the "Creditor Co-Proponents").[4]   The Requisite Members of the Noteholder Steering Committee shall mean 75% of the Noteholder Steering Committee,[5] based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule; provided, that if one of the seven members of the Noteholder Steering Committee transfers or assigns any of its claims (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned claims shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong to the same ad hoc noteholder group as the transferring or assigning member. |
| Requisite Creditor Parties | The "Requisite First Lien Lender Co-Proponents" shall mean (i) the First Lien Agent, and (ii) First Lien Lender Co-Proponents holding at least two-thirds (2/3) of the combined First Lien Lender Claims held by the First Lien Lender Co-Proponents.  The Requisite First Lien Lender Co-Proponents shall have approval, waiver and other similar rights over this Term Sheet, the PSA, the Plan and certain exhibits to the Plan as set forth herein; provided, however, notwithstanding any other provision herein to the contrary, upon the Debtors (a) receiving fully underwritten commitments with respect to the Exit Facility in the principal amount of $1.5 billion and approval thereof by the Bankruptcy Court and (b) filing an amended Plan providing that the First Lien Full Cash Recovery shall occur, the Requisite First Lien Lender Co-Proponents shall only have consent rights with respect to (1) any change to the treatment of the First Lien Lender Claims, the First Lien Agent or the First Lien Lenders under the Plan, including, without limitation, any changes to the proposed releases and exculpations with respect to the First |

---

[4]   Certain Creditor Co-Proponents are acting and shall act in their capacities as investment advisors or managers for funds or managed accounts which hold First Lien Lender Claims, Second Lien Notes Claims and/or Unsecured Senior Notes Claims subject to this Term Sheet.  The Creditor Co-Proponents assume no fiduciary duties to each other or any other creditors in connection with the transactions contemplated herein or otherwise.

[5]   The "Noteholder Steering Committee" means a steering committee of the Noteholder Co-Proponents.

| | |
|---|---|
| | Lien Agent or the First Lien Lenders or their respective Representatives, (2) the PSA or (3) the Breakup Administrative Claim Treatment.<br><br>The "Requisite Consenting Noteholders" shall mean the applicable individual(s) or group(s) of holders of Second Lien Notes Claims and Claims in Class 5B identified in the Voting/Consent Structure Schedule attached hereto as [Exhibit 8].<br><br>Together, the Requisite First Lien Lender Co-Proponents and the Requisite Consenting Noteholders shall be the "Requisite Creditor Parties." |
| PSA | The Creditor Co-Proponents shall execute a Plan Support Agreement with the Debtors in form and substance acceptable to the Creditor Co-Proponents and the Debtors (the "PSA").<br><br>The PSA shall include a fiduciary termination event for the Debtors.   After entry by the Bankruptcy Court of the PPA and BCA Approval Order (as defined below), the Breakup Payments and Expense Reimbursement (both as defined below), shall be payable, following the exercise by the Debtors of the fiduciary out in accordance with the terms of PSA, the Private Placement Agreement and the Backstop Commitment Agreement (both as defined below) and shall, prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis, as set forth in Exhibit 5 hereto and consistent with the Breakup Administrative Claim Treatment (as defined in Exhibit 5).<br><br>From the Debtors' execution of the PSA until the PSA is terminated in accordance with its terms (the "Non-Solicitation Period"), the Debtors will not, and will not permit their affiliates or their respective officers, directors, agents or representatives to initiate contact with or solicit any inquiries, proposals or offers by any party with respect to an alternative restructuring; provided, however, the Debtors, their affiliates or their respective officers, directors, agents or representatives may review and consider any inquiries, proposals or offers initiated or continued by any party with respect to an alternative restructuring.  To the extent the Debtors receive any inquiry, proposal or offer with respect to an alternative restructuring during the Non-Solicitation Period, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) |

| | days of receiving such inquiry, proposal or offer. |
|---|---|
| | Prior to the date on which the PPA and BCA Approval Order is entered, the PSA may be terminated by the Debtors if holders of two-thirds (2/3) in amount of each of the Second Lien Notes Claims and the Unsecured Senior Notes Claims (as defined below) have not joined the PSA by such date (the "PSA Termination Condition"), which PSA Termination Condition may be waived in the Debtors' sole discretion.  No Break Up Fees, Expense Reimbursement or other amounts under the Private Placement Agreement of Backstop Commitment Agreement shall be due and payable if the PSA Termination Condition occurs. |
| Milestones | The Restructuring shall be implemented in accordance with the following milestones (the "Milestones"):<br><br>• By no later than December 22, 2016, the Debtors shall file (i) the Plan; (ii) a motion seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement; (iii) the disclosure statement  for the Plan (the "Disclosure Statement"); and (iv) a motion seeking approval of the Disclosure Statement.<br><br>• By no later than January 11, 2017, the Debtors shall file a motion to approve a commitment letter or an engagement letter with one or more reputable financial institutions acceptable to the Debtors (the "Lead Arrangers"), pursuant to which the Lead Arrangers shall have provided commitments for the Exit Facility (as defined below) in a principal amount of not less than $1.5 billion or agreed to use commercially reasonable efforts to arrange for commitments for the Exit Facility in a principal amount of not less than $1.5 billion.<br><br>• By no later than January 31, 2017, the PPA and BCA Approval Order (as defined in Exhibit 5) (approving the fees under the Private Placement Agreement and the Backstop Commitment Agreement as allowed administrative expense claims under section 503(b) of the Bankruptcy Code) shall have been entered by the Bankruptcy Court.<br><br>• By no later than January 31, 2017, an order approving the Disclosure Statement and the commencement of solicitation for the Plan shall have been entered by the Bankruptcy Court (the "Disclosure Statement Order").<br><br>• By no later than five (5) days after the date scheduled for |

|  | | the Confirmation Hearing by the Bankruptcy Court in the Disclosure Statement Order, the Confirmation Hearing shall have commenced.<br><br>• By no later than April 15, 2017, the Effective Date shall have occurred.<br><br>The amendment or waiver of any Milestone shall require the consent of the Requisite Creditor Parties. |

## II. Debtor Groups and Proposed Classification Scheme under the Plan

The Debtors will be divided into five "Debtor Groups" depending on their principal liabilities as follows:

| Letter | Debtor Group | Description |
|---|---|---|
| A | PEC | Debtor Peabody Energy Corporation |
| B | Encumbered Guarantor Debtors | Each Debtor as set forth on Exhibit 6 hereto that is a guarantor under the First Lien Credit Agreement and for the Second Lien Notes |
| C | Gold Fields Debtors | Each Debtor as set forth on Exhibit 6 hereto |
| D | Peabody Holdings (Gibraltar) Limited | Debtor Peabody Holdings (Gibraltar) Limited ("Gib1") |
| E | Unencumbered Debtors | Each Debtor as set forth on Exhibit 6 hereto which is not subject to the liens arising under the First Lien Credit Agreement or with respect to the Second Lien Notes, and is not a guarantor of (i) the 6.00% senior notes issued in November 2011 by PEC and due November 2018 (the "2018 Senior Notes"); (ii) the 6.50% senior notes issued in August 2010 by PEC and due in September 2020 (the "2020 Senior Notes"); (iii) the 6.25% senior notes issued in November 2011 by PEC and due in November 2021 (the "2021 Senior Notes"); and/or (iv) the 7.875% senior notes issued in October 2006 by PEC and due in November 2026 (the "2026 Senior Notes" and, together with the 2018 Senior Notes, the 2020 Senior Notes and the 2021 Senior Notes, the "Unsecured Senior Notes").[6] |

---

[6]   Any and all Claims arising under, evidenced by or in connection with the Unsecured Senior Notes are referred to herein collectively as the "Unsecured Senior Notes Claims."

Under the Plan, Claims under the Debtors' postpetition accounts receivable securitization facility (the "Securitization Facility Claims"),[7] Administrative Expense Claims and Priority Tax Claims (each as defined below) will not be classified.  The remaining Claims against each Debtor Group will be divided into the following eleven (11) classes:

| Class Number[8] | Designation |
|---|---|
| 1 | First Lien Lender Claims |
| 2 | Second Lien Notes Claims |
| 3 | Other Secured Claims |
| 4 | Other Priority Claims |
| 5 | General Unsecured Claims |
| 6 | Convenience Claims |
| 7 | MEPP Claim[9] |
| 8 | Unsecured Subordinated Debenture Claims |
| 9 | Intercompany Claims |
| 10 | Section 510(b) Claims against PEC |
| 11 | PEC Interests |
| 12 | Subsidiary Debtor Equity Interests |

A more detailed table reflecting the proposed Debtor Groups and the proposed classes of Claims against each Debtor Group is attached hereto as Exhibit 7.  The proposed treatment of unclassified and classified Claims is set forth below.

---

[7]    "Securitization Facility Claims" means any and all Claims constituting Facility Obligations, as such term is defined in the order of the Bankruptcy Court entered on May 18, 2016 [Docket No. 529] (the "ARS Order"), which order approved the Securitization Facility (as such term is defined in the ARS Order).

[8]    References to "Class" below, shall refer to the classification set forth in this chart.

[9]    "MEPP Claim" means any Claim arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including (a) proof of claim number 4722 and (b) any other Claim related to any withdrawal liability under U.S.C. § 1392(c).

### III.    Claims Treatment

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| **Unclassified Claims** | | |
| Contingent DIP Facility Surviving Claims[10] | $0.00 | All Contingent DIP Facility Surviving Claims (if any) shall be preserved.  If Allowed, any Contingent DIP Facility Surviving Claims shall be paid in full in cash as soon as reasonably practicable after they become Allowed; provided, however, that the foregoing treatment shall not in any way limit or impair any arguments or defenses the Debtors may have with respect to any Contingent DIP Facility Surviving Claims that may be asserted.  Notwithstanding the foregoing, the treatment of certain letters of credit issued under the terms of the DIP Credit Agreement and any related collateral shall be treated in accordance with the terms of that certain Payoff Letter with respect to the DIP Facility, dated December 15, 2016. |
| Securitization Facility Claims | **$[140 million]** to **$[160 million]** | The Securitization Facility (as defined in the ARS Order), which is scheduled to expire as of the Effective Date, shall, at the election of the Debtors, be extended, replaced with a new securitization facility or replaced with one or more ABL Facilities (as defined in Exhibit 1). |
| Administrative Expense Claims[11] | **$[15 million]** to **$[25 million]** | The Debtors (or, if applicable, the Reorganized Debtors[12]) shall pay to each holder of an Allowed Administrative Expense Claim, on account of and in |

---

[10]  "Contingent DIP Facility Surviving Claim" means any Claim of the DIP Facility Agent, DIP Facility Lenders or Citigroup Global Markets Inc. (in its capacity as sole lead arranger and book runner under the DIP Facility Credit Agreement) that are related to obligations of the Debtors that (a) arise under or are evidenced by (i) the DIP Facility Credit Agreement (ii) the Final DIP Order or (iii) any other agreements related thereto and (b) pursuant to the DIP Facility Repayment Order, survived termination of the DIP Facility Credit Agreement and continue in full force and effect.

[11]  "Administrative Expense Claim" means a Claim arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, excluding DIP Facility Claims and Securitization Facility Claims.

[12]  "Reorganized Debtor" means, on and after the Effective Date, subject to the Restructuring, each of the Debtors as to which the Plan is confirmed and "Reorganized PEC" means Peabody Energy Corporation, on and after the

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option in the ordinary course of business or (a) the latest to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter), (ii) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) on such other date as the Bankruptcy Court may order.[13] |
| Priority Tax Claims[14] | $[10 million] to $[30 million] | Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Priority Tax Claim becomes an |

Effective Date.

[13]    For purposes of this Term Sheet, "Allowed" when used with respect to any Claim means (a) any Claim that (i) is timely filed by the applicable bar date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or a final order; (b) any Claim (i) that is listed in the Debtors' schedules of assets and liabilities as not contingent, not unliquidated, and not disputed and (ii) for which no proof of Claim has been timely filed; or (c) any Claim allowed under the Plan or by a final order.  With respect to any Claim described in clauses (a) and (b) above, such Claim will be considered Allowed only if, and to the extent that, (i) no objection to the allowance of such Claim has been asserted on or before the bar date for filing objections to Claims under the Plan, (ii) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a final order, (iii) such Claim has not been disallowed by a final order, (iv) such Claim is allowed pursuant to a stipulation with the Debtors on or after the Effective Date or (v) such Claim is allowed pursuant to the Plan or any agreements related thereto and approved and authorized by the Bankruptcy Court.

[14]    "Priority Tax Claim" means any Claim of a governmental unit that is entitled to priority in payment pursuant to section 502(i) or section 507(a)(8) of the Bankruptcy Code.

NAI-1502345820v2

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Allowed Priority Tax Claim or (b) cash of a total value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim, payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date. |
| **Classified Claims** | | |
| First Lien Lender Claims | $[2.980 billion]^15 | Each holder of an Allowed First Lien Lender Claim in Classes 1A, 1B, 1C and 1D will receive its aggregate pro rata share of:  (i) cash equal to the full amount of the Allowed First Lien Lender Claims, including interest at the default rate (such treatment, a "First Lien Full Cash Recovery") or (ii) solely to the extent that the Debtors have not received commitments for the Exit Facility prior to the Effective Date in the aggregate principal amount of at least $1.5 billion, and subject to the conditions set forth on Exhibit 1 hereto, each holder's pro rata share of (a) the replacement secured first lien term loan on the terms and conditions set forth on Exhibit 1 hereto in an aggregate principal amount of up to $1.5 billion, such principal amount to be calculated as set forth on Exhibit 1 (the "Replacement Secured First Lien Term Loan"), plus (b) cash in an amount equal to the difference |

---

[15]    The total estimated amount of Allowed First Lien Lender Claims is currently $2.980 billion, comprised of approximately (a) $1,162,343,00 principal amount of term loans net of unamortized original issue discount, (b) $947,000,000 principal amount of revolver loans, (c) $612,753,000 of letters of credit reimbursement obligations (assuming $6,118,000 of future letter of credit draws and the rollover of the PBGC letter of credit undrawn into the ABL Facility (as defined in Exhibit 1) and (d) $257,300,000 in Swap Contract termination , plus accrued and unpaid interest at the default rate for Allowed First Lien Lender Claims except for claims under Swap Contracts (as defined in the First Lien Credit Agreement) at the contractual rate for claims under the Swap Contracts, plus accrued and unpaid adequate protection payments, plus professional fees and expenses payable under the First Lien Credit Agreement.  The foregoing estimate assumes: (i) an April 3, 2017 Effective Date and (ii) the PBGC letter of credit rolls onto an ABL Facility (as defined in Exhibit 1).  All parties have reserved their rights as to the applicable interest rate for Allowed First Lien Lender Claims other than claims under Swap Contracts.  To the extent the Effective Date occurs after April 3, 2017, any increase in the size of the First Lien Lender Claims shall be satisfied with cash. The amount of the First Lien Lender Claims will also fluctuate based on letter of credit draws or returns through the Effective Date.

-10-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | between (i) the Allowed First Lien Lender Claims, including interest at the default rate, and (ii) the aggregate principal amount of the Replacement Secured First Lien Term Loan. <br><br> The First Lien Lender Claims shall be impaired and holders of such Claims shall be entitled to vote on the Plan. |
| Second Lien Notes Claims | $1.158 billion[16] | On or as soon as practicable after the Effective Date,[17] each holder of an Allowed Second Lien Notes Claim in Classes 2A, 2B, 2C and 2D shall receive: <br><br> (i) at the option of the Debtors in their sole discretion, provided, in the case of (a) or (b), the First Lien Full Cash Recovery occurs, its aggregate pro rata share of $450 million (calculated as the amount of any such cash and the principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental New Second Lien Notes Claims) in any combination of (a) cash, (b) principal amount of first lien debt on terms consistent with the Exit Facility (the "Additional First Lien Debt") and/or (c) principal amount of new second lien notes on the terms and conditions set forth on Exhibit 2 hereto ("New Second Lien Notes"); provided that in no event shall the aggregate principal amount of New Second Lien Notes (plus, if applicable, the principal amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250 million; provided, further that in no event shall the combined consideration issued under this clause (i) (calculated as the amount of any such cash and the |

---

[16]    The Second Lien Notes Claims shall be allowed in the amount of $1.0 billion, plus accrued and unpaid pre-petition interest and post-petition interest at the non-default rate, accruing through and until the Effective Date. The total estimated amount of Second Lien Notes Claims is $1.158 billion, assuming an April 3, 2017 Effective Date.  The Second Lien Notes Claims shall continue to accrue interest at the non-default rate if the Effective Date extends beyond April 3, 2017.

[17]    As part of the global settlement set forth herein and to be embodied in the Plan, upon the Effective Date (subject to its occurrence), the value of any and all collateral securing the Second Lien Notes Claims (including, but not limited to, any and all collateral granted to holders of Second Lien Notes as adequate protection or otherwise pursuant to the Final DIP Order) shall be deemed to exceed the total estimated amount of Second Lien Notes Claims (including accrued and unpaid pre-petition and post-petition interest at the non-default rate), and the Second Lien Notes Claims shall be treated in accordance with the terms set forth in this Term Sheet.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | principal amount of any such Additional First Lien Debt and New Second Lien Notes, excluding any consideration on account of Incremental Second Lien Notes Claims) exceed $450 million in the aggregate;[18]<br><br>(ii) its pro rata share of the Pro Rata Split as of the Effective Date of Reorganized PEC Common Stock (as defined below) (which shall be subject to the dilution[19] from the LTIP Shares, the Preferred Equity, and the Penny Warrants (each as defined below), and shall be issued after giving effect to the issuance of the Rights Offering Shares (as defined below),  the issuance of any shares of Reorganized PEC Common Stock issued on account of Incremental Second Lien Notes Claims (the "Incremental Second Lien Shares"), the issuance of any shares of Reorganized PEC Common Stock issued on account of the Commitment Premiums (as defined below), the issuance of any Ticking Premiums (as defined below) (collectively, the "Premium Shares") and the issuance of any Disputed Claims Reserve Shares (as defined below)), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity (as defined below) and the exercise of the Penny Warrants (as defined below);[20] and |

---

[18]    If the total amount of Second Lien Notes Claims increases because the Effective Date extends beyond April 3, 2017 (the total amount of Second Lien Notes Claims in excess of $1.158 billion, the "Incremental Second Lien Notes Claims"), then additional consideration shall be provided to the holders of Second Lien Notes Claims (A) by increasing the consideration pursuant to clause (i) of this paragraph on a pro rata basis in an amount equal to 50% of the amount of the Incremental Second Lien Notes Claims (and any Additional First Lien Debt so distributed pursuant to this footnote shall be referred to herein as the "Incremental Additional First Lien Debt", and any additional New Second Lien Notes so distributed pursuant to this footnote shall be referred to herein as the "Incremental New Second Lien Notes"), subject to a $20 million cap for such increase above $450 million pursuant to this clause (A), and (B) in the form of additional Reorganized PEC Common Stock with a total value at Plan Equity Value equal to the remaining amount of Incremental Second Lien Notes Claims not settled pursuant to clause (A) above; provided, however, that if no Additional First Lien Debt or New Second Lien Notes are being issued pursuant to clause (i)(b) or (i)(c) (prior to giving effect to the additional consideration described in this footnote), then the additional consideration pursuant to clause (A) above shall be paid in cash; and provided further that such incremental amounts may only be paid in cash or Incremental Additional First Lien Debt if the First Lien Full Cash Recovery occurs.

[19]    For the avoidance of doubt, see Exhibit 9 hereto for an illustrative allocation of Reorganized PEC Common Stock (Fully-Diluted).

[20]    "Pro Rata Split" shall mean the following percentages:  (x) in respect of Claims in Class 2, the quotient of

NAI-1502345820v2

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iii) its pro rata share of the Pro Rata Split as of the Record Date (as defined below) of the Section 1145 Equity Rights (as defined below). For the avoidance of doubt, any of the consideration received by holders of Second Lien Notes Claims shall be independently transferable, shall not be required to be transferred as part of a "strip" and shall not be subject to any minimum holding period or similar lock-up provisions; provided, that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Other Secured Claims[21] | $[0-25 million] | On or as soon as practicable after the Effective Date, Other Secured Claims, if any, shall receive the following treatment at the option of the Debtors or the Reorganized Debtors (as applicable): (i) Reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code;[22] (ii) payment in full (in cash) of any such Allowed Other Secured Claim; (iii) satisfaction of any such Allowed Other Secured Claim by delivering the collateral securing any such Allowed Other Secured Claims and paying any interest required to be paid under section 506(b) of |

---

(A) $708 million divided by (B) the Allowed Claims in Classes 5B plus $708 million; and (y) in respect of Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million. The Pro Rata Split for Reorganized PEC Common Stock shall be determined based on Allowed Claims as of the Effective Date, with a reserve of Reorganized PEC Common Stock created for disputed Claims as of the Effective Date. The Pro Rata Split for all other purposes shall be determined based on Allowed Claims as of the Record Date as determined in accordance with the Rights Offering Procedures. As set forth below, in lieu of Section 1145 Equity Rights, holders of disputed Claims as of the Record Date whose Claims later become Allowed shall receive Reorganized PEC Common Stock at Plan Equity Value with a value equal to their pro rata share of the Equity Rights Value (as defined below).

21 "Secured Claim" shall mean a Claim that is secured by a lien on property in which a Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code. "Other Secured Claim" shall mean any Secured Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, First Lien Lender Claim or Second Lien Notes Claim.

22 "Reinstatement" shall mean rendering a Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code.

NAI-1502345820v2

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | the Bankruptcy Code; or (iv) providing such holders with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. |
| Other Priority Claims[23] | $[0-25 million] | On or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim will receive cash equal to the amount of such Allowed Claim, unless the holder of such Other Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different treatment. |
| General Unsecured Claims[24] | (i) PEC $[3.944 billion] to $[4.219 billion] (ii) Encumbered Guarantor Debtors $[3.960 billion] to $[4.160 billion] (iii) Gold Fields Debtors $[3.929 billion] to $[5.289 billion] (iv) Gib1 | On or as soon as practicable after the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor: (i) each holder of an Allowed General Unsecured Claim against PEC will receive its pro rata share of $[3 million] plus any Additional PEC Cash;[25] (ii) each holder of an Allowed General Unsecured Claim against one of the Encumbered Guarantor Debtors will receive the holder's pro rata share of: (a) the Pro Rata Split as of the Effective Date of the Reorganized PEC Common Stock (which shall be subject to the dilution from the LTIP Shares, the Preferred Equity, and the Penny Warrants and shall be issued after giving effect to the issuance of the Rights |

---

[23]  "Other Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim or Priority Tax Claim.

[24]  "General Unsecured Claim" shall mean any Claim that is not an Administrative Expense Claim, DIP Facility Claim, Securitization Facility Claim, Priority Tax Claim, First Lien Lender Claim, Second Lien Notes Claim, Other Secured Claim, Other Priority Claim, Convenience Class Claim, Unsecured Subordinated Debenture Claim (as defined below), Intercompany Claim (as defined below) or Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include the Unsecured Senior Notes Claims.  Additional Claims filed by governmental units on or around October 11, 2016, include a $1.8 billion Claim asserted by the U.S. Environmental Protection Agency against PEC, as well as other governmental units' Claims in excess of $1.0 billion against various other Debtors.  The Debtors are in the process of reviewing and analyzing these recently filed Claims and therefore they are not included in the Claims estimates herein.

[25]  This pool of cash is available for holders of General Unsecured Claims pursuant to the settlement of the Encumbered PEC Cash Dispute (as defined below).  "Additional PEC Cash" means, to the extent payments to Allowed Convenience Claims in Class 6A are less than $2 million, the difference between total payments to Allowed Convenience Claims in Class 6A and $2 million.

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | None.<br><br>(v) Unencumbered Debtors<br><br>$[10 million] to $[30 million] | Offering Shares, the issuance of any Incremental Second Lien Shares, the issuance of any Premium Shares and the issuance of any Disputed Claims Reserve Shares), the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity and the exercise of the Penny Warrants; and (b)(i) the Pro Rata Split as of the Record Date of the Section 1145 Equity Rights; provided, however, that any holder of a General Unsecured Claim against one of the Encumbered Guarantor Debtors that is not Allowed as of the Record Date shall not participate in the Rights Offering, and instead, if and when such holder's Claim becomes Allowed, shall receive an amount of Disputed Claims Reserve Shares with a value equal such holders pro rata share of the Equity Rights Value;[26]<br><br>(iii) each holder of an Allowed General Unsecured Claim against one of the Gold Fields Debtors will receive the holder's pro rata share of interests in a liquidating trust to be formed to hold and liquidate all of the assets of the Gold Fields Debtors; |

---

[26]    On the Effective Date, the Debtors shall create a reserve of Reorganized PEC Common Stock (the "Disputed Claims Reserve Shares") for distribution to holders of such disputed Claims as of the Record Date that were not permitted to participate in the Section 1145 Rights Offering. The Disputed Claims Reserve Shares shall have a value, as determined by reference to Plan Equity Value, equal to the estimated value of the Section 1145 Equity Rights holders of disputed Claims as of the Record Date would have been entitled to receive if such disputed Claims later became Allowed Claims (as reasonably estimated by the Debtors) calculated as follows: (a) for each share of Rights Offering Shares that would have been available for purchase by a holder of a Class 5B Claim that was not Allowed as of the Record Date through the exercise of Section 1145 Equity Rights if such holder's Claims had been Allowed as of the Record Date, the difference between (i) the value of such share at Plan Equity Value and (ii) $[13.75]; and (b) for each Penny Warrant that such holder would have received through the exercise of Rights Offering Equity Rights if such holder's Claim had been Allowed as of the Record Date, the difference between (i) the value of a share of Reorganized PEC Common Stock at Plan Equity Value that underlies such Penny Warrant and (ii) $0.01 (the "Equity Rights Value"). Following completion of the reconciliation, settlement, and distribution procedures in connection with such disputed Claims, any Disputed Claims Reserve Shares which are not distributed from such reserve to holders of such disputed Claims pursuant to such procedures shall be cancelled. Prior to the Effective Date, the Debtors will file a motion to establish appropriate claims reserves and related procedures necessary to effectuate the Plan, which motion and order shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee, provided, however, that the aggregate face amount of disputed Claims permitted to receive Disputed Claims Reserve Shares shall not exceed $300 million without the approval of the Requisite Members of the Noteholder Steering Committee.

-15-

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | (iv) each holder of an Allowed General Unsecured Claim against Gib1 will receive no recovery; and |
| | | (v) each holder of an Allowed General Unsecured Claim against one of the Unencumbered Debtors will receive cash in the amount of the holders' Allowed Claim, less any amounts attributable to late fees, postpetition interest or penalties. |
| | | For the avoidance of doubt, any of the consideration received by holders of Allowed Unsecured Senior Notes Claims shall be independently transferable and shall not be required to be transferred as part of a "strip;" provided that the foregoing shall not apply to the Section 1145 Equity Rights, which shall only be transferable together with the underlying claim. |
| Convenience Claims | PEC Convenience Claims - $[2.7 million to $4.0 million] <br><br> Encumbered Guarantor Debtors Convenience Claims - $[24 million to $36 million] | "Convenience Claims" means General Unsecured Claims (other than Unsecured Senior Notes Claims) against PEC or any Encumbered Guarantor Debtor that otherwise would be classified in Class 5A or Class 5B, but, with respect to each such Claim, the aggregate amount of such Claim is equal to or less than $[200,000]; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim. |
| | | On or as soon as practicable after the Effective Date, unless otherwise agreed by a Convenience Claim holder and the applicable Debtor or Reorganized Debtor: |
| | | (i) each holder of an Allowed Convenience Claim against PEC shall receive cash in an amount up to [72.5]% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against PEC shall not exceed $[2] million and (b) to the extent such payments would exceed $[2] million, holders of Allowed Convenience Claims shall receive their pro rata share of $[2] million and (c) to the extent such payments are less than $[2] million, the Additional PEC Cash shall become available for distribution to |

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | Class 5A creditors; and |
| | | (ii) each holder of an Allowed Convenience Claim against an Encumbered Guarantor Debtor shall receive an amount up to **[72.5]**% of the Allowed Convenience Claim; provided, however, that (a) total payments on account of Allowed Convenience Claims against the Encumbered Guarantor Debtors shall not exceed $**[18]** million and (b) to the extent such payments would exceed $**[18]** million, holders of Allowed Convenience Claims shall receive their pro rata share of $**[18]** million. |
| MEPP Claim | $**[0.00]** to $**[643 million]** | [TBD] |
| Unsecured Subordinated Debenture Claims[27] | $**[743.9 million]** | In accordance with the provisions in the 2066 Subordinated Indenture and section 510(a) of the Bankruptcy Code, holders of Unsecured Subordinated Debenture Claims have no right to receive any distributions and, therefore, will receive no recovery under the terms of the Plan until holders of senior funded debt Claims are paid in full in accordance with the terms of the 2066 Subordinated Indenture. |
| Intercompany Claims[28] | - | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, all prepetition and postpetition Intercompany Claims shall be ignored for purposes of calculating distributions to holders of Claims pursuant to the Plan.  At the Debtors' option, on the Effective Date, Intercompany Claims may be reinstated, settled, offset, cancelled, extinguished or eliminated, including by way of capital contribution. The intercompany loans (i) owed by Gib1 to Peabody |

---

[27]   "Unsecured Subordinated Debenture Claims" means any and all Claims arising under or in connection with the 2066 Unsecured Subordinated Debentures.  "2066 Unsecured Subordinated Debentures" means the 4.75% convertible junior subordinated debentures due 2066 issued in connection with the First Supplemental Indenture between Peabody Energy Corporation and U.S. Bank National Association, dated as of December 20, 2006 (the "2066 Subordinated Indenture").

[28]   "Intercompany Claims" shall mean (a) any Claim of any Debtor against any other Debtor, (b) any Claim of any Debtor against any non-Debtor Affiliate and (c) any Claim of any non-Debtor Affiliate against any Debtor.

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 730 of 876 PageID

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C
- Backstop Commitment Agreement    Pg 242 of 330
#: 1697

| Class of Claims or Interests | Amount of Allowed Claims (estimated) | Treatment of Claim or Interest |
|---|---|---|
| | | IC Holdings, LLC, (ii) owed by Peabody IC Holdings, LLC to Peabody IC Funding Corporation and (iii) owed by non-Debtor Peabody Energy Australia Pty Ltd. to Peabody Investments Corp. will be treated as debt for purposes of calculating distributions to holders of Claims pursuant to the Plan. The principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower, will be reinstated on the Effective Date. |
| Section 510(b) Claims[29] | - | Claims against PEC that are subordinated by operation of section 510(b) of the Bankruptcy Code, if any, shall be extinguished, cancelled and discharged as of the Effective Date, and holders thereof shall receive no distributions from the Debtors in respect of their Claims. |
| PEC Interests[30] | N/A | PEC Interests shall be extinguished, cancelled and discharged as of the Effective Date, and holders of existing PEC Interests shall receive no distribution in respect of their Interests. |
| Subsidiary Debtor Interests[31] | N/A | On the Effective Date, Subsidiary Debtor Interests will be reinstated, subject to any restructuring transactions. |

---

[29] "Section 510(b) Claims" shall include all Claims subject to subordination pursuant to section 510(b) of the Bankruptcy Code, including, without limitation, for damages arising from the sale or purchase of any debt or equity security of any of the Debtors.

[30] "PEC Interests" shall mean all Interests in PEC. "Interests" shall mean the common stock, limited liability company interests, and any other equity, ownership, or profits interests in any Debtor and options, warrants, rights, or other securities or agreements to acquire common stock, limited liability company interests, or other equity, ownership, or profits or interests in any Debtor (arising under, or in connection with, any employment agreement), and includes any "Equity Security" (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

[31] "Subsidiary Debtor Interests" shall mean as to a particular Debtor other than PEC, all Interests in such Debtor.

