UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| PEABODY ENERGY CORPORATION, ) | |
| ) | |
| Debtor ) | |
| _____ ) | |
| ) | |
| AD HOC COMMITTEE OF NON- ) | |
| CONSENTING CREDITORS ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | No. 4:17-CV-01053-AGF |
| ) | |
| PEABODY ENERGY CORPORATION, ) | |
| et al., ) | |
| ) | |
| Appellees. ) | |

## MEMORANDUM AND ORDER

This matter arises out of the Chapter 11 bankruptcy of Peabody Energy Corporation and its subsidiaries ("Debtors"). The United States Bankruptcy Court for the Eastern District of Missouri entered an order confirming the Debtors' plan of reorganization (the "Plan") on March 17, 2017 (the "Confirmation Order"). The Ad Hoc Committee of Non-Consenting Creditors ("Ad Hoc Committee") now appeals. The Ad Hoc Committee is comprised of a group of beneficial holders and/or investment advisors to certain holders of second lien notes ("Second Lien Notes Claims") and senior unsecured notes ("Class 5B Claims") who objected to confirmation. Before the Court is the emergency motion of the Ad Hoc Committee for a stay pending appeal, pursuant to Federal Rule of Bankruptcy Procedure 8007, or, in the alternative, to expedite the appeal under Rule 8013. The parties

filed expedited briefs, and the Court heard argument on the motion on March 29, 2017. Upon careful review of the record and arguments, the Court will deny the motion.

## BACKGROUND

The Debtors filed for Chapter 11 bankruptcy on April 13, 2016. At that time, the coal industry was continuing to experience a decline, and the Debtors had approximately $8.8 billion in outstanding principal long-term debt. Approximately $4.3 billion of this debt was secured by collateral that included real property at Debtors' larger mines. The "First Lien Lender Claims," claims arising under a first lien credit agreement between Debtors and certain first lien lenders, represented more than $3 billion of this secured debt. The remainder was comprised mostly of Second Lien Note Claims.

A significant dispute existed with respect to how much of the property secured the First Lien Lender Claims and the Second Lien Note Claims (the "CNTA dispute"). As resolution of this dispute—involving a difference of over $1 billion—proved essential to any efforts to reorganize, the Debtors agreed, in a post-petition financing agreement approved by the bankruptcy court, to file an adversary proceeding, seeking declaratory judgment related to this dispute among the Debtors, the First Lien Lender Claims, and the Second Lien Note Claims. The bankruptcy court ordered all parties to that adversary proceeding, and parties who later intervened, to participate in non-binding mediation beginning on September 7, 2016. Because of the significance of the CNTA dispute to any reorganization plan, the mediation was subsequently expanded to cover plan negotiations as a whole. The Ad Hoc Committee admitted at oral argument that it knew the scope of

the mediation had expanded and that it could have moved to intervene and participate in the mediation, but that it elected not do so.[1]

The Debtors assert that they approached these negotiations with four overarching goals: (1) to ensure that after reorganization, the Reorganized Debtors had adequate liquidity to operate their business in the normal course, both in the short- and long-term, particularly given the volatile and cyclical nature of the coal industry; (2) to ensure that the emergence capital structure of the Reorganized Debtors, including their funded debt balance at emergence, was of such a size that the Reorganized Debtors could service debts as they came due at every point in the business cycle, including during market highs and lows; (3) to maximize the value of the Debtors' estates for the benefit of creditors; and (4) to achieve broadest possible consensus among various stakeholders with respect to the Plan. The Debtors ultimately determined that the best way to achieve these goals was to raise approximately $1.5 billion in new money in the form of an equity investment, which would allow them to satisfy the claims of their creditors holding first lien notes and to provide meaningful recovery to their unsecured creditors.

Through mediation, the Debtors negotiated commitments for $1.5 billion in new money equity from some of the mediation participants, as part of a larger global settlement package that included settling the CNTA dispute and other disputes, and agreeing on the terms of a reorganization plan. The $1.5 billion new equity raise involved two components. First, the Debtors would raise $750,000 through a private placement of

---

[1] Participation in the mediation included certain restrictions including confidentiality and an agreement to refrain from trading.

preferred equity of the Reorganized Debtors, sold at a 35% discount[2] (the "Private Placement Agreement" or "PPA"). Second, the Debtors would raise another $750,000 through a rights offering exempted from registration under Section 1145 of the Bankruptcy Code, sold at a 45% discount (the "Rights Offering"). The entities that signed on to the PPA also committed to provide a full "backstop" of the Rights Offering ("Backstop Commitment Agreement"), such that if the Debtors did not raise the full $750,000 in the Rights Offering, these entities would be obligated to exercise subscription rights that remained unfulfilled at the conclusion of the offering.

