UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| PEABODY ENERGY CORPORATION, ) | |
| ) | |
| Debtor ) | |
| _____ ) | |
| ) | |
| AD HOC COMMITTEE OF NON- ) | |
| CONSENTING CREDITORS ) | |
| ) | |
| Appellant, ) | |
| ) | No. 4:17-CV-01053-AGF |
| v. ) | |
| ) | Lead Case and Consolidated Cases |
| PEABODY ENERGY CORPORATION, ) | |
| et al., ) | |
| ) | |
| Appellees. ) | |

## **MEMORANDUM AND ORDER**

This matter arises out of the Chapter 11 bankruptcy of Peabody Energy Corporation and its subsidiaries ("Debtors"). The United States Bankruptcy Court for the Eastern District of Missouri ("Bankruptcy Court") entered an order confirming the Debtors' plan of reorganization (the "Plan") on March 17, 2017 (the "Confirmation Order"). The Ad Hoc Committee of Non-Consenting Creditors ("Ad Hoc Committee") now appeals.[1] The Ad Hoc Committee is comprised, as of May 12, 2017, of seven beneficial holders (or

---

[1] The Ad Hoc Committee also filed notices of appeal with respect to the Bankruptcy Court's interlocutory orders entered before the Confirmation Order. Those appeals were consolidated with this proceeding (ECF No. 56), and the Ad Hoc Committee has represented that the Confirmation Order subsumed all relevant interlocutory orders.

investment managers or advisers to holders) of, among other things, second lien notes ("Second Lien Notes Claims") and senior unsecured notes ("Class 5B Claims").[2]

On March 30, 2017, the Court denied the Ad Hoc Committee's emergency motion for a stay pending appeal. On April 21, 2017, the Debtors, who had by then reorganized, moved to dismiss the appeal as equitably moot because the Plan had been "substantially consummated." The Official Committee of Unsecured Creditors ("Unsecured Creditors Committee") appointed in the bankruptcy case,[3] and other creditors that supported the Plan (all named, with the Debtors, as Appellees in these proceedings) have joined the motion to dismiss. The motion to dismiss and the merits of this appeal were submitted to the Court at approximately the same time, and the Court heard oral argument on both on September 20, 2017. For the reasons set forth below, the Court finds that this appeal is equitably moot and will grant the motions to dismiss. In the alternative, the Court will affirm the judgment of the Bankruptcy Court.

## BACKGROUND

The Debtors filed for Chapter 11 bankruptcy on April 13, 2016. At that time, the coal industry was continuing to experience a decline, and the Debtors had approximately $8.8 billion in outstanding principal long-term debt. Approximately $4.3 billion of this debt was secured by collateral that included real property at the Debtors' larger coal mines.

---

[2] The Court has adopted the terms used in the parties' briefs to define certain creditor classes and other aspects of the Plan.

[3] "Creditor Committees have the responsibility to protect the interest of the creditors; in essence, the function of a creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents." *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 280–81 (8th Cir. 2015).

Another $3.7 billion of this debt was senior unsecured debt, with the remaining amounts represented by convertible junior subordinated debentures.

Before the Debtors filed for bankruptcy, a significant contractual dispute developed between the Debtors' secured lenders and senior unsecured lenders regarding the extent of the secured lenders' security interests in the Debtors' larger coal mines. The parties referred to this dispute as the "CNTA dispute" based on a contractual term ("consolidated net tangible assets") material to the dispute. As resolution of this dispute—involving a difference of over $1 billion—proved essential to any efforts to reorganize, the Debtors agreed, in a post-petition financing agreement approved by the Bankruptcy Court, to file an adversary proceeding seeking declaratory judgment related to this dispute. The Bankruptcy Court ordered all parties to that adversary proceeding, and parties who later intervened, to participate in a mediation beginning on September 7, 2016, which was overseen by the Honorable James L. Garrity, of the United States Bankruptcy Court for the Southern District of New York. Because of the significance of the CNTA dispute to any reorganization plan, the mediation was subsequently expanded to cover plan negotiations as a whole. The Ad Hoc Committee knew that the scope of the mediation had expanded and could have moved to intervene and participate in the mediation, but elected not to do so.[4]