## IV. Settlement and Compromise Incorporated into the Plan

| | |
|---|---|
| Settlement and Compromise | The Plan shall contain and effect a global and integrated compromise and settlement (the "Settlement") of all disputes between the Debtors and the Creditor Co-Proponents, including the Claims and causes of action set forth below pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure. |
| CNTA Dispute | The CNTA Dispute (as defined in the DIP Facility credit documents) shall be deemed resolved upon the Effective Date of the Plan based on the settlements and comprises set forth in this Term Sheet and, ultimately, the Plan. On the Effective Date, the declaratory judgment action with respect to the CNTA Dispute shall be dismissed with prejudice. |
| Material Claim Settlements | The Requisite First Lien Lender Co-Proponents and the Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim. |
| Committee Lien Challenge | In full settlement and satisfaction of certain causes of action raised by the creditors' commitee with respect to whether cash at PEC on the Petition Date was encumbered or unencumbered (the "Encumbered PEC Cash Dispute") and other challenge actions, including, without limitation, any and all claims raised in that certain Claims Disclosure Letter [ECF No. 1267] filed by the Committee and the supplement thereto delivered to the Debtors, Citibank and the Second Lien Notes Indenture Trustee on September 15, 2016, $**[3 million]** of cash at PEC shall be made available for distribution to holders of Allowed Claims in Class 5A, and $**[2 million]** of cash at PEC shall be made available for distribution to holders of Allowed Convenience Claims against PEC. |
| Preference Actions | The Debtors shall release all preference claims against any holder of a General Unsecured Claim or a Claim arising under section 503(b)(9) of the Bankruptcy Code. |
| Intercompany Claims | In accordance with the global settlement and compromise contemplated by this Term Sheet and to be embodied in the Plan, Intercompany Claims shall be ignored for purposes of calculating distributions to third party creditors except as otherwise set forth herein. |

NAI-1502345820v2

## V. **Other**

| | |
|---|---|
| Plan Value | The Plan enterprise value shall be $4.275 billion (the "Plan Enterprise Value").  The Plan equity value shall be $3.105 billion (the "Plan Equity Value").[32] |
| Distribution Mechanics | Citibank will act as the distribution agent for the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement; provided, however, that any cash distributions on account of Claims arising from Swap Contracts shall be made by the Reorganized Debtors directly to the applicable counter-party to a Swap Contract. |
| Direct Investment Pursuant to Private Placement | Pursuant to a private placement agreement (the "Private Placement Agreement"), the Noteholder Co-Proponents (the "Initial Parties") and, to the extent applicable, the Additional Private Placement Parties (as defined in Exhibit 5) shall have the right and obligation to purchase $750 million in the aggregate of Preferred Equity on the terms and conditions set forth on Exhibit 3 and Exhibit 5, which direct investment shall be a private placement exempt from registration pursuant to Section 4(a)(2) of the Securities Act (the "Private Placement") (as more fully detailed in Exhibit 5 hereto). |
| Section 1145 Rights Offering | In connection with a rights offering pursuant to the Plan (the "Section 1145 Rights Offering"), up to $750 million will be raised through the sale of units consisting of (a) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (b) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date ("Rights Offering Penny Warrants"), in each case, after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein.  Participation in the Section 1145 Rights Offering will be available to all holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B as of the Record Date, in each case, according to the Pro Rata Split as of the Record Date. |
| Backstop Commitment | Pursuant to a backstop agreement (the "Backstop Commitment Agreement"), the Initial Parties, together with any additional |

---

[32]    Calculation of Plan Equity Value assumes $1.95 billion of funded debt and approximately $20 million of capital leases.

| | |
|---|---|
| | holders of Allowed Second Lien Notes Claims and Claims in Class 5B that are qualified institutional buyers and other accredited investors (as such terms are defined under the Securities Act of 1933) who become party to the PSA and Backstop Commitment Agreement on or prior to the date the Backstop Commitment Agreement is approved by the Bankruptcy Court, shall backstop its portion of 100% of the Section 1145 Rights Offering on the terms described in <u>Exhibit 5</u> hereto. |
| Record Date for the Private Placement, Backstop Commitment Agreement and Section 1145 Rights Offering | The record date for determining a creditor's eligibility to participate in the Private Placement, the Backstop Commitment Agreement and the Section 1145 Rights Offering shall be the date on which the Disclosure Statement Order is entered by the Bankruptcy Court (the "<u>Record Date</u>"). |
| Reclamation Bonding | The Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "<u>Bonding Solution</u>").  The Debtors shall provide updates once every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution. |
| Reorganized PEC Common Stock | The Plan will provide for the cancellation of all outstanding PEC common stock and the issuance of shares of new common stock, par value $**[0.001]** per share, in Reorganized PEC (the "<u>Reorganized PEC Common Stock</u>"), initially subject to dilution by the LTIP Shares, the conversion of the Preferred Equity, and the exercise of the Penny Warrants.  Each share of Reorganized PEC Common Stock shall entitle its holder to one vote on matters submitted to a vote of shareholders and shall vote as one class.<br><br>The Plan will also provide that, upon emergence, Reorganized PEC shall amend and restate its charter and bylaws, which shall be in form and substance reasonably acceptable to the Requisite Members of the Noteholder Steering Committee.<br><br>The Reorganized PEC Common Stock will be registered under the Securities Exchange Act of 1934 on the Effective Date.<br><br>Reorganized PEC shall use reasonable best efforts to cause the Reorganized PEC Common Stock and the Preferred Equity to be listed for trading on the New York Stock Exchange ("<u>NYSE</u>") as soon as practicable after the Effective Date.[33] |

---

[33]    This obligation will be included in the Registration Rights Agreement (as defined in Exhibit 5 hereto) or shareholders' agreement.

| | |
|---|---|
| Exit Facility | The Debtors shall attempt, on a best efforts basis, to obtain commitments for an exit facility (the "Exit Facility") of not less than $1.5 billion in principal amount, the terms of which are no less favorable, when taken as a whole, to the Debtors than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, as determined by the Debtors in their reasonable business judgment, and of sufficient size and on appropriate terms, including the ability to enter into up to $250 million of ABL Facilities (as defined in Exhibit 1), to avoid the need to issue all or part of the Replacement Secured First Lien Term Loan and/or the New Second Lien Notes. The Debtors will provide updates as requested to the professional advisors of the First Lien Agent on the process for raising the Exit Facility (including proposals received from any such reputable financial institutions on a professional eyes only basis). In the Debtors' sole discretion, provided that the First Lien Full Cash Recovery occurs, the size of the Exit Facility may be increased up to $1.95 billion in order to provide holders of Second Lien Notes Claims with up to $450 million in cash and/or Additional First Lien Debt as set forth in greater detail above (or incrementally higher, if necessary in accordance with footnote [19], if the Effective Date does not occur on or before April 3, 2017). |
| Corporate Governance Matters | The initial board of directors of the Reorganized PEC (the "New Board") shall include nine (9) members and shall include (a) the chief executive officer of Reorganized PEC and (b) eight independent directors (the "Independent Directors"). Each of the individuals designated as nominees to be Independent Directors on the New Board shall be independent under the listing rules of the NYSE, as applicable, and the independence requirements for members of audit and compensation committees under the rules of the SEC. The Independent Directors shall be selected as follows: (i) the Debtors shall designate one (1) Independent Director; (ii) Contrarian, PointState and Panning may, together, select one (1) Independent Director; (iii) Elliott and Discovery may each select one (1) Independent Director; and (iv) a selection committee comprising the chief executive officer of PEC, Elliott, Discovery, and a nominee acting on behalf of Contrarian, PointState, and Panning (collectively, the "Selection Committee") shall agree on the retention of a search firm to identify and recommend the remaining four (4) Independent Directors, which recommendation shall be decided upon by the Selection Committee; provided that any existing members of the board of directors of PEC who wishes to stand for the New Board shall be interviewed and evaluated by such search firm. Reorganized PEC shall acknowledge that (A) none of Contrarian, PointState nor Panning shall be an "affiliate" |

| | |
|---|---|
| | (as defined in Rule 144(a)(1) of the Securities Act) of Reorganized PEC solely on the basis of the right described in clause (ii) of the immediately preceding sentence; and (B) neither Elliot nor Discovery shall be such an "affiliate" solely on the basis of the right described in clause (i) of the immediately preceding sentence.<br><br>The boards of directors for the direct and indirect subsidiaries of Reorganized PEC shall be identified in the supplement to the Plan.<br><br>Reorganized PEC will continue to be a reporting company with the SEC following the Effective Date. |
| Long Term Incentive Plan | The terms and conditions of the long-term incentive plan (the "LTIP") for management and employees shall be as forth on Exhibit 4 hereto, including the amount of Preferred Equity and Reorganized PEC Common Stock to be reserved for the LTIP (the "LTIP Shares").  The number of LTIP Shares reserved for the LTIP will be set forth in the Plan, and the apportionment of LTIP Shares that will be granted to LTIP participants on the Effective Date shall be determined by the compensation committee of the board of directors of PEC.<br><br>For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| Executory Contracts, Unexpired Leases and Employee Benefit Obligations | All executory contracts and unexpired leases not expressly listed for assumption on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed rejected as of the Effective Date.<br><br>The Debtors shall assume all of their existing pension plans (other than the SERP, the Gold Fields PEP and a portion of the SERA), collective bargaining agreements, severance plans, SERA (as modified) and other employee and retiree benefits plans (as the same may be modified or amended in accordance with their terms and applicable law).<br><br>Any contract or lease assumed on the Effective Date shall be deemed amended and modified to provide that the confirmation and consummation of the Plan shall not trigger any "change of |

|  | control" provisions in such contract or lease. |
|---|---|
| Ongoing Environmental and Reclamation Obligations | The Plan shall provide that the Reorganized Debtors (other than the Reorganized Gold Fields Debtors or any claims relating to the Gold Fields Debtors' assets or liabilities), as owners, lessees, permittees or operators of real property or a mining operation after the Effective Date, shall continue to operate in accordance with all applicable laws, rules and regulations, including all applicable environmental laws. |
| Restructuring Transactions | The Plan shall provide for the implementation of a series of restructuring transactions that are necessary or appropriate, in the Debtors' judgment, to streamline and simplify their overall corporate structure. |
| Means of Implementation | The Plan shall contain standard means of implementation, including provisions for the continued corporate existence of the Reorganized Debtors (subject to any restructuring transactions), the cancellation of certain prepetition debt and related agreements, the cancellation of prepetition equity interests in PEC, the issuance of the Reorganized PEC Common Stock, the effectuation of the Section 1145 Rights Offering and the issuance of Section 1145 Equity Rights, Reorganized PEC Common Stock and Penny Warrants in connection therewith (including pursuant to the Backstop Commitments), the effectuation of the Private Placement and the issuance of Preferred Equity in connection therewith, the revesting of the Debtors' assets in the Reorganized Debtors and the creation of appropriate reserves for the distributions contemplated under the Plan. |

-24-

| Releases | The Plan shall provide customary release provisions for the benefit of the Debtors and their Representatives to the maximum extent permitted by applicable law.[34] |
|---|---|
| | The Plan shall include (a) a release by the Debtors and their Representatives of the Released Parties (as defined below) with respect to matters related to the Chapter 11 Cases and (b) a third party release with respect to matters related to the Chapter 11 Cases which shall be binding on creditors that vote in favor of the Plan or are deemed to accept the Plan for the benefit of: (i) the Committee and its members, in their capacity as such; (ii) Citibank, in its capacity as agent under the DIP Facility and First Lien Agent; (iii) the lenders under the DIP Facility and the First Lien Lenders; and (iv) the Creditor Co-Proponents, in their capacity as such and in their capacity as First Lien Lenders, holders of Second Lien Notes and holders of Unsecured Senior Notes, and each of their respective Representatives, in their capacity as such (collectively, the "Released Parties"). |
| Exculpation | The Plan shall provide customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors and their Representatives, solely in their capacity as such, and the Released Parties, to the fullest extent permitted by applicable law, from any and all Claims and causes of action arising before the Effective Date, including, without limitation, any and all Claims and causes of action in connection with, relating to or arising out of the Chapter 11 Cases, the restructuring of the Debtors, the formulation, negotiation, preparation, dissemination, implementation, administration, solicitation, confirmation or consummation of this term sheet, the PSA, the Plan, the Disclosure Statement, the settlements set forth herein and to be embodied in the Plan or any contract, instrument, release or other agreement or document created or entered into in connection therewith or in relation thereto or any act taken or omitted to be taken in connection with or relating to any of the foregoing; provided, that the foregoing shall not affect the liability of any party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a final order to have constituted gross negligence or willful misconduct. |

---

[34] "Representatives" shall mean any successor, predecessor, assign, subsidiary, affiliate, officer, director, member of a limited liability company, employee, partner, limited partner, general partner, management company, investment manager, shareholder of a Cayman Islands exempted company, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other professional, in each case in such capacity, serving on or after the Petition Date.

| Fees | Subject to (a) entry of the PPA and BCA Approval Order and (b) receipt of documentation reasonably acceptable to the Debtors, the Debtors shall pay or reimburse the Noteholder Co-Proponents, the Second Lien Notes Indenture Trustee and the indenture trustees for the Unsecured Senior Notes for their respective reasonable, documented out-of-pocket fees and expenses incurred after the Petition Date, including payment of the reasonable fees and expenses of legal and financial advisors, in connection with the Debtors' Chapter 11 Cases and the Restructuring earned and accrued up until the occurrence of any Termination Event (as defined in <u>Exhibit 5</u>), in each case whether or not the Restructuring is ultimately consummated; provided no such fees shall be payable in the event the PSA Termination Event occurs; and provided further that upon the occurrence of any Termination Event (other than the PSA Termination Event), any and all fees and expenses accrued and unpaid as of such date (whether or not such fees and expenses have been billed or invoiced) shall be paid by the Debtors.<br><br>The payment of the fees set forth above shall (i) be approved upon entry of an order approving the Private Placement Agreement, and/or the Backstop Commitment Agreement; (ii) be payable within two weeks of receipt of an invoice; and (iii) prior to the time paid, be granted administrative expense status against each Debtor on a joint and several basis pursuant to <u>Exhibit 5</u> hereto.<br><br>It shall be a condition precedent to the Effective Date that all fees provided for in the Final DIP Order, including the reasonable and documented fees and expenses of the legal and financial advisors of Citibank or the First Lien Lenders (subject to and in accordance with the terms of the First Lien Credit Agreement) incurred in connection with the Chapter 11 Cases prior to the Effective Date and for which the Debtors have received invoices, shall have been paid in full by the Debtors. For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by (a) the absence of the entry of the BCA and PPA Approval Order, or (b) the occurrence of any Termination Event, including but not limited to the PSA Termination Event.<br><br>Each of the Noteholder Co-Proponents agrees to submit bills and invoices with respect to incurred fees and expenses as promptly as possible on a monthly basis. At least ten (10) days prior to the Effective Date, each of the foregoing shall provide reasonable estimates of the fees and expenses to be paid by the Debtors on the Effective Date, which amount shall be placed into an escrow for payment of such fees and expenses. Any residual balance in the escrow after payment of the foregoing fees and expenses shall be |
|---|---|

| | |
|---|---|
| | returned to the Reorganized Debtors. |
| Creditor Co-Proponent Approval Rights | Each substantive document in connection with the Restructuring, including without limitation, the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee:<br><br>• The Disclosure Statement and the motion and order to approve same;<br>• The Plan and any exhibits, supplements, appendices, etc. thereto;<br>• The credit agreement and/or indenture for the Exit Facility (if applicable);<br>• The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on Exhibit 1 hereto;<br>• The corporate constituent documents of the Reorganized Debtors;<br>• The certificate of designation of Series A convertible preferred stock of PEC;<br>• The documents relating to the Section 1145 Rights Offering and the Private Placement;<br>• The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee;<br>• The Confirmation Order; and<br>• The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement.<br><br>Notwithstanding the foregoing, the following material documents in connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent:<br><br>• The Term Sheet;<br>• The PSA;<br>• The Private Placement Agreement;<br>• The Backstop Commitment Agreement; and<br>• The orders relating to the PSA, the Private Placement Agreement, and the Backstop Commitment Agreement.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes |

(including, without limitation, the security and guaranty documentation (and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance acceptable to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.

The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable).

As to the Requisite First Lien Lender Co-Proponents:

- If applicable, the credit agreement for the Replacement Secured First Lien Term Loan and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms set forth on Exhibit 1 hereto and otherwise in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents in their sole discretion;

- the PSA, this Term Sheet and the provisions of any order approving the same shall be in form and substance satisfactory to the Requisite First Lien Lender Co-Proponents;

- the indenture for the New Second Lien Notes (if applicable), the credit agreement and/or indenture for the Exit Facility and order relating thereto (if applicable), the Plan, the Disclosure Statement, the Disclosure Statement Order and the Confirmation Order (but excluding documents related to the Bonding Solution) and any changes to the Breakup Administrative Claim Treatment shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents; provided, however, that no such consents and approvals shall be required with respect to the indenture for the New Second Lien Notes and related documentation (if applicable), which indenture and related documentation shall be, as applicable, consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite First Lien Lender Co-Proponents; and

- each other substantive document in connection with the Restructuring (but excluding documents related to the

| | |
|---|---|
| | Bonding Solution), shall be in form and substance reasonably acceptable to the Requisite First Lien Lender Co-Proponents, solely to the extent that a proposed term, action, modification, amendment, supplement or waiver adversely affects the First Lien Agent, the First Lien Lenders, the First Lien Lender Claims or the terms of the Replacement Secured First Lien Term Loan. |
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan (the "Conditions to Confirmation") shall be customary for a reorganization of this size and type, including, without limitation, the following: |
| | • The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties as set forth herein, approving the adequacy of the Disclosure Statement. |
| | • All exhibits and other documents necessary for the implementation of the Plan and any related transactions shall be in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties (except for those documents that should be in form and substance satisfactory to each Noteholder Co-Proponent, as set forth above); provided, however, that the Requisite Creditor Parties shall not have any approval rights regarding exhibits and documents relating to the Bonding Solution. |
| | • The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and subject to the reasonable approval of the Requisite Creditor Parties. |
| | • The PSA shall not have been terminated. |
| | • All of the schedules documents, supplements and exhibits to the Plan shall be substantially in form and substance as required by the PSA. |
| | • The Backstop Commitment Agreement shall not have been terminated. |
| | Each of the foregoing may be waived by the Debtors, subject to the approval rights of the Requisite Creditor Parties set forth above and in the PSA. |
| Conditions to the Effective Date | The conditions precedent to the occurrence of the Effective Date of the Plan shall be customary for a reorganization of this size and type, and shall include, without limitation, the Conditions to |

Confirmation set forth in this Term Sheet and the following:

- All documents and agreements necessary to consummate the Plan shall have been effected or executed;

- If applicable, the conditions to closing of the Exit Facility shall have occurred or will occur on the Effective Date and the Debtors or Reorganized Debtors, as applicable, shall have received (or will receive in connection with the consummation of the Plan) the amounts required to be funded thereunder.

- If applicable, the conditions to issuing the Replacement Secured First Lien Term Loan as set forth in Exhibit 1 shall have occurred or will occur on the Effective Date;

- The conditions to consummating the Private Placement and the Section 1145 Rights Offering shall have been satisfied or waived by the parties thereto, and the Reorganized Debtors shall have received (or will receive simultaneously with the consummation of the Plan) the amounts required to be funded thereunder in the aggregate gross amount of not less than $1.5 billion;

- The MEPP Claim shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee and the Requisite First Lien Lender Co-Proponents if for an amount above the amounts held in reserve by the Debtors for such claim;

- The Debtors shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and that are required by law, regulation, or order and any and all steps necessary to consummate the Restructuring in any applicable jurisdictions other than the United States have been effectuated;

- The Debtors shall have obtained a Bonding Solution to cover all of their self-bonded reclamation obligations in accordance with applicable laws and regulations; and

- Any waiting period applicable to the Restructuring under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or similar law or statute shall have been terminated or shall have expired;

- All of the schedules documents, supplements and exhibits to the Plan shall be in substantially in form and substance as required by the PSA.

NAI-1502345820v2

Case: 4:17-cv-01053-AGF   Doc. #:  6-5   Filed: 03/23/17   Page: 743 of 876 PageID #: 1690

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 255 of 330

|  | <ul><li>The Backstop Commitment Agreement shall not have been terminated.</li><li>The PSA shall not have been terminated.</li><li>The Plan and all exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification are made in accordance with the applicable provisions of the Plan.</li></ul> Each of the foregoing may be waived by the Debtors, subject to the approval of the Requisite Creditor Parties (as applicable); <u>provided</u>, <u>however</u>, that for the avoidance of doubt, the Effective Date condition relating to the Bonding Solution shall be waivable solely by the Debtors. |
|---|---|

NAI-1502345820v2

**Exhibit 1 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – Replacement Secured First Lien Term Loan**

This summary of principal terms (this "Replacement 1L Term Loan Term Sheet") sets forth certain of the principal terms for the Replacement Secured First Lien Term Loan referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet"). Capitalized terms used and not otherwise defined in this Replacement 1L Term Loan Term Sheet have the meanings assigned thereto in the Plan Term Sheet. This Replacement 1L Term Loan Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein. Matters not covered by the provisions hereof and of the Plan Term Sheet (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) are subject to mutual approval and agreement of the Borrower and the Effective Date Lenders referred to herein. All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Required First Lien Co-Proponents.

| | |
|---|---|
| **Borrower:** | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company" or the "Borrower"). |
| **Guarantors:** | Each of the Borrower's direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), whether now owned or hereafter formed or acquired, subject to certain exceptions to be agreed (together with the Borrower, the "Loan Parties"). Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, or future permitted securitization and captive insurance entities, (ii) Peabody Holdings (Gibraltar) Limited, any future domestic subsidiary of any foreign subsidiary, and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "FSHCO") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Loan Parties; provided that any such FSHCO may only be excluded pursuant to this clause (ii) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the First Lien Debt), and provided further that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor, and (iii) unrestricted subsidiaries. Notwithstanding the foregoing, if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FHSCO to be guarantors without causing any adverse tax consequences to the Borrower, the Borrower shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Borrower. |

Exhibit 1-1

|  | As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes.<br><br>Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed.  The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default, and (b) other conditions and limitations to be agreed. Notwithstanding the foregoing, none of Peabody Investments Corporation, Peabody IC Funding Corp., Peabody Holdings (Gibraltar) Limited, Peabody Investments (Gibraltar) Limited or Peabody Global Funding, LLC shall be designated as unrestricted subsidiaries. |
|---|---|
| **Administrative Agent:** | An affiliate of Citibank, N.A. shall act as administrative agent in respect of the Replacement Secured First Lien Term Loan (the "<u>Administrative Agent</u>"). |
| **Effective Date Lenders:** | Each holder of a Secured First Lien Lender Claim. |
| **Principal Amount:** | Up to $1.5 billion, provided that the maximum principal amount of the Replacement Secured First Lien Term Loan shall be reduced, on a dollar-for-dollar basis, by (1) the principal amount of the Exit Facility on the Effective Date (as defined below), net of any upfront fees associated therewith that are netted from the amount funded on the Effective Date, (2) cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP, "<u>Unrestricted Cash</u>") as of the Effective Date after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA (the "<u>PSA Transactions</u>") in excess of $800 million and (3) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) (any such transaction, an "<u>Equity Offering</u>") in excess of $1.5 billion. |
| **Closing Date:** | The Effective Date. |
| **Maturity Date:** | Five (5) years after the Effective Date. |
| **Interest Rate:** | LIBOR Rate (subject to a LIBOR floor of 1.0%) + 900 bps (the "<u>Margin</u>"), payable quarterly in arrears in cash (and with typical LIBOR interest period mechanism).  Notwithstanding the foregoing, the Margin shall be increased (by up to but no more than 175bps) on a bp-for-bp basis, based on the greater of the increase in yield for (i) the Bloomberg BVAL U.S. Corporate B+/B/B- BVAL 5 Year Yield Curve  and (ii) the Bank of America Merrill Lynch U.S. Metals & Mining High Yield Index, in each case, measured for the ten trading day period ending on December 22, 2016 as compared to the ten trading day period ending on the day prior to the Effective Date; provided further, that any decrease in such yield will not result in a decrease in the Margin or LIBOR floor. |

Exhibit 1-2

| | |
|---|---|
| **Additional PIK Interest:** | Beginning on the 6-month anniversary of the Effective Date, additional PIK interest of 100bps per annum shall accrue on a quarterly basis (including on capitalized PIK interest), if either (a) the Replacement Secured First Lien Term Loan has not received a facility credit rating from S&P, Moody's or Fitch or (b) the facility credit rating assigned to the Replacement Secured First Lien Term Loan is below B- by S&P or Fitch or below B3 by Moody's.

Beginning on the 12-month anniversary of the Effective Date, either (a) additional PIK interest of 200bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate principal amount of funded indebtedness of the Company secured by first priority liens (excluding the ABL Facilities (defined below), capital leases and other purchase money financings) ("First Lien Debt") of the Borrower exceeds $1.125 billion or (b) additional PIK interest of 100bps per annum, accruing on a quarterly basis, shall accrue (including on capitalized PIK interest) if the aggregate First Lien Debt obligations of the Borrower are greater than $750 million and less than or equal to $1.125 billion, *provided* that, for purposes of calculating the amount of the aggregate First Lien Debt obligations of the Borrower, the First Lien Debt obligations shall be deemed to be increased by the amount by which Unrestricted Cash is less than $800 million. |
| **Default Rate:** | 2% per annum (additive to "Interest Rate" above).  The Default Rate shall be imposed automatically on any Event of Default resulting from the failure of the Borrower to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any Event of Default resulting from the insolvency or bankruptcy of the Borrower, and may be imposed upon the written election of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan while any other Event of Default is continuing. |
| **Amortization:** | The principal amount of the Replacement First Lien Term Loan shall be repayable in quarterly installments equal to 0.75% of the original principal amount of the Replacement First Lien Term Loan as of the Effective Date. |
| **Collateral:** | The Replacement First Lien Term Loan shall be secured by a security interest on substantially all of the existing and after-acquired assets of the Borrowers and Guarantors (including, without limitation, liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), licenses and a pledge of 100% of equity interest of Peabody IC Funding Corp and other domestic subsidiaries and, subject to the last sentence of this paragraph, a pledge limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs formed or acquired on or after the Effective Date (to the extent the pledge of such FSHCO would result in an adverse tax consequences), subject to customary carve-outs) and a pledge limited to 65% of the equity interests in Peabody Investments (Gibraltar) Limited, which liens shall in each case be first in priority with respect to assets other than "ABL Priority Collateral" (to be limited to accounts receivables, cash other than identifiable proceeds of non-ABL Priority Collateral and inventory) and second in priority with respect to all ABL Priority Collateral. Notwithstanding the foregoing, but subject to the last sentence of this paragraph, none of the equity interests in Peabody Holdings (Gibraltar) Limited, and none of the equity interests in any domestic subsidiary of a foreign subsidiary or in any |

Exhibit 1-3

|  | subsidiary, whether now owned or hereafter formed or acquired, substantially all the assets of which consist of equity of Peabody Holdings (Gibraltar) Limited, shall be pledged. Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case, without causing any adverse tax consequences, would permit the Borrower (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Borrower shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Borrower, or (b) if requested by the lenders, to cause the relevant entities described in this sentence to pledge their operating assets, the Borrower shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Borrower.<br><br>The Loan Parties shall, not later than the date that is 90 days following the Closing Date (or such later date as the Administrative Agent shall agree in its discretion), cause all deposit accounts and securities accounts of the Loan Parties, subject to customary exceptions to be agreed, to be subject to control agreements for the benefit of the Lenders satisfactory to the Administrative Agent in its reasonable discretion.<br><br>The liens securing the Replacement First Lien Term Loan shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.<br><br>The liens securing the Replacement First Lien Term Loan shall, if applicable, be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the New Second Lien Notes referred to in the Plan Term Sheet and the collateral agent for the Replacement First Lien Term Loan. The terms of the Intercreditor Agreement in no event shall be less favorable in any material respect to the holders of the Replacement Secured First Lien Term Loan than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes referred to in the Plan Term Sheet (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap).  Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
|---|---|
| **Commitment Fee:** | None |
| **Funding Fee:** | A fee equal to 4.0% of the original principal amount of the Replacement Secured First Lien Term Loan on the Effective Date shall be payable in cash on the Effective Date. |
| **Voluntary Prepayments:** | The Borrower may repay the Replacement Secured First Lien Term Loan at any time and from time to time in whole or in part without premium or penalty, upon written notice, at the option of the Borrower. |

Exhibit 1-4

| **Mandatory Prepayments:** | Mandatory prepayments (at par) shall be required, without duplication, in an amount equal to: |
|---|---|
| | (i) (a) 100% of the net cash proceeds of non-ordinary course sales or dispositions of assets by the Borrower or any restricted subsidiary subject to thresholds and exceptions to be agreed, but not subject to reinvestment rights; *provided* that, in the case of any such sale or disposition of assets constituting ABL Priority Collateral, the amount of such prepayment will be reduced on a dollar-for-dollar basis by the amount of any repayments of outstanding borrowings or the amount required to cash collateralize letters of credit under the applicable ABL Facility, as a result of such sale or disposition, to be made by the Borrower pursuant to the terms of such ABL Facility; *provided*, *further*, that prepayments described in this subclause (i)(a) shall not be required to the extent (but only to the extent) proceeds are generated or received by any foreign subsidiary and repatriation of such proceeds would be prohibited by law, limited by fiduciary duties, or would reasonably be expected to result in any material adverse tax or other Liabilities (it being understood and agreed that (x) the Borrower and its subsidiaries shall be required to use commercially reasonable efforts to take all actions available under applicable law to permit the repatriation of the relevant amounts, (y) if the applicable barrier to repatriation shall cease to exist within 18 months following the date on which such prepayment would otherwise be required to be made, the Borrower or the applicable subsidiary shall repatriate the relevant amounts to the Borrower for application to the Replacement Secured First Lien Term Loan as required above promptly following the date on which the relevant circumstance shall have ceased to exist and (z) the utilization of available net operating losses or other tax attributes or credits shall not constitute a material adverse tax or other liability); and

(b) 100% of the net cash proceeds from the sale of Metropolitan Collieries Pty Ltd (to the extent such sale is consummated after the Effective Date) to the extent that, after any such prepayment under this subclause (i)(b), the Borrower and its subsidiaries shall have Unrestricted Cash of at least $800 million;

(ii) (a) prior to the later of (X) the 12-month anniversary of the Effective Date and (Y) the time at which at least $425 million of the outstanding principal amount of the Replacement Secured First Lien Term Loan has been repaid, the lesser of (1) the amount of Unrestricted Cash in excess of $800 million and (2) 75% of Excess Cash Flow (to be defined in a manner to be agreed, but will be calculated after giving effect to customary adjustments to be agreed for mandatory prepayments of indebtedness), in each case paid quarterly (to be paid on the 10th business day after the filing of the Borrower's report on Form 10-Q or 10-K, as applicable, or such date that the Borrower is required to have filed its reports on Form 10-Q or 10-K, as applicable (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended)); and |

Exhibit 1-5

<table>
<tbody>
<tr>
<td></td>
<td>

(b) thereafter, subject to further reduction based on first lien gross leverage ratios to be agreed, (X) the lesser of the amount of Unrestricted Cash of the Borrower and its subsidiaries in excess of $800 million and (Y) 50% of Excess Cash Flow (to be paid semi-annually on the 10th business day after the filing of the Borrower's reports on Form 10-Q for each of the first and third quarter of a fiscal year or such date that the Borrower is required to have filed such forms (or, if the Borrower shall not be required to file such reports, such date that the Borrower would be required to file such reports if it were a public reporting company in accordance with the Securities Exchange Act of 1934, as amended) (the prepayments described in section (ii) hereof, the "<u>Cash Flow Sweep</u>"); and

(iii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "<u>Intercompany Note</u>") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Borrower on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed.

"Excess Cash Flow" repayments will be reduced by the amount of any voluntary prepayments of the Replacement Secured First Lien Term Loan.

</td>
</tr>
<tr>
<td>

**Conditions to Closing:**

</td>
<td>

Customary conditions to be agreed, including, without limitation:

(i) Minimum Unrestricted Cash of $600 million after giving effect to the PSA Transactions on the Effective Date;

(ii) Maximum funded indebtedness of the Borrower and its subsidiaries after giving effect to the PSA Transactions, excluding borrowings under the ABL Facilities, capital leases and similar purchase money financings, as of the Effective Date of $1.95 billion (of which no more than $1.5 billion may be first lien debt) plus, to the extent the Effective Date is after April 3, 2017, the amount of any Incremental New Second Lien Notes;

(iii) The Debtors shall have consummated the Section 1145 Rights Offering and Private Placement and received at least $1.5 billion in gross proceeds therefrom;

(iv) The Debtors shall have attempted, on a best efforts basis, to obtain commitments for the full amount of the Exit Facility, the terms of which are no less favorable to the Debtors, when taken as a whole, than the terms provided for in this Replacement 1L Term Loan Term Sheet as determined by the Debtors in their reasonable business judgment;

(v) All Milestones set forth in the PSA shall have been satisfied (or waived) on the terms set forth therein; and

</td>
</tr>
</tbody>
</table>

Exhibit 1-6

|  | (vi) No Unrestricted Cash and none of the proceeds from any Equity Offering shall be applied, or shall have been applied, to reduce the size of the Section 1145 Rights Offering or the Private Placement, repay or reduce the principal amount of the New Second Lien Notes or otherwise repay or satisfy any claims that are junior to the Secured First Lien Lender Claims except as expressly provided pursuant the PSA. |
|---|---|
| **Representations and Warranties:** | Usual and customary representations and warranties for facilities of this type. |
| **Affirmative Covenants:** | Usual and customary affirmative covenants for facilities of this type, including, without limitation, (i) a covenant to use commercially reasonable efforts to obtain a rating on the Replacement Secured First Lien Term Loan from S&P, Moody's or Fitch within 6 months of the Effective Date, (ii) preservation of existence, (iii) payment of liabilities, including taxes, (iv) maintenance of insurance, (v) maintenance of properties and leases, (vi) visitation rights, (vii) keeping of records and books of accounts, (viii) compliance with laws; sanctions, (iv) collateral; further assurances, (x) subordination of intercompany loans, (xi) reporting requirements, including delivery of financial statements and compliance certificates, (xii) post-closing covenants and (xiii) creation or ownership of certain subsidiaries, partnerships and joint ventures. |
| **Negative Covenants:** | Usual and customary negative covenants for facilities of this type, including, without limitation, restrictions on

(a) indebtedness, including limitations on:

(1) debt at non-guarantor subsidiaries of the Company;

(2) other debt incurrence, liens and guaranties subject to carve-outs TBD, including (i) unsecured debt baskets based on satisfaction of both a total leverage ratio and fixed charge coverage ratio (each to be agreed); (ii) $450 million in New Second Lien Notes, plus any Incremental New Second Lien Notes, plus any accrued and capitalized interest (and refinancing thereof); (iii) one or more or a combination of A/R receivables or securitization facilities and/or ABL facilities in a maximum amount of up to $250 million and secured by a first lien on accounts receivable and inventory (the "ABL Facilities"), it being understood that there may be domestic ABL Facilities and Australian ABL Facilities; and (iv) cash management and hedging obligations baskets secured on a pari passu basis (subject to a $300 million cap) with the First Lien Debt;

(b) repayment or repurchase of subordinated indebtedness, indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan (including the New Second Lien Notes) and unsecured indebtedness, subject to a carve-out for the Borrower's share of Excess Cash Flow for any fiscal period up to $50 million principal amount in the aggregate per year (plus accrued and unpaid interest on the principal amount of such indebtedness so repaid or repurchased), with no roll-over rights, provided that such repayments or repurchases are only permitted if Unrestricted Cash exceeds $800 million immediately after giving effect to the most recent Cash Flow Sweep and pro forma for such repayments or |

Exhibit 1-7

repurchases (it being understood and agreed that the foregoing shall not apply to restrict the cash payment of any regularly scheduled interest in respect of any New Second Lien Notes in accordance with the terms described in the section captioned "Interest" in Exhibit 2 to the Plan Term Sheet or repayments due at scheduled maturity);

(c) liquidations, mergers, consolidations, acquisitions;

(d) disposition of assets or subsidiaries, including the equity interests of subsidiaries;

(e) affiliate transactions;

(f) investments (including acquisitions);

(g)  dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests, including:

(1) no cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions); and

(2) no cash payments on account of any principal, interest or premium of junior indebtedness (including indebtedness secured on a junior lien basis to the Replacement Secured First Lien Term Loan and unsecured indebtedness) apart from contractual interest payments, repayments due at scheduled maturity and payments permitted under clause (b) above;

(h) fundamental changes (including dispositions of all or substantially all assets);

(i) transactions with respect to bonding subsidiaries;

(j) hedging transactions;

(k) entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, payments of principal, interest and other amounts in respect of the Intercompany Note or other intercompany indebtedness), and the granting of negative pledges;

(l) continuation of or change in business;

(m) changes in accounting practices or fiscal year;

(n) amendments/modification to organization documents or material agreements;

(o) issuance of preferred stock;

(p) use of proceeds in violation of margin regulations; and

(q) restrictions on activities of the subsidiaries that directly hold equity interests in

Exhibit 1-8

| | |
|---|---|
| | Peabody Holdings (Gibraltar) Limited consistent with standard limitations on activities of special purpose vehicles, including incurrence and guarantees[1] of indebtedness, pledges of assets, bankruptcy remoteness, amendments to organizational documents, ownership of assets and conduct of business other than activities incidental to the ownership of equity interests in Peabody Holdings (Gibraltar) Limited; and

(r) amendments, waivers or consents in respect of the Intercompany Note and other intercompany loans owed to any Loan Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Loan Party in subsidiaries that are not Loan Parties (subject to exceptions and materiality thresholds to be agreed, in each case that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the holders of a majority of the outstanding principal amount of the Replacement Secured First Lien Term Loan. Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the Intercompany Note on the Effective Date shall be subject to the approval of the Requisite First Lien Lender Co-Proponents (as defined in the Plan Term Sheet).