Participation in the PPA was initially limited to a small group of holders of Second Lien Notes Claims and Class 5B Claims ("Noteholder Co-Proponents"). The Ad Hoc Committee has represented that the Noteholder Co-Proponents hold 40% of such claims, and they were also involved in the CNTA dispute. Under the PPA, the Noteholder Co-Proponents would have exclusive rights to purchase the first 22.5% of preferred equity. The remaining amount of preferred equity could then be purchased by the Noteholder Co-Proponents and any Second Lien Notes Claims and Class 5B Claims holders who elected to participate and conditionally agreed to support the Plan. The opportunity to participate occurred on several dates, with those committing to the earlier dates gaining a larger share. The agreement to support the Plan was subject to the bankruptcy court's approval of the disclosure statement required under the Bankruptcy Code. The Second

---

[2] This discount is measured by the value that the parties to the mediation agreed that the equity was worth.

Lien Notes Claims and Class 5B Claims holders who did not agree to support the Plan were not entitled to purchase the private equity available under the PPA.[3]

The PPA and related agreements include a series of important deadlines, consistent with the Debtors' goal of emerging promptly from bankruptcy. For example, the PPA and Backstop Commitment Agreement each requires payment of a "ticking premium," in the form of a monthly fee equal to $18,750,00 per month, beginning on the Plan's proposed effective date of April 3, 2017, and ending on the closing date. The Plan Support Agreement allows an election to terminate on two business days' prior written notice if "the order confirming [the Plan] is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended" in a manner not acceptable to the Debtors and the Requisite Creditor Parties. Plan Support Agreement § 12.02(m). The PPA and Backstop Commitment Agreements contain similar termination provisions.

On December 22, 2016, the Debtors filed a motion in the bankruptcy court to approve the disclosure statement related to the Debtors' proposed reorganization plan. The next day, the Debtors moved to approve the PPA and related agreements. The Ad Hoc Committee objected to these motions, and a hearing was set in the bankruptcy court for January 26, 2017.

The PPA and Backstop Commitment Agreement were subject to an unqualified "fiduciary out" provision to permit the Debtors to pursue any alternative transactions they determined to be superior. Pursuant to this provision, during the time between the initial

---

[3] The Rights Offering was not subject to such limitations, and is not challenged by the Ad Hoc Committee in this appeal.

filing of the Plan on December 22, 2016, and the hearing on the PPA and Backstop Commitment Agreement on January 26, 2017, the Debtors received a series of alternative proposals by the Ad Hoc Committee, including proposals submitted on January 16 and January 20, 2017, and a proposal made on March 1, 2017. The Unsecured Creditors Committee also reviewed the alternative proposals in its fiduciary capacity. At least one of the alternative proposals offered the Debtors more money than the PPA provided for the preferred equity, up to $1.77 billion, but did not include all of the same terms as the PPA and related agreements. The Debtors, in consultation with the Unsecured Creditors Committee, rejected these alternative proposals.

On January 26, 2017, the bankruptcy court heard oral argument on the Debtors' motions, and on January 27, 2017, the bankruptcy court entered orders granting the motions, and approving the disclosure statement and the PPA and related agreements, over the Ad Hoc Committee's objections. The bankruptcy court's order included findings that:

(i) the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors;

(ii) the decision to enter into the Plan Support Agreement, Private Placement Agreement and Backstop Commitment Agreement is an appropriate exercise of the Debtors' business judgment; [and]

(iii) the proposed dates and deadlines for the implementation of the Section 1145 Rights Offering, as set forth in the Section 1145 Rights Offering Procedures, are reasonable and appropriate and allow a reasonable amount of time for Rights Offering Eligible Creditors to make an informed decision regarding whether to exercise their respective subscription rights[.]

The Ad Hoc Committee appealed these orders to the United States Bankruptcy Appellate Panel for the Eighth Circuit, but that appeal was dismissed on February 8, 2017

as interlocutory, with the panel noting that the Ad Hoc Committee could raise its objections if the Plan was ultimately confirmed.