The Debtors assert that they approached these negotiations with four overarching goals: (1) to ensure that after reorganization, the Reorganized Debtors would have

---

[4] Participation in the mediation was conditioned on certain restrictions, such as agreements to refrain from trading and to maintain confidentiality.

adequate liquidity to operate their business in the normal course, both in the short- and long-term, particularly given the volatile and cyclical nature of the coal industry; (2) to ensure that the capital structure of the Reorganized Debtors, including their funded debt balance at emergence, was of such a size that the Reorganized Debtors could service debts as they came due at every point in the business cycle, including during market highs and lows; (3) to maximize the value of the Debtors' estates for the benefit of creditors; and (4) to achieve broadest possible consensus among various stakeholders with respect to a reorganization plan. The Debtors ultimately determined that the best way to achieve these goals was to raise approximately $1.5 billion in new money in the form of an equity investment, which would allow them to satisfy the claims of their creditors holding first lien notes and to provide meaningful recovery to their unsecured creditors.

Through mediation, the Debtors negotiated commitments for $1.5 billion in new money from some of the mediation participants, as part of a larger global settlement package that included settling the CNTA dispute and other disputes, and agreeing on the terms of a reorganization plan. The $1.5 billion raise would involve two components. First, the Debtors would raise $750 million through a private placement of preferred equity of the Reorganized Debtors, sold at a 35% discount[5] (the "Private Placement Agreement" or "PPA"). Second, the Debtors would raise another $750 million through a rights offering exempted from registration under Section 1145 of the Bankruptcy Code, sold at a 45% discount (the "Rights Offering"). The entities that committed to purchasing equity

---

[5] This discount was measured by the value that the parties to the mediation agreed the equity was worth.

under the PPA were also required to (1) provide a full "backstop" of the Rights Offering ("Backstop Commitment Agreement"), such that if the Debtors did not raise the full $750 million in the Rights Offering, these entities would be obligated to exercise subscription rights that remained unfulfilled at the conclusion of the offering, and (2) sign a Plan Support Agreement ("PSA"), agreeing to support the Plan, subject to the Bankruptcy Court's approval of the disclosure statement required under the Bankruptcy Code.

Participation in the PPA was initially limited to a small group of holders of Second Lien Notes and Class 5B Claims ("Noteholder Co-Proponents"). The Noteholder Co-Proponents held approximately 40% of such claims, and they were also involved in the CNTA dispute. Under the PPA, the Noteholder Co-Proponents had the exclusive right and obligation to purchase the first 22.5% of preferred equity, and were required to sign the Backstop Commitment Agreement and PSA. The Noteholder Co-Proponents and other Second Lien Notes and Class 5B Claims holders that signed the Backstop Commitment Agreement and PSA prior to an initial deadline had the exclusive right and obligation to purchase their pro rata share of the next 5%. And these two groups plus an additional group of Second Lien Notes and Class 5B Claims holders that signed the Backstop Commitment Agreement and PSA prior to a final deadline had the exclusive right and obligation to purchase their pro rata share of the remaining 72.5% of preferred equity.

The Second Lien Notes and Class 5B Claims holders who did not sign the Backstop Commitment Agreement and PSA could participate in the Rights Offering, but were neither entitled nor obligated to purchase the preferred equity available under the PPA.