The covenants under the Replacement Secured First Lien Term Loan shall be at least as restrictive as the covenants under the New Second Lien Notes. |
| **Financial Covenants** | Maximum Gross Leverage Ratio, measured quarterly and Maximum Capital Expenditures, measured annually; *provided* that unused capital expenditures may be carried forward to the immediately succeeding fiscal year (and any amounts so carried forward shall be deemed to have been used last in any fiscal year). |
| **Events of Default** | Usual and customary for facilities of this type. |
| **Governing Law** | New York. |

---

[1]   Any unsecured guaranty by any such FSHCO of New Second Lien Notes will be subordinated in right of payment to Permitted First Lien Indebtedness on terms acceptable to the Requisite First Lien Co-Proponents.

Exhibit 1-9

**Exhibit 2 to Plan Term Sheet**

**Peabody Energy Corporation**
**Summary of Principal Terms – New Second Lien Notes**

This summary of principal terms (this "New 2L Notes Term Sheet") sets forth certain of the principal terms for the New Second Lien Notes referred to in that certain Peabody Energy Corporation Plan Term Sheet, dated as of December 22, 2016 (together with the exhibits and other attachments thereto, the "Plan Term Sheet"). Capitalized terms used and not otherwise defined in this New 2L Notes Term Sheet have the meanings assigned thereto in the Plan Term Sheet. This New 2L Notes Term Sheet shall be subject to the disclaimers and other provisions of the Plan Term Sheet, as if more fully set forth herein. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Indenture referred to below and related documents (including, without limitation, the terms of any security and guaranty documentation and any intercreditor agreements) shall be consistent with the terms and conditions set forth in this New 2L Notes Term Sheet and otherwise in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion. All references to the Plan Term Sheet and any exhibits thereto refer to the Plan Term Sheet in effect as of December 22, 2016 and exclude any amendments thereto, absent the written agreement of the Requisite Consenting Noteholders.

| Issuer | Peabody Energy Corporation, a reorganized Delaware corporation (the "Company"). |
| --- | --- |
| Notes Offered | New Second Lien Notes (the "Notes"; the holders of the Notes, the "Holders," and the indenture governing the Notes, the "Indenture") in an aggregate principal amount of $450.0 million (plus, if applicable, the principal face amount of any Incremental New Second Lien Notes); provided that the amount of Notes issued on the Effective Date shall be subject to adjustment in connection with cash consideration and/or Additional First Lien Debt distributed to the holders of Second Lien Notes Claims as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"; provided, further, that in no event shall the aggregate principal amount of the Notes (including the principal face amount of any Incremental New Second Lien Notes) issued on the Effective Date be less than $250.0 million. The Notes are to be issued on, and as a condition to, the Effective Date (unless cash and/or Additional First Lien Debt in the aggregate amount of $450 million (plus, if applicable, cash and/or Incremental Additional First Lien Debt distributed on account of Incremental Second Lien Notes Claims) is distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims - Second Lien Notes Claims*"). |
| Second Lien Debt Adjustment | Notwithstanding anything herein to the contrary, to the extent there is a First Lien Full Cash Recovery, the aggregate principal amount of the Additional First Lien Debt and the Notes, as appropriate, permitted to be issued or incurred on the Effective Date shall be reduced, on a dollar-for-dollar basis, by the amount by which Unrestricted Cash (as defined below) as of the Effective Date (after giving effect to the transactions contemplated by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million ( the |

Exhibit 2-1

| | |
|---|---|
| | "Second Lien Debt Adjustment"). "Unrestricted Cash" means cash and cash equivalents of the Company and its subsidiaries (excluding such amounts constituting restricted cash of the Company and its subsidiaries in accordance with GAAP). |
| **Maturity Date** | Six (6) years after the Effective Date; provided that, in the event the latest stated maturity of the Permitted First Lien Indebtedness (as defined below) (as in effect on the Effective Date) is six (6) years or longer after the Effective Date, then the maturity of the Notes shall be the 91st day after such latest stated maturity (as in effect on the Effective Date); provided, further, that in no event shall the maturity of the Notes be later than the 91st day after the seventh (7th) anniversary of the Effective Date. |
| **Interest** | The Notes will bear interest at a per annum rate equal to 3-month LIBOR, plus an applicable margin equal to 300 basis points over the highest all-in yield (calculated and otherwise determined as described below) of any Permitted First Lien Indebtedness outstanding on the Effective Date (disregarding the ABL Facilities (as defined below) for this purpose) (such Permitted First Lien Indebtedness with the highest all-in yield, the "1L Reference Debt"). LIBOR shall be subject to an interest rate floor equal to 1.00% (subject to adjustment as described below). Interest on the Notes shall be payable quarterly in arrears in cash; provided that any applicable portion of interest expressly contemplated below to be payable in kind shall be capitalized on a quarterly basis. |
| | The all-in yield of Permitted First Lien Indebtedness for purposes of identifying the 1L Reference Debt and determining the applicable margin on the Notes shall be determined as follows: |
| | • If more than one series or class of Permitted First Lien Indebtedness is outstanding on the Effective Date, the 1L Reference Debt shall be such debt with the highest all-in yield. |
| | • With respect to any such Permitted First Lien Indebtedness bearing interest at a rate based on LIBOR, the LIBOR component of such debt shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt and has a LIBOR floor greater than the LIBOR floor applicable to the Notes, then the LIBOR floor (but not the applicable margin) applicable to the Notes shall be increased to the extent of such differential between LIBOR floors. |
| | • With respect to any such Permitted First Lien Indebtedness bearing interest at a fixed rate, the all-in yield shall be calculated as described below, minus 1.50%. |
| | • To the extent any Permitted First Lien Indebtedness requires any portion of interest on such debt to be paid in kind with an increase to the principal amount of such debt at specified times during the term of such debt or upon the occurrence of certain conditions ("1L PIK Interest," and the per annum interest rate for such 1L PIK Interest, the "PIK Rate"), then such 1L PIK Interest shall not be included in the calculation of the all-in yield for such debt; provided that, if such debt is the 1L Reference Debt, then the Notes shall bear additional interest, at the PIK Rate, which shall be paid in kind with an increase to the principal amount of the Notes, subject to the same conditions applicable to the 1L PIK Interest; provided, however, that accrual of any such |

Exhibit 2-2

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 755 of 876 PageID #: 7102

Case 16-42529   Doc 1854-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 267 of 330

|  | paid-in-kind interest on the Notes shall not commence until the second (2nd) anniversary of the Effective Date and any such additional paid-in-kind interest shall cease to the extent the 1L Reference Debt is refinanced within 24 months of the Effective Date and such refinanced debt does not contain paid-in-kind interest provisions. |
|--|--|
|  | • The all-in yield calculation for any Permitted First Lien Indebtedness (other than the Replacement Secured First Lien Term Loan (as defined below)) shall not include any commitment or similar fees that are (x) paid or payable to any underwriters or arrangers (in their respective capacities as such) of such debt and (y) not shared generally with lenders in the primary syndication of such debt (it being agreed that any OID shall not be subject to this sentence). |
|  | As used in this section, "all-in yield" means, as to any series or class of Permitted First Lien Indebtedness, the yield to maturity of such debt, whether in the form of interest rate, margin, OID, commitment fees, upfront or similar fees (including, with respect to the Replacement Secured First Lien Term Loan, the "funding fee" referred to in Exhibit 1 to the Plan Term Sheet, provided that the maximum amount of such "funding fee" included in this calculation for the Replacement Secured First Lien Term Loan shall not be more than 300 basis points) or a LIBOR or other interest rate floor (subject to the provisions above), in each case, incurred or payable by the Company generally to all lenders or initial purchasers of such debt or other financing sources (including, as applicable, the Backstop Parties and any arrangers or underwriters of such debt) providing commitments in respect of such debt; provided that OID and upfront fees shall be equated to interest rate assuming a 4-year life to maturity (or, if less, the stated life to maturity at the time of incurrence of the applicable debt). "Replacement Secured First Lien Term Loan" means any replacement secured first lien debt issued to any of the holders of Secured First Lien Lender Claims as part of the treatment for such Claims or other first lien debt committed to by the Backstop Parties in connection with the treatment for such Claims. |
|  | If the holders of any Permitted First Lien Indebtedness receive any non-cash consideration, then (a) such non-cash consideration shall not be included in calculating the all-in yield of such debt and (b) the Holders of the Notes shall receive the same non-cash consideration on a proportionate basis relative to the aggregate principal amount of Notes issued on the Effective Date compared to the aggregate principal amount of the applicable tranche(s) of Permitted First Lien Indebtedness receiving such consideration. |
|  | The Indenture will contain customary "AHYDO" catch-up payment provisions applicable to debt with a term of more than five years. |
| **Default Rate:** | 2% per annum (additive to the interest rate otherwise applicable to the Notes, as described above). The Default Rate shall be imposed automatically on any default under the Indenture resulting from the failure of the Company to pay any scheduled principal installment when due or any scheduled interest payment within five days of the date due or any event of default resulting from the insolvency or bankruptcy of the Company or any Guarantor (as defined below), and may be imposed upon the written election of the Holders of a majority of the outstanding principal amount of the Notes while any other event of default is |

Exhibit 2-3

|  | continuing. |
|---|---|
| **Guarantees, Collateral and Certain Intercreditor Matters** | The Notes shall be jointly and severally guaranteed by (a) each of the Company's existing or hereafter formed or acquired direct and indirect domestic subsidiaries (which shall exclude any domestic subsidiary of any foreign subsidiary), subject to certain exceptions to be agreed, and (b) each other subsidiary of the Company that, as of the Effective Date or from time to time thereafter, guarantees any Permitted First Lien Indebtedness (as defined below) or certain other debt to be agreed (such entities guarantying the Notes, collectively, the "<u>Guarantors</u>"; the Company collectively with the Guarantors, the "<u>Note Parties</u>").  Notwithstanding the foregoing, but subject to the last sentence of this paragraph, the Guarantors shall not include (i) P&L Receivables Company LLC, Sterling Centennial Missouri Insurance Corp., Peabody IC Funding Corp. and Peabody IC Holdings LLC, (ii) future permitted special purpose securitization entities and permitted captive insurance entities, (iii) unrestricted subsidiaries and (iv) Peabody Holdings (Gibraltar) Limited and any future domestic subsidiary of any foreign subsidiary and any domestic subsidiary formed or acquired on or after the Effective Date substantially all of the assets of which consist of the equity interests of foreign subsidiaries (a "<u>FSHCO</u>") to the extent the inclusion of any FSHCO would cause adverse tax consequences to the Note Parties; provided that any such FSHCO may only be excluded pursuant to this clause (iv) so long as such subsidiary (x) does not conduct any substantial business or activities other than direct or indirect ownership of equity interests in or debt owed by foreign subsidiaries or FSHCOs (except for immaterial assets and activities reasonably related or ancillary thereto) and (y) does not incur, and is not otherwise liable for, any material indebtedness or other material liabilities (other than intercompany indebtedness permitted pursuant to the Indenture); provided, further, that any subsidiary, whether now owned or hereafter formed or acquired, that holds equity of Peabody Holdings (Gibraltar) Limited, shall be a guarantor.  Notwithstanding the foregoing, if there is a change in law after the Effective Date that would permit foreign subsidiaries, FSHCOs, and any domestic subsidiaries of a foreign subsidiary or FSHCO to be guarantors without causing any adverse tax consequences to the Company, the Company shall cause each foreign subsidiary, FSHCO, and any domestic subsidiary of a foreign subsidiary or FSHCO to become a guarantor (other than, in each case, unrestricted subsidiaries) to the extent that joining such entity as a guarantor would not cause an adverse tax consequence to the Company.<br><br>As of the Effective Date, the Guarantors shall include, among others, each of the Company's existing direct and indirect subsidiaries that guaranteed the obligations under the DIP Facility Credit Agreement (including Peabody Global Funding, LLC (f/k/a Global Center for Energy and Human Development, LLC)) and/or the prepetition Second Lien Notes.<br><br>The Notes shall be secured by liens on substantially all of the existing and after-acquired assets of the Company and the Guarantors, including, without limitation, (a) a pledge (i) of 100% of the equity interests of Peabody IC Funding Corp and other domestic subsidiaries, (ii) subject to the last sentence of this paragraph, limited to 65% of the equity interests in first tier foreign subsidiaries and FSHCOs now existing or hereafter formed or acquired (to the extent the pledge of 100% of the equity interests of any such entity would result in an adverse tax |

Exhibit 2-4

consequence to the Note Parties) and (iii) of intercompany debt owed to the Company or any Guarantor, and (b) liens on current assets, equipment, intellectual property, material real property (subject to thresholds to be agreed), leaseholds in real property (on a commercially reasonable efforts basis), and licenses. Assets constituting collateral shall be subject to customary exceptions to be agreed, which exceptions shall in no event be less favorable in any material respect to the Holders than the definition of "Excluded Assets" (as defined in the prepetition First Lien Credit Agreement). Notwithstanding the forgoing, if there is a change in law after the Effective Date that in each case without causing any adverse tax consequences, would permit a Note Party (a) to pledge 100% of any foreign subsidiary, any FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO (including, without limitation, Peabody Investments (Gibraltar) Limited and Peabody Holdings (Gibraltar) Limited)), the Company shall or shall cause the 100% of equity interests of each such foreign subsidiary, FSHCO, or any domestic subsidiary of a foreign subsidiary or FSHCO to be pledged hereunder to the extent that doing so would not cause an adverse tax consequence to the Company, or (b) if requested by the trustee or the Holders of a majority of the outstanding principal amount of the Notes, to cause the relevant entities described in this sentence to pledge their operating assets, the Company shall cause such entities to pledge their operating assets to the extent that doing so would not cause an adverse tax consequence to the Company.

Notwithstanding the foregoing (but subject to the last sentence of the immediately preceding paragraph), (i) none of the equity interests of Peabody Holdings (Gibraltar) Limited ("Gib1") shall be pledged, (ii) any subsidiary of the Company directly or indirectly owning any equity interests of Gib1 shall be a Guarantor (it being agreed that any such direct owner that is a FSHCO, substantially all the assets of which consist of equity interests of Gib1, shall be permitted to be an unsecured Guarantor (the "Unsecured Guarantors") and shall not be required to have its equity pledged to secure the Notes, to the extent that a secured guaranty and such an equity pledge would have adverse tax consequences to the Note Parties), (iii) Gib1 shall pledge 65% of the equity interests of Peabody Investments (Gibraltar) Limited ("Gib2") and (iv) the equity interests of Gib1 and any Unsecured Guarantor shall not otherwise be pledged to secure other obligations. The guaranty of the Notes provided by any permitted Unsecured Guarantor shall be subordinated in right of payment to any guaranty of Permitted First Lien Indebtedness provided by such Unsecured Guarantor on terms reasonably acceptable to the Ad Hoc Group of Second Lien Noteholders.

The collateral securing the Notes shall include any assets subject to liens securing any Permitted First Lien Indebtedness (other than any Australian ABL Facility) and other debt to be agreed, and the liens securing the Notes shall be junior in priority to the liens securing any such Permitted First Lien Indebtedness.

The liens securing the Notes shall not be subject to any "principal property cap" or similar cap limiting either the amount of debt subject to such liens or the amount or value of asset subject to such liens from time to time.

The liens securing the Notes shall be subject to an intercreditor agreement (the "Intercreditor Agreement") between the collateral trustee for the Notes and the collateral agent(s) for any Permitted First Lien Indebtedness. The terms of the

Exhibit 2-5

| | |
|---|---|
| | Intercreditor Agreement in no event shall be less favorable in any material respect to the Holders than the terms of the existing intercreditor agreement governing the relative rights of the lenders under the prepetition First Lien Credit Agreement and the holders of the prepetition Second Lien Notes (subject to appropriate modifications to reflect that the liens governed thereby are not subject to any "principal property cap" or similar cap).  Pursuant to the Plan, such existing intercreditor agreement shall be terminated in full on the Effective Date. |
| **Special Limitations on the Activities of certain Subsidiaries** | The Unsecured Guarantors, any subsidiary that directly holds equity interests in Gib1 and other subsidiaries to be agreed shall be subject to customary special purpose entity restrictions, including bankruptcy remoteness and special limitations on (i) incurrence and guarantees of indebtedness, (ii) pledges of assets, (iii) conduct of business activities unrelated to owning certain assets (in the case of any Unsecured Guarantor, unrelated to owning equity interests of Gib1), (iv) ownership of assets, (v) dispositions or other transfers of assets and (vi) amendments to their organizational documents.  The organizational documents of such subsidiaries shall be required to be amended to reflect such special purpose entity restrictions and provide that further modification thereof is subject to the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Unrestricted Subsidiaries** | Subsidiaries of the Company designated as "unrestricted subsidiaries" as of the Effective Date are to be mutually agreed.  The designation of additional unrestricted subsidiaries after the Effective Date shall be subject to (a) the absence of a default under the Indenture, and (b) other conditions and limitations to be agreed.  Notwithstanding the foregoing, none of the entities identified on Annex A hereto  or any direct or indirect parent company of any such entity shall be designated as unrestricted subsidiaries. |
| **Optional Redemption** | Redeemable, in whole or in part, without premium or penalty. |
| **Change of Control Repurchase Offer** | 101% mandatory repurchase offer upon the occurrence of a change of control (customary definition to be agreed). |
| **Asset Sale Proceeds Mandatory Prepayment** | Mandatory prepayment (at par) in an amount equal to (i) 100% of the net proceeds from asset sales by the Company or its restricted subsidiaries (subject to exceptions to be agreed, including exceptions for certain ordinary course or de minimis sales) and (ii) 100% of the permanent reduction in the principal balance of the Loan Agreement, dated as of April 11, 2012, among Peabody Investment Corp., as lender, and Peabody Energy Australia Pty Ltd, as borrower (the "PIC Intercompany Note") as of the Effective Date in excess of the sum of (A) an amount equal to the Excess Cash Flow generated by non-domestic subsidiaries of the Company on and after the Effective Date, (B) an amount equal to the amount of mandatory prepayments of the Notes and any Permitted First Lien Indebtedness made on account of net cash proceeds from asset dispositions made by any non-domestic subsidiaries on and after the Effective Date and (C) an amount to be agreed, in any such case, except to the extent such amounts are applied to prepay any Permitted First Lien Indebtedness (other than any revolving or similar credit facility) then outstanding. |
| **Excess Cash** | The Company will be required to make mandatory prepayments of the Notes in |

Exhibit 2-6

| Mandatory Prepayment | an amount equal to the lesser of (x) 25% of Excess Cash Flow (to be defined no less favorable to the Holders than the definition of "Excess Cash Flow" in the definitive documents governing the Permitted First Lien Indebtedness as in effect on the Effective Date) for the applicable fiscal period and (y) the difference between (i) 75% of Excess Cash Flow for the applicable fiscal period minus (ii) the Excess Cash Flow mandatory prepayment percentage applied ratably to outstanding Permitted First Lien Indebtedness (or, if Excess Cash Flow mandatory prepayments on Permitted First Lien Indebtedness are not applied ratably, the aggregate of all Excess Cash Flow mandatory prepayment percentages actually applied to prepay the Permitted First Lien Indebtedness); provided that (A) any liquidity, minimum cash or similar threshold for an Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than any such threshold for "Excess Cash Flow" or "Cash Flow Sweep" summarized in Exhibit 1 to the Plan Term Sheet and (B) any payment restrictions applicable to any Excess Cash Flow mandatory prepayment shall be no less favorable to the Holders than the payment restrictions for "Excess Cash Flow" summarized in Exhibit 1 to the Plan Term Sheet.

Notwithstanding the above, for so long as any Replacement Secured First Lien Term Loans remains outstanding and the Excess Cash Flow required to be prepaid (and actually prepaid) under such Replacement Secured First Lien Term Loans in any fiscal year is less than 75%, the Company will be required to make mandatory prepayments of the Notes in an amount equal to 25% of Excess Cash Flow (as defined in and calculated under the definitive documents governing the Replacement Secured First Lien Term Loans as in effect on the Effective Date) for the applicable fiscal period, subject to the thresholds, payment restrictions and other terms and conditions set forth in Exhibit 1 to the Plan Term Sheet.

No amendment or refinancing of the Permitted First Lien Indebtedness shall be permitted to modify the terms of the Excess Cash Flow mandatory prepayments in a manner that is adverse in any material respect to the Holders.

Excess Cash Flow mandatory prepayments of the Notes shall be made no less frequently than on an annual basis, and, in the case of an annual mandatory prepayment, no later than 30 days after the date on which the Company's Annual Report on Form 10-K for its most recently completed fiscal year is filed with the Securities and Exchange Commission or, if the Company is not required to file such reports, the date on which the Company's audited annual financials for its most recently completed fiscal year are delivered under the Indenture (or, if earlier, 30 days after the date on which the annual financials for such fiscal year were required to be delivered under the Indenture), commencing with the Company's fiscal year ending December 31, 2018; provided that (i) the Excess Cash Flow mandatory prepayment for the Notes for any applicable fiscal period shall be made no later than five (5) business days after the Excess Cash Flow mandatory prepayment for such fiscal period is made in respect of any Permitted First Lien Indebtedness and (ii) in the event that any Permitted First Lien Indebtedness requires Excess Cash Flow mandatory prepayments more frequently than on an annual basis for any fiscal period (e.g., quarterly or semi-annually), then Excess Cash Flow mandatory prepayments of the Notes shall be determined and required on the same periodic basis applicable to such Permitted First Lien Indebtedness. |
|---|---|

Exhibit 2-7

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 760 of 876 PageID #: 7407

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 272 of 330

| | |
|---|---|
| **Financial Covenants** | The Indenture shall contain financial maintenance covenants identical to the most restrictive financial maintenance covenants contained in any definitive documentation for any Permitted First Lien Indebtedness outstanding from time to time; provided that, in the event the requisite holders of such Permitted First Lien Indebtedness amend or waive compliance with the financial maintenance covenants applicable to such Permitted First Lien Indebtedness, a corresponding amendment or waiver shall automatically apply to the financial maintenance covenants contained in the Indenture. |
| **Permitted ABL Facilities** | One or more of a combination of A/R receivables or securitization facilities and/or ABL facilities in an aggregate principal amount not to exceed the U.S. dollar equivalent of $250 million, on customary terms for facilities of such type (together with any refinancing or replacement facilities of such type, the "ABL Facilities"). The ABL Facilities will be secured by a first priority lien on the ABL Priority Collateral (as defined in Exhibit 1 to the Plan Term Sheet) and, in the case of domestic ABL Facilities that are not A/R receivables or securitization facilities, by a second priority lien on the other collateral securing the Notes. It is understood that there may be domestic ABL Facilities and Australian ABL Facilities. |
| **Certain Intercompany Claims** | Notwithstanding anything to the contrary in the Plan Term Sheet, any reinstatement, offset, cancellation, extinguishment, elimination and/or other settlement (including by way of capital contribution) of the PIC Intercompany Note on the Effective Date shall be subject to the approval of the Ad Hoc Group of Second Lien Noteholders. The Indenture shall include restrictions on amendments, waivers or consents in respect of (i) the PIC Intercompany Note and (ii) other intercompany loans owed to any Note Party from time to time or that are outstanding from time to time from the on-lending of proceeds of investments by any Note Party in subsidiaries that are not Note Parties (subject to exceptions and materiality thresholds to be agreed), in any such case, that would reduce the aggregate amount of principal or interest required to be paid thereunder or otherwise extend the date for the making of any required payments principal or interest thereunder, in each case without the prior written consent of the Holders of a majority of the outstanding principal amount of the Notes. |
| **Certain Covenants** | The Indenture shall contain high-yield bond covenants and other covenants and restrictions to be negotiated, including:<br><br>• Limitations on debt incurrence, liens and guaranties applicable to the Company and its restricted subsidiaries, capping total secured and unsecured debt at $2.20 billion (plus any interest paid in kind on such debt and, if applicable, the amount of any cash or debt consideration on account of any Incremental Second Lien Notes Claims, minus the amount of any Second Lien Debt Adjustment, minus the amount of any First Lien Debt Adjustment[1]), subject to certain ordinary course exceptions to be agreed |

---

[1] "First Lien Debt Adjustment" the reduction of the aggregate principal amount of the Replacement Secured First Lien Term Loan permitted to be issued or incurred on the Effective Date, on a dollar-for-dollar basis, by (i) the amount by which Unrestricted Cash as of the Effective Date (after giving effect to the transactions contemplated

*(cont'd)*

Exhibit 2-8

> o First lien indebtedness consisting of the following (any such indebtedness so secured on a senior basis, collectively, the "Permitted First Lien Indebtedness"):
>
> - the Exit Facility and/or the Replacement Secured First Lien Term Loan issued or incurred on the Effective Date in an aggregate principal amount not to exceed the sum of the following amounts less any amounts prepaid or repaid (not refinanced) thereunder from time to time: (x) $1.5 billion (minus the amount of any First Lien Debt Adjustment), plus (y) the amount of cash consideration and/or Additional First Lien Debt (including any such cash or debt on account of any Incremental Second Lien Notes Claims) distributed to the holders of Second Lien Notes Claims in lieu of Notes as further described in Part III of the Plan Term Sheet under the section captioned "*Classified Claims -Second Lien Notes Claims*," plus (z) any interest paid in kind on such first lien indebtedness;
> - the ABL Facilities in an aggregate principal amount of up to $250 million; and
> - any refinancing of the foregoing, subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity than the debt being refinanced, (ii) be secured by assets that do not constitute collateral of the debt being refinanced, unless such collateral shall also secure (or be added to secure) the Notes and (iii) be guaranteed by affiliates of the Company that do not guaranty the debt being refinanced unless such guarantor shall also guarantee (or be added to guarantee) the Notes;
>
> o Additional first lien or second lien debt may be incurred to the extent the proceeds are used to ratably repay all or a portion of the Notes; provided that any such refinancing of the Notes shall be subject to customary "permitted refinancing" conditions to be agreed, including requirements that any such refinancing debt shall not (i) have a shorter maturity or weighted average life to maturity (unless such refinancing debt is first lien debt) than the Notes, (ii) have a greater all-in yield than the Notes, (iii) be secured by assets that do not constitute collateral for the Notes, (iv) be guaranteed by affiliates of the Company that do not guaranty the Notes, (v) in the case of any such second lien refinancing debt, contain more restrictive covenants or events of default than those applicable to the Notes (unless the Holders receive the benefit of such more restrictive terms) and (vi) in the case of any such second lien refinancing debt, contain any mandatory prepayment or redemption provisions that would

---

*(cont'd from previous page)*

by the Plan Term Sheet and accounting for all cash payments required to be made in connection with confirmation of the Plan (including payment of all Administrative Expense Claims and Priority Tax Claims) in accordance with the terms of the PSA) exceeds $800 million and (ii) the amount of any aggregate net proceeds from the Section 1145 Rights Offering and the Private Placement (or any similar transaction agreed to pursuant to the PSA) in excess of $1.5 billion, as described in Exhibit 1 to the Plan Term Sheet in the section captioned "*Principal Amount*".