Approximately 95% of the Second Lien Notes Claims and Class 5B Claims holders agreed to participate in the PPA, support the Plan, and provide the backstop commitment. The Ad Hoc Committee represents those holders who did not so agree.

After obtaining the equity commitments, the Debtors were able, in February 2017, to secure exit financing, including a term loan commitment for $1.95 billion in exit debt financing, which commitment expires May 1, 2017; a commitment from PNC Bank for an expanded $250 million accounts receivable securitization facility upon emergence, that also expires on May 1, 2017, and may be terminated by PNC if the Confirmation Order is stayed; and $854 million of new surety bonds to be issued at emergence, which are also keyed to May 1, 2017.

On March 9, 2017, the Ad Hoc Committee objected to confirmation of the Plan, specifically challenging the PPA for the following reasons: (1) it resulted in the unequal treatment of claims in the same class, in violation of §1123(a)(4) of the Bankruptcy Code, (2) it violated the good faith requirement of §1129(a)(3) of the Code because it failed to maximize the value of the Debtors' estate, and (3) it constituted an improper solicitation of creditor votes in favor of the Plan in violation of § 1125(b) of the Code.

The bankruptcy court held a confirmation hearing on March 16, 2017, during which the bankruptcy court heard the Ad Hoc Committee's objections and also during which the Ad Hoc Committee made an oral motion to stay the Confirmation Order pending appeal, pursuant to Federal Rule of Bankruptcy Procedure 8007. On March 17, 2017, the

bankruptcy court entered the Confirmation Order, confirming the Plan over the objection of the Ad Hoc Committee. In that Order, the bankruptcy court also granted the Debtors' request to waive the automatic 14-day stay of confirmation orders provided for by Federal Rule of Bankruptcy Procedure 3020(e). The same day, the bankruptcy court entered an order denying the Ad Hoc Committee's oral motion for a stay pending appeal.

The Ad Hoc Committee filed its notice of appeal in this Court on March 22, 2017, and filed this emergency motion for a stay the next day, March 23, 2017.

When the Debtors negotiated the PPA in December 2016, coal prices had peaked, due in part to international market forces. Coal prices have since steadily and substantially declined. The Debtors have asserted that they are uncertain whether parties to the PPA would elect to terminate their agreements if the Confirmation Order were stayed or delayed, or whether the Debtors could replace the exit financing commitments they have obtained if the necessary deadlines are not met.

## DISCUSSION

The parties agree that, as the party seeking the stay, the Ad Hoc Committee "must demonstrate [1] that it is likely to succeed on the merits, [2] that it will suffer irreparable injury unless the stay is granted, [3] that no substantive harm will come to other interested parties, and [4] that the stay will do no harm to the public interest." *In re Ross*, 223 B.R. 702, 703 (B.A.P. 8th Cir. 1998). The most important factor is the appellant's likelihood of success on the merits," but ultimately, courts must consider the relative strength of the four factors, "balancing them all," including balancing the relative harms to each side. *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011).

**Likelihood of Success on the Merits**

A district court reviews a Bankruptcy Court's legal conclusions *de novo* and its findings of fact for clear error. *In re Reynolds*, 425 F.3d 526, 531 (8th Cir. 2005). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

At this stage, the Court is not sufficiently convinced that the Ad Hoc Committee is likely to succeed on the merits. The Ad Hoc Committee's appeal focuses on the three arguments noted above, namely, that the PPA treated claims in the same class unequally under § 1123(a)(4) of the Bankruptcy Code, failed to satisfy the good faith requirement of § 1129(a)(3) of the Code by failing to maximize the value of the Debtors' estate, and constituted an improper solicitation of votes in violation of § 1125(b) of the Code. However, the Ad Hoc Committee has offered little authority to persuade the Court that any of these arguments are meritorious.

**I.     Unequal Treatment Under § 1123(a)(4)**

Section 1123(a)(4) of the Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

The Code does not define the standards of "equal treatment," but it is generally understood that "[t]he equality addressed by section 1123(a)(4) extends only to the

treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interests. . . . Creditors should not confuse equal treatment of claims with equal treatment of claimants." 7 Collier on Bankruptcy ¶ 1123.01; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249–50 (Bankr. S.D.N.Y. 2007) ("[T]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under plan on account of the class members' other rights or contributions."); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992) ("The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4).").