The Plan provided that "[f]or the avoidance of doubt, any Preferred Equity purchased by the Private Placement Parties in the Private Placement pursuant to the [PPA] shall be solely on account of the new money provided in the Private Placement and not on account of any purchaser's Second Lien Notes Claims or Unsecured Senior Notes Claims." Plan Section IV.B.3, ECF No. 6-15 at 49.   The PPA and Backstop Commitment Agreement also provided for the payment of certain premiums and fees to the signatories of those agreements in exchange for their financing commitments.   These included an 8% "Private Placement Commitment Premium," payable on the effective date in the form of common stock in the reorganized company (worth approximately $60 million); a "Private Placement Ticking Premium," which was a 2.5% monthly ticking commitment premium beginning on April 3, 2017, until the effective date, and also in the form of common stock in the reorganized company; and, in the event the agreements were terminated, breakup payments of $120 million in lieu of the aforementioned commitment premiums.

As a result of obtaining the commitments in the PPA and related agreements on the stated terms, the Debtors were able to secure exit financing, including a term loan commitment for $1.95 billion in exit debt financing; a commitment from PNC Bank for an expanded $250 million accounts receivable securitization facility upon emergence; and $854 million in new surety bonds to be issued at emergence.

On December 22, 2016, the Debtors filed a motion in the Bankruptcy Court to approve the disclosure statement related to the Plan.   The next day, the Debtors moved to approve the PPA and related agreements.   The Ad Hoc Committee objected to these motions, and a hearing was set in the Bankruptcy Court for January 26, 2017.

The PPA and Backstop Commitment Agreement were subject to an unqualified "fiduciary out" provision to permit the Debtors and the Unsecured Creditors Committee to pursue, without incurring break-up fees, any alternative transactions they determined to be superior. Pursuant to this provision, during the time between the initial filing of the Plan on December 22, 2016, and the hearing on January 26, 2017, the Ad Hoc Committee submitted a series of alternative proposals, including proposals submitted on January 16, 2017 and January 20, 2017, and a proposal made on March 1, 2017.

The alternative proposals offered the Debtors more money than the PPA provided for the preferred equity, up to $1.77 billion, but did not include all of the same terms as the Plan. The Debtors and the Unsecured Creditors Committee each independently evaluated and rejected the alternative proposals as inferior to the Plan because, among other reasons, the alternative proposals presented risks that the Debtors would emerge from bankruptcy with more funded indebtedness than the Debtors believed they could responsibly bear and that such emergence would be delayed, which due to the volatile market for coal, would threaten existing financing commitments.

On January 26, 2017, the Bankruptcy Court heard oral argument on the Debtors' motions, and the next day, the Bankruptcy Court entered orders granting the motions, and approving the disclosure statement and the PPA and related agreements, over the Ad Hoc Committee's objections. In these orders, the Bankruptcy Court made findings, including that:

(i) the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors;

> (ii) the decision to enter into the Plan Support Agreement, Private Placement Agreement and Backstop Commitment Agreement is an appropriate exercise of the Debtors' business judgment; [and]
>
> (iii) the proposed dates and deadlines for the implementation of the Section 1145 Rights Offering, as set forth in the Section 1145 Rights Offering Procedures, are reasonable and appropriate and allow a reasonable amount of time for Rights Offering Eligible Creditors to make an informed decision regarding whether to exercise their respective subscription rights[.]

Bankr. Case No. 16-42529, ECF No. 2233 at 2 (Bankr. E.D. Mo. Jan. 27, 2017). The Ad Hoc Committee appealed these orders to the United States Bankruptcy Appellate Panel for the Eighth Circuit, but that appeal was dismissed as interlocutory on February 8, 2017, with the panel noting that the Ad Hoc Committee could raise its objections if the Plan was ultimately confirmed.

Approximately 95% of the Second Lien Notes and Class 5B Claims holders agreed to participate in the PPA, support the Plan, and provide the backstop commitment. The Ad Hoc Committee represents those holders who did not so agree.

On March 9, 2017, the Ad Hoc Committee objected to confirmation of the Plan, specifically challenging the PPA for the following reasons: (1) it resulted in the unequal treatment of claims in the same class, in violation of §1123(a)(4) of the Bankruptcy Code, (2) it violated the good faith requirement of §1129(a)(3) of the Code because it failed to maximize the value of the Debtors' estate, and (3) it constituted an improper solicitation of creditor votes in favor of the Plan in violation of § 1125(b) of the Code.