Exhibit 2-9

|  | result in prepayments or redemptions of such debt prior to the Notes;<br>○ No pari passu or junior lien debt shall be permitted;<br>○ Limitations on acquisition indebtedness;<br>○ Limitations on unsecured indebtedness to be agreed;<br>○ Non-speculative hedging transactions shall be permitted, subject to customary parameters to be agreed, and up to $300 million to the extent a First Lien Full Cash Recovery does not occur on the Effective Date, otherwise $400 million of net exposure under such hedging transactions shall be permitted to be secured by a senior lien on the collateral securing the Notes;<br>○ Any debt outstanding on the Effective Date shall not contain restrictions on the payment or prepayment of the Notes that are less favorable to the Holders than any such restrictions contained in Exhibit 1 to the Plan Term Sheet<br>• Limitations on making dividends, distributions or similar transfers on (and redemptions and purchases of) equity interests and other restricted payments (including repayments or repurchases of, or other cash payments on account of, junior lien, subordinated or unsecured debt and the making of investments and acquisitions)<br>○ No cash payments shall be permitted on account of any common or preferred equity of the Company (other than permitted tax distributions);<br>○ No cash payments on junior indebtedness apart from contractual interest payments and repayments due at scheduled maturity; and<br>○ The up to $50 million annual basket referred to in Exhibit 1 of the Plan Term Sheet for repayments and repurchases of junior lien, subordinated or unsecured indebtedness may only be utilized for the Notes<br>• Limitations on entering into burdensome agreements, including agreements that restrict distributions by or from the Company's subsidiaries (including, for the avoidance of doubt, agreements that restrict payments of principal, interest and other amounts in respect of the PIC Intercompany Note and other intercompany indebtedness), and the granting of negative pledges<br>• Anti-layering covenant<br>• Limitations on the issuance of preferred stock<br>• Limitations on fundamental changes, including dispositions of all or substantially all assets, liquidations, mergers, consolidations and acquisitions<br>• Limitations on sales of assets, including the equity interests of subsidiaries<br>• Limitations on affiliate transactions<br>• Limitations on transactions with respect to bonding subsidiaries<br>• Limitations on change in business or changes in accounting practices or fiscal year<br>• Limitations on amendments/modification to organization documents or material agreements<br>• Limitations on the issuance of preferred stock<br>• Reporting requirements, including delivery of financial statements and compliance certificates<br>• Affirmative covenants to be agreed, including (i) preservation of existence, (ii) payment of liabilities, including taxes, (iii) maintenance of insurance, (iv) maintenance of properties and leases, (v) visitation rights, (vi) keeping of |
|---|---|

Exhibit 2-10

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 763 of 876 PageID #: 7730

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C
- Backstop Commitment Agreement   Pg 275 of 330

| | |
|---|---|
| | records and books of accounts, (vii) compliance with laws; sanctions, (viii) collateral; further assurances, (ix) subordination of intercompany loans, (x) post-closing covenants and (xi) creation or ownership of certain subsidiaries, partnerships and joint ventures |
| **Limitations on Refinancing Restrictions** | Permitted First Lien Indebtedness may contain customary "permitted refinancing" conditions to be agreed with respect to restrictions on the refinancing or replacement of the Notes; provided that any such restrictions shall not prohibit such refinancing debt from (i) having a greater all-in yield than the Notes to the extent such additional yield is in the form of interest payable only in kind or (ii) having covenants that are more restrictive than the Notes, so long as such (x) covenants are not more restrictive (when taken as a whole) than the most restrictive terms of any Permitted First Lien Indebtedness then outstanding (provided that the foregoing shall not permit the elimination of any first lien/second lien covenant cushions, standstills or like deviations and/or terms) and (y) without in any manner limiting the preceding clause (x), to the extent any particular clause is more restrictive, it is added for the benefit of the holders of the Permitted First Lien Indebtedness. |
| **Events of Default** | The Indenture shall contain event of default provisions customary for high-yield bonds, with certain grace periods and materiality thresholds to be agreed, including, in the case of a default of the financial covenants, a 30-day grace period.  Such provisions shall include a cross-acceleration provision with respect to any Permitted First Lien Indebtedness, and cross-default to other indebtedness subject to a materiality threshold to be agreed. |
| **Governing Law** | The Notes and the Indenture shall be governed by New York law. |

Exhibit 2-11

NAI-1502346427v1

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 764 of 876 PageID #: 1191

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 276 of 330

**Annex A to Exhibit 2 to Plan Term Sheet**

Peabody Australia Holdco Pty Ltd
Peabody Australia Intermediate Pty Ltd
Peabody COALTRADE Pacific Pty Ltd
Peabody Energy (Gibraltar) Limited
Peabody Energy Australia Pty Ltd.
Peabody Energy Finance Pty Ltd
Peabody Global Funding, LLC
Peabody Holdings (Gibraltar) Limited
Peabody Holland B.V.
Peabody IC Funding Corp.
Peabody IC Holdings, LLC
Peabody International (Gibraltar) Limited
Peabody International Investments, Inc.
Peabody Investments (Gibraltar) Limited
Peabody Investments (Gibraltar) Limited
Peabody Investments Corporation
Peabody MCC (Gibraltar) Limited
Peabody Mining (Gibraltar) Limited
Peabody Netherlands Holding B.V.
U.S. newco to be formed to hold any equity in Peabody Holdings (Gibraltar) Limited

NAI-1502346427v1

## Exhibit 3

### Preferred Equity Term Sheet

| Term | Description |
|---|---|
| **The Preferred Equity** | Mandatorily convertible preferred equity issued by Reorganized PEC that is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over any another class of capital stock issued by the Reorganized Debtors. |
| **Dividend Rate** | 8.5% per annum, payable semi-annually in kind as a dividend of additional shares of Preferred Equity. Dividends shall accumulate to the extent not paid and shall accrue dividends in the same manner as the outstanding Preferred Equity. |
| **Participation** | The Preferred Equity shall participate on an as-converted basis (giving effect to any accrued and unpaid dividends) in any dividend or distribution (whether in cash, securities, debt, or assets, other than common stock dividends), and any payments in connection with a liquidation event, payable on the Reorganized PEC Common Stock. |
| **Liquidation Preference** | $25.00 per share of Preferred Equity, plus any accrued but unpaid dividends through, but not including, the date of liquidation or other determination (whether or not declared, prorated for any partial dividend period). |
| **Conversion at the Option of the Holder** | The Preferred Equity shall be convertible into Reorganized PEC Common Stock at any time, at the option of the holder of such Preferred Equity, at an initial conversion price based on a discount of 35% to Plan Equity Value (the "Conversion Price"), subject to anti-dilution protection as provided herein.  In connection with any optional conversion of the Preferred Equity, the Conversion Price shall be adjusted for accrued but unpaid dividends to, but not including, the conversion date. The Conversion Price for any such optional conversion shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Optional Redemption by the Company** | Subject to early conversion or other retirement of the Preferred Equity, if at any time following the Effective Date, less than 25% of the total number of shares of Preferred Equity that were issued on the Effective Date remain outstanding, then the Company shall have the right, but not the obligation, to redeem all (but not less than all) of the remaining shares of Preferred Equity, following thirty (30) days' notice, at a redemption price equal to the Liquidation Preference of such shares of Preferred Equity, payable in cash or shares of Reorganized PEC Common Stock at Reorganized PEC's election; provided that the |

| Term | Description |
|------|-------------|
| | Company shall not redeem any shares of Preferred Equity for cash during any time that any obligations under the Replacement Secured First Lien Term Loan remain outstanding. The Conversion Price for any such optional redemption shall also be adjusted to reflect the Makewhole Amount (if applicable). |
| **Mandatory Conversion** | <u>Conversion Threshold</u>. Beginning on the Effective Date, each outstanding share of Preferred Equity shall automatically convert (unless previously converted at the option of the holder of such Preferred Equity or pursuant to an exercise of a conversion right in connection with a Fundamental Change (as defined below)) into a number of shares of Reorganized PEC Common Stock at the Conversion Price (such conversion, the "<u>Mandatory Conversion</u>") if the volume weighted average price of the Reorganized PEC Common Stock exceeds 130% of the plan common equity value (the "<u>Conversion Threshold</u>") for at least 45 trading days in a 60 consecutive trading day period, including each of the last 20 days in such 60 consecutive trading day period (such period, the "<u>Mandatory Conversion Period</u>'). The issuance of shares of Reorganized PEC Common Stock pursuant to the Mandatory Conversion shall be effected on the third business day following the expiration of the Mandatory Conversion Period (such date, the "<u>Mandatory Conversion Date</u>"). Notwithstanding the foregoing, during the first 45 trading days post Effective Date, a Mandatory Conversion will be deemed to have occurred if the volume weighted average price of Reorganized PEC Common Stock exceeds 150% of the plan common equity value for at least 10 trading days in a 20 consecutive day trading period, including each of the last 5 days of the 10 trading days when the threshold is achieved.<br><br>If the Mandatory Conversion occurs within the first 36 months after the Effective Date, the Conversion Price applicable to such Mandatory Conversion shall also be adjusted to reflect the amount of preferred dividends that would otherwise have been payable within the first 36 months to the extent not already paid (such additional amount, the "<u>Makewhole Amount</u>"). In connection with any Mandatory Conversation after the first 36 months after the Effective Date, the Conversion Price shall only be adjusted for accrued but unpaid dividends as of, but not including, the Mandatory Conversion Date.<br><br><u>Conversion by Holders</u>. At any time following the Effective Date, if holders of at least 66 2/3% of all outstanding Preferred Equity (the "<u>Electing Holders</u>") elect to convert the Preferred |

| Term | Description |
|------|-------------|
| | Equity held by them, then all Preferred Equity then outstanding that is not held by the Electing Holders shall automatically convert at the same time and on the same terms as the Preferred Equity held by the Electing Holders.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable). |
| **Conversion Upon a Fundamental Change** | The Preferred Equity shall automatically convert into shares of Reorganized PEC Common Stock immediately prior to the consummation of a Fundamental Change, approved as provided below under "Voting Rights," if either (x) at consummation of the Fundamental Change, the price of the Reorganized PEC Common Stock exceeds the Conversion Threshold, or (y) the consideration payable in the Fundamental Change per share of Reorganized PEC Common Stock exceeds the Conversion Threshold and is payable in cash.  The Conversion Price for such conversion shall be adjusted to reflect the Makewhole Amount (if applicable). <br><br> "Fundamental Change" means a sale of Reorganized PEC, whether by merger, share purchase or otherwise, a sale of substantially all of the assets of Reorganized PEC and its subsidiaries taken as a whole or other business combination transaction involving Reorganized PEC as a result of which the equity holders of Reorganized PEC immediately following the transaction are holders of less than 50% of the equity interests in the surviving entity. |
| **Anti-dilution Protection** | If and to the extent not  otherwise paid or provided for as contemplated   by   "Dividend   Participation"   above,   the Conversion Price shall be subject to customary anti-dilution adjustment for: <br><br> ▪ stock splits, reverse stock splits and stock dividends on all or substantially all shares of Reorganized PEC Common Stock; <br><br> ▪ issuance to all or substantially all holders of Reorganized PEC Common Stock of certain warrants or rights to purchase additional shares of Reorganized PEC Common Stock; <br><br> ▪ issuance of Reorganized PEC Common Stock (and/or securities exercisable for or convertible into Reorganized PEC Common Stock) at a price (or exercise price) per share |

| Term | Description |
|------|-------------|
| | less than 95% of the current market price per share of Reorganized PEC Common Stock;[1] and |
| | ▪ successfully completed above-market self-tender offers and exchanges offers involving the Reorganized PEC Common Stock. |
| | In addition, upon the occurrence of a Fundamental Change, approved as provided below under "Voting Rights," unless the Preferred Equity is mandatorily convertible immediately prior thereto, the Preferred Equity shall thereafter be convertible into the cash, securities or assets receivable by holders of Reorganized PEC Common Stock in the applicable transaction. |
| **Voting Rights** | The Preferred Equity will vote with the Reorganized PEC Common Stock as a single class on an as-converted basis (giving effect to any accrued but unpaid dividends) on all matters submitted to a vote of the holders of Reorganized PEC Common Stock. |
| | The Preferred Equity will be entitled to vote as a separate class in respect of each of the following (with the affirmative vote of a majority of the outstanding Preferred Equity required to approve such matters, except as specified below): |
| | ▪ Any increase in the authorized amount of the Preferred Equity; |
| | ▪ Authorization of any class of equity ranking senior to or on par with the Preferred Equity; |
| | ▪ Any amendment to the terms of the Preferred Equity, which approval shall require the affirmative vote of 2/3 of the outstanding Preferred Equity; |
| | ▪ Any Fundamental Change requiring approval of the holders of Reorganized PEC Common Stock; |
| | ▪ Any liquidation or winding-up of Reorganized PEC; and |
| | ▪ Authorization of dividends on Reorganized PEC Common Stock in excess of $100 million payable to holders of Reorganized PEC Common Stock in any 12-month period. |
| **Registration Rights** | Without limiting the Company's obligations under the Registration Rights Agreement, all holders of Preferred Equity and any shares of Reorganized PEC Common Stock issuable |

---

[1]   Inclusion of this provision is subject to this provision not causing the Preferred Equity to be treated other than as equity for accounting purposes and not requiring debt [or derivative] accounting treatment (and this provision being the only cause of such treatment).

| Term | Description |
|---|---|
| | upon exercise or conversion thereof that constitute "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act) and all holders that are "affiliates" of Reorganized PEC (as defined in Rule 144(a)(1) under the Securities Act) shall be entitled to customary resale registration rights, including shelf, demand and resale registration (and, for clarity, the Company shall agree that if any person who proposes to make a sale of any such securities would be entitled to such registration rights but for the Company's view that such proposed seller is not an "affiliate" of Reorganized PEC, then the Company and its legal counsel shall upon request promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such proposed seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such proposed sale to be made without compliance with the volume or manner of sale restrictions of Rule 144 under the Securities Act).<br><br>Reorganized PEC shall file a resale shelf registration statement for such holders, and shall use commercially reasonable efforts to cause the registration statement to go effective, as promptly as practicable following the Effective Date, as summarized in more detail in Exhibit 5 under "Registration Rights." |
| **Stock Exchange Listing** | TBD |
| **Accounting Treatment** | TBD |

# Exhibit 4

**PEABODY ENERGY CORPORATION
LONG-TERM INCENTIVE PLAN**

**PEABODY ENERGY CORPORATION**
**LONG-TERM INCENTIVE PLAN**

The following term sheet summarizes the principal terms of a Long-Term Incentive Plan (the "LTIP") to be sponsored on and after the Effective Date by Reorganized PEC.

| General Description of LTIP | <u>Purpose</u>.  The purpose of the LTIP is to help align the interests of participants with Reorganized PEC's shareholders and to recognize, reward and retain the services of executives, other employees, and consultants of Reorganized PEC and its subsidiaries and non-employee directors of Reorganized PEC. |
|---|---|
| | <u>LTIP Pool</u>.  The LTIP will provide for a pool of shares of Reorganized PEC Common Stock to consist of 10% of the fully diluted equity (after giving effect to the exercise of the Penny Warrants and the conversion of the Preferred Equity) of Reorganized PEC (the "<u>LTIP Pool</u>").  The LTIP Pool will be used for awards to be granted on the Effective Date and for potential future awards. |
| | <u>Awards</u>.  The LTIP will provide for the grant of cash and stock-based awards including stock options, stock appreciation rights, restricted stock, shares of Reorganized PEC Common Stock, restricted stock units, deferred stock, performance units, dividend equivalents and cash incentive awards. |
| | <u>Administration</u>.  The LTIP initially will be administered by the Compensation Committee of the Board of Directors of PEC (the "<u>Committee</u>").  Emergence Awards will be allocated and approved by the Committee.  Future awards will be allocated and approved by the Post-Emergence Committee (as defined below). |
| Allocation of Emergence Awards | 25.8% of the LTIP Pool (the "<u>Emergence Pool</u>") will be granted to employees and executives on the Effective Date in the form of restricted Reorganized PEC Common Stock (or units) ("<u>Emergence Awards</u>").  The Emergence Pool will be allocated by the Committee to the six most senior executives as follows: |

|  | Executive / Level | Allocation of Emergence Pool |
|---|---|---|
| | G. Kellow | 18.75% |
| | C. Meintjes | 6.25% |
| | K. Williamson | 6.25% |
| | A. Schwetz | 6.50% |
| | V. Dorch | 4.38% |
| | B. Galli | 3.75% |

| | The remainder of the Emergence Pool (54%) will be allocated by the Committee to other employees prior to the Effective Date. |
|---|---|
| Terms of Emergence Awards | <u>Normal Vesting</u>. |
| | • Emergence Awards granted to Directors and above will generally vest ratably on each of the first three anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | • Emergence Awards granted to employees below the level of Director will generally vest ratably on each of the first two anniversaries of the Effective Date if the employee remains employed with Reorganized PEC and its subsidiaries on each applicable vesting date, subject to the accelerated vesting provisions as described below. |
| | <u>Accelerated Vesting</u>.  Emergence Awards will become fully vested upon (i) a participant's termination of employment by Reorganized PEC and its subsidiaries (or any applicable successors) without Cause or for Good Reason and (ii) a participant's termination of |

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 772 of 876 PageID #: 7119

Case 16-42529    Doc 1854-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C
- Backstop Commitment Agreement    Pg 284 of 330

| | |
|---|---|
| | employment with Reorganized PEC and its subsidiaries (or applicable successors) due to death or Disability. To the extent the Emergence Awards are not replaced upon a Change in Control, the Post-Emergence Committee may convert the awards to cash-settled awards based on the value of the consideration shareholders receive in the Change in Control, as determined by the Post-Emergence Committee. |
| | Forfeiture.  Participants will forfeit unvested Emergence Awards upon (i) any voluntary resignation of employment with Reorganized PEC and its subsidiaries (or applicable successors) (other than for Good Reason) and (ii) any termination of employment by Reorganized PEC and its subsidiaries (or applicable successors) for Cause. |
| | Dividend Equivalents.  Unvested Emergence Awards will accrue dividend equivalents. Accrued dividend equivalents will be subject to the same vesting and termination provisions as the underlying shares of Reorganized PEC Common Stock to which they relate. |
| | Taxes.  Participants will satisfy taxes required to be withheld upon vesting and/or settlement of an Emergence Award through share withholding, subject to compliance with applicable laws. |
| **Future Awards** | The remaining LTIP Pool will be granted, on terms and conditions (including allocation and vesting) to be established by the Compensation Committee of the Board of Directors of Reorganized PEC (the "Post-Emergence Committee"), in its discretion. |
| **Restrictive Covenants** | Generally, participants will be bound by the standard restrictive covenant agreement which contains non-competition and non-solicitation provisions, among others. |
| **Definition of Cause for Emergence Awards** | "Cause" means: (a) any willful fraud, dishonesty or misconduct of the participant that can reasonably be expected to have a detrimental effect on (i) the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates or (ii) the participant's reputation or performance of his or her duties to Reorganized PEC or any of its subsidiaries or affiliates; (b) willful refusal or failure of the participant to comply with Reorganized PEC's Code of Business Conduct and Ethics, Reorganized PEC's Anti- Corruption and Bribery policy or any other material corporate policy of Reorganized PEC; (c) the participant's willful or repeated failure to meet documented performance objectives or to perform his or her duties or to follow reasonable and lawful directives of his or her manager (other than due to death or Disability); (d) the participant's conviction of, or plea of nolo contendere to (i) any felony; or (ii) any other criminal charge that may reasonably be expected to have a material detrimental effect on the reputation or business of Reorganized PEC or any of its subsidiaries or affiliates; or (e) the participant's willful failure to cooperate with a bona fide internal investigation or an investigation by regulatory or law enforcement authorities, whether or not related to the participant's employment with Reorganized PEC, after being instructed to cooperate by the Chairman and/or Chief Executive Officer or by the Board of Directors of Reorganized PEC, or the willful destruction of or willful failure to preserve documents or other material known to be relevant to any such investigation; provided that with respect to clause (b) or (c) above, the participant shall have 15 business days following written notice of the conduct which is the basis for the potential termination for Cause within which to cure such conduct, to the extent it can be cured, to prevent termination for Cause by Reorganized PEC. If the participant cures the conduct that is the basis for the potential termination for Cause within such period, Reorganized PEC's notice of termination shall be deemed withdrawn. |
| **Definition of Change in Control for Emergence Awards** | "Change in Control" means the occurrence of any one or more of the following: (a) any corporation, person or other entity (other than Reorganized PEC, a majority-owned subsidiary of Reorganized PEC or any of its subsidiaries, or an employee benefit plan (or related trust) sponsored or maintained by Reorganized PEC or any of its subsidiaries), including a "group" as defined in Section 13(d)(3) of the Exchange Act, becomes the beneficial owner of stock representing more than 50% of the combined voting power of Reorganized PEC's then outstanding securities; (b) there is consummated (i) a merger, consolidation, plan of arrangement, reorganization or similar transaction or series of |

| | |
|---|---|
| | transactions in which Reorganized PEC is involved, other than such a transaction or series of transactions which would result in the shareholders of Reorganized PEC immediately prior thereto continuing to own (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the securities of Reorganized PEC or such surviving entity (or the parent, if any) outstanding immediately after such transaction(s) in substantially the same proportions as their ownership immediately prior to such transaction(s); (ii) a sale or other disposition of all or substantially all of Reorganized PEC's assets; or (iii) approval by Reorganized PEC's shareholders of a plan of liquidation for Reorganized PEC; or (c) within any period of 24 consecutive months, persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period, together with persons who were first elected as directors (other than as a result of any settlement of a proxy or consent solicitation contest or any action taken to avoid such a contest) during such 24-month period by or upon the recommendation of persons who were members of the Board of Reorganized PEC immediately prior to such 24-month period and who constituted a majority of the Board of Reorganized PEC at the time of such election, cease to constitute a majority of the Board of Reorganized PEC. To the extent required for an award that is "deferred compensation" within the meaning of Section 409A of the Internal Revenue Code ("Code") to comply with Section 409A of the Code, no transaction will be a Change in Control unless it is also a change in the ownership or effective control of Reorganized PEC, or in the ownership of a substantial portion of Reorganized PEC's assets, as provided in Section 409A(a)(2)(A)(v) of the Code and Treasury Regulations Section 1.409A-3(i)(5).<br><br>For the avoidance of doubt, (a) any issuance, transfer, or acquisition of common stock, preferred stock, or other securities upon the Effective Date pursuant to the Plan or in connection with the Restructuring, including, but not limited to, any purchase of shares by any party or parties pursuant to the Private Placement or the Section 1145 Rights Offering, (b) entry into any agreement, including the Backstop Commitment Agreement and the Private Placement Agreement in connection with such proposed issuance, transfer, or acquisition, and (c) revesting of assets in Reorganized PEC as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "Change in Control" under the LTIP. |
| **Definition of Disability for Emergence Awards** | "Disability" means a mental or physical illness that entitles the participant to receive benefits under the long-term disability plan of an employer, or if the participant is not covered by such a plan or the participant is not an employee of an employer, a mental or physical illness that renders a participant totally and permanently incapable of performing the participant's duties for Reorganized PEC or a subsidiary.  Notwithstanding the foregoing, (a) an illness shall not qualify as a Disability if it is the result of (i) a willfully self-inflicted injury or willfully self-induced sickness; or (ii) an injury or disease contracted, suffered, or incurred while participating in a felony criminal offense; and (b) with respect to any award subject to Section 409A of the Code, Disability shall mean a participant's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. |
| **Definition of Good Reason for Emergence Awards** | "Good Reason" shall mean (a) "Good Reason" as defined in the participant's employment agreement with Reorganized PEC, if any; or (b) if the participant does not have an employment agreement with Reorganized PEC or such agreement does not define Good Reason, then:  (i) a reduction, other than a reduction that generally affects all similarly-situated executives and does not exceed 10% in one year or 20% in the aggregate over three consecutive years, by Reorganized PEC in the participant's base salary from that in effect immediately prior to the reduction; (ii) a material reduction, other than a reduction that generally affects all similarly-situated executives, by Reorganized PEC in the participant's target or maximum annual cash incentive award opportunity or target or maximum annual equity-based compensation award opportunity from those in effect immediately prior to any such reduction; (iii) relocation, other than through mutual agreement in writing between |

|  | Reorganized PEC and the participant or a secondment or temporary relocation for a reasonably finite period of time, of the participant's primary office by more than 50 miles from the location of the participant's primary office as of the agreement date; or (iv) any material diminution or material adverse change in the participant's duties or responsibilities as they exist as of the agreement date; provided, that (x) if the participant terminates participant's employment for "Good Reason," the participant shall provide written notice to Reorganized PEC at least 30 days in advance of the date of termination, such notice shall describe the conduct the participant believes to constitute "Good Reason" and Reorganized PEC shall have the opportunity to cure the "Good Reason" event within 30 days after receiving such notice, (y) if Reorganized PEC cures the conduct that is the basis for the potential termination for "Good Reason" within such 30 day period, the participant's notice of termination shall be deemed withdrawn and (z) if the participant does not give notice to Reorganized PEC as described herein within 90 days after an event giving rise to "Good Reason," the participant's right to claim "Good Reason" termination on the basis of such event shall be deemed waived. |

## Exhibit 5

### Private Placement and Backstop Commitment Term Sheet

Set forth below are the key terms of (i) a private placement for $750 million of Preferred Equity (the "***Private Placement***") and (ii) the backstop of the Section 1145 Rights Offering for up to $750 million of Reorganized PEC Common Stock (the "***Backstop Commitment***") and Rights Offering Penny Warrants, in each case in connection with the Plan. As set forth herein, certain holders of Allowed Second Lien Notes Claims and Allowed Claims in Class 5B (the "***Claims***") shall have the right and obligation to participate in the Private Placement and the Backstop Commitment according to the following percentages, based on Allowed Claims as of the Record Date, in each case subject to adjustment as provided herein: such holder's pro rata portion of (i) in respect of Allowed Claims in Class 2, the quotient of (A) $708 million divided by (B) the Allowed Claims in Class 5B plus $708 million; and (ii) in respect of Allowed Claims in Class 5B, the quotient of (A) the Allowed Claims in Class 5B divided by (B) the Allowed Claims in Class 5B plus $708 million (such percentage split hereafter defined as the "***Pro Rata Split***"). If a holder of Claims elects to participate in the Private Placement, such holder must also agree to participate in the Backstop Commitment, subscribe for its full entitlement in the Section 1145 Rights Offering and become party to the PSA.

The Noteholder Co-Proponents (or the "***Initial Parties***") have agreed to subscribe for all Preferred Equity being issued in the Private Placement and to provide the full Backstop Commitment, subject to participation by other creditors as provided herein.

| Private Placement | |
| --- | --- |
| **Term** | **Description** |
| **Private Placement:** | This Term Sheet describes the Private Placement of shares of Preferred Equity (the "***Private Placement Shares***") in the Reorganized Debtors for an aggregate purchase price of $750 million at a price per share consistent with the conversion ratio of Preferred Equity to Reorganized PEC Common Stock detailed in the Preferred Equity Term Sheet under "Conversion at the Option of the Holder." The aggregate number of Private Placement Shares shall be reasonably acceptable to the Requisite Members of the Noteholder Steering Committee.<br><br>For the avoidance of doubt, any Preferred Equity purchased by the Private Placement Parties (as defined below) shall be solely on account of the new money provided in the Private Placement and not on account of such party's Class 2 or Class 5B Claims. |
| **Private Placement Commitments:** | Subject to the terms and conditions of the Private Placement Agreement (as defined below):<br><br>(i) the Initial Parties have each committed (on a several and not joint |

basis) to purchase 22.5% of the Private Placement Shares in the aggregate, in accordance with the Pro Rata Split, on a pro rata basis based upon the Initial Parties' holdings as set forth on the Initial Private Placement Schedule;

(ii) the Initial Parties and the creditors that become Additional Private Placement Parties by 5:00 pm New York City time on the third business day following execution of the Private Placement Agreement (such creditors, the "***Phase Two Private Placement Parties***") shall have the exclusive right and obligation (on a several and not joint basis) to purchase 5% of the Private Placement Shares in the aggregate; and according to (a) the Pro Rata Split and (b)(1) with respect to the Initial Parties, on a pro rata basis based on, and calculated using, the Initial Parties' claim amounts as set forth on the Initial Private Placement Schedule, and, (b)(2) with respect to the Phase Two Private Placement Parties, each Phase Two Private Placement Party's claim amounts as disclosed to the Initial Parties upon such Phase Two Private Placement Parties' execution of the Private Placement Agreement; and

(iii) the Initial Parties, the Phase Two Private Placement Parties, and any other Additional Private Placement Parties (together, the "***Private Placement Parties***") have each committed (on a several and not joint basis) to purchase their respective Private Placement Percentage of the remaining 72.5% of the Private Placement Shares in the aggregate; provided that, with respect to such 72.5%, if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are party to the Private Placement Agreement before the Private Placement Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to purchase the full amount of such Preferred Equity that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Private Placement Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims participated in the Private Placement (a "***Surplus Preferred Participation Adjustment***"), and the Preferred Equity available to Additional Private Placement Parties in the respective Class shall be reduced accordingly on a pro rata basis.

In accordance with the foregoing, the "***Private Placement Percentages***" means, for any Private Placement Party, a percentage determined by multiplying—

    (I)   the Pro Rata Split applicable to the relevant Class of Claims held by such Private Placement Party by—

    (II) (i)   if the Surplus Preferred Participation Adjustment shall apply—

|  |  |
|---|---|
|  | (X) in the case of an Initial Party that has elected[1] to apply the Surplus Preferred Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth on the Initial Private Placement Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Private Placement Schedule) <u>divided by</u> (B) the amount of two-thirds (2/3) of all Claims within such Class; and<br><br>(Y) in the case of a Phase Two Private Placement Party, the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Private Placement Party (as defined below) in such Class <u>divided by</u> (B) the amount of two-thirds of all Claims within such Class, (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) (1) 50% of the amount of the Claims of such Phase Two Private Placement Party in such Class, <u>divided by</u> (2) the amount of all Participating Private Placement Claims[2] within such Class, other than the Claims, or portions thereof, to which clause (II)(i)(X) and/or clause (II)(i)(Y)(a) is applicable; and<br><br>(ii) in the case of (x) any other Private Placement Party, if the Surplus Preferred Participation Adjustment applies, or (y) any Private Placement Party, if the Surplus Preferred Participation Adjustment does not apply—<br><br>(A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Private Placement Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Private Placement Claims in such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable. |
| **Private Placement Agreement**: | The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Private Placement (the "***Private*** |

---

[1]   Each Initial Party must elect to apply the Surplus Preferred Participation Adjustment no later than ten (10) business days following the Private Placement Enrollment Outside Date.

[2]   "<u>Participating Private Placement Claims</u>" shall mean Claims within the applicable class held by all Private Placement Parties.

|  | _**Placement Agreement**_"). |
|  | The Private Placement Percentage of each Private Placement Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Private Placement Agreement (the "_**Private Placement Schedule**_"). |
|  | The initial commitment schedule attached as Schedule 1(a) hereto (the "_**Initial Private Placement Schedule**_") reflects the percentage allocation of the obligations of the Initial Parties to purchase shares of Preferred Equity in the Private Placement (prior to the addition of Additional Private Placement Parties as contemplated hereby). The Initial Private Placement Schedule shall be amended only upon consent of each of the Initial Parties. |
|  | If any Private Placement Party fails to fund the purchase price for the Private Placement Shares required to be purchased by them under the Private Placement Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Private Placement Party fails to fund. |
| **Additional Private Placement Parties:** | Holders of Claims will have the opportunity to become Private Placement Parties under the Private Placement Agreement prior to the date that is 20 business days following the Debtors' filing of the motion seeking entry of the PPA and BCA Approval Order (such order, the "_**PPA and BCA Approval Motion**_", and such date, the "_**Private Placement Enrollment Outside Date**_"). |
|  | "_**Additional Private Placement Parties**_" means, collectively, each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to (i) participate in the Private Placement by joining the Private Placement Agreement and the PSA in accordance with the foregoing, (ii) join the Backstop Commitment Agreement as a Backstop Party prior to the applicable deadline described herein, and (iii) subscribe for its full entitlement of Rights Offering Shares in the Section 1145 Rights Offering. Initial Parties may be Additional Private Placement Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as of the execution of the Private Placement Agreement. |
| **Securities Law Exemptions:** | The Private Placement Shares shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another |

NAI-1502345820v2

| | available exemption from registration. |
|---|---|
| **Implementation of the Private Placement:** | The Debtors shall conduct the Private Placement on behalf of the Reorganized Debtors through customary private placement documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties. |
| **Private Placement Premiums**: | The Debtors will pay the Private Placement Parties in respect of the Private Placement (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Private Placement Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 until the Effective Date (with proration for partial months) (the "***Private Placement Ticking Premium***" and, together with the Private Placement Premium, the "***Private Placement Premiums***").<br><br>With respect to the Private Placement Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Private Placement Percentages as set forth on the Initial Private Placement Schedule; (ii) 57.5% shall be allocated to the Initial Parties and the Phase Two Private Placement Parties on a pro rata basis based upon their respective Private Placement Commitment (as defined in the Private Placement Agreement); and (iii) 20% shall be allocated to all Private Placement Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after the filing of the PPA and BCA Approval Motion based upon each Private Placement Party's Private Placement Percentage.  The Private Placement Ticking Premium will be shared pro rata among Private Placement Parties.  The Private Placement Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.  The Reorganized PEC Common Stock issued in connection with the Private Placement Commitment Premium shall be issued after giving effect to the conversion of the Preferred Equity and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> of the Term Sheet.<br><br>The Private Placement Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order.  The Private Placement Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
| **Pro Rata Split** | For purposes of the Private Placement Percentages, the Pro Rata Split shall be determined as of the Record Date. |

-5-

| **SECTION 1145 RIGHTS OFFERING AND BACKSTOP COMMITMENT** | |
|---|---|
| **Term** | **Description** |
| **Rights Offering**: | This Term Sheet describes the Section 1145 Rights Offering of rights to purchase units (the "***Rights Offering Shares***") consisting of (i) shares of Reorganized PEC Common Stock valued at a 45% discount to Plan Equity Value and (ii) warrants exercisable for 2.5% of the fully diluted Reorganized PEC Common Stock on the Effective Date, in each case after giving effect to the conversion of Preferred Equity, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein.  The price per unit to be paid in the Section 1145 Rights Offering shall be determined in accordance with the Plan such that the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering shall be $750 million.  The holders of Allowed Claims in Classes 2 and 5B as of the Record Date will be permitted to participate in the Section 1145 Rights Offering. <br><br> After consultation with counsel and the Noteholder Steering Committee, the Debtors may decrease the number of Section 1145 Equity Rights distributed to holders of Second Lien Notes Claims, Unsecured Senior Notes Claims and General Unsecured Claims in Class 5B as required or instructed by the Bankruptcy Court or the SEC, in each case to allow the Section 1145 Rights Offering to be exempt from registration under the Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code; provided, however, that (a) in no event shall such decrease in the number of Section 1145 Equity Rights result in a decrease of the aggregate purchase price for all Rights Offering Shares offered in the Section 1145 Rights Offering below $650 million, and (b) in no event shall the price per unit to be paid in the Section 1145 Rights Offering be subject to increase or decrease in connection with such decrease in the number of Section 1145 Equity Rights.  In this event, any amounts excluded shall instead be purchased directly by the Backstop Parties pursuant to the Backstop Commitment Agreement. <br><br> The Section 1145 Rights Offering will be conducted by the Company on behalf of the Reorganized Debtors, and the Plan will provide that the rights and obligations of the Company hereunder will vest in the Reorganized Debtors on the Effective Date. |
| **Commitments**: | Subject to the terms and conditions of the Backstop Commitment Agreement (as defined below), the Initial Parties (together with any Additional Backstop Parties (as defined below), the "***Backstop Parties***") have each committed (on a several and not joint basis, and based on, and calculated using, the claim amount set forth in the Initial Backstop Commitment Schedule) to purchase their respective Backstop Commitment Percentage of any unsubscribed Rights Offering Shares (the "***Backstop Commitment***" and together with the |

Private Placement, the "***Commitments***"); provided, however, that if holders of more than two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class are parties to the Backstop Commitment Agreement before the Backstop Enrollment Outside Date, the Initial Parties shall have the right, but not the obligation, to elect for their Backstop Commitments to equal the full amount of Backstop Commitments that would be allocated to the Initial Parties (a) according to the Pro Rata Split and (b) based on, and calculated using, the claim amounts set forth in the Initial Backstop Commitment Schedule, if holders of exactly two-thirds (2/3) of Allowed Second Lien Notes Claims and/or Unsecured Senior Notes Claims in the respective Class participated in the Backstop Commitment (a "***Surplus Backstop Participation Adjustment***"), and the Backstop Commitment available to Additional Backstop Parties in the respective Class shall be reduced accordingly.

In accordance with the foregoing, the "***Backstop Commitment Percentages***" means, for any Backstop Party, a percentage determined by multiplying—

(I)   the Pro Rata Split applicable to the relevant Class of Claims held by such Backstop Party by—

(II) (i)   if the Surplus Backstop Participation Adjustment shall apply—

(X)   in the case of an Initial Party that has elected[3] to apply the Surplus Backstop Participation Adjustment with respect to the Initial Party's Claims in such Class (as set forth in the Initial Backstop Commitment Schedule), (A) the amount of the Claims in such Class of such Initial Party (as set forth on the Initial Backstop Commitment Schedule) divided by (B) the amount of two-thirds (2/3) of all Claims within such Class; and

(Y)   in the case of a Phase Two Backstop Party (as defined herein), the sum of (a) (A) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class divided by (B) the amount of two-thirds of all Claims within such Class, plus (b) (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), multiplied by (B) (1) 50% of the amount of the Claims of such Phase Two Backstop Party in such Class, divided by (2) the amount of all Participating Backstop Claims[4] within such Class, other than the Claims, and/or portions thereof (if any) to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable; and

---

[3]   Each Initial Party must elect to apply the Surplus Backstop Participation Adjustment no later than [three (3)] business days following the Backstop Enrollment Outside Date.

[4]   "Participating Backstop Claims" shall mean Claims within the applicable class held by all Backstop Parties.