The Ad Hoc Committee has not presented any authority for the proposition that providing preferential opportunities to participate in equity investments (with related backstop commitments) violates § 1123(a)(4). The few cases addressing this issue suggest that it does not. *See In re CHC Grp. Ltd*, No. 16-31854 (BJH), ECF No. 1794 at 23-25 (Bankr. N.D. Tex. Mar. 3, 2017) (confirming a Chapter 11 plan over a similar objection, and holding that it did not violate § 1123(a)(4) for a debtor to provide plan sponsors—those who committed to backstop a rights offering—a "Put Option Premium" in the form of a fixed fee payable in convertible notes or a cash payment); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (rejecting argument that a plan provided disparate treatment in violation of § 1123(a)(4) when only certain second lien noteholders were permitted to participate in a backstop of a rights offering); *but see In re*

*Adelphia Commc'ns Corp.*, 361 B.R. 337, 362 (S.D.N.Y. 2007) (finding a likelihood of success on the merits of an appeal challenging confirmation of a plan, for purposes of a stay, "[w]here the receipt of valuable benefits in a plan [was] conditioned on a vote to accept *that plan*" because the "very real possibility of dissuading or silencing opposition to the plan . . . goes against the spirit of section 1123(a)(4)," but ultimately not having to decide the issue because the movant failed to post the substantial bond the court required for a stay and the appeal was thereafter dismissed). At this stage, the Court is not sufficiently persuaded that the PPA and related agreements constituted treatment on account of class members' claims or interests, rather than treatment on account the class members' other rights or contributions, including their commitments (and ability) to provide financing.

## II. Good Faith Under § 1129(a)(3)

Section 1129(a)(3) provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[A] finding of good faith is primarily a factual determination, which we therefore review for clear error." *In re Keeley & Grabanski Land P'ship*, 832 F.3d 853, 858–59 (8th Cir. 2016) (citation omitted).[4]

"Good faith" is not defined in the Code, but generally, "a plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of S. D.,*

---

[4] Even if determined to be a mixed question of fact and law, as the Ad Hoc Committee asserts, this Court would still find that the Ad Hoc Committee is unlikely to demonstrate the finding of good faith was erroneous.

11

*N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987) (overruled in part on other grounds). These standards include serving Bankruptcy Code objectives, such as "preserving going concerns and maximizing property available to satisfy creditors, giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).

The Court does not believe that the Ad Hoc Committee is likely to demonstrate that the bankruptcy court's finding of good faith here was erroneous. Rather, the complexity of the issues and interests at stake support the bankruptcy court's finding that the Plan was a good-faith attempt to provide the most recovery to creditors, satisfy a wide variety of stakeholders, and emerge from bankruptcy with a feasible plan.

The Ad Hoc Committee is unhappy with only one component of the Plan, the PPA, and believes that the Debtors should have marketed the private placement opportunity more broadly or should have accepted the Ad Hoc Committee's alternative proposals. But at this stage, the Court is not convinced that the Debtors were required under the Bankruptcy Code to conduct broader marketing efforts or that the Debtors rejected the Ad Hoc Committee's alternative proposals in bad faith.[5] Moreover, the bankruptcy court found the PPA and related agreements to be in the best interest of the Debtors, the estates, and the creditors, and found the decision to enter into the agreements to be a proper

---

[5] The Debtors and Unsecured Creditors Committee have explained why they found the various proposals to be unacceptable, for reasons including that some were inconsistent with other essential financial requirements and goals, and that they would risk unraveling the other interrelated components of the Plan, including settlement of the CNTA dispute.

exercise of business judgment. These findings are supported by evidence that the terms of the PPA were within acceptable market ranges. Finally, the overwhelming support for the Plan by creditors other than the Ad Hoc Committee supports the bankruptcy court's finding of good faith. *See In re WR Grace & Co.*, 729 F.3d at 347 (holding that a good faith finding was bolstered by "the overwhelming vote by creditors in favor of the plan").