The Bankruptcy Court held a confirmation hearing on March 16, 2017, during which the Ad Hoc Committee argued its objections and made an oral motion to stay any

8

confirmation order pending appeal, pursuant to Federal Rule of Bankruptcy Procedure 8007. During that hearing, the Bankruptcy Court addressed the Ad Hoc Committee's objections to the PPA as follows:

> I do agree with the debtors that there was no right to participate [in the PPA] and it wasn't on account of the claim, even though that phrase isn't quite what the Code section says, but it's close enough.
>
> I view the participation in the private placement, and therefore the backstop obligation, to be an investment, an obligation, a commitment -- those are commas between those words -- and not a treatment of the plan or treatment provided for under the plan.

Mar. 16, 2017 Confirmation Hr'g Tr. at 253-55, Bankr. Case No. 16-42529, ECF No. 2270 at 253-55 (Bankr. E.D. Mo. Mar. 20, 2017).

On March 17, 2017, the Bankruptcy Court entered the Confirmation Order, confirming the Plan over the objections of the Ad Hoc Committee. In that Order, the Bankruptcy Court also granted the Debtors' request to waive the automatic 14-day stay of confirmation orders provided for by Federal Rule of Bankruptcy Procedure 3020(e). The same day, the Bankruptcy Court denied the Ad Hoc Committee's oral motion for a stay pending appeal.

The Ad Hoc Committee filed its notice of appeal in this Court on March 22, 2017, and filed an emergency motion for a stay the next day, March 23, 2017. The Court held oral argument on March 29, 2017, and advised the parties that it would attempt to rule promptly to allow for an appeal, if appropriate. The Court also advised the parties that it had alerted the United States Court of Appeals for the Eighth Circuit as to the possibility of

9

such an appeal. On March 30, 2017, the Court denied a stay. The Ad Hoc Committee did not appeal that Order.

Following the Court's denial of a stay, the Debtors completed numerous transactions as provided in the Plan, including closing and receiving $1.5 billion under the PPA and Rights Offering; closing and receiving exit financing; satisfying (in full) obligations under a first lien credit agreement and (in part) obligations under the second lien notes; issuing and distributing 29,999,999 shares of new preferred stock and 71,835,965 shares of new common stock, and listing the latter shares on the New York Stock Exchange; issuing new surety bonds and posting related collateral; extending and expending their accounts receivable securitization facility; rejecting approximately 561 contracts and leases, and assuming approximately 2,984; and canceling old debt securities and equity securities.

In this appeal, as in the Bankruptcy Court, the Ad Hoc Committee challenges only one component of the Plan—the PPA. The Ad Hoc Committee argues that the PPA (1) resulted in the unequal treatment of claims in the same class, in violation of §1123(a)(4), and/or (2) violated the good faith requirement of §1129(a)(3) because it failed to maximize the value of the Debtors' estate and because the process employed by the Debtors and other Plan proponents, including the mediation and the "manipulation" of the voting process, was at odds with the policies and objectives of the Bankruptcy Code.[6]

---

[6] The Ad Hoc Committee has dropped the argument, raised in the Bankruptcy Court and in the emergency stay motion before this Court, that the PPA also constituted an improper solicitation of votes in violation of § 1125(b) of the Code.

As relief, the Ad Hoc Committee asks the Court to (1) order the Debtors to provide the Ad Hoc Committee the right to participate in the PPA on the most beneficial terms provided to any other holders of claims in the same class, or alternatively, (ii) order the Debtors to pay the Ad Hoc Committee damages in the amount of the current value of the profits the Ad Hoc Committee would have made had it been permitted to invest in the PPA.