NAI-1502345820v2

|  | (ii) in the case of (x) any other Backstop Party, if the Surplus Backstop Participation Adjustment applies, or (y) any Backstop Party, if the Surplus Backstop Participation Adjustment does not apply— |
|--|--|
|  | (A) one (1) minus the sum of all fractions (if any) determined in accordance with clause (II)(i)(X) and/or clause (II)(i)(Y)(a), <u>multiplied by</u> (B) the amount of the Claims of such Backstop Party in the relevant Class, and <u>divided by</u> (C) the amount of all Participating Backstop Claims within such Class, other than the Claims, and/or portions thereof (if any), to which clause (II)(i)(X) or clause (II)(i)(Y)(a) is applicable. |
| **Backstop Commitment Agreement**: | The Initial Parties and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance reasonably acceptable to the Initial Parties and the Debtors, setting forth the terms and conditions of the Backstop Commitments (the "***Backstop Commitment Agreement***"). |
|  | The Backstop Commitment Percentage of each Backstop Party will be based on the ownership of Claims (as adjusted as set forth above) and will be set forth in a schedule to the Backstop Commitment Agreement (the "***Backstop Commitment Schedule***"). |
|  | The initial backstop commitment schedule attached as <u>Schedule 1(b)</u> hereto (the "***Initial Backstop Commitment Schedule***") reflects the initial percentage allocation of the backstop obligations of the Initial Parties to purchase unsubscribed Rights Offering Shares pursuant to their Backstop Commitments (prior to the addition of Additional Backstop Parties as contemplated hereby).  The Initial Backstop Commitment Schedule shall be amended only upon consent of each of the Initial Parties. |
|  | If any Backstop Parties fail to fund the purchase price for the Rights Offering Shares required to be purchased by them under the Backstop Commitment Agreement, the Initial Parties shall, on a pro rata basis relative to their respective commitments, fund such amounts that any Backstop Party fails to fund. |
| **Additional Backstop Parties**: | Holders of Claims will have the opportunity to become Backstop Parties under the Backstop Commitment Agreement prior to the date that is 20 business days following the Debtors' filing of the PPA and BCA Approval Motion (such date, the "***Backstop Enrollment Outside Date***"). |
|  | "***Additional Backstop Parties***" means, collectively, each party that is that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an Institutional Accredited Investor (which is an "accredited investor" |

-8-

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 783 of 876 PageID #: 7180

Case 16-42529    Doc 1854-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 295 of 330

| | |
|---|---|
| | as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that holds Claims and that agrees to participate in the Backstop Commitment by joining the Backstop Commitment Agreement and the PSA in accordance with the foregoing. Initial Parties may be Additional Backstop Parties with respect only to additional Claims purchased in excess of the Claims held by such Initial Parties as the execution of the Backstop Commitment Agreement. |
| **Securities Law Exemptions:** | The Rights Offering Shares issued pursuant to the Section 1145 Rights Offering (other than on account of Backstop Commitments) shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code.<br><br>The Rights Offering Shares purchased in the Backstop Commitment shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another available exemption from registration. |
| **Implementation of the Section 1145 Rights Offering:** | The Debtors shall conduct the Section 1145 Rights Offering on behalf of the Reorganized Debtors through customary subscription documentation and procedures that are in form and substance reasonably acceptable to the Debtors and the Initial Parties.<br><br>The commencement and duration of the offering period for the Rights Offering (the "***Offering Period***") shall be reasonably acceptable to the Initial Parties.<br><br>Subscription rights issued in the Section 1145 Rights Offering to purchase Rights Offering Shares (the "***Section 1145 Equity Rights***") will be exercisable during the Offering Period by completing and returning to the rights agent (an agent appointed by the Debtors, and reasonably acceptable to the Initial Parties, to administer the Section 1145 Rights Offering) the applicable subscription form and paying the per share price for each Rights Offering Share to be purchased by wire transfer of immediately available funds to an account designated by the rights agent prior to the expiration of the Offering Period, except that each Backstop Party (except to the extent it has previously been required to fund, and has funded, such amounts in accordance with the terms of the Backstop Commitment Agreement) shall be permitted to fund its per share price for its exercise of Section 1145 Equity Rights and Backstop Commitments promptly following receipt of written notice from the rights agent advising of the amounts to be funded, and such Backstop Parties may fund to the rights agent or an escrow account established pursuant to terms reasonably satisfactory to the Initial Parties. All Backstop Parties shall be required to exercise their Section 1145 Equity Rights by completing and returning the applicable subscription form to the rights agent prior to the expiration of the Offering Period. |

| | |
|---|---|
| | Section 1145 Equity Rights are not transferable other than in connection with the transfer of the allowed claims to which Section 1145 Equity Rights relate, in accordance with the terms of the PSA.<br><br>If the Section 1145 Rights Offering is terminated for any reason, the funded amounts will be refunded to the applicable participant, without interest, as soon as practicable following termination of the Section 1145 Rights Offering.<br><br>The exercise of a Section 1145 Equity Right will be irrevocable unless the Section 1145 Rights Offering is not consummated by the date on which the Private Placement Agreement or the Backstop Commitment Agreement is terminated.<br><br>There will be no oversubscription rights under the Section 1145 Rights Offering. |
| **Backstop Premiums**: | The Debtors will pay the Backstop Parties in respect of the Backstop Commitment (i) an initial commitment premium equal to 8.0% of the $750 million committed amount (the "***Backstop Commitment Premium***") and (ii) a 2.5% monthly ticking fee beginning on April 3, 2017 (with proration for partial months) (the "***Backstop Ticking Premium***" and, together with the Backstop Commitment Premium, the "***Backstop Premiums***" and, together with the Private Placement Premiums, the "***Commitment Premiums***")  The Backstop Ticking Premium and the Private Placement Ticking Premium are referred to herein collectively as the "***Ticking Premiums***."<br><br>With respect to the Backstop Commitment Premium, (i) 22.5% shall be allocated to the Initial Parties on a pro rata basis based upon the Initial Parties' Backstop Commitment Percentage as set forth on the Initial Backstop Commitment Schedule; (ii) 57.5% shall be allocated to the Initial Parties and creditors that become Additional Backstop Parties by 5:00 pm New York City time on the third business day following execution of the Backstop Commitment Agreement (the "***Phase Two Backstop Parties***") based upon (a) with respect to the Initial Parties, each Initial Party's Backstop Commitment Percentage, and (b) with respect to Phase Two Backstop Parties, each Phase Two Backstop Party's Backstop Commitment Percentage; and (iii) 20% shall be allocated to all Backstop Parties that have executed the Private Placement Agreement at any time prior to the date occurring 15 business days after  the filing of the PPA and BCA Approval Motion based upon each Backstop Party's Backstop Commitment Percentage.  The Backstop Ticking Premium will be allocated pro rata among Backstop Parties.  The Backstop Premiums shall be payable in Reorganized PEC Common Stock at Plan Equity Value as of the Effective Date.   The Reorganized PEC Common Stock issued in connection with the Backstop Commitment Premium shall be issued after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity |

|  | and the exercise of the Penny Warrants, but subject to dilution by the LTIP Shares and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in <u>Exhibit 3</u> of the Term Sheet<br><br>The Backstop Commitment Premium shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the PPA and BCA Approval Order. The Backstop Ticking Premium shall be fully earned and nonrefundable as accrued through the Effective Date. |
|---|---|
| **Warrants** | On the Effective Date, the Debtors will issue warrants (the "***Penny Warrants***") exercisable for 5% of the fully diluted Reorganized PEC Common Stock as of the Effective Date (after giving effect to the reservation and deemed issuance of shares of Reorganized PEC Common Stock for issuance upon the conversion of the Preferred Equity, but subject to dilution by the LTIP Shares, and any post-Effective Date issuances of capital stock, including pursuant to any dividend or make-whole provision described in Exhibit 3 herein), half of which shall be paid to the Initial Parties and half of which shall constitute the Rights Offering Penny Warrants.  The Penny Warrants shall have the following terms:<br>▪ Date of Issuance: the Effective Date;<br><br>▪ Exercise Price: $0.01 per share of Reorganized PEC Common Stock;<br><br>▪ Term: 90 days;<br><br>▪ Exercise Trigger: exercisable from and after the Effective Date. |
| **Pro Rata Split** | For purposes of the Backstop Commitment Percentages, the Pro Rata Split shall be determined as of the Record Date. |

| **GENERAL** | |
|---|---|
| **Term** | **Description** |
| **Registration Rights:** | Each Private Placement Party and each Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants) and each other creditor that receives 10% or more of the shares of Reorganized PEC Common Stock on a fully-converted basis (including the Reorganized PEC Common Stock issuable upon conversion of the Preferred Equity) issued under the Plan and/or the Section 1145 Rights Offering and cannot sell its shares under Rule 144 under the Securities Act without volume or manner of sale restrictions, together with each such person's affiliates to whom such person transfers such shares or other securities  (collectively, the "***Registration Rights Agreement Parties***"), shall be entitled to customary registration rights |

with respect to such Reorganized PEC Common Stock (including shares of Reorganized PEC Common Stock issuable pursuant to the Penny Warrants) and Preferred Equity pursuant to a registration rights agreement to be entered into, as of the Effective Date, by the Reorganized Debtors and the Registration Rights Agreement Parties (the "***Registration Rights Agreement***"), provided that the Company shall further agree that in any case in which the Company asserts that any Private Placement Party or Backstop Party (including their affiliates who hold Reorganized PEC Common Stock, Preferred Equity or Penny Warrants), or any affiliate of any such person to whom such person has transferred shares or other securities, may sell its shares (no matter the manner herein described under which such shares were acquired) under Rule 144 under the Securities Act without volume or manner of sale restrictions, the Company and its legal counsel shall upon request, and following receipt of all required certifications of such Private Placement Party, Backstop Party or affiliate reasonably requested by the Company or its legal counsel, promptly provide, at the Company's sole expense, such transfer instructions (including instructions regarding the removal of restrictive legends) and legal opinions (on which such seller may rely), and shall undertake, also at the Company's sole expense, such other actions, as shall be reasonably requested to permit or facilitate such sale under Rule 144 under the Securities Act.

The Registration Rights Agreement will provide that the Company will (i) file a registration statement on Form S-1 (or other appropriate form) (the "Initial Resale Registration Statement") no later than 30 days following the Effective Date (the "<u>Filing Deadline</u>") covering all registrable securities that the holders thereof request to have included therein, (ii) use its reasonable best efforts to have the Initial Resale Registration Statement declared effective by the SEC no later than (X) in the case of a "no review", the 15th day following the Filing Deadline; (Y) in the case of a "limited review", the 45th day following the Filing Deadline, and (Z) in the case of a "review," the 75th day following the Filing Deadline (each such date, as applicable, the "Registration Deadline") and (iii) use its reasonable best efforts to keep such registration statement continuously effective (including filing any necessary post-effective amendment and/or subsequent registration statements) for a period of three years (or such shorter period if all registrable securities have been disposed by the holder thereof or are no longer registrable securities).

The Registration Rights Agreement will provide for liquidated damages of $75,000 per day in the event that (i) the Initial Resale Registration Statement is not filed on or prior to the Filing Deadline, (ii) the Initial Resale Registration Statement is not declared effective by the SEC on or prior to the applicable Registration Deadline or (iii) Holders are not permitted to use the prospectus included in the Initial Resale Registration

-12-

|  | Statement to resell the securities for 15 or more consecutive days, or more than an aggregate of 30 days (which need not be consecutive calendar days), in any 12 month period.  Notwithstanding the foregoing, the aggregate amount of such liquidated damages payable by the Company under this Agreement shall not exceed $10,000,000. |
|  | The Registration Rights Agreement will provide customary piggy-back and demand registration rights to the Registration Rights Agreement Parties (including, without limitation, rights regarding "shelf" registrations and underwritten offerings). |
|  | The Registration Rights Agreement shall be in substantially the form to be filed with the Plan supplement, provided that such form is in form and substance reasonably acceptable to the Company and the Requisite Members of the Noteholder Steering Committee. |
| **Transferability of Private Placement Commitments and Backstop Commitments:** | A Private Placement Party or a Backstop Party may not transfer, directly or indirectly, all or any portion of its Commitments other than to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Backstop Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors; provided, that no such transfer shall relieve the transferring Private Placement Party or Backstop Party, as applicable, from such obligations. |
|  | Claims held by Backstop Parties are transferable only in accordance with the PSA and to the extent the Backstop Party remains a party to the Backstop Commitment Agreement.  Claims held by Private Placement Parties are transferable only in accordance with the PSA and to the extent the Private Placement Party remains a party to the Private Placement Agreement. |
|  | For the avoidance of doubt, any Initial Party may transfer its Claims in accordance with the PSA as set forth above, provided, however, such Initial Party shall retain its commitment and obligation to purchase its share as an Initial Party, based on, and calculated using, the Claim amounts set forth in the Initial Private Placement Schedule, of 22.5% of the Private Placement Shares in the aggregate, provided further, that any transferee which receives Claims from an Initial Party may not, in respect of such transferred Claims, become a Phase Two Private Placement Party, a Phase Two Backstop Party, an Additional Private Placement Party, or an Additional Backstop Party.  No such transfer shall relieve the transferring Initial Party from its obligations under the Private Placement Agreement or Backstop Commitment Agreement. |
| **Failure to Fund** | Any party that fails to timely fund its Private Placement Commitments or |

NAI-1502345820v2

| | |
|---|---|
| **Commitments:** | Backstop Commitments, respectively (a "***Defaulting Party***"), will be liable for the consequences of its breach and that the parties to such agreement can enforce rights of damages and/or specific performance upon the failure to timely fund by the Defaulting Party. |
| **Debtors' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Debtors. |
| **Private Placement / Backstop Parties' Representations and Warranties**: | The Private Placement Agreement and the Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Private Placement Parties and the Backstop Parties, respectively, to be provided severally and not jointly. |
| **Interim Operating Covenant**: | Prior to and through the Effective Date, except as set forth in the Private Placement Agreement or the Plan, or with the written consent of the Requisite Consenting Noteholders, as applicable, the Company (x) shall, and shall cause its subsidiaries to, carry on their businesses in the ordinary course of business (considering the impact of the chapter 11 cases) and, except as currently subject to litigation, use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and make any required filing with the SEC within the time periods required under the Exchange Act, and (y) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with (i) with its business plan dated November 2016, (ii) the parameters described in the Private Placement Agreement or (iii) the Plan. <br><br> For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and will require the prior written consent of the Requisite Members of the Noteholder Steering Committee (unless otherwise contemplated by the Backstop Commitment Agreement, the Private Placement Agreement or the Plan): (a) except as currently subject to litigation, any amendment, modification, termination, waiver, supplement, restatement or other change to any material contract (definition to be reasonably agreed) or any assumption of any material contract, (b) any (i) termination by the Debtors without cause or (ii) reduction in title or responsibilities, in each case, of the individuals who are, as of the date of this Agreement, the Chief Executive Officer or the Chief Financial Officer of the Company, (c) the adoption or amendment of any management incentive or equity plan by any of the Debtors, except for as provided in the Plan or (d) any sale, abandonment, or disposition of any assets other than (i) the sale of |

| | |
|---|---|
| | Metropolitan Collieries Pty Ltd and/or Peabody (Burton Coal) Pty Ltd or the Debtors' interests in Dominion Terminal Associates LLC or (ii) any ordinary course land sales made upon reasonable prior notice to the Noteholder Co-Proponents and in accordance with the Company's business plan dated November 2016, provided, however, that such ordinary course land sales shall not exceed $5 million individually or $20 million in the aggregate.  Following a request by the Debtors for consent with respect to any operational matter that requires the consent of the Requisite Members of the Noteholder Steering Committee pursuant to this section, if the consent of such parties is not obtained or declined within three (3) business days following the date such request is made in writing and delivered to each of the Noteholder Co-Proponents (which notice will be deemed delivered if given in writing to Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, and Skadden, Arps, Slate, Meagher & Flom LLP), such consent shall be deemed to have been granted by the Requisite Members of the Noteholder Steering Committee, as applicable. If such consent is not given or deemed to be given, the Debtors shall be permitted to seek approval from the Bankruptcy Court to take such actions, and seeking such approval shall not be a breach of this interim operating covenant; provided, that in such event the Noteholder Co-Proponents shall have a termination right under the PSA. |
| **Effectiveness of Private Placement Agreement and Backstop Commitment Agreement:** | The Private Placement Agreement and the Backstop Commitment Agreement and the respective Commitments thereunder shall become effective upon execution and delivery of such agreement by the Debtors and each Private Placement Party or Backstop Party, as applicable, and the entry by the Bankruptcy Court of the PPA and BCA Approval Order; provided that, the obligations of such parties in respect of their Commitments shall be subject to the satisfaction or waiver of the Conditions Precedent below. |
| **PPA and BCA Approval Order:** | The parties hereto agree that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, and the Expense Reimbursement shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code under the PPA and BCA Approval Order, on such terms consistent with the Breakup Administrative Claim Treatment.<br><br>The "***PPA and BCA Approval Order***" shall mean the final order entered by the Bankruptcy Court, in form and substance acceptable to the Initial Parties, authorizing the Company (on behalf of itself and the other Debtors) to execute and deliver the Private Placement Agreement, the Backstop Commitment Agreement, including the authorization of the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and the indemnification provisions contained in the Private Placement Agreement and the |

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 790 of 876 PageID #: 1737

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 302 of 330

Backstop Commitment Agreement, and providing that the Private Placement Premiums, the Backstop Premiums, the Breakup Payments, the Expense Reimbursement and indemnification obligations shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code, on terms consistent with the Breakup Administrative Claim Treatment, and shall be payable by the Debtors as provided in the relevant agreement without further order of the Bankruptcy Court.

For the avoidance of doubt, the Debtors' obligations with respect to the payment of fees and expense under the Final DIP Order shall not be limited or impaired by the absence of the entry of the BCA and PPA Approval Order.

NAI-1502345820v2

| Conditions Precedent: | The Commitments and the Backstop Parties' and Private Placement Parties' obligations to consummate the transactions contemplated in connection therewith will be subject to customary conditions precedent (the "Conditions Precedent"), including without limitation:

• The Company Group must have at least $600 million in cash on hand on the Effective Date;

• The Reorganized Debtors must have no more than $1.95 billion of outstanding funded debt on the Effective Date (excluding any capital lease obligations, borrowings under any ABL facilities, and, to the extent the Effective Date occurs after April 3, 2017, any Incremental Additional First Lien Debt or, Incremental Second Lien Notes or additional amounts under the Exit Facility to finance any cash consideration on account of Incremental Second Lien Notes Claims); provided that, except in the event of a First Lien Full Cash Recovery, no more than $1.5 billion of such outstanding funded debt may be first lien debt;

• The claim asserted by the United Mine Workers of America 1974 Pension Plan shall be resolved in a manner satisfactory to the Debtors, subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee if for an amount above the amounts held in reserve by the Debtors for such claim;

• the PSA must remain in effect through the Effective Date;

• no event or events shall have occurred or exist that constitute, individually or in the aggregate, a Material Adverse Event;[5] and |
|---|---|

---

[5] "**_Material Adverse Event_**" means any event, which individually, or together with all other events, has or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities (including reclamation obligations, whether or not contingent), finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Term Sheet, including the Private Placement and the Section 1145 Rights Offering, in each case, except to the extent such event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the [date hereof] in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the [date hereof] in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of the transactions contemplated by the Term Sheet (including any act or omission of the Debtors expressly required or prohibited, as applicable, by this Term Sheet or consented to or required by the Requisite Members of the Noteholder Steering Committee in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the departure of officers or directors of any of the Debtors not in contravention of the terms and conditions of this Term Sheet (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses

-17-

| | |
|---|---|
| | • the other conditions precedent to the Effective Date shall have been satisfied or waived in accordance with the terms of the Term Sheet as set forth above.<br><br>The foregoing conditions shall be waivable by the Requisite Consenting Noteholders in respect of Backstop Commitment Agreement and Private Placement Agreement, respectively. |
| **Termination of the Private Placement Agreement and the Backstop Commitment Agreement**: | The Commitments and the Debtors' obligations to consummate the transactions contemplated in connection herewith will be subject to customary termination events (each a "***Termination Event***"), including without limitation, the occurrence of any event that would give any party to the PSA the right to terminate its obligations thereunder, including without limitation the PSA Termination Condition.<br><br>Upon the occurrence of a Termination Event, all of the Private Placement Parties', Backstop Parties' and Debtors' obligations under the Private Placement Agreement and the Backstop Commitment Agreement, respectively, shall automatically terminate.  Upon termination, the Debtors shall have no ongoing obligations or liabilities under the Private Placement Agreement or the Backstop Commitment Agreement (including the payment of the Commitment Premiums), except for the Debtors' indemnification obligations; provided that such termination shall not relieve a party of liability for any pre-termination breach, or (subject to entry of the PPA and BCA Approval Order) relieve the Debtors of any obligations with respect to the Breakup Payments (to the extent payable pursuant to the terms thereof) and/or the Expense Reimbursement.<br><br>If either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason, both agreements shall be deemed to have been terminated. |
| **Breakup Payments:** | If following entry by the Bankruptcy Court of the PPA and BCA Approval Order either the Private Placement Agreement or the Backstop Commitment Agreement is terminated by the Debtors for any reason other than occurrence of the PSA Termination Condition (to the extent the Debtors terminate prior to entry of the PPA and BCA Approval Order), each of the following shall be payable in cash:<br><br>• a termination fee of 8% of the $750 million committed amount shall be paid to the Private Placement Parties, with (i) 22.5% of such fee |

contained in this definition); (vi) the filing or pendency of the Debtors' chapter 11 cases (including events resulting from any filings made in such cases); or (vii) declarations of national emergencies in the United States or natural disasters in the United States; provided, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such event is materially and disproportionately adverse to the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Private Placement Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Private Placement Parties pro rata in accordance with the Pro Rata Split and each Private Placement Party's Private Placement Commitment Period;[6] and

- a termination fee of 8% of the $750 million committed amount shall be paid to the Backstop Parties, with (i) 22.5% of the such fee allocated to the Initial Parties pro rata in accordance with the Pro Rata Split; (ii) 57.5% allocated to the Initial Parties and the Phase Two Backstop Parties pro rata in accordance with the Pro Rata Split; and (iii) 20% allocated to the Backstop Parties pro rata in accordance with the Pro Rata Split and each Backstop Party's Backstop Commitment Period;

(collectively, the "***Breakup Payments***").

If owed, the Breakup Payments shall be payable in lieu of the Private Placement Premiums, the Backstop Premiums, and half of the Penny Warrants.

All reasonable monthly fees and expenses of legal and financial professionals to the Noteholder Co-Proponents shall be payable in accordance with the terms set forth in this Term Sheet.

The Expense Reimbursement payable under this Term Sheet shall be entitled to administrative expense priority, and the Breakup Payments payable under this Term Sheet shall be entitled to superpriority administrative expense priority junior to any superpriority claims granted under the Final DIP Order (including any adequate protection claims in respect of holders of First Lien Claims or Second Lien Claims) and any claims to which such superpriority claims are themselves junior (including the Bonding Carve Out (as defined in the Final DIP Order) and the Fee Carve Out (as defined in the Final DIP Order)), subject to the following:

(a) In the event of a First Lien Full Cash Recovery under a plan or consummation of a plan that provides any combination of cash and first lien notes (on terms no less favorable than the terms of the Replacement Secured First Lien Term Loan as set forth on Exhibit 1 hereto, including no greater amount of first lien notes than would be issued in accordance with Exhibit 1 hereto) that is equal to the allowed amount of the First Lien Lender Claims, then such fees shall be paid in cash on the Effective

---

[6]   "***Private Placement Commitment Period***" shall mean, for each Private Placement Party, the duration of such party's private placement obligations, which days shall be counted from the date on which the documentation necessary to be obligated under the Private Placement Agreement has been executed by a Private Placement Party and received and verified by the Debtors.

| | |
|---|---|
| | Date on such Plan;<br><br>(b) In the event the conditions set forth in subsection (a) do not occur, then the Breakup Payments and the administrative expense claim on account of such the Breakup Payments shall be payable on the effective date of such plan in second lien notes with a face amount equal to the amount of the fees which are on terms consistent with the terms of the New Second Lien Notes set forth in Exhibit 2 hereto; provided that, (i) such New Second Lien Notes shall be subordinated to any debt received by Class 1 as a distribution on substantially the same terms as the existing Intercreditor Agreement governing the First Lien Claims and Second Lien Claims, and (ii) to the extent Class 2 shall receive any New Second Lien Notes, the second lien notes shall be subordinated in a chapter 11 or liquidation to such Class 2 holder's New Second Lien Notes (such treatment, the "Breakup Administrative Claim Treatment"). |
| **Fiduciary Out** | The Backstop Commitment Agreement and Private Placement Agreement shall each include a fiduciary out for the Debtors by which the Debtors may not shop or solicit alternative restructurings but may consider any alternative restructuring brought to them; provided, however, the Debtors shall provide the Creditor Co-Proponents (subject to mutually agreed terms of confidentiality) and their counsel with a copy of and/or any details regarding such proposal within three (3) days of receiving such proposal; provided, further, the Breakup Payments and Expense Reimbursement (as defined below), shall be payable upon exercise by the Debtors of the fiduciary out in accordance with the terms of the Private Placement Agreement and the Backstop Commitment Agreement after the entry of the PPA and BCA Approval Order on such terms consistent with the Breakup Administrative Claim Treatment. |
| **Expense Reimbursement:** | In accordance with and subject to the entry of the PPA and BCA Approval Order, the Debtors will pay all reasonably incurred and documented out-of-pocket fees and expenses incurred in connection with the Debtors' chapter 11 cases after the Petition Date of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Noteholder Co-Proponents (including any fees incurred on behalf of any noteholders through the applicable indenture trustee and any fees that have accrued and would otherwise continue to accrue as administrative claims of certain Noteholder Co-Proponents under the Final DIP Order), including the fees and expenses of Kirkland & Ellis LLP, Kramer Levin Naftalis & Frankel LLP, Doster, Ullom & Boyle, LLC, Skadden, Arps, Slate, Meagher & Flom LLP, Stinson Leonard Street LLP, Houlihan Lokey, Inc., and Moelis & Company (such payment obligations, the "***Expense Reimbursement***"), in each case whether or not the Restructuring is ultimately consummated. The payment of the fees set forth in this section shall (i) be approved upon entry of the PPA and BCA Approval Order; and (ii) prior to the time paid, |

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 795 of 876 PageID #: 1742

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C
- Backstop Commitment Agreement    Pg 307 of 330

|  | be granted administrative expense priority against each Debtor on a joint and several basis.

Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment hereunder shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court.  The Expense Reimbursement accrued through the date on which the PPA and BCA Approval Order is entered shall be paid as promptly as reasonably practicable after such order is entered.  Thereafter, the Expense Reimbursement shall be payable by the Debtors two weeks following their receipt of invoices.  If the Private Placement Agreement and the Backstop Commitment Agreement are terminated for any reason in accordance with their terms, the Debtors will no longer be obligated to pay the Expense Reimbursement in respect of any fees incurred after the date of such termination.  For the avoidance of doubt, the Debtors shall have no obligation to make any payment on account of the Expense Reimbursement if (i) the PSA Termination Condition occurs prior to the date of entry of the PPA and BCA Approval Order by the Bankruptcy Court, or (ii) the PPA and BCA Approval Order is not entered by the Bankruptcy Court. |
|---|---|

| | |
|---|---|
| **Specific Performance** | Each of the Debtors, the Private Placement Parties and the Backstop Parties agree that irreparable damage would occur if any provision of the Private Placement Agreement or the Backstop Commitment Agreement were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the Private Placement Agreement and the Backstop Commitment Agreement or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in the Private Placement Agreement or the Backstop Commitment Agreement or herein, no right or remedy described or provided in the Private Placement Agreement or the Backstop Commitment Agreement or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity. |
| **Noteholder Co-Proponent Approval Rights** | Each substantive document in connection with the Restructuring, including without limitation the following (but excluding documents related to the Bonding Solution), shall be subject to the reasonable approval of the Requisite Members of the Noteholder Steering Committee in accordance with the terms set forth on <u>Exhibit 8</u>: <br><br> • The Disclosure Statement and the motion and order to approve same; <br> • The Plan and any exhibits, supplements, appendices, etc. thereto; <br> • The credit agreement and/or indenture for the Exit Facility; <br> • The credit agreement for the Replacement Secured First Lien Term Loan (if applicable); provided that the Replacement Secured First Lien Term Loan shall be consistent with the terms set forth on Exhibit 1 hereto. <br> • The corporate constituent documents of the Reorganized Debtors; <br> • The certificate of designation of Series A convertible preferred stock of PEC; <br> • The documents relating to the Section 1145 Rights Offering and the Private Placement; <br> • The indenture for the New Second Lien Notes and related documentation (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be consistent with the terms set forth on Exhibit 2 hereto and otherwise in form and substance reasonably satisfactory to the Requisite Members of the Noteholder Steering Committee; <br> • The Confirmation Order; and <br> • The motions seeking approval of the Private Placement Agreement and the Backstop Commitment Agreement. <br><br> Notwithstanding the foregoing, the following material documents in |

| | connection with the Restructuring shall be in form and substance satisfactory to each Noteholder Co-Proponent: |
|---|---|
| | • The Term Sheet;<br>• The PSA;<br>• The Private Placement Agreement;<br>• The Backstop Commitment Agreement; and<br>• The orders relating to each of the above.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary herein, the indenture for the New Second Lien Notes (including, without limitation, the security and guaranty documentation and any intercreditor agreements) (if applicable) shall be in form and substance satisfactory to each member of the Ad Hoc Group of Second Lien Noteholders in such member's sole discretion.<br><br>The Plan and any exhibits, supplements, appendices, etc. thereto may not be modified in any way that adversely affects the distributions, recovery, treatment, classification, or other rights or entitlements of the Noteholder Co-Proponents (either as a group or individually) without the consent of the Requisite Members of the Noteholder Steering Committee (or the affected Noteholder Co-Proponent, as applicable). |
| **Milestones** | The Restructuring shall be implemented in accordance with the Milestones set forth in the Term Sheet. |
| **Reclamation Bonding** | As a condition to the Effective Date, the Debtors shall finalize a solution for all of their continuing self-bonded reclamation obligations with Wyoming, New Mexico, Illinois and Indiana (the "***Bonding Solution***"). The Debtors shall provide updates every two weeks to the Creditor Co-Proponents' professionals regarding their efforts to achieve the Bonding Solution. |
| **Material Claim Settlements** | The Requisite Members of the Noteholder Steering Committee shall have reasonable approval rights over any material claim settlement, including but not limited to, any settlement related to the MEPP Claim above the amounts held in reserve by the Debtors for such MEPP Claim. |

NAI-1502345820v2

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 798 of 876 PageID #: 1745

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 310 of 330

# Schedule 1(a)

## Initial Private Placement Schedule

# Initial Private Placement Schedule

$ in millions

| Initial Private Placement Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Class 2 Holdings | Class 5B Holdings | Steering Comm. Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entites managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P.1 | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

**<u>Schedule 1(b)</u>**

**Initial Backstop Commitment Schedule**

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 801 of 876 PageID #: 1748

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C
- Backstop Commitment Agreement   Pg 313 of 330

# Initial Backstop Schedule

*$ in millions*

**Initial Backstop Commitment Schedule**

| | Class 2 Holdings | Class 5B Holdings | Steering Comm Voting % | Class 2 Claims | Class 5B Claims | Commitment (%) | Commitment ($) |
|---|---|---|---|---|---|---|---|
| Discovery Capital Management, LLC | | | 32.585% | | | 35.147% | $263.600 |
| Elliott Management Corporation | | | 30.433% | | | 32.775% | 245.814 |
| Entities managed by Aurelius Capital Management, LP | | | 5.310% | | | 5.724% | 42.932 |
| Unsecured Group Initial Parties | | | 68.329% | | | 73.646% | $552.346 |
| | | | | | | | |
| Contrarian Capital Fund I, L.P.1 | | | 4.789% | | | 3.833% | $28.746 |
| CCM Pension-A, L.L.C. | | | 0.377% | | | 0.314% | 2.359 |
| CCM Pension-B, L.L.C. | | | 0.070% | | | 0.058% | 0.439 |
| Contrarian Dome du Gouter Master Fund, L.P. | | | 0.881% | | | 0.706% | 5.292 |
| Contrarian Opportunity Fund, L.P. | | | 1.740% | | | 1.452% | 10.889 |
| Contrarian Capital Senior Secured, L.P. | | | 0.160% | | | 0.129% | 0.970 |
| Contrarian Capital Trade Claims, L.P. | | | 0.490% | | | 0.391% | 2.934 |
| Contrarian Advantage-B, L.P. | | | 0.174% | | | 0.139% | 1.045 |
| Contrarian Emerging Markets, L.P. | | | 3.044% | | | 3.046% | 22.847 |
| Contrarian EM SIF Master L.P. | | | 0.480% | | | 0.484% | 3.630 |
| Boston Patriot Summer St. L.P. | | | 1.617% | | | 1.606% | 12.045 |
| PointState Capital LP | | | 11.400% | | | 9.312% | 69.843 |
| Panning Capital Management, LP | | | 3.461% | | | 2.796% | 20.968 |
| South Dakota Investment Council | | | 2.988% | | | 2.086% | 15.648 |
| Second Lien Group Initial Parties | | | 31.671% | | | 26.354% | $197.654 |
| | | | | | | | |
| **Total** | | | **100.000%** | | | **100.000%** | **$750.000** |