### III. Improper Solicitation Under § 1125(b)

Section 1125(b) provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

The Ad Hoc Committee is unlikely to persuade the Court that the PPA and related agreements here constituted improper solicitation. Rather, "solicitation" under § 1125(b) is interpreted narrowly, to leave ample room for the parties to negotiate and reach tentative agreement with respect to plan terms before developing and submitting for approval the disclosure statement contemplated by the Code. *See Century Glove, Inc. v. First Am. Bank of N.Y.* 860 F.2d 94, 101 (3d Cir. 1988) ("The purpose of negotiations between creditors is to reach a compromise over the terms of a tentative plan. The purpose of compromise is to win acceptance for the plan. *We find no principled, predictable difference between negotiation and solicitation of future acceptances.* We therefore reject any definition of solicitation which might cause creditors to limit their negotiations."). As

13

such, plan support agreements like the one entered into here and conditioned on the bankruptcy court's approval of the disclosure statement, have been found to comply with § 1125(b). *See, e.g., In re Kellogg Square P'ship*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993). At this stage, the Ad Hoc Committee has not cited any contrary authority suggesting that the agreements entered here constituted improper solicitation.

For all of these reasons, the Court does not believe that the Ad Hoc Committee is likely to succeed on the merits of its appeal.

**<u>Irreparable Harm To Movant</u>**

The Ad Hoc Committee acknowledged at the hearing that the only harm it will suffer is the risk that, absent a stay, its appeal will become equitably moot. *See In re Williams*, 256 B.R. 885, 896 (B.A.P. 8th Cir. 2001) ("The doctrine of equitable mootness is most often applied in the context of a reorganization bankruptcy where the bankruptcy court has confirmed a plan, the plan has been substantially consummated, and then a party seeks appellate review of an issue that, if upset, would unduly disturb the plan."). Without discounting this risk, the Court notes (and the parties agree) that the federal courts are split as to whether such a risk, standing alone, constitutes irreparable harm for purposes of a motion to stay. *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 347 (finding that "strong possibility of mootness" demonstrated irreparable harm but noting split in authority and recognizing that "[a] majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm.") (collecting cases). The Eighth Circuit apparently has not weighed in. The Court is not convinced that the failure to grant a stay will necessarily moot the Ad Hoc Committee's appeal. However, even assuming that the risk

of equitable mootness constitutes some degree of irreparable harm, the Court's findings as to the other factors, on balance, weigh decidedly against granting a stay.

**Harm to Other Interested Parties**

The Court finds that the other interested parties, particularly the Debtors and the creditors who supported the Plan, would suffer substantial harm in the event of a stay. In their briefs and at oral argument, these parties persuaded the Court that a stay, which is a "termination event" under the Plan and would allow the parties to the PPA and other agreements to withdraw their financing commitments, would put the entire Plan at risk. The risk is especially great here, in light of the decline in the coal market since the date on which the PPA and related agreements and the critical exit financing commitments were obtained. The Ad Hoc Committee's speculation that the financing would remain in place or that the Debtors would be able to put together some other plan of reorganization at a later date does little to suggest otherwise. Upending the financing would, in turn, jeopardize the Debtors' ability to reorganize, to the detriment of the other creditors and of the Debtors' employees and retirees, who stand to substantially benefit under the Plan. This factor weighs heavily against granting a stay.[6]

**Public Interest**

Although there is a significant public interest in "vindicating the rights of the minority," that interest carries less weight where, as here, the minority is unlikely to

---

[6] If the Court were to grant a stay, it would require a sizeable bond, in the neighborhood of $4 billion, to protect the Debtors and other interested parties against loss caused by an unsuccessful appeal. At the hearing, counsel for the Ad Hoc Committee represented that it would be unlikely that his client would be able to satisfy a bond of even $3 billion.

15

demonstrate that those rights have been violated.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 367.  Rather, "strong public interest in the swift and efficient resolution of bankruptcy proceedings" prevails in such circumstances.  *See id.* at 367–68.  Therefore, this factor, too, weighs against granting a stay.

**Alternative Request to Expedite Appeal**

The Court does not believe that the circumstances of this case warrant an expedited appeal under Federal Rule of Bankruptcy Procedure 8013.  Moreover, given the number of interested parties and extent of the issues, it would be impracticable to complete these proceedings within the time sought by the Ad Hoc Committee, namely, before the April 15, 2017 date by which the PPA and related agreements must go into effect under the Plan's terms.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Appellant's Emergency Motion for a Stay of the Confirmation Order Pending Appeal or, in the Alternative, to Expedite the Appeal is **DENIED**.  ECF No. 6.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2017.