## DISCUSSION

### Equitable Mootness

"The doctrine of equitable mootness is most often applied in the context of a reorganization bankruptcy where the bankruptcy court has confirmed a plan, the plan has been substantially consummated, and then a party seeks appellate review of an issue that, if upset, would unduly disturb the plan." *In re Williams*, 256 B.R. 885, 896 (B.A.P. 8th Cir. 2001). The Ad Hoc Committee argues that the Eighth Circuit has not expressly recognized the doctrine of equitable mootness in a "precedential" opinion. This argument is unavailing. The Eighth Circuit has affirmed the dismissal of bankruptcy appeals on equitable mootness grounds in unpublished opinions. *See, e.g., In re President Casinos, Inc.*, 409 F. App'x 31 (8th Cir. 2010). Moreover, "[e]very other circuit to consider the issue has found that equitable, prudential, or pragmatic considerations can render an appeal of a bankruptcy court decision moot even when the appeal is not constitutionally moot." *In re Paige*, 584 F.3d 1327, 1337 (10th Cir. 2009) (collecting cases, including unpublished Eighth Circuit cases).

> Factors considered by courts to determine whether an appeal is equitably moot in the context of a reorganization bankruptcy include: (1) whether the reorganization plan has been substantially consummated; (2) whether a stay

11

has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality to bankruptcy judgments.

*In re Williams*, 256 B.R. at 896 n.11. As discussed below, the Court concludes that these factors, on balance, warrant a finding of equitable mootness here.

### I. Substantial Consummation

The Ad Hoc Committee does not dispute that the Plan has been substantially consummated[7] here, which weighs in favor of finding equitable mootness.

### II. Existence of a Stay

Although the Ad Hoc Committee sought a stay from the Bankruptcy Court and this Court, it did not appeal the denial of those motions to the Eighth Circuit. Therefore, while not dispositive, this factor weighs somewhat in favor of finding equitable mootness. *See Paige*, 584 F.3d at 1341 (describing such a situation as "a sort of middle ground," and holding that where the appellant "made some effort to obtain a stay, [but] it did not pursue 'with diligence *all available remedies* to obtain a stay of execution,'" the factor "weigh[ed] somewhat against proceeding to the merits of [the] appeal").

### III. Rights of Third Parties and the Success of the Plan

Although the Ad Hoc Committee argues that it does not seek a wholesale reversal of the Plan's confirmation, the Court is not convinced that the narrower relief sought by the

---

[7] The Bankruptcy Code defines "substantial consummation" as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

Ad Hoc Committee is an appropriate remedy for the types of Bankruptcy Code violations alleged here. And even if it were, it would not be "a quick, surgical change to the confirmation order," as required to avoid equitable mootness. *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 486 (2d Cir. 2012). Rather, it would require "unraveling complex transactions undertaken after the Plan was consummated." *Id.* at 485.

The PPA and related agreements were inextricably intertwined with the Plan as a whole, which itself was the product of intense, multi-party negotiations undertaken in the context of a volatile coal market. Allowing the Ad Hoc Committee to participate in the PPA would alter and unfairly dilute the interests of those who agreed to its terms. And both remedies would permit the Ad Hoc Committee unfairly to reap the benefits of participation, after the fact, without having to make the commitments and incur the risks undertaken by those who participated originally. The Court is simply not convinced that there is any practicable (and authorized) remedy for the legal errors alleged in this appeal other than unwinding the Plan. *See, e.g.*, *Charter*, 691 F.3d at 486 (affirming a finding of equitable mootness where the plan provisions challenged, and alternative monetary relief requested, would risk undoing a settlement critical to the reorganization plan); *In re Pub. Serv. Co. of N.H.*, 963 F.2d 469, 475 (1st Cir. 1992) ("[U]nraveling the substantially consummated [ ] reorganization plan would work incalculable inequity to many thousands of innocent third parties who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation"). Thus, this factor weighs in favor of finding equitable mootness.

## IV. Public Policy

Though the Ad Hoc Committee has raised questions of fairness and bankruptcy policy, on balance, public policies affording finality and reliability to bankruptcy judgments weigh in favor of finding equitable mootness. *See In re Paige*, 584 F.3d at 1347.