# Exhibit 6

## Encumbered Guarantor Debtors

|  | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | American Land Development, LLC | 20-3405570 | 16-42535 |
| 2. | American Land Holdings of Colorado, LLC | 26-3730572 | 16-42540 |
| 3. | American Land Holdings of Illinois, LLC | 30-0440127 | 16-42600 |
| 4. | American Land Holdings of Indiana, LLC | 20-2514299 | 16-42546 |
| 5. | American Land Holdings of Kentucky, LLC | 20-0766113 | 16-42589 |
| 6. | American Land Holdings of West Virginia, LLC | 20-5744666 | 16-42571 |
| 7. | Big Ridge, Inc. | 37-1126950 | 16-42553 |
| 8. | Big Sky Coal Company | 81-0476071 | 16-42530 |
| 9. | Black Hills Mining Company, LLC | 32-0049741 | 16-42544 |
| 10. | BTU Western Resources, Inc. | 20-1019486 | 16-42554 |
| 11. | Caballo Grande, LLC | 27-1773243 | 16-42559 |
| 12. | Caseyville Dock Company, LLC | 20-8080107 | 16-42537 |
| 13. | Central States Coal Reserves of Illinois, LLC | 43-1869432 | 16-42688 |
| 14. | Central States Coal Reserves of Indiana, LLC | 20-3960696 | 16-42551 |
| 15. | Century Mineral Resources, Inc. | 36-3925555 | 16-42567 |
| 16. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 | 16-42543 |
| 17. | COALSALES II, LLC | 43-1610419 | 16-42570 |
| 18. | Conservancy Resources, LLC | 20-5744701 | 16-42564 |
| 19. | Cottonwood Land Company | 43-1721982 | 16-42572 |
| 20. | Cyprus Creek Land Company | 73-1625890 | 16-42534 |
| 21. | Cyprus Creek Land Resources LLC | 75-3058264 | 16-42602 |
| 22. | Dyson Creek Coal Company, LLC | 43-1898526 | 16-42612 |
| 23. | Dyson Creek Mining Company, LLC | 20-8080062 | 16-42621 |
| 24. | Empire Land Holdings, LLC | 61-1742786 | 16-42692 |
| 25. | Falcon Coal Company, LLC | 35-2006760 | 16-42547 |
| 26. | Francisco Equipment Company, LLC | 37-1805119 | 16-42568 |
| 27. | Francisco Land Holdings Company, LLC | 36-4831111 | 16-42580 |
| 28. | Francisco Mining, LLC | 30-0922117 | 16-42591 |
| 29. | Highwall Mining Services Company | 20-0010659 | 16-42588 |
| 30. | Hillside Recreational Lands, LLC | 32-0214135 | 16-42594 |
| 31. | HMC Mining, LLC | 43-1875853 | 16-42566 |
| 32. | Illinois Land Holdings, LLC | 26-1865197 | 16-42599 |
| 33. | Independence Material Handling, LLC | 43-1750064 | 16-42606 |
| 34. | James River Coal Terminal, LLC | 55-0643770 | 16-42569 |
| 35. | Kayenta Mobile Home Park, Inc. | 86-0773596 | 16-42607 |
| 36. | Kentucky Syngas, LLC | 26-1156957 | 16-42618 |
| 37. | Lively Grove Energy, LLC | 20-5752800 | 16-42595 |
| 38. | Marigold Electricity, LLC | 26-0180352 | 16-42628 |
| 39. | Midco Supply and Equipment Corporation | 43-6042249 | 16-42585 |
| 40. | Midwest Coal Acquisition Corp. | 20-0217640 | 16-42576 |
| 41. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 | 16-42597 |
| 42. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 | 16-42611 |
| 43. | Mustang Energy Company, LLC | 43-1898532 | 16-42657 |
| 44. | Pacific Export Resources, LLC | 27-5135144 | 16-42598 |
| 45. | Peabody Archveyor, L.L.C. | 43-1898535 | 16-42623 |
| 46. | Peabody Arclar Mining, LLC | 31-1566354 | 16-42545 |
| 47. | Peabody Bear Run Mining, LLC | 26-3582291 | 16-42565 |

NAI-1502345820v2

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 48. | Peabody Bear Run Services, LLC | 26-3725923 | 16-42574 |
| 49. | Peabody Caballo Mining, LLC | 83-0309633 | 16-42533 |
| 50. | Peabody Cardinal Gasification, LLC | 20-5047955 | 16-42542 |
| 51. | Peabody Coalsales, LLC | 20-1759740 | 16-42539 |
| 52. | Peabody COALTRADE International (CTI), LLC | 20-1435716 | 16-42590 |
| 53. | Peabody COALTRADE, LLC | 43-1666743 | 16-42575 |
| 54. | Peabody Coulterville Mining, LLC | 20-0217834 | 16-42550 |
| 55. | Peabody Development Company, LLC | 43-1265557 | 16-42558 |
| 56. | Peabody Electricity, LLC | 20-3405744 | 16-42532 |
| 57. | Peabody Employment Services, LLC | 26-3730348 | 16-42538 |
| 58. | Peabody Energy Generation Holding Company | 73-1625891 | 16-42656 |
| 59. | Peabody Energy Investments, Inc. | 68-0541702 | 16-42642 |
| 60. | Peabody Energy Solutions, Inc. | 43-1753832 | 16-42632 |
| 61. | Peabody Gateway North Mining, LLC | 27-2294407 | 16-42624 |
| 62. | Peabody Gateway Services, LLC | 26-3724075 | 16-42581 |
| 63. | Peabody Holding Company, LLC | 74-2666822 | 16-42592 |
| 64. | Peabody Illinois Services, LLC | 26-3722638 | 16-42610 |
| 65. | Peabody Indiana Services, LLC | 26-3724339 | 16-42619 |
| 66. | Peabody International Investments, Inc. | 26-1361182 | 16-42536 |
| 67. | Peabody International Services, Inc. | 20-8340434 | 16-42541 |
| 68. | Peabody Investments Corp. | 20-0480084 | 16-42549 |
| 69. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 | 16-42587 |
| 70. | Peabody Midwest Management Services, LLC | 26-3726045 | 16-42593 |
| 71. | Peabody Midwest Mining, LLC | 35-1799736 | 16-42667 |
| 72. | Peabody Midwest Operations, LLC | 20-3405619 | 16-42660 |
| 73. | Peabody Midwest Services, LLC | 26-3722194 | 16-42608 |
| 74. | Peabody Natural Gas, LLC | 43-1890836 | 16-42626 |
| 75. | Peabody Operations Holding, LLC | 26-3723890 | 16-42678 |
| 76. | Peabody Powder River Mining, LLC | 43-0996010 | 16-42666 |
| 77. | Peabody Powder River Operations, LLC | 20-3405797 | 16-42676 |
| 78. | Peabody Powder River Services, LLC | 26-3725850 | 16-42613 |
| 79. | Peabody PowerTree Investments, LLC | 20-0116980 | 16-42596 |
| 80. | Peabody Recreational Lands, L.L.C. | 43-1898382 | 16-42605 |
| 81. | Peabody School Creek Mining, LLC | 20-3585831 | 16-42633 |
| 82. | Peabody Services Holdings, LLC | 26-3726126 | 16-42645 |
| 83. | Peabody Southwest, LLC | 20-5744732 | 16-42631 |
| 84. | Peabody Terminal Holding Company, LLC | 26-1087861 | 16-42650 |
| 85. | Peabody Terminals, LLC | 31-1035824 | 16-42614 |
| 86. | Peabody Trout Creek Reservoir LLC | 30-0746873 | 16-42622 |
| 87. | Peabody Venezuela Coal Corp. | 43-1609813 | 16-42651 |
| 88. | Peabody Venture Fund, LLC | 20-3405779 | 16-42637 |
| 89. | Peabody-Waterside Development, L.L.C. | 75-3098342 | 16-42662 |
| 90. | Peabody Western Coal Company | 86-0766626 | 16-42644 |
| 91. | Peabody Wild Boar Mining, LLC | 26-3730759 | 16-42672 |
| 92. | Peabody Wild Boar Services, LLC | 26-3725591 | 16-42677 |
| 93. | Peabody Wyoming Gas, LLC | 20-5744610 | 16-42640 |
| 94. | Peabody Wyoming Services, LLC | 26-3723011 | 16-42653 |
| 95. | PEC Equipment Company, LLC | 20-0217950 | 16-42673 |
| 96. | Point Pleasant Dock Company, LLC | 20-0117005 | 16-42655 |
| 97. | Pond River Land Company | 73-1625893 | 16-42629 |
| 98. | Porcupine Production, LLC | 43-1898379 | 16-42648 |
| 99. | Porcupine Transportation, LLC | 43-1898380 | 16-42665 |

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 100. | Riverview Terminal Company | 13-2899722 | 16-42664 |
| 101. | Sage Creek Land & Reserves, LLC | 38-3936826 | 16-42635 |
| 102. | School Creek Coal Resources, LLC | 20-2902073 | 16-42643 |
| 103. | Seneca Coal Company, LLC | 84-1273892 | 16-42652 |
| 104. | Shoshone Coal Corporation | 25-1336898 | 16-42668 |
| 105. | Star Lake Energy Company, L.L.C. | 43-1898533 | 16-42639 |
| 106. | Sugar Camp Properties, LLC | 35-2130006 | 16-42649 |
| 107. | Thoroughbred Generating Company, L.L.C. | 43-1898534 | 16-42679 |
| 108. | Thoroughbred Mining Company LLC. | 73-1625889 | 16-42680 |
| 109. | West Roundup Resources, LLC | 20-2561489 | 16-42671 |
| 110. | Wild Boar Equipment Company, LLC | 32-0488114 | 16-42658 |
| 111. | Wild Boar Land Holdings Company, LLC | 36-4831131 | 16-42661 |

### Gold Fields Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Gold Fields Mining, LLC | 36-2079582 | 16-42561 |
| 2. | Arid Operations, Inc. | 84-1199578 | 16-42562 |
| 3. | Gold Fields Chile, LLC | 13-3004607 | 16-42548 |
| 4. | Gold Fields Ortiz, LLC | 22-2204381 | 16-42578 |

### Unencumbered Debtors

| | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 1. | Four Star Holdings, LLC | 30-0885825 | 16-42556 |
| 2. | Southwest Coal Holdings, LLC | 37-1794829 | 16-42674 |
| 3. | New Mexico Coal Resources, LLC | 20-3405643 | 16-42647 |
| 4. | El Segundo Coal Company, LLC | 20-8162824 | 16-42691 |
| 5. | Peabody New Mexico Services, LLC | 20-8162939 | 16-42646 |
| 6. | Peabody America, LLC | 93-1116066 | 16-42609 |
| 7. | Gallo Finance Company, LLC | 43-1823616 | 16-42586 |
| 8. | Peabody Natural Resources Company | 51-0332232 | 16-42634 |
| 9. | American Land Holdings of New Mexico, LLC | 32-0478983 | 16-42579 |
| 10. | Peabody Southwestern Coal Company, LLC | 43-1898372 | 16-42641 |
| 11. | NM Equipment Company, LLC | 36-4821991 | 16-42582 |
| 12. | Peabody Colorado Operations, LLC | 20-2561644 | 16-42563 |
| 13. | Twentymile Holdings, LLC | 38-3937156 | 16-42654 |
| 14. | Sage Creek Holdings, LLC | 26-3286872 | 16-42670 |
| 15. | Peabody Sage Creek Mining, LLC | 26-3730653 | 16-42625 |
| 16. | Hayden Gulch Terminal, LLC | 86-0719481 | 16-42583 |
| 17. | Colorado Yampa Coal Company, LLC | 95-3761211 | 16-42560 |
| 18. | Juniper Coal Company, LLC | 43-1744675 | 16-42577 |
| 19. | Peabody Williams Fork Mining, LLC | 20-8162742 | 16-42630 |
| 20. | Moffat County Mining, LLC | 74-1869420 | 16-42636 |
| 21. | Peabody Colorado Services, LLC | 26-3723774 | 16-42531 |
| 22. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 | 16-42603 |
| 23. | Peabody Rocky Mountain Services, LLC | 20-8162706 | 16-42616 |
| 24. | Peabody Twentymile Mining, LLC | 26-3725223 | 16-42627 |

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 805 of 876 PageID #: 7182

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 317 of 330

|  | Debtor's Name | Debtor's EIN Number | Debtor's Case No. |
|---|---|---|---|
| 25. | Seneca Property, LLC | 36-4820253 | 16-42659 |
| 26. | Twentymile Equipment Company, LLC | 38-3982017 | 16-42675 |
| 27. | Twentymile Coal, LLC | 95-3811846 | 16-42669 |
| 28. | Kentucky United Coal, LLC | 35-2088769 | 16-42573 |
| 29. | United Minerals Company, LLC | 35-1922432 | 16-42663 |
| 30. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 | 16-42620 |
| 31. | Peabody Asset Holdings, LLC | 20-3367333 | 16-42555 |
| 32. | Peabody China, LLC | 43-1898525 | 16-42552 |
| 33. | Peabody Mongolia, LLC | 20-8714315 | 16-42617 |
| 34. | Peabody IC Funding Corp | 46-2326991 | 16-42615 |
| 35. | Peabody IC Holdings, LLC | 30-0829603 | 16-42601 |
| 36. | PG Investments Six, L.L.C. | 43-1898530 | 16-42638 |

# Exhibit 7

## Summary Table of Proposed Classification Scheme

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 1A – 1D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | First Lien Lender Claims | Impaired | Entitled to Vote |
| 2A – 2D | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 3A – 3E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4A – 4E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Other Priority Claims | Unimpaired | Deemed to Accept |
| 5A – 5E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | General Unsecured Claims | Impaired | Entitled to Vote /<br>Deemed to Reject (Gib1) |
| 6A, 6B | PEC<br>Encumbered Guarantor Debtors | Convenience Class Claims | Impaired | Entitled to Vote |
| 7A – 7E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | MEPP Claim | TBD | TBD |
| 8A | PEC | Unsecured Subordinated Debenture Claims | Impaired | Deemed to Reject |

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 807 of 876 PageID #: 1784

Case 16-42529   Doc 1834-3   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit C - Backstop Commitment Agreement   Pg 319 of 330

| Class(es) | Debtor Groups | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 9A – 9E | PEC<br>Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Intercompany Claims | Unimpaired | Deemed to Accept |
| 10A | PEC | Section 510(b) Claims | Impaired | Deemed to Reject |
| 11A | PEC | PEC Interests | Impaired | Deemed to Reject |
| 12B – 12E | Encumbered Guarantor Debtors<br>Gold Fields Debtors<br>Peabody Holdings (Gibraltar) Limited<br>Unencumbered Debtors | Subsidiary Debtor Interests | Unimpaired | Deemed to Accept |

NAI-1502345820v2

## Exhibit 8

## Private Placement and Backstop Commitment Parties
## Voting/Consent Structure

Set forth below is the structure for voting and consents by the Private Placement Parties and the Backstop Commitment Parties with respect to material issues, including the Private Placement, Plan terms, the Backstop Commitment and the Restructuring (the "Voting / Consent Structure").

## Gatekeeping for All Issues – 75% of Noteholder Steering Committee

All proposed changes, modifications and amendments to the Plan Documents (as defined in the PSA) and the Transactions contemplated therein shall be vetted by the Noteholder Steering Committee. Proposals will be submitted for ratification – as set forth below – only if supported by 75% of the committee based on combined Class 2 and Class 5 holdings as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule (a "75% Supermajority"). If one of the seven members of the Noteholder Steering Committee transfers or assigns any of its holdings (in either Class 2 or Class 5) to a third party, such member's Noteholder Steering Committee voting power attributable to the face amount of such transferred or assigned holdings shall be reallocated on a pro rata basis based on holdings as set forth in the Initial Backstop Commitment Schedule to the other Noteholder Steering Committee members who belong as of the date of execution of the Plan Support Agreement (the "PSA") to the same ad hoc noteholder group as the transferring or assigning member.[42]

The Noteholder Steering Committee shall retain voting and consent rights with respect to any termination rights, default provisions, cross-default provisions, and waivers of such rights and provisions. Such voting and consent rights shall require a 75% Supermajority of the Noteholder Steering Committee parties, pursuant to the terms and conditions set forth in the immediately

---

[42]    For example, any transfer of any Claims by Elliott (regardless of whether it is a Class 2 or Class 5 Claim) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Elliott to Discovery and Aurelius on a pro rata basis based on the Claim holdings of Discovery and Aurelius, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Similarly, any transfer of any Claims by Point State (regardless of the type of claim transferred) will result in the reallocation of voting power attributable to the face amount of such transferred holdings from Point State to Contrarian, Panning, and SDIC on a pro rata basis based on the claim holdings of Contrarian, Panning, and SDIC, respectively, as set forth in the Initial Backstop Commitment Schedule and Initial Private Placement Schedule. Solely for purposes of this Exhibit, for the avoidance of doubt, any member of the Noteholder Steering Committee may transfer or assign, directly or indirectly, all or any portion of its Claims or commitments to purchase Private Placement Commitments or Backstop Commitments to (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Private Placement Party or Commitment Party, as applicable, or its affiliated investment funds, created for the purpose of holding such Claims, Private Placement Commitment or Backstop Commitment or holding debt or equity of the Debtors, and no such transfer or assignment shall alter the voting rights set forth herein. For the avoidance of doubt, Contrarian, in its capacity as investment advisor or manager to various entities and managed accounts set forth on the Initial Private Placement Schedule and Initial Backstop Commitment Schedule, shall vote for the same for purposes hereof.

preceding paragraph; provided, however, that for the avoidance of doubt the Steering Committee may not extend the effective date milestone beyond June 14, 2017 absent consent from all parties in accordance with C.10 below.

In the event that a proposed change falls, or could be interpreted to fall, into two or more voting threshold categories (A, B, C, and D) set forth below, such proposed change shall be deemed to fall into the category with the highest voting threshold and shall be subject to such category's voting threshold accordingly.

## A.  Class Issues – 66% by Class

Requires a 66% supermajority affirmative vote of parties who vote[43] in each affected class, based on aggregate respective Private Placement Commitments held by each Private Placement Party at such time, on a class-by-class basis (2-class vote):

1.  issuance of dilutive securities not contemplated by the Restructuring Term Sheet
2.  changes to the allocation of Private Placement Commitment (including changes to holdback)
3.  changes to the allocation of Backstop Commitment
4.  terms of the New Second Lien Notes; provided, however, that no such vote or approval shall be required in connection with the terms of the New Second Lien Notes, to the extent such terms are consistent with the terms set forth on Exhibit 2 to the Restructuring Term Sheet
5.  changes to the capital structure (e.g. increase in total debt above Restructuring Term Sheet debt levels)
6.  any material changes that would disproportionately treat either the Unsecured Senior Notes Claims or Second Lien Notes Claims more favorably or less favorably on anything other than a proportionate basis

## B.  Other Issues – 66% of All

Requires a 66% supermajority affirmative vote of all parties who vote, based on aggregate respective Private Placement Commitments held by each party at such time:

1.  the Private Placement Amount (as defined in the Private Placement Agreement) or Rights Offering Amount (as defined in the Backstop Commitment Agreement) (except for adjustments of up to $100 million in aggregate in order to ensure that the Rights Offering is compliant with section 1145 of the Bankruptcy Code and any other applicable regulations)
2.  changes to corporate governance set forth in the Restructuring Term Sheet
3.  priority of dilution of all securities (Penny Warrants, Preferred Equity, Common Shares)
4.  Material Adverse Event definition & waivers of potential Material Adverse Events

---

[43]   For the avoidance of doubt, any Additional Private Placement Party or Additional Backstop Party, including, but not limited to, any Phase Two Placement Party or any Additional Backstop Party, shall not be entitled to exercise voting or consent rights as set forth herein unless and until the applicable subscription or enrollment period (as may be extended, reduced, or otherwise modified as set forth herein) has expired.

NAI-1502345820v2

5.   any other changes not specifically subject to a different standard herein over which the Requisite Consenting Noteholders have consent or approval rights as set forth in the Term Sheet

## C.  All Party Fundamental Rights – 100% of All

Requires unanimous consent by all affected parties.  Except with respect to proposed changes under items 3 or 4 listed below (as well as item 11, to the extent any proposed change under item 11 would impact, directly or indirectly, items 3 or 4), if a proposal achieves affirmative votes from parties holding 66% or more of the aggregate Private Placement Commitments outstanding at such time, the rights and obligations under the Private Placement Agreement and Backstop Commitment Agreement of any party that dissents from such proposed change will be automatically terminated, subject to the decision by a 75% Supermajority to proceed with the proposed change on the basis of redistributing the dissenters' commitments to Private Placement Parties/Commitment Parties that agree to assume the additional commitments.  This ejection shall not limit the dissenters' obligations under the Plan Support Agreement (other than any obligation to be a Private Placement Party or Commitment Party, as applicable).  If the Noteholder Steering Committee determines not to proceed with the amendment, dissenters will remain Private Placement Parties and Commitment Parties, as applicable.

1.   increasing the dollar amount of each party's commitment (other than through the addition of Additional Private Placement/Commitment Parties)
2.   changing any voting or consent threshold or any related definitions (including "Requisite Creditor Parties", "Requisite Consenting Noteholders"  or "Requisite Members of the Noteholder Steering Committee")
3.   changes disproportionately adversely affecting any individual party
4.   changes to the Pro Rata Split
5.   changes to Backstop Premiums, Backstop Breakup Payments, Private Placement Premiums, or Private Placement Breakup Payments or allocation of such fees
6.   changes to Plan Enterprise Value (as set forth in the Restructuring Term Sheet) or Plan Equity Value (as set forth in the Restructuring Term Sheet)
7.   discounts to Plan Equity Value for the Private Placement and Rights Offering
8.   increase of Penny Warrant issuance
9.   conversion rates for Penny Warrants
10.  extension or waiver of the Effective Date milestone in the PSA or Term Sheet past June 14, 2017, or any modification of the termination rights set forth in (i) section 9.3 of the Private Placement Agreement (Termination by a Private Placement Party), (ii) section 2.7(a) of the Private Placement Agreement (Designation and Assignment Rights). (iii) section 9.3 of the Backstop Commitment Agreement (Termination by a Commitment Party), (iv) section 2.7(a) of the Backstop Commitment Agreement (Designation and Assignment Rights), and (v) section 12.08 of the PSA
11.  changes in definitions impacting, directly or indirectly, any of the above items

## D.  Initial Party Fundamental Rights – 100% of Initial Parties

Requires unanimous consent of Noteholder Co-Proponents:
1.   changes to the Initial Backstop Commitment Schedule or Initial Private Placement Schedule

2.  changes to the allocations, conditions, or other terms of any "protected" commitments of any of the Initial Parties, including but not limited to the Private Placement holdback, the Surplus Private Placement Adjustment, and the Surplus Backstop Participation Adjustment

NAI-1502345820v2

**Exhibit 9**

**Illustrative Allocation of Reorganized PEC Common Stock (Fully-Diluted)**

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 813 of 876 PageID #: 1780

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 325 of 330

**Exhibit 9: Illustrative Allocation of Reorganized PEC Common Shares (Fully-Diluted)** [1]

| Share Calculation | |
|---|---|
| Plan Enterprise Value | $4,275,000,000 |
| Less: Net Debt | (1,170,000,000) |
| **Plan Equity Value** | **$3,105,000,000** |
| Divided by: Assumed Per Share Plan Value | $25.00 |
| **Fully-Diluted Common Shares** | **124,200,000** |

| Rights Offering | |
|---|---|
| Rights Offering Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (BCA) | $13.75 |
| **Rights Offering Shares** | **54,545,454** |

| Private Placement | |
|---|---|
| Private Placement Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (PPA) | $25.00 |
| **Private Placement Shares** | **30,000,000** |
| Divided by: Conversion Price | $16.25 |
| **Private Placement Shares (As-Converted into Common Shares)** | **46,153,846** |

| Private Placement / Backstop Commitment Premium | |
|---|---|
| Total Rights Offering / Private Placement Amount | $1,500,000,000 |
| Multiplied by: Private Placement / Backstop Commitment Premium (%) | 8.00% |
| **Private Placement / Backstop Commitment Premium ($)** | **$120,000,000** |
| Divided by: Per Share Plan Value | $25.00 |
| **Commitment Premium Shares** | **4,800,000** |

| Penny Warrants | |
|---|---|
| Plan Equity Value | $3,105,000,000 |
| Divided by: Per Share Plan Value | $25.00 |
| Multiplied by: Amount of Fully-Diluted Plan Equity Value (%) | 5.00% |
| **Warrant Shares (As-Exercised into Common Shares)** | **6,210,000** |

| Fully-Diluted Equity Capitalization at Emergence | |
|---|---|
| Rights Offering Shares | 54,545,454 |
| Private Placement Shares (As-Converted) | 46,153,846 |
| Commitment Premium Shares | 4,800,000 |
| Warrant Shares (As-Exercised) | 6,210,000 |
| Incremental Second Lien Shares | TBD |
| Disputed Claims Reserve Shares | TBD |
| Ticking Premium Shares | TBD |
| Shares for Class 2/5B Plan Distributions [1] | 12,490,700 |
| **Total Shares of Reorganized PEC Common Shares (Fully-Diluted)** | **124,200,000** |

---

[1] Shares of Reorganized PEC Common Shares issued to holders of Class 2 and Class 5B claims pursuant to the Plan shall be reduced share-for-share to the extent of the issuance of Incremental Second Lien Shares, Disputed Claims Reserve Shares, and/or Ticking Premium Shares.

**EXHIBIT 2**

**FORM OF JOINDER AGREEMENT**

This JOINDER AGREEMENT to that certain Plan Support Agreement entered into as of [_____], 2016 by and among the Debtors, the Supporting Creditor Parties (in their capacities as parties thereto), and attached hereto as <u>Exhibit A</u> (as amended, modified, or amended and restated from time to time in accordance with its terms, the "<u>Plan Support Agreement</u>"), is hereby executed and delivered by [●] (the "<u>Joining Party</u>") as of _____ [●], ___.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Plan Support Agreement.

<u>Agreement to be Bound</u>.  The Joining Party hereby agrees, on a several basis, to be bound by the Plan Support Agreement in accordance with its terms.  The Joining Party shall hereafter be deemed to be a Party, and to the extent the Joining Party is a transferee of a Creditor Co-Proponent, such Joining Party shall hereafter be deemed to be an Additional Supporting Party, for any and all purposes under the Plan Support Agreement, and not a Creditor Co-Proponent.  For the avoidance of doubt, to the extent not already a Party to the Plan Support Agreement, the Joining Party shall only become a Party (or Supporting Creditor Party, to the extent applicable) to the Plan Support Agreement with respect to any and all Claims owned by such a Joining Party shall automatically and immediately upon execution of this Joinder Agreement be deemed to be subject to all of the terms of the Plan Support Agreement.   In the event of any inconsistency between this Joinder Agreement and the Plan Support Agreement, the Plan Support Agreement shall control in all respects.

<u>Representations and Warranties</u>.  With respect to the aggregate principal amount and type of Claims set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Parties set forth in <u>Section 9</u> of the Plan Support Agreement to each other Party to the Plan Support Agreement.  For the avoidance of doubt, only the aggregate principal amount of the Claims that are the subject of the Transfer must be stated on the signature page of this Joinder Agreement.

<u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of laws principles thereof that would require the application of the law of any other jurisdiction.

[Signature pages follow.]

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 815 of 876 PageID #: 1782

Case 16-42529    Doc 1834-3    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit C - Backstop Commitment Agreement    Pg 327 of 330

Date executed:    [_____]

[NAME OF TRANSFEREE]

By:    _____

Name:

Title:

Address:    _____

    _____

    _____

Attn.:    _____

Tel.:    _____

Fax:    _____

Email: _____

Aggregate principal amount of Claims beneficially owned or managed on behalf of funds or accounts that beneficially own such Claims:

First Lien Lender Claims:

$_____

Second Lien Notes Claims:

$_____

Unsecured Senior Notes Claims:

$_____

[Signature Page to Joinder to Plan Support Agreement]

**<u>Exhibit A</u>**

**Plan Support Agreement**

**Exhibit E**

**Illustrative Allocation of Common Shares (Fully Diluted)**

**Illustrative Allocation of Reorganized PEC Common Shares (Fully-Diluted)** [1]

| Share Calculation | |
|---|---:|
| Plan Enterprise Value | $4,275,000,000 |
| Less: Net Debt | (1,170,000,000) |
| **Plan Equity Value** | **$3,105,000,000** |
| Divided by: Assumed Per Share Plan Value | $25.00 |
| **Fully-Diluted Common Shares** | **124,200,000** |

| Rights Offering | |
|---|---:|
| Rights Offering Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (BCA) | $13.75 |
| **Rights Offering Shares** | **54,545,454** |

| Private Placement | |
|---|---:|
| Private Placement Amount | $750,000,000 |
| Divided by: Per Share Purchase Price (PPA) | $25.00 |
| **Private Placement Shares** | **30,000,000** |
| Divided by: Conversion Price | $16.25 |
| **Private Placement Shares (As-Converted into Common Shares)** | **46,153,846** |

| Private Placement / Backstop Commitment Premium | |
|---|---:|
| Total Rights Offering / Private Placement Amount | $1,500,000,000 |
| Multiplied by: Private Placement / Backstop Commitment Premium (%) | 8.00% |
| **Private Placement / Backstop Commitment Premium ($)** | **$120,000,000** |
| Divided by: Per Share Plan Value | $25.00 |
| **Commitment Premium Shares** | **4,800,000** |

| Penny Warrants | |
|---|---:|
| Plan Equity Value | $3,105,000,000 |
| Divided by: Per Share Plan Value | $25.00 |
| Multiplied by: Amount of Fully-Diluted Plan Equity Value (%) | 5.00% |
| **Warrant Shares (As-Exercised into Common Shares)** | **6,210,000** |

| Fully-Diluted Equity Capitalization at Emergence | |
|---|---:|
| Rights Offering Shares | 54,545,454 |
| Private Placement Shares (As-Converted) | 46,153,846 |
| Commitment Premium Shares | 4,800,000 |
| Warrant Shares (As-Exercised) | 6,210,000 |
| Incremental Second Lien Shares | TBD |
| Disputed Claims Reserve Shares | TBD |
| Ticking Premium Shares | TBD |
| Shares for Class 2/5B Plan Distributions[1] | 12,490,700 |
| **Total Shares of Reorganized PEC Common Shares (Fully-Diluted)** | **124,200,000** |

---

[1] Shares of Reorganized PEC Common Shares issued to holders of Class 2 and Class 5B claims pursuant to the Plan shall be reduced share-for-share to the extent of the issuance of Incremental Second Lien Shares, Disputed Claims Reserve Shares, and/or Ticking Premium Shares.

# EXHIBIT D

**Rights Offering Procedures, Subscription
Agreement and Subscription Forms**

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 820 of 876 PageID #: 1467
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 2 of 58

# PEABODY ENERGY CORPORATION

## RIGHTS OFFERING PROCEDURES

> **The Offered Shares are being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").**
>
> **None of the Rights Offering Equity Rights distributed in connection with these Rights Offering Procedures or any Offered Shares have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no Rights Offering Equity Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Rights Offering Equity Rights, the Allowed Claims in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) and 5B (General Unsecured Claims against the Encumbered Guarantor Debtors), or the Offered Shares) (each of the above, a "<u>Transfer</u>") except in compliance with the applicable registration requirements of the Securities Act and applicable state or local laws and the terms of the Subscription Agreement.**
>
> **The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, or of an affiliate participating in a joint plan with the debtor, or of a newly organized debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

**Terms used and not defined herein or in the Subscription Agreement have the meanings assigned to them in the Plan (as defined below).**

To Eligible Holders and Nominees of Eligible Holders:

On December 22, 2016, the Debtors filed the Joint Chapter 11 Plan of Reorganization of the Debtors with the United States Bankruptcy Court for the Eastern District of Missouri (as such plan of reorganization may be amended, supplemented or modified from time to time in accordance with its terms, the "<u>Plan</u>"), and the Disclosure Statement with respect to the Plan (as such disclosure statement may be amended, supplemented or modified from time to time in accordance with its terms, the "<u>Disclosure Statement</u>").  Pursuant to the Plan, each holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) and 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) as of the Record Date (as defined below) has the right to participate in the Rights Offering in accordance with the terms and conditions of the Subscription Agreement and these Rights Offering Procedures.  Only holders of Allowed Claims

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 821 of 876 PageID #: 7168
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 3 of 58

in Classes 2A - 2D and 5B as of the Record Date and their permitted Transferees may participate in the Rights Offering of the Offered Shares.

Pursuant to the Plan, each Eligible Holder will receive Rights Offering Equity Rights to subscribe for its Pro Rata Shares, provided it timely and properly executes and delivers a Subscription Agreement and the appropriate Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent in advance of the Subscription Expiration Deadline.

**Please note that Eligible Holders that hold Allowed Claims in Classes 2A - 2D and 5B through a broker, dealer, commercial bank, trust company or other nominee ("Nominee") must deliver their Subscription Agreements and the appropriate Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee instead of the Subscription Agent. All Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) of Allowed Claims held through a Nominee must be delivered to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, in sufficient time to allow such Nominee to process and deliver the Master Subscription Form, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.**

No Eligible Holder will be entitled to participate in the Rights Offering unless the aggregate Purchase Price for the Offered Shares it subscribes for is received by the Subscription Agent in advance of the Subscription Expiration Deadline; provided, that, notwithstanding anything to the contrary herein, Eligible Holders that have agreed to backstop the Rights Offering pursuant the Backstop Commitment Agreement will be entitled to submit the applicable Purchase Price in accordance with that agreement. No interest is payable on any advanced funding of the Purchase Price. Any Eligible Holder submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent in advance of the Subscription Expiration Deadline.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline, you will be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

### 1. Rights Offering

Eligible Holders have the right, but not the obligation, to participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreements, each Eligible Holder is entitled to subscribe for up to its Pro

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 822 of 876 PageID #: 7189
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 4 of 58

Rata Shares at the Purchase Price, subject to the individual limits included in the calculations under Item 2 of such Eligible Holder's Beneficial Holder Subscription Form. The number of Offered Shares actually subscribed for and purchased by an Eligible Holder is referred to as such Eligible Holder's "Subscribed Shares" and the aggregate Purchase Price to be paid for such Eligible Holder's Subscribed Shares is referred to as such Eligible Holder's "Rights Offering Payment."