In short, the factors weigh in favor of granting Appellees' motions to dismiss the Ad Hoc Committee's appeal as equitably moot. In the alternative, the Court concludes that the appeal is without merit.

## **Merits**

A district court reviews a Bankruptcy Court's legal conclusions *de novo* and its findings of fact for clear error. *In re Reynolds*, 425 F.3d 526, 531 (8th Cir. 2005). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). As indicated in its Memorandum and Order denying a stay, the Court agrees with the Bankruptcy Court's findings that the Plan did not violate requirements of equal treatment and good faith under §§ 1123(a)(4) and 1129(a)(3) of the Bankruptcy Code.

### I. **Equal Treatment Under § 1123(a)(4)**

Section 1123(a)(4) of the Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

The Code does not define the standards of "equal treatment," but it is generally understood that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interests . . . . Creditors should not confuse equal treatment of claims with equal treatment of claimants." 7 Collier on Bankruptcy ¶ 1123.01; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[T]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions."); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992) ("The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4).").

The Ad Hoc Committee acknowledges that consideration provided to creditors who are willing to provide post-petition financing commitments does not constitute treatment for the creditors' claims under § 1123(a)(4). *See In re CHC Grp. Ltd*, No. 16-31854 (BJH), ECF No. 1794 at 23-25 (Bankr. N.D. Tex. Mar. 3, 2017) (holding that it did not violate § 1123(a)(4) for a debtor to provide plan sponsors—those who committed to backstop a rights offering—a "Put Option Premium" in the form of a fixed fee payable in convertible notes or a cash payment); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (rejecting argument that a plan provided disparate treatment in

15

violation of § 1123(a)(4) when only certain second lien noteholders were permitted to participate in a backstop of a rights offering).

But the Ad Hoc Committee argues that such consideration was provided here in the form of the various fees and premiums payable to the creditors who signed the PPA and Backstop Commitment Agreement. The Ad Hoc Committee argues that the 35% discount on the equity sold under the PPA—and the right to participate in the PPA at all—was not mere consideration for these creditors' financial commitments but was an additional benefit that must be construed as treatment for their prepetition claims. Thus, the Ad Hoc Committee argues that participation in the PPA was required to be offered on equal terms to all creditors of those classes. The Court disagrees. Rather, the Court views the PPA and related agreements like the Bankruptcy Court did—as not merely a benefit, but also an obligation and a commitment to refrain from trading and to purchase a substantial amount of equity with the attendant risk of substantial loss. Indeed, the risk of loss was particularly great at the time the agreements were entered.

The primary case relied upon by the Ad Hoc Committee, *Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), does not persuade the Court to hold otherwise. *LaSalle* did not address the requirements of § 1123(a)(4), but instead considered the requirements for a judicial "cramdown" process by which a reorganization plan is imposed on a dissenting class, rather than, as here, confirmed on a consensual basis. One such requirement is that the plan be "fair and equitable" with respect to each class of impaired unsecured claims that has not accepted the plan. 11 U.S.C. § 1129(b)(1). A plan is "fair and equitable" as to a dissenting class if the

"the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." § 1129(b)(2)(B)(ii). This is known as the "absolute priority rule." *LaSalle*, 526 U.S. at 442.

The Supreme Court in *LaSalle* held that, under the absolute priority rule, a debtor's pre-bankruptcy equity holders could not, over the objection of a senior class of impaired creditors, receive an exclusive opportunity to buy the reorganized debtor's new equity under a plan adopted without consideration of alternatives. *Id.* at 457-58 ("[P]lans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).").