Any Eligible Holder that is an Affiliate of the Debtors will receive restricted securities under the Securities Act bearing a legend indicating that the securities may not be resold unless such securities are registered with the Securities and Exchange Commission ("SEC") or the resale is exempt from the registration requirements of the Securities Act.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

**2.      Subscription Period**

The Rights Offering will commence on the date on which Subscription Agreements are first sent to Eligible Holders (the "Subscription Commencement Date") and will expire on the Subscription Expiration Deadline. Each Eligible Holder intending to purchase Offered Shares in the Rights Offering must affirmatively elect to exercise its Rights Offering Equity Rights in the manner set forth in the Rights Offering Instructions included with the Subscription Agreement (consistent herewith, including as described in Sections 4 and 5 hereof) on or prior to the Subscription Expiration Deadline.

If you do not exercise Rights Offering Equity Rights on or prior to the Subscription Expiration Deadline, upon the Subscription Expiration Deadline you will be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering, so any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

**3.      Delivery of Subscription Agreement**

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Rights Offering Equity Rights, but subject to the terms and conditions of the Subscription Agreement, the exercise of any Rights Offering Equity Rights will be unconditional and irrevocable. In order to facilitate the exercise of the Rights Offering Equity Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Agreement and appropriate Beneficial Holder Subscription Form and the payment of the applicable Rights Offering Payment.

**4.      Exercise of Rights Offering Equity Rights**

In order to validly exercise Rights Offering Equity Rights, each Eligible Holder must:

(a)      return a duly executed Subscription Agreement along with the appropriate duly completed and executed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent on or before the Subscription Expiration Deadline; and

(b)      at the same time it returns its Subscription Agreement and Beneficial Holder Subscription Form to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Rights Offering Payment by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 3 of the Beneficial Holder Subscription Form; provided, that, notwithstanding anything to the contrary herein, Eligible Holders that have agreed to backstop the Rights Offering pursuant the Backstop Commitment Agreement will be entitled to submit the applicable Purchase Price in accordance with that agreement.

With respect to (a) and (b) above, any Eligible Holder that holds Allowed Claims in Classes 2A - 2D and 5B through a Nominee must duly complete, execute and return its Subscription Agreement and Beneficial Holder Subscription Form in accordance with the instructions herein **directly to its Nominee** in sufficient time to allow the Nominee to process the instructions and deliver to the Subscription Agent the completed Subscription Agreement and Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and payment on or before the Subscription Expiration Deadline.

Any Eligible Holder that does not hold an Allowed Claim through a Nominee must deliver its completed Subscription Agreement, Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and payment directly to the Subscription Agent on or before the Subscription Expiration Deadline.

In the event that funds received by the Subscription Agent in payment for an Eligible Holder's Subscribed Shares are less than the Rights Offering Payment required to be paid, the number of Subscribed Shares deemed to be purchased by the Eligible Holder will be the lesser of (i) the number of Subscribed Shares elected to be purchased by such Eligible Holder as set forth in such Eligible Holder's Beneficial Holder Subscription Form and (ii) a number determined by dividing the amount of such funds received by the Purchase Price.

The Subscription Agent will deposit and hold the payments of cash made in accordance with the Rights Offering in a segregated escrow account until administered in connection with the settlement of the Rights Offering on the Effective Date.  The Subscription Agent may not use such funds for any other purpose prior to such Effective Date and may not encumber or permit such funds to be encumbered with any lien or similar encumbrance.  Such funds held by the Subscription Agent will not be deemed part of the Debtors' bankruptcy estates.

## 5.      Practices and Procedures of DTC

The Second Lien Notes and Unsecured Senior Notes are held in book-entry form in accordance with the practices and procedures of the Depository Trust Company ("DTC"). The sole registered holder of the Second Lien Notes and Unsecured Senior Notes is Cede & Co., the

custodian for DTC. In the event the Rights Offering with respect to Second Lien Notes Claims and Unsecured Senior Notes Claims is conducted through DTC, the Debtors will employ DTC's customary practices, processes, and procedures, including but not limited to DTC's Automated Tender Offer Program ("ATOP"). The banks, brokers, or other Nominees that hold the Second Lien Notes and Unsecured Senior Notes in "street name" through DTC on behalf of the beneficial owners of the Second Lien Notes and Unsecured Senior Notes (the "DTC Participating Nominees") possess the necessary access to ATOP.

On the Subscription Commencement Date (or as soon as practicable thereafter), the Subscription Agent will cause to be opened on the DTC's ATOP platform one or more "envelopes" into which DTC Participating Nominees can submit "instructions" on behalf of their clients—the beneficial holders of the Second Lien Notes and Unsecured Senior Notes that are Eligible Holders. Submitting an instruction into ATOP is akin to the voluntary electronic tendering of the Second Lien Notes and Unsecured Senior Notes. Once "tendered," DTC will assign to the tendered Second Lien Notes and Unsecured Senior Notes "Contra CUSIPs"—designed to identify and isolate the tendered Second Lien Notes and Unsecured Senior Notes separate and apart from the non-tendered Second Lien Notes and Unsecured Senior Notes. Upon the successful submission of instructions into an ATOP envelope, the DTC ATOP system generates (and sends to the DTC Participating Nominee submitting the instruction) a unique reference number called a "voluntary offering instruction" or "VOI."

Submission of instructions into a DTC ATOP envelope (a "Contra-CUSIP Envelope") will constitute a valid representation that the holder of the Second Lien Notes or Unsecured Senior Notes is an Eligible Holder.

Upon receiving a valid submission from an Eligible Holder's DTC Participating Nominee, DTC will debit each DTC Participating Nominee the corresponding Rights Offering Payment for the Rights Offering Equity Rights exercised and will forward those funds to the Subscription Agent in one lump sum at or promptly following the Subscription Expiration Deadline.

The Debtors intend to comply with the practices and procedures of DTC for these purposes, and these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance. In lieu of returning the Subscription Agreement and Beneficial Holder Subscription Form and making the Rights Offering Payment directly to the Subscription Agent, Eligible Holders of Second Lien Notes and Unsecured Senior Notes are directed to instruct their respective DTC Participating Nominees to exercise the Rights Offering Equity Rights on their behalf, and will be required to remit the Rights Offering Payment through DTC, before the Subscription Expiration Deadline. In all other respects, these Rights Offering Procedures will apply.

**6. Transfer Restriction; Revocation**

The Rights Offering Equity Rights will not be transferable, assignable or detachable, other than in connection with the transfer by the Eligible Holder thereof of the corresponding Allowed Claims in respect of which such Rights Offering Equity Rights were issued, as

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 825 of 876 PageID
#: 1172
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 7 of 58

evidenced by delivery of a Transfer Notice to the Subscription Agent or other procedure acceptable to the Debtors and the Subscription Agent.

A "Transfer Notice" is a notice delivered to the Subscription Agent notifying the Subscription Agent of the transfer of an Allowed Claim by the Eligible Holder of the corresponding Rights Offering Equity Rights through the Subscription Expiration Deadline, which indicates the name of the transferor, the name of the transferee, the type of Allowed Claim being transferred and the principal amount of such Allowed Claim.

Following the exercise of any Rights Offering Equity Rights, the Eligible Holder thereof cannot transfer or assign the Allowed Claim corresponding to such Rights Offering Equity Rights until the earlier of (i) the Effective Date and (ii) the termination of the Rights Offering. By its execution of the Subscription Agreement, the Eligible Holder of the Rights Offering Equity Rights will be deemed to have represented and warranted to the Debtors and the Reorganized Debtors that the Eligible Holder is the beneficial owner of the Allowed Claims corresponding to the Rights Offering Equity Rights and will be the Eligible Holder of such Allowed Claims as of the Effective Date.

If and to the extent that an Eligible Holder of Rights Offering Equity Rights transfers or assigns a corresponding Allowed Claims in violation of these provisions, the exercise of the Rights Offering Equity Rights by the holder will be null and void and of no effect, and the holder will be liable to the Debtors, Reorganized Debtors and the Subscription Agent for any claims, damages or losses incurred by them as a result of such transfer or assignment.

The exercise of Rights Offering Equity Rights is irrevocable.

## 7.    Return of Payment

If the Rights Offering is terminated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days, after the date on which the Rights Offering is terminated.

## 8.    Settlement of the Rights Offering and Distribution of the Subscribed Shares

The Debtors intend that the Subscribed Shares will be issued in book-entry form through accounts maintained by Reorganized PEC's transfer agent.

With respect to Subscribed Shares issued on account of Second Lien Notes Claims and Unsecured Senior Notes Claims, DTC or its nominee will be the holder of record of such Subscribed Shares. The ownership interest of each holder of such Subscribed Shares will be recorded on the records of the direct and indirect participants in DTC. Holders who exercise their Rights Offering Equity Rights may be required to furnish the Debtors or their agents information regarding their broker, bank or other Nominee in order that the Subscribed Shares for which they have subscribed can be properly credited to their securities account. To the extent required, the Debtors intend to solicit such information on a timely basis, so that the Subscribed Shares may be delivered to the holders exercising their Rights Offering Equity Rights on or as promptly as practicable after the Effective Date.

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 826 of 876 PageID #: 1173
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 8 of 58

9.        **Fractional Subscribed Shares**

No fractional shares will be issued in the Rights Offering.  All share allocations (including each Eligible Holder's Subscribed Shares) will be calculated and rounded down to the nearest whole share.  Any exercise of Rights Offering Equity Rights that would result in less than one share of Reorganized PEC Common Stock being issued to the Eligible Holder will be rejected and the Rights Offering Payment relating to that exercised returned to the Eligible Holder.

10.        **Validity of Exercise of Rights Offering Equity Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights Offering Equity Rights (including each Eligible Holder's Subscribed Shares) will be determined in good faith by the Debtors, subject to the obligations of the Debtors under the Backstop Commitment Agreement and, if necessary, subject to a final and binding determination by the Bankruptcy Court.  The Debtors may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as they may determine in good faith, or reject the purported exercise of any Rights Offering Equity Rights.  Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.  In addition, the Debtors may permit any such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.

*Before exercising any Rights Offering Equity Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and risk factors to be considered.*

11.        **Modification of Procedures**

The Debtors reserve the right to modify or adopt additional procedures, including to comply with the practices and procedures of DTC or to comply with applicable law, consistent with the provisions of these Rights Offering Procedures to effectuate the Rights Offering and to issue the Subscribed Shares; provided, however, that the Debtors will provide prompt written notice to each Eligible Holder of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date.  In so doing, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effect and implement the Rights Offering and the issuance of the Subscribed Shares.  Nothing in this paragraph will be construed so as to permit the Debtors to modify the terms of the Subscription Agreement, other than to reduce the number of Offered Shares available in the Rights Offering, without the consent of the Subscriber party thereto.

12.        **Inquiries And Transmittal of Documents; Subscription Agent**

The Rights Offering Instructions included with the Subscription Agreement should be carefully read and strictly followed.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number:  [_____].

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 827 of 876 PageID
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 9 of 58
#: 1774

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 828 of 876 PageID #: 1765
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 10 of 58

**PEABODY ENERGY CORPORATION**

---

**SUBSCRIPTION AGREEMENT**

---

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 829 of 876 PageID
#: 1766
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 11 of 58

<u>NOTICES</u>

THIS SUBSCRIPTION AGREEMENT HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF ELIGIBLE HOLDERS IN CONNECTION WITH THE RIGHTS OFFERING BY PEABODY ENERGY CORPORATION (THE "<u>COMPANY</u>") PURSUANT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE COMPANY AND ITS SUBSIDIARIES THAT COMMENCED JOINTLY ADMINISTERED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS SUCH TERM IS HEREINAFTER DEFINED) (THE "<u>PLAN</u>").  ANY REPRODUCTION OR DISTRIBUTION OF THIS SUBSCRIPTION AGREEMENT, OR RETRANSMITTAL OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY.  NONE OF THE FOREGOING AUTHORITIES HAVE PASSED UPON, OR ENDORSED THE MERITS OF, THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED [_____] (THE "<u>DISCLOSURE STATEMENT</u>") PREVIOUSLY DISTRIBUTED.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR UNDER THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES WILL BE OFFERED AND SOLD PURSUANT TO THE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE.  THIS SUBSCRIPTION AGREEMENT IS NOT AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR WILL ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

THE COMPANY MAKES NO REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS SUBSCRIPTION AGREEMENT, THE DISCLOSURE STATEMENT OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ANY OF ITS AGENTS, OFFICERS OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE.  EACH OFFEREE SHOULD CONSULT ITS OWN ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  IT IS SPECULATIVE AND SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES, CAN AFFORD TO LOSE ITS ENTIRE INVESTMENT AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.  FURTHER, THIS INVESTMENT SHOULD ONLY BE MADE BY THOSE WHO UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX CONSEQUENCES OF AND RISK FACTORS ASSOCIATED WITH THE INVESTMENT AND WHO ARE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 831 of 876 PageID #: 1768
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 13 of 58

# SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Subscription Agreement"), by and among Peabody Energy Corporation (the "Company"), and the undersigned (the "Subscriber"), will be deemed executed as of the date the Company executes a counterpart to this Subscription Agreement previously executed by the Subscriber.

WHEREAS, on April 13, 2016, the Company and certain of its direct and indirect debtor subsidiaries (collectively, the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court");

WHEREAS, the Debtors submitted a Disclosure Statement with respect to the Debtors' Joint Chapter 11 Plan of Reorganization, dated as of December 22, 2016 (as amended, supplemented or modified, the "Disclosure Statement), to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Joint Chapter 11 Plan of Reorganization of Peabody Energy Corporation and Certain of its Affiliates, dated as of December 22 (as amended, supplemented or modified, the "Plan");

WHEREAS, capitalized terms used but not defined in this Subscription Agreement have the meaning given to them in the Plan;

WHEREAS, pursuant to the Plan, each Eligible Holder (as defined below) of Allowed Claims in Classes 2A - 2D or 5B as of the Record Date will be granted Rights Offering Equity Rights (as defined below) entitling such Eligible Holder to purchase up to its Pro Rata Shares (as defined below) at the Purchase Price, as calculated in accordance with Item 2a of such Eligible Holder's Beneficial Holder Subscription Form(s) and the Rights Offering Procedures (such offering of the Rights Offering Equity Rights, the "Rights Offering");

WHEREAS, the Subscriber has certified that it is a Eligible Holder and that it beneficially holds an Allowed Claim in Classes 2A - 2D or 5B set forth in Item 1 of such Eligible Holder's Beneficial Holder Subscription Form(s); and

WHEREAS, the Subscriber wishes to subscribe to purchase Subscribed Shares (as defined below) as set forth herein on the terms and subject to the conditions of the Rights Offering and in accordance with the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.  SUBSCRIPTION.

(a)    The Subscriber hereby irrevocably agrees to subscribe for that number of Offered Shares set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s) (the "Subscribed Shares") in accordance with and subject to the terms and conditions

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 832 of 876 PageID
#: 4789
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 14 of 58

contained in this Subscription Agreement.  The Subscriber will pay to the Subscription Agent the Purchase Price for such Subscribed Shares set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s) in cash, at the time it returns this Subscription Agreement to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, by wire transfer of immediately available funds in accordance with the instructions included on Item 3 of such Eligible Holder's Beneficial Holder Subscription Form(s) (or, if the Subscriber is a party to the Backstop Commitment Agreement, in accordance with that agreement).

(b)      In the event that funds received by the Subscription Agent in payment for the Subscriber's Subscribed Shares in accordance with the instructions provided with this Subscription Agreement are less than the Rights Offering Payment required to be paid (as set forth in Item 2b of such Eligible Holder's Beneficial Holder Subscription Form(s)), the number of Subscribed Shares deemed to be purchased by the Subscriber pursuant to this Subscription Agreement will be the lesser of (i) the aggregate number of Subscribed Shares set forth set forth in Item 2b of the Beneficial Holder Subscription Forms submitted by such Eligible Holder and (ii) a number determined by dividing the amount of such funds received in accordance with the instructions included with this Subscription Agreement by the Purchase Price and rounding down to the nearest whole number.

(c)      Subject to the conditions specified in Section 6, the closing of the issuance of Subscribed Shares contemplated by this Subscription Agreement (the "Closing") will take place at the offices of Jones Day, 250 Vesey Street, New York, New York 10281 on the Effective Date.  The date on which the Closing occurs is the "Closing Date."

(d)      If the Rights Offering is terminated, any cash paid to the Subscription Agent will be returned, without interest, to the Subscriber as soon as reasonably practicable, but in any event within six (6) Business Days, after the date on which the Rights Offering is terminated.

2.      REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Subscriber as follows:

(a)      The Company is and, as of the Effective Date, will be, duly organized and validly existing under the laws of the State of Delaware.

(b)      Subject to the entry of the Bankruptcy Court's confirmation order relating to the Plan and occurrence of the Closing, (i) the Company will have the requisite corporate power and authority to execute and deliver this Subscription Agreement, (ii) this Subscription Agreement and the consummation by the Company of the transactions contemplated hereby will have been duly authorized by all requisite corporate action of the Company and (iii) this Subscription Agreement will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)      The shares of Reorganized PEC Common Stock to be issued (i) in the Rights Offering, when issued in accordance with the provisions hereof, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company and (ii)

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 833 of 876 PageID #: 1780
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 15 of 58

upon the exercise of Penny Warrants upon the valid exercise thereof and payment to Reorganized PEC of the exercise price, when issued in accordance with the Penny Warrants, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company.

Except for the representations and warranties contained in this <u>Section 2</u>, the Plan and the Disclosure Statement, neither the Company, the Debtors nor any other Person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber.  Neither the Company, the Debtors nor any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber, unless and only to the extent that any such information is included in a representation or warranty contained in this <u>Section 2</u>, the Plan or the Disclosure Statement.

3.    <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>.

The Subscriber represents and warrants to the Company as follows:

(a)    The Subscriber is an Eligible Holder and beneficially holds on the date hereof the Allowed Claim in Classes 2A - 2D or 5B set forth on Item 1 of such Eligible Holder's Beneficial Holder Subscription Form(s).

(b)    The Subscriber has the requisite corporate or other applicable power and authority to execute and deliver this Subscription Agreement and the Beneficial Holder Subscription Form(s) and to perform its respective obligations hereunder and thereunder.  This Subscription Agreement and the consummation by the Subscriber of the transactions contemplated hereby have been duly authorized by all requisite action.  This Subscription Agreement has been duly and validly executed and delivered by the Subscriber and constitutes the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.  Except to the extent the Subscriber is an individual, the Subscriber is a duly organized entity validly existing under the laws of the jurisdiction of its incorporation or formation.

(c)    Except as provided under applicable state securities laws and subject to the conditions contained in <u>Section 6</u>, this subscription is and will be irrevocable, except that the Subscriber will have no obligation hereunder if this Subscription Agreement is for any reason rejected or the Rights Offering is for any reason terminated.

(d)    The Subscriber understands that the Subscribed Shares have not been registered under the Securities Act nor qualified under any state securities laws and that the Subscribed Shares are being offered and sold pursuant to an exemption from such registration and qualification requirements based in part upon the Subscriber's representations, warranties and acknowledgements contained herein.

(e)    The Subscriber has read and understands this Subscription Agreement, the Plan, the Disclosure Statement (including but not limited to the risks described under the caption titled "PLAN-RELATED RISK FACTORS") and the appropriate Beneficial Holder Subscription

- 3 -

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 834 of 876 PageID #: 1181
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 16 of 58

Form(s) and understands the terms and conditions herein and therein and the risks associated with the Company and its business as described in the Disclosure Statement. The Subscriber has, to the extent deemed necessary by the Subscriber, discussed with legal counsel the representations, warranties, acknowledgements and agreements that the Subscriber is making herein.

(f)      The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment contemplated by this Subscription Agreement, and it is able to bear the economic risk of an investment in the Company. The Subscriber has sufficient financial resources available to support the loss of all or a portion of its investment in the Company, and has no need for liquidity in its investment in the Company.

(g)      The Subscriber is acquiring the Subscribed Shares solely for its own account for investment and neither with a view toward, nor any present intention of, Transferring the Subscribed Shares. No other Person has any right with respect to or interest in the Subscribed Shares to be purchased by the Subscriber, nor has the Subscriber agreed to give any Person any such interest or right in the future.

(h)      The Subscriber is not a party to any contract with any Person (other than, if applicable, the Backstop Commitment Agreement and/or the Private Placement Agreement) that would give rise to a valid claim against the Company or any of its subsidiaries for a brokerage commission, finder's fee or like payment in connection with the Subscriber's investment in the Company.

(i)      No third-party consents or approvals (including governmental consents or approvals) are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this Subscription Agreement and to perform its obligations hereunder.

(j)      Neither the execution and delivery of this Subscription Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees to which the Subscriber is subject.

(k)      The Subscriber is not relying upon any information, representation or warranty by the Company other than as set forth in this Subscription Agreement, the Plan or the Disclosure Statement. The Subscriber has consulted, to the extent deemed appropriate by the Subscriber, with the Subscriber's own advisors as to the financial, tax, legal and related matters concerning an investment in the Subscribed Shares and on that basis believes that an investment in the Subscribed Shares is suitable and appropriate for the Subscriber.

(l)      The foregoing representations and warranties are true on the date hereof and will be true as of the Closing Date and will survive delivery of this Subscription Agreement. If any of such representations and warranties is not true prior to acceptance of this Subscription Agreement by the Company or prior to the Closing Date, the Subscriber will give written notice

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 835 of 876 PageID #: 1782
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 17 of 58

of such fact to the Company, specifying which representations and warranties are not true and the reasons therefor.

## 4.   SUBSCRIBER ACKNOWLEDGMENTS.

The Subscriber further acknowledges and agrees as follows:

(a)     The Subscribed Shares purchased pursuant hereto will be initially issued in the name of the Subscriber, an Affiliate of the Subscriber or a Related Fund, as indicated on such Subscriber's Beneficial Holder Subscription Form(s).

(b)     This Subscription Agreement contains its irrevocable firm commitment, subject only to the terms and conditions of this Subscription Agreement and the Rights Offering, to purchase the Subscribed Shares.

(c)     Except to the extent provided in this Subscription Agreement, the Plan or the Disclosure Statement, neither the Debtors nor the Company makes any representation or warranty in connection with the purchase of the Subscribed Shares.

(d)     No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in connection with its consideration of its investment in the Subscribed Shares or as to the fairness of this private placement for investment, nor any recommendation or endorsement of the Subscribed Shares.

(e)     The Debtors and the Company will be relying on representations, warranties, acknowledgements and agreements made by the Subscriber to the Company, and the covenants agreed to by the Subscriber, herein; that the Subscriber will promptly provide, if requested, any additional information that may reasonably be required to determine its eligibility to purchase the Subscribed Shares; and that if there is any change in any of the information provided by the Subscriber, or if any of the Subscriber's representations and warranties becomes inaccurate in any respect, the Subscriber will furnish such revised or corrected information to the Company as soon as reasonably practicable, but in any event within five (5) Business Days prior to the Subscription Expiration Deadline.

(f)     All calculations, including, to the extent applicable, the calculation of (i) the value of the Subscriber's or any other Eligible Holder's Allowed Claims under Classes 2A - 2D or 5B or (ii) the Subscriber's or any other Eligible Holder's Pro Rata Shares, will be made in good faith by the Company and in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations will be subject to a final and binding determination by the Bankruptcy Court.

(g)     The Disclosure Statement contains projections.  The projections are subjective in many respects and are based on expectations, estimates, opinions and beliefs of the Debtors and the Company's management with respect to its financial condition, business and industry performance, general economic, industry and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Debtors' and the Company's control.  Accordingly, there can be no assurance that the estimates and assumptions made in

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 836 of 876 PageID #: 1783
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 18 of 58

preparing the projections will prove accurate or that the forecasts will be realized. In addition, the projections do not and cannot take into account such factors as general economic conditions, unforeseen changes and developments in available technologies and products, the entry into the Company's industry of significant additional competitors, natural disasters, the terms and conditions of future financings of the Company, and other risks inherent to the business of the Company. While management believes that the projections reflect the possible future results of the Company's operations, such results cannot be guaranteed. The Subscriber acknowledges that it is prepared for the substantial economic risks involved in the purchase of the Subscribed Shares, including the total loss of its investment. The Company will not be under any duty to update the projections or the risk factors included in the Disclosure Statement prior to or after the Closing Date.

(h)   If the Subscriber is an "underwriter" as defined under section 1145(b)(1) of the Bankruptcy Code, any Subscribed Shares it subscribes for will be "restricted securities" and may not be resold under the Securities Act and applicable state "Blue Sky Laws" absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning a debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

(i)   The Debtors and the Company may decrease the number of Offered Shares available to the Subscriber as reasonably required by the Debtors, or as required by the Bankruptcy Court or the Securities and Exchange Commission, in each case to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

5.   <u>TRANSFER RESTRICTION; REVOCATION</u>.

(a)   The Subscriber acknowledges and agrees that the Rights Offering Equity Rights are not transferable, assignable or detachable, other than in connection with the Transfer by the Eligible Holder thereof of the corresponding Allowed Claims in respect of which such Rights Offering Equity Rights were issued, as evidenced by delivery of a Transfer Notice to the Subscription Agent or other procedure acceptable to the Debtors and the Subscription Agent.

(b)   Following the exercise of any Rights Offering Equity Rights, the Subscriber cannot Transfer the Allowed Claim corresponding to such Rights Offering Equity

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 837 of 876 PageID #: 1784
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 19 of 58

Rights until the earlier of (i) the Effective Date and (ii) the termination of the Rights Offering in accordance with <u>Section 7</u>.

(c)    The Subscriber acknowledges and agrees that, if and to the extent that the Subscriber Transfers or assigns a corresponding Allowed Claims in violation of these provisions, the exercise of the Rights Offering Equity Rights by the Transferee will be null and void and of no effect, and the Subscriber and the Transferee will be liable to the Debtors, Reorganized Debtors and the Subscription Agent for any claims, damages or losses incurred by them as a result of such Transfer or assignment.

(d)    The exercise of Rights Offering Equity Rights pursuant to this Subscription Agreement is irrevocable.

6.    <u>CONDITIONS TO CLOSING</u>.

(a)    <u>Conditions to Each Party's Obligations</u>.  The respective obligations of the Subscriber and the Company to consummate the transactions contemplated by this Subscription Agreement are subject to the simultaneous occurrence of the Effective Date.

(b)    <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the transactions contemplated by this Subscription Agreement with the Subscriber are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)    All representations and warranties of the Subscriber in <u>Section 3</u> of this Subscription Agreement must be true, correct and complete in all material respects on the Closing Date;

(ii)    All acknowledgments of the Subscriber in <u>Section 4</u> of this Subscription Agreement must be true, correct and complete in all material respects on the Closing Date;

(iii)    The Plan must have been confirmed by the Bankruptcy Court;

(iv)    Any waiting period applicable to the restructuring contemplated by the Plan under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or similar law or statute shall have been terminated or shall have expired;

(v)    The conditions to the Effective Date other than completion of the Rights Offering must have been satisfied or waived by the Company; and

(vi)    Compliance by the Subscriber with the Rights Offering Procedures governing the Rights Offering, including payment by the Subscriber of the Purchase Price.

(c)    <u>Conditions to Obligations of the Subscriber</u>.  The obligations of the Subscriber to consummate the transactions contemplated by this Subscription Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 838 of 876 PageID #: 1785
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 20 of 58

(i)  All representations and warranties of the Company in <u>Section 2</u> of this Subscription Agreement must be true and correct in all material respects on the Closing Date; and

(ii)  Compliance by the Company in all material respects with the Rights Offering Procedures governing the Rights Offering.

<div align="center">

7. <u>TERMINATION</u>.

</div>

This Subscription Agreement will terminate upon the earlier to occur of (i) rejection of the Plan by all Classes entitled to vote and (ii) termination of the Backstop Commitment Agreement.

<div align="center">

8. <u>INTERPRETATION OF THIS SUBSCRIPTION AGREEMENT</u>.

</div>

(a) <u>Terms Defined</u>.  As used in this Subscription Agreement, the following terms have the respective meanings set forth below:

"<u>Affiliate</u>":  With respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by agreement, contract, obligation, promise, undertaking or understanding, whether written or oral, or otherwise).

"<u>Allowed Claims in Classes 2A - 2D and 5B</u>": Allowed Second Lien Notes Claims in Classes 2A - 2D under the Plan and Allowed General Unsecured Claims in Class 5B under the Plan.

"<u>Backstop Commitment Agreement</u>":  The Backstop Commitment Agreement dated as of December 22, 2016 by and among the holders of Second Lien Notes Claims in Classes 2A-2D and General Unsecured Claims in Class 5B identified therein, the other parties thereto and the Company, as may be amended or modified from time to time in accordance with its terms.

"<u>Beneficial Holder Subscription Form(s)</u>":  The applicable subscription form(s) to be completed by Eligible Holders included as <u>Schedule 1B</u> hereto.

"<u>Business Day</u>":  Any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"<u>Class 2 Offered Shares</u>":  The number of total Offered Shares that will be available to Eligible Holders in Classes 2A - 2D, which shall be determined based on the following percentage applied to the total Offered Shares:  the quotient of (A) $708

<div align="center">

- 8 -

</div>

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 839 of 876 PageID #: 1786
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 21 of 58

million divided by (B) the Allowed Claims in Class 5B (measured as of the Record Date) plus $708 million.

"Class 5B Offered Shares": The number of total Offered Shares that will be available to Eligible Holders in Class 5B shall be determined based on the following percentage applied to the total Offered Shares: the quotient of (A) the Allowed Claims in Class 5B (measured as of the Record Date) divided by (B) the Allowed Claims in Class 5B (measured as of the Record Date) plus $708 million.

"Debtors": The Company and each of its direct and indirect debtor subsidiaries listed on Exhibit A.

"Disclosure Statement Order": An order approving the Disclosure Statement with respect to the Plan and the solicitation with respect to the Plan.

"Effective Date": The date the Plan becomes effective in accordance with its terms.

"Eligible Holder": Any holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) or Class 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) as of the Record Date and any Transferee that received such Allowed Claim in accordance with Section 5.

"Master Subscription Form": The applicable subscription form to be completed by the Nominee of any beneficial holders of Allowed Claims in Classes 2A - 2D and 5B included as Schedule 1C hereto.

"Nominee": Broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, as applicable.

"Offered Shares": The [_____] units offered pursuant to the exercise of Rights Offering Equity Rights in the Rights Offering, each unit constituting (i) one (1) share of Reorganized PEC Common Stock having a Plan Equity Value (as defined in the Plan) equal to $[_____], and (ii) [____] Penny Warrants each exercisable into one (1) share of Reorganized PEC Common Stock; provided, that the Debtors and the Company may decrease such number of units as reasonably required by the Debtors, or as required by the Bankruptcy Court or the Securities and Exchange Commission, in each case to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

"Penny Warrants": Warrants exercisable in the aggregate for 2.50% of the fully diluted Reorganized PEC Common Stock as of the Effective Date, which Penny Warrants will be issued on the Effective Date, have an exercise price of $0.01 per share of Reorganized PEC Common Stock, have a term of 90 days from issuance and will be exercisable from and after the Effective Date.

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 840 of 876 PageID #: 1787
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 22 of 58

"Person":  An individual, partnership, limited liability company, joint-stock company, corporation, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"Private Placement Agreement":  The Private Placement Agreement dated as of December 22, 2016 by and among the holders of Second Lien Notes Claims in Classes 2A-2D and General Unsecured Claims in Class 5B identified therein, the other parties thereto and the Company, as may be amended or modified from time to time in accordance with its terms.

"Pro Rata Shares":  In respect of each Eligible Holder's Allowed Claims in Classes 2A - 2D, the number of Class 2 Offered Shares offered to such Eligible Holder in the Rights Offering so that the ratio of (a)(i) the amount of the Class 2 Offered Shares offered to such Eligible Holder to (ii) the total Class 2 Offered Shares is the same as the ratio of (b)(i) the total amount of Second Lien Notes Claims in Class 2A - 2D beneficially held by the Eligible Holder as of the Record Date to (ii) total Second Lien Notes Claims in Class 2A - 2D as of the Record Date.  In respect of each Eligible Holder's Allowed Claims in Class 5B, the number of Class 5B Offered Shares offered to such Eligible Holder in the Rights Offering so that the ratio of (a)(i) the amount of the Class 5B Offered Shares offered to such Eligible Holder to (ii) the total Class 5B Offered Shares is the same as the ratio of (b)(i) the total amount of Allowed Claims in Class 5B beneficially held by such Eligible Holder as of the Record Date to (ii) total Allowed Claims in Class 5B as of the Record Date.

"Purchase Price":  $[_____] per Offered Share.

"Record Date":  The date on which the Disclosure Statement Order is entered by the Bankruptcy Court.

"Related Fund":  With respect to the Subscriber, any fund, account or investment vehicle that is controlled or managed by (a) the Subscriber, (b) an Affiliate of the Subscriber or (c) the same investment manager or advisor as the Subscriber or an Affiliate of such investment manager or advisor.

"Reorganized PEC Common Stock": Common stock, par value $[0.001] per share, in reorganized Peabody Energy Corporation.

"Rights Offering Equity Rights":  The rights to purchase Offered Shares on the Effective Date for an aggregate Purchase Price equal to $750 million pursuant to the terms and conditions set forth in the Plan, the Rights Offering Procedures and this Subscription Agreement.

"Rights Offering Instructions":  The instructions included as Schedule 1A hereto.

"Rights Offering Payment":  The aggregate Purchase Price for the Subscribed Shares to be purchased by an Eligible Holder in the Rights Offering.

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 841 of 876 PageID #: 1788
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 23 of 58

"Subscribed Shares": Offered Shares acquired in connection with the exercise of Rights Offering Equity Rights by an Eligible Holder pursuant to the terms and conditions set forth in the Plan, the Rights Offering Procedures and this Subscription Agreement.