In addition to addressing a different statutory provision, *LaSalle* is distinguishable from this case because, here, alternatives were considered. The Ad Hoc Committee does not dispute that it, like all members of the relevant classes, could have intervened in the mediation negotiations to offer competing reorganization plans. And after the mediation, the Ad Hoc Committee in fact submitted more than one such competing plan. The record supports that the Debtors and Unsecured Creditors Committee each independently reviewed and rejected the Ad Hoc Committee's alternative plans as inferior options for maximizing value for all creditors and for promptly exiting Chapter 11 bankruptcy. In short, the Court agrees with the Bankruptcy Court that § 1123(a)(4) was satisfied here.

**II.  Good Faith Under § 1129(a)(3)**

Section 1129(a)(3) provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C.

17

§ 1129(a)(3). "[A] finding of good faith is primarily a factual determination, which we therefore review for clear error." *In re Keeley & Grabanski Land P'ship*, 832 F.3d 853, 858-59 (8th Cir. 2016) (citation omitted).

"Good faith" is not defined in the Code, but in general, "a plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987) (overruled in part on other grounds). These standards include serving Bankruptcy Code objectives, such as "preserving going concerns and maximizing property available to satisfy creditors, giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).

The Bankruptcy Court's finding of good faith was not erroneous. The complexity of the issues and interests at stake support the Bankruptcy Court's finding that the Plan was a good-faith attempt to provide the most recovery to creditors, satisfy a wide variety of stakeholders, and expeditiously emerge from bankruptcy with a feasible plan. The overwhelming support for the Plan by creditors other than the Ad Hoc Committee also supports the Bankruptcy Court's finding of good faith. *See In re WR Grace & Co.*, 729 F.3d at 347 (holding that a good faith finding was bolstered by "the overwhelming vote by creditors in favor of the plan").

Neither does the Court find that the process employed by the Debtors and other Plan proponents, including the mediation process and the use of the PSA, was at odds with the

policies and objectives of the Bankruptcy Code. The cases relied upon by the Ad Hoc Committee are again inapplicable. The first, *Young v. Higbee Co.,* 324 U.S. 204 (1945), did not involve § 1129(a)(3) but instead involved a provision of the United States Bankruptcy Act of 1938, also known as the "Chandler Act," which allowed a bankruptcy court to designate a vote of a creditor not cast in good faith. In *Young*, two stockholders objected to confirmation of a plan, and the basis for their appeal would have benefitted all stockholders of their class. But the two stockholders later abandoned their appeal after selling their stock to junior stockholders. The Supreme Court held that the two stockholders, once they objected to the plan on appeal, assumed a duty of good faith to the other stockholders in their class, and that abandoning their appeal for a benefit that was not shared by the class constituted bad faith.

The facts are not analogous here, where the Noteholder Co-Proponents did not object to the plan but were involved in an inter-creditor dispute; the Bankruptcy Court ordered a mediation of that dispute; all parties could have participated in the mediation, including the Ad Hoc Committee; and the settlement of the dispute involved not only benefits to the Noteholder Co-Proponents but corresponding risks and obligations.

Likewise, plan support agreements like the one entered into here, conditioned on a bankruptcy court's approval of the disclosure statement, have been upheld as consistent with the Bankruptcy Code. *See, e.g., In re Kellogg Square P'ship*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993). The caselaw relied upon by the Ad Hoc Committee—*American United Mutual Life Insurance Co. v. City of Avon Park*, 311 US 138, 144-45 (1940) (finding violation of good faith under the now-repealed Bankruptcy Act based on lack of

full and complete disclosure) and *In re Quigley Co.*, 437 B.R. 102, 126-27 (Bankr. S.D.N.Y. 2010) (finding bad faith where a non-debtor parent company solicited votes for plan primarily to shield itself from future asbestos liability )—are based on significant factual findings that the Ad Hoc Committee admits are not present here, where there was undisputedly full and complete disclosure.

## **CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Appellees' motions to dismiss the consolidated appeals as equitably moot are **GRANTED**. ECF Nos. 66, 67, 68, 70, 71 & 72.

**IT IS FURTHER ORDERED** that, in the alternative, the Bankruptcy Court's judgment is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 29th day of December, 2017.