"Subscription Agent": [_____], or any other entity designated as such by the Company, in its capacity as a subscription agent and escrow agent in connection with the Rights Offering.

"Subscription Expiration Deadline": 5:00 p.m. New York City Time on [_____], 2017, the date by which properly completed Subscription Agreements and the Rights Offering Payment will be required to be delivered to the Subscription Agent as provided in this Subscription Agreement.

"Transfer": With respect to any object, any resale, sale, transfer, assignment, pledge, hypothecation, participation, donation, or other disposition or encumbrance, direct or indirect (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in such object).

"Transfer Notice": A notice delivered to the Subscription Agent within three (3) Business Days of any Transfer of an Allowed Claim by the Eligible Holder notifying the Subscription Agent of the Transfer of the Allowed Claim and the corresponding Rights Offering Equity Rights and indicates the name of the transferor, the name of the transferee, the type of Allowed Claim being transferred and the principal amount of such Allowed Claim (in the case of Allowed Claims in Classes 2A - 2D and Allowed Claims in Class 5B on account of Unsecured Senior Notes) and amount of such Allowed Claim (in the case of Allowed Claims in Class 5B not on account of Unsecured Senior Notes).

(b)     Directly or Indirectly.  Where any provision in this Subscription Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person.

(c)     Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each party hereto agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party hereto.

Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby

(d)   Section Headings.  The headings of the sections and subsections of this Subscription Agreement are inserted for convenience only and will not be deemed to constitute a part thereof.

(e)   Construction.  This Subscription Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Subscription Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Subscription Agreement.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  The words "or," "either" and "any" are not exclusive.  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Subscription Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Subscription Agreement as a whole and not to any particular subdivision unless expressly so limited.

9.   MISCELLANEOUS.

(a)   Notices.

(i)   The Subscriber acknowledges that a completed and signed copy of this Subscription Agreement, the appropriate Beneficial Holder Subscription Form(s) or Master Subscription Form(s), as applicable, together with payment of the Rights Offering Payment, must be received by the Subscription Agent in accordance with the instructions included herewith prior to the Subscription Expiration Deadline for the subscription contemplated hereby to be valid.

(ii)   Except as otherwise provided in this Subscription Agreement, following execution of this Subscription Agreement, all demands, notices, requests, consents and other communications under this Subscription Agreement must be in writing, sent contemporaneously to all of the notice parties set forth below and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by facsimile, or if no response to the effect that an email cannot be delivered to the sender is received within two (2) hours, if delivered by email, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

(A)   if to the Subscriber, at its address or facsimile number shown on the applicable Beneficial Holder Subscription Form, or at such other address or facsimile number as the Subscriber may have furnished the Company and the Subscription Agent in writing; and

(B)   if to the Company, at (or at such other address or facsimile number as it may have furnished in writing to the Subscriber):

- 12 -

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 843 of 876 PageID #: 1790
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 25 of 58

Peabody Energy Corporation
701 Market Street
St. Louis, Missouri 63101
Facsimile:  (314) 342-3419
Attention:  Chief Legal Officer

with a copy (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
Facsimile:  (216) 579-0212
Attention:    Heather Lennox

(b)      Expenses and Taxes.  The Company will pay stamp and other taxes (other than income taxes and other similar taxes), if any, which may be payable or determined to be payable under applicable law on the execution and delivery of this Subscription Agreement or acquisition of the Subscribed Shares pursuant to this Subscription Agreement.

(c)      Reproduction of Documents.  This Subscription Agreement and all documents relating hereto may not be reproduced or distributed by the Subscriber without the prior written consent of the Company.

(d)      Assignment; Successors.  This Subscription Agreement is not assignable by the Subscriber without the prior written consent of the Company.  This Subscription Agreement and the rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties.

(e)      Entire Agreement; Amendment and Waiver.  This Subscription Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings among such parties with respect to the matters covered herein.  This Subscription Agreement may be amended, and the observance of any term of this Subscription Agreement may be waived, with (and only with) the written consent of the Company and the Subscriber.

(f)      Severability.  If any provision of this Subscription Agreement or the application of such provision to any Person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Subscription Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

(g)      Specific Performance.  It is understood and agreed by the parties that money damages would be an insufficient remedy for any breach of this Agreement by any party, and a non-breaching party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder; provided, however, that each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 844 of 876 PageID #: 1191
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 26 of 58

      (h)    <u>Counterparts; Facsimile and PDF Signatures</u>. This Subscription Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement. The exchange of copies of this Subscription Agreement and of signature pages by facsimile or portable document format (PDF) transmission will constitute effective execution and delivery of this Subscription Agreement as to the parties hereto and may be used in lieu of the original Subscription Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF will be deemed to be their original signatures for all purposes.

      (i)    <u>Survival</u>. All representations, warranties and covenants contained in this Subscription Agreement shall survive (i) the acceptance of the subscription by the Company and the Closing, (ii) changes in the transactions, documents and instruments described in the Plan, the Disclosure Statement, this Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions which are not material or which are to the benefit of the Subscriber and (iii) the death, disability, insolvency or dissolution of the Subscriber.

<p align="center">[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]</p>

Please indicate your acceptance and approval of the foregoing in the space provided below.


ACCEPTED AND APPROVED

as of the _____ day of _____, 2017

SUBSCRIBER: _____
(Please provide full legal name)

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

City: _____ State: _____

Postal Code: _____

Country: _____

Telephone: _____ Facsimile: _____

Email Address: _____

If U.S. person, check here and attach IRS Form W-9:  ☐ U.S. person

If Non-U.S. person, check here and attach appropriate IRS Form W-8:  ☐ Non-U.S. person


Peabody Energy Corporation


_____
Name:
Title:

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 846 of 876 PageID #: 1493
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 28 of 58

Exhibit A

## Debtors

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Marigold Electricity, LLC | 26-0180352 |
| 52. | Midco Supply and Equipment Corporation | 43-6042249 |

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 847 of 876 PageID #: 1194
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 29 of 58

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 53. | Midwest Coal Acquisition Corp. | 20-0217640 |
| 54. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |
| 55. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 56. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 57. | Moffat County Mining, LLC | 74-1869420 |
| 58. | Mustang Energy Company, LLC | 43-1898532 |
| 59. | New Mexico Coal Resources, LLC | 20-3405643 |
| 60. | NM Equipment Company, LLC | 36-4821991 |
| 61. | Pacific Export Resources, LLC | 27-5135144 |
| 62. | Peabody America, LLC | 93-1116066 |
| 63. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 64. | Peabody Arclar Mining, LLC | 31-1566354 |
| 65. | Peabody Asset Holdings, LLC | 20-3367333 |
| 66. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 67. | Peabody Bear Run Services, LLC | 26-3725923 |
| 68. | Peabody Caballo Mining, LLC | 83-0309633 |
| 69. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 70. | Peabody China, LLC | 43-1898525 |
| 71. | Peabody Coalsales, LLC | 20-1759740 |
| 72. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 73. | Peabody COALTRADE, LLC | 43-1666743 |
| 74. | Peabody Colorado Operations, LLC | 20-2561644 |
| 75. | Peabody Colorado Services, LLC | 26-3723774 |
| 76. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 77. | Peabody Development Company, LLC | 43-1265557 |
| 78. | Peabody Electricity, LLC | 20-3405744 |
| 79. | Peabody Employment Services, LLC | 26-3730348 |
| 80. | Peabody Energy Generation Holding Company | 73-1625891 |
| 81. | Peabody Energy Investments, Inc. | 68-0541702 |
| 82. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 83. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 84. | Peabody Gateway Services, LLC | 26-3724075 |
| 85. | Peabody Holding Company, LLC | 74-2666822 |
| 86. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 87. | Peabody IC Funding Corporation | 46-2326991 |
| 88. | Peabody IC Holdings, LLC | 30-0829603 |
| 89. | Peabody Illinois Services, LLC | 26-3722638 |
| 90. | Peabody Indiana Services, LLC | 26-3724339 |
| 91. | Peabody International Investments, Inc. | 26-1361182 |
| 92. | Peabody International Services, Inc. | 20-8340434 |
| 93. | Peabody Investments Corp. | 20-0480084 |
| 94. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 95. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 96. | Peabody Midwest Mining, LLC | 35-1799736 |
| 97. | Peabody Midwest Operations, LLC | 20-3405619 |
| 98. | Peabody Midwest Services, LLC | 26-3722194 |
| 99. | Peabody Mongolia, LLC | 20-8714315 |
| 100. | Peabody Natural Gas, LLC | 43-1890836 |
| 101. | Peabody Natural Resources Company | 51-0332232 |
| 102. | Peabody New Mexico Services, LLC | 20-8162939 |
| 103. | Peabody Operations Holding, LLC | 26-3723890 |
| 104. | Peabody Powder River Mining, LLC | 43-0996010 |
| 105. | Peabody Powder River Operations, LLC | 20-3405797 |
| 106. | Peabody Powder River Services, LLC | 26-3725850 |
| 107. | Peabody PowerTree Investments, LLC | 20-0116980 |
| 108. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 109. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 848 of 876 PageID #: 1765
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 30 of 58

|  | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 110. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 111. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 112. | Peabody School Creek Mining, LLC | 20-3585831 |
| 113. | Peabody Services Holdings, LLC | 26-3726126 |
| 114. | Peabody Southwest, LLC | 20-5744732 |
| 115. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 116. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 117. | Peabody Terminals, LLC | 31-1035824 |
| 118. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 119. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 120. | Peabody Venezuela Coal Corp. | 43-1609813 |
| 121. | Peabody Venture Fund, LLC | 20-3405779 |
| 122. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 123. | Peabody Western Coal Company | 86-0766626 |
| 124. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 125. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 126. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 127. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 128. | Peabody Wyoming Services, LLC | 26-3723011 |
| 129. | PEC Equipment Company, LLC | 20-0217950 |
| 130. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 131. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 132. | Pond River Land Company | 73-1625893 |
| 133. | Porcupine Production, LLC | 43-1898379 |
| 134. | Porcupine Transportation, LLC | 43-1898380 |
| 135. | Riverview Terminal Company | 13-2899722 |
| 136. | Sage Creek Holdings, LLC | 26-3286872 |
| 137. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 138. | School Creek Coal Resources, LLC | 20-2902073 |
| 139. | Seneca Coal Company, LLC | 84-1273892 |
| 140. | Seneca Property, LLC | 36-4820253 |
| 141. | Shoshone Coal Corporation | 25-1336898 |
| 142. | Southwest Coal Holdings, LLC | 37-1794829 |
| 143. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 144. | Sugar Camp Properties, LLC | 35-2130006 |
| 145. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 146. | Thoroughbred Mining Company LLC. | 73-1625889 |
| 147. | Twentymile Coal, LLC | 95-3811846 |
| 148. | Twentymile Equipment Company, LLC | 38-3982017 |
| 149. | Twentymile Holdings, LLC | 38-3937156 |
| 150. | United Minerals Company, LLC | 35-1922432 |
| 151. | West Roundup Resources, LLC | 20-2561489 |
| 152. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 153. | Wild Boar Land Holdings Company, LLC | 36-4831131 |

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 849 of 876 PageID #: 1196
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 31 of 58

Schedule 1A

## PEABODY ENERGY CORPORATION

## RIGHTS OFFERING INSTRUCTIONS

**Terms used and not defined herein or in the Subscription Agreement have the meanings assigned to them in the Plan (as defined below).**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.    **Insert** the amount(s) of your Allowed Claim(s) that you hold in Item 1 of the appropriate Beneficial Holder Subscription Form. You may be required to complete multiple Beneficial Holder Subscription Forms if you hold Allowed Claims in different Classes or in multiple series of Unsecured Senior Notes. If your Nominee holds your Allowed Claims in Classes 2A - 2D or 5B on your behalf and you do not know the amount, please contact your Nominee immediately. For Second Lien Notes Claims and Unsecured Senior Notes Claims, the amount of your Allowed Claims on account of Second Lien Notes and Unsecured Senior Notes is the principal amount of those securities that you beneficially hold.

2.    **Complete** the calculation in Item 2a of your Beneficial Holder Subscription Form(s), which calculates the maximum number of Offered Shares available for you to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates. Such amount must be rounded down to the nearest whole share.

3.    **Insert** the number of Subscribed Shares that you elect to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates (this amount may not be greater than the number of Offered Shares available for you to purchase on account of those Allowed Claims as calculated in Item 2a). **Complete** the calculation in Item 2b of your Beneficial Holder Subscription Form(s), which calculates the Rights Offering Payment for the amount of Subscribed Shares that you elect to purchase on account of the Allowed Claims to which the Beneficial Holder Subscription Form relates.

4.    **Read, complete and sign** the certification in Item 4 of your Beneficial Holder Subscription Form(s). If you are a party to the Backstop Commitment Agreement and will submit your Rights Offering Payment in accordance with that agreement, you should check the appropriate box on the signature page to the Beneficial Holder Subscription Form(s).

5.    **Read and countersign** the Subscription Agreement. Your signature indicates your acceptance and approval of the terms and conditions set forth therein.

6.    **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

7.    **Return** your signed Subscription Agreement and Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 850 of 876 PageID #: 1197
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 32 of 58

Subscription Agent prior to the Subscription Expiration Deadline. **Please note** that if you hold Allowed Claims through a Nominee, you must deliver your Subscription Agreement and any Beneficial Holder Subscription Form relating to Allowed Claims held through the applicable Nominee (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) **to the applicable Nominee instead of the Subscription Agent**. All Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) of Allowed Claims held through a Nominee must be delivered to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, in sufficient time to allow such Nominee to process and deliver the Master Subscription Form, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline. The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

      **8.**     **Arrange for full payment** of the Rights Offering Payment by wire transfer of immediately available funds, calculated in accordance with Item 2b of your Beneficial Holder Subscription Form(s). For Eligible Holders that hold Allowed Claims via a Nominee, please instruct your Nominee to coordinate payment of the Rights Offering Payment and transmit and deliver such payment to the Subscription Agent prior to the Subscription Expiration Deadline.

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by your Beneficial Holder Subscription Form(s) will not be counted and will be deemed forever relinquished and waived.**

---

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 851 of 876 PageID #: 1198

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D - Rights Offering Procedures   Subscription Agreement and Subscription   Pg 33 of 58

**Schedule 1B**

## PEABODY ENERGY CORPORATION

**BENEFICIAL HOLDER SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**

**FOR USE BY ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN CLASSES 2A - 2D**

**10.00% SENIOR SECURED SECOND LIEN NOTES DUE MARCH 2022**
**OF PEABODY ENERGY CORPORATION**
**(CUSIP: [_____]) IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [_____]**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by this Beneficial Holder Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to this Beneficial Holder Subscription Form.  Any terms capitalized but not defined herein have the meanings as set forth in the Plan.**

---

**Item 1. Amount of Allowed Claims in Classes 2A - 2D.**

I certify that I am a beneficial holder of an Allowed Claim in Classes 2A - 2D (Second Lien Notes Claims against PEC, the Encumbered Guarantor Debtors, the Gold Fields Debtors and Gib 1) or that I am the authorized signatory of that beneficial holder.  For purposes of this Beneficial Holder Subscription Form, do not adjust the principal (face) amount of 10% Senior Secured Second Lien Notes due 2022 of Peabody Energy Corporation for any accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multipliers set forth in Item 2a below. If you do not know the principal amount, please contact your Nominee immediately).

Insert amount of Allowed Claims in Classes 2A - 2D held
     (principal amount of 10% Senior Secured Second Lien
     Notes due 2022)                                        _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 852 of 876 PageID #: 1199

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 34 of 58

**Item 2. Rights.**

      **2a. Calculation of Maximum Number of Offered Shares**.  The maximum number of Offered Shares for which you may subscribe is calculated as follows:

| Allowed Claims in Classes 2A - 2D (insert amount from Item 1 above) | | | | |
|---|---|---|---|---|
| _____ | X | [Rights Factor][1] | = | _____ Maximum Number of Offered Shares in respect of Allowed Claims in Classes 2A - 2D (round down to nearest whole number) |

      Each Eligible Holder may subscribe for its Pro Rata Shares (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in Item 2.  To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

      **2b. Purchase Price**.  By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____ (Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____ Total Purchase Price |
|---|---|---|---|---|

**Item 3. Payment and Delivery Instructions**

      You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below.  No other method of payment is permitted.

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

      Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the

---

[1] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

**Item 4. Certification.**

I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

By electing to subscribe for the amount of Subscribed Shares designated under Item 2b above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Subscription Agreement Deadline.

**I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8  ☐

If U.S. person, check here and attach IRS Form W-9  ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here  ☐

Signature: _____

Name of Signatory: _____

Title: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 854 of 876 PageID #: 1801

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D - Rights Offering Procedures   Subscription Agreement and Subscription   Pg 36 of 58

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____


**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 855 of 876 PageID
#: 1862
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 37 of 58

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 856 of 876 PageID #: 1863
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 38 of 58

**PEABODY ENERGY CORPORATION**

**BENEFICIAL HOLDER SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**

**FOR USE BY ELIGIBLE HOLDERS OF CLAIMS IN CLASS 5B ON ACCOUNT OF**
**UNSECURED SENIOR NOTES**

**6.00% SENIOR NOTES DUE NOVEMBER 2018**
**(CUSIP: [_____])**

**6.50% SENIOR NOTES DUE SEPTEMBER 2020**
**(CUSIP: [_____])**

**6.25% SENIOR NOTES DUE NOVEMBER 2021**
**(CUSIP: [_____])**

**7.875% SENIOR NOTES DUE NOVEMBER 2026**
**(CUSIP: [_____])**

**OF PEABODY ENERGY CORPORATION**
**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [_____]**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by this Beneficial Holder Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to this Beneficial Holder Subscription Form. Any terms capitalized but not defined herein have the meanings as set forth in the Plan.**

---

**Item 1. Amount of Allowed Claims in Class 5B on Account of Unsecured Senior Notes.**

I certify that I am a beneficial holder of an Allowed Claim in Class 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) on account of Unsecured Senior Notes in the following amounts as of the date hereof (insert amount on the line below) or that I am the authorized signatory of that beneficial holder. For purposes of this Beneficial Holder Subscription Form, do not adjust the principal (face) amount of Unsecured Senior Notes for any accrued or unmatured interest. Accrued prepetition interest is accounted for in the multipliers set

forth in Item 2a below.  If you do not know the principal amount, please contact your Nominee immediately).

Insert amounts of Allowed Claims in Class 5B **on account of Unsecured Senior Notes** held (principal amount of Unsecured Senior Notes)

6.00% Senior Notes due November 2018 _____

6.50% Senior Notes due September 2020 _____

6.25% Senior Notes due November 2021 _____

7.875% Senior Notes due November 2026 _____

## Item 2. Rights.

**2a. Calculation of Maximum Number of Offered Shares**.  The maximum number of Offered Shares for which you may subscribe is calculated as follows:

| **Allowed Claims in Class 5B on Account of Unsecured Senior Notes** (insert amounts from Item 1 above) | | | | |
|---|---|---|---|---|
| _____<br>(6.00% Senior Notes due 2018) | X | [Rights Factor][2] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(6.50% Senior Notes due 2020) | X | [Rights Factor][3] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(6.25% Senior Notes due 2021) | X | [Rights Factor][4] | = | _____<br>Maximum Number of Offered Shares |
| _____<br>(7.875% Senior Notes due 2026) | X | [Rights Factor][5] | = | _____<br>Maximum Number of Offered Shares |
| | | | | _____<br>Total Maximum Number of Offered Shares in respect of Allowed Claims in Class 5B on Account of Unsecured Senior Notes |

---

[2] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[3] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[4] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

[5] Rights Factor to be provided (Rights Factor to give effect to prepetition interest).

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 858 of 876 PageID #: 1805

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D - Rights Offering Procedures   Subscription Agreement and Subscription   Pg 40 of 58

| | (round down to nearest whole number) |
|---|---|
| | |

Each Eligible Holder may subscribe for its Pro Rata Shares (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in Item 2. To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

**2b. Purchase Price**. By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____ (Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____ Total Purchase Price |
|---|---|---|---|---|

## Item 3. Payment and Delivery Instructions

You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below. No other method of payment is permitted

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the applicable Nominee in sufficient time to allow such Nominee to process and deliver a Master Subscription Form, which the Nominee will use to summarize the Rights Offering Equity Rights exercised by each Eligible Holder that returns a Beneficial Holder Subscription Form to such Nominee, together with copies of all Subscription Agreements and Beneficial Holder Subscription Forms (with accompanying IRS Forms), and appropriate funding to the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 859 of 876 PageID #: 1806

Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D - Rights Offering Procedures   Subscription Agreement and Subscription   Pg 41 of 58

**Item 4. Certification.**

I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

By electing to subscribe for the amount of Subscribed Shares designated under Item 2b above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Subscription Agreement Deadline.

**I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here ☐

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 860 of 876 PageID #: 1867

Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D - Rights Offering Procedures    Subscription Agreement and Subscription    Pg 42 of 58

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 861 of 876 PageID #: 1868

Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D - Rights Offering Procedures    Subscription Agreement and Subscription    Pg 43 of 58

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 862 of 876 PageID #: 1809
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 44 of 58

# PEABODY ENERGY CORPORATION

## BENEFICIAL HOLDER SUBSCRIPTION FORM
## FOR RIGHTS OFFERING

### FOR USE BY ELIGIBLE HOLDERS OF CLAIMS IN CLASS 5B OTHER THAN ON ACCOUNT OF UNSECURED SENIOR NOTES

### IN CONNECTION WITH DEBTORS'
### DISCLOSURE STATEMENT DATED [_____]

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [_____], 2017.**

**Please note that your Subscription Agreement and this Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent prior to the Subscription Expiration Deadline or the subscription represented by this Beneficial Holder Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to this Beneficial Holder Subscription Form. Any terms capitalized but not defined herein have the meanings as set forth in the Plan.**

---

**Item 1. Amount of Allowed Claims in 5B Other Than on Account of Unsecured Senior Notes.**

I certify that I am a beneficial holder of an Allowed Claim in Class 5B (General Unsecured Claims against the Encumbered Guarantor Debtors) other than on account of Unsecured Senior Notes in the following amounts as of the date hereof (insert amount on the line below) or that I am the authorized signatory of that beneficial holder.

Insert amount of Allowed Claims in Class 5B **other than on account of Unsecured Senior Notes** held         _____

**Item 2. Rights.**

**2a. Calculation of Maximum Number of Offered Shares**. The maximum number of Offered Shares for which you may subscribe is calculated as follows:

| Allowed Claims in Class 5B **Not on Account of Unsecured Senior Notes** (insert amount from Item 1 above) | | | | |
|---|---|---|---|---|
| _____ | X | [Rights | = | _____ |
| | | | | Maximum Number of Offered Shares in |

| | | Factor][6] | respect of Allowed Claims in Class 5B Other Than on Account of Unsecured Senior Notes (round down to nearest whole number) |
|---|---|---|---|

Each Eligible Holder may subscribe for its Pro Rata Shares (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in Item 2. To subscribe, fill out Items 1, 2a and 2b, read Item 3 and read and complete Item 4 below.

**2b. Purchase Price**. By filling in the following blanks, you indicate your interest in purchasing the number of Subscribed Shares specified below (specify a number of Subscribed Shares, which is not greater than the Maximum Participation Amount calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement, the Plan and the Rights Offering Procedures.

| _____ (Indicate number of Subscribed Shares you elect to purchase) | X | $[_] | = | $_____ Total Purchase Price |
|---|---|---|---|---|

## Item 3. Payment and Delivery Instructions

You must pay the Purchase Price calculated pursuant to Item 2b above by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below. No other method of payment is permitted

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please mail or deliver your properly executed Subscription Agreement and completed Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent such that they are received by the Subscription Agent prior to the Subscription Expiration Deadline.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Holder electing to exercise its Rights Offering Equity Rights and not the Debtors or the Subscription Agent.

---

[6] Rights Factor to be provided.

Case: 4:17-cv-01053-AGF    Doc. #: 6-5    Filed: 03/23/17    Page: 864 of 876 PageID
#: 7851
Case 16-42529    Doc 1854-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 46 of 58

**Item 4. Certification.**

I certify and agree that (i) the undersigned is the beneficial holder of the Allowed Claims set forth in Item 1 above as of the date hereof and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

**I acknowledge that, by executing the Subscription Agreement and this Beneficial Holder Subscription Form, the undersigned Eligible Holder has irrevocably elected to subscribe for the number of Subscribed Shares designated under Item 2b above and will be bound to pay for the Subscribed Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

U.S. Federal Tax EIN/SSN (optional): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If party to Backstop Commitment Agreement and will submit the Rights Offering Payment in accordance with that agreement (in which case Item 3 will not apply), check here ☐

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email Address: _____

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Debtors' records for the Subscribed Shares should they need to be registered in your name:**

**Registration Name(s)/ Name(s) of Affiliate(s) or Related Fund(s) in Whose Name Subscribed Shares Should be Issued:**

Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____


Number of Subscribed Shares: _____

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 866 of 876 PageID
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
#: 1893
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 48 of 58

Registration Line 1: _____

Registration Line 2: _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 867 of 876 PageID #: 1854

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 49 of 58

**Schedule 1C**

### PEABODY ENERGY CORPORATION

### MASTER SUBSCRIPTION FORM
### FOR RIGHTS OFFERING

### FOR USE BY NOMINEES OF ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN
### CLASSES 2A - 2D

### 10.00% SENIOR SECURED SECOND LIEN NOTES DUE MARCH 2022
### OF PEABODY ENERGY CORPORATION
### (CUSIP: [_____])

### IN CONNECTION WITH DEBTORS'
### DISCLOSURE STATEMENT DATED [_____]

---

**For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees for beneficial holders of Second Lien Notes  (the "Notes").**

---

**YOUR MASTER SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 5:00 P.M. (NEW YORK CITY TIME) ON [_____], 2017 (THE "SUBSCRIPTION EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS MASTER SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**

**PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**

**PLEASE CONSULT THE PLAN, THE SUBSCRIPTION AGREEMENT AND THE RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS MASTER SUBSCRIPTION FORM.  IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT [_____].**

---

**Item 1. Certification of Authority to Subscribe.**

The undersigned certifies that as of the date hereof it (please check the applicable box):

☐    Is a broker, bank or other nominee for the beneficial holders of the Notes listed in Item 2 below, and is the registered holder of such Notes, or

☐    Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Notes listed in Item 2 below.

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 868 of 876 PageID #: 1845
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 50 of 58

**Item 2. Notes Beneficial Holder Information.**

The undersigned certifies that as of the date hereof the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Notes, as identified by their respective account numbers, that have delivered duly completed Beneficial Holder Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below.  Attach additional sheets if necessary)**

| 10.00% Senior Secured Second Lien Notes due March 2022 (Classes 2A - 2D) | | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

**Item 3. Payment and Delivery Instructions**

All cash payments with respect to the exercise of Rights Offering Equity Rights that are being transmitted by this Master Subscription Form must be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| Account Name : | [_____] |
|---|---|
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please email, mail or deliver your completed subscription form (together with any duly completed and received Beneficial Holder Subscription Forms (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreements) to:

[KCC
1290 Avenue of the Americas, 9th Floor

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 869 of 876 PageID #: 1876
Case 16-42529   Doc 1854-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 51 of 58

New York, New York 10104
Attn:  [Peabody Energy Rights Offer]
Tel#:  [(917) 281-4800]
Email:  [_]@kccllc.com]

---

**PLEASE NOTE:  NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND EXECUTED SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE AGGREGATE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE (5:00 P.M. NEW YORK CITY TIME ON [_____], 2017).**

---

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**PROPERLY EXECUTED MASTER SUBSCRIPTION FORMS ALONG WITH RESPECTIVE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [_]@KCCLLC.COM BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

---

**Item 4. Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Notes listed under Item 1 of the Beneficial Holder Subscription Form, (ii) the beneficial holder is entitled to participate in the Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the Beneficial Holder Subscription Form have been received from each beneficial holder.

Date: _____

Name of Nominee: _____

DTC Participant Number: _____

U.S. Federal Tax EIN/SSN (optional): _____

Signature: _____

Name: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email: _____

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 871 of 876 PageID #: 1898
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 53 of 58

**PEABODY ENERGY CORPORATION**

**MASTER SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**

**FOR USE BY NOMINEES OF ELIGIBLE HOLDERS OF ALLOWED CLAIMS IN**
**CLASS 5B**

**6.00% SENIOR NOTES DUE NOVEMBER 2018**
**(CUSIP: [_____])**

**6.50% SENIOR NOTES DUE SEPTEMBER 2020**
**(CUSIP: [_____])**

**6.25% SENIOR NOTES DUE NOVEMBER 2021**
**(CUSIP: [_____])**

**7.875% SENIOR NOTES DUE NOVEMBER 2026**
**(CUSIP: [_____])**

**OF PEABODY ENERGY CORPORATION**

**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [_____]**

---

**For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees for beneficial holders Unsecured Senior Notes (the "Notes").**

---

**YOUR MASTER SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 5:00 P.M. (NEW YORK CITY TIME) ON [_____], 2017 (THE "SUBSCRIPTION EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS MASTER SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**

**PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**

**PLEASE CONSULT THE PLAN, THE SUBSCRIPTION AGREEMENT AND THE RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS MASTER SUBSCRIPTION FORM.  IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT [_____].**

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 872 of 876 PageID #: 1899

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D - Rights Offering Procedures   Subscription Agreement and Subscription   Pg 54 of 58

## Item 1. Certification of Authority to Subscribe.

The undersigned certifies that as of the date hereof it (please check the applicable box):

☐    Is a broker, bank or other nominee for the beneficial holders of the Notes listed in Item 2 below, and is the registered holder of such Notes, or

☐    Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Notes listed in Item 2 below.

## Item 2. Notes Beneficial Holder Information.

The undersigned certifies that as of the date hereof the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Notes, as identified by their respective account numbers, that have delivered duly completed Beneficial Holder Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below.  Attach additional sheets if necessary)**

| 6.00% Senior Notes due 2018 (Class 5B) | | | | | | |
|---|---|---|---|---|---|---|
| **Customer Account Number for each Beneficial Holder** | **Party to Backstop Commitment Agreement (Y/N)** | **Principal Amount of Notes Beneficially Held** | **X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number)** | **Maximum number of Subscribed Shares (round down to nearest whole number)** | **Number of Subscribed Shares Beneficial Holder Elects to Purchase** | **Total Purchase Price: (Subscribed Shares X $[____] Purchase Price)** |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |

| | 6.50% Senior Notes due 2020 (Class 5B) | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

| | 6.25% Senior Notes due 2021 (Class 5B) | | | | | |
|---|---|---|---|---|---|---|
| Customer Account Number for each Beneficial Holder | Party to Backstop Commitment Agreement (Y/N) | Principal Amount of Notes Beneficially Held | X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number) | Maximum number of Subscribed Shares (round down to nearest whole number) | Number of Subscribed Shares Beneficial Holder Elects to Purchase | Total Purchase Price: (Subscribed Shares X $[____] Purchase Price) |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| TOTALS | | | | | | |

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 874 of 876 PageID #: 1821
Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 56 of 58

| | | | | | | |
|---|---|---|---|---|---|---|
| **7.875% Senior Notes due 2026 (Class 5B)** | | | | | | |
| **Customer Account Number for each Beneficial Holder** | **Party to Backstop Commitment Agreement (Y/N)** | **Principal Amount of Notes Beneficially Held** | **X [Rights Factor] = Maximum number of Offered Shares (round down to nearest whole number)** | **Maximum number of Subscribed Shares (round down to nearest whole number)** | **Number of Subscribed Shares Beneficial Holder Elects to Purchase** | **Total Purchase Price: (Subscribed Shares X $[____] Purchase Price)** |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| **TOTALS** | | | | | | |

## Item 3. Payment and Delivery Instructions

All cash payments with respect to the exercise of Rights Offering Equity Rights that are being transmitted by this Master Subscription Form must be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| | |
|---|---|
| Account Name : | [_____] |
| Bank Account No.: | [_____] |
| ABA/Routing No.: | [_____] |
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Reference: | [_____] |

Please email, mail or deliver your completed subscription form (together with any duly completed and received Beneficial Holder Subscription Forms (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreements) to:

[KCC
1290 Avenue of the Americas, 9th Floor
New York, New York 10104
Attn:  [Peabody Energy Rights Offer]
Tel#:  [(917) 281-4800]
Email:  [_]@kccllc.com]

**PLEASE NOTE:  NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS**

Case: 4:17-cv-01053-AGF   Doc. #: 6-5   Filed: 03/23/17   Page: 875 of 876 PageID #: 1822

Case 16-42529   Doc 1834-4   Filed 12/23/16   Entered 12/23/16 01:48:12   Exhibit D
- Rights Offering Procedures   Subscription Agreement and Subscription   Pg 57 of 58

APPLICABLE) AND EXECUTED SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE AGGREGATE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE (5:00 P.M. NEW YORK CITY TIME ON [_____], 2017).

---

### ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL

PROPERLY EXECUTED MASTER SUBSCRIPTION FORMS ALONG WITH RESPECTIVE BENEFICIAL HOLDER SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [_]@KCCLLC.COM BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.

---

**Item 4. Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Notes listed under Item 1 of the Beneficial Holder Subscription Form, (ii) the beneficial holder is entitled to participate in the Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the Beneficial Holder Subscription Form have been received from each beneficial holder.

Case: 4:17-cv-01053-AGF    Doc. #:  6-5    Filed: 03/23/17    Page: 876 of 876 PageID #: 1823
Case 16-42529    Doc 1834-4    Filed 12/23/16    Entered 12/23/16 01:48:12    Exhibit D
- Rights Offering Procedures    Subscription Agreement and Subscription    Pg 58 of 58

Date: _____

Name of Nominee: _____

DTC Participant Number: _____

U.S. Federal Tax EIN/SSN (optional): _____

Signature: _____

Name: _____

Title: _____

Address: _____

Telephone Number: _____

Fax: _____

Email: _____

Nominee Contact Information:
(if different from above)

_____

_____

_____